1
2
3
4
5
6

COOLEY LLP
ANTHONY M. STIEGLER (126414)
(astiegler@cooley.com)
JON F. CIESLAK (268951)
(jcieslak@cooley.com)
SOPHIA M. RIOS (305801)
(srios@cooley.com)
4401 Eastgate Mall
San Diego, CA  92121
Telephone: (858) 550-6000
Facsimile:  (858) 550-6420

7
8

*Attorneys for Plaintiff*
*ChromaDex, Inc.*

9
10
11
12

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# (SOUTHERN DIVISION)

13
14
15
16
17
18
19
20

ChromaDex, Inc.,

            Plaintiff,

    v.

Elysium Health, Inc.,

            Defendant.

Case No.  16-cv-2277

**COMPLAINT**

    **(1) BREACH OF CONTRACT**

    **(2) BREACH OF CONTRACT**

    **(3) BREACH OF CONTRACT**

    **(4) FRAUDULENT DECEIT**

**DEMAND FOR JURY TRIAL**

21
22
23
24
25
26
27
28

Plaintiff ChromaDex, Inc. ("ChromaDex"), by and through its undersigned attorneys, brings this action for breach of contract and fraudulent deceit against Elysium Health, Inc. ("Elysium") for punitive damages, money damages, and interest, and demands a jury trial.

## NATURE OF THE CASE

1.  ChromaDex brings this action to recover damages resulting from Elysium's material breach of, and fraud related to, three contracts between the parties: (1) the NIAGEN Supply Agreement, dated February 3, 2014 (attached hereto as Exhibit A), as amended by the Amendment to Supply Agreement, dated February 19, 2016 (attached hereto as Exhibit B) (as so amended, the "NIAGEN Supply Agreement"); (2) the pTeroPure Supply Agreement (attached hereto as Exhibit C) (the "pTeroPure Supply Agreement," and together with the NIAGEN Supply Agreement, the "Supply Agreements"); and (3) the Trademark License and Royalty Agreement, dated February 3, 2014  (attached hereto as Exhibit D) (the "License Agreement") (collectively, the "Agreements").

2.  Pursuant to the Agreements, ChromaDex supplies Elysium with NIAGEN® nicotinamide riboside ("NR"), a patented, proprietary health ingredient that is part of the vitamin B3 family, and pTeroPure® pterostilbene, a patented, proprietary health ingredient, in return for product payments and sales royalties for the use of the branded ingredient NIAGEN NR.

3.  Elysium sells a health supplement called Basis which combines NIAGEN NR and pTeroPure pterostilbene, along with other non-active ingredients.

4.  Beginning in 2015, Mark Morris, who was the Vice President of Business Development of ChromaDex at the time, but is now the Head of Scientific Technology at Elysium, was the primary manager of Elysium's account at ChromaDex.

5.  In all of 2015, Elysium ordered 900 kg of NIAGEN NR from ChromaDex.  In the first quarter of 2016, Elysium ordered 1590 kg of NIAGEN NR

and 300 kg of pTeroPure pterostilbene.  Around this time, Elysium raised concerns about pricing under the NIAGEN Supply Agreement directly with Frank Jaksch, co-founder and CEO of ChromaDex, and Will Black, ChromaDex's Vice President of Sales and Marketing.  Mr. Jaksch reached out to Elysium in an effort to open a dialogue about their concerns and ultimately resolve them.  Elysium, however, refused or ignored these offers to talk.

6.  On June 28, 2016, without any prior discussion or advance notification, Elysium submitted extraordinarily large purchase orders for 6600 kg of NIAGEN NR and 1260 kg of pTeroPure pterostilbene (the "June 28 Purchase Orders").  These amounts were approximately four times larger than any previous order from Elysium, and more than double the sum of all Elysium's prior orders.  The June 28 Purchase Orders included a demand for pricing at $400/kg, far below the parties' agreed price of $1000/kg for NIAGEN NR, even though Elysium never discussed the proposed pricing changes with ChromaDex.  Elysium knew or should have know that ChromaDex would not accept the June 28 Purchase Orders at that price.

7.  Because the June 28 Purchase Orders were wildly inconsistent with the parties' Supply Agreements and past dealings, and in light of Elysium's subsequent failure to pay for NIAGEN NR and pTeroPure pterostilbene supplied by ChromaDex, ChromaDex alleges on information and belief that Elysium intended to induce ChromaDex to inadvertently supply large amounts of NIAGEN NR and pTeroPure pterostilbene to Elysium at grossly discounted prices.

8.  ChromaDex noticed the grossly discounted prices on the June 28 Purchase Orders and did not fulfill them.  Instead, ChromaDex reached out to Elysium to discuss the June 28 Purchase Orders and their inconsistency with the parties' Agreements.

9.  After Elysium again showed an unwillingness to engage with ChromaDex's senior management to discuss the June 28 Purchase Orders, Morris—who was the one person at ChromaDex whom Elysium would respond to in a

1    productive manner—helped schedule a call between ChromaDex and Elysium to
2    address the issues between the parties, including the June 28 Purchase Orders.

3        10.    On June 30, 2016, Mr. Jaksch and Mr. Black of ChromaDex, joined a call
4    with Elysium's CEO, Eric Marcotulli, and COO, Dan Alminana (the "June 30 Call").

5        11.    On the June 30 Call, the parties discussed Elysium's concerns and the
6    appropriate pricing of NIAGEN NR for the orders Elysium wished to place.
7    Alminana and Marcotulli stated that Elysium intended to be a good business partner to
8    ChromaDex and explained that Elysium was ramping up, which was the reason the
9    June 28 Purchase Orders were far larger than their past orders.  Though Elysium was
10   not entirely satisfied with the price of $800 per kg of NIAGEN NR, which is what
11   ChromaDex offered, Marcotulli represented that Elysium would accept that price now,
12   place an order so that their supply was not interrupted, and work to resolve Elysium's
13   remaining concerns another day.

14       12.    Later that day, June 30, 2016, Elysium submitted two purchase orders to
15   ChromaDex for 580 kg of pTeroPure pterostilbene and 3000 kg of NIAGEN NR (the
16   "June 30 Purchase Orders").  As agreed upon during the June 30 Call, the June 30
17   Purchase Orders superceded the (in retrospect, disingenuous) June 28 Purchase
18   Orders.  And although smaller than the June 28 Purchase Orders, the June 30 Purchase
19   Orders were still two times the size of any of Elysium's previous fulfilled orders.

20       13.    Around the middle of July, Morris left ChromaDex to work for Elysium.

21       14.    According to the terms of the Supply Agreements, and in reliance on the
22   representations Alminana and Marcotulli made on the June 30 Call, ChromaDex filled
23   the June 30 Purchase Orders of NIAGEN NR and pTeroPure pterostilbene on July 1,
24   2016 and August 9, 2016. ChromaDex provided Elysium with invoices for the
25   shipments by email on July 1, 2016 and August 9, 2016 (the "Past Due Invoices")
26   (attached hereto as Exhibit E).

27       15.    The total amount Elysium owes ChromaDex for the Past Due Invoices is
28   $2,983,350.

16.    At the time Marcotulli and Alminana spoke on the June 30 Call, Elysium had no intention of (1) ever working with ChromaDex to resolve Elysium's concerns about the NIAGEN Supply Agreement, (2) paying for the NIAGEN NR or pTeroPure pterostilbene ordered with the June 30 Purchase Orders, or (3) ramping up their sales to the degree they represented.

17.    Instead, having failed to induce ChromaDex to supply NIAGEN NR and pTeroPure pterostilbene at grossly discounted prices with the June 28 Purchase Orders, Marcotulli and Alminana made their false representations on the June 30 Call with the intent of inducing ChromaDex to provide it with large supplies of NIAGEN NR and pTeroPure pterostilbene and to exert financial pressure on ChromaDex by refusing to pay for the orders.

18.    Marcotulli and Alminana's false promises were further motivated by the fact that Elysium, which was seeking financing during the middle of 2016 and into November, has been able to improve its balance sheet by continuing to sell its product for millions of dollars in revenue without paying ChromaDex for its supply.

19.    On August 10, 2016—the day after ChromaDex shipped the last portion of pTeroPure pterostilbene—Alminana wrote an email to ChromaDex stating that Elysium would not pay the Past Due Invoices until the concerns raised on the June 30 Call were fixed according to terms set by Elysium. However, over the next several weeks, Alminana refused ChromaDex's sincere offers to meet and resolve his and Elysium's concerns, all the while maintaining that Elysium would not pay until its concerns were resolved.

20.    Elysium breached the Supply Agreements by failing to pay the Past Due Invoices within the dates agreed to by the parties and set forth in the payment terms on the Past Due Invoices.

21.    Elysium also breached the License Agreement by failing to deliver to ChromaDex (1) a report accounting for its net sales and royalties due (a "Royalty Report") for the quarter ended June 30, 2016 ("Q2 2016") and (2) payment for the

royalties due as reflected in that Royalty Report, within 90 days of the end of the quarter.

22.     Elysium intends to continue its breach of the License Agreement by withholding payment of royalties for the quarter ended September 30, 2016 ("Q3 2016") and the quarter ending December 31, 2016 ("Q4 2016"), which will come due on December 29, 2016 and March 31, 2017, respectively.

23.     In this action, ChromaDex seeks from Elysium the $2,983,350 due under the Supply Agreements, all past due royalties under the License Agreement, and damages and punitive damages caused by Elysium's false promises, plus interest.

## JURISDICTION AND VENUE

24.     Diversity jurisdiction is conferred upon this Court by 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of seventy-five thousand U.S. Dollars ($75,000), exclusive of interest and costs, and is between a Delaware Corporation with its principal place of business in New York and a California Corporation with its principal place of business in California.

25.     Venue is proper in this District under 28 U.S.C. § 1391 because the parties agreed to this forum to resolve disputes under Section 15.2 of the License Agreement, which states that "[a]ny dispute arising out of this Agreement shall be brought in, and the parties consent to personal and exclusive jurisdiction of and venue in the Federal District Court in Orange County, California."

## PARTIES

26.     Plaintiff ChromaDex is a California Corporation with its principal place of business located at 10005 Muirlands Blvd, Suite G, Irvine, CA 92618. ChromaDex discovers, acquires, develops, and commercializes patented and proprietary ingredient technologies in the dietary supplement, food, beverage, skin care, and pharmaceutical markets. Its portfolio of patented ingredient technologies includes NIAGEN®, pTeroPure®, PURENERGY®, ProC3G®,  and AnthOrigin™.

27.     Defendant Elysium is a Delaware Corporation with its principal place of

business located at 594 Broadway, Suite 707, New York, New York, 10012.  Elysium describes itself as a company that utilizes science and technology to create consumer health products.

## FACTUAL ALLEGATIONS

### ChromaDex's NIAGEN NR and pTeroPure pterostilbene

28.    ChromaDex sells NIAGEN NR and licenses the rights to the brand name "NIAGEN" to ingredient customers across the country, one of which is Elysium.

29.    NIAGEN NR is composed of nicotinamide riboside ("NR").  NR is found naturally in trace amounts in milk and other foods and is a B3 vitamin metabolite. The body converts NR into Nicotinamide Adenine Dinucleotide ("NAD+"), which is an essential molecule found in every living cell.  NIAGEN NR increases NAD+ levels in the body, which promote cellular metabolism, mitochondrial function, and energy production.

30.    NIAGEN NR is a patented, proprietary dietary ingredient owned by ChromaDex.

31.    ChromaDex is the sole owner of the brand "NIAGEN."

32.    pTeroPure, also known as pterostilbene, activates a very specific nuclear receptor known as PPAR-alpha. Nuclear receptors are proteins that activate gene expression. PPAR-alpha is activated during fasting states or the prolonged periods without food. Once activated, PPAR-alpha controls lipid metabolism among other essential functions.

33.    pTeroPure pterostilbene is a patented, proprietary dietary ingredient owned by ChromaDex.

34.    ChromaDex is the sole owner of the brand "pTeroPure."

35.    ChromaDex and Elysium entered the NIAGEN Supply Agreement and the License Agreement on February 3, 2014. The parties entered an Amendment to NIAGEN Supply Agreement on February 19, 2016.   The parties entered the pTeroPure Supply Agreement on June 26, 2014.

36.     Elysium sells a health supplement called Basis which combines NIAGEN NR and pTeroPure pterostilbene, along with other non-active ingredients.  Basis is Elysium's sole product on the market.  ChromaDex is the sole source and supplier of NIAGEN NR and, is accordingly, Elysium's sole supplier of NIAGEN NR and pTeroPure pterostilbene.

**Elysium's False Promises**

37.     The parties' commercial arrangement was unremarkable until June 28, 2016, when Alminana, on behalf of Elysium, submitted the disingenuous June 28 Purchase Orders seeking abnormally large amounts of NIAGEN NR and pTeroPure pterostilbene at prices far below those previously agreed on.

38.     On June 30, 2016, Mr. Jaksch and Mr. Black of ChromaDex joined a call with Marcotulli and Alminana of Elysium to discuss the June 28 Purchase Orders and concerns Elysium had identified in regards to pricing under the NIAGEN Supply Agreement.

39.     On the June 30 Call, Alminana and Marcotulli explained that Elysium was ramping up, which explained the large volume of NIAGEN NR and pTeroPure pterostilbene the company ordered.  Alminana and Marcotulli represented that, due to the ramp up, Elysium expected to use all the NIAGEN NR ordered over the next few months and would place other large orders in Q3 and Q4 2016.

40.     ChromaDex said it would supply Elysium with NIAGEN NR at $800 per kg.  Though Alminana and Marcotulli were not entirely satisfied with that price, Marcotulli represented that Elysium would accept that price for now, place a new order so that their supply was not interrupted, and work with ChromaDex to resolve Elysium's remaining concerns another day.

41.     Later that day, June 30, 2016, Elysium submitted the June 30 Purchase Orders to ChromaDex for 580 kg of pTeroPure pterostilbene and 3000 kg of NIAGEN NR.  The volume was still around two times larger than Elysium's largest order at that time.

42.    According to the terms of the Supply Agreements, and in reliance on Alminana's and Marcotulli's representations on the June 30 Call, ChromaDex shipped 3000 kg of NIAGEN NR and 400 kg of pTeroPure pterostilbene to Elysium on July 1, 2016, along with invoices numbered IVC114996 and IVC114992, respectively, bearing the same date.

43.    The amount due on the July 1, 2016 NIAGEN invoice is $2,402,600.

44.    The amount due on the July 1, 2016 pTeroPure invoice is $400,750.

45.    Copies of the invoices were sent to Elysium by email on July 1, 2016.

46.    On July 18, 2016, in response to an email from Thomas Varvaro, ChromaDex's CFO, requesting an estimate of royalties to be due for Q2 2016, Alminana stated that the royalties due for Q2 would be approximately $245,000, implying that the Royalty Report and payment would be made as usual.

47.    On August 9, 2016, ChromaDex shipped the remaining 180 kg of pTeroPure pterostilbene to Elysium, along with an invoice numbered IVC116510 bearing the same date.

48.    The amount due on the August 9, 2016 pTeroPure invoice is $180,000.

49.    A copy of the invoice was sent to Elysium by email on August 9, 2016.

50.    The total amount Elysium owes ChromaDex for the Past Due Invoices is $2,983,350.

51.    Also on August 9, 2016, Mr. Varvaro emailed Alminana to request a final Royalty Report for Q2 2016.

52.    On August 10, 2016—the day after Elysium received a shipment notification for the last portion of pTeroPure pterostilbene—Alminana wrote an email to ChromaDex stating that Elysium would not pay the Past Due Invoices until the concerns raised on the June 30 Call were fixed according to terms set by Elysium.

53.    On August 12, 2016, Mr. Black of ChromaDex responded by requesting an in-person meeting to discuss Elysium's concerns and affirmed ChromaDex's commitment to its relationship with Elysium.

54.     Mr. Black received no response to his invitation for an in-person meeting, despite exchanging several emails with Alminana, and reiterated his invitation on August 17, 2016. Alminana, yet again, ignored this invitation and refused to discuss the issues even by phone.

55.     In late August and continuing into October 2016, ChromaDex demanded payment from Elysium of the $2,983,350 due for the Past Due Invoices, while continuing to extend invitations to work toward a solution for all parties concerned and proposing such solutions.

56.     Elysium at all times refused to pay the amount due for the Past Due Invoices and to rationally engage in discussions of a resolution.

57.     On information and belief, ChromaDex alleges that, at the time it submitted the June 28 Purchase Orders, on the June 30 Call, and when it submitted the June 30 Purchase Orders, Elysium—under the direction of Marcotulli and Alminana—had no intention of (1) paying for the NIAGEN NR or pTeroPure pterostilbene ordered, (2) ever working with ChromaDex to resolve Elysium's concerns about the NIAGEN Supply Agreement, or (3) ramping up their sales to the degree that Alminana and Marcotulli represented.

58.     Alminana's and Marcotulli's intent is evidenced by the fact that (1) Elysium never ramped up in a way that was consistent with Alminana and Marcotulli's representations on the June 30 Call, (2) the NIAGEN NR and pTeroPure pterostilbene that was delivered in July and August has been sufficient supply for Elysium until the present and it is expected to last into 2017, months beyond what Alminana and Marcotulli projected on the June 30 Call, and (3) Elysium did not place further large orders in Q3 and Q4 as it represented it would.

59.     Alminana and Marcotulli further intended to use the financial pressure ChromaDex would predictably experience after not receiving payment on such large orders as leverage if and when they decided to resolve their concerns about the NIAGEN Supply Agreement.

60. Elysium has refused to make good on Alminana and Marcotulli's promises, on behalf of Elysium, to attempt to resolve their concerns with ChromaDex and pay $800 per kg for the NIAGEN NR ordered on June 30, 2016.

61. Marcotulli and Alminana made the false representations on the June 30 Call with the intent of inducing ChromaDex to provide it with large supplies of NIAGEN NR and pTeroPure pterostilbene so that Elysium's supply of product would be uninterrupted while it refused to pay ChromaDex for the Past Due Invoices.

62. Elysium's continued refusal to engage in substantive discussions regarding its failed payments and terms for moving forward, has forced ChromaDex to file this Complaint in order for it to obtain the monies owed under the Agreements.

## Breach of the pTeroPure Supply Agreement

63. The pTeroPure Supply Agreement sets forth the terms under which ChromaDex would sell and deliver, and Elysium would purchase, pTeroPure pterostilbene.

64. Section 2.1 of the pTeroPure Supply Agreement specifies that Elysium shall place orders for the product by submitting purchase orders.

65. Section 2.2 states that the "purchase price for the Product shall be at one thousand USD per kilogram ($1,000/kg)." It further states that "[f]ailure to make prompt and full payment hereunder constitutes a material breach of the Agreement."

66. The invoices for the pTeroPure pterostilbene shipped on July 1, 2016 and August 9, 2016, contain payment terms specifying that payment must be made "30% Net30 70% Net60," meaning 30% of the payment is due within 30 days of the date of the invoice and 70% of the payment is due within 60 days of the date of the invoice.

67. Elysium breached the pTeroPure Supply Agreement on July 31, 2016, by failing to pay 30% of the $400,750 due within 30 days of the July 1, 2016 invoice. It further breached the agreement by failing to pay any monies due before August 30, 2016, 60 days after the date of the July 1, 2016 invoice.

68. Elysium breached the pTeroPure Supply Agreement on September 8,

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

10.

COMPLAINT
16-CV-2277

2016, by failing to pay 30% of the $180,000 due within 30 days of the August 9, 2016 invoice. It further breached the agreement by failing to pay any monies due before October 8, 2016, 60 days after the date of the August 9, 2016 invoice.

### Breach of the NIAGEN Supply Agreement

69. The NIAGEN Supply Agreement sets forth the terms under which ChromaDex would sell and deliver, and Elysium would purchase, NIAGEN.

70. Section 7.4 of the NIAGEN Supply Agreement provides that it shall be governed by and construed in accordance with the laws of the State of California.

71. Section 3.1 of the NIAGEN Supply Agreement states that "[w]ith respect to all NIAGEN provided by ChromaDex to Elysium Health under this Agreement Elysium Health shall pay to ChromaDex a maximum price of one thousand three hundred US dollars per kilogram ($1,300 per kg)."

72. Section 3.4 of the NIAGEN Supply Agreement states that "Elysium Health shall pay ChromaDex within thirty (30) days from the date of the applicable invoice by ChromaDex to Elysium Health for all NIAGEN® purchased . . . ."

73. Under Section 3.11.1 of the NIAGEN Supply Agreement, in 2016 Elysium Health was required to purchase, at a minimum, "the lesser of (i) 1,000kg at the then-current price, or (ii) $1,000,000 take or pay."

74. Elysium breached the NIAGEN Supply Agreement on July 31, 2016 by failing to pay $2,402,600 within 30 days of the July 1, 2016 invoice, as required by Section 3.4 of the agreement.

75. On October 31, 2016, ChromaDex sent to Elysium, in writing, a letter indicating it would not renew the NIAGEN Supply Agreement. Thus the NIAGEN Supply Agreement will expire, according to Section 5.1 of that agreement, after the initial term of three years on February 3, 2017.

### Breach of the License Agreement

76. According to the terms of the License Agreement, Elysium is required to pay royalties to ChromaDex based on its net sales of product containing NIAGEN

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

11.

COMPLAINT
16-CV-2277

1  NR.

2      77.     Section 15.2 of the License Agreement provides that "all actions for the

3  breach thereof will be governed, construed, and interpreted in accordance with the

4  laws of the State of California."

5      78.     Section 15.2 of the License Agreement further provides that "any non-

6  contractual cause of action that either party may assert . . . will be governed by U.S.

7  federal law and the law of the State of California."

8      79.     Pursuant to Section 9.2 of the License Agreement, the royalty rate

9  Elysium is to pay to ChromaDex is determined according to the total cumulative

10  worldwide net sales of NIAGEN NR by Elysium and the corresponding royalty rate as

11  specified in the table in Section 9.2 of the License Agreement.

12      80.     Under Section 9.4 of the License Agreement, Elysium is required to

13  "furnish to ChromaDex a quarterly written report showing in reasonably specific

14  detail the calculation of royalties owing for the reporting period."  Section 9.4 further

15  states that "[r]eports shall be due on the ninetieth (90th) day following the close of

16  each quarter."

17      81.     Section 9.7 of the License Agreement provides that "royalties shown to

18  have accrued by each Royalty Report provided for under Section 9.4 above shall be

19  due on the date such Royalty Report is due."

20      82.     On September 28, 2016, 90 days after the close of the quarter ended June

21  30, 2016, Elysium breached the License Agreement by failing to furnish to

22  ChromaDex the Royalty Report and payment required under Section 9.4.

23      83.     Based on its refusal to pay the royalties due for the Q2 2016, ChromaDex

24  alleges on information and belief that Elysium will continue to breach the License

25  Agreement because it does not intend to furnish the required Royalty Report or

26  payment for the quarter ended September 30, 2016 and the quarter ending December

27  31, 2016, which will come due on December 29, 2016 and March 31, 2017,

28  respectively.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

12.

COMPLAINT
16-CV-2277

84.     The information necessary to determine the total amount of royalties due under the License Agreement for the quarters ended June 30, 2016 and September 30, 2016 is within the sole possession of Elysium.  However, Elysium's sales of NIAGEN NR increased in the first half of 2016, and by all accounts, continued to increase in the second half of 2016. ChromaDex therefore believes that royalties due for each successive quarter have increased as well. This conclusion is supported by Alminana's estimate of $245,000 for the Q2 2016 royalty, a nearly $100,000 increase over the $150,855 royalty paid for Q1 2016.

85.     Based on Elysium's continued growth in sales, ChromaDex estimates that the total amount of royalties due for Q2, Q3, and Q4 of 2016 will be no less than $1 million.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### (Breach of Contract – pTeroPure Supply Agreement)

86.     ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 85, above.

87.     The pTeroPure Supply Agreement is a binding and enforceable contract between ChromaDex and Elysium.

88.     ChromaDex fulfilled its obligations under the pTeroPure Supply Agreement by fulfilling the June 30, 2016 pTeroPure purchase order by supplying Elysium with the requested amounts of pTeroPure pterostilbene.

89.     Elysium has materially breached the pTeroPure Supply Agreement by refusing to pay the monies owed to ChromaDex for the pTeroPure pterostilbene which ChromaDex delivered to Elysium.

90.     Elysium's material breach of the pTeroPure Supply Agreement injured ChromaDex and caused it to sustain monetary damages in the amount of $580,750, plus interest.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

13.

COMPLAINT
16-CV-2277

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SECOND CLAIM FOR RELIEF**

**(Breach of Contract – NIAGEN Supply Agreement)**

91.    ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 90, above.

92.    The NIAGEN Supply Agreement is a binding and enforceable contract between ChromaDex and Elysium.

93.    ChromaDex fulfilled its obligations under the NIAGEN Supply Agreement by fulfilling the June 30, 2016 NIAGEN NR purchase order within 30 days by supplying Elysium with the requested amounts of NIAGEN NR.

94.    Elysium has materially breached the NIAGEN Supply Agreement by refusing to pay the monies owed to ChromaDex for the NIAGEN NR which ChromaDex sold and delivered to Elysium.

95.    Elysium's material breach of the NIAGEN Supply Agreement injured ChromaDex and caused it to sustain monetary damages in the amount of $2,402,600, plus interest.

**THIRD CLAIM FOR RELIEF**

**(Breach of Contract – License Agreement)**

96.    ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 95, above.

97.    The License Agreement is a binding and enforceable contract between ChromaDex and Elysium.

98.    ChromaDex acted in good faith and in accordance with the License Agreement at all times.

99.    Elysium has materially breached the License Agreement by refusing to pay the royalties owed based on its net sales of NIAGEN NR.

100.   Elysium's material breach of the License Agreement injured ChromaDex and caused it to sustain monetary damages in an amount estimated to be no less than $1 million, plus interest.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

14.

COMPLAINT
16-CV-2277

## FOURTH CLAIM FOR RELIEF

### (Fraudulent Deceit)

101.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 100, above.

102.   On the June 30 Call, Alminana and Marcotulli falsely represented that Elysium was ramping up and needed large volumes of NIAGEN NR and pTeroPure pterostilbene over the next few months.

103.   At the time Alminana and Marcotulli made this representation, they had no intention of ramping up their sales to the degree that they represented.

104.   Also on the June 30 Call, Marcotulli made a false promise to pay $800 per kg for the anticipated order of NIAGEN NR and to work with ChromaDex to resolve Elysium's concerns about the NIAGEN Supply Agreement.

105.   At the time Marcotulli made such promise, he knew that he and Alminana would not work with ChromaDex to resolve their concerns and would not pay for the goods delivered.

106.   On July 18, 2016, when Alminana emailed the estimate for royalties due for Q2 2016, Alminana and Elysium had no intent of paying the royalties due for Q2 2016 and instead intended to induce ChromaDex to ship the remaining portion of pTeroPure that Elysium ordered on July 1, 2016.

107.   Marcotulli and Alminana made these false promises and representations with the intent of inducing ChromaDex to provide it with unusually large supplies of NIAGEN NR and pTeroPure pterostilbene that would last it through any dispute with ChromaDex and which would also serve as leverage in any dispute between the two companies by placing financial pressure on ChromaDex.

108.   Based on more than two years of performance under the Agreements and the parties' business relationship, ChromaDex justifiably relied on Elysium's promises and representations.

109.   Elysium's false promises and representations injured ChromaDex and

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

15.

COMPLAINT
16-CV-2277

1 caused it to sustain monetary damages in an amount to be proved at trial, plus interest.

2 ## PRAYER FOR RELIEF

3 WHEREFORE, Plaintiff ChromaDex requests that Judgment be entered in its
4 favor as follows:

5 a) On the First Cause of Action, monetary damages in an amount to be proved at
6 trial, but believed to be no more than $580,750, plus interest (including
7 prejudgment interest);

8 b) On the Second Cause of Action, monetary damages in an amount to be proved
9 at trial, but believed to be no more than $2,402,600, plus interest (including
10 prejudgment interest);

11 c) On the Third Cause of Action, monetary damages in an amount to be proved at
12 trial, but believed to be no less than $1 million, plus interest (including
13 prejudgment interest);

14 d) On the Fourth Cause of Action, monetary damages in an amount to be proved at
15 trial, plus interest (including prejudgment interest) and punitive damages.

16

17 Dated:        December 29, 2016        COOLEY LLP
18                                       ANTHONY M. STIEGLER (126414)
19                                       JON F. CIESLAK (268951)
                                         SOPHIA M. RIOS (305801)

20

21                                       *s/ Anthony M. Stiegler*
                                         Anthony M. Stiegler (126414)
22
23                                       *Attorneys for Plaintiff*
                                         *ChromaDex, Inc.*

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

16.

COMPLAINT
16-CV-2277

Exhibit A

## SUPPLY AGREEMENT

THIS SUPPLY AGREEMENT (this "Agreement") is entered into as of February 3rd, 2014 (the "Effective Date"), between ChromaDex, Inc., a California corporation ("ChromaDex"), having a place of business at 10005 Muirlands Blvd., Suite G, Irvine, CA 92618, and Elysium Health, LLC, a Florida limited liability corporation ("Elysium Health"), having a place of business at 200 Congress Park Drive, Suite 205, Delray Beach, FL 33445.

WHEREAS, ChromaDex has rights in, and provides supply of, Niagen (as defined below).

WHEREAS, Elysium Health desires to develop dietary supplements containing Niagen for use in the Field.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants herein contained, the parties agree as follows:

1.      DEFINITIONS

1.1    "Affiliate" shall mean, with respect to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with, such Person. A Person shall be regarded as in control of another Person if it owns, or directly or indirectly controls, at least fifty percent (50%) of the voting stock or other ownership interest of the other Person, or if it directly or indirectly possesses the power to direct or cause the direction of the management and policies of the other Person by any means whatsoever.

1.2    "Facility" means any facility where Niagen that is supplied by ChromaDex under this Agreement is Manufactured.

1.3    "cGMPs" mean current good manufacturing practices (i) as described in Parts 210 and 211 of Title 21 of the United States' Code of Federal Regulations and the latest FDA guidance documents pertaining to manufacturing and quality control practice, and (ii) as applicable in each other country in which Elysium Health advises ChromaDex in writing that Niagen products are intended to be sold; all as updated, amended and revised from time to time.

1.4    "Confidential Information" shall mean, with respect to a party, all information of any kind whatsoever, and all tangible and intangible embodiments thereof of any kind whatsoever, which is disclosed by such party to the other party and is marked, identified as or otherwise acknowledged to be confidential at the time of disclosure to the other party. Notwithstanding the foregoing, Confidential Information of a party shall not include information which the other party can establish by written documentation (a) to have been publicly known prior to disclosure of such information by the disclosing party to the other party, (b) to have become publicly known, without fault on the part of the other party, subsequent to disclosure of such information by the disclosing party to the other party, (c) to have been received by the other party at any time from a source, other than the disclosing party, rightfully having possession of and the right to disclose such information, (d) to have been otherwise known by the other party prior to disclosure of such information by the disclosing party to the other party, or (e) to have been independently developed by employees or agents of the other

party without access to or use of such information disclosed by the disclosing party to the other party. For the avoidance of doubt, all Royalty Reports and any information concerning the pricing and sale of Niagen products shall be Elysium Health Confidential Information for purposes of this Agreement.

1.5 "Excluded Products" means topical skincare or cosmetic products and any and all dietary supplements in the form of a melt (melting or dissolvable tablet or delivery system).

1.6 "Excluded Field" means the doctor channel and the Multi-Level Marketing channel.

1.7 "Field" shall mean the sale of dietary supplements in any channel within the Territory, except for those in the Excluded Field so long as Elysium Health provides written notice to ChromaDex thirty (30) days prior to selling in a new channel of distribution.

1.8 "FDA" means the United States Food and Drug Administration and any successor agency or entity that may be established thereafter.

1.9 "First Commercial Sale" shall mean, with respect to any finished product containing Niagen, the first sale for use or consumption by the general public of such product.

1.10 "Force Majeure" shall mean a failure or delay in fulfilling or performing any term of this Agreement to the extent such failure or delay is caused by or results from causes beyond the reasonable control of the affected party including fire, floods, embargoes, war, acts of war (whether war be declared or not), acts of terrorism, insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, acts of God or acts, omissions or delays in acting by any governmental authority.

1.11 "Manufacture" means the manufacturing, processing, formulation, supplying, testing, packaging, labeling, storing and preparing for shipment of the Niagen supplied by ChromaDex under this Agreement.

1.12 "Niagen" shall mean the dietary ingredient comprised of nicotinamide riboside (NR) chloride supplied by ChromaDex and conforming to the specifications set forth on Exhibit A.

1.13 "Person" shall mean an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock company, joint venture, pool, syndicate, sole proprietorship, unincorporated organization, governmental authority or any other form of entity not specifically listed herein.

1.14 "Territory" shall mean the United States and Canada and can be expanded by mutual agreement of the parties in writing..

1.15 "Third Party" shall mean any Person other than ChromaDex, Elysium Health and their respective Affiliates.

2.    REPRESENTATIONS AND WARRANTIES

2.1    <u>Mutual Representations and Warranties</u>.  Each party hereby represents and warrants to the other party as follows:

2.1.1    <u>Corporate Existence</u>.  Such party is a corporation duly organized, validly existing and in good standing under the laws of the state in which it is incorporated.

2.1.2    <u>Authorization and Enforcement of Obligations</u>.  Such party (a) has the corporate power and authority and the legal right to enter into this Agreement and to perform its obligations hereunder, and (b) has taken all necessary corporate action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder. This Agreement has been duly executed and delivered on behalf of such party, and constitutes a legal, valid, binding obligation, enforceable against such party in accordance with its terms.

2.1.3    <u>No Consents</u>.  All necessary consents, approvals and authorizations of all governmental authorities and other Persons required to be obtained by such party in connection with this Agreement have been obtained.

2.1.4    <u>No Conflict</u>.  The execution and delivery of this Agreement and the performance of such party's obligations hereunder (a) do not conflict with or violate any requirement of applicable laws or regulations, and (b) do not conflict with, or constitute a default under, any contractual obligation of such party.

3.    SUPPLY

ChromaDex shall sell and deliver, and Elysium Health shall purchase from ChromaDex, such Niagen as Elysium Health orders from time to time on the terms and subject to the conditions set forth below:

3.1    <u>Price</u>.  With respect to all Niagen provided by ChromaDex to Elysium Health under this Agreement Elysium Health shall pay to ChromaDex a maximum price of one thousand three hundred US dollars per kilogram ($1,300 per kg) ("<u>Maximum Price</u>"); If, at any time during the Term, ChromaDex supplies Niagen (or a substantially similar product) to a Third Party at a price that is lower than that at which Niagen is supplied to Elysium Health under this Agreement, then the price of Niagen supplied under this Agreement shall be revised to such Third Party price with effect from the date of the applicable sale to such Third Party and ChromaDex shall promptly provide Elysium Health with any refund or credits thereby created; provided Elysium Health purchases equal volumes or higher volumes than the Third Party.  For the sake of clarity this Section does not apply to inter-Affiliate transfers.

3.2    <u>Delivery</u>.  All the Niagen supplied under this Agreement shall be shipped FCA (INCOTERMS 2010) from the ChromaDex dock.  Elysium Health shall be responsible for all freight, insurance charges, taxes, import and export duties, inspection fees and other charges applicable to the sale and transport of the Niagen purchased by Elysium Health hereunder.  Title and risk of loss and damages to the Niagen purchased by Elysium Health hereunder shall pass to Elysium Health upon delivery of Niagen to a common carrier at ChromaDex dock and Elysium Health shall be fully responsible, and shall hold ChromaDex harmless for and assume all risk of

3

loss, destruction of or damage to the Niagen.  Loss or damage to the Niagen after risk of loss has passed to Elysium Health will not release or excuse Elysium Health from its obligations under this Agreement to ChromaDex, including the obligation to make full payment of the purchase price.

3.3    Sales and Use Taxes.  Elysium Health shall pay any federal, state, county or municipal sales or use tax, excise or similar charge, or other tax assessment (other than that assessed against income), assessed or charged on the sale of the Niagen sold to it pursuant to this Agreement.

3.4    Payments.  Elysium Health shall pay ChromaDex within thirty (30) days from the date of the applicable invoice by ChromaDex to Elysium Health for all Niagen purchased hereunder.  Elysium Health shall make all payments under the Agreement to ChromaDex in United States dollars to ChromaDex's account in a financial institution located in the United States.

3.5    Orders.  Elysium Health shall make all purchases hereunder by submitting firm purchase orders to ChromaDex.  Each such purchase order shall be in writing in a form reasonably acceptable to ChromaDex, and shall specify the quantity ordered, the transfer price therefor under Section 3.1 above, the place of delivery and the required delivery date therefor, which shall not be less than thirty (30) days after the date of such purchase order.  In the event of a conflict between the terms and conditions of any purchase order or invoice or other purchasing document and this Agreement, the terms and conditions of this Agreement shall prevail.

3.6    Returned Niagen.  If any Niagen does not conform to the specifications set forth on Exhibit A,  any rejection or revocation of acceptance by Elysium Health must be made within thirty (30) days of delivery and any attempted rejection or revocation of acceptance of the Niagen made thereafter shall be null and void unless agreed to in writing by ChromaDex, except that, notwithstanding the foregoing, in the event that a defect in the Niagen could not reasonably be discovered within such thirty (30) day period ("Latent Defect"), Elysium Health shall have the right to reject such Niagen within fifteen (15) days after discovering the Latent Defect.  Failure to make a claim within such period shall be conclusive evidence that the Niagen was supplied in accordance with the specifications set forth on Exhibit A.  Subject to the foregoing, Elysium Health shall return the nonconforming Niagen to ChromaDex in accordance with the reasonable instructions of ChromaDex or, on ChromaDex's request, dispose of such nonconforming Niagen.  In both cases all costs shall be borne by ChromaDex.  Should any Niagen be returned as provided above, ChromaDex shall replace the returned Niagen as soon as reasonably practicable.  Such replacement Niagen shall be at no additional cost to Elysium Health if Elysium Health had previously paid ChromaDex for the returned Niagen.

3.7    Limited Warranty and Disclaimer of all other Warranties.    (a) CHROMADEX WARRANTS THAT THE NIAGEN SOLD HEREUNDER SHALL BE (i) MANUFACTURED IN ACCORDANCE WITH cGMP AND APPLICABLE LAWS AND REGULATIONS IN THE UNITED STATES AND    (ii) SHALL CONFORM TO THE SPECIFICATIONS SET FORTH ON EXHIBIT A; (b)  EXCEPT AS OTHERWISE PROVIDED IN SECTION 3.7(a) HEREOF, CHROMADEX HEREBY EXPRESSLY DISCLAIMS ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE NIAGEN,

4

INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. CHROMADEX HAS NOT MADE ANY RECOMMENDATION TO ELYSIUM HEALTH REGARDING THE USE OR SUBSEQUENT SALE OF THE NIAGEN. ELYSIUM HEALTH ASSUMES ALL RISKS AND LIBAILITIES FOR ANY LOSS, DAMAGE OR INJURY TO PERSONS OR PROPERTY RESULTING FROM THE USE OR SUBSEQUENT SALE OF THE NIAGEN, EITHER ALONE OR IN COMBINATION WITH OTHER INGREDIENTS. ELYSIUM HEALTH HAS SATISFIED ITSELF THAT THE NIAGEN AND THE PURPOSE FOR WHICH IT WILL BE USED AND/OR SOLD IS IN COMPLIANCE WITH THE LAWS OF THE RELEVANT COUNTRIES; (c) ELYSIUM HEALTH'S EXCLUSIVE REMEDY AND CHROMADEX'S EXCLUSIVE LIABILITY FOR SHIPMENT OF NON-CONFORMING NIAGEN SHALL BE LIMITED TO, AT CHROMADEX'S SOLE OPTION, EITHER REPLACEMENT OF THE NON-CONFORMING NIAGEN OR A REFUND OF THE PURCHASE PRICE PAID.  EXCEPT AS SET FORTH IN SECTION 3.6: (x) ALL CLAIMS MADE WITH RESPECT TO THE PRODUCT SHALL BE DEEMED WAIVED BY ELYSIUM HEALTH UNLESS MADE IN WRITING AND RECEIVED BY CHROMADEX WITHIN THIRTY (30) DAYS OF DELIVERY; (y) ELYSIUM HEALTH MUST MAKE ANY CLAIM FOR NON-COMFORMING NIAGEN, BREACH OF WARRANTY WITH RESPECT TO THE NIAGEN SOLD, OR ANY CLAIM OF ANY NATURE WHATSOEVER WITH RESPECT TO THE NIAGEN SOLD HEREUNDER IN WRITING WITHIN THIRTY (30) DAYS AFTER ELYSIUM HEALTH'S RECEIPT OF NIAGEN; AND (z) ELYSIUM HEALTH IRREVOCABLY WAIVES AND RELEASES ALL CLAIMS THAT ARE NOT PROPERLY MADE WITHIN SAID PERIOD.

      3.8   <u>Regulatory Requirements</u>.  ChromaDex shall keep Elysium Health reasonably and timely informed of regulatory developments related to Niagen throughout the Territory.  Without limiting the foregoing, ChromaDex represents and warrants that to the best of its knowledge Niagen may be lawfully sold under the Federal Food, Drug, and Cosmetic Act (as amended, including by the Dietary Supplement Nonprescription Drug Consumer Protection Act).

      3.9   <u>Product Safety</u>.  ChromaDex shall promptly inform Elysium Health in writing of any information concerning or that can potentially impact the safety, identity, strength, quality or purity of any Niagen of which it becomes aware, and shall provide supporting documentation.  Without limiting the foregoing, ChromaDex further agrees to notify Elysium Health within five (5) days if it receives notice of a serious adverse event, as defined in the Dietary Supplement Nonprescription Drug Consumer Protection Act, associated with an Elysium Health product containing Niagen, or to the extent legally obligated to do so.

      3.10  <u>Niagen Control</u>.  Each shipment of Niagen by ChromaDex shall contain a Certificate of Analysis providing an identifying lot number, expiration date, and lot-specific quality control report.

      3.11  <u>Minimum Purchase Commitments</u>.  Elysium Health shall order and pay for at least the minimum quantities of Niagen for each of the periods specified below.

| Period | Length of Period | Minimum Purchase Commitment for the Applicable Period |
|---|---|---|
| 1 | 12 months commencing upon date of First Commercial Sale | One hundred kilograms (100 kgs) |
| 2 | 12 months commencing on the | Two hundred kilograms (200 kgs) |

| | expiration of period 1 above | |
|---|---|---|
| 3 | 12 months commencing on the expiration of period 2 above | Four hundred kilograms (400 kgs) |
| | Each subsequent successive 12 month period, the first such period commencing on the expiration of period 3 above | To be negotiated in good faith within 90 days prior to the expiration of such period 3. |

If Elysium Health fails to make First Commercial Sale of Niagen six (6) months from the Effective Date, or if Elysium Health fails to meet the minimum purchase requirements set forth herein, ChromaDex, at its sole option and discretion, and upon written notice to Elysium Health, has the right to terminate this Agreement.

3.12    Patent Marking.  During the Term, Elysium Health will ensure proper patent marking for all uses of Niagen, all Niagen product shall be marked as follows:

"Patent: See www.chromadex.com/ingredients/patents;"

https://chromadex.com/Ingredients/Patents.html;

or as mutually agreed to in writing by the Parties.

4.      CONFIDENTIALITY

4.1     Confidential Information.  During the Term, and for a period of five (5) years following the termination hereof, each party shall maintain in confidence all Confidential Information disclosed by the other party, and shall not use, disclose or grant the use of the Confidential Information except on a need-to-know basis to those Affiliates, directors, officers, employees, consultants, clinical investigators, contractors, agents, or permitted assignees, to the extent such disclosure is reasonably necessary in connection with such party's activities as expressly authorized by this Agreement.  To the extent that disclosure is authorized by this Agreement, prior to disclosure, each party hereto shall obtain agreement of any such person or entity to hold in confidence and not make use of the Confidential Information for any purpose other than those permitted by this Agreement.  Each party shall notify the other promptly upon discovery of any unauthorized use or disclosure of the other party's Confidential Information.

4.2     Terms of this Agreement.  Except as otherwise provided in Section 7.1 above, neither party shall disclose any terms or conditions of this Agreement to any Third Party without the prior consent of the other party.  Notwithstanding the foregoing, prior to execution of this Agreement, the parties have agreed upon the substance of information that can be used to describe the terms of this transaction, and each party may disclose such information, as modified by mutual agreement from time to time, without the other party's consent.

4.3     Permitted Disclosures.  The confidentiality obligations contained in this Section 7 shall not apply to the extent that the receiving party (the "Recipient") is required (a) to disclose information by law, order or regulation of a governmental agency or a court of competent jurisdiction, or (b) to disclose information to any governmental agency for purposes

6

of obtaining approval to test or market a Niagen product, provided in either case that the Recipient shall provide written notice thereof to the other party and sufficient opportunity to object to any such disclosure or to request confidential treatment thereof.

5.      TERM; TERMINATION

     5.1   Term. This Agreement shall be effective as of the Effective Date and shall continue for an initial term of three (3) years (the "Initial Term"). At the end of the Initial Term, this Agreement shall continue automatically for successive additional one (1) year periods (each a "Renewal Term," together with the Initial Term, the "Term") under the same terms and conditions hereunder until terminated in accordance with the terms of Section 5.2.

     5.2   Termination. This Agreement may be terminated by:

        (i)     Any Party upon ninety (90) days written notice prior to the end of the Initial Term or any subsequent Renewal Term.

        (ii)     Any Party in the event that the other Party breaches any material term of this agreement and fails to cure such breach within ninety (90) days following notice thereof from the non-breaching party in writing.

        (iii)     a Party immediately upon the giving of notice if the other Party files a petition for bankruptcy, is adjudicated bankrupt, takes advantage of the insolvency laws of any state, territory or country, or has a receiver, trustee, or other court officer appointed for its property.

        (iv)     a Party if an event of Force Majeure (as described in Section 1.9 of this Agreement) with respect to the other Party shall have continued for ninety (90) days or is reasonably expected to continue for more than one hundred eighty (180) days.

     5.3   Nonexclusive Rights and Remedies. Termination is not an election of remedies. Except as otherwise specifically provided herein, all rights and remedies of the Parties provided under this Agreement are not exclusive and are in addition to any other rights and remedies provided by law or under this Agreement. Termination of this Agreement shall not relieve either Party of any liability which has accrued prior to the effective date of such termination, or prejudice either Party's right to obtain performance of any obligation provided for in this Agreement, which by its express terms or context survives termination. Without limiting the foregoing, Sections 4, 5.3, 6 and 7 shall survive the termination of this Agreement.

6.      INDEMNIFICATION

     6.1   Indemnification. Each party shall defend, indemnify and hold the other party harmless from all losses, liabilities, damages and expenses (including reasonable attorneys' fees and costs) ("Losses") resulting from any claims, demands, actions and other proceedings by any Third Party (a "Claim") to the extent resulting from such party's breach of a representation, warranty or covenant under this Agreement. In addition, (i) ChromaDex shall defend, indemnify and hold Elysium Health harmless from all Losses resulting from any Claims to the extent resulting from ChromaDex's research, development or commercialization of

Niagen; and (ii) Elysium Health shall defend, indemnify and hold ChromaDex harmless from all Losses resulting from any Claims to the extent resulting from Elysium Health's research, development or commercialization of Niagen products.

6.2     Procedure.  In the event of a Claim, a party (the "Indemnitee") that intends to claim indemnification under this Section shall promptly notify the other party (the "Indemnitor") of such Claim.  The Indemnitor shall have the right to assume the defense thereof with counsel selected by the Indemnitor.  The indemnity obligations under this Section shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior express written consent of the Indemnitor, which consent shall not be unreasonably withheld or delayed.  The failure to deliver notice to the Indemnitor within a reasonable time after notice of any such Claim, if prejudicial to its ability to defend such Claim, shall relieve such Indemnitor of any liability to the Indemnitee under this Section with respect thereto.  The Indemnitee, its employees and agents, shall reasonably cooperate with the Indemnitor and its legal representatives in the investigation of any Claim.

7.     MISCELLANEOUS

7.1     ChromaDex represents, warrants and covenants that ChromaDex has no pre-existing obligations or commitments (and will not assume or otherwise undertake any obligations or commitments) that would be in conflict or inconsistent with or that would hinder ChromaDex's performance of its obligations under this Agreement.  ChromaDex shall notify Elysium Health in writing at least thirty (30) days prior to entering into any agreement with any Third Party with respect to the supply or sale of Niagen in the dietary supplement channel in which Elysium Health has provided written notice to ChromaDex in accordance with Section 1.7 that it would be selling Niagen, and, if Elysium Health notifies ChromaDex within ten (10) days from receipt of such notice that it would like to negotiate an exclusive arrangement relating to the supply or sale of Niagen in such channel, ChromaDex agrees to negotiate in good faith with Elysium Health the terms of such exclusive arrangement; provided that ChromaDex will be entitled to continue to negotiate with such Third Party.

7.2     Notices.  Any consent, notice or report required or permitted to be given or made under this Agreement by one of the parties to the other shall be in writing and addressed to such other party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the addressor, and shall be effective upon receipt by the addressee.

| | |
|---|---|
| If to ChromaDex: | ChromaDex, Inc.<br>10005 Muirlands Blvd., Suite G,<br>Irvine, CA 92618<br>Attention:  General Counsel |
| If to Elysium Health: | Elysium Health, LLC<br>200 Congress Park Drive, Suite 205,<br>Delray Beach, FL 33445<br>Attention:  CEO |

7.3    Assignment.    Except as otherwise expressly provided under this Agreement neither this Agreement nor any right or obligation hereunder may be assigned or otherwise transferred (whether voluntarily, by operation of law or otherwise), without the prior express written consent of the other party; provided, however, that either party may, without such consent, assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business, or in the event of its merger, consolidation, change in control or similar transaction.  Any permitted assignee shall assume all obligations of its assignor under this Agreement.   Any purported assignment or transfer in violation of this Section 7.3 shall be void.

7.4    Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law principles thereof.

7.5    Entire Agreement.   This Agreement and the Trademark License and Royalty Agreement entered into between the parties as of the Effective Date contains the entire understanding of the parties with respect to the subject matter hereof.  All express or implied representations, agreements and understandings, either oral or written, heretofore made are expressly superseded by this Agreement.

7.6    Amendment.  No change, modification, extension, termination or waiver of this Agreement, or any of the provisions herein contained, shall be valid unless made in writing and signed by duly authorized representatives of the parties hereto.

7.7    Insurance.  Each Party shall carry liability insurance at a sufficient level to meet its obligations and liability under this Agreement.

7.8    Independent Contractors.  Each party hereby acknowledges that the parties shall be independent contractors and that the relationship between the parties shall not constitute a partnership, joint venture or agency.  Neither party shall have the authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding on the other party, without the prior consent of the other party to do so.

7.9    Severability.   Any of the provisions of this Agreement which are determined to be invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability in such jurisdiction, without rendering invalid or unenforceable the remaining provisions hereof and without affecting the validity or enforceability of any of the terms of this Agreement in any other jurisdiction.

7.10   Waiver.  The waiver by a party of any right hereunder, or of any failure to perform or breach by the other party hereunder, shall not be deemed a waiver of any other right hereunder or of any other breach or failure by the other party hereunder whether of a similar nature or otherwise.

7.11   Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

CHROMADEX, INC.

By _____

Title _____

ELYSIUM HEALTH, LLC

By _____

Title ___CEO_____

10

EXHIBIT A

<u>Niagen Specifications</u>

Exhibit B

# AMENDMENT TO SUPPLY AGREEMENT

THIS AMENDMENT is entered into this 19th day of February, 2016 (the "Effective Date" of the Amendment), by and between ChromaDex, Inc., a corporation duly organized and existing under the laws of California, having its principal place of business at 10005 Muirlands Blvd, Suite G, Irvine, CA 92618 (hereinafter referred to as "ChromaDex") and Elysium Health, Inc, a Delaware corporation, with principal offices located at 594 Broadway Suite 707, New York, NY 10012 (hereinafter referred to as "Elysium Health," and collectively with ChromaDex, the "Parties," and each, a "Party").

WHEREAS, ChromaDex and Elysium Health (the successor in interest Elysium Health LLC) are parties to a Supply Agreement, with an Effective Date of February 3, 2014 pursuant to which ChromaDex supplies NIAGEN® to Elysium Health (the "NIAGEN® Agreement");

WHEREAS, the Parties are parties to a Supply Agreement, with an Effective Date of June 26, 2014 pursuant to which ChromaDex supplies pTeroPure® (as defined below) to Elysium Health (the "pTeroPure® Agreement");

WHEREAS, the Parties have determined that it is in their mutual interest to amend the NIAGEN® Agreement in accordance with the terms of this Amendment, including, to grant Elysium Health certain exclusivity rights as set forth herein;

NOW THEREFORE, in consideration of mutual premises and mutual agreements herein contained, the Parties hereto agree to amend the NIAGEN® Agreement as follows:

1.    Amend Section 1.5 to added additional Excluded Products.  The amended Section 1.5 in its entirety states:

   "1.5    "Excluded Products" means topical skincare or cosmetic products, foods or beverages, and any and all dietary supplements in the form of an energy shot or a melt (melting or dissolvable tablet or delivery system), the combination of NIAGEN® with Choline and/or Betaine and/or DMG (all forms), unless it is a multi-vitamin, the combination of NIAGEN® with collagen, nano NIAGEN®, and Finished Products with "methyl donor" claims. Additional products, may be added to this definition of Excluded Products at any time at the sole discretion of Seller upon written notice, unless the Parties have previously agreed in writing that such product may not be excluded because Buyer has demonstrated established sales of or other commitment to a similar product or product format.  Notwithstanding the foregoing, in no event shall the definition of Excluded Products be altered to hinder, impair or prevent Buyer from selling dietary supplement products in tablet or capsule form for which it has been granted exclusivity hereunder."

2.    Add Section 1.16 which states:
   ""pTeroPure®" shall mean the novel and proprietary ingredient, Pterostilbene."

3.    Amend Section 3.4 to include language pertaining to Seller's ability to modify credit terms.  The amended Section 3.4 in its entirety states:

   "3.4    Payments. Elysium Health shall pay ChromaDex within thirty (30) days from the date of the applicable invoice by ChromaDex to Elysium Health for all NIAGEN® purchased hereunder; provided, however, solely if Elysium Health is delinquent on previous invoices, ChromaDex reserves the right to modify such credit terms in its commercially reasonable discretion by notice in writing to Elysium Health. Elysium Health shall make all payments under the Agreement to ChromaDex in United States dollars to ChromaDex's account in a financial institution located in the United States."

30822/00100/SF/5550433.4



4.   Amend Section 3.11 by deleting it and replacing it in its entirety with the following:

"3.11    <u>Minimum Purchase Commitments</u>.  In each of the calendar years set forth in Sections 3.11.1 and 3.11.2 below, Elysium Health will purchase the corresponding minimum quantity of NIAGEN® and/or pTeroPure® set forth below (and, for the avoidance of doubt, all purchases during the applicable calendar year of NIAGEN® under the NIAGEN® Agreement and of pTeroPure® under the pTeroPure® Agreement shall be counted to determine whether the applicable minimum quantities have been purchased):

3.11.1

    (a)  <u>2016</u>:       the lesser of (i) 1,000kg at the then-current price, or (ii) $1,000,000, take or pay;

    (b)  <u>2017</u>:       the lesser of (i) 2,000kg at the then-current price, or (ii) $2,000,000, take or pay;

    (c)  <u>2018</u>:       the lesser of (i) 3,000kg at the then-current price, or (ii) $3,000,000 take or pay;

    (d)  2019 and every year thereafter shall be negotiated in good faith within 90 days prior to the end of the previous calendar year.

If Elysium Heath fails to meet the applicable minimum purchase commitment set forth in this Section 3.11.1 in a calendar year, Elysium Health may, within 90 days of the end of the applicable calendar year, purchase the difference between the actual amount of NIAGEN® and pTeroPure® purchased by it during the applicable calendar year and the applicable minimum purchase requirement set forth above in this Section 3.11.1.  If Elysium Heath fails to meet the minimum purchase requirement set forth above in this Section 3.11.1, and Elysium Health does not purchase the difference as aforesaid, the Parties will use commercially reasonable efforts to negotiate in good faith revised minimum purchase commitments for the following calendar year.  If the Parties do not agree upon such minimum purchase commitments within 120 days of the end of the applicable calendar year, ChromaDex, at its sole option and discretion, and upon written notice to Elysium Health, has the right to terminate this Agreement.

3.11.2

    (a)  <u>2016</u>:       the lesser of (i) 2,000kg at the then-current price, or (ii) $2,000,000;

    (b)  <u>2017</u>:       the lesser of (i) 4,000kg at the then-current price, or (ii) $4,000,000;

    (c)  <u>2018</u>:       the lesser of (i) 6,000kg at the then-current price, or (ii) $6,000,000;

    (d)  2019 and every year thereafter shall be negotiated in good faith within 90 days prior to the end of the previous calendar year.

If Elysium Heath fails to meet the applicable minimum purchase requirement set forth in this Section 3.11.2 in a calendar year, Elysium Health may, within 90 days of the end of the applicable calendar year, purchase the difference between the actual amount of NIAGEN® and pTeroPure® purchased by it with respect to the applicable calendar year (including any additional purchases by Elysium Health under Section 3.11.1) and the applicable minimum purchase requirement set forth above in this Section 3.11.2.  If Elysium Heath fails to meet the minimum purchase requirement set forth above in this Section 3.11.2, and Elysium Health does not purchase the difference as aforesaid, ChromaDex, at its sole option and discretion, and upon written notice to Elysium Health, has the right to terminate Section 3.11.3.

2

3.11.3  During the Term, ChromaDex shall not, directly or indirectly, sell, transfer or otherwise provide to any Third Party, or license or otherwise enable any Third Party to make, any products containing both Niagen and pTeroPure® (or any ingredients that are substantially similar thereto) in combination, whether in the same delivery mechanism (including tablet, capsule, melt or liquid form) or packaging or in separate form or packaging but marketed together (collectively a "Combined Product").  To the extent not prohibited by applicable law, ChromaDex shall restrict (through contracts and/or purchase orders, marketing literature, shipping documents, or similar documents used when a supply, distribution or similar agreement is not in place) its customers and distributors and require similar restrictions throughout the supply chain, from selling any Combined Product.  ChromaDex shall use its best efforts to enforce such restrictions, including by (i) notifying such customer or distributor in writing of such alleged violation, (ii) conducting an investigation of such alleged violation reasonably appropriate under the circumstances, and (iii) suspending shipments of the applicable ingredients to a customer or distributor if ChromaDex becomes aware that such customer or distributor is selling such Combined Product.

5.     Except as changed, altered, amended or restructured by this Amendment, all terms and provisions of the NIAGEN® Agreement shall remain unchanged and unaffected and in full force and effect.  For the avoidance of doubt, the pTeroPure® Agreement shall remain unchanged and unaffected and in full force and effect.

6.     This Amendment may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Facsimile, Portable Document Format (PDF) or photocopied signatures of the Parties will have the same legal validity as original signatures.

30822/00100/SF/5550433.330822/00100/SF/5550433.4

IN WITNESS WHEREOF, the Parties have executed this Amendment by their duly authorized representatives for good and valuable consideration.

CHROMADEX, INC.

By: _____
Name: _____
Title: _____
Date: _____

ELYSIUM HEALTH, INC.

By: _____
Name: Daniel Alminana
Title: Chief Operating Officer
Date: 2/19/2016

Exhibit C

# SUPPLY AGREEMENT

**THIS SUPPLY AGREEMENT** (the "Agreement"), is made and entered into as of June 26, 2014 (the "Effective Date") by and between Elysium Health, LLC, a Florida limited liability corporation having a place of business at 200 Congress Park Drive, Suite 205, Delray Beach, FL 33445 and ChromaDex Inc., a California corporation with principal offices located at 10005 Muirlands, Blvd, Suite G, Irvine, CA 92618, USA.

## R E C I T A L S

WHEREAS, the Seller (as defined below) has developed a novel and proprietary ingredient, pterostilbene, with the trade name pTeroPure® ("the Product").

WHEREAS, the Buyer (as defined below) desires to purchase the Product from Seller and Seller desires to sell Product to Buyer subject to the terms and conditions hereinafter described.

NOW, THEREFORE, in consideration of the mutual premises and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows.

### 1. **Definitions.**

The following terms have the meanings specified below:

"Affiliate" shall mean, with respect to a Party, any person or entity that controls, is controlled by, or is under common control with such Party.  An entity or person shall be deemed to be in control of another entity ("Controlled Entity") if the former owns directly or indirectly at least fifty percent (50%) of the outstanding voting equity of the Controlled Entity (or some other majority equity or ownership interest exits, in the event that such Controlled Entity is other than a corporation).

"Buyer" means Elysium Health, LLC, collectively with any Affiliate of such party.

"Confidential Information" shall mean, with respect to a party, all information of any kind whatsoever, and all tangible and intangible embodiments thereof of any kind whatsoever, which is disclosed by such party to the other party and is marked, identified as or otherwise acknowledged to be confidential at the time of disclosure to the other party.   Notwithstanding the foregoing, Confidential Information of a party shall not include information which the other party can establish by written documentation (a) to have been publicly known prior to disclosure of such information by the disclosing party to the other party, (b) to have become publicly known, without fault on the part of the other party, subsequent to disclosure of such information by the disclosing party to the other party, (c) to have been received by the other party at any time from a source, other than the disclosing party, rightfully having possession of and the right to disclose such information without obligation of confidentiality to the disclosing party, (d) to have been otherwise known by the other party prior to disclosure of such information by the disclosing party to the other party, or (e) to have been independently developed by employees or agents of the other party without access to or use of such information disclosed by the disclosing party to the other party.

"Finished Products" shall mean the Buyer's finished product containing Product.

"Good Manufacturing Practices" shall mean good manufacturing practices and quality system regulations set forth by any Regulatory Authority of a country in which the Finished Products shall be manufactured or sold, and if the Product is manufactured outside of the Territory, the good manufacturing practices and quality system regulations in the country in which the Product is manufactured; all as updated, amended and revised from time to time.

"Specification" shall mean the description the Product set forth on Exhibit A.

"Territory" shall mean the United States.

"Seller" means ChromaDex, Inc., its Affiliates and their respective successors and assigns.

**2.  Ordering, Purchase Price and Payment.**

2.1 Purchase Orders.  Buyer shall periodically submit purchase orders for the Product to Seller, which purchase orders shall set forth the specific quantities needed, delivery date and shipping instructions.  Such purchase orders shall be submitted to Seller at least thirty (30) days prior to the required delivery date specified therein. Seller does not guarantee fulfillment of any purchase orders submitted on less than thirty (30) day notice, however Seller will use commercially reasonable efforts to fulfill those purchase orders.  The minimum purchase order quantity shall be 20kg and purchases must be made in 20kg increments.

2.2 Purchase Price and Payment.  The purchase price for the Product shall be at one thousand USD per kilogram ($1,000/kg) (the "Price").  During the Term of this Agreement, the Parties agree to negotiate in good faith price reductions based on volumes purchased.  Buyer shall pay for all Product via credit card prior to shipment. Payment terms may be modified after the Effective Date by mutual agreement of the parties in writing.  Failure to make prompt and full payment hereunder constitutes a material breach of the Agreement.

**3.  Obligations.**

3.1 Buyer may not re-sell or re-ship the Product in bulk raw material form, unless expressly authorized to do so in writing by Seller.

3.2 For U.S. distribution, on or in labels, packaging, advertising, promotional materials or Internet communications for Buyer's Finished Product, Buyer will only make claims that are substantiated by competent and reliable scientific evidence, and are in compliance with all applicable laws, rules, and regulations.  Buyer may not use, in labeling, advertising, promotion or otherwise: (a) any statements or quotations made by or attributed to any investigator who has conducted clinical studies on the Product, or (b) any photographs or other images of such investigators, without (i) the prior written consent of such investigators and the institutions at which such studies were conducted, and (ii) 20 days notification to Seller of such written consent prior to any such use.  Buyer will not misrepresent on product labels the amount, quantity or level of the Product contained in the Finished Product.  Without limiting Section 9(a), in the event that a third party is used by Buyer to manufacture any of the Finished Product for marketing or sale by Buyer, Buyer hereby guarantees compliance by said third party with the requirements of this Section 3, specifically including compliance with current Good Manufacturing Practices as set forth in 21 CFR section 111 and other applicable rules, regulations, statutes, and laws.  In the event that current labeling, packaging or formulations of the Finished Product do not comply with the requirements of this Section 3, Buyer will immediately rectify all nonconforming Finished Product in a manner reasonably acceptable to Seller or Seller reserves the right to immediately terminate this Agreement.

3.3 Patent Marking.  During the Term, Buyer will ensure proper patent marking on all Finished Product.  All Finished Product shall be marked as follows if the webpage that is accessed through the following link lists out to a patent that claims the Product:

"Patent: See www.ChromaDexPatents.com";

or as mutually agreed to in writing by the Parties.

**4.  Taxes and Import Duties.**  The price of the Product specified does not include federal taxes, state or local sales taxes, use taxes, occupational taxes or import duties.  Unless prohibited by law, Buyer is responsible for and shall pay all applicable sales, use, occupational, excise, value added or other similar taxes or import duties applicable to the manufacture, sale, price, delivery or use of the Products provided by Seller, or in lieu thereof,

Buyer shall provide Seller with a tax-exemption certificate acceptable to and considered valid by the applicable taxing authorities.

**5.   Delivery and Risk of Loss.**  Each shipment of Product by Seller shall contain a Certificate of Analysis providing an identifying lot number, expiration date, and lot-specific quality control report.  All sales are FOB\FCA (INCOTERMS 2010) Seller's U.S. dock. Risk of loss, destruction of or damage to the Product shall be Seller's until delivery of the Product to a common carrier at Seller's U.S. dock. Thereafter, title shall pass to Buyer and Buyer shall be fully responsible, and shall hold Seller harmless, for and assume all risk of loss, destruction of or damage to the Product occurring thereafter. Loss or damage to the Product after risk of loss has passed to Buyer will not release or excuse Buyer from its obligations under this Agreement to Seller, including the obligation to make full payment of the purchase price. Seller reserves the right to pack or ship orders in the most economical manner, provided that this does not result in increased risk of loss of the Product.  However, where Buyer requests special packaging or shipping, any additional cost will be billed to and be the responsibility of Buyer. Buyer acknowledges that Seller cannot accept returns, unless they do not meet the applicable Specifications or are otherwise defective.

**6.   Delivery Delays.**  Seller shall use reasonable efforts to make prompt deliveries in a commercially reasonable manner.  Delivery dates and estimates are, however, not guaranteed. Seller disclaims any liability or responsibility, and Buyer shall hold Seller harmless, for the late or non-delivery of Product. Buyer has no right to delay or defer delivery or acceptance.

**7.   Rejection and Revocation of Acceptance; Regulatory Requirements; Product Safety.**

7.1 Rejection and Revocation of Acceptance.  Any rejection or revocation of acceptance of Product by Buyer must be made within thirty (30) days of delivery of Product and any attempted rejection or revocation of acceptance of such Product made thereafter shall be null and void unless agreed to in writing by Seller, except that, notwithstanding the foregoing, in the event that a defect in the Product could not reasonably be discovered within such thirty (30) day period ("Latent Defect"), Buyer shall have the right to reject such Product within fifteen (15) days after discovering the Latent Defect.  A rejection or revocation, including rejection or revocation for a Latent Defect, must be made no later than six (6) months from delivery of Product. Failure to make a claim within such period shall be conclusive evidence that the Product was satisfactory in all respects and supplied in accordance with the Specifications.  Subject to the foregoing, Buyer shall return the nonconforming Product to Seller in accordance with the reasonable instructions of Seller or, on Seller's request, dispose of such nonconforming Product.  In both cases all costs shall be borne by Seller.  Should any Product be returned as provided above, Seller shall replace the returned Product as soon as reasonably practicable.  Such replacement Product shall be at no additional cost to Buyer if Buyer had previously paid Seller for the returned Product.  Each shipment hereunder is to be regarded as a separate and independent sale.

7.2 Regulatory Requirements.  Seller shall keep Buyer reasonably and timely informed of regulatory developments related to Product throughout the Territory.  Without limiting the foregoing, Seller represents and warrants that to the best of its knowledge Product may be lawfully sold under the Federal Food, Drug, and Cosmetic Act (as amended, including by the Dietary Supplement Nonprescription Drug Consumer Protection Act).

7.3 Product Safety.  Seller shall promptly inform Buyer in writing of any information concerning or that can potentially impact the safety, identity, strength, quality or purity of any Product of which it becomes aware, and shall provide supporting documentation. Without limiting the foregoing, Seller further agrees to notify Buyer within five (5) days if it receives notice of a serious adverse event, as defined in the Dietary Supplement Nonprescription Drug Consumer Protection Act, associated with an Buyer product containing Product, or to the extent legally obligated to do so.

**8.   Term and Termination.**

8.1   Term.  This Agreement shall commence on the Effective Date and shall remain in full force and effect for a term (the "Term") of one (1) year from the Effective Date and continue thereafter in successive one (1) year automatic renewal terms unless terminated in accordance herewith.

8.2  <u>Termination</u>.  This Agreement may be terminated by: (i) any Party upon ninety (90) days prior written notice; (ii) a Party immediately upon the giving of notice if the other Party files a petition for bankruptcy, is adjudicated bankrupt, takes advantage of the insolvency laws of any state, territory or country, or has a receiver, trustee, or other court officer appointed for its property; or, (iii) a Party if an event of Force Majeure (as described in Section 14 of this Agreement) with respect to the other Party shall have continued for ninety (90) days or is reasonably expected to continue for more than one hundred eighty (180) days.

### 9.  <u>LIMITED WARRANTY AND DISCLAIMER OF ALL OTHER WARRANTIES</u>.

(a)  SELLER WARRANTS THAT THE PRODUCT SOLD HEREUNDER SHALL BE (i) MANUFACTURED IN ACCORDANCE WITH GOOD MANUFACTURING PRACTICES AND APPLICABLE LAWS AND REGULATIONS AND (ii) SHALL CONFORM TO THE SPECIFICATION; (b) EXCEPT AS OTHERWISE PROVIDED IN SECTION 9(a) HEREOF, SELLER HEREBY EXPRESSLY DISCLAIMS ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCT, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. SELLER HAS NOT MADE ANY RECOMMENDATION TO BUYER REGARDING THE USE OR SUBSEQUENT SALE OF THE PRODUCT.  EXCEPT AS PROVIDED IN SECTIONS 7 AND 14, (i) BUYER ASSUMES ALL RISKS AND LIABILITIES FOR ANY LOSS, DAMAGE OR INJURY TO PERSONS OR PROPERTY RESULTING FROM THE USE OR SUBSEQUENT SALE OF THE PRODUCT, EITHER ALONE OR IN COMBINATION WITH OTHER INGREDIENTS NOT SUPPLIED BY SELLER; AND (ii) BUYER HAS SATISFIED ITSELF THAT THE PRODUCT AND THE PURPOSE FOR WHICH IT WILL BE USED AND/OR SOLD IS IN COMPLIANCE WITH THE LAWS OF THE RELEVANT COUNTRIES; (c) BUYER'S EXCLUSIVE REMEDY AND SELLER'S EXCLUSIVE LIABILITY FOR SHIPMENT OF NON-CONFORMING PRODUCT SHALL BE LIMITED TO, AT SELLER'S SOLE OPTION, EITHER REPLACEMENT OF THE NON-CONFORMING PRODUCT OR A REFUND OF THE PURCHASE PRICE PAID.  EXCEPT AS PROVIDED IN SECTIONS 7 AND 14: (x) ALL BREACH OF WARRANTY CLAIMS MADE WITH RESPECT TO THE PRODUCT SHALL BE DEEMED WAIVED BY BUYER UNLESS MADE IN WRITING AND RECEIVED BY SELLER WITHIN THIRTY (30) DAYS OF DELIVERY; (y) BUYER MUST MAKE ANY CLAIM FOR NON-COMFORMING PRODUCT, BREACH OF WARRANTY WITH RESPECT TO THE PRODUCT SOLD, OR ANY CLAIM OF ANY NATURE WHATSOEVER WITH RESPECT TO THE PRODUCT SOLD HEREUNDER IN WRITING WITHIN THIRTY (30) DAYS AFTER BUYER'S RECEIPT OF PRODUCT; AND (z)  BUYER IRREVOCABLY WAIVES AND RELEASES ALL CLAIMS THAT ARE NOT PROPERLY MADE WITHIN SAID PERIOD.

### 10. <u>LIMITATION OF LIABILITY.</u>

TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES WAIVE AND RELINQUISH ANY CLAIMS, DEMANDS, AND CAUSES OF ACTION OR RECOVERIES FOR PUNITIVE DAMAGES OR EXEMPLARY DAMAGES.  IN NO EVENT WILL EITHER PARTY BE LIABLE FOR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING UNDER THIS AGREEMENT OR OTHERWISE, INCLUDING ANY LOST REVENUES OR PROFITS, CONSEQUENTIAL AND/OR INCIDENTAL DAMAGES, BUSINESS INTERRUPTION OR DAMAGE TO BUSINESS REPUTATION, REGARDLESS OF THE THEORY UPON WHICH ANY CLAIM MAY BE BASED, INCLUDING ANY TORT OR STATUTORY CAUSES OF ACTION. BOTH PARTIES UNDERSTAND AND AGREE THAT THIS LIMITATION OF LIABILITY ALLOCATES RISK OF NONCONFORMING GOODS BETWEEN THE PARTIES AS AUTHORIZED BY THE UNIFORM COMMERCIAL CODE AND OTHER APPLICABLE LAW.  THE PRICES SET FORTH HEREIN REFLECT THIS ALLOCATION OF RISK AND THE LIMITATIONS OF LIABILITY, INCLUDING THE EXCLUSION OF SPECIAL, INDIRECT, CONSEQUENTIAL AND INCIDENTAL DAMAGES, IN THIS AGREEMENT.

**11.  <u>Intellectual Property Rights</u>**. The sale of Product covered by this Agreement shall not confer upon Buyer any license or right under any patents, trade secrets or other proprietary information owned or controlled by Seller, or the right to otherwise utilize such proprietary information, it being specifically understood and agreed

that all such rights are reserved to Seller.  Buyer's sole right to use any of Seller's trademarks in connection with the Product or in any manner shall be provided only to the extent expressly set forth in a separate trademark license agreement between Buyer and Seller.

**12.  Waiver and Severability.**  No claim or right arising out of a breach of this Agreement can be discharged in whole or in part by a waiver or renunciation of the claim or right unless the waiver or renunciation is in writing signed by the aggrieved party. If any term, covenant, warranty, remedy or condition of this Agreement, or the application thereof to any person or circumstance shall, to any extent, be held or deemed invalid or unenforceable, the remainder of this Agreement or the application of such term, covenant or provision, to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each remaining term, covenant or provision of this Agreement shall be deemed valid and enforced to the fullest extent permitted by law.

**13.  Force Majeure.**  A party shall have no liability or obligation to the other party of any kind, including, but not limited to, any obligation to deliver Product or to make payment or accept delivery of Product, arising from any delay or failure to perform all or any part of this Agreement as a result of causes, conduct or occurrences beyond such party's reasonable control, including, but not limited to, commercial impracticability, fire, flood, earthquake, lightning, storm, accidents, act of war, terrorism, civil disorder or disobedience, act of public enemies, problems associated with transportation (including car or truck shortages), shortages of energy or raw materials, acts or failure to act of any state, federal or foreign governmental or regulatory authorities, labor disputes, strikes, or failure of suppliers to make timely deliveries of materials, goods or services.  Seller may allocate its available supply among its customers in a manner determined by Seller to be fair and reasonable.

**14.  Indemnification and Insurance.**

To the fullest extent permitted by law, Buyer shall defend, indemnify and hold Seller harmless from any and all claims, demands, causes of action, controversy, liabilities, fines, regulatory actions, seizures of product, losses, costs and expenses (including, but not limited to attorneys' fees, expert witness expenses and litigation expenses) (hereinafter "Claim"), arising from or in connection with any Claim asserted by a third party against Seller for any damage, environmental liability, patent or intellectual property infringement caused by Buyer's modification or alteration of the Product, injury, death, loss, property damage, delay or failure in delivery of Buyer's Finished Product or any other Claim asserted by a third party against Seller, whether in tort, contract, breach of warranty or otherwise, relating to Buyer's Finished Product or Buyer's breach of this Agreement. Notwithstanding the foregoing, Buyer has no indemnity obligation to Seller to the extent that any Claims (i) result from the gross negligence or breach of applicable laws by Seller or (ii) are Claims for which Seller is obligated to indemnify Buyer under the following paragraph.

To the fullest extent permitted by law, Seller shall defend, indemnify and hold Buyer harmless from any and all Claims, arising from or in connection with any Claim asserted by a third party against Buyer for any patent or intellectual property infringement in connection with the Product (provided that such alleged infringement does not arise from the combination of the Product with other ingredients not supplied by Seller), injury, death, loss, property damage or any other Claim, whether in tort, contract, breach of warranty or otherwise, relating directly to the Product (except if such injury, death, loss, property damage or other Claim arises from the combination of the Product with other ingredients not supplied by Seller, from the packaging, delivery system, or subsequent handling by Buyer), or Seller's breach of this Agreement. Notwithstanding the foregoing, Seller has no indemnity obligation to Buyer to the extent that any Claims result from the gross negligence or breach of applicable laws by Buyer.

The parties agree, for the Term of this Agreement, to maintain a program of insurance or self-insurance at levels sufficient to satisfy its obligations as set forth in this Agreement.

**15.  Confidentiality.**

15.1  Confidential Information.  During the Term, and for a period of five (5) years following the termination hereof, each party shall maintain in confidence all Confidential Information disclosed by the other

party, and shall not use, disclose or grant the use of the Confidential Information except on a need-to-know basis to those Affiliates, directors, officers, employees, consultants, clinical investigators, contractors, agents, or permitted assignees, to the extent such disclosure is reasonably necessary in connection with such party's activities as expressly authorized by this Agreement.  To the extent that disclosure is authorized by this Agreement, prior to disclosure, each party hereto shall obtain agreement of any such person or entity to hold in confidence and not make use of the Confidential Information for any purpose other than those permitted by this Agreement.  Each party shall notify the other promptly upon discovery of any unauthorized use or disclosure of the other party's Confidential Information.

15.2  <u>Terms of this Agreement</u>.  Except as otherwise provided in Section 15.1 above, neither party shall disclose any terms or conditions of this Agreement to any Third Party without the prior consent of the other party.  Notwithstanding the foregoing, prior to execution of this Agreement, the parties have agreed upon the substance of information that can be used to describe the terms of this transaction, and each party may disclose such information, as modified by mutual agreement from time to time, without the other party's consent.

15.3  <u>Permitted Disclosures</u>.  The confidentiality obligations contained in this Section 15 shall not apply to the extent that the receiving party (the "Recipient") is required (a) to disclose information by law, order or regulation of a governmental agency or a court of competent jurisdiction, or (b) to disclose information to any governmental agency for purposes of obtaining approval to test or market a Product product, provided in either case that the Recipient shall provide written notice thereof to the other party and sufficient opportunity to object to any such disclosure or to request confidential treatment thereof.

**16.  Relationship.**  The relationship between Seller and Buyer shall be that of independent contractors and neither party, its agents and employees, shall under no circumstances be deemed the employees, distributors, franchisees, agents or representatives of the other party.

**17.  Assignment and Modification.**  The rights and obligations of Buyer under this Agreement shall not be assignable without the prior written consent of Seller; <u>provided</u>, <u>however</u>, that Buyer may, without such consent, assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business, or in the event of its merger, consolidation, change in control or similar transaction.  Any permitted assignee shall assume all obligations of its assignor under this Agreement.  This Agreement shall not be modified, altered or amended in any respect except by a writing signed by the parties.  Any variation, modification or addition to the terms set forth in this Agreement shall be considered a material modification and shall not be considered part of this Agreement.

**18.  Governing Law.**  This Agreement and all claims and causes of action shall be governed by and subject to the internal laws (exclusive of the conflicts of law provisions) and decisions of the courts of the State of California.  The sole and exclusive venue for all claims and causes of action between the parties shall be the state or federal court located in California.

**19.  Notices.**  Any demand upon or notice to a Party hereunder shall be effective when delivered by hand or when properly deposited in the mails postage prepaid, or sent by e-mail or electronic facsimile transmission with receipt acknowledged, or delivered to an overnight courier, in each case addressed to the Party at the address shown below or such other address as the Parties may advise in writing.

| If to Seller: | If to Buyer: |
|---|---|
| ChromaDex, Inc. | Elysium Health, LLC |
| 10005 Muirlands Blvd., Suite G | 200 Congress Park Drive, Suite 205 |
| Irvine, CA 92618 | Delray Beach, FL 33445 |
| Attention: Tom Varvaro | Attention: CEO |
| Fax: 949-419-0294 | Fax: _____ |
| Email: tom.varvaro@chromadex.com | Email: _____ |

**20.  Entire Agreement**.  This Agreement and any documents referred to herein contain the complete agreement between the parties with respect to the subject matter hereof.  All previous agreements, representations,

warranties, promises and conditions relating to the subject matter of this Agreement are superseded by this Agreement.  This Agreement may only be amended by a written instrument duly executed by the Parties hereto.

**21.  Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties have caused this Supply Agreement to be executed by their duly authorized representatives.

| Buyer  **ELYSIUM HEALTH, LLC** | Seller  **CHROMADEX, INC.** |
|---|---|
| Name:  Title: | Name:  Frank  Jaksch  Title:  CEO |

**EXHIBIT A**
**Product Specification**

Exhibit D

## TRADEMARK LICENSE AND ROYALTY AGREEMENT

This Trademark License and Royalty Agreement ("Agreement") is entered into as of February 3rd, 2014 by and between Elysium Health LLC, a Florida limited liability corporation having its principal place of business located at 200 Congress Park Drive, Suite 205, Delray Beach, FL 33445 (together with its affiliates, "Elysium Health", "Licensee" or "You") and ChromaDex, Inc. ("ChromaDex"), a California corporation with its principal place of business located at 10005 Muirlands Blvd., Suite G, Irvine, CA 92618 USA.

Licensee may use and affix ChromaDex trademarks, logos, patent numbers and other intellectual property and proprietary information of ChromaDex for Qualifying Products as defined below in the manner and subject to the requirements specified in this Agreement. Now, therefore, the parties agree as follows:

### 1. DEFINITIONS:

"Brand Usage Guidelines" are attached hereto as Exhibit "A" and set forth the rules and guidelines pertaining to the proper use of ChromaDex Marks that may be amended by ChromaDex, at any time, in ChromaDex's sole discretion. If the Brand Usage Guidelines are supplemented or amended, a supplemented or amended version shall be promptly provided to You, and You have the obligation to ensure that You are in compliance with current Brand Usage Guidelines.

"ChromaDex Marks" shall mean the trademarks and logos owed by ChromaDex incorporating the name, mark, and/or brand of a Covered ChromaDex Ingredient as shown in the Brand Usage Guidelines.

"IP Rights" means copyright, trademark, trade name, patent and other similar intellectual property rights.

"Licensed Materials" shall mean any advertising, promotional, and/or merchandising materials and artwork prepared and provided to You by ChromaDex. Licensed Materials may or may not display ChromaDex Marks, and may or may not be provided to You by ChromaDex, in ChromaDex's sole discretion.

"Covered ChromaDex Ingredient" shall mean any designated ChromaDex ingredients manufactured by or for ChromaDex and supplied to Elysium Health under the Supply Agreement. Ingredients manufactured by a party other than ChromaDex and/or counterfeit ingredients are not "Covered ChromaDex Ingredients".

"Qualifying Product(s)" shall mean a dietary supplement under Your brand, model or SKU which contain the Covered ChromaDex Ingredient.

"Supply Agreement" shall mean the supply agreement entered into between the parties effective as of the date hereof.

Definitions for capitalized terms not otherwise defined in this Agreement shall have the meanings given to them in the Supply Agreement.

### 2. LICENSE GRANT: 
ChromaDex hereby grants and You accept a worldwide, non-exclusive, non-transferable, revocable license to use and display the ChromaDex Marks solely to market, advertise, promote, sell and distribute Qualifying Products and to use the ChromaDex Marks on labeling, advertising, promotional collateral materials and websites in accordance with the terms of this Agreement, and the Brand Usage Guidelines. ChromaDex further grants You a worldwide, non-exclusive, non-transferable, revocable license to use and display the Licensed Materials and promotional material created by You containing ChromaDex Marks in accordance with the Brand Usage Guidelines solely to advertise and promote Qualifying Product. Sublicense rights may be granted if mutually agreed to in writing by the parties. No other right, title, or license is granted hereunder.

### 3. MARKINGS. 
Except to the extent otherwise decided by ChromaDex, all Licensed Materials and, to the extent You use ChromaDex Marks, Qualifying Products packaging and promotional materials may include (in easily readable, non-obscured type that is of reasonable prominence in light of the other names and notices) the ChromaDex Mark "_____" and any other ChromaDex Marks specified by ChromaDex, a legend that ChromaDex owns such ChromaDex Marks, and any reasonable patent, patent application or other proprietary markings and notices of ChromaDex as contained in the Brand Usage Guidelines. Use of such ChromaDex Marks and any related goodwill will inure to ChromaDex's benefit. ChromaDex will have the right of prior approval with respect to any promotional materials, packaging or statements regarding Qualifying Products or any ChromaDex Marks.

3.1. General. To the extent Licensee desires to use ChromaDex Marks, Licensee agrees to abide by ChromaDex's

1

reasonable written Brand Usage Guide Lines as issued and provided to Licensee from time to time. In any case where the ChromaDex Marks are not used in compliance with ChromaDex's trademark policies, Licensee will promptly correct the non-compliance and submit samples of compliant use to ChromaDex for approval.

3.2. Quality Control.  ChromaDex has the right to supervise and control the Licensee's use of the ChromaDex Marks with respect to the nature and quality of the Qualifying Products, pursuant to this Agreement. During the Term, without limitation Licensee agrees: (i) to the extent Licensee uses ChromaDex Marks, to use the ChromaDex Marks on and only in connection with Qualifying Products in strict accordance with this Agreement; and, (ii) prior to use of the ChromaDex Marks, Licensee shall furnish to ChromaDex for its written approval copies of the versions of all labels and packaging, together with the advertising and promotional materials with the ChromaDex Marks. All requests for approval shall be submitted via email to:

> LegalCounsel@ChromaDex.com

3.3.  Corrections. If, at any time, Licensee's unapproved use of the ChromaDex Marks, or any use of the ChromaDex Marks on any labeling, packaging, marketing, promotion, sale, or quality of Qualifying Products fail, in the sole opinion of ChromaDex, to meet the Brand Usage Guidelines or any other requirement of this Agreement and ChromaDex notifies Licensee of such failure, Licensee shall immediately take all necessary steps to bring the Qualifying Products into conformance. If Licensee fails to cure such defects within ten (10) days of notice of nonconformity (or such other times as the parties may agree), then Licensee shall promptly cease marketing, promotion, or sale, of non-conforming Qualifying Products, or undertake such reasonable measures to cure such defects as ChromaDex may request.  Failure to cure such defect to satisfaction of ChromaDex, constitutes a breach and may result in termination of this Agreement.

3.4.  Branding.  For the avoidance of doubt, Elysium Health shall have sole discretion as to the branding and marketing of the Qualifying Products.

**4. LIMITATIONS ON LICENSE AND PROPER USE OF CHROMADEX MARKS:**

4.1. To the extent You desire to use ChromaDex Marks, You agree to use the ChromaDex Marks in accordance with this Section 3, and in accordance with the Brand Usage Guidelines.

4.2. To the extent You use ChromaDex Marks, You agree to always use a ChromaDex Mark accompanied by an appropriate noun as shown in the Brand Usage Guidelines. You further agree that You shall not use any ChromaDex Mark as a noun and that You shall not pluralize, make possessive, abbreviate, or join any ChromaDex Mark to other words, symbols, or numbers, either as one word or with a hyphen.

4.3. You shall always use the proper spelling and the proper trademark symbol for the ChromaDex Marks in accordance with the Brand Usage Guidelines.

4.4. You shall attribute ownership of all ChromaDex Marks to ChromaDex by using the TM, SM ,or ® symbol (as indicated in the Brand Usage Guidelines) and by using the following trademark attribution in documents and user manuals for all Qualifying Product: "ChromaDex, the ChromaDex Logo, and all other ChromaDex Marks used or referenced are trademarks or registered trademarks of ChromaDex Inc. or its subsidiaries in the United States and other countries." For the trademark symbol, the superscript or subscript mode is preferred, but if it is not available, use parentheses: (TM), (SM) or (R).

4.5. You may not incorporate Your and/or any other third party mark into any ChromaDex Mark nor may You integrate any ChromaDex Mark into any of Your own trademarks, logos, or designs. You shall not alter, make puns on, or modify the ChromaDex Marks in any way, nor may You use and/or adopt any marks or logos that are confusingly similar to or that dilute any ChromaDex Marks.

4.6. You shall not use any ChromaDex Mark in any manner that creates confusion as to the source, sponsorship, or association of Your products and/or site or facility with ChromaDex or, that in any way indicates to the public that You are a division or affiliate, or franchisee of ChromaDex or otherwise related to ChromaDex. You may not use or display any ChromaDex Marks on Your invoices, bills, shipping memos, and/or letterhead, and You may not incorporate any ChromaDex Marks into any company name or product name.

4.7. You shall not re-use, copy, modify, and/or counterfeit any proprietary packaging associated with any ChromaDex product. To do so will constitute a material breach of this Agreement and ChromaDex shall have the right to terminate

2

300070043.1

this Agreement. ChromaDex further reserves all rights to pursue any and all remedies available to it as a result of Your selling and/or manufacturing any remarked, counterfeited, copied, re-used, modified ChromaDex Mark, ChromaDex product, and/or ChromaDex product packaging.

4.8. You shall not use any ChromaDex Marks on any promotional material created by You in close proximity to non Qualifying Licensee Product unless it is completely clear that the ChromaDex Mark is being used and associated solely with the appropriate Qualifying Licensee Product. You agree to take all steps necessary to avoid creating the false impression that ChromaDex is in any way the source, sponsor, or licensor of any product that is not a Qualifying Product.

4.9. You shall not use or display any ChromaDex Marks in any manner that may disparage ChromaDex, its products or services, or for promotional goods or for products which, in ChromaDex's sole discretion may diminish or otherwise damage ChromaDex's goodwill in any ChromaDex Marks, including but not limited to uses which could be deemed to be obscene, pornographic, excessively violent, or otherwise in poor taste or unlawful, or which purpose is to encourage unlawful activities.

4.10. Notwithstanding any of the foregoing, You are not prohibited from making textual, non-logo use in advertising, promotional materials, and invoices of ChromaDex product names to refer to ChromaDex products that You are selling, so long as such product names are used properly as trademarks with the appropriate trademark symbol and attribution legend as required by this section 3, and the Brand Usage Guidelines.

## 5. PRODUCT QUALITY:

5.1. You may affix ChromaDex Marks only in connection with Qualifying Products that meet or exceed the quality and performance standards customary in the industry. You are prohibited from affixing ChromaDex Marks to Dietary Supplements that do not contain any Covered ChromaDex Ingredient, that You did not manufacture, formulate, assemble or have manufactured on your behalf.

5.2. You hereby warrant and represent that You shall comply with all applicable federal, state and local laws and regulations in the manufacture, assembly, marketing, and sale of Qualifying Products to which You affix the ChromaDex Marks.

## 6. RIGHT TO INSPECT:
ChromaDex shall have the right to review, inspect, test, and/or validate any Qualifying Product to determine whether it is a quality product and whether it meets the definition of Qualifying Product in accordance with this Agreement. ChromaDex shall have the right and be given the opportunity to make random checks of the quality of the Qualifying Products and, upon request by ChromaDex, You shall submit a sample to ChromaDex for validation to confirm compliance with these quality standards. You agree to make any modification reasonably requested by ChromaDex to ensure compliance with this Agreement and the Brand Usage Guidelines. ChromaDex shall have the right to inspect Your manufacturing and sales premises during normal business hours, to ensure that You are in full compliance with Your obligations under this Agreement and the Brand Usage Guidelines.

## 7. PROTECTION OF INTEREST:

7.1. Acknowledgment of Rights: You acknowledge ChromaDex's exclusive IP Rights in the Licensed Materials and the ChromaDex Marks, and all goodwill associated therewith, and acknowledge that any and all use of the Licensed Materials, and/or ChromaDex Marks by You inures solely to the benefit of ChromaDex. You shall not challenge ChromaDex's exclusive IP Rights in and to the Licensed Materials and ChromaDex Marks. You shall not do anything that might harm the reputation or goodwill of ChromaDex or ChromaDex Marks. You shall take no action inconsistent with ChromaDex's rights in the Licensed Materials and ChromaDex Marks. If at any time You acquire any rights in, or registration(s) or application(s) for the Licensed Materials or any ChromaDex Marks by operation of law or otherwise, You will immediately and at no expense to ChromaDex assign such rights, registrations, or applications to ChromaDex, along with any and all associated goodwill.

7.2. Enforcement: In the event You become aware of any unauthorized use of the Licensed Materials or ChromaDex Marks by a third party, You shall promptly notify ChromaDex in writing, and shall cooperate fully, at ChromaDex's expense, in any enforcement of ChromaDex's rights against such third party. The right to enforce ChromaDex's rights in the Licensed Materials, and ChromaDex Marks rests entirely with ChromaDex and shall be exercised in ChromaDex's sole discretion; You shall not commence any action or claim to enforce ChromaDex's rights in the Licensed Materials and/or ChromaDex Marks.

3

**8. WARRANTY ON TRADEMARKS:** ChromaDex represents and warrants that it owns all the necessary IP Rights in and to the ChromaDex Marks and Licensed Materials in order to grant the rights it grants hereunder, and represents and warrants that such ChromaDex Marks and Licensed Materials do not infringe upon any third party IP Rights.

## 9. ROYALTIES

9.1.  For purposes of this Agreement, "Net Sales" shall mean, with respect to any Qualifying Product, the gross sales price invoiced for such Qualifying Product by Elysium Health and its Affiliates to independent customers who are not Affiliates, less any (a) trade, quantity and cash discounts on Qualifying Product actually provided to third parties in connection with arms- length transactions, (b) credits, allowances or refunds, not to exceed the original invoice amount, for actual claims, damaged goods, rejections or returns of Qualifying Product, (c) actual freight and insurance costs incurred in transporting such Qualifying Product to such customers, and (d) excise, sale, use, value added or other taxes, other than income taxes paid by Elysium Health due to the sale of Qualifying Product.

9.2 Base Royalty Rate.  Elysium Health shall pay to ChromaDex the following royalties ("Base Royalty Rate") on cumulative worldwide Net Sales of all Qualifying Products by Elysium Health, and its Affiliates:

| Cumulative worldwide Net Sales of all Qualifying Products by Elysium Health and its Affiliates (in US Dollars) | Royalty Rate on Net Sales of Qualifying Products in the Field |
|---|---|
| < $5,000,000 | 5.0% |
| ≥ $5,000,000 < $7,500,000 | 5.5% |
| ≥ $7,500,000 < $10,000,000 | 6.0% |
| ≥ $10,000,000 < $15,000,000 | 6.5% |
| ≥ $15,000,000 < $20,000,000 | 7.0% |
| ≥ $20,000,000 USD | 7.5% |

9.3.  Potential Increase to Base Royalty Rate.  Within thirty (30) days following the end of each calendar year during the Term, the parties shall calculate the average price of the Covered ChromaDex Ingredient supplied to Elysium Health by ChromaDex under the Supply Agreement during the previous calendar year.  Where such average price per kilogram for such previous calendar year is less than the Maximum Price, the applicable Base Royalty Rate payable under Section 9.2 with respect to the immediately following calendar year shall increase as follows:

| Average price per kilogram of Covered ChromaDex Ingredient charged to Elysium Health under the Supply Agreement in a calendar year (in US Dollars per kilogram) | Associated Increase in the applicable Base Royalty Rate on Net Sales of Qualifying Products |
|---|---|
| ≤ $1,200 per kg > $1,100 per kg | 0.5% |
| ≤ $1,100 per kg > $1,000 per kg | 1.0% |
| ≤ $1,000 per kg > $900 per kg | 1.5% |
| ≤ $900 per kg > $800 per kg | 2.0% |
| ≤ $800 per kg | 2.5% |

For the avoidance of doubt: (a) any increase under this Section 9.3 shall be applied to the Base Royalty Rate set forth in Section 9.2 only and not a royalty rate that has already been subject to an increase under this Section 9.3; (b) the maximum royalty rate payable under this Agreement at any time (and only once all increases under this Section 9 have been applied) shall be ten percent (10%) on Net Sales of Qualifying Product; and (c) only one royalty shall be owing for a Qualifying Product.  Without limiting the foregoing, if a Qualifying Product contains or consists of more than one ingredient supplied by ChromaDex (whether under the Supply Agreement or otherwise), only one royalty shall be owing for such Qualifying Product and no additional royalties shall be payable with respect to such additional ingredients.  In addition, if a Qualifying Product contains or consists of a Covered ChromaDex Ingredient and one or more third party ingredient requiring payment of a royalty or one or more proprietary Elysium Health ingredient, the parties may negotiate in good faith a potential modification to the Base Royalty Rate with respect to sales of such Qualifying Product.

4

9.4.   Royalty Payments and Accounting.   During the Term following the First Commercial Sale of a Qualifying Product, Elysium Health shall furnish to ChromaDex a quarterly written report showing in reasonably specific detail the calculation of royalties owing for the reporting period ("Royalty Report").   With respect to sales of Qualifying Products invoiced in United States dollars, all amounts shall be expressed in United States dollars.   With respect to sales of Qualifying Products invoiced in a currency other than United States dollars, all amounts shall be expressed in the domestic currency of the territory where the sale was made together with the United States dollar equivalent.   The United States dollar equivalent shall be calculated using the average of the exchange rate (local currency per US$1) published in The Wall Street Journal, Western Edition, under the heading "Currency Trading" on the last business day of each month during the applicable calendar quarter.   Reports shall be due on the ninetieth (90th) day following the close of each quarter.   Elysium Health shall keep complete and accurate records in sufficient detail to enable the Royalties payable hereunder to be determined.

9.5.   Audits.   Upon the written request of ChromaDex and not more than once in each calendar year, Elysium Health shall permit an independent certified public accounting firm of nationally recognized standing selected by ChromaDex and reasonably acceptable to Elysium Health, at ChromaDex's expense, to have access during normal business hours to such of the records of Elysium Health as may be reasonably necessary to verify the accuracy of the royalty reports for any year ending not more than twenty-four (24) months prior to the date of such request.   The accounting firm shall disclose to ChromaDex only whether or not the reports are correct and the amount of any discrepancies.   No other information shall be shared.   If such accounting firm concludes that additional royalties were owed during such period, Elysium Health shall pay the additional royalties within thirty (30) days of the date ChromaDex delivers to Elysium Health such accounting firm's written report so concluding.   The fees charged by such accounting firm shall be paid by ChromaDex; provided, however, if the audit correctly discloses that additional royalties are owed by Elysium Health for the audited period, then Elysium Health shall pay the reasonable fees and expenses charged by such accounting firm.

9.6.   Confidential Financial Information.   ChromaDex shall treat all financial information subject to review under this Section 9 as confidential, and shall cause its accounting firm to retain all such financial information in confidence under Section 4 of the Supply Agreement.

9.7.   Payment Terms.   Royalties shown to have accrued by each Royalty Report provided for under Section 9.4 above shall be due on the date such Royalty Report is due.   Payment of royalties in whole or in part may be made in advance of such due date.

9.8.   Withholding Taxes.   Elysium Health shall be entitled to deduct the amount of any withholding taxes, value-added taxes or other taxes, levies or charges with respect to such amounts, (other than income taxes payable by Elysium Health or its Affiliates), or any taxes required to be withheld by Elysium Health or its Affiliates, to the extent Elysium Health or its Affiliates pay to the appropriate governmental authority on behalf of ChromaDex such taxes, levies or charges.   Elysium Health shall use reasonable efforts to minimize any such taxes, levies or charges required to be withheld on behalf of ChromaDex by Elysium Health or its Affiliates.   Elysium Health promptly shall deliver to ChromaDex proof of payment of all such taxes, levies and other charges, together with copies of all communications from or with such governmental authority with respect thereto.

**10. CHROMADEX INDEMNITY:** ChromaDex agrees to indemnify, defend and hold Licensee harmless from all loss, cost, liability and expense incurred by Licensee and any of its subsidiaries or affiliated entities which arise out of a third party claim alleging that the use by Licensee, in compliance with the terms hereof, of the IP Rights in and to the ChromaDex Marks and Licensed Materials, infringes upon a third party's IP Rights.

**11. LICENSEE INDEMNITY:** Licensee agrees to indemnify, defend and hold ChromaDex harmless from all loss, cost, liability and expense incurred by ChromaDex and any of its subsidiaries or affiliated entities which arise out of a third party claim concerning Licensee's design, manufacture, use, marketing, promotion or sale of Qualifying Products, except where such claims arise from the Covered ChromaDex Ingredient. ChromaDex agrees to provide Licensee with prompt notice of any such claims and shall provide Licensee with reasonable assistance (at Licensee's expense) in the defense or settlement of such claims.

**12. DISCLAIMER:** EXCEPT AS OTHERWISE PROVIDED HEREIN, THE CHROMADEX MARKS AND LICENSED MATERIALS ARE PROVIDED "AS-IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, WHETHER EXPRESS OR IMPLIED, AND ALL WARRANTIES AND/OR

5

INDEMNITIES THAT MIGHT OTHERWISE BE IMPLIED BY APPLICABLE LAW.

**13. LIMITATION OF LIABILITY:** NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**14. TERM AND TERMINATION:**

14.1. Term: This Agreement shall remain in full force and effect until the termination of the Supply Agreement between the parties for the Covered ChromaDex Ingredient, unless otherwise terminated in accordance herewith.

14.2. Termination: This Agreement may be terminated as follows: (i) immediately upon written notice that the Supply Agreement for the Covered ChromaDex Ingredient has been terminated; (ii) by ChromaDex upon prior written notice of Licensee's breach or default under this Agreement, and unless such breach or default is cured within thirty (30) days after delivery of such notice of the breach or default; or, (iii) upon mutual agreement of the parties in writing.

14.3. Effect of Termination: Upon any termination of this Agreement, You shall immediately cease all use of the ChromaDex Mark, promotional material created by You containing ChromaDex Marks, including Licensed Materials, unless otherwise agreed to in writing.

14.4. Continuing Obligations: Obligations of the parties under the provisions of 1, 7.1, 8, 9, 10, 11, 13, 14.4, and 15 shall remain in force notwithstanding the termination or expiration of this Agreement.

**15. GENERAL OBLIGATIONS:**

15.1. Assignment. Except as otherwise expressly provided under this Agreement neither this Agreement nor any right or obligation hereunder may be assigned or otherwise transferred (whether voluntarily, by operation of law or otherwise), without the prior express written consent of the other party; provided, however, that either party may, without such consent, assign this Agreement and its rights and obligations hereunder in connection with the transfer or sale of all or substantially all of its business, or in the event of its merger, consolidation, change in control or similar transaction. Any permitted assignee shall assume all obligations of its assignor under this Agreement. Any purported assignment or transfer in violation of this Section 15.1 shall be void.

15.2. Choice of Law and Jurisdiction. In the US, this Agreement and all actions for the breach thereof will be governed, construed, and interpreted in accordance with the laws of the State of California without regard to or application of choice of law rules or principles. The parties further acknowledge and agree that any non-contractual cause of action that either party may assert, including but not limited to trademark infringement, trademark dilution, passing off, false designation of origin, unfair competition and other non-contractual causes of action, will be governed by U.S. federal law and the law of the State of California. Any dispute arising out of this Agreement shall be brought in, and the parties consent to personal and exclusive jurisdiction of and venue in the Federal District Court in Orange County, California.

15.3. Equitable Relief. You recognize and acknowledge that Your breach of this Agreement or the Brand Usage Guidelines may cause ChromaDex irreparable damage, which may not be readily remedied by monetary damages in an action at law, and may, in addition thereto, constitute an infringement of ChromaDex's IP Rights and rights under the laws of unfair competition. Accordingly, in the event of any default or breach by You, including any action by You which could cause some loss or dilution of ChromaDex's goodwill, reputation, or rights in any ChromaDex Marks, ChromaDex may be entitled to seek an immediate injunction in addition to any other remedies available, to stop or prevent such irreparable harm, loss, or dilution.

15.4. Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, such determination shall not affect the validity of the remaining provisions unless ChromaDex determines in its reasonable discretion that the courts determination causes this Agreement to fail in any of its essential purposes.

15.5. Waiver. The failure of any party to enforce at any time the provisions of this Agreement shall in no way be construed to be a present or future waiver of such provisions, nor in any way affect the ability of any party to enforce each and every such provision thereafter.

15.6. Relationship of the Parties: No agency, partnership, joint venture, franchise, or employment relationship is created between ChromaDex and You as a result of this Agreement. Neither party is authorized to create any

300070043 1

obligation, express or implied, on behalf of the other party.

15.8. Notices from a party to the other can be delivered electronically, by mail, fax, delivery service, or in person.

15.9.   Entire Agreement: This Agreement along with the Brand Usage Guidelines and the Supply Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all previous agreements, proposals (oral or written), all negotiations, conversations, and/or discussions between the parties relating to this Agreement and all past courses of dealing or industry customs. This Agreement may not be modified except in a writing signed by authorized representatives of both parties.


**IN WITNESS WHEREOF,** the parties have caused this Trademark License and Royalty Agreement to be executed by their duly authorized representatives.

**ELYSIUM HEALTH, LLC**

By: _____
    Name: Eric Marpotulli
    Title:  CEO

**CHROMADEX, INC.**

By: _____
    Name:  Frank  Jmeson
    Title:  CEO

Exhibit E



# SALES INVOICE



ChromaDex Inc.
10005 Muirlands Blvd  Suite G
Irvine CA, 92618

Phone: 949-419-0288
Fax:    949-419-0294
www.chromadex.com

| INVOICE | IVC114992 |
|---|---|
| Date | 1-Jul-2016 |
| Page | 1 of 1 |

| Bill To | Ship To |
|---|---|
| Elysium Health<br>594 Broadway<br>Suite. 707<br>New York, NY 10012    United States | Elysium Health<br>C/O Tishcon Corp<br>818 Brown Street<br>Salisbury, MD 21801    United States |

| PO Number | Customer No. | Salesperson ID | Shipping Method | Payment Terms | Req Date. |
|---|---|---|---|---|---|
| PT109 | 108701 | CDI | FREIGHT | 30% Net30 70% Net60 | 6/30/16 |

| Order | Invoice | B/O | Item Number | Description | | Unit Price | Ext Price |
|---|---|---|---|---|---|---|---|
| 58.000 | 40.000 | 18.000 | ASB-00016996-110 | PTEROPURE (PTEROSTILBENE)(FG)(REQUEST QUOTE) | | $10,000.000 | $400,000.000 |
| | | | | Lot:       ADPEPVSP10040416 | 21.00 | | |
| | | | | Lot:       ADPEPVSP10050416 | 19.00 | | |

| Comments: | | Subtotal | $400,000.00 |
|---|---|---|---|
| * Please include invoice & packing slip<br>* Please ship by 7/1/16<br>* Please ship 400 kg first<br>* Please ship UPS Freight | | Miscellaneous | $0.00 |
| | | Freight & Handling | $750.00 |
| | | Sales Tax | $0.00 |
| Tracking #:       608560352 | | Trade Discount | $0.00 |
| | | Payment received | $0.00 |
| Ship Complete Status:       Partial Shipments allowed | | Total | $400,750.00 |

**THIS ORDER IS SUBJECT TO OUR STANDARD TERMS AND CONDITIONS FOR THE PURCHASE AND SALE OF CHROMADEX PRODUCTS AND SERVICES, A COPY OF WHICH HAS BEEN PROVIDED TO COMPANY AND IS INCORPORATED HEREIN BY THIS REFERENCE.**

Entered By:       Henry N

Printed:     07/01/2016   14:12



# SALES INVOICE



ChromaDex Inc.
10005 Muirlands Blvd  Suite G
Irvine CA, 92618

Phone: 949-419-0288
Fax:    949-419-0294
www.chromadex.com

| INVOICE | IVC114996 |
|---|---|
| Date | 1-Jul-2016 |
| Page | 1 of 1 |

| Bill To | Ship To |
|---|---|
| Elysium Health<br>594 Broadway<br>Suite. 707<br>New York, NY 10012    United States | Elysium Health<br>C/O Tishcon Corp<br>818 Brown Street<br>Salisbury, MD 21801    United States |

| PO Number | Customer No. | Salesperson ID | Shipping Method | Payment Terms | Req Date. |
|---|---|---|---|---|---|
| NR109 | 108701 | CDI | FREIGHT | 30% Net30 70% Net60 | 6/30/16 |

| Order | Invoice | B/O | Item Number | Description | | Unit Price | Ext Price |
|---|---|---|---|---|---|---|---|
| 300.000 | 300.000 | 0.000 | ASB-00014315-110 | NIAGEN (NICOTINAMIDE RIBOSIDE CHLORIDE) (DI)(REQUEST QUOTE) | | $8,000.00 | $2,400,000.000 |
| | | | | Lot: | 40C910-15214-21 | 69.00 | |
| | | | | Lot: | 40C910-15214-21 | 1.00 | |
| | | | | Lot: | 40C910-15216-21 | 74.00 | |
| | | | | Lot: | 40C910-15217-21 | 74.00 | |
| | | | | Lot: | 40C910-15218-21 | 68.00 | |
| | | | | Lot: | 40C910-15219-21 | 14.00 | |

| Comments: | | Subtotal | $2,400,000.00 |
|---|---|---|---|
| * Please include invoice & packing slip<br>* Please ship by 7/1/16<br>* Please ship FedEx Freight | | Miscellaneous | $0.00 |
| | | Freight & Handling | $2,600.00 |
| | | Sales Tax | $0.00 |
| | | Trade Discount | $0.00 |
| | | Payment received | $0.00 |
| Ship Complete Status: | No Partial shipments Allowed | Total | $2,402,600.00 |

**THIS ORDER IS SUBJECT TO OUR STANDARD TERMS AND CONDITIONS FOR THE PURCHASE AND SALE OF CHROMADEX PRODUCTS AND SERVICES, A COPY OF WHICH HAS BEEN PROVIDED TO COMPANY AND IS INCORPORATED HEREIN BY THIS REFERENCE.**

Entered By:    Henry N

Printed:    07/01/2016   14:29

 ChromaDex

# SALES INVOICE



ChromaDex Inc.
10005 Muirlands Blvd  Suite G
Irvine CA, 92618

Phone: 949-419-0288
Fax:    949-419-0294
www.chromadex.com

| INVOICE | IVC116510 |
|---------|-----------|
| Date | 9-Aug-2016 |
| Page | 1 of 1 |

| Bill To | Ship To |
|---------|---------|
| Elysium Health<br>594 Broadway<br>Suite. 707<br>New York, NY 10012    United States | Elysium Health<br>C/O Tishcon Corp<br>818 Brown Street<br>Salisbury, MD 21801    United States |

| PO Number | Customer No. | Salesperson ID | Shipping Method | Payment Terms | Req Date. |
|-----------|--------------|----------------|-----------------|---------------|-----------|
| PT109 | 108701 | CDI | FREIGHT | 30% Net30 70% Net60 | 6/30/16 |

| Order | Invoice | B/O | Item Number | Description | Unit Price | Ext Price |
|-------|---------|-----|-------------|-------------|------------|-----------|
| 58.000 | 18.000 | 0.000 | ASB-00016996-110 | PTEROPURE (PTEROSTILBENE)(FG)(REQUEST QUOTE) | $10,000.000 | $180,000.000 |
| | | | | Lot:        ADPEPVSP10060716      18.00 | | |
| | | | | Lot:        ADPEPVSP10060716      18.00 | | |
| | | | | Lot:        ADPEPVSP10060716      18.00 | | |
| | | | | Lot:        ADPEPVSP10060716      18.00 | | |
| | | | | Lot:        ADPEPVSP10060716      18.00 | | |
| | | | | Lot:        ADPEPVSP10060716      18.00 | | |
| | | | | Lot:        ADPEPVSP10060716      18.00 | | |
| | | | | Lot:        ADPEPVSP10060716      18.00 | | |
| | | | | Lot:        ADPEPVSP10060716      18.00 | | |

| Comments: | | Subtotal | $180,000.00 |
|-----------|---|----------|-------------|
| * Please include invoice & packing slip | | Miscellaneous | $0.00 |
| * Please ship by 7/1/16 | | Freight & Handling | $0.00 |
| * Please ship 400 kg first | | Sales Tax | $0.00 |
| * Please ship FedEx Freight | | Trade Discount | $0.00 |
| *Freight already charged on IVC114992 | | Payment received | $0.00 |

Tracking #:            662160293613                                                          ORD86078

| Ship Complete Status: | Partial Shipments allowed | Total | $180,000.00 |
|-----------------------|---------------------------|-------|-------------|

**THIS ORDER IS SUBJECT TO OUR STANDARD TERMS AND CONDITIONS FOR THE PURCHASE AND SALE OF CHROMADEX PRODUCTS AND SERVICES, A COPY OF WHICH HAS BEEN PROVIDED TO COMPANY AND IS INCORPORATED HEREIN BY THIS REFERENCE.**

Entered By:      Thomas L                                                    Printed:    08/09/2016   16:53