PETER B. MORRISON (State Bar No. 230148)
peter.morrison@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
julia.nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:    (213) 687-5600

JOSEPH N. SACCA (*pro hac vice* application pending)
joseph.sacca@skadden.com
BRADLEY E. HONIGMAN (*pro hac vice* application pending)
bradley.honigman@skadden.com
SPENCER A. GOTTLIEB (*pro hac vice* application pending)
spencer.gottlieb@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone:   (212) 735-3000
Facsimile:    (212) 735-2000

DONALD R. WARE (*pro hac vice* application pending)
dware@foleyhoag.com
MARCO J. QUINA (*pro hac vice* application pending)
mquina@foleyhoag.com
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone:   (617) 832-1000
Facsimile:    (617) 832-7000

Attorneys for Defendant and Counterclaimant
Elysium Health, Inc.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### (SOUTHERN DIVISION)

| | |
|---|---|
| CHROMADEX, INC., <br><br> Plaintiff, <br><br> v. <br><br> ELYSIUM HEALTH, INC., <br><br> Defendant. | Case No. 8:16-cv-02277-KES <br><br> **ANSWER AND COUNTERCLAIMS** <br><br> **DEMAND FOR JURY TRIAL** |

1    Defendant Elysium Health, Inc. ("Elysium"), upon personal knowledge with
2  respect to itself and its own acts, and upon information and belief with respect to all
3  other matters, responds to the allegations made by Plaintiff ChromaDex, Inc.
4  ("ChromaDex") in the Complaint and counterclaims as follows:

5                              **INTRODUCTION**

6    ChromaDex, through multiple misrepresentations, induced Elysium into
7  entering a series of contractual supply arrangements.  ChromaDex also misused its
8  patent estate and market power to coerce Elysium to enter into a costly trademark
9  license it did not want or need.  Brazenly, intentionally and secretly, ChromaDex
10 then breached fundamental terms of the supply agreements.  It tried to conceal its
11 breaches from Elysium by emailing falsified customer data purporting to show
12 compliance with the contract, but ham-handedly disclosed its deception when it
13 neglected to delete the true data from an attachment to the same email.

14    After Elysium discovered ChromaDex's attempt to mislead it, it nevertheless
15 sought to resolve the issues created by ChromaDex's breaches and deception without
16 turning to litigation, including through multiple conversations with ChromaDex's
17 CEO and some of its board members.  Justifiably reluctant to accept only
18 ChromaDex's word about the scope and extent of its breaches, particularly in light of
19 ChromaDex's circulation of fraudulent customer data, Elysium sought information in
20 an effort to verify what it was being told.  After stonewalling Elysium, one of
21 ChromaDex's directors suggested Elysium conduct an audit to determine the scope
22 and extent of ChromaDex's breach and the amount owed to Elysium.  When Elysium
23 sought to take ChromaDex up on that offer, ChromaDex ceased communicating
24 through its officers and directors.  In a highly unusual move, ChromaDex tasked a
25 single individual – a former board member who remains one of ChromaDex's largest
26 shareholders but is no longer a company director or officer – to harangue Elysium
27 and one of its investors with increasingly threatening and profane telephone calls.
28

DEFENDANT'S ANSWER AND COUNTERCLAIMS

1    Elysium asked to resume discussions with ChromaDex management, that request

2    was ignored, and this lawsuit followed.

3           Elysium has continually met all of its obligations to ChromaDex, and has been

4    repaid with dishonesty and violations of the parties' agreements.  ChromaDex should

5    now be held to account for its conduct.

6           Elysium remains hopeful that ChromaDex will in fact resolve its breaches and

7    remedy its misconduct.  Even if ChromaDex does not do so, however, Elysium

8    intends to, and is highly confident it will continue to, supply its customers with

9    Elysium's lead product, Basis™, both now and in the future.

10                          *                *                *

11          Elysium is the highly successful and rapidly growing seller of a

12   groundbreaking proprietary dietary supplement, Basis™, which combines

13   nicotinamide riboside (or "NR") with other active ingredients that today are supplied

14   by ChromaDex.   To obtain a supply of nicotinamide riboside for use in Basis,

15   Elysium contracted with ChromaDex.   The parties' contracts are memorialized in,

16   among other things, an NR Supply Agreement, dated February 3, 2014 and amended

17   on February 19, 2016 (as amended, the "NR Supply Agreement") and a Trademark

18   License and Royalty Agreement, dated February 3, 2014 (the "License and Royalty

19   Agreement").

20          ChromaDex has failed to comply with its obligations to Elysium in numerous

21   respects. For example, under the NR Supply Agreement, ChromaDex covenanted not

22   to sell nicotinamide riboside to other customers buying the same or lesser quantities

23   for a price less than it was selling nicotinamide riboside to Elysium.  As Elysium

24   discovered, that was a misrepresentation on the part of ChromaDex and one Elysium

25   may not have uncovered but for ChromaDex's own misstep.  On June 13, 2016,

26   ChromaDex's CEO, Frank Jaksch, inadvertently disclosed to Elysium that it was

27   selling nicotinamide riboside to other customers for less than Elysium had been

28   paying for the same ingredient.   This information was accidentally left in an

1  attachment to an email Jaksch sent trying to deceive Elysium into believing that
2  ChromaDex was actually in compliance with the agreement.

3      ChromaDex's misconduct also includes its coercive insistence that Elysium
4  pay royalties to ChromaDex on Elysium product sales over and above the price of
5  materials Elysium purchases from ChromaDex.  It did so by conditioning its
6  execution of the NR Supply Agreement on Elysium's execution of a <u>trademark</u>
7  license, the License and Royalty Agreement, even though Elysium told ChromaDex
8  that Elysium had no interest in licensing ChromaDex's trademarks.  In this manner,
9  ChromaDex has exploited its nicotinamide riboside patents and market power in the
10 nicotinamide riboside market, engaging in patent misuse and unfair competition.
11 This misconduct renders the relevant patents unenforceable by ChromaDex.

12     When ChromaDex demanded that Elysium execute the License and Royalty
13 Agreement as a condition to supplying nicotinamide riboside, Elysium did so in
14 reliance on ChromaDex's representation that it demands and obtains such royalty
15 agreements from all of its NR customers.  That was not true; as Elysium only
16 subsequently learned, ChromaDex does not in fact insist on receiving royalties from
17 all of its customers.  Through ChromaDex's misrepresentation, the License and
18 Royalty Agreement thus was fraudulently induced.

19     None of the foregoing is disclosed or acknowledged in ChromaDex's
20 Complaint.  Instead, ChromaDex's lawsuit seeks to harass Elysium and to retain for
21 ChromaDex the fruits of its own breaches, coercion and deceit.  Elysium has made
22 clear its willingness to pay the balance, if any, that remains with respect to Elysium's
23 past orders once ChromaDex satisfies its own obligations.  Given the breadth of its
24 breaches and its attempts to conceal them, only ChromaDex can know the extent of
25 what it owes.  Until ChromaDex accounts for its misconduct, Elysium is excused
26 from any further obligations to ChromaDex.

27
28

DEFENDANT'S ANSWER AND COUNTERCLAIMS

1

**ANSWER**

2     1.    To the extent the allegations in Paragraph 1 of the Complaint state legal

3   conclusions, no response is required.  To the extent a response is deemed necessary,

4   Elysium admits that it entered into three contracts with ChromaDex (the

5   "Agreements") and that ChromaDex purports to state an action to recover damages,

6   but denies that ChromaDex is entitled to any relief on any claim asserted in the

7   Complaint.

8     2.    As to Paragraph 2 of the Complaint, Elysium refers to the Agreements

9   themselves for the terms, conditions and provisions of each Agreement.  Elysium

10  denies any paraphrasing, summarizing or characterization of the Agreements and any

11  factual inferences or legal conclusions made by ChromaDex based on the

12  Agreements.  To the extent a response is deemed necessary, Elysium denies the

13  allegations in Paragraph 2 of the Complaint.

14     3.    Elysium admits the allegations in Paragraph 3 of the Complaint.

15     4.    Elysium denies knowledge or information sufficient to form a belief as

16  to the truth of the allegations in Paragraph 4 of the Complaint, except admits that

17  Mark Morris is a former ChromaDex employee and is now Head of Scientific

18  Technology at Elysium.

19     5.    Elysium denies the allegations in Paragraph 5 of the Complaint, except

20  admits that Elysium ordered 900 kg of nicotinamide riboside ("NR") from

21  ChromaDex in 2015 and ordered 1590 kg of nicotinamide riboside and 300 kg of

22  pterostilbene ("PT") from ChromaDex in the first quarter of 2016.

23     6.    Elysium denies the allegations in Paragraph 6 of the Complaint, except

24  admits that Elysium submitted purchase orders for 6600 kg of nicotinamide riboside

25  and 1260 kg of pterostilbene on June 28, 2016 and refers to the purchase orders

26  themselves for the terms, conditions and provisions of each order.  Elysium denies

27  any paraphrasing, summarizing or characterization of the purchase orders and any

28

DEFENDANT'S ANSWER AND COUNTERCLAIMS

1  factual inferences or legal conclusions made by ChromaDex based on the purchase
2  orders.

3        7.      To the extent the allegations in Paragraph 7 of the Complaint state legal
4  conclusions, no response is required.  To the extent a response is deemed necessary,
5  Elysium denies the allegations in Paragraph 7 of the Complaint.

6        8.      Elysium denies the allegations in Paragraph 8 of the Complaint, except
7  admits that ChromaDex discussed the June 28 purchase orders with Elysium and
8  ultimately did not fill the June 28 purchase orders.

9        9.       Elysium denies the allegations in Paragraph 9 of the Complaint, except
10  admits that Mr. Morris scheduled a call between ChromaDex and Elysium to discuss
11  the June 28 Purchase Orders.

12        10.     Elysium admits the allegations in Paragraph 10 of the Complaint.

13        11.     Elysium denies the allegations in Paragraph 11 of the Complaint, except
14  admits that Elysium and ChromaDex spoke by phone on June 30, 2016 and that
15  Elysium objected to the price ChromaDex asked for nicotinamide riboside as being
16  in breach of the parties' Agreements.

17        12.     As to Paragraph 12 of the Complaint, Elysium refers to the June 30,
18  2016 purchase orders themselves for the terms, conditions and provisions of each
19  order.  Elysium denies any paraphrasing, summarizing or characterization of the
20  purchase orders and any factual inferences or legal conclusions made by ChromaDex
21  based on the purchase orders, and expressly denies that the June 28, 2016 purchase
22  orders were "disingenuous."

23        13.     Elysium admits the allegations in Paragraph 13 of the Complaint.

24        14.     Elysium denies knowledge or information sufficient to form a belief as
25  to the truth of the allegations in Paragraph 14 of the Complaint, except admits that
26  ChromaDex filled the June 30, 2016 purchase orders in two separate shipments and
27  provided Elysium with invoices for those shipments on July 1, 2016 and August 9,
28  2016.

5

DEFENDANT'S ANSWER AND COUNTERCLAIMS

15.     Elysium denies the allegations in Paragraph 15 of the Complaint.

16.     Elysium denies the allegations in Paragraph 16 of the Complaint, except admits that Elysium and ChromaDex spoke by phone on June 30, 2016.

17.     To the extent the allegations in Paragraph 17 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 17 of the Complaint.

18.     Elysium denies the allegations in Paragraph 18 of the Complaint.

19.     Elysium denies the allegations in Paragraph 19 of the Complaint, except admits that Mr. Alminana wrote an email to ChromaDex on August 10, 2016 and refers to the email for its complete contents.

20.     To the extent the allegations in Paragraph 20 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 20 of the Complaint.

21.     To the extent the allegations in Paragraph 21 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 21 of the Complaint.

22.     To the extent the allegations in Paragraph 22 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 22 of the Complaint.

23.     To the extent the allegations in Paragraph 23 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium admits that ChromaDex purports to seek damages under the Agreements, but denies that ChromaDex is entitled to any relief on any claim asserted in the Complaint.

24.     Paragraph 24 of the Complaint contains legal conclusions as to which no response is required.

25.     To the extent the allegations in Paragraph 25 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed

DEFENDANT'S ANSWER AND COUNTERCLAIMS

1   necessary, Elysium admits that venue is proper in this District with respect to claims
2   under the License and Royalty Agreement, and otherwise denies the allegations in
3   Paragraph 25.

4          26.     Elysium denies knowledge or information sufficient to form a belief as
5   to the truth of the allegations in Paragraph 26 of the Complaint.

6          27.     Elysium admits the allegations in Paragraph 27 of the Complaint.

7          28.     Elysium denies knowledge or information sufficient to form a belief as
8   to the truth of the allegations in Paragraph 28 of the Complaint, except admits that it
9   purchases nicotinamide riboside from ChromaDex.

10         29.     Elysium admits the allegations in Paragraph 29 of the Complaint.

11         30.     Elysium denies knowledge or information sufficient to form a belief as
12   to the truth of the allegations in Paragraph 30 of the Complaint.

13         31.     Elysium denies knowledge or information sufficient to form a belief as
14   to the truth of the allegations in Paragraph 31 of the Complaint.

15         32.     Elysium admits the allegations in Paragraph 32 of the Complaint.

16         33.     Elysium denies knowledge or information sufficient to form a belief as
17   to the truth of the allegations in Paragraph 33 of the Complaint.

18         34.     Elysium denies knowledge or information sufficient to form a belief as
19   to the truth of the allegations in Paragraph 34 of the Complaint.

20         35.     As to Paragraph 35 of the Complaint, Elysium admits that it entered into
21   the referenced Agreements, and refers to the Agreements themselves for the terms,
22   conditions and provisions of each Agreement.  Elysium denies any paraphrasing,
23   summarizing or characterization of the Agreements and any factual inferences or
24   legal conclusions made by ChromaDex based on the Agreements.

25         36.     Elysium admits the allegations in Paragraph 36 of the Complaint.

26         37.     Elysium denies the allegations in Paragraph 37 of the Complaint, except
27   admits that Elysium submitted purchase orders for nicotinamide riboside and
28   pterostilbene on June 28, 2016.

38.    Elysium denies the allegations in Paragraph 38 of the Complaint, except admits that Elysium and ChromaDex spoke by phone on June 30, 2016.

39.    Elysium denies the allegations in Paragraph 39 of the Complaint, except admits that admits that Elysium and ChromaDex spoke by phone on June 30, 2016.

40.    Elysium denies the allegations in Paragraph 40 of the Complaint, except admits that Elysium objected to the price ChromaDex asked for nicotinamide riboside as being in breach of the parties' Agreements.

41.    As to Paragraph 41 of the Complaint, Elysium admits that it submitted purchase orders on June 30, 2016, and refers to the referenced purchase orders themselves for the terms, conditions and provisions of each order.  Elysium denies any paraphrasing, summarizing or characterization of the purchase orders and any factual inferences or legal conclusions made by ChromaDex based on the purchase orders.

42.    Elysium denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 of the Complaint, except admits that ChromaDex shipped 3000 kg of nicotinamide riboside and 400 kg of pterostilbene to Elysium on July 1, 2016 and provided Elysium with invoices for those shipments.

43.    Elysium denies the allegations in Paragraph 43 of the Complaint.

44.    Elysium denies the allegations in Paragraph 44 of the Complaint.

45.    Elysium admits the allegations in Paragraph 45 of the Complaint.

46.    Elysium denies the allegations in Paragraph 46 of the Complaint, except admits that Mr. Alminana wrote an email to ChromaDex on July 18, 2016 and refers to the email for its complete contents.

47.    Elysium admits the allegations in Paragraph 47 of the Complaint.

48.    Elysium denies the allegations in Paragraph 48 of the Complaint.

49.    Elysium admits the allegations in Paragraph 49 of the Complaint.

50.    Elysium denies the allegations in Paragraph 50 of the Complaint.

51.    Elysium admits the allegations in Paragraph 51 of the Complaint.

8

52.     Elysium denies the allegations in Paragraph 52 of the Complaint, except admits that Mr. Alminana wrote an email to ChromaDex on August 10, 2016 and refers to the email for its complete contents.

53.     As to Paragraph 53 of the Complaint, Elysium refers to the referenced email for its complete contents.  Elysium denies any paraphrasing, summarizing or characterization of the email and any factual inferences or legal conclusions made by ChromaDex based on the email.

54.     Elysium denies the allegations in Paragraph 54 of the Complaint.

55.     Elysium denies the allegations in Paragraph 55 of the Complaint, except admits that ChromaDex periodically sought payment from Elysium.

56.     Elysium denies the allegations in Paragraph 56 of the Complaint, and further states that Michael Brauser, acting with ChromaDex's express, implied or apparent authority, has continually harassed both Elysium and one of its investors by phone in an effort to frustrate rather than promote the amicable resolution of this matter.

57.     Elysium denies the allegations in Paragraph 57 of the Complaint.

58.     Elysium denies the allegations in Paragraph 58 of the Complaint.

59.     Elysium denies the allegations in Paragraph 59 of the Complaint.

60.     Elysium denies the allegations in Paragraph 60 of the Complaint.

61.     Elysium denies the allegations in Paragraph 61 of the Complaint.

62.     Elysium denies the allegations in Paragraph 62 of the Complaint.

63.     As to Paragraph 63 of the Complaint, Elysium refers to the PT Supply Agreement itself for its terms, conditions and provisions.  Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

64.     As to Paragraph 64 of the Complaint, Elysium refers to the PT Supply Agreement itself for its terms, conditions and provisions.  Elysium denies any

DEFENDANT'S ANSWER AND COUNTERCLAIMS

paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

65.     As to Paragraph 65 of the Complaint, Elysium refers to the PT Supply Agreement itself for its terms, conditions and provisions.   Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

66.     As to Paragraph 66 of the Complaint, Elysium refers to the referenced invoice itself for its complete terms.  Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

67.     To the extent the allegations in Paragraph 67 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 67 of the Complaint.

68.     To the extent the allegations in Paragraph 68 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 68 of the Complaint.

69.     As to Paragraph 69 of the Complaint, Elysium refers to the NR Supply Agreement itself for its terms, conditions and provisions.   Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

70.     As to Paragraph 70 of the Complaint, Elysium refers to the NR Supply Agreement itself for its terms, conditions and provisions.   Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

71.     As to Paragraph 71 of the Complaint, Elysium refers to the NR Supply Agreement itself for its terms, conditions and provisions.   Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

DEFENDANT'S ANSWER AND COUNTERCLAIMS

72.     As to Paragraph 72 of the Complaint, Elysium refers to the NR Supply Agreement itself for its terms, conditions and provisions.  Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

73.     As to Paragraph 73 of the Complaint, Elysium refers to the NR Supply Agreement itself for its terms, conditions and provisions.  Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

74.     To the extent the allegations in Paragraph 74 of the Complaint state legal conclusions, no response is required.  To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 74 of the Complaint.

75.     As to Paragraph 75 of the Complaint, Elysium refers to the referenced letter and the NR Supply Agreement itself for their terms, conditions and provisions. Elysium denies any paraphrasing, summarizing or characterization of the letter or the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the letter or the Agreement.

76.     As to Paragraph 76 of the Complaint, Elysium refers to the License and Royalty Agreement itself for its terms, conditions and provisions.  Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

77.     As to Paragraph 77 of the Complaint, Elysium refers to the License and Royalty Agreement itself for its terms, conditions and provisions.  Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

78.     As to Paragraph 78 of the Complaint, Elysium refers to the License and Royalty Agreement itself for its terms, conditions and provisions.  Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

79.     As to Paragraph 79 of the Complaint, Elysium refers to the License and Royalty Agreement itself for its terms, conditions and provisions.  Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

80.     As to Paragraph 80 of the Complaint, Elysium refers to the License and Royalty Agreement itself for its terms, conditions and provisions.  Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

81.     As to Paragraph 81 of the Complaint, Elysium refers to the License and Royalty Agreement itself for its terms, conditions and provisions.  Elysium denies any paraphrasing, summarizing or characterization of the Agreement and any factual inferences or legal conclusions made by ChromaDex based on the Agreement.

82.     Paragraph 82 of the Complaint contains legal conclusions as to which no response is required.  To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 82 of the Complaint.

83.     To the extent the allegations in Paragraph 83 of the Complaint state legal conclusions, no response is required.  To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 83 of the Complaint.

84.     Elysium denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84 of the Complaint.

85.     Elysium denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85 of the Complaint.

86.     Elysium incorporates by reference its responses to Paragraphs 1-85 of the Complaint as if set forth herein.

87.     Paragraph 87 of the Complaint states legal conclusions to which no response is required.

DEFENDANT'S ANSWER AND COUNTERCLAIMS

88.     To the extent the allegations in Paragraph 88 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 88 of the Complaint.

89.     To the extent the allegations in Paragraph 89 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 89 of the Complaint.

90.     To the extent the allegations in Paragraph 90 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 90 of the Complaint.

91.     Elysium incorporates by reference its responses to Paragraphs 1-90 of the Complaint as if set forth herein.

92.     Paragraph 92 of the Complaint contains legal conclusions as to which no response is required.

93.     To the extent the allegations in Paragraph 93 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 93 of the Complaint.

94.     To the extent the allegations in Paragraph 94 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 94 of the Complaint.

95.     To the extent the allegations in Paragraph 95 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 95 of the Complaint.

96.     Elysium incorporates by reference its responses to Paragraphs 1-95 of the Complaint as if set forth herein.

97.     Paragraph 97 of the Complaint states legal conclusions to which no response is required.

98.     To the extent the allegations in Paragraph 98 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 98 of the Complaint.

99.     To the extent the allegations in Paragraph 99 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 99 of the Complaint.

100.   To the extent the allegations in Paragraph 100 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 100 of the Complaint.

101.   Elysium incorporates by reference its responses to Paragraphs 1-100 of the Complaint as if set forth herein.

102.   Elysium denies the allegations in Paragraph 102 of the Complaint, except admits that Elysium and ChromaDex spoke by phone on June 30, 2016.

103.   Elysium denies the allegations in Paragraph 103 of the Complaint.

104.   Elysium denies the allegations in Paragraph 104 of the Complaint, except admits that Elysium and ChromaDex spoke by phone on June 30, 2016 and that Elysium raised concerns about ChromaDex's breaches of the NR Supply Agreement.

105.   Elysium denies the allegations in Paragraph 105 of the Complaint.

106.   Elysium denies the allegations in Paragraph 106 of the Complaint.

107.   To the extent the allegations in Paragraph 107 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 107 of the Complaint.

108.   To the extent the allegations in Paragraph 108 of the Complaint state legal conclusions, no response is required.   To the extent a response is deemed necessary, Elysium denies the allegations in Paragraph 108 of the Complaint.

DEFENDANT'S ANSWER AND COUNTERCLAIMS

1    109.   To the extent the allegations in Paragraph 109 of the Complaint state

2    legal conclusions, no response is required.   To the extent a response is deemed

3    necessary, Elysium denies the allegations in Paragraph 109 of the Complaint.

### GENERAL DENIAL

5    Elysium denies each and every allegation, statement and matter not expressly

6    admitted or qualified here.   The WHEREFORE clause is denied in its entirety.

7    Elysium denies that ChromaDex is entitled to any of the relief requested or to any

8    other relief based on the allegations in the Complaint.

### AFFIRMATIVE DEFENSES

10    Without undertaking any burden of proof not otherwise assigned to it by law,

11    Elysium asserts the following affirmative and other defenses with respect to the

12    allegations in the Complaint:

### FIRST AFFIRMATIVE DEFENSE

14    The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

16    The amount sought to be recovered in this action is barred, in whole or in part,

17    by the amount owing from ChromaDex to Elysium.

### THIRD AFFIRMATIVE DEFENSE

19    ChromaDex's claims are barred, in whole or in part, because, and to the extent

20    that, any relief or recovery would unjustly enrich it.

### FOURTH AFFIRMATIVE DEFENSE

22    ChromaDex's claims are barred, in whole or in part, because ChromaDex

23    materially breached one or more of the Agreements.   Accordingly, Elysium's

24    obligations under the Agreements were excused in whole or in part and the damages

25    to which ChromaDex would otherwise be entitled, if any, are offset in whole or in

26    part.

27

28

DEFENDANT'S ANSWER AND COUNTERCLAIMS

1

### FIFTH AFFIRMATIVE DEFENSE

2 ChromaDex's claims are barred, in whole or in part, because all or part of
3 Elysium's undertaking of obligations under the Agreements resulted from fraud,
4 deceit and/or misrepresentation (whether knowingly, recklessly, negligently or
5 otherwise) by ChromaDex.

6

### SIXTH AFFIRMATIVE DEFENSE

7 ChromaDex's claims are barred in whole or in part because ChromaDex failed
8 to perform its obligations under the Agreements and/or failed to satisfy a condition
9 precedent.

10

### SEVENTH AFFIRMATIVE DEFENSE

11 ChromaDex's claims are barred in whole or in part by the doctrines of waiver,
12 estoppel, ratification and/or consent.

13

### EIGHTH AFFIRMATIVE DEFENSE

14 One or more of the Agreements are invalid or unenforceable because are
15 unconscionable or they were induced by duress, coercion or undue influence.

16

### NINTH AFFIRMATIVE DEFENSE

17 One or more of the Agreements are invalid or unenforceable as contrary to law
18 or public policy.

19

### TENTH AFFIRMATIVE DEFENSE

20 ChromaDex's claim for fraudulent deceit is barred by the economic loss rule.

21

### ELEVENTH AFFIRMATIVE DEFENSE

22 ChromaDex's claims under the License and Royalty Agreement are barred to
23 the extent they are not ripe.

24

### TWELFTH AFFIRMATIVE DEFENSE

25 ChromaDex's claims are barred by the equitable doctrine of unclean hands.

26

### THIRTEENTH AFFIRMATIVE DEFENSE

27 The Complaint fails to state with particularity the claim for fraudulent deceit.

28

**FOURTEENTH AFFIRMATIVE DEFENSE**

Any and all actions taken by Elysium in relation to ChromaDex and the Agreements were taken in good faith and in accordance with Elysium's duties, obligations and rights pursuant to the Agreements.

**FIFTEENTH AFFIRMATIVE DEFENSE**

ChromaDex's claim for punitive damages is barred in whole or in part by applicable law or statute or, in the alternative, is unconstitutional insofar as it violates the due process protections of the United States and California Constitutions.

**DEFENSES RESERVED**

Elysium reserves the right to assert any other affirmative defenses that are supported by information or facts obtained through discovery or other means during this case and expressly reserves the right to amend its Answer to assert such other affirmative defenses in the future.

WHEREFORE, Elysium respectfully requests that the Court enter judgment:

1. Dismissing all claims asserted herein with prejudice; and

2. Granting Elysium all other and further relief that the Court deems just and proper.

**COUNTERCLAIMS**

Defendant Elysium Health, Inc. ("Elysium"), by and through its undersigned counsel, files these Counterclaims against ChromaDex, Inc. ("ChromaDex") and alleges on personal knowledge as to its own acts and on information and belief as to all other matters as follows:

**NATURE OF THE CASE**

1. This is an action for fraud, breach of contract, unfair competition and declaratory judgment. Elysium and ChromaDex are parties to three contracts: (1) the Niagen Supply Agreement, dated February 3, 2014, as amended by the Amendment to Supply Agreement, dated February 19, 2016 (the "NR Supply Agreement"); (2) the pTeroPure Supply Agreement, dated June 26, 2014 (the "PT Supply Agreement,"

and, together with the NR Supply Agreement, the "Supply Agreements"); and (3) the Trademark License and Royalty Agreement, dated February 3, 2014 (the "License and Royalty Agreement") (collectively, "the Agreements").

2.     Elysium sells a dietary supplement, Basis, that combines nicotinamide riboside (sometimes called "NR") and pterostilbene (sometimes called "PT").

3.     Pursuant to the Supply Agreements, ChromaDex provides Elysium with nicotinamide riboside and pterostilbene.  ChromaDex sells nicotinamide riboside under the name NIAGEN®, a federally registered trademark.

4.     At the time the NR Supply Agreement and License and Royalty Agreement were executed, ChromaDex had, and still has, market power in the market for supply of nicotinamide riboside in the United States and worldwide.  It is currently the sole commercial supplier of nicotinamide riboside.

5.     ChromaDex has in-licensed several patents relating to nicotinamide riboside.  ChromaDex's market power comes from, among other things, the patents it has in-licensed.  Although the NR Supply Agreement includes no express license to ChromaDex's patent rights, ChromaDex's supply of nicotinamide riboside under the NR Supply Agreement necessarily includes an implied sublicense for Elysium to use ChromaDex's license under principles of patent exhaustion and other law.

6.     ChromaDex has committed patent misuse and engaged in unfair competition by leveraging its market power in the supply of nicotinamide riboside to impose conditions on its customers that impermissibly broaden the scope of the patent grant with anticompetitive effect.  For example, on multiple occasions ChromaDex has conditioned its sale of nicotinamide riboside on the purchaser's agreement to license ChromaDex's trademarks and pay ChromaDex substantial royalties on product sales based on that trademark license. With respect to Elysium, ChromaDex conditioned its execution of the NR Supply Agreement on Elysium's simultaneous execution of the License and Royalty Agreement, which forces Elysium to pay a substantial royalty to ChromaDex on _all_ Elysium products

containing ingredients supplied by ChromaDex under the NR Supply Agreement, even if Elysium does not use, and does not want to use, any ChromaDex marks.

7.   ChromaDex induced Elysium to sign the License and Royalty Agreement by insisting, falsely, that ChromaDex required all of its nicotinamide riboside customers to sign similar royalty agreements.

8.   The NR Supply Agreement also contains multiple covenants that have been breached by ChromaDex.   Under the NR Supply Agreement, Elysium is entitled to receive pricing on nicotinamide riboside that is at least as favorable as the price at which ChromaDex supplies nicotinamide riboside or a substantially similar product to other purchasers, but never more than a certain maximum price (the "Most Favored Nations Provision" or "MFN Provision").

9.   The MFN Provision further provides that ChromaDex must promptly issue a refund or credit to Elysium in the event that ChromaDex sells nicotinamide riboside or a substantially similar product to another purchaser for an amount less than Elysium has paid for nicotinamide riboside.

10.   As amended, the NR Supply Agreement prohibits ChromaDex from selling, or licensing or enabling any third party to manufacture or sell, a product containing both nicotinamide riboside and either pterostilbene or any ingredient substantially similar to pterostilbene, either in combination or in separate form but marketed together (the "Exclusivity Provision").

11.   ChromaDex materially breached the MFN Provision and the Exclusivity Provision of the NR Supply Agreement.

12.   With respect to the MFN Provision, on June 13, 2016, in response to a request from Elysium for information regarding ChromaDex's compliance with the MFN Provision, ChromaDex's CEO, Frank Jaksch, provided Elysium with a manipulated and misleading Excel spreadsheet (the "Fraudulent Spreadsheet") purporting to list the prices at which ChromaDex was selling nicotinamide riboside to purchasers other than Elysium under various supply agreements.

19

13.     The Fraudulent Spreadsheet was described by Mr. Jaksch as a "blinded" list of the prices at which ChromaDex was selling nicotinamide riboside to other customers, without revealing those customers' identities.  As part of the Fraudulent Spreadsheet, however, Jaksch inadvertently neglected to delete two tabs containing "unblinded" sheets apparently used as a basis for preparing the Fraudulent Spreadsheet.  Those "unblinded" sheets listed additional customers that Jaksch notably omitted from the "blinded" sheets, and confirm – contrary to Jaksch's intended deception – that ChromaDex had agreed to sell nicotinamide riboside to other purchasers at a price more favorable than the price at which ChromaDex had sold nicotinamide riboside to Elysium.  Moreover, the Fraudulent Spreadsheet revealed, contrary to what ChromaDex had represented to induce Elysium to execute the License and Royalty Agreement, that some ChromaDex customers were _not_ required to sign similar license and royalty agreements.  The Fraudulent Spreadsheet thus revealed not only that ChromaDex had been acting in violation of the MFN Provision, but also that it had fraudulently induced Elysium to enter into the License and Royalty Agreement.

14.     On a June 30, 2016 phone call with two of Elysium's co-founders, Eric Marcotulli and Dan Alminana, Jaksch confirmed that other purchasers of nicotinamide riboside had been paying a price substantially lower than Elysium had been paying, in violation of the MFN Provision.

15.     On June 30, 2016, Elysium submitted purchase orders for 3000 kg of nicotinamide riboside and 580 kg of pterostilbene, with the understanding that ChromaDex would promptly issue a refund or credit to Elysium on account of ChromaDex's breach of the MFN Provision (the "June 30 Purchase Orders").

16.     After submitting the June 30 Purchase Orders, Elysium discovered another breach of the NR Supply Agreement.  With respect to the Exclusivity Provision, around August 2016, Elysium learned that other products containing both nicotinamide riboside and pterostilbene or nicotinamide riboside and resveratrol, a

1  product substantially similar to pterostilbene, were being sold on the market by other
2  ChromaDex customers.

3      17.    Elysium also learned after submitting the June 30 Purchase Orders that
4  ChromaDex was not only enabling other customers to manufacture and sell products
5  that combined nicotinamide riboside and pterostilbene or the substantially similar
6  ingredient resveratrol, but was actively recommending to other customers that they
7  create such products to compete with Elysium's Basis, in violation of the Exclusivity
8  Provision.

9      18.    In violation of the NR Supply Agreement, ChromaDex has failed to
10  issue a refund or credit to remedy its breaches of the MFN Provision since filling the
11  June 30 Purchase Orders.  It also has failed adequately to remedy the more recently
12  discovered violations of the Exclusivity Provision.

13      19.    As a result of ChromaDex's breaches of the MFN Provision and
14  Exclusivity Provision of the NR Supply Agreement, and its fraudulent and coercive
15  conduct in inducing Elysium into executing the License and Royalty Agreement,
16  Elysium has sustained, and continues to sustain, damages.   Because only
17  ChromaDex knows the full extent of its breaches of the NR Supply Agreement, and
18  because such breaches are continuing in nature, Elysium cannot yet calculate its
19  damages with precision.

20      20.    ChromaDex further breached confidentiality provisions in both the NR
21  Supply Agreement and the PT Supply Agreement, which require both parties to
22  protect "Confidential Information," including the price at which nicotinamide
23  riboside and pterostilbene products were purchased, by annexing to its Complaint
24  and thereby publicly disclosing the agreements themselves and invoices that reveal
25  precisely that confidential information.

26      21.    Through these Counterclaims, Elysium seeks to rescind the License and
27  Royalty Agreement, to obtain restitution and to recover for the damages, the full

28

1 amount of which is yet unknown, that it has sustained as a result of ChromaDex's

2 breaches of contract and fraud.

3 <center>**JURISDICTION AND VENUE**</center>

4     22.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332

5 in that it is an action between citizens of different states and the matter in

6 controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

7     23.    Venue is proper in this District because ChromaDex resides within the

8 District.

9 <center>**THE PARTIES**</center>

10     24.    Counterclaimant Elysium is a Delaware corporation with its principal

11 place of business in New York.  Elysium manufactures and sells the dietary

12 supplement Basis, which combines nicotinamide riboside, pterostilbene and other

13 ingredients.

14     25.    Counterdefendant ChromaDex is a California corporation with its

15 principal place of business in California.  ChromaDex distributes, among other

16 things, nicotinamide riboside and pterostilbene.

17 <center>**FACTUAL ALLEGATIONS**</center>

18 <center>**ChromaDex Exploits Market Power in the Market For Supply of NR**</center>

19     26.    Nicotinamide riboside is a pyridine nucleoside form of Vitamin $B_3$ that

20 functions as an efficient precursor to oxidized nicotinamide adenine dinucleotide

21 (NAD+).  NAD+ is a coenzyme found in all living cells that plays an essential role in

22 hundreds of metabolic processes.

23     27.    Nicotinamide riboside is found in nature, including in milk.

24 ChromaDex marketing materials admit that nicotinamide riboside is "naturally-

25 occurring" and state that ChromaDex's nicotinamide riboside product, Niagen, is

26 "nature-identical."  Niagen® is the federally registered trademark used by

27 ChromaDex to market its nicotinamide riboside product.

28

<center>22</center>

28.     Despite the fact that nicotinamide riboside is a naturally-occurring product, at the time the parties executed the NR Supply Agreement, ChromaDex had, and still has, market power in the market for supply of nicotinamide riboside in the United States and worldwide.

29.     At all relevant times, ChromaDex has had no competitors in the market for supply of nicotinamide riboside.  ChromaDex has been the sole commercial supplier of nicotinamide riboside, and every nicotinamide riboside product in the global market today is supplied by ChromaDex.  ChromaDex's website states that Niagen is "the world's first and only commercially available nicotinamide riboside."

30.     On multiple occasions, Jaksch stated to Elysium that "I am NR," referring to nicotinamide riboside.

31.     ChromaDex does not itself manufacture nicotinamide riboside nor does it have the manufacturing capabilities to do so.  Instead, ChromaDex is solely a middleman in supplying nicotinamide riboside to the market.  ChromaDex obtains its nicotinamide riboside from a third-party contract manufacturer.  ChromaDex's contract manufacturer is under an exclusive dealing arrangement, and is prohibited by ChromaDex from selling nicotinamide riboside to any customer other than ChromaDex.  ChromaDex then resells the nicotinamide riboside at a substantial markup to the global market.

32.     As a consequence of its market power, ChromaDex is able to control output of nicotinamide riboside and to charge prices for nicotinamide riboside that are substantially in excess of ChromaDex's marginal cost for obtaining it. ChromaDex is also able to dictate different prices for nicotinamide riboside to its different customers.

33.     ChromaDex's market power comes from, among other things, patents it has in-licensed relating to nicotinamide riboside.  These include U.S. Patent Nos. 8,383,086 ("the '086 patent") and 8,197,807 ("the '807 patent"), which are assigned

DEFENDANT'S ANSWER AND COUNTERCLAIMS

to the Trustees of Dartmouth College ("Dartmouth").  ChromaDex has exclusively licensed the '086 and '807 patents from Dartmouth.

34. Claim 1 of the '086 patent, its only independent claim, claims:

1. A pharmaceutical composition comprising nicotinamide riboside in admixture with a carrier, wherein said composition is formulated for oral administration.

35. Claim 1 of the '807 patent, its only independent claim, claims:

1. A composition comprising isolated nicotinamide riboside in combination with one or more of tryptophan, nicotinic acid, or nicotinamide, wherein said combination is in admixture with a carrier comprising a sugar, starch, cellulose, powdered tragacanth, malt, gelatin, talc, cocoa butter, suppository wax, oil, glycol, polyol, ester, agar, buffering agent, alginic acid, isotonic saline, Ringer's solution, ethyl alcohol, polyester, polycarbonate, or polyanhydride, wherein said composition is formulated for oral administration and increases NAD+ biosynthesis upon oral administration.

36. ChromaDex's website lists a number of other patents relating to nicotinamide riboside and its manufacture, including U.S. Patent Nos. 8,106,184 ("the '184 patent"), 8,114,626 ("the '626 patent") and 7,776,326 ("the '326 patent").

37. ChromaDex has exclusively licensed the '184 patent from Cornell University, the '626 patent from Dartmouth and the '326 patent from Washington University.

38. ChromaDex's website repeatedly publicizes the patents it has obtained for nicotinamide riboside and its manufacture and the "proprietary" nature of its asserted rights to a naturally-occurring molecule.

39. ChromaDex has leveraged its market power in the supply of nicotinamide riboside to impose conditions on its customers that impermissibly

broaden the scope of the patent grant with anticompetitive effect.  In particular, ChromaDex has sometimes conditioned its sale of nicotinamide riboside on the purchaser's agreement to license ChromaDex's trademarks and pay substantial royalties to ChromaDex based on that trademark license.

40.    In some instances, ChromaDex has required purchasers not only to license, but also to use ChromaDex trademarks in order to obtain a supply of nicotinamide riboside.

41.    ChromaDex's tying of its patent rights to a trademark license has substantial anticompetitive effects and secures rights and monopolies that extend beyond the patent grant.  By conditioning access to nicotinamide riboside to payment of royalties on product sales under a trademark license for ChromaDex's Niagen® mark, ChromaDex coerces customers into paying for the right to use a mark they do not need or may not want to use.  To the extent customers do use ChromaDex's licensed marks, the effect is to strengthen the association of nicotinamide riboside with ChromaDex, thereby further extending ChromaDex's market power in the supply of nicotinamide riboside even beyond the expiration of ChromaDex's patent estate.

**ChromaDex Fraudulently Induces Elysium to Sign the License and Royalty Agreement and Conditions Its Supply of Nicotinamide Riboside to Elysium on an Agreement to License and Pay Royalties for ChromaDex Trademarks that Elysium Does Not Use and Does Not Want to Use**

42.    Elysium is a dietary supplement company that currently sells a single product, Basis, which combines nicotinamide riboside, pterostilbene and certain inactive ingredients.

43.    In the summer and early fall of 2013, Elysium engaged in discussions with ChromaDex about obtaining a supply of nicotinamide riboside.

44.    From the outset, ChromaDex emphasized to Elysium the onerous terms it had been able to require from its business partners.  In an August 26, 2013 e-mail to Leonard Guarente, one of Elysium's co-founders, Jaksch said that ChromaDex

1 sought to require upfront cash payments, minimum purchase commitments, royalties
2 and even equity positions from businesses seeking to use ChromaDex as a source for
3 the supply of nicotinamide riboside.

4        45.    In addition, before ChromaDex and Elysium executed the NR Supply
5 Agreement and the License and Royalty Agreement, ChromaDex represented to
6 Elysium that all of its customers who sign purchase agreements to obtain
7 nicotinamide riboside are required to sign trademark license and royalty agreements,
8 whether they want to or intend to use ChromaDex marks or not.

9        46.    In response, Elysium stated its enthusiasm for NAD-related products,
10 but explained that it had limited resources and likely could not meet all of
11 ChromaDex's onerous requirements.   However, Elysium expressed interest in
12 exploring solutions that would benefit ChromaDex, Elysium and consumers through
13 increased access to NAD-based products.

14        47.    On November 8, 2013, Marcotulli sent a draft patent license and supply
15 agreement under which ChromaDex agreed to supply nicotinamide riboside to
16 Elysium for a maximum price.   The draft also included a patent and know-how
17 license permitting Elysium to make, use, sell, offer to sell or import products
18 containing nicotinamide riboside, including a license granting Elysium the right to
19 manufacture nicotinamide riboside on its own if it wished.   The agreement did not
20 contain a trademark license.

21        48.    ChromaDex, through Jaksch, responded by email on December 13,
22 2013, attaching a revised draft supply agreement and stating that ChromaDex would
23 require Elysium not only to enter into a supply agreement, but also a brand license
24 agreement, which Jaksch would send later.   Jaksch explained that this forthcoming
25 agreement would include royalty obligations.

26        49.    In its December 13, 2013 draft of the supply agreement, apparently
27 trying to avoid an obligation to pay patent sublicensing fees to its licensors,
28 ChromaDex removed all references to a patent license.   In sending the revised draft

DEFENDANT'S ANSWER AND COUNTERCLAIMS

to Elysium, ChromaDex included a note that it "will include licensing rights in the Niagen [trademark] in a separate agreement which will also contain the Royalty Payments."

50.     One week later, on December 20, 2013, Jaksch sent another e-mail reemphasizing that ChromaDex would require a "Niagen TM Agreement" that would include royalty requirements.

51.     On December 27, 2013, Jaksch sent a draft trademark license agreement along with a revised supply agreement.  The draft trademark license, like the supply agreement, omitted any express patent license.

52.     Ultimately, given ChromaDex's position at the time as the sole commercial supplier of nicotinamide riboside, and given ChromaDex's representation that all customers who obtained nicotinamide riboside were required to pay royalties on sales under a trademark license agreement, Elysium had no choice but to agree to ChromaDex's requirement that it also license ChromaDex's trademarks, and agree to pay substantial royalties on Elysium product sales under the trademark license if it wished to obtain access to nicotinamide riboside.

53.     The parties executed the NR Supply Agreement and License and Royalty Agreement on February 3, 2014.   Under the NR Supply Agreement, ChromaDex agreed to supply Elysium with nicotinamide riboside at or below a designated maximum price.  That maximum price, and the price that Elysium in fact has paid ChromaDex for nicotinamide riboside, is substantially higher than ChromaDex's marginal cost for obtaining nicotinamide riboside.

**ChromaDex Unlawfully Ties Royalty Payments Under
the License and Royalty Agreement to the Price of ChromaDex's Supply**

54.     As noted, the NR Supply Agreement contains no express license to ChromaDex's patent rights.  However, because ChromaDex itself was supplying nicotinamide riboside under the agreement for use in Elysium's products, its supply of that ingredient includes an implied sublicense to ChromaDex's patents under

27

1  principles of patent exhaustion and other applicable law.   ChromaDex's sale of
2  nicotinamide riboside to Elysium is an authorized sale of nicotinamide riboside and
3  constitutes ChromaDex's compensation for its nicotinamide riboside product.

4      55.    The License and Royalty Agreement grants Elysium a license to use
5  ChromaDex's trademarks, including Niagen®.  The License and Royalty Agreement
6  is expressly tied to ChromaDex's supply of nicotinamide riboside.  It cannot be
7  terminated by Elysium without ChromaDex's consent, unless the NR Supply
8  Agreement also is terminated.

9      56.    In exchange for the trademark license, Elysium is required to pay a
10  substantial royalty on all products containing any ingredients supplied by
11  ChromaDex under the NR Supply Agreement upon any sale of those products.  This
12  is true whether or not Elysium uses any ChromaDex marks at all.

13      57.    Not only is the royalty obligation unconnected to use of ChromaDex's
14  trademarks, but the royalty rate also changes for reasons unrelated to use of any
15  trademarks.  Instead, for example, the royalty rate increases as Elysium's annual
16  worldwide net sales of products containing ingredients supplied by ChromaDex
17  increases.

18      58.    The License and Royalty Agreement also provides that the royalty rate
19  for access to ChromaDex's trademarks increases, by as much as 50%, as Elysium's
20  per-kilogram price under the NR Supply Agreement drops.  This forced royalty step-
21  up has the effect of increasing Elysium's royalty burden even as ChromaDex's
22  ability to extract higher prices diminishes – such as, for example, when its patent
23  rights expire and its market power diminishes.  It also insulates ChromaDex from the
24  effects of patent expiration and invalidity, eventually providing ChromaDex with
25  unlawful post-expiration royalties for sales of unpatented products.

26      59.    By tying payments of royalties under the trademark license (which must
27  be paid even if the trademarks are not used) inversely to the price of ChromaDex's
28  supply, the agreement provided additional means for ChromaDex to protect its

1  market power in nicotinamide riboside, unlawfully extend ChromaDex's patent

2  monopoly, and adversely affect competition.

3  **The MFN and Exclusivity Provisions**

4      60.    Under the NR Supply Agreement's MFN Provision, Elysium agreed to

5  pay to ChromaDex a specified maximum price for nicotinamide riboside.  However,

6  if "ChromaDex supplies [nicotinamide riboside] (or a substantially similar product)

7  to a Third Party at a price that is lower than that at which [nicotinamide riboside] is

8  supplied to Elysium under this Agreement, then the price of [nicotinamide riboside]

9  supplied under this Agreement shall be revised to such Third Party price with effect

10 from the date of the applicable sale to such Third Party."

11     61.    The MFN Provision further provides that "ChromaDex shall promptly

12 provide Elysium Health with any refund or credits thereby created [by virtue of

13 ChromaDex's sale of nicotinamide riboside to a third party for a lesser price],

14 provided Elysium Health purchases equal volumes or higher volumes than the Third

15 Party."

16     62.    The parties amended the NR Supply Agreement on February 19, 2016.

17 The amendment provides that "ChromaDex shall not, directly or indirectly, sell,

18 transfer or otherwise provide to any Third Party, or license or otherwise enable any

19 Third Party to make, any products containing" nicotinamide riboside and either

20 pterostilbene or any other ingredient "substantially similar" to pterostilbene,

21 "whether in the same delivery mechanism . . . or packaging or in separate form or

22 packaging but marketed together."

23     63.    ChromaDex and Elysium knew that, if another ChromaDex customer

24 were permitted to manufacture a substantially similar combination to Basis,

25 Elysium's business – which involves selling that single combination as its only

26 currently marketed product – could be irreparably damaged.

27

28

DEFENDANT'S ANSWER AND COUNTERCLAIMS

**1**
**2**

### ChromaDex Breaches the NR Supply Agreement And Inadvertently Discloses Its Own Breach in Another Attempt to Defraud Elysium

**3**    64.    On May 29, 2016, Alminana requested from Jaksch data listing the

**4** prices at which ChromaDex was selling nicotinamide riboside to other customers.

**5** At the time Alminana made this request, Elysium recognized that it was an

**6** exemplary customer of ChromaDex, even "self-policing" the parties' contracts to

**7** ensure that ChromaDex was receiving the payments prescribed by the contracts.

**8** Alminana's friendly request was intended to confirm that, in light of Elysium's

**9** orders of substantial volumes of nicotinamide riboside and its full performance under

**10** the contracts, ChromaDex was similarly upholding its end of the bargain by

**11** providing Elysium with the lowest price.

**12**    65.    On June 13, 2016, in response to that request, Jaksch sought to defraud

**13** Elysium by transmitting the Fraudulent Spreadsheet, which purported to list in

**14** "blinded" form the prices at which ChromaDex was selling nicotinamide riboside to

**15** purchasers other than Elysium, without identifying those other purchasers by name.

**16** Jaksch apparently meant to provide Elysium with only his blinded spreadsheet, as he

**17** indicated in the text of his e-mail: "Attached is a blinded summary of supply

**18** agreements for NR."

**19**    66.    The "blinded" sheet of the Fraudulent Spreadsheet purported to list all

**20** of ChromaDex's customers who purchased nicotinamide riboside along with the per-

**21** kilogram price and royalty rates of each.  The "blinded" sheet plainly was intended

**22** to convince Elysium that it was receiving the lowest price ChromaDex charged for

**23** nicotinamide riboside and that ChromaDex was in compliance with the MFN

**24** Provision.

**25**    67.    ChromaDex might have succeeded in deceiving Elysium had Jaksch not

**26** inadvertently neglected to delete two "unblinded" sheets contained in the Excel

**27** spreadsheet that apparently provided the information from which ChromaDex

**28** concocted the "blinded" sheet.  The "unblinded" sheets list underlined additional customers that

Jaksch notably omitted from the "blinded" sheet. The list of omitted customers confirms that ChromaDex had, in fact, agreed to sell nicotinamide riboside to other purchasers at a price far more favorable than the price at which ChromaDex had sold nicotinamide riboside to Elysium.

68.    The "unblinded" sheets of the Fraudulent Spreadsheet also confirm, contrary to what ChromaDex had represented to Elysium earlier, that some purchasers of nicotinamide riboside were not required to sign license and royalty agreements or pay royalties.

69.    The Fraudulent Spreadsheet, while sent to convince Elysium falsely that ChromaDex was complying with the NR Supply Agreement, thus revealed not only that ChromaDex had been acting in violation of the MFN Provision, but also that it had fraudulently induced Elysium to enter into the License and Royalty Agreement.

70.    When pressed for an explanation, Jaksch sent a follow-up email on June 14, 2016 conceding that at least one ChromaDex customer had paid less per kilogram for nicotinamide riboside than Elysium had paid – and that this customer did not have a royalty agreement in place. Jaksch's admission – made just one day after he sent the Fraudulent Spreadsheet to Elysium – only serves to confirm ChromaDex's intent to deceive Elysium, because this customer, which Jaksch obviously knew about, was not included on the "blinded" sheet.

71.    On a June 30, 2016 phone call with Marcotulli and Alminana, Jaksch further confessed that other purchasers had been paying far less per kilogram for nicotinamide riboside than Elysium had been paying, in violation of the MFN Provision.

72.    ChromaDex explained on the June 30 phone call that it also promised one customer that it would provide nicotinamide riboside for an even more substantial discount, also in violation of the MFN Provision.

73.    At the time Elysium discovered ChromaDex's breaches of the MFN Provision, it had fully performed all of its obligations under the Agreements. In fact,

Elysium had been an exemplary customer, even "self-policing" its contracts with ChromaDex to ensure that it had been paying all that it had agreed to pay under the Agreements.

74.     Acting under the assumption that ChromaDex would provide a prompt credit or refund for its breach of the MFN Provision, as it was required to do under the contract, Elysium submitted the June 30 Purchase Orders for both nicotinamide riboside and pterostilbene.

75.     After it submitted the June 30 Purchase Orders, Elysium discovered that ChromaDex's breach of the NR Supply Agreement was not limited to the breach of the MFN Provision.  With respect to the Exclusivity Provision, Elysium learned, after the June 30 Purchase Orders were submitted, that other products containing both nicotinamide riboside and pterostilbene or resveratrol were being sold on the market by other ChromaDex customers.

76.     Resveratrol is substantially similar to pterostilbene.  ChromaDex's own website refers to pterostilbene as "closely related to resveratrol," an "analog of resveratrol," and a "derivative of resveratrol."  And, in an April 27, 2010 press release, ChromaDex called pterostilbene a "next generation resveratrol."

77.     During negotiations for the NR Supply Agreement, ChromaDex acknowledged that resveratrol was among those ingredients that would be considered "substantially similar" to pterostilbene.  In fact, ChromaDex never disputed the substantial similarity between pterostilbene and resveratrol until it became advantageous for it to do so – that is, when ChromaDex was confronted with its breaches of the Exclusivity Provision.  Only when Elysium advised ChromaDex that it had learned ChromaDex was violating the Exclusivity Provision did ChromaDex abruptly change its tune and begin to deny that pterostilbene and resveratrol are substantially similar, despite ChromaDex's many prior statements to the contrary. ChromaDex did, however, admit that it was, and had been, selling NR and resveratrol in combination.

32

78.     Elysium also learned after submitting the June 30 Purchase Orders that ChromaDex was not only enabling other customers to manufacture and sell products that combined nicotinamide riboside and pterostilbene or the substantially similar ingredient resveratrol, but was actively <u>recommending</u> to other customers that they create such products to compete with Elysium's Basis, in further violation of the Exclusivity Provision.

79.     ChromaDex's breaches of the MFN Provision and Exclusivity Provision have caused Elysium substantial damages, including, but not limited to, consequential damages.  Had Elysium in fact been paying the lowest price for nicotinamide riboside, it would have had more cash on hand to purchase more new inventory and to market or create new products.  And, because had Elysium was not the exclusive producer of a combination of nicotinamide and pterostilbene (or a substantially similar ingredient) as a result of the breach of the Exclusivity Provision, other customers likely bought competitors' products and compromised Elysium's market share.

### ChromaDex Fails to Remedy Its Breaches, Despite Elysium's Best Efforts to Resolve the Parties' Disputes

80.     Elysium expended significant effort attempting to resolve this dispute amicably.  Elysium had several conversations with ChromaDex officers and directors, including Jaksch, Will Black (ChromaDex's Vice President of Sales and Marketing) and Rob Fried (a ChromaDex director), an in-person meeting with Jaksch and Fried in California and a subsequent follow-up call with Jaksch and Steve Block (a ChromaDex director).  Those discussions led to the exchange of proposals between ChromaDex and Elysium, but were hampered by ChromaDex's refusal to provide information to Elysium necessary to calculate the credit due for ChromaDex's breach of the MFN Provision.

DEFENDANT'S ANSWER AND COUNTERCLAIMS

81.     Despite knowing that it was in material breach of the Agreements, ChromaDex failed to provide Elysium with the credit to which it is entitled, or even to engage in good faith discussions with Elysium to remedy the breaches.

82.     Indeed, rather than simply provide the information Elysium sought, Block's proposal was for Elysium to conduct an audit to determine the credit to which it is entitled.

83.     On December 7, 2016, Elysium requested such an audit from Tom Varvaro, ChromaDex's Chief Financial Officer.

84.     Elysium's request for an audit was ignored.  Instead, ChromaDex responded by issuing a "non-renewal" notice purporting to terminate the NR Supply Agreement as of February 2, 2017.

85.     After Elysium requested the audit Block had offered, ChromaDex ceased communicating with Elysium through its officers and directors, and tasked Michael Brauser, one of its former directors who has, to Elysium's knowledge, no position within ChromaDex, to make a series of increasingly hostile and threatening calls to Elysium and one of its investors in an attempt to intimidate Elysium into forfeiting its rights and capitulate to ChromaDex's demands.  When Elysium told Jaksch it would be pleased to continue discussions with ChromaDex management but found Brauser's behavior counterproductive, ChromaDex responded with this lawsuit.

86.     ChromaDex's breaches not only damaged Elysium to an unknown extent, but also excused Elysium's further performance under the Agreements.

87.     Moreover, in its filing of the Complaint in this action and including the invoices – which reveal sensitive information about the pricing at which Elysium purchased nicotinamide riboside and pterostilbene – as exhibits, ChromaDex breached yet another provision of the NR Supply Agreement and PT Supply Agreement, each of which provides that both parties will maintain in confidence all

DEFENDANT'S ANSWER AND COUNTERCLAIMS

1  "Confidential Information" disclosed by the other party, including information

2  concerning the pricing and sale of nicotinamide riboside products.

3      88.   Only ChromaDex can know the full extent of its breaches of the Supply

4  Agreements.  Those breaches injured Elysium and caused it to sustain damages in an

5  amount to be proven at trial.

6      89.   Furthermore, ChromaDex fraudulently induced Elysium to execute the

7  License and Royalty Agreement and to make substantial royalty payments under that

8  contract.  Elysium is entitled to recover those royalty payments and/or any further

9  damages, in an amount to be proven at trial.

10              **FIRST COUNTERCLAIM FOR RELIEF**

11              **(Breach of Contract – NR Supply Agreement)**

12      90.   Elysium incorporates and re-alleges each and every allegation in

13  paragraphs 1 to 89 above as if fully set forth herein.

14      91.   The parties entered into the NR Supply Agreement on February 2, 2014.

15      92.   Elysium performed all of its obligations under the NR Supply

16  Agreement, or its performance was excused by ChromaDex's breaches.

17      93.   The NR Supply Agreement unambiguously requires that ChromaDex

18  issue a refund or credit to Elysium in the event that ChromaDex sells nicotinamide

19  riboside or a substantially similar product to another purchaser for a lesser amount

20  than Elysium paid for nicotinamide riboside.  (NR Supply Agreement § 3.1.)

21      94.   ChromaDex sold nicotinamide riboside to other companies for a price

22  less than the price at which ChromaDex sold nicotinamide riboside to Elysium but

23  has not issued a refund or credit to Elysium, in breach of the NR Supply Agreement.

24      95.   The NR Supply Agreement, as amended by the Amendment to Supply

25  Agreement, unambiguously covenants that ChromaDex will not sell, transfer or

26  otherwise provide to any third party, or license or otherwise enable any third party to

27  produce, both nicotinamide riboside and pterostilbene or any ingredient substantially

28

DEFENDANT'S ANSWER AND COUNTERCLAIMS

1 similar to pterostilbene, either in combination or in separate form but marketed
2 together.  (NR Supply Agreement § 3.11.3.)

3    96.    ChromaDex has created or sold products containing both nicotinamide
4 riboside and pterostilbene (or the substantially similar analog resveratrol) in
5 combination or has enabled third parties, including its other customers, to create such
6 products, in breach of the NR Supply Agreement.

7    97.    The NR Supply Agreement further provides that both parties will
8 maintain in confidence all "Confidential Information" disclosed by the other party,
9 including information concerning the pricing and sale of nicotinamide riboside
10 products.  (NR Supply Agreement § 4.1.)

11    98.    ChromaDex has breached the NR Supply Agreement by annexing to its
12 Complaint exhibits revealing the price at which Elysium purchased nicotinamide
13 riboside and pterostilbene.

14    99.    By failing to issue a refund or credit to Elysium; by creating or selling,
15 or permitting the creation or sale of, products other than Basis that contain both
16 nicotinamide riboside and pterostilbene (or closely related analogs); and by annexing
17 sensitive and confidential information to its Complaint in this action, ChromaDex
18 has materially breached the NR Supply Agreement and denied Elysium the benefit of
19 its bargain.

20    100.    Elysium has suffered damages and continues to be damaged as a result
21 of ChromaDex's breaches, in an amount to be determined at trial.

22                    **SECOND COUNTERCLAIM FOR RELIEF**

23                    **(Breach of the Implied Covenant of Good**
24          **Faith and Fair Dealing – NR Supply Agreement)**

25    101.    Elysium incorporates and re-alleges each and every allegation in
26 paragraphs 1 to 100 above as if fully set forth herein.

27

28

DEFENDANT'S ANSWER AND COUNTERCLAIMS

102.   The NR Supply Agreement contains an implied covenant of good faith and fair dealing (the "Implied Covenant"), which forbids either party from doing anything to defeat the reasonable expectations of the other.

103.   Elysium had the reasonable expectation that ChromaDex would not enable or encourage other companies to manufacture, sell or distribute products containing both nicotinamide riboside and pterostilbene or any substantially similar ingredient.

104.   ChromaDex violated the Implied Covenant by recommending to other customers that they create products containing both nicotinamide riboside and either pterostilbene or a substantially similar ingredient, which unfairly interfered with Elysium's right to receive the benefits of exclusivity under the NR Supply Agreement.

105.   Elysium has suffered damages and continues to be damaged as a result of ChromaDex's breach of the Implied Covenant.

### THIRD COUNTERCLAIM FOR RELIEF

#### (Breach of Contract – PT Supply Agreement)

106.   Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 105 above as if fully set forth herein.

107.   The parties entered into the PT Supply Agreement on June 26, 2014.

108.   Elysium performed all of its obligations under the PT Supply Agreement, or its performance was excused by ChromaDex's breaches.

109.   The PT Supply Agreement provides that both parties will maintain in confidence all "Confidential Information" disclosed by the other party, including information concerning the pricing and sale of pterostilbene products.  (PT Supply Agreement § 15.1.)

110.   ChromaDex materially breached the PT Supply Agreement by annexing to its Complaint exhibits revealing the price at which Elysium purchased

DEFENDANT'S ANSWER AND COUNTERCLAIMS

1  nicotinamide riboside and pterostilbene and has denied Elysium the benefit of its

2  bargain.

3      111.  Elysium has suffered damages and continues to be damaged as a result

4  of ChromaDex's breaches, in an amount to be determined at trial.

5              **FOURTH COUNTERCLAIM FOR RELIEF**

6        **(Fraudulent Inducement – License and Royalty Agreement)**

7      112.  Elysium incorporates and re-alleges each and every allegation in

8  paragraphs 1 to 111 above as if fully set forth herein.

9      113.  The parties entered into both the NR Supply Agreement and License

10  and Royalty Agreement on February 2, 2014.

11      114.  During negotiations, ChromaDex falsely represented to Elysium that it

12  required all of its customers who signed nicotinamide riboside supply agreements

13  also to execute license and royalty agreements, under which customers agreed to pay

14  royalties on product sales for use of ChromaDex marks, in addition to whatever

15  amount they paid per kilogram for nicotinamide riboside.

16      115.  This representation was knowingly false when made, or was made with

17  reckless disregard for its truth.

18      116.  Elysium justifiably relied on the misrepresentation.   At the time

19  ChromaDex made the misrepresentation, Elysium was ignorant of its falsity and

20  believed it to be true and could not have reasonably discovered the true facts.

21      117.  The representation was made with the intent to deceive Elysium and

22  induce it to enter into the License and Royalty Agreement and did, in fact, deceive

23  and induce Elysium to enter into License and Royalty Agreement.

24      118.  As a result of ChromaDex's fraud, Elysium is entitled to rescission of

25  the License and Royalty Agreement and the return of all royalties paid under that

26  contract or, in the alternative, damages in an amount to be proven at trial.

27

28

DEFENDANT'S ANSWER AND COUNTERCLAIMS

## FIFTH COUNTERCLAIM FOR RELIEF

### (Declaratory Judgment of Patent Misuse)

119.   Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 118 above as if fully set forth herein.

120.   ChromaDex has conditioned its supply of nicotinamide riboside, and access to patent rights accompanying such supply, on purchasers' (including Elysium's) agreement to license ChromaDex's trademarks, whether the purchasers want such a license or not.

121.   ChromaDex has market power in the supply of nicotinamide riboside, and its tying of access to its patent rights to a royalty-bearing trademark license impermissibly broadens the scope of those patent rights, with anticompetitive effect.

122.   ChromaDex's conduct constitutes misuse of its patent rights, including the '086 patent, the '807 patent and other patents asserted by ChromaDex as covering nicotinamide riboside or its use or manufacture.

123.   The '086 patent, the '807 patent and other patents asserted by ChromaDex as covering nicotinamide riboside or its use or manufacture are unenforceable by ChromaDex as a consequence of ChromaDex's misconduct.

## SIXTH COUNTERCLAIM FOR RELIEF

### (Unlawful and Unfair Business Practices – California Business and Professions Code § 17200)

124.   Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 122 above as if fully set forth herein.

125.   ChromaDex's practice of conditioning its supply of nicotinamide riboside on the purchaser's agreement to license ChromaDex's trademarks is a business act or practice under California's state law of unfair competition.

126.   ChromaDex's practice of stepping up the royalty rates tied to its supply of nicotinamide riboside as its patent and market power decreases also constitutes a business act or practice under California's state law of unfair competition.

DEFENDANT'S ANSWER AND COUNTERCLAIMS

127.   ChromaDex's breaches of the NR Supply Agreement and PT Supply Agreement, its active and deliberate concealment of those breaches from Elysium, and its attempt to defraud Elysium by its presentation to Elysium of the Fraudulent Spreadsheet constitute business acts or practices under California's state law of unfair competition.

128.   ChromaDex has violated patent law and policy by committing patent misuse as a consequence of one or more of these acts or practices.

129.   These acts or practices constitute unlawful and/or unfair acts or practices under California's state law of unfair competition.

130.   Elysium has suffered injury in fact and has lost money or property as a result of ChromaDex's unfair competition.   In order to obtain a supply of nicotinamide riboside, Elysium has been required to pay substantial royalties for a license of ChromaDex's trademark rights, which Elysium did not want and has not used.

**WHEREFORE**, Counterclaimant Elysium prays for judgment:

(1) For all damages available by reason of ChromaDex's breaches of the NR Supply Agreement and PT Supply Agreement including, without limitation, offset of the amount, if any, Elysium may owe to ChromaDex;

(2)   For all remedies available by reason of ChromaDex's fraudulent inducement of Elysium to enter into the License and Royalty Agreement, including, without limitation, compensatory damages, punitive damages and/or rescission of the agreement and restitution of any royalty payments conveyed by Elysium pursuant to the agreement;

(3) Declaring that ChromaDex has misused and is misusing the '086 and '807 patents  and other patents asserted by ChromaDex as covering nicotinamide riboside or its use or manufacture;

1    (4) Declaring that the '086 patent, the '807 patent and other patents asserted

2  by ChromaDex as covering nicotinamide riboside or its use or manufacture are

3  unenforceable by ChromaDex as a consequence of ChromaDex's misconduct;

4    (5) Declaring that ChromaDex has engaged in unlawful or unfair competition

5  under Cal. Bus. & Prof. Code. § 17200 et seq.;

6    (6) For restitution of monies received by ChromaDex because of its unlawful

7  and unfair practices, including restitution of all royalties paid to ChromaDex by

8  Elysium pursuant to the License and Royalty Agreement;

9    (7) Enjoining ChromaDex from enforcing the License and Royalty Agreement

10  or any other agreements conditioning the supply of nicotinamide riboside or other

11  access to ChromaDex's patent rights on a license to ChromaDex's trademarks and

12  payment of royalties under such license; and

13    (8) For such other and further relief as the Court may deem just and proper.

14    **<u>DEMAND FOR JURY TRIAL</u>**

15    Defendant/Counterclaimant Elysium respectfully requests a trial by jury on all

16  issues so triable.

17

18  DATED:  January 25, 2017

19

20    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

21    FOLEY HOAG LLP

22    By:  /s/ Peter B. Morrison

23    PETER B. MORRISON
      Attorneys for Defendant and

24    Counterclaimant Elysium Health, Inc.

25

26

27

28

41