PETER B. MORRISON (State Bar No. 230148)
peter.morrison@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
julia.nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

JOSEPH N. SACCA (admitted *pro hac vice*)
joseph.sacca@skadden.com
BRADLEY E. HONIGMAN (admitted *pro hac vice*)
bradley.honigman@skadden.com
SPENCER A. GOTTLIEB (admitted *pro hac vice*)
spencer.gottlieb@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone:  (212) 735-3000
Facsimile:   (212) 735-2000

DONALD R. WARE (admitted *pro hac vice*)
dware@foleyhoag.com
MARCO J. QUINA (admitted *pro hac vice*)
mquina@foleyhoag.com
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Telephone:  (617) 832-1000
Facsimile:   (617) 832-7000

*Attorneys for Defendant and Counterclaimant*
*Elysium Health, Inc.*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## (SOUTHERN DIVISION)

| | |
|---|---|
| CHROMADEX, INC., | ) Case No. 8:16-cv-02277-CJC-DFM |
| Plaintiff, | ) **FIRST AMENDED** |
| | ) **COUNTERCLAIMS** |
| v. | ) |
| ELYSIUM HEALTH, INC., | ) **DEMAND FOR JURY TRIAL** |
| Defendant. | ) Hon. Cormac J. Carney |
| | ) |

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

**COUNTERCLAIMS**

Defendant Elysium Health, Inc. ("Elysium"), by and through its undersigned counsel, files these Counterclaims against ChromaDex, Inc. ("ChromaDex") and alleges on personal knowledge as to its own acts and on information and belief as to all other matters as follows:

**NATURE OF THE CASE**

1.      This is an action for fraud, breach of contract, unfair competition and declaratory judgment.  Elysium and ChromaDex are parties to three contracts: (1) the Niagen Supply Agreement, dated February 3, 2014, as amended by the Amendment to Supply Agreement, dated February 19, 2016 (the "NR Supply Agreement"); (2) the pTeroPure Supply Agreement, dated June 26, 2014 (the "PT Supply Agreement," and, together with the NR Supply Agreement, the "Supply Agreements"); and (3) the Trademark License and Royalty Agreement, dated February 3, 2014 (the "License and Royalty Agreement") (collectively, "the Agreements").

2.      Elysium sells a dietary supplement, Basis, that combines nicotinamide riboside (sometimes called "NR") and pterostilbene (sometimes called "PT").

3.      Pursuant to the Supply Agreements, ChromaDex provides Elysium with nicotinamide riboside and pterostilbene.  ChromaDex sells nicotinamide riboside under the name NIAGEN®, a federally registered trademark.

4.      At the time the NR Supply Agreement and License and Royalty Agreement were executed, ChromaDex had, and still has, market power in the market for supply of nicotinamide riboside in the United States and worldwide.  It is currently the sole commercial supplier of nicotinamide riboside.

5.      ChromaDex has in-licensed several patents relating to nicotinamide riboside.  ChromaDex's market power comes from, among other things, the patents it has in-licensed.  Although the NR Supply Agreement includes no express license to ChromaDex's patent rights, ChromaDex's supply of nicotinamide riboside under the

1
DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

NR Supply Agreement necessarily includes an implied sublicense for Elysium to use ChromaDex's license under principles of patent exhaustion and other law.

6.   ChromaDex has committed patent misuse and engaged in unfair competition by leveraging its market power in the supply of nicotinamide riboside to impose conditions on its customers that impermissibly broaden the scope of the patent grant with anticompetitive effect.  For example, on multiple occasions ChromaDex has conditioned its sale of nicotinamide riboside on the purchaser's agreement to license ChromaDex's trademarks and pay ChromaDex substantial royalties on product sales based on that trademark license. With respect to Elysium, ChromaDex conditioned its execution of the NR Supply Agreement on Elysium's simultaneous execution of the License and Royalty Agreement, which forces Elysium to pay a substantial royalty to ChromaDex on all Elysium products containing ingredients supplied by ChromaDex under the NR Supply Agreement, even if Elysium does not use, and does not want to use, any ChromaDex marks.

7.   ChromaDex induced Elysium to sign the License and Royalty Agreement by insisting, falsely, that ChromaDex required all of its nicotinamide riboside customers to sign similar royalty agreements.

8.   The NR Supply Agreement also contains multiple covenants that have been breached by ChromaDex.  Under the NR Supply Agreement, Elysium is entitled to receive pricing on nicotinamide riboside that is at least as favorable as the price at which ChromaDex supplies nicotinamide riboside or a substantially similar product to other purchasers, but never more than a certain maximum price (the "Most Favored Nations Provision" or "MFN Provision").

9.   The MFN Provision further provides that ChromaDex must promptly issue a refund or credit to Elysium in the event that ChromaDex sells nicotinamide riboside or a substantially similar product to another purchaser for an amount less than Elysium has paid for nicotinamide riboside.

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

10.     As amended, the NR Supply Agreement prohibits ChromaDex from selling, or licensing or enabling any third party to manufacture or sell, a product containing both nicotinamide riboside and either pterostilbene or any ingredient substantially similar to pterostilbene, either in combination or in separate form but marketed together (the "Exclusivity Provision").

11.     ChromaDex materially breached the MFN Provision and the Exclusivity Provision of the NR Supply Agreement.

12.     With respect to the MFN Provision, on June 13, 2016, in response to a request from Elysium for information regarding ChromaDex's compliance with the MFN Provision, ChromaDex's CEO, Frank Jaksch, provided Elysium with a manipulated and misleading Excel spreadsheet (the "Fraudulent Spreadsheet") purporting to list the prices at which ChromaDex was selling nicotinamide riboside to purchasers other than Elysium under various supply agreements.

13.     The Fraudulent Spreadsheet was described by Mr. Jaksch as a "blinded" list of the prices at which ChromaDex was selling nicotinamide riboside to other customers, without revealing those customers' identities.  As part of the Fraudulent Spreadsheet, however, Jaksch inadvertently neglected to delete two tabs containing "unblinded" sheets apparently used as a basis for preparing the Fraudulent Spreadsheet.  Those "unblinded" sheets listed additional customers that Jaksch notably omitted from the "blinded" sheets, and confirm – contrary to Jaksch's intended deception – that ChromaDex had agreed to sell nicotinamide riboside to other purchasers at a price more favorable than the price at which ChromaDex had sold nicotinamide riboside to Elysium.  Moreover, the Fraudulent Spreadsheet revealed, contrary to what ChromaDex had represented to induce Elysium to execute the License and Royalty Agreement, that some ChromaDex customers were not required to sign similar license and royalty agreements.  The Fraudulent Spreadsheet thus revealed not only that ChromaDex had been acting in violation of the MFN

Provision, but also that it had fraudulently induced Elysium to enter into the License and Royalty Agreement.

14.    On a June 30, 2016 phone call with two of Elysium's co-founders, Eric Marcotulli and Dan Alminana, Jaksch confirmed that other purchasers of nicotinamide riboside had been paying a price substantially lower than Elysium had been paying, in violation of the MFN Provision.

15.    On June 30, 2016, Elysium submitted purchase orders for 3000 kg of nicotinamide riboside and 580 kg of pterostilbene, with the understanding that ChromaDex would promptly issue a refund or credit to Elysium on account of ChromaDex's breach of the MFN Provision (the "June 30 Purchase Orders").

16.    After submitting the June 30 Purchase Orders, Elysium discovered another breach of the NR Supply Agreement.  With respect to the Exclusivity Provision, around August 2016, Elysium learned that other products containing both nicotinamide riboside and pterostilbene or nicotinamide riboside and resveratrol, a product substantially similar to pterostilbene, were being sold on the market by other ChromaDex customers.

17.    Elysium also learned after submitting the June 30 Purchase Orders that ChromaDex was not only enabling other customers to manufacture and sell products that combined nicotinamide riboside and pterostilbene or the substantially similar ingredient resveratrol, but was actively recommending to other customers that they create such products to compete with Elysium's Basis, in violation of the Exclusivity Provision.

18.    In violation of the NR Supply Agreement, ChromaDex has failed to issue a refund or credit to remedy its breaches of the MFN Provision since filling the June 30 Purchase Orders.  It also has failed adequately to remedy the more recently discovered violations of the Exclusivity Provision.

19.    As a result of ChromaDex's breaches of the MFN Provision and Exclusivity Provision of the NR Supply Agreement, and its fraudulent and coercive

4

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

conduct in inducing Elysium into executing the License and Royalty Agreement, Elysium has sustained, and continues to sustain, damages.   Because only ChromaDex knows the full extent of its breaches of the NR Supply Agreement, and because such breaches are continuing in nature, Elysium cannot yet calculate its damages with precision.

20.    Through these Counterclaims, Elysium seeks to rescind the License and Royalty Agreement, to obtain restitution and to recover for the damages, the full amount of which is yet unknown, that it has sustained as a result of ChromaDex's breaches of contract and fraud.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that it is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

22.    Venue is proper in this District because ChromaDex resides within the District.

## THE PARTIES

23.    Counterclaimant Elysium is a Delaware corporation with its principal place of business in New York.   Elysium manufactures and sells the dietary supplement Basis, which combines nicotinamide riboside, pterostilbene and other ingredients.

24.    Counterdefendant ChromaDex is a California corporation with its principal place of business in California.   ChromaDex distributes, among other things, nicotinamide riboside and pterostilbene.

## FACTUAL ALLEGATIONS

### ChromaDex Exploits Market Power in the Market For Supply of NR

25.    Nicotinamide riboside is a pyridine nucleoside form of Vitamin $B_3$ that functions as an efficient precursor to oxidized nicotinamide adenine dinucleotide

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

1  (NAD+).  NAD+ is a coenzyme found in all living cells that plays an essential role in
2  hundreds of metabolic processes.

3      26.    Nicotinamide riboside is found in nature, including in milk.
4  ChromaDex marketing materials admit that nicotinamide riboside is "naturally-
5  occurring" and state that ChromaDex's nicotinamide riboside product, Niagen, is
6  "nature-identical."    Niagen® is the federally registered trademark used by
7  ChromaDex to market its nicotinamide riboside product.

8      27.    Despite the fact that nicotinamide riboside is a naturally-occurring
9  product, at the time the parties executed the NR Supply Agreement, ChromaDex had,
10  and still has, market power in the market for supply of nicotinamide riboside in the
11  United States and worldwide.

12      28.     At all relevant times, ChromaDex has had no competitors in the market
13  for supply of nicotinamide riboside.  ChromaDex has been the sole commercial
14  supplier of nicotinamide riboside, and every nicotinamide riboside product in the
15  global market today is supplied by ChromaDex.  ChromaDex's website states that
16  Niagen is "the world's first and only commercially available nicotinamide riboside."

17      29.    On multiple occasions, Jaksch stated to Elysium that "I am NR,"
18  referring to nicotinamide riboside.

19      30.    ChromaDex does not itself manufacture nicotinamide riboside nor does
20  it have the manufacturing capabilities to do so.  Instead, ChromaDex is solely a
21  middleman in supplying nicotinamide riboside to the market.  ChromaDex obtains its
22  nicotinamide riboside from a third-party contract manufacturer.    ChromaDex's
23  contract manufacturer is under an exclusive dealing arrangement, and is prohibited
24  by ChromaDex from selling nicotinamide riboside to any customer other than
25  ChromaDex.  ChromaDex then resells the nicotinamide riboside at a substantial
26  markup to the global market.

27      31.    As a consequence of its market power, ChromaDex is able to control
28  output of nicotinamide riboside and to charge prices for nicotinamide riboside that

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

1    are substantially in excess of ChromaDex's marginal cost for obtaining it.
2    ChromaDex is also able to dictate different prices for nicotinamide riboside to its
3    different customers.

4      32. ChromaDex's market power comes from, among other things, patents it
5    has in-licensed relating to nicotinamide riboside.  These include U.S. Patent Nos.
6    8,383,086 ("the '086 patent") and 8,197,807 ("the '807 patent"), which are assigned
7    to the Trustees of Dartmouth College ("Dartmouth").  ChromaDex has exclusively
8    licensed the '086 and '807 patents from Dartmouth.

9      33. Claim 1 of the '086 patent, its only independent claim, claims:

10      1.  A pharmaceutical composition comprising nicotinamide
11      riboside in admixture with a carrier, wherein said composition is
12      formulated for oral administration.

13     34. Claim 1 of the '807 patent, its only independent claim, claims:

14      1. A composition comprising isolated nicotinamide riboside in
15      combination with one or more of tryptophan, nicotinic acid, or
16      nicotinamide, wherein said combination is in admixture with a
17      carrier comprising a sugar, starch, cellulose, powdered
18      tragacanth, malt, gelatin, talc, cocoa butter, suppository wax,
19      oil, glycol, polyol, ester, agar, buffering agent, alginic acid,
20      isotonic saline, Ringer's solution, ethyl alcohol, polyester,
21      polycarbonate, or polyanhydride, wherein said composition is
22      formulated for oral administration and increases NAD+
23      biosynthesis upon oral administration.

24     35. ChromaDex's website lists a number of other patents relating to
25   nicotinamide riboside and its manufacture, including U.S. Patent Nos. 8,106,184
26   ("the '184 patent"), 8,114,626 ("the '626 patent") and 7,776,326 ("the '326 patent").

27

28

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

36.     ChromaDex has exclusively licensed the '184 patent from Cornell University, the '626 patent from Dartmouth and the '326 patent from Washington University.

37.     ChromaDex's website repeatedly publicizes the patents it has obtained for nicotinamide riboside and its manufacture and the "proprietary" nature of its asserted rights to a naturally-occurring molecule.

38.     ChromaDex has leveraged its market power in the supply of nicotinamide riboside to impose conditions on its customers that impermissibly broaden the scope of the patent grant with anticompetitive effect.  In particular, ChromaDex has sometimes conditioned its sale of nicotinamide riboside on the purchaser's agreement to license ChromaDex's trademarks and pay substantial royalties to ChromaDex based on that trademark license.

39.     In some instances, ChromaDex has required purchasers not only to license, but also to use ChromaDex trademarks in order to obtain a supply of nicotinamide riboside.

40.     ChromaDex's tying of its patent rights to a trademark license has substantial anticompetitive effects and secures rights and monopolies that extend beyond the patent grant.  By conditioning access to nicotinamide riboside to payment of royalties on product sales under a trademark license for ChromaDex's Niagen® mark, ChromaDex coerces customers into paying for the right to use a mark they do not need or may not want to use.  To the extent customers do use ChromaDex's licensed marks, the effect is to strengthen the association of nicotinamide riboside with ChromaDex, thereby further extending ChromaDex's market power in the supply of nicotinamide riboside even beyond the expiration of ChromaDex's patent estate.

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

## ChromaDex Fraudulently Induces Elysium to Sign the License and Royalty Agreement and Conditions Its Supply of Nicotinamide Riboside to Elysium on an Agreement to License and Pay Royalties for ChromaDex Trademarks that Elysium Does Not Use and Does Not Want to Use

41.    Elysium is a dietary supplement company that currently sells a single product, Basis, which combines nicotinamide riboside, pterostilbene and certain inactive ingredients.

42.    In the summer and early fall of 2013, Elysium engaged in discussions with ChromaDex about obtaining a supply of nicotinamide riboside.

43.    From the outset, ChromaDex emphasized to Elysium the onerous terms it had been able to require from its business partners.  In an August 26, 2013 e-mail to Leonard Guarente, one of Elysium's co-founders, Jaksch said that ChromaDex sought to require upfront cash payments, minimum purchase commitments, royalties and even equity positions from businesses seeking to use ChromaDex as a source for the supply of nicotinamide riboside.

44.    In response, Elysium stated its enthusiasm for NAD-related products, but explained that it had limited resources and likely could not meet all of ChromaDex's onerous requirements.   However, Elysium expressed interest in exploring solutions that would benefit ChromaDex, Elysium and consumers through increased access to NAD-based products.

45.    On November 8, 2013, Marcotulli sent a draft patent license and supply agreement under which ChromaDex agreed to supply nicotinamide riboside to Elysium for a maximum price.  The draft also included a patent and know-how license permitting Elysium to make, use, sell, offer to sell or import products containing nicotinamide riboside, including a license granting Elysium the right to manufacture nicotinamide riboside on its own if it wished.  The agreement did not contain a trademark license.

46.    ChromaDex, through Jaksch, responded by email on December 13, 2013, attaching a revised draft supply agreement and stating that ChromaDex would

9

require Elysium not only to enter into a supply agreement, but also a brand license agreement, which Jaksch would send later.  Jaksch explained that this forthcoming agreement would include royalty obligations.

47.    In its December 13, 2013 draft of the supply agreement, apparently trying to avoid an obligation to pay patent sublicensing fees to its licensors, ChromaDex removed all references to a patent license.  In sending the revised draft to Elysium, ChromaDex included a note that it "will include licensing rights in the Niagen [trademark] in a separate agreement which will also contain the Royalty Payments."

48.    On December 16, 2013, on a phone call between Jaksch, Marcotulli and Alminana, Jaksch falsely represented that all of ChromaDex's customers who signed purchase agreements to obtain nicotinamide riboside were also required to sign separate trademark license and royalty agreements, whether they wanted to or intended to use ChromaDex marks or not.

49.    Four days later, on December 20, 2013, Jaksch sent another e-mail reemphasizing that ChromaDex would require a "Niagen TM Agreement" that would include royalty requirements.

50.    On December 27, 2013, Jaksch sent a draft trademark license agreement along with a revised supply agreement.  The draft trademark license, like the supply agreement, omitted any express patent license.

51.    In reliance on ChromaDex's false representation that it required all of its customers to execute trademark license and royalty agreements, Elysium concluded that the issue was non-negotiable, and instead focused its efforts on negotiating the other provisions of the NR Supply Agreement.

52.    Ultimately, given ChromaDex's position at the time as the sole commercial supplier of nicotinamide riboside, and given ChromaDex's representation that all customers who obtained nicotinamide riboside were required to pay royalties on sales under a trademark license agreement, Elysium determined it

10

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

1    had no choice but to agree to ChromaDex's requirement that it also license
2    ChromaDex's trademarks, and agree to pay substantial royalties on Elysium product
3    sales under the trademark license if it wished to obtain access to nicotinamide
4    riboside.

5        53.    The parties executed the NR Supply Agreement and License and
6    Royalty Agreement on February 3, 2014.    Under the NR Supply Agreement,
7    ChromaDex agreed to supply Elysium with nicotinamide riboside at or below a
8    designated maximum price.  That maximum price, and the price that Elysium in fact
9    has paid ChromaDex for nicotinamide riboside, is substantially higher than
10   ChromaDex's marginal cost for obtaining nicotinamide riboside.

11   **ChromaDex Unlawfully Ties Royalty Payments Under
12   the License and Royalty Agreement to the Price of ChromaDex's Supply**

13       54.    As noted, the NR Supply Agreement contains no express license to
14   ChromaDex's patent rights.  However, because ChromaDex itself was supplying
15   nicotinamide riboside under the agreement for use in Elysium's products, its supply
16   of that ingredient includes an implied sublicense to ChromaDex's patents under
17   principles of patent exhaustion and other applicable law.  ChromaDex's sale of
18   nicotinamide riboside to Elysium is an authorized sale of nicotinamide riboside and
19   constitutes ChromaDex's compensation for its nicotinamide riboside product.

20       55.    The License and Royalty Agreement grants Elysium a license to use
21   ChromaDex's trademarks, including Niagen®.  The License and Royalty Agreement
22   is expressly tied to ChromaDex's supply of nicotinamide riboside.  It cannot be
23   terminated by Elysium without ChromaDex's consent, unless the NR Supply
24   Agreement also is terminated.

25       56.    In exchange for the trademark license, Elysium is required to pay a
26   substantial royalty on all products containing any ingredients supplied by
27   ChromaDex under the NR Supply Agreement upon any sale of those products.  This
28   is true whether or not Elysium uses any ChromaDex marks at all.

57.     Not only is the royalty obligation unconnected to use of ChromaDex's trademarks, but the royalty rate also changes for reasons unrelated to use of any trademarks.   Instead, for example, the royalty rate increases as Elysium's annual worldwide net sales of products containing ingredients supplied by ChromaDex increases.

58.     The License and Royalty Agreement also provides that the royalty rate for access to ChromaDex's trademarks increases, by as much as 50%, as Elysium's per-kilogram price under the NR Supply Agreement drops.  This forced royalty step-up has the effect of increasing Elysium's royalty burden even as ChromaDex's ability to extract higher prices diminishes – such as, for example, when its patent rights expire and its market power diminishes.  It also insulates ChromaDex from the effects of patent expiration and invalidity, eventually providing ChromaDex with unlawful post-expiration royalties for sales of unpatented products.

59.     By tying payments of royalties under the trademark license (which must be paid even if the trademarks are not used) inversely to the price of ChromaDex's supply, the agreement provided additional means for ChromaDex to protect its market power in nicotinamide riboside, unlawfully extend ChromaDex's patent monopoly, and adversely affect competition.

**The MFN and Exclusivity Provisions**

60.     Under the NR Supply Agreement's MFN Provision, Elysium agreed to pay to ChromaDex a specified maximum price for nicotinamide riboside.  However, if "ChromaDex supplies [nicotinamide riboside] (or a substantially similar product) to a Third Party at a price that is lower than that at which [nicotinamide riboside] is supplied to Elysium under this Agreement, then the price of [nicotinamide riboside] supplied under this Agreement shall be revised to such Third Party price with effect from the date of the applicable sale to such Third Party."

61.     The MFN Provision further provides that "ChromaDex shall promptly provide Elysium Health with any refund or credits thereby created [by virtue of

12

ChromaDex's sale of nicotinamide riboside to a third party for a lesser price], provided Elysium Health purchases equal volumes or higher volumes than the Third Party."

62.     The parties amended the NR Supply Agreement on February 19, 2016. The amendment provides that "ChromaDex shall not, directly or indirectly, sell, transfer or otherwise provide to any Third Party, or license or otherwise enable any Third Party to make, any products containing" nicotinamide riboside and either pterostilbene or any other ingredient "substantially similar" to pterostilbene, "whether in the same delivery mechanism . . . or packaging or in separate form or packaging but marketed together."

63.     ChromaDex and Elysium knew that, if another ChromaDex customer were permitted to manufacture a substantially similar combination to Basis, Elysium's business – which involves selling that single combination as its only currently marketed product – could be irreparably damaged.

**ChromaDex Breaches the NR Supply Agreement And Inadvertently Discloses Its Own Breach in Another Attempt to Defraud Elysium**

64.     On May 29, 2016, Alminana requested from Jaksch data listing the prices at which ChromaDex was selling nicotinamide riboside to other customers. At the time Alminana made this request, Elysium recognized that it was an exemplary customer of ChromaDex, even "self-policing" the parties' contracts to ensure that ChromaDex was receiving the payments prescribed by the contracts. Alminana's friendly request was intended to confirm that, in light of Elysium's orders of substantial volumes of nicotinamide riboside and its full performance under the contracts, ChromaDex was similarly upholding its end of the bargain by providing Elysium with the lowest price.

65.     On June 13, 2016, in response to that request, Jaksch sought to defraud Elysium by transmitting the Fraudulent Spreadsheet, which purported to list in "blinded" form the prices at which ChromaDex was selling nicotinamide riboside to

13

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

1   purchasers other than Elysium, without identifying those other purchasers by name.

2   Jaksch apparently meant to provide Elysium with only his blinded spreadsheet, as he

3   indicated in the text of his e-mail: "Attached is a blinded summary of supply

4   agreements for NR."

5       66.    The "blinded" sheet of the Fraudulent Spreadsheet purported to list all

6   of ChromaDex's customers who purchased nicotinamide riboside along with the per-

7   kilogram price and royalty rates of each.  The "blinded" sheet plainly was intended

8   to convince Elysium that it was receiving the lowest price ChromaDex charged for

9   nicotinamide riboside and that ChromaDex was in compliance with the MFN

10  Provision.

11      67.    ChromaDex might have succeeded in deceiving Elysium had Jaksch not

12  inadvertently neglected to delete two "unblinded" sheets contained in the Excel

13  spreadsheet that apparently provided the information from which ChromaDex

14  concocted the "blinded" sheet.  The "unblinded" sheets list <u>additional</u> customers that

15  Jaksch notably omitted from the "blinded" sheet.  The list of omitted customers

16  confirms that ChromaDex had, in fact, agreed to sell nicotinamide riboside to other

17  purchasers at a price far more favorable than the price at which ChromaDex had sold

18  nicotinamide riboside to Elysium.

19      68.    The "unblinded" sheets of the Fraudulent Spreadsheet also confirm,

20  contrary to what Jaksch had represented to Marcotulli and Alminana by phone on

21  December 16, 2013 to induce them to sign the License and Royalty Agreement, that

22  some purchasers of nicotinamide riboside were not required to sign license and

23  royalty agreements or pay royalties.  The Fraudulent Spreadsheet further disclosed

24  that at least one of these customers, in ChromaDex's own words, "pre-dates

25  Elysium," thus confirming that Jaksch's representation was false when made.

26      69.    The Fraudulent Spreadsheet, while sent to convince Elysium falsely that

27  ChromaDex was complying with the NR Supply Agreement, thus revealed not only

28

14

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

1 | that ChromaDex had been acting in violation of the MFN Provision, but also that it
2 | had fraudulently induced Elysium to enter into the License and Royalty Agreement.

3 | 70.   When pressed for an explanation, Jaksch sent a follow-up email on June
4 | 14, 2016 conceding that at least one ChromaDex customer had paid less per
5 | kilogram for nicotinamide riboside than Elysium had paid – and that this customer
6 | did not have a royalty agreement in place.  Jaksch's admission – made just one day
7 | after he sent the Fraudulent Spreadsheet to Elysium – only serves to confirm
8 | ChromaDex's intent to deceive Elysium, because this customer, which Jaksch
9 | obviously knew about, was not included on the "blinded" sheet.

10 | 71.   On a June 30, 2016 phone call with Marcotulli and Alminana, Jaksch
11 | further confessed that other purchasers had been paying far less per kilogram for
12 | nicotinamide riboside than Elysium had been paying, in violation of the MFN
13 | Provision.

14 | 72.   ChromaDex explained on the June 30 phone call that it also promised
15 | one customer that it would provide nicotinamide riboside for an even more
16 | substantial discount, also in violation of the MFN Provision.

17 | 73.   At the time Elysium discovered ChromaDex's breaches of the MFN
18 | Provision, it had fully performed all of its obligations under the Agreements.  In fact,
19 | Elysium had been an exemplary customer, even "self-policing" its contracts with
20 | ChromaDex to ensure that it had been paying all that it had agreed to pay under the
21 | Agreements.

22 | 74.   Acting under the assumption that ChromaDex would provide a prompt
23 | credit or refund for its breach of the MFN Provision, as it was required to do under
24 | the contract, Elysium submitted the June 30 Purchase Orders for both nicotinamide
25 | riboside and pterostilbene.

26 | 75.   After it submitted the June 30 Purchase Orders, Elysium discovered that
27 | ChromaDex's breach of the NR Supply Agreement was not limited to the breach of
28 | the MFN Provision.  With respect to the Exclusivity Provision, Elysium learned,

after the June 30 Purchase Orders were submitted, that other products containing both nicotinamide riboside and pterostilbene or resveratrol were being sold on the market by other ChromaDex customers.

76.     Resveratrol is substantially similar to pterostilbene.  ChromaDex's own website refers to pterostilbene as "closely related to resveratrol," an "analog of resveratrol," and a "derivative of resveratrol."  And, in an April 27, 2010 press release, ChromaDex called pterostilbene a "next generation resveratrol."

77.     During negotiations for the NR Supply Agreement, ChromaDex acknowledged that resveratrol was among those ingredients that would be considered "substantially similar" to pterostilbene.  In fact, ChromaDex never disputed the substantial similarity between pterostilbene and resveratrol until it became advantageous for it to do so – that is, when ChromaDex was confronted with its breaches of the Exclusivity Provision.  Only when Elysium advised ChromaDex that it had learned ChromaDex was violating the Exclusivity Provision did ChromaDex abruptly change its tune and begin to deny that pterostilbene and resveratrol are substantially similar, despite ChromaDex's many prior statements to the contrary. ChromaDex did, however, admit that it was, and had been, selling NR and resveratrol in combination.

78.     Elysium also learned after submitting the June 30 Purchase Orders that ChromaDex was not only enabling other customers to manufacture and sell products that combined nicotinamide riboside and pterostilbene or the substantially similar ingredient resveratrol, but was actively <u>recommending</u> to other customers that they create such products to compete with Elysium's Basis, in further violation of the Exclusivity Provision.

79.     ChromaDex's breaches of the MFN Provision and Exclusivity Provision have caused Elysium substantial damages, including, but not limited to, consequential damages.  Had Elysium in fact been paying the lowest price for nicotinamide riboside, it would have had more cash on hand to purchase more new

inventory and to market or create new products.  And, because had Elysium was not the exclusive producer of a combination of nicotinamide and pterostilbene (or a substantially similar ingredient) as a result of the breach of the Exclusivity Provision, other customers likely bought competitors' products and compromised Elysium's market share.

**ChromaDex Fails to Remedy Its Breaches, Despite
Elysium's Best Efforts to Resolve the Parties' Disputes**

80.    Elysium expended significant effort attempting to resolve this dispute amicably.   Elysium had several conversations with ChromaDex officers and directors, including Jaksch, Will Black (ChromaDex's Vice President of Sales and Marketing) and Rob Fried (a ChromaDex director), an in-person meeting with Jaksch and Fried in California and a subsequent follow-up call with Jaksch and Steve Block (a ChromaDex director).  Those discussions led to the exchange of proposals between ChromaDex and Elysium, but were hampered by ChromaDex's refusal to provide information to Elysium necessary to calculate the credit due for ChromaDex's breach of the MFN Provision.

81.    Despite knowing that it was in material breach of the Agreements, ChromaDex failed to provide Elysium with the credit to which it is entitled, or even to engage in good faith discussions with Elysium to remedy the breaches.

82.    Indeed, rather than simply provide the information Elysium sought, Block's proposal was for Elysium to conduct an audit to determine the credit to which it is entitled.

83.    On December 7, 2016, Elysium requested such an audit from Tom Varvaro, ChromaDex's Chief Financial Officer.

84.    Elysium's request for an audit was ignored.  Instead, ChromaDex responded by issuing a "non-renewal" notice purporting to terminate the NR Supply Agreement as of February 2, 2017.

17
DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

85.    After Elysium requested the audit Block had offered, ChromaDex ceased communicating with Elysium through its officers and directors, and tasked Michael Brauser, one of its former directors who has, to Elysium's knowledge, no position within ChromaDex, to make a series of increasingly hostile and threatening calls to Elysium and one of its investors in an attempt to intimidate Elysium into forfeiting its rights and capitulating to ChromaDex's demands.  When Elysium told Jaksch it would be pleased to continue discussions with ChromaDex management but found Brauser's behavior counterproductive, ChromaDex responded with this lawsuit.

86.    ChromaDex's breaches not only damaged Elysium to an unknown extent, but also excused Elysium's further performance under the Agreements.

87.    Only ChromaDex can know the full extent of its breaches of the Supply Agreements.  Those breaches injured Elysium and caused it to sustain damages in an amount to be proven at trial.

88.    Furthermore, ChromaDex fraudulently induced Elysium to execute the License and Royalty Agreement and to make substantial royalty payments under that contract.  Elysium is entitled to recover those royalty payments and/or any further damages, in an amount to be proven at trial.

## FIRST COUNTERCLAIM FOR RELIEF

### (Breach of Contract – NR Supply Agreement)

89.    Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 88 above as if fully set forth herein.

90.    The parties entered into the NR Supply Agreement on February 2, 2014.

91.    Elysium performed all of its obligations under the NR Supply Agreement, or its performance was excused by ChromaDex's breaches.

92.    The NR Supply Agreement unambiguously requires that ChromaDex issue a refund or credit to Elysium in the event that ChromaDex sells nicotinamide

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

riboside or a substantially similar product to another purchaser for a lesser amount than Elysium paid for nicotinamide riboside.  (NR Supply Agreement § 3.1.)

93.     ChromaDex sold nicotinamide riboside to other companies for a price less than the price at which ChromaDex sold nicotinamide riboside to Elysium but has not issued a refund or credit to Elysium, in breach of the NR Supply Agreement.

94.     The NR Supply Agreement, as amended by the Amendment to Supply Agreement, unambiguously covenants that ChromaDex will not sell, transfer or otherwise provide to any third party, or license or otherwise enable any third party to produce, both nicotinamide riboside and pterostilbene or any ingredient substantially similar to pterostilbene, either in combination or in separate form but marketed together.  (NR Supply Agreement § 3.11.3.)

95.     ChromaDex has created or sold products containing both nicotinamide riboside and pterostilbene (or the substantially similar analog resveratrol) in combination or has enabled third parties, including its other customers, to create such products, in breach of the NR Supply Agreement.

96.     By failing to issue a refund or credit to Elysium, and by creating or selling, or permitting the creation or sale of, products other than Basis that contain both nicotinamide riboside and pterostilbene (or closely related analogs), ChromaDex has materially breached the NR Supply Agreement and denied Elysium the benefit of its bargain.

97.     Elysium has suffered damages and continues to be damaged as a result of ChromaDex's breaches, in an amount to be determined at trial.

## SECOND COUNTERCLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing – NR Supply Agreement)

98.     Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 97 above as if fully set forth herein.

99.   The NR Supply Agreement contains an implied covenant of good faith and fair dealing (the "Implied Covenant"), which forbids either party from doing anything to defeat the reasonable expectations of the other.

100.   Elysium had the reasonable expectation that ChromaDex would not enable or encourage other companies to manufacture, sell or distribute products containing both nicotinamide riboside and pterostilbene or any substantially similar ingredient.

101.   ChromaDex violated the Implied Covenant by recommending to other customers that they create products containing both nicotinamide riboside and either pterostilbene or a substantially similar ingredient, which unfairly interfered with Elysium's right to receive the benefits of exclusivity under the NR Supply Agreement.

102.   Elysium has suffered damages and continues to be damaged as a result of ChromaDex's breach of the Implied Covenant.

## THIRD COUNTERCLAIM FOR RELIEF

### (Fraudulent Inducement – License and Royalty Agreement)

103.   Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 102 above as if fully set forth herein.

104.   The parties entered into both the NR Supply Agreement and License and Royalty Agreement on February 2, 2014.

105.   During negotiations, ChromaDex falsely represented to Elysium that it required all of its customers who signed nicotinamide riboside supply agreements also to execute license and royalty agreements, under which customers agreed to pay royalties on product sales for use of ChromaDex marks, in addition to whatever amount they paid per kilogram for nicotinamide riboside.

106.   During a December 16, 2013 telephone call, Jaksch falsely represented to Marcotulli and Alminana that ChromaDex required all of its customers who purchased nicotinamide riboside to sign trademark license and royalty agreements,

20

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

without regard to whether the customers wished or intended to use ChromaDex marks.

107.   This representation was knowingly false when made.  The Fraudulent Spreadsheet confirms that at least one purchaser of nicotinamide riboside that contracted with ChromaDex before Elysium did was not required to sign a license and royalty agreement or pay royalties.

108.   Elysium justifiably relied on this misrepresentation because it believed ChromaDex's demand for a license and royalty agreement was non-negotiable, in view of ChromaDex's false claim that it required an agreement of this nature from each and every one of its customers.  Elysium therefore forwent the opportunity to negotiate an agreement with ChromaDex that did not require the payment of royalties, and instead focused its efforts in negotiations on other aspects of the NR agreement. At the time ChromaDex made the misrepresentation, Elysium was ignorant of its falsity and believed it to be true and could not have reasonably discovered the true facts.

109.   The representation was made with the intent to deceive Elysium and induce it to enter into the License and Royalty Agreement and did, in fact, deceive and induce Elysium to enter into License and Royalty Agreement.

110.   As a result of ChromaDex's fraud, Elysium is entitled to rescission of the License and Royalty Agreement and the return of all royalties paid under that contract or, in the alternative, damages in an amount to be proven at trial.

## FOURTH COUNTERCLAIM FOR RELIEF

### (Declaratory Judgment of Patent Misuse)

111.   Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 110 above as if fully set forth herein.

112.   ChromaDex has conditioned its supply of nicotinamide riboside, and access to patent rights accompanying such supply, on purchasers' (including

21

Elysium's) agreement to license ChromaDex's trademarks, whether the purchasers want such a license or not.

113.   ChromaDex has market power in the supply of nicotinamide riboside, and its tying of access to its patent rights to a royalty-bearing trademark license impermissibly broadens the scope of those patent rights, with anticompetitive effect.

114.   ChromaDex's conduct constitutes misuse of its patent rights, including the '086 patent, the '807 patent and other patents asserted by ChromaDex as covering nicotinamide riboside or its use or manufacture.

115.   The '086 patent, the '807 patent and other patents asserted by ChromaDex as covering nicotinamide riboside or its use or manufacture are unenforceable by ChromaDex as a consequence of ChromaDex's misconduct.

## FIFTH COUNTERCLAIM FOR RELIEF

### (Unlawful and Unfair Business Practices –
### California Business and Professions Code § 17200)

116.   Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 115 above as if fully set forth herein.

117.   ChromaDex's practice of conditioning its supply of nicotinamide riboside on the purchaser's agreement to license ChromaDex's trademarks is a business act or practice under California's state law of unfair competition.

118.   ChromaDex's practice of stepping up the royalty rates tied to its supply of nicotinamide riboside as its patent and market power decreases also constitutes a business act or practice under California's state law of unfair competition.

119.   ChromaDex's breaches of the NR Supply Agreement, its active and deliberate concealment of those breaches from Elysium, and its attempt to defraud Elysium by its presentation to Elysium of the Fraudulent Spreadsheet constitute business acts or practices under California's state law of unfair competition.

120.   ChromaDex has violated patent law and policy by committing patent misuse as a consequence of one or more of these acts or practices.

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS

121.   These acts or practices constitute unlawful and/or unfair acts or practices under California's state law of unfair competition.

122.   Elysium has suffered injury in fact and has lost money or property as a result of ChromaDex's unfair competition.   In order to obtain a supply of nicotinamide riboside, Elysium has been required to pay substantial royalties for a license of ChromaDex's trademark rights, which Elysium did not want and has not used.

**WHEREFORE**, Counterclaimant Elysium prays for judgment:

(1) For all damages available by reason of ChromaDex's breaches of the NR Supply Agreement including, without limitation, offset of the amount, if any, Elysium may owe to ChromaDex;

(2) For all damages available by reason of ChromaDex's breaches of the implied covenant of good faith and fair dealing;

(3) For all remedies available by reason of ChromaDex's fraudulent inducement of Elysium to enter into the License and Royalty Agreement, including, without limitation, compensatory damages, punitive damages and/or rescission of the agreement and restitution of any royalty payments conveyed by Elysium pursuant to the agreement;

(4) Declaring that ChromaDex has misused and is misusing the '086 and '807 patents  and other patents asserted by ChromaDex as covering nicotinamide riboside or its use or manufacture;

(5) Declaring that the '086 patent, the '807 patent and other patents asserted by ChromaDex as covering nicotinamide riboside or its use or manufacture are unenforceable by ChromaDex as a consequence of ChromaDex's misconduct;

(6) Declaring that ChromaDex has engaged in unlawful or unfair competition under Cal. Bus. & Prof. Code. § 17200 et seq.;

1      (7) For restitution of monies received by ChromaDex because of its unlawful

2  and unfair practices, including restitution of all royalties paid to ChromaDex by

3  Elysium pursuant to the License and Royalty Agreement;

4      (8) Enjoining ChromaDex from enforcing the License and Royalty Agreement

5  or any other agreements conditioning the supply of nicotinamide riboside or other

6  access to ChromaDex's patent rights on a license to ChromaDex's trademarks and

7  payment of royalties under such license; and

8      (9) For such other and further relief as the Court may deem just and proper.

9                  **<u>DEMAND FOR JURY TRIAL</u>**

10      Defendant/Counterclaimant Elysium respectfully requests a trial by jury on all

11  issues so triable.

12

13  DATED:  March 6, 2017

14

15                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

16                    FOLEY HOAG LLP

17                    By:  /s/ Joseph N. Sacca

18                          JOSEPH N. SACCA

19                          Attorneys for Defendant and
                               Counterclaimant Elysium Health, Inc.

20

21

22

23

24

25

26

27

28

DEFENDANT'S FIRST AMENDED COUNTERCLAIMS