PETER B. MORRISON (State Bar No. 230148)
peter.morrison@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
julia.nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

JOSEPH N. SACCA (admitted *pro hac vice*)
joseph.sacca@skadden.com
BRADLEY E. HONIGMAN (admitted *pro hac vice*)
bradley.honigman@skadden.com
SPENCER A. GOTTLIEB (admitted *pro hac vice*)
spencer.gottlieb@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone:  (212) 735-3000
Facsimile:   (212) 735-2000

DONALD R. WARE (admitted *pro hac vice*)
dware@foleyhoag.com
MARCO J. QUINA (admitted *pro hac vice*)
mquina@foleyhoag.com
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, Massachusetts 02210
Telephone:  (617) 832-1000
Facsimile:   (617) 832-7000

*Attorneys for Defendant and Counterclaimant*
*Elysium Health, Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### (SOUTHERN DIVISION)

| | |
|---|---|
| CHROMADEX, INC., | Case No. 8:16-cv-02277-CJC-DFM |
| Plaintiff, | **OPPOSITION TO CHROMADEX'S MOTION TO DISMISS ELYSIUM'S THIRD, FOURTH AND FIFTH COUNTERCLAIMS** |
| v. | |
| ELYSIUM HEALTH, INC., | Hearing Date: April 24, 2017 |
| Defendant. | Time:             1:30 p.m. |
| | Courtroom:    9B |
| | Judge:           Hon. Cormac J. Carney |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................1

II.   BACKGROUND ................................................................3

III.  ARGUMENT......................................................................5

    A.   Elysium Has Stated a Claim for Fraud.................................5

        1.   Elysium Adequately Pleads Falsity ...........................6

        2.   Elysium Adequately Pleads Reliance .........................9

    B.   Elysium Properly Seeks a Declaratory Judgment of Patent Misuse...13

        1.   The Broad, Remedial Scope of the Declaratory Judgment Act Embraces a Judicial Declaration of Patent Misuse............13

        2.   Elysium Has Stated a Claim for a Declaratory Judgment of Patent Misuse ........................................................15

    C.   Elysium Has Stated a Claim for Violation of California's Unfair Competition Law................................................................19

        1.   Elysium's UCL Claim Satisfies the Notice Requirements of Rule 8 ................19

        2.   ChromaDex's Patent Misuse Constitutes Unlawful Conduct Under the UCL ................21

        3.   ChromaDex's Breach of Contract Coupled with Deceptive and Misleading Activity Constitutes Unlawful Conduct in Violation of the UCL ................22

        4.   ChromaDex's Patent Misuse Is Also Actionable Under the UCL "Unfair" Prong ................23

IV.   CONCLUSION ................................................................25

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>CASES</u>                                                                                                      <u>PAGE</u>

3
*Alvarez v. Hill*,
4     518 F.3d 1152 (2008) ....................................................................... 19, 20

*B. Braun Medical Inc. v. Abbott Laboratories*,
5     124 F.3d 1419 (Fed. Cir. 1997) .............................................................. 14

6
*Blizzard Entertainment Inc. v. Ceiling Fan Software LLC*,
7     28 F. Supp. 3d 1006 (C.D. Cal. 2013) ...................................................... 23

8
*In re Boeing Securities Litigation*,
      40 F. Supp. 2d 1160 (W.D. Wash. 1998) .................................................. 6

9
*Bowers v. Campbell*,
10    505 F.2d 1155 (9th Cir. 1974) ................................................................. 20

11
*Brulotte v. Thys Co.*,
      379 U.S. 29 (1963) ................................................................................ 22

12
*C.R. Bard, Inc. v. M3 Systems*,
13    157 F.3d 1340 (Fed. Cir. 1998) .............................................................. 17

14
*Cadlo v. Owens-Illinois, Inc.*,
      125 Cal. App. 4th 513 (2004) ................................................................. 13

15
*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
16    20 Cal. 4th 163 (1999) ..................................................................... 21, 24

17
*Clayworth v. Pfizer, Inc.*,
      49 Cal. 4th 758 (2010) ........................................................................... 25

18
*Conrad v. Bank of America*,
19    45 Cal. App. 4th 133 (1996) ................................................................... 13

20
*Cortez v. Global Ground Support, LLC*,
      No. 09-4138 SC, 2009 WL 4282076 (N.D. Cal. Nov. 25, 2009) .................... 23

21
*Cortez v. Weymouth*,
22    235 Cal. App. 2d 140 (1965) .................................................................. 12

23
*Crews v. Wachovia Mortgage Corp.*,
      CV 10-3894 SVW (AGRx),
24    2010 U.S. Dist. LEXIS 77660 (C.D. Cal. July 23, 2010) ............................. 13

25
*Dolan v. CMTC*,
      No. CV12-08384-RGK (Ex),
26    2013 WL 12139355 (C.D. Cal. May 1, 2013)..................................... 10, 12

27
*Eastman Kodak Co. v. Image Technical Services*,
      504 U.S. 451 (1992) ............................................................................... 16

28

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

*Ehret v. Uber Technologies, Inc.*,
  68 F. Supp. 3d 1121 (N.D. Cal. 2014) ........................................... 10

*Enercon GmbH v. ErdMan*,
  13 F. App'x 651 (9th Cir. 2001)..................................................... 14

*Engalla v. Permanente Medical Group., Inc.*,
  938 P.2d 903 (Cal. 1997)................................................................ 13

*Epicor Software Corp. v. Alternative Technology Solutions, Inc.*,
  SACV 13-00448-CJC(RNBx),
  2013 U.S. Dist. LEXIS 79125 (C.D. Cal. May 9, 2013)................. 21

*Estate of Migliaccio v. Midland National Life Insurance Co.*,
  436 F. Supp. 2d 1095 (C.D. Cal. 2006) ........................................... 8

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) .................................................. 7, 8, 9

*In re First Alliance Mortgage Co.*,
  471 F.3d 977 (9th Cir. 2006) .......................................................... 24

*G.U.E. Tech, LLC v. Panasonic Avionics Corp.*,
  No. SACV 15-00789-CJC (DFMx),
  2015 WL 12696203 (C.D. Cal. Sept. 15, 2015)................................ 6

*In re Gabapentin Patent Litigation*,
  649 F. Supp. 2d 340 (D.N.J. 2009) ................................................. 14

*Gillette Co. v. '42' Products Ltd.*,
  435 F.2d 1114 (9th Cir. 1970) ........................................................ 13

*In re GlenFed, Inc. Securities Litigation*,
  42 F.3d 1541 (9th Cir. 1994)....................................................... 7, 9

*Glitsch, Inc. v. Koch Engineering Co.*,
  216 F.3d 1382 (Fed. Cir. 2000) ...................................................... 14

*Imperial Irrigation District v. Cal. Independent Systems Operator Corp.*,
  No.: 15-CV-1576-AJB-RBB,
  2016 U.S. Dist. LEXIS 101258 (S.D. Cal. Aug. 1, 2016) ............... 24

*Inamed Corp. v. Kuzmak*,
  275 F. Supp. 2d 1100 (C.D. Cal. 2002),
  *aff'd*, 64 F. App'x 241 (Fed. Cir. 2003) ...................................... 14

*Jack Winter Inc. v. Koratron Co., Inc.*,
  375 F. Supp. 1 (N.D. Cal. 1974).............................................. 18, 21

*Jacobs v. Nintendo of America Inc.*,
  370 F.3d 1097 (Fed. Cir. 2004) ...................................................... 15

*Jefferson Parish Hospital District No. 2 v. Hyde*,
  466 U.S. 2 (1984) ..................................................................... 17, 18

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

*Johnson v. City of Shelby*,
    135 S. Ct. 346 (2014) ................................................................... 19

*Johnson v. Wal-Mart Stores, Inc.*,
    544 F. App'x 696 (9th Cir. 2013) ..................................... 10, 11

*Kimble v. Marvel Entertainment*,
    135 S. Ct. 2401 (2015) ........................................................ 15, 22

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ............................................................. 25

*Kwikset Corp. v. Superior Court*,
    51 Cal. 4th 310 (2011) ............................................................... 10

*Linear Technology Corp. v. Applied Materials*,
    152 Cal. App. 4th 115 (2007) .................................................. 24

*Linzer Products Corp. v. Sekar*,
    499 F. Supp. 2d 540 (S.D.N.Y. 2007) ................................... 14

*Matsushita Electric Industrial Co. v. CMC Magnetics Corp.*,
    No. C 06-04538 WHA,
    2006 U.S. Dist. LEXIS 101358 (C.D. Cal. Nov. 13, 2006) ........................... 14

*Maffei v. Allstate Insurance Co.*,
    No. 02:05-cv-2197-GEB-EFB,
    2006 WL 2585560 (E.D. Cal. Sept. 8, 2006) ................................ 10

*MedImmune, Inc.v. Genentech, Inc.*,
    549 U.S. 118 (2007) ................................................................... 15

*Miotox LLC v. Allergan, Inc.*,
    No. 2:14-cv-08723-ODW(PJWx),
    2015 U.S. Dist. LEXIS 58896 (C.D. Cal. May 5, 2015) .................... 15, 24

*Mirkin v. Wasserman*,
    5 Cal. 4th 1082 (1993) ................................................................. 9

*Molko v. Holy Spirit Association.*,
    46 Cal. 3d 1092 (1988) ................................................................ 9

*Mozart Co. v. Mercedes-Benz of North America, Inc.*,
    593 F. Supp. 1506 (N.D. Cal. 1984) .................................... 16, 18

*National Rural Telecommunications Cooperative v. DIRECTV, Inc.*,
    319 F. Supp. 2d 1059 (C.D. Cal. 2003) .................................. 23

*PAE Government Services v. MPRI, Inc.*,
    514 F.3d 856 (9th Cir. 2007) ................................................... 20

*Parino v. Bidrack, Inc.*,
    838 F.Supp.2d 900 (N.D. Cal. 2011) ...................................... 20

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

*Peel v. BrooksAmerica Mortgage Corp.,*
    788 F. Supp. 2d 1149 (C.D. Cal. 2011) .......................................................... 10

*Rose v. Bank of America, N.A.,*
    57 Cal. 4th 390 (2013) .................................................................................... 22

*Sagana v. Tenorio,*
    384 F.3d 731 (9th Cir. 2004) .......................................................................... 19

*Saunders v. Superior Court,*
    27 Cal. App. 4th 832 (1994) ...................................................................... 20, 22

*Senza-Gel Corp. v. Siffhart,*
    803 F.2d 661 (Fed. Cir. 1986) ................................................................... 17, 18

*Shroyer v. New Cingular Wireless Services, Inc.,*
    622 F.3d 1035 (9th Cir. 2010) ........................................................................ 23

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.,*
    No. C-07-0635 JCS,
    2007 WL 1455903 (N.D. Cal. May 16, 2007) ............................................... 24

*Stone v. Farnell,*
    239 F.2d 750 (9th Cir. 1956) .......................................................................... 12

*Urica, Inc. v. Pharmaplast, S.A.E.,*
    No. CV 11-02476 MMM (RZx),
    2013 WL 12123305 (C.D. Cal. Jan. 10, 2013) .............................................. 10

*Zenith Electronics Corp. v. PDI Communication Systems, Inc.,*
    522 F.3d 1348 (Fed. Cir. 2008) ...................................................................... 15

*Zenith Radio Corp. v. Hazeltine Research,*
    395 U.S. 100 (1969) ........................................................................................ 16

*Zila, Inc. v. Tinnell,*
    502 F.3d 1014 (9th Cir. 2007) .................................................................. 15, 22

## STATUTES                                                         PAGE

28 U.S.C. § 2201 ............................................................................................. 13

35 U.S.C. § 271(d) ........................................................................................... 21

Cal. Bus. & Prof. Code § 17200 ................................................................. 20, 23

Cal. Bus. & Prof. Code § 17204 ...................................................................... 24

Cal. Civ. Code § 1572 ...................................................................................... 23

Cal. Civ. Code § 1709 ...................................................................................... 23

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

# I.    INTRODUCTION

Defendant and Counterclaimant Elysium Health, Inc. ("Elysium") sells Basis™, a groundbreaking dietary supplement that combines nicotinamide riboside (or "NR"), pterostilbene ("PT") and other ingredients.   Plaintiff and Counter-Defendant ChromaDex, Inc. ("ChromaDex") supplied NR and PT to Elysium pursuant to supply agreements between the parties.   In the course of the parties' relationship, Elysium discovered that ChromaDex had secretly violated key contractual provisions governing the supply and pricing of NR.   Not only that, but ChromaDex attempted to deceive Elysium and conceal its misconduct by sending a manipulated spreadsheet (the "Fraudulent Spreadsheet") that contained falsified data engineered to give the impression that ChromaDex was complying with its contractual obligation.   Elysium then learned that, at the outset of the parties' relationship, ChromaDex fraudulently induced Elysium into executing one of the agreements, a trademark agreement under which Elysium paid substantial royalties, on the false premise that all ChromaDex's NR customers were required to sign substantially identical agreements.

When ChromaDex inadvertently exposed its deception, Elysium confronted it and sought to resolve the issue with ChromaDex by obtaining information necessary to determine the size of the refund or audit ChromaDex owed Elysium.   Instead of honoring its promises and engaging in good faith efforts to resolve the parties' issues, ChromaDex instead brought this lawsuit.   ChromaDex's complaint seeks, among other things, enforcement of the trademark license agreement that ChromaDex had forced Elysium to sign to obtain NR (and thus access ChromaDex's patent rights).

Elysium counterclaimed, seeking rescission or damages on account of fraudulent inducement (Count 3) and a declaratory judgment that ChromaDex's tying of its patent rights to an unwanted and unneeded trademark license constituted patent misuse (Count 4).   It also alleged that ChromaDex's patent misuse and its

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

1  fraudulent and deceptive attempts to conceal its breaches of the parties' supply
2  agreement violated California's Unfair Competition Law ("UCL") (Count 5).

3      Seeking to escape the consequences of its wrongdoing, ChromaDex moves to
4  dismiss Counts 3, 4 and 5.  However, accepting Elysium's allegations as true, as the
5  Court must, Elysium has stated claims for fraudulent inducement, declaratory
6  judgment of patent misuse and violation of the UCL.

7      ChromaDex first contends that Elysium fails to allege that one of
8  ChromaDex's lies – that every customer was required to sign a trademark license
9  agreement and pay royalties – was false when made, or that Elysium relied on the
10 misrepresentation to its detriment.  ChromaDex's contentions are without merit.
11 Elysium pleads specific facts demonstrating that ChromaDex's misrepresentation
12 was false at the time it was made and that, in reliance on it, Elysium signed the
13 trademark license agreement and paid royalties rather than insisting on a more
14 favorable arrangement.  Elysium pleads the fraud with the requisite particularity –
15 including who made the statement; when, how and to whom it was made; and why it
16 was false.

17     With respect to Elysium's declaratory judgment claim, ChromaDex contends
18 that courts will not recognize a claim that they routinely do – one for declaratory
19 judgment of patent misuse.  In fact, both the Federal Circuit and this Court have
20 sustained claims for declaratory judgment of patent misuse.  ChromaDex's other
21 arguments also fail.  As alleged in the First Amended Counterclaims, ChromaDex
22 conditioned its supply of patented NR on Elysium's purchase of a trademark license.
23 Further, ChromaDex's patent rights and its NIAGEN® trademark are not the same
24 products under patent misuse law as courts have applied it.

25     ChromaDex's arguments seeking dismissal of the unfair competition
26 counterclaim also fail, because Elysium has provided ChromaDex with sufficient
27 notice of claims permitted under the UCL.  Patent misuse violates both court-made
28 and statutory law, as does ChromaDex's deceitful attempt to conceal its breaches.

2

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

ChromaDex's patent misuse and related conduct also were "unfair" under the UCL. The UCL unfair prong proscribes misconduct, like the patent misuse at issue here, that affects the general public by violating the letter or the spirit of antitrust laws.

ChromaDex's motion should be denied in its entirety.

## II.   BACKGROUND

ChromaDex supplied NR and PT to Elysium.  (First Amended Counterclaims, Docket No. ("D.N.") 11 ("FACC") ¶ 53.)   Three different contracts govern the parties' business relationship: an NR Supply Agreement, originally dated February 3, 2014 (as amended, the "NR Supply Agreement") (*id.* ¶ 1, First Amended Complaint, D.N. 26 ("FAC") Exs. A, B), a PT Supply Agreement, dated June 26, 2014 (the "PT Supply Agreement") (*id.*; FAC Ex. C); and a Trademark License and Royalty Agreement, dated February 3, 2014 (the "Trademark Agreement") (*id.*; FAC Ex. D).

ChromaDex is the sole commercial supplier of NR, which it sells under the trademark NIAGEN.  *Id.* ¶¶ 27-29.  ChromaDex has market power in the supply of NR; it has no competitors and every NR product in the global market today is supplied by ChromaDex.  *Id.* ¶¶ 27-29, 32.  ChromaDex leverages its market power to impose conditions on its supply of NR (and thus access to its patents).  *Id.* ¶ 39.  In particular, ChromaDex has conditioned its sale of NR on the purchaser's agreement to license ChromaDex's trademarks.  *Id.*   This practice has substantial anticompetitive effects.  *Id.* ¶ 40.  By conditioning access to NR on the purchase of a license to ChromaDex's trademarks, ChromaDex incentivizes its customers to use ChromaDex's marks and, when they do, the effect is to strengthen the association of NR with ChromaDex.  This improperly extends ChromaDex's market power and patent leverage in the supply of NR even beyond the expiration of ChromaDex's patent estate.  *Id.*

Elysium was one of the ChromaDex customers required to purchase a trademark license.  During the negotiation of the parties' business relationship, ChromaDex's CEO informed Elysium that *all* customers who enter into supply

1   agreements with ChromaDex must also sign trademark license and royalty
2   agreements regardless of whether they intend to use ChromaDex's marks, *id.* ¶ 48, a
3   representation that Elysium later learned to be false, *id.* ¶ 68.  In December 2013,
4   ChromaDex told Elysium that it would grant licensing rights to the NIAGEN
5   trademark in a separate agreement and emphasized that ChromaDex would require a
6   "Niagen TM Agreement" that would require the payment of royalties. *Id.* ¶¶ 47, 49.
7   In reliance on the false representation that all ChromaDex customers must sign
8   trademark license and royalty agreements, Elysium concluded that the issue was
9   non-negotiable and that it had no choice but to sign the Trademark Agreement and
10  pay royalties.  *Id.* ¶¶ 51-52.

11          On February 3, 2014, the parties entered into both the NR Supply Agreement
12  and the Trademark Agreement.  *Id.* ¶ 1.[1]  Under the Trademark Agreement, Elysium
13  must pay royalties on all sales of any product containing an ingredient supplied by
14  ChromaDex, regardless of whether Elysium uses the licensed ChromaDex
15  trademarks.  *Id.* ¶ 56. The Trademark Agreement grants no rights to Elysium other
16  than trademark rights.

17          The NR Supply Agreement contained a "most favored nation" provision
18  providing that if ChromaDex supplied NR to anyone for less than Elysium had paid,
19  Elysium would be refunded or promptly credited the difference.  *Id.* ¶¶ 60-61.  On
20  May 29, 2016, Elysium requested that ChromaDex's CEO disclose the prices at
21  which ChromaDex supplied NR to other customers.   *Id.* ¶ 64.   ChromaDex
22  responded by transmitting a fraudulent "blinded" spreadsheet, which ostensibly
23  showed prices at which ChromaDex supplied NR to each of its customers. *Id.* ¶¶ 65-
24  66.   However, in additional tabs, ChromaDex mistakenly included "unblinded"
25  sheets, which revealed that other customers omitted from the fraudulent "blinded"
26  tab had received NR on more favorable terms than Elysium.  *Id.* ¶ 67.  The

27  _____
28  [1] The parties entered into the PT Supply Agreement in June 2014. *Id.* ¶ 1.

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

spreadsheet also confirmed that, contrary to ChromaDex's earlier representation to induce Elysium to sign the Trademark Agreement, not all purchasers of NR had been required to sign trademark license agreements or pay royalties. *Id.* ¶ 68.

Despite Elysium's several attempts to resolve these issues with ChromaDex, in December 2016, ChromaDex filed this lawsuit alleging, among other things, that Elysium breached the Trademark Agreement by "refusing to pay royalties owed based on its net sales of products containing NIAGEN." (FACC ¶ 85, FAC, Count 3.) Elysium's counterclaims allege that ChromaDex committed fraud (Count 3) by inducing Elysium to enter into the Trademark Agreement based on knowingly false statements that ChromaDex required such an agreement from all customers. Elysium also seeks a declaration (Count 4) that ChromaDex engaged in patent misuse by conditioning its supply of NR, and thus access to its patent rights, on Elysium's purchase of a license to ChromaDex's trademarks. Lastly, the counterclaims allege that ChromaDex's patent misuse, as well as its fraudulent and deceptive attempts to conceal ChromaDex's breaches of the NR Supply Agreement, violate California's Unfair Competition Law (the "UCL").

## III.  ARGUMENT

### A.  Elysium Has Stated a Claim for Fraud

In its First Amended Counterclaims, Elysium alleges that ChromaDex's CEO, Frank Jaksch, falsely represented to Elysium "that all ChromaDex customers who signed purchase agreements to obtain [NR] were required to sign separate trademark license and royalty agreements." (FACC ¶ 48.) Elysium provides not only the content, but also the date of this misrepresentation (December 16, 2013), the manner in which it was made (by telephone), the speaker (Jaksch) and the listeners (Elysium's co-founders). *Id.* Elysium further alleges that, in reliance on that misrepresentation, it "concluded that the issue was non-negotiable," "focused its efforts on negotiating [other contractual provisions aside from the Trademark Agreement]," and "determined it had no choice but to agree to ChromaDex's

1    requirement that it also license ChromaDex's trademarks, and agree to pay
2    substantial royalties on Elysium product sales under the trademark license if it
3    wished to obtain access to [NR]."  *Id.* ¶¶ 51-52.  The Fraudulent Spreadsheet
4    subsequently revealed that "Jaksch's representation was false when made," because
5    it disclosed that at least one NR purchaser whose relationship with ChromaDex <u>pre-</u>
6    <u>dated</u> Elysium's "was not required to sign [a] license and royalty agreement[] or pay
7    royalties."  *Id.* ¶¶ 68, 107.  Elysium was damaged not only by forfeiting its right to
8    negotiate whether (or on what terms) to agree to the Trademark Agreement, but also
9    by paying substantial royalties pursuant to the agreement.  *Id.* ¶¶ 52, 88, 108, 110.
10   These allegations are more than sufficient to state a fraud claim.

11        In reality, ChromaDex's motion to dismiss the fraud claim is less about a lack
12   of particularity under Federal Rule of Civil Procedure 9(b)'s heightened pleading
13   standard for fraud claims – the amount of detail in the allegations is not contested –
14   than it is about an asserted failure to state a claim.  Indeed, many of the cases cited
15   by ChromaDex did not involve Rule 9(b) at all.  ChromaDex frames its arguments
16   under Rule 9(b) perhaps to avoid acknowledging the cardinal rule – cited in every
17   12(b)(6) case but not always featured prominently in 9(b) cases – that Elysium's
18   facts are taken as true and inferences are drawn in Elysium's favor.  But this
19   legerdemain is fruitless, because Rule 9(b) does not alter the settled rule that, on a
20   motion to dismiss, the court accepts the non-movant's allegations as true and draws
21   inferences in its favor.  *See, e.g.*, *G.U.E. Tech, LLC v. Panasonic Avionics Corp.*,
22   2015 WL 12696203, at *5 (C.D. Cal. Sept. 15, 2015) (accepting allegations as true
23   under Rule 9(b)); *see also In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1166 (W.D.
24   Wash. 1998) (collecting cases).

25        1.   <u>Elysium Adequately Pleads Falsity</u>

26        ChromaDex first contends that Elysium has failed to allege facts
27   demonstrating that Jaksch's misrepresentation was false when made.  Numerous
28   ways exist to adequately plead that a statement was false when made; the question is

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

1   not *how*, but *whether* the facts as pled, and inferences drawn from them, convey why

2   the statement was false.  *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995).  For

3   example, a party alleging fraud may proffer "direct evidence of fraud, *i.e.*,

4   '[inconsistent] facts that had existed all along and were later revealed.'"  *Id.*

5   (alterations in original).  Alternatively, a party may allege "circumstantial evidence

6   [that] explains how and why the statement was misleading when made."  *Id.* at

7   1083.[2]

8         In this case, Elysium pleads direct evidence of fraud.  The First Amended

9   Counterclaims allege that, before the parties had signed their contracts, Jaksch

10  represented to Elysium that all ChromaDex customers were required to sign

11  trademark and license agreements "under which customers agreed to pay royalties on

12  product sales" for NR.  (FACC ¶¶ 48, 105.)  Elysium then points to specific evidence

13  of fraud: the Fraudulent Spreadsheet detailed that, in fact, *not* all customers "were

14  required to sign license and royalty agreements or pay royalties." (FACC ¶ 68.)  At

15  least one ChromaDex customer who had not been required to sign a license or pay

16  royalties formed its relationship with ChromaDex before Elysium did, confirming

17  the falsity of Jaksch's December 16, 2013 representation when it was made.  (FACC

18  ¶ 68.)[3]

19        ChromaDex arguments that Elysium's pleading purportedly is insufficient are

20  not persuasive.  First, ChromaDex contends that the Fraudulent Spreadsheet "says

21

22  [2] As ChromaDex suggests (MTD 7-8), another way to allege fraud sufficiently –
    though most often in securities cases – is to identify "inconsistent contemporaneous
23  statements or information (such as internal reports) which were made by or available
    to the defendants."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir.
24  1994).  As the court noted in *GlenFed*, a securities fraud case that ChromaDex cites
    for this proposition, a party may need to allege falsity this way when, unlike here,
25  "some more or less catastrophic event" intervenes between the time the
    representation is made and the time the truth is revealed.  *Id.* at 1548-49.  *See also*
26  *Fecht*, 70 F.3d at 1083 (inconsistent contemporaneous statements used principally in
    cases involving a known intervening event).

27  [3] These are facts, not conclusions, and ChromaDex's contention that Elysium's fraud
    claim is "conclusory" (MTD 8) is entirely without merit.

28

nothing about" the terms that ChromaDex customers had in 2013, before Elysium and ChromaDex formed their relationship. (MTD 8.) Not so. Although Jaksch may have sent the Fraudulent Spreadsheet in 2016, it reveals "[inconsistent] facts that *had existed all along*," *Fecht*, 70 F.3d at 1082 (alterations in original) (emphasis added), namely that ChromaDex customers who pre-dated Elysium were not required to sign license and royalty agreements or pay royalties, making Jaksch's assertion false when made. And, contrary to ChromaDex's suggestion, it is well-settled that "when no catastrophic event intervened between the time of the complained-of statements and the revelation of the truth," a party may show falsity "by pointing to later inconsistent statements or conditions." *Id.* at 1084.

Only by impermissibly drawing inferences in its *own* favor can ChromaDex attack the sufficiency of Elysium's claim. ChromaDex suggests that the historical facts on the Fraudulent Spreadsheet about other customers may have changed over time, such that Jaksch's statement might have been literally true at the moment he uttered it. No rule permits ChromaDex to defeat well-pled allegations of fraud by inferring an alternative factual universe, especially one so implausible. ChromaDex's tactic turns well-settled pleading standards on their head and should be rejected.

To the extent ChromaDex believes further detail about the fraud is required (and Elysium respectfully submits that it is not), that information is peculiarly within ChromaDex's knowledge, and Elysium cannot be faulted for failing to plead it. *See, e.g.*, *Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*, 436 F. Supp. 2d 1095, 1106 (C.D. Cal. 2006) (Rule 9(b) is relaxed where the "facts supporting the allegation of fraud [by the accused] are exclusively within the [accused's] possession").

ChromaDex's other arguments are equally infirm. ChromaDex contends that the Fraudulent Spreadsheet "says nothing about" Jaksch's scienter in December 2013. (MTD 8.) However, Elysium explicitly pleads that Jaksch knew that his statement was false when made (FACC ¶ 107) and that he made the statement "with

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

the intent to deceive Elysium and induce it to enter into the License and Royalty Agreement." *Id.* ¶¶ 107, 109. Elysium's allegations are more than sufficient at this stage. Fed. R. Civ. P. 9(b) (scienter "may be alleged generally"); *see, e.g.*, *Fecht*, 70 F.3d at 1082 n.4 (allegations that defendants "knew the impression created by this conduct and these statements . . . was false" and that company was aware the reports were false and misleading "clearly meet[s]" pleading standards); *GlenFed*, 42 F.3d at 1547 (scienter may be pled "generally . . . simply by saying that scienter existed").

Finally, ChromaDex contends that Elysium "fails to plead that any customer did not have a *royalty obligation*" (MTD 8.) To the contrary, Elysium pleads precisely what ChromaDex claims is missing. (*See, e.g.*, FACC ¶ 68 ("some purchasers of [NR] were not required to sign license and royalty agreements *or pay royalties*" (emphasis added)); ¶ 107 ("at least one purchaser of [NR] that contracted with ChromaDex before Elysium did was not required to sign a license and royalty agreement *or pay royalties*" (emphasis added)).) Ironically, ChromaDex <u>admits</u> that not all customers are required to pay royalties and, for this proposition, cites to the <u>very counterclaims</u> it says are missing that allegation. (*See* MTD 5 (citing FACC ¶ 68 to clarify that "not all customers are required to pay royalties").)

## 2. Elysium Adequately Pleads Reliance

ChromaDex then contends that Elysium fails to plead reliance, relying on a rule it suggests was adopted by the Supreme Court of California requiring the injured party to show that "in all reasonable probability" he would not have engaged in the injury-producing conduct but for the misrepresentation. (MTD 9 (purporting to quote *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1111 (1993)).) What ChromaDex overlooks is that the language it quotes is from a partial concurrence that relies on a case addressing what a plaintiff must show to survive summary judgment under the state's procedural rules, not to survive a motion to dismiss under the Federal Rules. *See Mirkin*, 5 Cal. 4th at 1111 (Kennard, J., concurring in part and dissenting in part) (quoting *Molko v. Holy Spirit Ass'n*, 46 Cal. 3d 1092, 1108 (1988)).

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

1    Under the prevailing rule in federal court, a party alleging fraud under

2  California law withstands dismissal so long as he alleges that he "would have . . .

3  behaved differently" had he known the truth. *Peel v. BrooksAmerica Mortg. Corp.*,

4  788 F. Supp. 2d 1149, 1162 (C.D. Cal. 2011) (citation omitted); *cf. Urica, Inc. v.*

5  *Pharmaplast, S.A.E.*, 2013 WL 12123305, at *12 (C.D. Cal. Jan. 10, 2013)

6  ("Pharmaplast succinctly pleads, moreover, that it would not have entered into the

7  agreement had Medline not made the misrepresentation. This adequately pleads

8  reliance."); *Maffei v. Allstate Ins. Co.*, 2006 WL 2585560, at *3 (E.D. Cal. Sept. 8,

9  2006) (finding that "allegations in the Second Amended Complaint plead a

10  cognizable theory of detrimental reliance because Plaintiffs allege they would not

11  have participated in the mileage band practices had Defendants not assured them the

12  practices were legal and/or proper"). Moreover, "[t]he question of whether . . .

13  reliance is reasonable is a question of fact, not of law, unless 'the undisputed facts

14  leave no room for a reasonable difference of opinion.'" *Dolan v. CMTC*, 2013 WL

15  12139355, at *2 (C.D. Cal. May 1, 2013) (citation omitted).

16    *Johnson v. Wal-Mart Stores, Inc.*, 544 F. App'x 696 (9th Cir. 2013), is

17  instructive. In *Johnson*, Wal-Mart allegedly misrepresented that it was legally

18  required to collect a nine dollar "recycling fee" from each customer who purchased a

19  car battery. *Id.* at 697. In reality, California law did not require collection of such a

20  fee. *Id.* Johnson alleged that she would not have paid the fee "if she had known that

21  California law did not require her to pay it." *Id.* Reversing the district court's

22  dismissal, the Ninth Circuit held that these allegations "permit a reasonable inference

23  that Johnson paid more 'than she otherwise would have' if Wal-Mart had not

24  engaged in the alleged misrepresentation." *Id.*; *cf. Kwikset Corp. v. Superior Court*,

25  51 Cal. 4th 310, 330 (2011) ("extra money paid" establishes both transaction

26  causation – that is, reliance – and economic injury); *Ehret v. Uber Techs., Inc.*, 68 F.

27  Supp. 3d 1121, 1137 (N.D. Cal. 2014) (allegations of fraud were sufficient where

28  plaintiffs alleged that Uber misrepresented the amount of gratuity it remitted to the

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

1    driver and plaintiffs, who agreed to the gratuity under that false pretext, "expended

2    more money than they otherwise would have but for the misrepresentation").

3          In this case, Elysium alleges that it would have proceeded differently absent

4    the misrepresentation.   In the First Amended Counterclaims, Elysium alleges that

5    "[i]n reliance on ChromaDex's false representation . . . Elysium concluded that the

6    issue was non-negotiable" and ceased expending effort negotiating the Trademark

7    Agreement.   (FACC ¶ 51.)   Further, "*given ChromaDex's representation* that all

8    customers  who  obtained  [NR]  were  required  to  pay  royalties  on  sales  under  a

9    trademark  license  agreement,  *Elysium determined it had no choice* but to agree to

10   ChromaDex's requirement that it also *license ChromaDex's trademarks, and agree*

11   *to pay substantial royalties* on Elysium product sales under the trademark license if it

12   wished  to  obtain  access  to  [NR]."   *Id.*  ¶  52  (emphases  added).   "In  view  of

13   ChromaDex's  false  claim,"  Elysium  thus  "believed  ChromaDex's  demand  for  a

14   license  and  royalty  agreement  was  non-negotiable . . . .   Elysium  *therefore forwent*

15   *the opportunity to negotiate an agreement with ChromaDex that did not require the*

16   *payment of royalties*."   (FACC ¶ 108 (emphasis added).)   Elysium's damages include

17   all royalties paid under the contract it was fraudulently induced into signing.   *Id.* ¶

18   110.   These allegations suffice under federal pleading standards.   *Cf. Johnson*, 544 F.

19   App'x at 697 (customer sufficiently plead fraud by alleging, among other things, that

20   she paid a fee when falsely led into believing that it was required).

21         ChromaDex's  arguments  for  dismissal  are  meritless.   First,  ChromaDex

22   contends that the parties had unequal bargaining power and thus Elysium was in any

23   case powerless to resist the Trademark Agreement so long as it wanted to purchase

24   NR.   (MTD 9.)   ChromaDex again asks the Court to draw inferences in its favor

25   regarding the parties' bargaining position, which is utterly improper on a motion to

26   dismiss.   ChromaDex's  contention  also  is  inconsistent  with  its  admission  that  the

27   parties  in  fact  *did*  negotiate  other  terms  of  the  contracts.   *See id.* 9-10.   More

28   troubling is that, taking the argument to its logical end, ChromaDex is proposing that

1   it has an unfettered license to defraud as a matter of law.  Under ChromaDex's
2   position, it could make any number of fraudulent statements about the requirement of
3   a trademark license or other customers' royalty payments and be immune from suit
4   so long as it has market power in NR.  ChromaDex's argument is irrational, contrary
5   to public policy and internally inconsistent.

6       Second, ChromaDex contends that Elysium's reliance was not "plausible"
7   because Elysium highlights one particular misrepresentation by ChromaDex, as
8   opposed to many different misrepresentations.  (MTD 10.)  The case law contradicts
9   ChromaDex's claim that a party cannot be defrauded by a single statement.  *See, e.g.*,
10  *Stone v. Farnell*, 239 F.2d 750, 753 (9th Cir. 1956) (in action for fraud under
11  California law, a single material misrepresentation is sufficient); *cf. Cortez v.*
12  *Weymouth*, 235 Cal. App. 2d 140, 149 (1965) (finding reliance and noting that "[o]ne
13  material misrepresentation is sufficient").  To the extent ChromaDex suggests that
14  Elysium may not have relied on the misrepresentation, ChromaDex raises an issue of
15  fact improper for resolution at this stage.  *See Dolan*, 2013 WL 12139355, at *2.

16      Finally, ChromaDex argues that "Elysium does not allege that it would not
17  have entered the agreement but for the alleged false statement, or even that it would
18  have been able to negotiate a deal that did not contain a royalty payment."  (MTD
19  10.)   It then renews its argument that, given ChromaDex's allegedly supreme
20  position, Elysium might have failed in endeavoring to avoid a trademark agreement.
21  In so arguing, ChromaDex again resorts to drawing inferences in its own favor,
22  rather than Elysium's, and then using those improper inferences to urge dismissal.
23  ChromaDex's argument that Elysium inevitably would have succumbed to
24  ChromaDex's demands fails to give proper deference to Elysium's factual
25  allegations, which are taken as true and need only raise a plausible right to relief.
26  Viewed in the proper light, Elysium's pleading alleges precisely what ChromaDex
27  asserts is lacking – that Elysium was worse off as a result of the fraud.  (MTD 10.)
28  (*See* FACC ¶ 52 ("Elysium determined that it had no choice but to agree to [the

1   Trademark Agreement] and to pay substantial royalties," ¶ 108 ("Elysium therefore

2   forwent the opportunity to negotiate an agreement with ChromaDex that did not

3   require the payment of royalties").  ChromaDex does not, and cannot, explain how

4   these allegations are insufficient to state a fraud claim.[4]

### B.  Elysium Properly Seeks a Declaratory Judgment of Patent Misuse

1.   The Broad, Remedial Scope of the Declaratory Judgment Act Embraces a Judicial Declaration of Patent Misuse

8   Elysium's request for declaratory judgment of patent misuse falls comfortably

9   within the broad scope of the Declaratory Judgment Act, 28 U.S.C. § 2201, a statute

10  that is given "a liberal interpretation because it is remedial in character."  *Gillette Co.*

11  *v. '42' Prods.*, 435 F.2d 1114, 1118 (9th Cir. 1970).  ChromaDex's argument that

12  claims for *damages* for patent misuse are not always recognized is a sleight-of-hand.

13  Numerous courts, including both this Court and the Federal Circuit, have

14  sustained claims requesting a declaratory judgment of patent misuse.  As this Court

15  has explained, although "patent misuse developed as an equitable defense to an

16  infringement action[,] . . . [i]t is a defense that may be raised by way of an action for

---

[4] ChromaDex's cited cases are not to the contrary.  *Conrad v. Bank of Am.*, 45 Cal. App. 4th 133 (1996), which involved the sufficiency of *evidence* and not pleadings, merely found that a plaintiff did not prove consequential damages where she offered no evidence of any detriment.  Elysium alleges that it suffered damage as a direct result of the misrepresentation.  In *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513 (2004), the plaintiff failed to allege that he was aware of, much less that he relied on, the misrepresentation, and thus could not state a fraud claim in state court.  *Engalla v. Permanente Med. Group., Inc.*, 938 P.2d 903, 919 (Cal. 1997), supports *Elysium's* position.  In that case, the court *found* reliance by acknowledging a "presumption" of reliance "wherever there is a showing that a misrepresentation was material," and further held that materiality is a question of fact not to be decided even at summary judgment, much less on a motion to dismiss.  Finally, the portion of *Crews v. Wachovia Mortg. Corp.*, 2010 U.S. Dist. LEXIS 77660 (C.D. Cal. July 23, 2010), cited by ChromaDex involved whether a plaintiff had shown a likelihood of success on the merits of a fraud claim for purposes of a preliminary injunction, not whether allegations of reliance were sufficient to withstand a motion to dismiss.  In any event, the plaintiff in *Crews* could not show a detrimental change in position.  *Id.* at *9.  In contrast, Elysium – which had been "arduously negotiating" (MTD 10) – relied to its detriment on ChromaDex's misrepresentation by capitulating to its demands, ceasing negotiations and remitting substantial royalty payments under the contract it was induced to sign (FACC ¶ 108).

---

1  declaratory relief." *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1124 (C.D. Cal.

2  2002).  Ample authority supports this Court's interpretation.  *B. Braun Med. Inc. v.*

3  *Abbott Labs.*, 124 F.3d 1419, 1428 (Fed. Cir. 1997) (district court could enter a

4  declaratory judgment that patent was unenforceable due to misuse); *Glitsch, Inc. v.*

5  *Koch Eng'g Co.*, 216 F.3d 1382, 1386 (Fed. Cir. 2000) (patent misuse may be

6  asserted as "a request for declaratory relief"); *Linzer Prods. Corp. v. Sekar*, 499 F.

7  Supp. 2d 540, 552-53 (S.D.N.Y. 2007) (holding that the law does "not proscribe

8  claims seeking declaratory judgment of patent misuse" and stating that arguments to

9  the contrary were "without merit"); *In re Gabapentin Patent Litig.*, 649 F. Supp. 2d

10  340, 349 (D.N.J. 2009) ("courts have found patent misuse . . . to be a proper basis for

11  declaratory relief").  *See also Matsushita Elec. Indus. Co. v. CMC Magnetics Corp.*,

12  2006 U.S. Dist. LEXIS 101358 (N.D. Cal. Nov. 13, 2006) (denying motion to

13  dismiss patent misuse counterclaim.

14          In *B. Braun*, which ChromaDex misleadingly and incompletely quotes in a

15  footnote, the Federal Circuit did not hold that a claim seeking declaratory relief of

16  patent misuse was improper.  To the contrary, it specifically allowed such a claim to

17  proceed and remanded the case to the district court to adjudicate it. *Id.* at 1429.  The

18  Federal Circuit merely observed the district court could, but was not required to,

19  award damages after entering its declaratory judgment. *Id.* at 1428.  In this context

20  the Federal Circuit stated that patent misuse "may not be converted to an affirmative

21  claim for damages simply by restyling it as a declaratory judgment counterclaim."

22  *Id.*  This statement has no application here.  Likewise, in *Enercon GmbH v. ErdMan*,

23  13 F. App'x 651 (9th Cir. 2001) (unpublished)[5], the Ninth Circuit did not address,

24  much less reject, a declaratory judgment claim.

25

26  _____

27  [5] Contrary to ChromaDex's suggestion, *Enercon*, even if it were relevant, is not
    "binding" on this Court and "may not be cited to [by] the courts of this circuit,"
    except in limited circumstances that do not apply here.  *See* Ninth Circuit Rule 36.3.

28

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

1    All that courts require for a declaratory judgment claim is the existence of a

2    case or controversy.  *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).

3    A case or controversy plainly exists here.  ChromaDex, in Count 3 of its Complaint,

4    seeks to enforce the royalty requirement in the parties' Trademark Agreement.

5    Elysium seeks to enjoin enforcement of the Trademark Agreement's royalty

6    requirement due to ChromaDex's patent misuse.  FACC, Prayer for Relief, ¶ 8.

7    Even the case law cited by ChromaDex acknowledges the propriety of declaratory

8    judgments finding royalty provisions unenforceable.  *See Zila, Inc. v. Tinnell*, 502

9    F.3d 1014, 1019 (9th Cir. 2007) (upholding declaratory judgment claim asserting

10   post-patent-expiration royalty obligation unenforceable due to patent misuse); *see*

11   *also Kimble v. Marvel Entertainment*, 135 S. Ct. 2401, 2411 (2015) (same); *Miotox*

12   *LLC v. Allergan, Inc.*, 2015 U.S. Dist. LEXIS 58896 (C.D. Cal. May 5, 2015)

13   (denying motion to dismiss patent misuse counterclaim brought in response to breach

14   of license claim).  Moreover, as discussed below, patent misuse can also constitute

15   an unlawful or unfair act under California's Unfair Competition Law.

16          2.   Elysium Has Stated a Claim for a Declaratory Judgment of Patent
     Misuse

17

18          a.   *The Counterclaims Sufficiently Allege Tying*

19   ChromaDex's merits challenge also fails.  The counterclaims, taken as true

20   and construed in the light most favorable to Elysium, sufficiently allege that

21   ChromaDex:  (1) conditioned access to its patent rights[6] on (2) the purchase from

22

23   _____
     [6] In a footnote, ChromaDex claims that Elysium's allegation that it receives an

24   implied sublicense to ChromaDex's patents is "conclusory."  Not so.  The
     counterclaims allege that ChromaDex has exclusively licensed certain patents related

25   to nicotinamide riboside from Dartmouth, *see* FACC ¶ 32, and that ChromaDex then
     agreed to supply material to Elysium, *id.* ¶ 53.  It is well-settled that a licensed

26   manufacturer who then supplies product to third parties pursuant to the
     manufacturer's license grants an implied license to its customers to use that product

27   for all purposes.  *See Zenith Elecs. Corp. v. PDI Commc'n. Sys. Inc.*, 522 F.3d 1348,
     1360-62 (Fed. Cir. 2008); *Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097, 1099-

28   1102 (Fed. Cir. 2004).

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

1  ChromaDex of a trademark license.  *See* FACC ¶¶ 6, 38-40, 47-48, 112.  That is
2  sufficient to allege the existence of a tie.  ChromaDex's argument that the Trademark
3  Agreement does not require Elysium to <u>use</u> the licensed trademarks is irrelevant.
4  Tying does not require both purchase <u>and</u> use of the tied product, but only its
5  required purchase, as even ChromaDex concedes in its brief.  *See* MTD at 12-13,
6  quoting *Mozart Co. v. Mercedes-Benz of N. Am., Inc.,* 593 F. Supp. 1506, 1515-16
7  (N.D. Cal. 1984) (claim requires "demonstrat[ing] that the <u>purchase</u> of the tying
8  product is conditioned on the purchase of the tied product") (emphasis added); *see*
9  *also Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 461-62 (1992) (a tying
10 arrangement is one where a party agrees "to sell one product but only on the
11 condition that the buyer also <u>purchases</u> a different (or tied) product") (emphasis
12 added); *see also Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 139-40
13 (1969) ("We think . . . patent misuse inheres in a patentee's insistence on a . . .
14 royalty, regardless of use, and his rejection of licensee proposals to pay only for
15 actual use.").

16      ChromaDex's claim that there was no "purchase" of a trademark license
17 ignores the language of the Trademark Agreement.  The agreement is titled
18 "<u>Trademark</u> License and Royalty Agreement," and the only right it grants is a
19 trademark license.  *See* FAC, Ex. D. at Title and § 2.  Under the Trademark
20 Agreement's terms, Elysium pays substantial consideration for those rights: a
21 continuing royalty based on product sales.  *Id.* §§ 2, 9.   That is a purchase, by any
22 definition.

23      ChromaDex asserts in its motion that the real purpose of the royalties was
24 "deferred compensation" for product supply.  There is certainly nothing in the
25 Trademark License that so states.  Moreover, if what ChromaDex really means is
26 that Elysium is paying royalties not for the use of ChromaDex's trademarks but
27 rather for Elysium's use of ChromaDex's patent rights when Elysium purchases
28 supply of NR, ChromaDex would face a different problem, because those patents are

16
ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

1   licensed from Dartmouth, and ChromaDex would then owe Dartmouth a percentage
2   of its sublicensing revenue.  If the real reason that ChromaDex insisted on separating
3   the royalty from the supply agreement was to disguise the payments as trademark
4   royalties and avoid paying patent sublicensing revenue to its licensor Dartmouth,
5   ChromaDex would at a minimum be guilty of unclean hands and this Court should
6   deny relief.  In any case, ChromaDex's litigation-inspired characterization of the
7   Trademark Agreement should not be accepted, and no inferences should be drawn in
8   its favor at the pleading stage on a motion to dismiss.

9             b.    *The Supply of Patented Products and the Granting of a*
10                  *Trademark License Constitute Separate Products*

11         ChromaDex's argument that its patent rights and trademark rights do not
12   constitute separate products is incorrect.  ChromaDex argues that, under the Supreme
13   Court's antitrust analysis in *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 24
14   (1984), Elysium must show two distinguishable markets based on the nature of
15   consumer demand for the two items.  ChromaDex is wrong, because patent misuse is
16   not as limited as antitrust claims.  It is a claim that a patent holder has unlawfully
17   extended the exclusionary right of its patent, regardless of whether it also results in
18   violation of the antitrust laws.

19         In *Senza-Gel Corp. v. Siffhart*, 803 F.2d 661, 670 (Fed. Cir. 1986), the Federal
20   Circuit explained that "[e]ffort[s] to equate the determination of product separability
21   for misuse purposes with product separability for antitrust purposes must fail."  *Id.* at
22   670.  In particular, "[t]he law of patent misuse in licensing need not look to
23   consumer demand (which may be non-existent) but need look only to the nature of
24   the claimed invention as the basis for determining whether a product is a necessary
25   concomitant of the invention or an entirely separate product."  *Id.* at n.14.  The
26   antitrust separability test is "tailored for situations that may or may not involve a
27   patent," and thus involves a different analysis.  *Id.*; *see also C.R. Bard, Inc. v. M3*
28   *Sys.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) ("Patent misuse is viewed as a broader

17

1   wrong than antitrust violation because of the economic power that may be derived
2   from the patentee's right to exclude.").

3        Here, the patents, and the supply of nicotinamide riboside, are entirely
4   different products from ChromaDex's NIAGEN trademark.  The trademark is not, of
5   course, a "necessary concomitant of the invention"; indeed, trademarks or their use
6   are not part of the inventions at all.  *See*, *e.g.*, FACC ¶¶ 33-34.  If the tying product
7   in *Senza-Gel* (a method patent license) and the tied product (a machine used to carry
8   out one step of the method) were separate products, then the patents and trademarks
9   here surely are as well.  *See Senza-Gel*, 803 F.2d at 667-68, 670.  *See also Jack*
10  *Winter Inc. v. Koratron Co., Inc.*, 375 F. Supp. 1, 71-72 (N.D. Cal. 1974) (finding
11  patent misuse where company tied the right to practice the patent to a requirement
12  that the patentee affix the trademark to all garments produced by the process).

13       Further, even under the *Jefferson Parish* antitrust consumer demand test,
14  under the facts as pled by Elysium, the patents and trademarks at issue here are
15  separate products in different markets.[7]  Indeed, in the prior version of ChromaDex's
16  motion to dismiss, ChromaDex agreed (in language now deleted from its current
17  brief) that the counterclaims support an inference that some customers who want
18  access to supply of nicotinamide riboside do not want access to ChromaDex's
19  NIAGEN marks.  *See* D.N. 27 at 18.  The NIAGEN mark is not essential to the sale,
20  supply or use of NR; a seller could call NR by many names, including different
21  brand names or just the chemical name, using "NR" or "nicotinamide riboside" to
22  describe the product.  *See* FACC ¶¶ 40, 68, 122.

23  _____
    [7] ChromaDex cites to several franchise cases in its argument regarding Elysium's
24  tying claims.  Those cases are inapposite.  In the franchise context, the franchisor's
    trademark and the franchisor's product are both "essential" elements of the
25  franchising business model.  *See Mozart Co.*, 593 F. Supp. at 1514-15.  In
    ChromaDex's case, there is no franchising arrangement, the trademark and patent
26  rights need not be sold together, and Elysium had no interest in the NIAGEN
    trademark.  *See id.* (car and replacement car parts were separate products as any
27  other state of affairs would allow a "franchisor to require its franchisees to distribute
    any product . . . whether or not those products were essential to the purpose of a
28  franchise").

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

### C. Elysium Has Stated a Claim for Violation of California's Unfair Competition Law

#### 1. Elysium's UCL Claim Satisfies the Notice Requirements of Rule 8

ChromaDex's arguments that Elysium's UCL claim does not provide it sufficient notice because it does not "specifically identify a statute" and includes the words "and/or" fundamentally misunderstands modern pleading requirements. All Rule 8 requires is that a party allege a "short and plain statement of the claim." Fed. R. Civ. P. 8(a). This is satisfied when a party gives the defendant fair notice of a plausible claim against him. *Id.* at 8(b). As ChromaDex's own motion demonstrates, ChromaDex had no trouble understanding that the Counterclaims alleged three business acts or practices, and that those acts or practices violated either or both of the unlawful and unfair prongs of the UCL. MTD at 15-16. *See Alvarez v. Hill*, 518 F.3d 1152, 1158 (9th Cir. 2008) (moving party's own brief "conclusively establish[ed] that they had fair notice" of the claim).

ChromaDex's claim that a party "must specifically identify the particular statutes that it alleges the defendant violated," MTD at 17, has been emphatically rejected by both the Supreme Court and the Ninth Circuit. In *Johnson v. City of Shelby*, 135 S. Ct. 346 (2014), the Court recently summarily reversed the Fifth Circuit for making the same fundamental error that ChromaDex urges here. *Johnson*, 135 S.Ct. 346 at 347 (per curiam) ("[N]o heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim."). The Court observed that requiring a pleading specifically to identify a particular statute contravened modern pleading, which was designed to avoid these types of "battles over mere form of statement" and "civil cases turning on technicalities." *Id.* (citations omitted). The Ninth Circuit likewise "long ago rejected the argument that a specific statute must be named [in a complaint], describing it as an 'attempt to evoke wholly out-moded technical pleading rules.'" *Sagana v. Tenorio*, 384 F.3d 731, 737 (9th Cir. 2004) (quoting

1 *Bowers v. Campbell*, 505 F.2d 1155, 1157 n.2 (9th Cir. 1974)); *see also Alvarez*, 518

2 F.3d 1152 at 1157 ("A complaint need not identify the statutory or constitutional

3 source of the claim raised in order to survive a motion to dismiss").

4 Given that the UCL itself does not require a statutory violation, it is baffling

5 why ChromaDex insists to this Court that the recitation of a statute is required.  As

6 case law ChromaDex cites recognizes, UCL violations can encompass court-made

7 law.  *See* MTD at 17-18 ("Under the UCL, 'unlawful' practices are practices

8 '<u>forbidden by law,</u> be it civil or criminal, federal, state, municipal, statutory,

9 regulatory, <u>or court-made</u>.'") (quoting *Saunders v. Superior Court*, 27 Cal. App. 4th

10 832, 838-39 (1994) (emphases added).

11 Elevating pleading hypertechnicality to new heights, ChromaDex also urges

12 that Elysium's claim should be dismissed because it includes the words "and/or."  In

13 particular, ChromaDex says that Elysium cannot allege conduct that was unlawful

14 "and/or" unfair, and instead must elect, at the pleading stage, the specific prong

15 under which it will proceed.  But the Federal Rules expressly permit pleading in the

16 alternative.  Parties may pursue overlapping, multiple, and even inconsistent theories

17 of a claim, and the rules expressly state that the pleading "is sufficient if any one of

18 them is sufficient."  Fed. R. Civ. P. 8(d); *see PAE Gov't Servs. v. MPRI, Inc.*, 514

19 F.3d 856, 858-59 (9th Cir. 2007) ("At the time a complaint is filed, the parties are

20 often uncertain about the facts and the law; and yet, prompt filing is encouraged and

21 often required . . . .  In recognition of these uncertainties, . . . we allow pleadings in

22 the alternative . . . .  As the litigation progresses, and each party learns more about its

23 case and that of its opponents, some allegations fall by the wayside as legally or

24 factually unsupported . . . .  [W]e call [this process] litigation."); *Parino v. Bidrack,*

25 *Inc.*, 838 F. Supp. 2d 900, 908 (N.D. Cal. 2011) ("[P]laintiff may properly assert

26 claims based on both existence and absence of a binding agreement between the

27 parties.").

28

1           2.    <u>ChromaDex's Patent Misuse Constitutes Unlawful Conduct
2    <u>Under the UCL</u>

3          California's UCL prohibits business activity that is "unlawful, unfair or

4    fraudulent." Cal. Bus. & Prof. Code § 17200, et seq.  ChromaDex's patent misuse, as

5    pled, qualifies as unlawful business activity under the UCL.

6          The "unlawful" prong of the UCL allows parties to bring suit based on a wide

7    variety of unlawful business practices.  As this Court has observed, "[v]irtually any

8    law or regulation — federal or state, statutory or common law — can serve as a

9    predicate for a [section] 17200 'unlawful' violation." *Epicor Software Corp. v. Alt.*

10   *Tech. Sols., Inc.*, 2013 U.S. Dist. LEXIS 79125, at *16-17 (C.D. Cal. May 9, 2013)

11   (Carney, J.) (second alteration in original) (citation omitted).  As the California

12   Supreme Court has explained, "the unfair competition law's scope is broad [and]

13   [i]ts coverage is sweeping, embracing anything that can properly be called a business

14   practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns., Inc. v.*

15   *Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citation omitted).

16         There can be no doubt that the law proscribes patent misuse.  As cases cited

17   above show, patent misuse violates at least court-made law and thus can constitute

18   an unlawful act under the UCL.  Courts have specifically found patent-trademark ties

19   to be a form of patent misuse.  *See, e.g.*, *Jack Winter,* 375 F. Supp. 1 at 71-72.

20   Patent misuse also satisfies ChromaDex's invented requirement of identifying a

21   statute.   The doctrine of patent misuse is expressly recognized by statute,

22   specifically, 35 U.S.C. § 271(d), which outlines, in part, some of the parameters for

23   making a claim.

24         ChromaDex also argues that if Elysium's patent misuse declaratory judgment

25   claim fails, then so too must a UCL claim based on unlawful patent misuse.  This is a

26   false syllogism.  Even if ChromaDex were correct (and it is not) that patent misuse

27   cannot be asserted under the Declaratory Judgment Act, that does not mean that

28   patent misuse cannot be a predicate for a UCL claim.  An unlawful act under the

1  UCL need not be independently actionable.  *See Rose v. Bank of Am., N.A.*, 57 Cal.

2  4th 390, 393 (2013) (plaintiffs alleged a claim under the unlawful prong even though

3  underlying statute had been amended to remove private right of action); *Saunders*, 27

4  Cal. App. 4th at 839 ("It is not necessary that the predicate law provide for private

5  civil enforcement.").

6       Moreover, tying is not the only problem with the Trademark Agreement.  By

7  its terms, it requires the continued payment of royalties long after ChromaDex's

8  patents have expired, so long as the NR Supply Agreement remains in effect.  This

9  itself is a form of patent misuse, and it also constitutes an unlawful act for purpose of

10 the UCL.  ChromaDex concedes that a licensor cannot require a royalty that extends

11 "beyond the expiration date of the patent."  *Brulotte v. Thys Co.*, 379 U.S. 29, 32

12 (1963); *see also Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2411 (2015) ("A

13 court need only ask whether a licensing agreement provides royalties for post-

14 expiration use of a patent . . . if so, no dice."); *Zila*, 502 F.3d at 1019.  ChromaDex's

15 argument that the Trademark Agreement does not violate *Brulotte* is misplaced.  The

16 Trademark Agreement remains "in full force and effect until the termination of the

17 Supply Agreement."  FAC, Ex. D, at §14.  The Supply Agreement, under its terms,

18 was capable of continuing <u>indefinitely</u>.  After its initial 3-year term, the Supply

19 Agreement renews "automatically for successive additional one year periods" until it

20 is terminated by a party.  FAC, Ex. A, at § 5.1.  Thus, Elysium's royalty obligation

21 under the terms of the Trademark Agreement unlawfully continued after the

22 expiration of all patents covering NR supplied by ChromaDex.

23       3.   <u>ChromaDex's Breach of Contract Coupled with Deceptive and
          Misleading Activity Constitutes Unlawful Conduct in Violation
24        of the UCL</u>

25       In its counterclaims, Elysium alleges that ChromaDex not only breached the

26 Supply Agreement, but fraudulently attempted to conceal that breach by sending

27 Elysium false data, in an attempt to convince Elysium that ChromaDex was in

28 compliance with its obligations.  This conduct also violated the UCL.

22

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

ChromaDex cites to cases in which courts have rejected garden variety breach of contract claims alone as a predicate for the UCL.  *See, e.g.*, *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010).  ChromaDex omits, however, that even *Shroyer* held that "a violation of common law can support a § 17200 claim, provided that the conduct is also unlawful, unfair, or fraudulent." *Id.* at 1044 (citing *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1074-75 (C.D. Cal. 2003)).  Here, Elysium alleges not just a run-of-the-mill breach of contract, but a breach coupled with intentional concealment of the breach and calculated attempts to deceive the counterparty regarding compliance.  That is sufficient to raise a claim under the UCL's unlawful prong.  *See* Cal. Civ. Code § 1572 (defining "actual fraud" in connection with a contract as including "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true" and "[t]he suppression of that which is true, by one having knowledge or belief of the fact"); Cal Civ. Code § 1709 ("One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable . . . .").  *See also, e.g.*, *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1017 (C.D. Cal. 2013) ("A claim under the UCL unlawful prong may be premised upon the unlawful actions that constitute tortious interference with contractual relations."); *Cortez v. Glob. Ground Support, LLC*, 2009 WL 4282076, at *3-4 (N.D. Cal. Nov. 25, 2009) (common law torts can provide basis for UCL claims).

4.   ChromaDex's Patent Misuse Is Also Actionable Under the UCL "Unfair" Prong

Patent misuse also is actionable under the "unfair" prong of the UCL, which proscribes conduct that "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 187 (1999).

23

1   Patent misuse undoubtedly meets this test.  As a leading patent law treatise
2   explains, "The relationship between the misuse doctrine and the federal antitrust
3   laws is a complex one . . . .  Nevertheless, a close relationship clearly exists between
4   the misuse doctrine and the antitrust laws."  6A-19 Chisum on Patents § 19.04.  *See*
5   *also Miotox LLC v. Allergan, Inc.*, 2015 U.S. Dist. LEXIS 58896, at *15 (C.D. Cal.
6   May 5, 2015) (patent misuse is a "broader wrong than antitrust violation because of
7   the economic power that may be derived from the patentee's right to exclude").

8   Thus, in alleging that ChromaDex has misused its patents, Elysium has alleged
9   an antitrust-like unfair business practice. Notwithstanding ChromaDex's efforts to
10   contort the holding of *Linear Technology Corp. v. Applied Materials*, that decision
11   specifically permits suits under the unfairness prong "involving . . . the public in
12   general." 152 Cal. App. 4th 115, 135 (2007).  Tellingly, ChromaDex does not
13   identify any case rejecting a UCL claim brought by a corporate plaintiff that raised
14   antitrust concerns.[8]   If ChromaDex's argument were true – and anticompetitive
15   contracts could never be challenged under the UCL – then the UCL's unfairness
16   prong would be a dead letter.   Such narrow application would undermine the
17   "sweeping" and "intentionally broad" scope of the UCL.  *See In re First Alliance*
18   *Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006).

19   ChromaDex's argument that Elysium's unfair prong UCL claim should be
20   dismissed because it "fail[ed] to plead damages" is nonsensical.  MTD at 23-24.
21   "[A] UCL action is equitable in nature [and] damages cannot be recovered."  *Korea*
22   *Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).   Thus,

23

24   ────────────────
[8] The moving brief asserts that Elysium's counterclaims do not allege harm to
25   competition or plead an incipient violation of antitrust law.  (MTD 21.)  In fact, they
   do.  *See* FACC ¶ 120, 121.  *See Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator*
26   *Corp.*, 2016 U.S. Dist. LEXIS 101258, at *38 (S.D. Cal. Aug. 1, 2016) (denying
   motion to dismiss UCL claim alleging monopolistic conduct that threatens
27   competition); *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, 2007 WL
   1455903, at *19 (N.D. Cal. May 16, 2007) (dismissal of UCL claim brought by
28   corporation alleging claim of harm to competition was inappropriate).

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS

1 damages cannot be an element of the claim.  A party has standing to bring a UCL
2 claim if it "has suffered an injury in fact and has lost money or property as a result of
3 the unfair competition."  Cal. Bus. & Prof. Code § 17204.  The California Supreme
4 Court has expressly "decline[d] . . . to turn this facially simple threshold condition
5 into a requirement that plaintiffs prove compensable loss at the outset."  *Clayworth v.*
6 *Pfizer, Inc.*, 49 Cal. 4th 758, 789 (2010).

7       Here, Elysium's counterclaim specifically alleges that "Elysium has suffered
8 injury in fact and has lost money or property as a result of ChromaDex's unfair
9 competition. In order to obtain a supply of nicotinamide riboside, Elysium has been
10 required to pay substantial royalties for a license of ChromaDex's trademark rights,
11 which Elysium did not want and has not used."  FACC ¶ 122.  That allegation more
12 than suffices to satisfy the UCL's standing requirement.  ChromaDex's argument
13 that Elysium "misrepresent[s]" the facts and that the royalty payments are really
14 "deferred compensation" for the supply of NIAGEN raises issues of disputed fact
15 that are inappropriate for resolution on a motion to dismiss.

16                            **IV.   CONCLUSION**
17       For the foregoing reasons, Elysium respectfully requests that the motion to
18 dismiss be denied.

19

20 DATED:  April 3, 2017

21                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
22                         FOLEY HOAG LLP

23

24                         JOSEPH N. SACCA

25                         By:    */s/ Joseph N. Sacca*
                                  JOSEPH N. SACCA
26                                Attorneys for Defendant and
27                                Counterclaimant Elysium Health, Inc.

28

ELYSIUM'S OPPOSITION TO CHROMADEX'S MOTION TO DISMISS