PETER B. MORRISON (State Bar No. 230148)
peter.morrison@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
julia.nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

JOSEPH N. SACCA (admitted *pro hac vice*)
joseph.sacca@skadden.com
BRADLEY E. HONIGMAN (admitted *pro hac vice*)
bradley.honigman@skadden.com
SPENCER A. GOTTLIEB (admitted *pro hac vice*)
spencer.gottlieb@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone:  (212) 735-3000
Facsimile:   (212) 735-2000

DONALD R. WARE (admitted *pro hac vice*)
dware@foleyhoag.com
MARCO J. QUINA (admitted *pro hac vice*)
mquina@foleyhoag.com
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, Massachusetts 02210
Telephone:  (617) 832-1000
Facsimile:   (617) 832-7000

*Attorneys for Defendant and Counterclaimant
Elysium Health, Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### (SOUTHERN DIVISION)

| | |
|---|---|
| CHROMADEX, INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>ELYSIUM HEALTH, INC.,<br><br>               Defendant. | Case No. 8:16-cv-02277-CJC-DFM<br><br>**ELYSIUM HEALTH, INC.'S REPLY IN SUPPORT OF ELYSIUM'S MOTION TO DISMISS CHROMADEX'S FOURTH, FIFTH AND SIXTH CLAIMS OF FIRST AMENDED COMPLAINT**<br><br>Hearing Date: April 24, 2017<br>Time:     1:30 p.m.<br>Courtroom: 9B<br>Judge:    Hon. Cormac J. Carney |

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ..................................................................... 1

II.   ARGUMENT ............................................................................................... 3

      A.   ChromaDex Improperly Mischaracterizes Its Own FAC ................... 3

      B.   ChromaDex Has Failed to State a Claim For Fraudulent Deceit.......... 4

           1.   ChromaDex's Fraud Claim Is Barred by the Economic
                Loss Rule ................................................................................. 4

           2.   ChromaDex Fails to Plead Justifiable Reliance ......................... 8

      C.   ChromaDex Has Failed to State a Claim for Misappropriation of
           Trade Secrets Under the CUTSA or the DTSA .................................... 9

           1.   ChromaDex Has Failed to Plead the Existence of a
                Protectable Trade Secret ............................................................ 9

           2.   ChromaDex Has Failed to Plead a Misappropriation ............... 14

           3.   ChromaDex Has Failed to Plead Damages............................... 15

           4.   ChromaDex's Claims Under the DTSA Fail Because the
                Alleged Misconduct Precedes the DTSA's Effective Date ...... 16

III.  CONCLUSION .......................................................................................... 17

# TABLE OF AUTHORITIES

**CASES** PAGE(S)

*Advanced Modular Sputtering, Inc. v. Superior Court*,
132 Cal. App. 4th 826 (2005)................................................................. 12

*Apollo Group, Inc. v. Avnet, Inc.*,
58 F.3d 477 (9th Cir. 1995) .................................................................... 5

*Aqua Connect, Inc. v. Code Rebel, LLC*,
No. CV 11-5764-RSWL MANX, 2012 WL 469737 (C.D. Cal. Feb. 13,
2012) .......................................................................................................... 16

*Bioriginal Food & Science Corp. v. Biotab Nutraceuticals Inc.*,
No. CV13-5704 CAS (Ex), 2013 WL 6572573 (C.D. Cal. Dec. 13,
2013) .......................................................................................................... 15

*Burnett v. Rowzee*,
No. SA CV 07-641DOCANX, 2007 WL 2735682 (C.D. Cal. Aug. 28,
2007) ............................................................................................................ 9

*Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.*,
160 Cal. App. 4th 288 (2008)................................................................. 14

*Elsayed v. Maserati North America, Inc.*,
No. SACV 16-00918-CJC(DFMx), 2016 WL 6091109 (C.D. Cal. Oct.
18, 2016) ..................................................................................................... 8

*Epicor Software Corp. v. Alternative Technology Solutions, Inc.*,
No. SACV 13-00448-CJC(RNBx), 2013 WL 12130024 (C.D. Cal. Dec.
2, 2013) ...................................................................................................... 15

*Erlich v. Menezes*,
21 Cal. 4th 543 (1999).................................................................... 2, 5, 6

*Frank M. Booth, Inc. v. Reynolds Metals Co.*,
754 F. Supp. 1441 (E.D. Cal. 1991) ....................................................... 5

*GeoData Systems Management, Inc. v. American Pacific Plastic
Fabricators, Inc.*,
No. CV 15-04125 MMM (JEMx), 2015 WL 12731920 (C.D. Cal. Sept.
21, 2015) ................................................................................................ 2, 10

*Hannibal Pictures, Inc. v. Sonja Productions LLC*,
432 F. App'x 700 (9th Cir. 2011)........................................................... 7

*Logtale, Ltd. v. IKOR, Inc.*,
No. C 11–5452 CW, 2013 WL 4427254 (N.D. Cal. Aug. 14, 2013)............... 10

*Magic Laundry Services, Inc. v. Workers United Service Employees
International Union*,
No. CV–12–9654–MWF (AJWx), 2013 WL 1409530 (C.D. Cal. Apr. 8,
2013) .......................................................................................................... 15

ELYSIUM'S REPLY IN SUPPORT OF MOTION TO DISMISS

*Meggitt San Juan Capistrano, Inc. v. Yongzhong*,
  575 F. App'x 801 (9th Cir. 2014)................................................................15

*Mirzai v. Matossian*,
  No. A100600, 2004 WL 2260611 (Cal. Ct. App. Oct. 8, 2004) .........................5

*Mozaffarian v. Breitling U.S.A., Inc.*,
  No. C 94–1133 SI, 1998 WL 827596 (N.D. Cal. Nov. 19, 1998)......................6

*Nextdoor.com, Inc. v. Abhyanker*,
  No. C-12-5667 EMC, 2013 WL 3802526 (N.D. Cal. July 19, 2013)..............12

*Oracle USA, Inc. v. XL Global Services, Inc.*,
  No. C 09–00537 MHP, 2009 WL 2084154 (N.D. Cal. July 13, 2009)..............7

*Robinson Helicopter Co. v. Dana Corp.*,
  34 Cal. 4th 979 (2004)...............................................................................passim

*Schneider v. California Department of Corrections*,
  151 F.3d 1194 (9th Cir. 1998).............................................................1, 4, 11

*Teva Pharmaceuticals USA, Inc. v. Health IQ, LLC*,
  No. SACV 13-00308-CJC(RNBx), 2013 WL 12134185 (C.D. Cal. July
  2, 2013).......................................................................................... 12, 13, 15

*TMX Funding v. Impero Technologies, Inc.*,
  No. C 10–00202 JF (PVT), 2010 WL 2509979 (N.D. Cal. June 17,
  2010)......................................................................................................... 13

**STATUTES**                                                                   **PAGE(S)**

18 U.S.C. § 1839(6) ................................................................................. 14

Cal. Civ. Proc. Code § 2019.210 ................................................................ 10

Cal. Comm. Code § 2306................................................................................ 6, 9

ELYSIUM'S REPLY IN SUPPORT OF MOTION TO DISMISS

# I.   PRELIMINARY STATEMENT[1]

Tacitly conceding the infirmity of the allegations it pled in its FAC, ChromaDex invents new facts in its Opposition[2] and then – almost as if it hopes no one will bother to check – cites to its FAC for these facts that are not there.  (*See infra* at II.A.)  The Court should not consider these new allegations on this motion. *See Schneider v. Cal. Dept. of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").

ChromaDex's numerous mischaracterizations of its own FAC more than cast the credibility of its Opposition in doubt.  They also reveal ChromaDex's own acknowledgment that those allegations ChromaDex *does* actually include in the FAC are insufficient to state a claim upon which relief can be granted for either fraudulent deceit or misappropriation of trade secrets.  Even if, however, the Court considers these embellishments added in the Opposition, the FAC remains deficient and thus ChromaDex's fourth, fifth and sixth claims should be dismissed with prejudice.

In defending its fraudulent deceit claim, ChromaDex relies heavily on language cherry-picked from the decision of the California Supreme Court in *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979 (2004), in an effort to avoid application of the economic loss rule.  ChromaDex ignores entirely, however, the court's caution there that "[o]ur holding today is narrow in scope and limited to a

---

[1] In the case citations that follow, all emphases are added and all internal citations, quotations and alterations are omitted, unless otherwise noted.  Changes to record citations, however, are noted.  Unless otherwise defined, terms and abbreviations used herein have the same meaning as used in the Motion.  (*See infra* at n.5.)

[2] "Opposition" or "Opp'n" refers to ChromaDex's Memorandum of Points and Authorities in Opposition to Elysium's Motion to Dismiss, filed on April 3, 2017. (ECF No. 37.)  ChromaDex also disregards the Local Rules' 25-page limit on memoranda of law, submitting an oversized brief without seeking (much less receiving) this Court's permission.  *See* C.D. Cal. R. 11-6.

1  defendant's affirmative misrepresentations on which a plaintiff relies and *which*
2  *expose a plaintiff to liability for personal damages independent of the plaintiff's*
3  *economic loss.*"   *Id.* at 993.   This case falls squarely outside the limitation of
4  *Robinson Helicopter*'s holding, because ChromaDex does not, and cannot, allege it
5  has been exposed to any "liability for personal damages."   ChromaDex's reliance on
6  the California Supreme Court's earlier decision in *Erlich v. Menezes*, 21 Cal. 4th 543
7  (1999), is no more helpful to it.   *Erlich* holds that "conduct amounting to a breach of
8  contract becomes tortious only when it violates a duty independent of the contract
9  *arising from principles of tort law*."   *Id.* at 551.   ChromaDex's attempt to invoke a
10  California *U.C.C.* provision as establishing an independent *tort* duty contravenes
11  established law.

12      In any event, ChromaDex's contention that the U.C.C.'s provisions applicable
13  to requirements contracts control here is incorrect, as the case law it cites
14  demonstrates.   This not only further undercuts ChromaDex's efforts to avoid the
15  economic loss rule, but also defeats ChromaDex's argument that it adequately pleads
16  reliance.   ChromaDex does not dispute – and thus concedes – that it could not have
17  relied on Elysium's alleged misrepresentations if it was contractually obligated to fill
18  Elysium's orders.   Its argument that it was not so obligated fails, because it is based
19  on the wrong contention that the Supply Agreements are requirements contracts.

20      ChromaDex's effort to convince the Court that it has identified the allegedly
21  misappropriated trade secrets with the requisite particularity to "ascertain at least the
22  boundaries within which the secret lies," *GeoData Sys. Mgmt., Inc. v. Am. Pac.*
23  *Plastic Fabricators, Inc.*, 2015 WL 12731920, at *11 (C.D. Cal. Sept. 21, 2015),
24  distorts the actual allegations of the FAC beyond recognition, and thus serves only to
25  highlight their deficiency.   Equally unpersuasive are ChromaDex's arguments that
26  the FAC adequately alleges that Elysium ever improperly acquired, used or disclosed
27  confidential information, or that ChromaDex has sustained actual harm.

28

## II.    ARGUMENT

### A.    ChromaDex Improperly Mischaracterizes Its Own FAC

In the Opposition's "Statement of Facts," ChromaDex states that "Elysium first raised a question about whether a sudden increase in its volume of NIAGEN purchases triggered a most favored nation ("MFN") pricing provision in the NIAGEN Supply [Agreement] (FAC ¶ 21)," and, further, that "ChromaDex explained why the MFN clause was not triggered and believed the issue was resolved when Elysium did not advance the issue further. (FAC ¶ 21)."  (Opp'n 3.)  But paragraph 21 of the FAC, which ChromaDex cites as support for both assertions, makes *no mention* of (1) the MFN provision; (2) a sudden increase of NIAGEN purchases; or (3) ChromaDex explaining *anything* to Elysium.[3]  In fact, paragraph 21 makes this third point an impossibility, since it alleges that Elysium "refused and/or ignored" ChromaDex's alleged requests to talk about pricing concerns.

This attempt to recast its allegations throughout the Opposition is on display yet again when ChromaDex suggests that the "trade secrets" it alleges were misappropriated "concern intellectual property related to the commercial manufacture of NIAGEN and pterostilbene . . . (FAC ¶ 13; FACC ¶ 28)." (Opp'n 6-7.)  Paragraph 13 of the FAC notes that ChromaDex owns patents related to NIAGEN and its manufacture, but makes *no mention* of any purported trade secrets or intellectual property, much less their relationship to the manufacture of NIAGEN and pterostilbene.[4]  As a final example of its mischaracterizing its own pleading,

---

[3] *See* FAC ¶ 21 (alleging, in its entirety, that "[i]n the second quarter of 2016, Elysium first raised concerns about pricing under the NIAGEN Supply Agreement directly with Frank Jaksch, co-founder and CEO of ChromaDex, and Will Black, ChromaDex's Vice President of Sales and Marketing.  Mr. Jaksch reached out to Elysium in an effort to open a dialogue about their concerns and ultimately resolve them.  Elysium, however, refused and/or ignored these offers to talk.").

[4] It is mystifying why ChromaDex also cited Elysium's amended *counterclaims* to support its own trade secrets claims, but nonetheless, this paragraph is likewise unrelated to the proposition for which it is cited.

3

ELYSIUM'S REPLY IN SUPPORT OF MOTION TO DISMISS

1  ChromaDex cites paragraph 74 of the FAC as support for its assertion that a
2  ChromaDex "research" partner asked Ryan Dellinger, a ChromaDex employee who
3  supposedly shared trade secrets with Elysium, about "the propriety of discussing his
4  confidential research and his research partnership with ChromaDex with Elysium."
5  (Opp'n 7–8.)  In reality, paragraph 74 of the FAC makes – predictably – *no mention*
6  of any ChromaDex research partner discussing the propriety of sharing confidential
7  information with Elysium, either with Dellinger or anyone else.

8       In deciding this Motion, the Court should look to the allegations of
9  ChromaDex's FAC to determine that pleading's adequacy, and should not consider
10 purported facts asserted for the first time in the Opposition.  *Schneider*, 151 F.3d at
11 1197 n.1.

12      **B.    ChromaDex Has Failed to State a Claim For Fraudulent Deceit**

13           1.    ChromaDex's Fraud Claim Is Barred by the Economic Loss Rule
14      In its Opposition, ChromaDex relies principally on selective quotations from
15 *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979 (2004), to argue against the
16 application of the economic loss rule to its fraud claim.  This disingenuous reading of
17 *Robinson Helicopter* ignores entirely that the court there significantly limited the
18 application of any exception to the economic loss rule, making clear that "[o]ur
19 holding today is narrow in scope and limited to a defendant's affirmative
20 misrepresentations on which a plaintiff relies and *which expose a plaintiff to liability*
21 *for personal damages* independent of the plaintiff's economic loss."  *Id.* at 993; *see*
22 *also id.* at 991 n.7 (distinguishing previous cases applying the economic loss rule
23 because in each the defendant's actions did not "put people at risk"); *id.* at 988
24 (reaffirming the rule that tort claims are unavailable unless the plaintiff alleges
25 "harm above and beyond a broken contractual promise").  ChromaDex does not
26 allege in the FAC – nor could it – that Elysium's alleged misrepresentations exposed
27 it to liability for personal damages, and therefore the limited exception to the
28 economic loss rule described in *Robinson Helicopter* does not apply here.

4

1    ChromaDex also relies heavily on *Erlich v. Menezes*, 21 Cal. 4th 543 (1999),

2  in which the California Supreme Court held that "conduct amounting to a breach of

3  contract becomes tortious only when it also violates a duty independent of the

4  contract *arising from principles of tort law*."  *Id.* at 551.  ChromaDex's attempt to

5  invoke this exception fails.  To the extent ChromaDex argues that the California

6  U.C.C. imposes an "independent statutory duty" to act in good faith (*see* Opp'n 10–

7  11), it cannot explain how this duty derives from principles of *tort law*, and for

8  obvious reason.  It does not.

9    In *Apollo Group, Inc. v. Avnet, Inc.*, 58 F.3d 477, 480 (9th Cir. 1995), for

10  instance, the Ninth Circuit recognized that the plaintiff sought to "simply recast what

11  would traditionally be a U.C.C. breach of warranty claim into what it calls a

12  'common law' tort-based breach of warranty claim to evade the preclusive effect of

13  the 'economic loss' doctrine."  *Id.* at 481.  The Court was not deceived, and held that

14  the economic loss rule barred the claim.  *Id.*  It applied the same logic to the

15  plaintiff's negligent misrepresentation claim, holding that because the U.C.C.

16  governed, the claim was barred.  *Id.* at 480 ("To escape the preclusive effect of the

17  'economic loss' rule, [the plaintiff] nevertheless seeks to recast the transaction at

18  issue as a contract to provide services," instead of a contract to provide goods

19  governed by the U.C.C.); *see also Frank M. Booth, Inc. v. Reynolds Metals Co.*, 754

20  F. Supp. 1441, 1449 (E.D. Cal. 1991) (applying the economic loss rule and noting

21  that courts applying California law have "limited the remedies through which

22  aggrieved commercial litigants may recoup their economic losses to those provided

23  by contract and the UCC"); *Mirzai v. Matossian*, 2004 WL 2260611, at \*23 (Cal. Ct.

24  App. Oct. 8, 2004) ("Because the predominant purpose of the contract was the sale

25  of goods, not services, the economic loss doctrine foreclosed the fraud claims . . . .").

26    Even if a duty arising under California's U.C.C. could suffice as a "duty

27  independent of the contract arising from principles of tort law" sufficient to

28  overcome the economic loss rule, *see Erlich*, 21 Cal. 4th at 551, ChromaDex's

argument still fails.   ChromaDex contends that the Supply Agreements are requirements contracts subject to California Commercial Code Section 2306(1), and that Elysium acted in bad faith in violation of that statute.   (Opp'n 10–11.)   The Supply Agreements are not, as ChromaDex argues, requirements contracts as they fix minimum purchase requirements.   (*See* FAC Ex. B, at 2 ("Elysium Health will purchase the corresponding minimum quantity of NIAGEN and/or pTeroPure set forth below . . . .").)   An agreement that fixes a minimum quantity of goods to be purchased is not a requirements contract.   *See Mozaffarian v. Breitling U.S.A., Inc.*, 1998 WL 827596, at *8–9 (N.D. Cal. Nov. 19, 1998).   In *Mozaffarian*, the court stated that the agreement did "not conform to the definition of a requirements contract" because it was "an arrangement for exclusive dealings conditioned not on 'requirements' but on minimum annual purchases."   *Id.* at *8.   The court continued:

> In a true requirements contract, "[t]he acceptor does not in such case agree to take any particular quantity, for he may not need any . . ." Witkin, Summary of California Law (7th Ed.) § 75, page 81.   In the exclusivity agreement alleged here, however, plaintiff alleges that he specifically bound himself to purchase a minimum dollar value.   The exclusivity agreement is therefore not a requirements contract . . . .

*Id.* at *9.

Selectively quoting from *Erlich*, ChromaDex further argues that the economic loss rule does not bar its claim because it alleges Elysium's conduct was "intentional and intended to harm."   (Opp'n 11.)   ChromaDex simply disregards, however, the context surrounding this sentence fragment.   *Erlich* identified the four types of cases where tort damages have been permitted in contract actions – where a breach of duty causes a physical injury, for breach of the covenant of good faith and fair dealing in an insurance contract, for wrongful discharge in violation of public policy and where a contract is fraudulently induced – and noted that "[i]n each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm."   *Erlich*, 21 Cal.

4th at 551–52; *see also Oracle USA, Inc. v. XL Glob. Servs., Inc.*, 2009 WL 2084154, at *4 (N.D. Cal. July 13, 2009) ("Exceptions [to the economic loss rule] have been permitted only where: a breach of duty causes a physical injury; the covenant of good faith and fair dealing is breached in an insurance contract; an employee was wrongfully discharged in violation of a fundamental public policy; or a contract was fraudulently induced."). ChromaDex, of course, does not allege any of those four circumstances here.

ChromaDex also asserts that the economic loss rule does not apply where "one party has lied to the other," citing only an unpublished memorandum disposition that offers little support for this statement beyond that "*Robinson Helicopter* controls this case." (Opp'n 11 (citing *Hannibal Pictures, Inc. v. Sonja Prods. LLC*, 432 F. App'x 700, 701 (9th Cir. 2011)).) *Robinson Helicopter* – as discussed above – does not, however, sweep so broadly as to capture ChromaDex's claim here. In *Robinson Helicopter*, the plaintiff contracted with the defendant to purchase helicopter clutches that functioned primarily as a safety device. *Robinson Helicopter*, 34 Cal. 4th 979 at 991. After the defendant misrepresented in written certifications that the clutches it supplied conformed to contract specifications, the F.A.A. required the plaintiff to recall each helicopter with a non-conforming clutch, resulting in substantial cost to plaintiff and exposing it to the risk of accidents and liability for personal damages. *Id.* The court in *Robinson Helicopter* permitted the plaintiff to pursue a fraud claim for the defendant's false certifications, but cautioned that "[o]ur holding today is narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies *and* which expose a plaintiff to liability for *personal damages* independent of the plaintiff's economic loss." *Id.* at 993.

Subsequent cases have further clarified that the exception in *Robinson Helicopter* was intended to apply only in the products liability context, where there is actual or potential physical injury resulting from the defendant's conduct. *See, e.g.*, *Oracle*, 2009 WL 2084154, at *6. In *Oracle*, the plaintiff sued for breach of contract

7

and "related claims based on defendant's alleged failure to pay for services rendered," including a promissory fraud claim. *Id.* at *1. The court considered and declined to apply the exception articulated in *Robinson Helicopter*, noting that "[t]he exposure to liability for personal damages was key to *Robinson Helicopter*'s holding that the economic loss rule did not bar tort remedies in that case" and "[i]t is unlikely that the California Supreme Court intended the holding of *Robinson Helicopter* to apply outside of the realm of products liability." *Id.* at *6.

In a last-gasp effort to save its fraud claim, ChromaDex asserts that the economic loss rule does not apply here because "ChromaDex has been distinctly damaged by Elysium's fraud." (Opp'n 13.) ChromaDex cites no law at all to support this "distinctly damaged" theory – the obvious reason being that ChromaDex has created it from whole cloth – and instead vaguely alleges that Elysium "exploit[ed] ChromaDex's weakened financial position" by making it take on "increased financial risk and exposure for Elysium's failure to pay." (Opp'n 13.) No matter what spin ChromaDex seeks to apply, however, this is an allegation only of economic loss, landing the fraud claim squarely within the ambit of the economic loss rule. *See Elsayed v. Maserati N. Am., Inc.*, 2016 WL 6091109, at *9 (C.D. Cal. Oct. 18, 2016) (Carney, J.) (applying the economic loss rule to bar plaintiff's negligence causes of action) ("Tellingly, Plaintiff's complaint alleges only economic loss."). In short, any amount of damages ChromaDex seeks is clearly not "beyond the four corners of the contract," as its allegations are based entirely on its fulfillment of an order placed pursuant to the Supply Agreements.

2. ChromaDex Fails to Plead Justifiable Reliance

A party's contractual performance in reliance on a purported misrepresentation cannot, as a matter of law, be detrimental if that party is already legally obligated to

ELYSIUM'S REPLY IN SUPPORT OF MOTION TO DISMISS

perform.  (*See* Mot. 9 (citing cases).)[5]  ChromaDex does not dispute that.  It thus concedes this point.  *See Burnett v. Rowzee*, 2007 WL 2735682, at *6 (C.D. Cal. Aug. 28, 2007) (plaintiff's opposition to motion to dismiss "does not address the . . . arguments as to" causes of action, "thereby conceding that these claims should be dismissed").

ChromaDex argues instead that it had no obligation to perform because Elysium's orders did not comply with California Commercial Code § 2306(1), which, ChromaDex argues, mandates that parties to a requirements contract must state their requirements in good faith and in reasonable proportion to prior orders and any estimates in their agreement.  (*See* Opp'n 13–16.)  But, as discussed above, the Supply Agreements are not requirements contracts subject to Section 2306.  (*See supra* at II.B.1.)  Thus, ChromaDex's argument that Section 2306 excused its performance under the Supply Agreements is wrong.  Because ChromaDex offers no other basis to support its contention that it could have, consistent with the Supply Agreements, declined to fill Elysium's order, and because it does not contest that it could not have relied on any alleged misrepresentations by Elysium if it were contractually obligated to fill the order, ChromaDex effectively concedes its failure to plead reliance.

### C.  ChromaDex Has Failed to State a Claim for Misappropriation of Trade Secrets Under the CUTSA or the DTSA

####   1.   ChromaDex Has Failed to Plead the Existence of a Protectable Trade Secret

#####       a.   *ChromaDex Has Not Identified the Purported Trade Secrets with the Requisite Specificity*

As demonstrated in Elysium's Motion, the FAC fails to identify any allegedly misappropriated trade secret with the requisite specificity.  In response, ChromaDex

---

[5] "Motion" or "Mot." refers to Elysium's Memorandum of Points and Authorities in Support of Elysium's Motion to Dismiss ChromaDex's Fourth, Fifth and Sixth Claims of First Amended Complaint, filed on March 1, 2017.  (ECF No. 30-1.)

ELYSIUM'S REPLY IN SUPPORT OF MOTION TO DISMISS

1   first tries misdirection, pointing to a California state procedural rule that mandates

2   trade secrets be identified with reasonable particularity "before commencing

3   discovery." (*See* Opp'n 21 n.7, *citing* Cal. Civ. Proc. Code § 2019.210.) This

4   argument disregards that to satisfy Rule 12(b)(6) of the Federal Rules of Civil

5   Procedure, ChromaDex still has the burden to plead with enough specificity to allow

6   Elysium to "ascertain at least the boundaries within which the secret lies." *See*

7   *GeoData Sys. Mgmt.,* 2015 WL 12731920, at *11. It is therefore immaterial whether

8   trade secrets must be specifically identified with even greater detail at a later point,

9   or that the state rule "does not provide grounds" for dismissal "at the pleading stage."

10   (*See* Opp'n 22 n.8.)

11       ChromaDex next argues unpersuasively that *GeoData* – in which the court

12   dismissed a claim failing to adequately describe the purported trade secrets – is

13   "inapposite" because the plaintiff in *GeoData* used "all-inclusive generalized and

14   nebulous language" and "ChromaDex intentionally did not use . . . overbroad

15   generalizations in its pleadings." (Opp'n 24.) This half-hearted *ipse dixit* makes no

16   meaningful distinction between *GeoData* and the facts here, because it is not

17   ChromaDex's intent but its actual allegations that matter, and its allegations rely

18   virtually exclusively on generalities. (*See, e.g.*, FAC ¶ 73 ("Morris informed

19   Alminana and Marcotulli about ChromaDex's confidential business dealings and

20   information ChromaDex had acquired about one or more potential partners.").)

21       Apparently recognizing the FAC's deficiency, ChromaDex yet again resorts to

22   misrepresenting its own allegations. In an unpersuasive effort to distinguish *Logtale,*

23   *Ltd. v. IKOR, Inc.*, 2013 WL 4427254 (N.D. Cal. Aug. 14, 2013), ChromaDex

24   asserts that the FAC "alleges that the clinical trial protocols at issue belong to

25   ChromaDex *and involved the ingredients Elysium is concerned with, NR and*

26   *pterostilbene.* (FAC ¶ 112)." (Opp'n 24 (emphasis added).) But paragraph 112 of

27   the FAC does not allege *anything* relating to NR or pterostilbene, or that the clinical

28

ELYSIUM'S REPLY IN SUPPORT OF MOTION TO DISMISS

trial protocols ChromaDex claims were misappropriated involved those ingredients.[6]
ChromaDex cannot argue that it alleged its trade secrets claims with particularity
based on facts it never included in the FAC. *Schneider*, 151 F.3d at 1197 n.1.

ChromaDex most egregiously distorts the allegations of the FAC when it tries
to suggest it has alleged that Elysium misappropriated trade secrets related to the
manufacture of NR or pterostilbene:

> Considered in context – where Elysium's sole product is comprised of
> NIAGEN and pTeroPure, which are solely sourced by ChromaDex –
> the FAC alleges that Elysium is interested in information related to the
> manufacture, supply, and use of NIAGEN and pTeroPure.  The FAC
> also alleges that the trade secret information includes ChromaDex's
> "information about the skills and abilities of its employees and agents,
> and their salaries and benefits."  (FAC ¶ 105).

(Opp'n 22–23.)  These statements weave the unfounded with the untrue.  The first
sentence does not contain any cite to the FAC, nor could it, because the allegation
that Elysium is "interested" in information relating to how NIAGEN and pTeroPure
are manufactured is not made in the FAC.  Indeed, not a single one of the FAC's
paragraphs related to the trade secrets claims even uses the word "manufacture" or
any of its synonyms.  (*See* FAC ¶¶ 68–78, 103–117.)  And no wonder.  ChromaDex
does not manufacture NR or pterostilbene.  These products are manufactured for it
by third parties.

The second sentence, citing paragraph 105 of the FAC, is simply false.
Neither paragraph 105 nor any other paragraph of the FAC alleges that Elysium has
misappropriated, or is even interested in, information about ChromaDex's employees
and agents.  Rather, paragraph 105 benignly states that "[s]ince ChromaDex's

---

[6] *See* FAC ¶ 112 ("During his employment with ChromaDex, at the behest of
Elysium, Dellinger wrongfully disclosed confidential proprietary information to
Elysium, including without limitation the identity and contact information of
ChromaDex's partners, clinical study designs, clinical safety reports, and clinical
study data.").

inception in 1999, . . . ChromaDex's trade secret proprietary information also includes information about the skills and abilities of its employees and agents, and their salaries and benefits."  (FAC ¶ 105.)  ChromaDex obviously hopes to lead this Court to believe that this is "*the* trade secret information" at issue here, when in fact the FAC makes no such allegation.  (Opp'n 23 (emphasis added).)

Finally, ChromaDex's own case law highlights that its trade secrets claims are not pled with the requisite particularity.  For example, ChromaDex cites two cases for the proposition that trade secrets must be identified with specificity that is "reasonable, i.e. fair, proper, just and rational" under the circumstances.  (Opp'n 22.)  But the plaintiffs in both of those cases provided far more detail than ChromaDex provides in its FAC.  The plaintiff in one case "identified eight alleged trade secrets, each with discreet features" and "described how it believes the combination of these features distinguish the alleged trade secrets from" matters within the industry's common knowledge.  *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 836 (2005).  The plaintiff in the other case, which ChromaDex cites to buttress the idea that trade secrets can be "somewhat more general," described its trade secrets with a manifestly greater level of detail than anything ChromaDex puts forward.[7]  Other cases ChromaDex cites follow a similar pattern.  *See, e.g.*, *Teva Pharm. USA, Inc. v. Health IQ, LLC*, No. SACV 13-00308-CJC(RNBx), 2013 WL 12134185, at *3 (C.D. Cal. July 2, 2013) (Carney, J.) (claimant provided "*25 categories of specific information*" including the "progress and results of ongoing

---

[7] *See Nextdoor.com, Inc. v. Abhyanker*, No. C-12-5667 EMC, 2013 WL 3802526, at *5 (N.D. Cal. July 19, 2013) (trade secrets included "key product details, algorithms, business plans, security algorithms, database structures, user interface designs, software code, product concepts, prototypes, methods, works of authorship, trademarks, white papers, and instrumentalities, information and plans pertaining to, but not limited to, software that makes sure only people who live in a specific neighborhood are able to join its network—giving users a level of privacy that sites like Facebook don't, email lists of inventive neighbors around Cupertino, California, inventive neighbors in the Lorelei neighborhood of Menlo Park, . . . .").

1   pre-clinical and clinical trials for *Teva's Neugranin and Neutroval products*").[8]

2   Because ChromaDex comes nowhere close to providing the level of specificity found

3   in the cases it cites, its reliance on them rings hollow.

4           b.   *ChromaDex Has Not Alleged Protectable Subject Matter*

5           ChromaDex's FAC likewise fails to plead facts demonstrating that the

6   purported trade secrets here have "independent economic value by being unknown to

7   the public." (*See* Mot. 14–16.) ChromaDex largely ignores the body of case law

8   Elysium presents underscoring that mere conclusory language cannot suffice.

9   Instead, ChromaDex devotes most of its energy to bolstering its claim that it

10  supposedly shielded the trade secrets from public knowledge. ChromaDex cites

11  *TMX Funding, Inc. v. Impero Technologies, Inc.* to support that it is "self-evident"

12  that some types of information would not be known to the public. *TMX Funding*,

13  2010 WL 2509979, at *4 (N.D. Cal. June 17, 2010). As is its practice, ChromaDex

14  artificially truncates its quotation from that case, which when considered in full,

15  demonstrates *why* certain information would not be generally known and would be

16  protected trade secrets:

17          Entities outside of Teledex certainly would not have general knowledge
18          of *Teledex's login and password information for access to Teledex's*
            *computer networks and servers*, nor would they have access to
19          Teledex's *software, source codes, data, formulas, business methods,*
            *marketing plans, or margin data*. At least with respect to Teledex's
20          login and password information, the information's only economic value
21          derives from the fact that it is *not* generally known to others.

22

23  *Id.* That type of specifically pled information – which "self-evidently" would be

24  private but for misappropriation – is a far cry from the broadly described

25

26  _____

27  [8] Surely not by coincidence, in quoting *Teva*, ChromaDex omitted the specific
    product names tested in the clinical trials there. (*See* Opp'n 23.) ChromaDex has
    not identified any clinical trials with the level of specificity that this Court deemed
28  sufficient in *Teva*.

"confidential and proprietary information" ChromaDex claims has independent economic value here.  (*See* FAC ¶¶ 111–12 ("the identity of potential customers and collaborators, knowledge of those customers, . . . contact information of one or more partners of ChromaDex, . . . clinical study designs, clinical safety reports, and clinical study data").)

It is perhaps unsurprising that ChromaDex is unable to allege in anything other than the barest of conclusory statements how the identity of its "collaborators" (FAC ¶ 111) or its "clinical study designs, clinical safety reports, and clinical study data" (FAC ¶ 112) qualify as trade secrets.  After all, its own *public SEC filings* include this information.  *See, e.g.*, Ex. 99.1 to ChromaDex's Form 8-K, filed Feb. 23, 2017, attached as Ex. A to the Declaration of Joseph N. Sacca, dated April 10, 2017, submitted in support of Elysium's Request for Judicial Notice (describing "twelve human clinical studies on nicotinamide riboside that are in various phases," including detailed information on two that are "fully sponsored by ChromaDex" and even one sponsored by Elysium).

### 2.   ChromaDex Has Failed to Plead a Misappropriation

The CUTSA and DTSA make clear that mere possession of trade secrets is not enough to state a claim for misappropriation.  A plaintiff must allege facts to show that the trade secret was "acquired, disclosed, or used" through "improper means." *See Cytodyn, Inc. v. Amerimmune Pharm., Inc.*, 160 Cal. App. 4th 288, 297 (2008) (discussing state statute); 18 U.S.C. § 1839(6) (same for federal statute). ChromaDex does not dispute its failure to allege in its FAC any act by Elysium improperly to acquire, disclose or use a purported trade secret.

ChromaDex instead argues that it has satisfactorily pled misappropriation because it alleged instances in which Elysium supposedly "induced" Mark Morris and Ryan Dellinger to disclose trade secrets.  (*See, e.g.*, FAC ¶ 111 ("[A]t the behest of Elysium, Morris wrongfully disclosed confidential proprietary information to Elysium . . . ."); *id.* ¶ 112 ("[A]t the behest of Elysium, Dellinger wrongfully

14

disclosed confidential proprietary information to Elysium . . . .").)  But ChromaDex never alleges anything more than conclusory language to enable this Court to determine whether ChromaDex has *any* factual basis for its claim.  *See Epicor Software Corp. v. Alt. Tech. Sols., Inc.*, 2013 WL 12130024, at *3 (C.D. Cal. Dec. 2, 2013) (allegation that "Epicor has, without authorization, acquired . . . customer information" insufficient to survive motion to dismiss); *Bioriginal Food & Sci. Corp. v. Biotab Nutraceuticals Inc.*, No. CV13-5704 CAS (Ex), 2013 WL 6572573, at *5 (C.D. Cal. Dec. 13, 2013) (dismissing trade secrets claim where complaint did not supply enough "factual content" to demonstrate that defendants acquired information through "improper means").  To the extent ChromaDex contends that Elysium improperly misappropriated trade secrets because ChromaDex's employees were parties to confidentiality agreements with ChromaDex, it fails to allege that Elysium knew of those agreements.  Its citation to the terse, unpublished memorandum decision in *Meggitt San Juan Capistrano, Inc. v. Yongzhong*, 575 F. App'x 801 (9th Cir. 2014), to suggest it need not do so is unpersuasive, as unpublished Ninth Circuit orders are "not precedent."  *See* 9th Cir. R. 36-3.

### 3.   ChromaDex Has Failed to Plead Damages

ChromaDex also contends that "actual damage is not a required element of a claim under CUTSA or the DTSA."  (Opp'n 17.)  ChromaDex mischaracterizes the holding of *Magic Laundry Services, Inc. v. Workers United Service Employees International Union* as being limited to "the context of a special motion to strike pursuant to California's Anti-SLAPP statute." (Opp'n 18.)  This is incorrect.  *Magic Laundry* addresses what elements are required for a "*prima facie* claim for misappropriation of trade secrets," and the third element is that "defendant's actions *damaged* the plaintiff."  *See Magic Laundry*, 2013 WL 1409530, at *3 (C.D. Cal. Apr. 8, 2013).  Cases in this District have repeatedly held that actual or threatened damage is an element of a trade secrets claim.  *E.g. Teva*, 2013 WL 12134185, at *3 (Carney, J.) (elements are "(1) possession by the plaintiff of a trade secret; (2) the

1   defendant's misappropriation of the trade secret, meaning its wrongful acquisition,

2   disclosure, or use; and (3) *resulting or threatened injury to the plaintiff*"); *Aqua*

3   *Connect, Inc. v. Code Rebel, LLC*, No. CV 11-5764-RSWL MANX, 2012 WL

4   469737, at *2 (C.D. Cal. Feb. 13, 2012) (elements are that "(1) the plaintiff owned a

5   trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret

6   through improper means, and (3) *the defendant's actions damaged the plaintiff*").

7        Moreover, ChromaDex does not include in its FAC *any* facts substantiating

8   that it has suffered either threatened or real harm.  As to the former, ChromaDex

9   suggests that it "would be gravely injured" if Elysium manufactured or obtained an

10   alternate supply of NR or pterostilbene.  (Opp'n 18.)  As described above, however,

11   the FAC does *not* allege that the trade secrets at issue here involve the manufacture

12   of NR or pterostilbene, and thus this "threatened harm" is not connected to

13   ChromaDex's trade secrets claims.  Likewise, ChromaDex does not describe at all

14   the "actual damages in an amount to be proven at trial" it supposedly has suffered.

15   (FAC ¶ 114.)

16           4.    <u>ChromaDex's Claims Under the DTSA Fail Because the Alleged</u>
17                 <u>Misconduct Precedes the DTSA's Effective Date</u>

18        Finally, ChromaDex's Opposition does not cure the FAC's absence of any

19   allegation involving Elysium that falls after the DTSA's effective date because it

20   offers nothing more than speculation that Elysium "*apparently* act[ed] with

21   information from Morris" when it purportedly contacted a ChromaDex research

22   partner weeks after Morris requested that partner's contact information from another

23   ChromaDex employee.  (Opp'n 27 (emphasis added).)  Why this is "apparent" goes

24   unexplained, especially since ChromaDex does not even allege Morris provided that

25   contact information to Elysium, but in any event, the FAC does not actually allege

26   that Elysium *did* act with such information.  ChromaDex also suggests that "[i]t can

27   also be properly inferred from the FAC's allegations that Elysium took further action

28   in violation of ChromaDex's trade secret rights after that date by discussing

ELYSIUM'S REPLY IN SUPPORT OF MOTION TO DISMISS

confidential NIAGEN research with that individual." (Opp'n 27.) This Court should decline to make any such inference when the FAC itself does not allege that Elysium ever discussed confidential NIAGEN research with any individual.

The only other dates ChromaDex offers following the DTSA's enactment are the dates Morris and Dellinger resigned from ChromaDex, acts that cannot possibly be considered a misappropriation of trade secrets. (Opp'n 27.) ChromaDex, in one last attempt to satisfy the DTSA's enactment provision, argues that "it is a plausible inference that Elysium improperly received further trade secret information" after May 11, 2016. Yet again, though, the FAC makes no such allegation, and any such "inference" is in reality no more than guesswork and speculation. In sum, ChromaDex does not allege in its FAC *any act* involving Elysium that relates to misappropriation and that post-dates the DTSA's enactment.

### III.   CONCLUSION

For the reasons stated herein and in the Motion, Elysium respectfully asks the Court to grant the Motion to Dismiss and dismiss ChromaDex's fourth, fifth and sixth claims with prejudice.

Dated:  April 10, 2017

                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                    FOLEY HOAG LLP


                    By:   */s/ Joseph N. Sacca*
                          JOSEPH N. SACCA
                          *Attorneys for Defendant and*
                          *Counterclaimant Elysium Health, Inc.*

ELYSIUM'S REPLY IN SUPPORT OF MOTION TO DISMISS