1  COOLEY LLP
ANTHONY M. STIEGLER (126414)
2  (astiegler@cooley.com)
EAMONN GARDNER (310834)
3  (egardner@cooley.com)
JON F. CIESLAK (268951)
4  (jcieslak@cooley.com)
SOPHIA M. RIOS (305801)
5  (srios@cooley.com)
4401 Eastgate Mall
6  San Diego, CA  92121
Telephone:  (858) 550-6000
7  Facsimile:  (858) 550-6420

8  *Attorneys for Plaintiff and Counter-Defendant
ChromaDex, Inc.*

9

10          **UNITED STATES DISTRICT COURT**

11          **CENTRAL DISTRICT OF CALIFORNIA**

12          **(SOUTHERN DIVISION)**

13

| 14 | ChromaDex, Inc. , | Case No. SACV 16-02277-CJC(DFMx) |
| 15 | Plaintiff, | **SECOND AMENDED COMPLAINT** |
| 16 | v. | **(1)  BREACH OF PTEROPURE SUPPLY AGREEMENT** |
| 17 | Elysium Health, Inc., | **(2) BREACH OF NIAGEN SUPPLY AGREEMENT;** |
| 18 | Defendant. | **(3) MISAPPROPRIATION OF TRADE SECRETS, CAL. CIV. CODE § 3426, ET SEQ.; AND** |
| 19 | Elysium Health, Inc., | **(4) MISAPPROPRIATION OF TRADE SECRETS, 18 U.S.C. § 1836.** |
| 20 | Counterclaimant, | |
| 21 | v. | |
| 22 | ChromaDex, Inc., | **DEMAND FOR JURY TRIAL** |
| 23 | Counter-Defendant. | |

24

25

26

27

28

Plaintiff ChromaDex, Inc. ("ChromaDex") brings this action for breach of contract and misappropriation of trade secrets against Elysium Health, Inc. ("Elysium") and seeks money damages, interest, disgorgement, attorney's fees, injunctive relief, and other relief.  ChromaDex demands a jury trial.

## NATURE OF THE CASE

1.     This case stems from defendant Elysium's concerted efforts to undermine and harm ChromaDex through willful breaches of contract, failures to pay for product purchased, deliberate refusals to constructively engage, and an implemented plan to steal and misappropriate technical and commercial trade secrets and confidential information from ChromaDex.

2.     ChromaDex is Elysium's sole authorized United States supplier of the two fundamental active ingredients in Elysium's only product: a dietary supplement named "Basis."  ChromaDex owns the United States patent estate covering at least one of those product components and supplied Elysium with NIAGEN®, a patented, proprietary health ingredient that is comprised of nicotinamide riboside ("NR"), and pTeroPure®, a patented, proprietary health ingredient made of pterostilbene.  Elysium promised to pay for those products, but now refuses to pay.

3.     On information and belief, Elysium's conduct and statements evidence its intent to act in an unlawful way deliberately designed to weaken and undermine ChromaDex, by withholding payments, soliciting and recruiting key employees, and stealing ChromaDex's confidential and trade secret information.

4.     Beginning in at least the spring of 2016, Elysium became openly antagonistic towards—and increased efforts to undermine, attack, and harm—ChromaDex.  In June 2016, Elysium induced ChromaDex to accept and fill large orders of NIAGEN and pTeroPure while never intending to pay for them, by making false and misleading representations.  On information and belief, Elysium intended to make ChromaDex its unwilling banker and lender, supporting Elysium's business by supplying Elysium with the two essential ingredients required for Elysium's product,

1.

but never intending to pay for them, and simultaneously stealing and exploiting ChromaDex's technical and commercial trade secrets to advance Elysium's own business.

5.     While simultaneously ordering extraordinarily large volumes of the essential ingredients from ChromaDex, Elysium also planned and implemented an employee and confidential information raid on ChromaDex, before revealing that it would refuse to pay for the product it ordered.  Elysium conspired with two senior ChromaDex employees to act as spies for Elysium, recruiting them to pass highly confidential information from ChromaDex to Elysium and inducing them to do so with the promise of better and/or more lucrative employment at Elysium.  Elysium prevailed on the two ChromaDex employees to misappropriate ChromaDex's trade secrets in violation of their express confidentiality agreements with ChromaDex, and on information and belief, Elysium has since used that confidential information for its own benefit with full knowledge that it orchestrated and directed the theft from ChromaDex. Indeed, shortly after passing ChromaDex's highly confidential trade secret technical, commercial, scientific and regulatory information to Elysium, the two employees abruptly resigned from ChromaDex and immediately accepted employment with Elysium.

6.     Elysium's breaches and unlawful conduct have caused millions of dollars of damages to ChromaDex.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over ChromaDex's claim for violation of the Federal Defense of Trade Secrets Act, 18 U.S.C. § 1836, pursuant to 28 U.S.C. § 1331.  The Court can exercise supplemental subject-matter jurisdiction over ChromaDex's state-law claims under 28 U.S.C. § 1367(a), and it should do so in order to promote judicial economy, avoid duplicative procedures, and avert the risk of inconsistent adjudications of the same issues of fact and law.

8.     Diversity jurisdiction is also conferred upon this Court by 28 U.S.C.

§ 1332 because the matter in controversy exceeds the sum or value of seventy-five thousand U.S. Dollars ($75,000), exclusive of interest and costs, and involves a Delaware Corporation with its principal place of business in New York and a California Corporation with its principal place of business in California.

9.  Venue is proper in this District under 28 U.S.C. § 1391 because ChromaDex is located in Orange County, California.

## PARTIES

10.  Plaintiff ChromaDex is a California Corporation with its principal place of business located at 10005 Muirlands Blvd, Suite G, Irvine, CA 92618.  ChromaDex discovers, acquires, develops, and commercializes patented and proprietary ingredient technologies in the dietary supplement, food, beverage, skin care, and pharmaceutical markets.  Its portfolio of patented ingredient technologies includes NIAGEN®, pTeroPure®, PURENERGY®, ProC3G®, and AnthOrigin™.

11.  Defendant Elysium is a Delaware Corporation with its principal place of business located at 594 Broadway, Suite 707, New York, NY, 10012.  Elysium describes itself as a company that utilizes science and technology to create consumer health products.

## FACTUAL ALLEGATIONS
### ChromaDex and Elysium

12.  ChromaDex sells NIAGEN and other ingredients to customers across the country, one of which was Elysium.

13.  NIAGEN is composed of NR.  NR is found naturally in trace amounts in milk and other foods and is a B3 vitamin metabolite.  The body converts NR into Nicotinamide Adenine Dinucleotide ("NAD+"), which is an essential molecule found in every living cell.  NR increases NAD+ levels in the body, which promote cellular metabolism, mitochondrial function, and energy production.

14.  NIAGEN is a patented, proprietary dietary ingredient owned by ChromaDex.  ChromaDex is the sole owner of the brand "NIAGEN" and the exclusive

licensee to several patents related to NR and its manufacture.

15.     pTeroPure is made up of pterostilbene, which activates a very specific nuclear receptor known as PPAR-alpha.  Nuclear receptors are proteins that activate gene expression.  PPAR-alpha is activated during fasting states or the prolonged periods without food.  Once activated, PPAR-alpha controls lipid metabolism among other essential functions.

16.     ChromaDex is the sole owner of the brand "pTeroPure."

17.     ChromaDex sold—and Elysium promised to buy and pay for—NIAGEN and pTeroPure pursuant to three contracts: (1) the NIAGEN Supply Agreement, dated February 3, 2014 (attached hereto as Exhibit A), as amended by the Amendment to Supply Agreement, dated February 19, 2016 (attached hereto as Exhibit B) (as so amended, the "NIAGEN Supply Agreement"); (2) the pTeroPure Supply Agreement, dated June 26, 2014 (attached hereto as Exhibit C) (the "pTeroPure Supply Agreement," and together with the NIAGEN Supply Agreement, the "Supply Agreements"); and (3) a Trademark License and Royalty Agreement, dated February 3, 2014.  The NIAGEN Supply Agreement and the Trademark License and Royalty Agreement are now terminated.

18.     Elysium sells a health supplement named Basis, which combines NIAGEN and pTeroPure, along with other non-active ingredients.  On information and belief, Basis is Elysium's only product.

19.     ChromaDex is the sole United States commercial source and supplier of the patent protected NR and was Elysium's sole supplier of NR and pterostilbene until ChromaDex exercised its right to not renew the NIAGEN Supply Agreement effective February 2, 2017.

**Elysium's False Promises**

20.     ChromaDex and Elysium's commercial arrangement was expanding but unremarkable until June 28, 2016.  In the first quarter of 2016, Elysium ordered nearly double the amount of NIAGEN it ordered in all of 2015.

21.     In the second quarter of 2016, Elysium first raised concerns about pricing under the NIAGEN Supply Agreement directly with Frank Jaksch, co-founder and CEO of ChromaDex, and Will Black, ChromaDex's Vice President of Sales and Marketing. Mr. Jaksch reached out to Elysium in an effort to open a dialogue about their concerns and ultimately resolve them.  Elysium, however, refused and/or ignored these offers to talk.

22.     On June 28, 2016, without any prior discussion or advance notification, Elysium submitted two extraordinarily large purchase orders for NIAGEN and pTeroPure (the "June 28 Purchase Orders").  These amounts were approximately seven times larger than any previous order from Elysium, and more than double the sum of all Elysium's prior orders combined.  The June 28 Purchase Orders included a demand for the two products at less than half the parties' agreed price.  Elysium never communicated about or discussed the proposed pricing changes with ChromaDex before submitting its June 28 Purchase Orders.  Elysium knew or should have known that ChromaDex would not accept the June 28 Purchase Orders at that price.

23.     Because the June 28 Purchase Orders were wildly inconsistent with the parties' Supply Agreements and past dealings, and in light of Elysium's subsequent failure to pay for the NIAGEN and pTeroPure supplied by ChromaDex, ChromaDex alleges on information and belief that Elysium intended to induce ChromaDex to inadvertently supply large amounts of NIAGEN and pTeroPure to Elysium at grossly discounted prices.

24.     ChromaDex noticed the grossly discounted prices on the June 28 Purchase Orders and did not fulfill them.  Instead, ChromaDex reached out to Elysium to discuss the June 28 Purchase Orders and their inconsistency with the parties' Supply Agreements.

25.     After Elysium again showed an unwillingness to engage with ChromaDex's senior management to discuss the June 28 Purchase Orders, Mark Morris—who was at the time ChromaDex's Vice President of Business Development

and the one person at ChromaDex whom Elysium would respond in a productive manner—helped schedule a call between ChromaDex and Elysium to address the issues between the parties, including the June 28 Purchase Orders. The call facilitated by Morris was set for June 30, 2016.

26. On June 30, 2016, Mr. Jaksch and Mr. Black of ChromaDex, joined a call with Elysium's CEO, Eric Marcotulli, and COO, Dan Alminana (the "June 30 Call").

27. On the June 30 Call, the parties discussed Elysium's concerns and the appropriate pricing of NIAGEN for the orders Elysium wished to place. Alminana and Marcotulli stated that Elysium intended to be a good business partner to ChromaDex and explained that Elysium was ramping up, which was the reason the June 28 Purchase Orders were far larger than their past orders. Alminana and Marcotulli represented that, due to the ramp up, Elysium expected to use all the NIAGEN ordered over the next few months and would place additional large orders in Q3 and Q4 2016. In reliance on Elysium's statements and promises, ChromaDex offered Elysium a discounted price for NIAGEN.

28. Though Elysium was not entirely satisfied with the discounted price, Marcotulli represented that Elysium would accept that price, place an order so that Elysium's supply was not interrupted, and work to resolve Elysium's remaining concerns at another time.

29. Later that same day, June 30, 2016, Elysium submitted two purchase orders to ChromaDex for pTeroPure and NIAGEN (the "June 30 Purchase Orders"). As agreed upon during the June 30 Call, the June 30 Purchase Orders superseded the (in retrospect, disingenuous) June 28 Purchase Orders. Although smaller than the June 28 Purchase Orders, the June 30 Purchase Orders were still three times the size of any of Elysium's previous fulfilled orders. According to the terms of the Supply Agreements, and in reliance on the representations Alminana and Marcotulli made on the June 30 Call, ChromaDex accepted the June 30 Purchase Orders.

30. ChromaDex filled the June 30 Purchase Orders on July 1, 2016 and

August 9, 2016.

31.   ChromaDex provided Elysium with three invoices for the shipments by email on July 1, 2016 and August 9, 2016 (the "Past Due Invoices").

32.   The total amount ChromaDex invoiced Elysium for the Past Due Invoices is $2,983,350.

33.   On August 10, 2016—one day after ChromaDex confirmed that it shipped the last portion of pTeroPure to Elysium—Alminana wrote an email to ChromaDex stating that Elysium would not pay the Past Due Invoices until the additional concerns raised on the June 30 Call were resolved according to terms set by Elysium.  However, over the next several weeks, Alminana refused ChromaDex's offers to meet, constructively engage, and resolve Elysium's concerns, all the while maintaining that Elysium would not pay for the product that it had received until Elysium's concerns were resolved.

34.   On August 12, 2016, Mr. Black of ChromaDex responded by requesting an in-person meeting to discuss Elysium's concerns and affirmed ChromaDex's commitment to its relationship with Elysium.

35.   Mr. Black received no response to his invitation for an in-person meeting, despite exchanging several emails with Alminana.  Mr. Black reiterated his invitation on August 17, 2016.  Alminana, yet again, ignored this invitation and refused to discuss the issues.   Elysium went dark, refusing to communicate with ChromaDex's management team.

36.   In late August and continuing into October 2016, ChromaDex continued to demand payment from Elysium of the $2,983,350 due for the Past Due Invoices, while also continuing to extend invitations to work toward a solution for all parties concerned and proposing such solutions.

37.   Elysium at all times refused to pay the amount due for the Past Due Invoices and to engage in discussions about a resolution.  Elysium refused to make good on Alminana and Marcotulli's promises on behalf of Elysium to attempt to resolve their

1   concerns with ChromaDex and have refused to pay for the June 30 Orders.

2       38.     To date, Elysium has not paid any sum to ChromaDex for product it

3   ordered, purchased, and received according to the June 30 Purchase Orders.

4   **Elysium's Intent To Harm ChromaDex**

5       39.     At the time Marcotulli and Alminana spoke on the June 30 Call, Elysium

6   had no intention of (1) ever working with ChromaDex to resolve Elysium's concerns

7   about the NIAGEN Supply Agreement, (2) paying for the NIAGEN or pTeroPure

8   ordered in the June 30 Purchase Orders, or (3) ramping up their sales to the degree they

9   represented.  Instead, unbeknownst to ChromaDex, Elysium was scheming to, or had

10  already, solicited and recruited two of ChromaDex's key employees and was further

11  plotting and implementing the theft of ChromaDex's trade secrets.

12      40.     After failing to induce ChromaDex to supply NIAGEN and pTeroPure at

13  grossly discounted prices with the June 28 Purchase Orders, Marcotulli and Alminana

14  made their false representations on the June 30 Call with the intent of inducing

15  ChromaDex to provide it with large supplies of NIAGEN and pTeroPure and to create

16  financial pressure for ChromaDex by refusing to pay for the orders and making

17  ChromaDex Elysium's unwilling bank and lender.

18      41.     On information and belief, Alminana and Marcotulli further intended to

19  use that financial pressure as bargaining leverage if and when Elysium ever decided to

20  resolve their concerns about the NIAGEN Supply Agreement.

21      42.     Alminana's and Marcotulli's intent is evidenced by the fact that

22  (1) Elysium never ramped up in a way that was consistent with Alminana and

23  Marcotulli's representations on the June 30 Call; (2) the NIAGEN and pTeroPure that

24  was delivered in July and August 2016 was a sufficient supply for Elysium until well

25  into 2017, months beyond what Alminana and Marcotulli projected on the June 30 Call;

26  and (3) Elysium did not place any other orders, let alone additional large orders, in Q3

27  and Q4 2016 as Alminana and Marcotulli represented it would.

28      43.     On information and belief, Marcotulli's and Alminana's false promises

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

8.

SECOND AMENDED COMPLAINT
16-CV-2277

were further motivated by the fact that Elysium, which was seeking financing during the middle of 2016 and at least into November 2016, has been able to improve its balance sheet by continuing to sell its product for millions of dollars in revenue without paying ChromaDex a dime for the supply, likely engaging in fictional book keeping and deceiving potential or actual investors about Elysium's financial condition.

### Breach of the pTeroPure Supply Agreement

44.    The pTeroPure Supply Agreement sets forth the terms under which ChromaDex would sell and deliver, and Elysium would purchase, pTeroPure.

45.    Section 2.1 of the pTeroPure Supply Agreement specifies that Elysium shall place orders for the product by submitting purchase orders.

46.    Section 2.2 sets the price for pTeroPure and states that "[f]ailure to make prompt and full payment hereunder constitutes a material breach of the Agreement."

47.    The invoices for the pTeroPure shipped on July 1, 2016 and August 9, 2016, contain payment terms specifying that payment must be made "30% Net30 70% Net60," meaning 30% of the payment is due within 30 days of the date of the invoice and 70% of the payment is due within 60 days of the date of the invoice.

48.    Elysium breached the pTeroPure Supply Agreement on July 31, 2016, by failing to pay 30% of the amount due within 30 days of the July 1, 2016 invoice.  It further breached the agreement by failing to pay any monies due before August 30, 2016, 60 days after the date of the July 1, 2016 invoice.

49.    Elysium breached the pTeroPure Supply Agreement on September 8, 2016, by failing to pay 30% of the amount due within 30 days of the August 9, 2016 invoice.  It further breached the agreement by failing to pay any monies due before October 8, 2016, 60 days after the date of the August 9, 2016 invoice.

### Breach of the NIAGEN Supply Agreement

50.    The NIAGEN Supply Agreement sets forth the terms under which ChromaDex would sell and deliver, and Elysium would purchase, NIAGEN.

51.    Section 7.4 of the NIAGEN Supply Agreement provides that it shall be

1    governed by and construed in accordance with the laws of the State of California.

2         52.    Section 3.1 of the NIAGEN Supply Agreement sets the maximum price

3    for NIAGEN provided by ChromaDex to Elysium.

4         53.    Section 3.4 of the NIAGEN Supply Agreement states that "Elysium Health

5    shall pay ChromaDex within thirty (30) days from the date of the applicable invoice by

6    ChromaDex to Elysium Health for all NIAGEN® purchased . . . ."

7         54.    Elysium breached the NIAGEN Supply Agreement on July 31, 2016 by

8    failing to pay the amount due within 30 days of the July 1, 2016 invoice, as required by

9    Section 3.4 of the agreement.

10        55.    On October 31, 2016, ChromaDex sent to Elysium, in writing, a notice

11   letter indicating it would not renew the NIAGEN Supply Agreement.  The NIAGEN

12   Supply Agreement, therefore, expired on February 2, 2017, according to Section 5.1 of

13   that agreement, following the initial term of three years.

14    **Elysium's Trade Secret Theft with the Aid of Mark Morris and Ryan Dellinger**

15        56.    Ryan Dellinger began working with ChromaDex in 2013 and held the

16   responsible position of "Director of Scientific Affairs."   Dellinger was one of

17   ChromaDex's lead scientists and was responsible for leading its clinical research and

18   supporting its regulatory efforts.   Dellinger was further responsible for managing

19   ChromaDex's relationships and interactions with its clinical research organization

20   collaborators.  His job responsibilities included managing the company's technological

21   and regulatory efforts and ensuring that they were synced and consistent with the

22   company's business strategies.  Dellinger further was responsible for managing all of

23   ChromaDex's relationships with the research universities and institutions who

24   requested and obtained ingredients from ChromaDex for research purposes.  Dellinger

25   was uniquely knowledgeable about ChromaDex's science, clinical research efforts, and

26   plans to validate and enhance the science behind ChromaDex's NIAGEN and

27   pTeroPure health products.

28        57.    Mark Morris began working for ChromaDex in 2007 and—following a

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

SECOND AMENDED COMPLAINT
16-CV-2277

brief tenure at another company—was steadily promoted until he attained the position of Vice President of Business Development.  Morris' responsibilities included creating long-term business goals for ChromaDex and implementing the strategies required to attain those goals.  Morris was intimately familiar with the confidential pricing for all of ChromaDex's products, by customer, and knew in detail which products were purchased by which customers and in what volume.  Beginning in 2015, Morris became ChromaDex's primary relationship manager with Elysium, and accordingly, developed what turns out to have been far too cozy a relationship, which is now known to have favored Elysium's interests over ChromaDex's.

58.   While employed at ChromaDex, both men were trusted insiders who had unfettered and complete access to, and responsibility for developing, ChromaDex's technical and commercial trade secrets, including scientific studies, clinical trial goals and strategies, business strategies, new intellectual property development, and the efforts to commercialize those assets.

59.   Pursuant to their Proprietary Information and Employee Confidentiality Agreements, both Morris and Dellinger contractually agreed and covenanted to maintain ChromaDex's trade secrets and information confidential, and specifically not to disclose ChromaDex's trade secret and proprietary information.

60.   Both men were seduced, induced, and encouraged by Elysium to breach those obligations.  They were both solicited by Elysium to steal and disclose ChromaDex's trade secrets and were recruited to work at Elysium.  Both succumbed to Elysium's solicitation and inducement, both stole ChromaDex's trade secrets, both shared those trade secrets with Elysium, both resigned from ChromaDex, and both immediately accepted employment with Elysium.

**Ryan Dellinger's Disclosures of the Trade Secret Safety Report and Study Proposal to Elysium and Leonard Guarente**

61.   Elysium's plan to do harm to ChromaDex is evident from the chronology of events.  In 2015, Elysium, on information and belief, asked Dellinger to share highly

Cooley LLP
Attorneys At Law
San Diego

11.

Second Amended Complaint
16-CV-2277

confidential information from ChromaDex about its clinical trial strategies and Dellinger complied.

62.    Leonard Guarente, Ph.D. is a founder of Elysium and Elysium's Chief Scientist.  On information and belief, Guarente is a significant stockholder in Elysium. Guarente directs Elysium's research and product development on NR and Basis and since 1982 has led the Glenn Lab for the Science of Aging at the Massachusetts Institute of Technology.  Guarente is one of seven senior members of Elysium's executive team, which now also includes Morris and Dellinger.

63.    On April 22, 2015, it is apparent that Dellinger and Guarente were engaged in close scientific communications about ChromaDex's studies, products, and business. In an email dated April 16, 2015, Elysium's Chief Operating Officer, Dan Alminana, introduced Dellinger to Guarente noting "Hi Lenny, please meet Ryan Dellinger, the scientific head at ChromaDex.  As discussed, we had a nice talk with him last night over dinner and thought it would be great for the two of you to chat.  Ryan thanks again for offering to connect with Lenny.  He is available on Wednesday at 1:30 p.m. ET.  Please feel free to call his office…"

64.    Dellinger did not miss a beat.  The same day four minutes later, he responded to both Alminana and Guarente saying "Dan, thank you for the introduction. Lenny, I will call your office on Wednesday at 1:30 eastern.  I look forward to speaking with you."  Guarente responded immediately saying "Hi Ryan, Looking forward to chatting soon.  Lenny".

65.    The conversation apparently took place, as evidenced by a subsequent email dated April 22, 2015 from Dellinger to Guarente, saying "Lenny, Great talking to you and I am excited about working closely with you and Elysium.  **Please find the safety report from our first clinical trial (and NAD+ data) and the outline of our 2nd trial getting ready to go in May.**  I would welcome any comments/insights you may have.  Best wishes, Ryan.  Ryan Dellinger, Ph.D., Director Scientific Affairs (ChromaDex)."

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

12.

SECOND AMENDED COMPLAINT
16-CV-2277

66.    The "safety report from our first clinical trial" ("Safety Report") and the "outline of our 2nd trial getting to ready to go in May" ("Study Proposal"), which Dellinger shared with Guarente, were ChromaDex's trade secrets and had not been disclosed, shared, or distributed by that date to any third parties in a complete form or outside of a confidentiality obligation.

67.    The Safety Report and the Study Proposal contained critical details and road map planning about ChromaDex's scientific path and the parameters that it was confidentially studying as well as highly sensitive and trade secret commercial information.  The Safety Report from ChromaDex's first clinical trial in 2014 with NR included, at a minimum, highly sensitive and proprietary trade secret information about NIAGEN's effectiveness and safety at different dosage levels, confidential details like the Schedule of Assessments, the Study Flow Diagram, the study objectives, the Investigation Plan, the Selection of the Study Population, the inclusion and exclusion criteria, the results of the demographics and characteristics of all randomized participants and screening, a Discussion and Overall Conclusions section, and at least seven tables of highly confidential data.

68.    The Study Proposal contained proprietary information about the nature of the planned study, and revealed aspects of ChromaDex's strategic plan for the development of sales channels for NIAGEN, as well as ChromaDex's detailed financial information regarding the study.  The Study Proposal was, in fact, expressly entitled "Study Proposal Confidentially Prepared for ChromaDex" and Dellinger was the key executive officer at ChromaDex responsible for interfacing with and directing the study contractor.

69.    All of the information in the Safety Report and Study Proposal was highly valuable to a competitor like Elysium, particularly in the hands of Elysium's founder and Chief Scientist, Guarente.  Dellinger was aware of the secrecy and value of these two documents, and indeed Dellinger was the "Study Contact" for both the Safety Study and the Study Proposal on behalf of ChromaDex.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

13.

SECOND AMENDED COMPLAINT
16-CV-2277

70.   Dellinger did not disclose to ChromaDex that he was sharing the Safety Report and the Study Proposal with Guarente and Elysium, nor did Dellinger ask for permission, which would have been refused or conditioned on redacting highly confidential and trade secret information contained in those documents.

71.   The Safety Report and the Study Proposal were both disclosed by Dellinger to Guarente and Elysium in violation of the Confidentiality Agreement Dellinger entered into with ChromaDex as a condition of his employment.

72.   ChromaDex, as a matter of practice, does not share confidential clinical study proposals or safety reports outside the company and neither document, or the information contained therein, had been shared outside the company at the time Dellinger sent them to Elysium.  The clinical study proposal has never been made public and only portions of the safety report have since been made public.  ChromaDex invested considerable time, money, and human resources to confidentially develop the clinical study proposal, and to design, conduct, and evaluate the clinical study, which the safety report analyzed.

73.   The value of ChromaDex's NIAGEN product and brand is derived and augmented from the development and execution of unique research initiatives supporting the safety and efficacy of NIAGEN, such as the two initiatives described in detail in the two documents sent by Dellinger to Elysium.  This value of ChromaDex's research is maintained by keeping such information confidential and maintaining ownership over the data which supports the benefits of ChromaDex's NIAGEN.

### The Disclosure of Trade Secret Commercial Information to Elysium by Mark Morris

74.   In 2016, Mark Morris's relationship with Elysium grew closer than he ever let on to his then-employer ChromaDex.  By at least April of 2016, Morris' allegiance to ChromaDex dissolved and shifted to Elysium.  On information and belief, this was no coincidence.  Rather it was the result of a full-court press by Elysium on both Dellinger and Morris to come work for Elysium and before doing so, to empty

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

14.

SECOND AMENDED COMPLAINT
16-CV-2277

1  ChromaDex's treasure chest of jewels to Elysium.  In fact, in an email to Elysium's

2  Chief Operating Officer Alminana, Morris incorrectly and falsely said, "Everyone here

3  [at ChromaDex] knows our success is truly dependent on Elysium.  Without you, we

4  are nothing.  They may never say it but the truth is undeniably [sic] to all."

5  75.  Then, without any notice or authorization from ChromaDex's

6  management, on or around April 28, 2016, Morris disclosed to Alminana and

7  Marcotulli facts regarding highly confidential discussions ChromaDex was having with

8  a company being considered as a potential collaborator on novel NR applications and

9  the related research initiatives necessary to support those applications.  Without

10  authority and in direct contravention of Morris' confidentiality obligations to

11  ChromaDex, Morris revealed the identity of the potential collaborator being considered

12  by ChromaDex, the status of the companies' discussions, and nonpublic information

13  gained through those discussions, from which Elysium could, and on information and

14  belief, did derive ChromaDex's business strategies.

15  76.  Indeed, Alminana and Marcotulli knew or should have known that the

16  information transmitted by Morris was confidential because Morris explicitly told them

17  that he was revealing the information "confidentially."  Morris's April 28, 2016 email

18  stated: "**Confidentially,** I am going to meet with ----- from ----- next week.  They are a

19  start up from ----- and -----. . . " (details omitted from this pleading for confidentiality).

20  77.  ChromaDex, as a matter of practice, does not reveal the identities of

21  companies with whom it is exploring collaborations because the information, as it did

22  in this instance, can reveal the confidential business strategies and initiatives it is

23  pursuing and which it intends will strengthen its competitiveness in the health ingredient

24  industry.  Further, ChromaDex derives value from maintaining a reputation in the

25  industry as a trusted party who is capable of maintaining secrecy over confidential

26  information gained in nonpublic discussions with other companies.  Morris's disclosure

27  of that information compromised ChromaDex.

28  78.  The information disclosed by Morris was transmitted in violation of the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

15.

SECOND AMENDED COMPLAINT
16-CV-2277

Confidentiality Agreement Morris entered into with ChromaDex as a condition of his employment.

79.    That was not the end of Morris's disclosures that are so far known to ChromaDex.  On or around May 25, 2016, Morris contacted Dellinger to make an unusual request for the contact information of one of ChromaDex's confidential contacts, with whom ChromaDex was exploring a licensing relationship and the development of scientific initiatives to support a novel application of pterostilbene. Morris's work at ChromaDex did not require that he contact the individual, nor was it related to the course and scope of his responsibilities.  Dellinger immediately shared that information with Morris.

80.    On information and belief, ChromaDex alleges that, after divulging proprietary information about the nonpublic opportunity to Elysium, from which Elysium could identify ChromaDex's strategy for further development of its intellectual property holdings, Morris asked for the contact information at Elysium's request and passed that information to Elysium.  On information and belief, Elysium would not have become aware of ChromaDex's research collaboration or the pterostilbene licensing opportunity but for obtaining that information from Morris and/or Dellinger.

81.    Less than one month later, on or around June 24, 2016, Dellinger was contacted by the same ChromaDex collaboration partner and potential licensor, who informed him that he had been contacted out of the blue by Elysium.  In response, Dellinger *encouraged* the ChromaDex's collaboration partner to talk with Elysium. Dellinger kept that information to himself, failed to inform anyone at ChromaDex that one of its most ambitious customers with an interest in pterostilbene was now in contact with a potential licensor and collaboration partner on one of ChromaDex's important strategic initiatives, and a result advanced Elysium's interests over ChromaDex's interests.

**Morris' and Dellinger's Abrupt Resignations from ChromaDex and**

**Immediate Hire by Elysium**

82.     On July 16, 2016, after many years of employment at ChromaDex, two weeks after the June 30 Orders and fifteen days after ChromaDex shipped the tremendous volume of NIAGEN and pTeroPure to ChromaDex, and with only one week of notice, Morris abruptly resigned from ChromaDex.  When asked about his future professional plans during his exit interview, Morris lied and told ChromaDex that he did not know what his next steps would be.  However, on information and belief, *the next business day* after his resignation from ChromaDex, Morris was on a plane to New York to Elysium's offices, and shortly thereafter Morris was formally hired by Elysium as its Head of Scientific Technology, where he remains to this day.

83.     On August 10, 2016—the same day that Elysium notified ChromaDex that it refused to pay the Past Due Invoices—Dellinger also resigned from ChromaDex *effective immediately*.  During his brief exit interview, Dellinger refused to say where he planned to work after his departure.  However, consistent with Elysium's strategic plan, Dellinger immediately joined Elysium in the same position he held at ChromaDex—Director of Scientific Affairs.  Dellinger continues to be employed by Elysium today.

84.     On information and belief, Morris knew Dellinger's compensation details at ChromaDex and conveyed confidential information to Elysium regarding Dellinger's pay and benefits at ChromaDex in order to enable Elysium to make an attractive offer, which would be accepted by Dellinger immediately.  As a matter of practice, ChromaDex keeps employee benefits and salary information confidential.

85.     On information and belief, ChromaDex alleges that since Morris's and Dellinger's departures from ChromaDex in July and August 2016 and subsequent employment with Elysium, Elysium has further misappropriated ChromaDex's trade secret information.  This belief is based on the fact that Elysium has systematically contacted and pursued relationships with many of ChromaDex's key NR and

pterostilbene collaborators, many of whom have never been publically revealed.

86.   The full extent of Elysium's misappropriation, effected by the improper disclosures and actions by Morris and Dellinger, is not yet known to ChromaDex and can only be uncovered through discovery.

**Elysium's Allegations of Patent Misuse and ChromaDex's Denial of Patent Misuse and Conduct to Purge Any Such Alleged Misuse**

87.   Elysium filed its First Amended Counterclaims on March 6, 2017 ("FACC"). (Dkt. 31.) Elysium's Fourth Counterclaim for Relief was for a declaratory judgment of patent misuse. (FACC ¶¶ 111–15.)

88.   Elysium alleges that ChromaDex engaged in patent misuse by "tying [] access to its patent rights to a royalty-bearing trademark license" (FACC ¶ 111) and, "in some instances," by "requir[ing] purchasers not only to license, but also to use ChromaDex trademarks in order to obtain a supply of nicotinamide riboside" (FACC ¶ 39).

89.   ChromaDex moved to dismiss Elysium's counterclaim for declaratory judgment of patent misuse on March 20, 2017 on multiple grounds and contends that there is no viable allegation of patent misuse as a matter of law and fact. (Dkt. 34.) However, the Court denied ChromaDex's motion to dismiss the patent misuse counterclaim by order dated May 10, 2017, permitting Elysium to attempt to prove its allegation of patent misuse at trial. (Dkt. 44.)

90.   ChromaDex denies that it has ever engaged in any act of alleged patent misuse and specifically denies that it has engaged in patent misuse by "tying [] access to its patent rights to a royalty-bearing trademark license" (FACC ¶ 111) and, "in some instances," by "requir[ing] purchasers not only to license, but also to use ChromaDex trademarks in order to obtain a supply of nicotinamide riboside" (FACC ¶ 39). ChromaDex further denies that Elysium's allegations constitute patent misuse as a matter of law.

91.   However, to eliminate an issue from this litigation, to conserve the parties'

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

18.

SECOND AMENDED COMPLAINT
16-CV-2277

and the Court's resources and to streamline this action, and without prejudice to ChromaDex's arguments and contentions, ChromaDex restates that it has already terminated the Trademark License and Royalty Agreement on February 2, 2017 and further, hereby unequivocally renounces any rights to collect, charge, or obtain royalties under the Trademark License and Royalty Agreement with Elysium. Pursuant to Section 14.1 of the Trademark License and Royalty Agreement and ChromaDex's notice sent to Elysium on October 31, 2016, the Trademark License and Royalty Agreement was permanently terminated along with the NIAGEN Supply Agreement, effective February 2, 2017. Accordingly, the allegedly offending terms of the Trademark License and Royalty Agreement as alleged by Elysium are no longer of any operative effect. The terminations of both agreements were made in the ordinary course of business and is noted here for the purpose of confirming the purge of any alleged patent misuse.

92. ChromaDex likewise hereby unequivocally renounces any rights to charge, obtain, or collect royalties on sales of non-trademark bearing NIAGEN from customers other than Elysium, or to require the use of its trademarks under any agreement. ChromaDex represents to the Court that it is immediately terminating all such trademark license agreements. These terminations are made for the purpose of purging any and all allegations of patent misuse.

93. ChromaDex is further refunding and/or crediting any and all past royalties paid by all customers pursuant to all "royalty-bearing trademark licenses." ChromaDex represents to the Court that it will provide a credit to Elysium for all past royalties against the damages owed by Elysium in this case, including for the failure to pay for product purchased.

94. These voluntary and proactive actions by ChromaDex are not an admission of any wrongdoing or acts of patent misuse, but instead are intended to prophylactically and completely eliminate issues in this and any other dispute related to ChromaDex's patents by purging any and all allegedly unlawful conduct with respect to all allegations

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

19.

SECOND AMENDED COMPLAINT
16-CV-2277

by Elysium of patent misuse. In particular, these voluntary acts are made to dissipate any and all alleged effects of any alleged patent misuse in the market. These voluntary steps taken by ChromaDex are intended to moot Elysium's allegation and counterclaim for a declaratory judgment that ChromaDex has misused any of its patents. Such counterclaim should be promptly voluntarily dismissed by Elysium, or dismissed *sua sponte* by the Court based on the unequivocal terminations and renouncements made herein.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Breach of Contract (pTeroPure Supply Agreement)

95. ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 94, above.

96. The pTeroPure Supply Agreement is a binding and enforceable contract between ChromaDex and Elysium.

97. ChromaDex fulfilled its obligations under the pTeroPure Supply Agreement by fulfilling the June 30, 2016 pTeroPure purchase order.

98. Elysium has materially breached the pTeroPure Supply Agreement by refusing to pay the monies owed to ChromaDex for the pTeroPure which ChromaDex delivered to Elysium.

99. Elysium's material breach of the pTeroPure Supply Agreement injured ChromaDex and caused it to sustain monetary damages in the amount of $580,750, plus interest.

### SECOND CLAIM FOR RELIEF

### Breach of Contract (NIAGEN Supply Agreement)

100. ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 99, above.

101. The NIAGEN Supply Agreement is a binding and enforceable contract between ChromaDex and Elysium.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

20.

SECOND AMENDED COMPLAINT
16-CV-2277

102.   ChromaDex fulfilled its obligations under the NIAGEN Supply Agreement by fulfilling the June 30, 2016 NIAGEN purchase order within 30 days.

103.   Elysium has materially breached the NIAGEN Supply Agreement by refusing to pay the monies owed to ChromaDex for the NIAGEN that ChromaDex sold and delivered to Elysium.

104.   Elysium's material breach of the NIAGEN Supply Agreement injured ChromaDex and caused it to sustain monetary damages in the amount of $2,402,600, plus interest.

### THIRD CLAIM FOR RELIEF

### Misappropriation of Trade Secrets under California Law

105.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 104, above.

106.   Defendants' conduct as alleged herein constitutes misappropriation of trade secrets under California Civil Code § 3426, et seq.

107.   Elysium has misappropriated ChromaDex's trade secrets including:

      a.   Confidential technical information, scientific information, clinical trial strategy and protocols, safety study data, business strategies, initiatives, and activities, including those related to nonpublic licensing opportunities and novel applications of NR and pterostilbene.

      b.   Confidential information about ChromaDex's potential NR and pterostilbene collaborators, including the potential collaborators' identities, the subjects and goals of the potential collaborations, the status of discussions, confidential information gained through discussions, and implications for other companies in the industry.

      c.   Confidential information about ChromaDex's actual NR and pterostilbene collaborators, including the subjects, results, and goals of the collaborations, including research initiatives.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

21.

SECOND AMENDED COMPLAINT
16-CV-2277

d. Confidential research initiatives related to NR, including novel applications of the ingredient, research designs, clinical study proposals (and financial estimates), and reports on ChromaDex's clinical data containing information that has never been made public.

e. Confidential information regarding ChromaDex's network of commercial relationships, including nonpublic research collaborators, licensors, and customers.

f. Confidential information concerning ChromaDex's employees' salary and benefits.

108.   ChromaDex has developed these trade secrets by expending a tremendous amount of time and resources on due diligence, relationship building, clinical research, obtaining the best employees, and the exercise of its business judgment, as developed over more than a decade in the health ingredient industry, regarding the most profitable opportunities for increasing the use and importance of NR and pterostilbene.

109.   ChromaDex's trade secrets as described above derive actual and potential economic value from not being generally known in that their use has resulted and continues to result in: the ability to obtain and retain customers; the ability to obtain and retain research partnerships with the brightest and most successful individuals and entities in the health ingredient industry; the ability to obtain or develop intellectual property concerning NR and pterostilbene, before other companies in the industry such as Elysium do so for themselves; the ability to identify and capitalize on promising opportunities for NR and pterostilbene before other companies in the industry such as Elysium do so for themselves; and the development of unique data regarding the value of its products as compared to other health products on the market.

110.   ChromaDex has made reasonable efforts to ensure that its trade secret information remains secret by, among other things: (1) informing its employees of the restricted and prohibited use of the information and that it constitutes a trade secret;

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

22.

SECOND AMENDED COMPLAINT
16-CV-2277

(2) making its employees with access to such information party to confidentiality agreements as conditions of their employment with ChromaDex; (3) by restricting access to its trade secret information to only employees who have executed its confidentiality agreement and acknowledged and agreed to keep ChromaDex's trade secrets secret; and (4) employing policies restricting the dissemination and use of its proprietary information.

111. Morris, by virtue of his position with ChromaDex, had access to ChromaDex's proprietary and confidential information and trade secrets, which he agreed to maintain as confidential and not to disclose or use that information in any way contrary to the interests of ChromaDex.

112. Dellinger, by virtue of his position with ChromaDex, had access to ChromaDex's proprietary and confidential information and trade secrets, which he agreed to maintain as confidential and not to disclose or use that information in any way contrary to the interests of ChromaDex.

113. During his employment with ChromaDex and after, at the behest of Elysium, Morris wrongfully disclosed ChromaDex's trade secrets to Elysium.

114. During his employment with ChromaDex and after, at the behest of Elysium, Dellinger wrongfully disclosed ChromaDex's trade secrets to Elysium.

115. ChromaDex is informed and believes and based thereon alleges that Elysium conspired with Morris and Dellinger to misappropriate ChromaDex's trade secrets, and has used or intends to use that information to (1) demand more favorable pricing from ChromaDex; (2) induce customers to sever their relationships with ChromaDex; (3) disrupt ChromaDex's existing commercial relationships with other companies and researchers; (4) induce or attempt to induce ChromaDex employees to leave ChromaDex and join Elysium; (5) obtain or attempt to obtain licenses which Elysium knows ChromaDex to be interested in before ChromaDex does; and (6) obtain an alternative supply of NR and pterostilbene or a method for manufacturing the products itself.

Cooley LLP
Attorneys At Law
San Diego

23.

Second Amended Complaint
16-CV-2277

116.  ChromaDex is informed and believes and based thereon alleges that Elysium knew or had reason to know that Morris and Dellinger had a duty to maintain secret the confidential and proprietary information disclosed to Elysium, and that its acquisition of that information from Morris and Dellinger was improper.

117.  As a proximate result of Elysium's misappropriation of ChromaDex's trade secrets and confidential information, ChromaDex has suffered actual damages in an amount to be proven at trial.  On information and belief, ChromaDex has been damaged inter alia because, through its theft, Elysium has been able to obtain an alternate supply of NR and/or pterostilbene or has been able to manufacture the ingredients itself.

118.  ChromaDex alleges on information and belief that Elysium's acts were willful and malicious acts in that they misappropriated ChromaDex's trade secrets with a deliberate intent to injure ChromaDex's business and improve Elysium's business, thereby depriving ChromaDex of property and legal rights otherwise causing injury. Such actions were fraudulent, willful, malicious, and oppressive and constitute despicable conduct and subjected ChromaDex to unjust hardship in conscious disregard of ChromaDex's rights so as to justify an award of exemplary or enhanced damages under California Civil Code § 3426.3(c), and attorney's fees pursuant to California Civil Code § 3426.4.

119.  Elysium's continuing wrongful conduct in misappropriating ChromaDex's trade secrets, unless and until enjoined and restrained by order of this Court, will result in irreparable harm to ChromaDex's business in that ChromaDex trade secrets are being and will continue to be compromised, ChromaDex is in danger of losing profitable business partners, and in addition, ChromaDex's business in this market will be substantially damaged or destroyed before this action can be brought to trial. ChromaDex has no adequate remedy at law and will be irreparably harmed absent relief enjoining such misappropriation.

120.  ChromaDex has no adequate remedy at law for the injuries it is currently

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

24.

SECOND AMENDED COMPLAINT
16-CV-2277

suffering and Defendants will continue to use the misappropriated trade secrets of ChromaDex and ChromaDex will be required to maintain a multiplicity of judicial proceedings in order to protect its interest.

## FOURTH CLAIM FOR RELIEF

### Federal Defense of Trade Secrets Act

121.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 120, above.

122.   Defendants have undertaken a deliberate plan to engage in the conduct alleged in this complaint and incorporated into this cause of action.   These actions constitute a violation of the Federal Defense of Trade Secrets Act, 18 U.S.C. § 1836, as amended.

123.   The products and information embodying ChromaDex's technology have been used in interstate commerce, as evidenced by the business relationship with Elysium in New York, and are intended to be used in interstate commerce.

124.   ChromaDex alleges on information and belief that Defendants acted willfully and maliciously in that they misappropriated ChromaDex's trade secrets so as to justify an award of exemplary damages under 18 U.S.C. § 1836(b)(3)(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ChromaDex requests that Judgment be entered in its favor as follows:

a) On the First Cause of Action, monetary damages in an amount to be proved at trial, but believed to be no less than $580,750, plus interest (including prejudgment interest);

b) On the Second Cause of Action, monetary damages in an amount to be proved at trial, but believed to be no less than $2,402,600, plus interest (including prejudgment interest);

c) On the Third Cause of Action, monetary damages in an amount to be proved at trial, plus interest (including prejudgment interest), enhanced damages

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

25.

SECOND AMENDED COMPLAINT
16-CV-2277

exemplary damages, disgorgement, attorneys' fees, costs and injunctive relief;

d) On the Fourth Cause of Action, monetary damages in an amount to be proved at trial, plus interest (including prejudgment interest), enhanced damages, exemplary damages, disgorgement, attorneys' fees, costs and injunctive relief;

e) On all causes of action, for attorney's fees as allowed by law;

f) On all causes of action, for such other and further legal and equitable relief as the Court may deem just and proper.

## **Request for Jury Trial**

ChromaDex hereby requests trial by jury on all causes of action for which a jury trial is available.

Dated:      May 24, 2017                     COOLEY LLP
                                             ANTHONY M. STIEGLER (126414)
                                             EAMONN GARDNER (310834)
                                             JON F. CIESLAK (268951)
                                             SOPHIA M. RIOS (305801)


                                             */s/ Anthony M. Stiegler*
                                             Anthony M. Stiegler (126414)

                                             *Attorneys for Plaintiff and Counter-*
                                             *Defendant ChromaDex, Inc.*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

26.

SECOND AMENDED COMPLAINT
16-CV-2277