COOLEY LLP
MICHAEL ATTANASIO (151529)
(mattanasio@cooley.com)
EAMONN GARDNER (310834)
(egardner@cooley.com)
JON F. CIESLAK (268951)
(jcieslak@cooley.com)
BARRETT J. ANDERSON (318539)
(banderson@cooley.com)
SOPHIA M. RIOS (305801)
(srios@cooley.com)
JAYME B. STATEN (317034)
(jstaten@cooley.com)
4401 Eastgate Mall
San Diego, CA  92121
Telephone: (858) 550-6000
Facsimile:  (858) 550-6420

*Attorneys for Plaintiff and Counter-Defendant
ChromaDex, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### (WESTERN DIVISION)

| | |
|---|---|
| ChromaDex, Inc., | Case No. SACV 16-02277-CJC(DFMx) |
| Plaintiff, | **FIFTH AMENDED COMPLAINT** |
| v. | **(1)  BREACH OF pTEROPURE SUPPLY AGREEMENT (Elysium);** |
| Elysium Health, Inc. and Mark Morris, | **(2)  BREACH OF NIAGEN SUPPLY AGREEMENT (Elysium);** |
| Defendants. | **(3)  MISAPPROPRIATION OF TRADE SECRETS, CAL. CIV. CODE § 3426, ET SEQ. (Elysium and Morris);** |
| Elysium Health, Inc., | **(4)  MISAPPROPRIATION OF TRADE SECRETS, 18 U.S.C. § 1836 (Elysium and Morris);** |
| Counterclaimant, | |
| v. | **(5)  BREACH OF FEBRUARY CONFIDENTIALITY AGREEMENT (Morris);** |
| ChromaDex, Inc., | **(6)  BREACH OF JULY CONFIDENTIALITY AGREEMENT (MORRIS)** |
| Counter-Defendant. | |
| | **(7)  BREACH OF FIDUCIARY DUTY** |

1

2

3

4

(Morris);

(8) **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Elysium).**

**DEMAND FOR JURY TRIAL**

Plaintiff ChromaDex, Inc. ("ChromaDex") brings this action for breach of contract, misappropriation of trade secrets, and aiding and abetting breach of fiduciary duty against Elysium Health, Inc. ("Elysium"), and for breach of contract, misappropriation of trade secrets, and breach of fiduciary duty against Mark Morris ("Morris"), an individual, and seeks money damages, punitive damages, interest, attorneys' fees, and other relief.  ChromaDex demands a jury trial.

## <u>NATURE OF THE CASE</u>

1.      This case stems from defendant Elysium's concerted efforts to undermine and harm ChromaDex through the recruitment of former ChromaDex Vice President of Business Development, Morris, encouragement and inducement of Morris to breach his fiduciary duty and contractual obligations to ChromaDex, Morris's and Elysium's coordinated misappropriation of ChromaDex's trade secrets and other valuable documents and information, willful breaches of the confidentiality provisions of the parties' contracts, Elysium's failure to pay for millions of dollars in product it received from ChromaDex and re-sold, and Morris's and Elysium's coordinated poaching of another senior ChromaDex employee.

2.      ChromaDex was Elysium's sole supplier of the two fundamental active ingredients in Elysium's only product: a dietary supplement named "Basis." ChromaDex owns the United States patent estate covering at least one of those product components and supplied Elysium with NIAGEN®, a patented, proprietary health ingredient that is comprised of nicotinamide riboside ("NR"), and pTeroPure®, a patented, proprietary health ingredient made of synthetic pterostilbene.  Elysium promised to pay for those products, but now refuses to pay.

3.      Elysium's conduct and statements evidence its intent to deliberately weaken and undermine ChromaDex by cheating off of ChromaDex's confidential and proprietary information with the help of Morris, withholding payments for products it ordered and received, and making ChromaDex Elysium's unwilling lender as it endeavored to create its own supplies of NR and synthetic pterostilbene.

4.      Beginning in at least the spring of 2016, Elysium became openly antagonistic towards—and increased efforts to undermine, attack, and harm—ChromaDex.  With offers of employment, Elysium induced Morris, then ChromaDex's Vice President of Business Development, to begin feeding Elysium ChromaDex's confidential and trade secret information while he was still a ChromaDex officer. Morris acted as Elysium's inside agent at ChromaDex for nearly two months in breach of his fiduciary duty to ChromaDex and its shareholders before terminating his employment with ChromaDex and beginning official employment with Elysium.

5.      Based on this wrongfully obtained information and with Morris's inside and influential help, in June 2016, Elysium induced ChromaDex to accept and fill large orders of NIAGEN and pTeroPure while never intending to pay for them, all by making false and misleading representations.  On information and belief, Elysium intended to make ChromaDex its unwilling banker and lender, supporting Elysium's business by supplying Elysium with nine months' worth of the two essential ingredients required for Elysium's product, all while Elysium invested the money it owed to ChromaDex into developing its own alternative sources of NR and pterostilbene.

6.      Shortly after ChromaDex shipped most of the extraordinarily large volumes of ingredients to Elysium, Morris, having achieved his goals for Elysium, left ChromaDex, taking ChromaDex's trade secrets along with him to Elysium. Shortly after the remaining ingredients shipped, Elysium executed the remainder of its planned employee raid, hiring another senior ChromaDex employee Morris had recruited on its behalf, before notifying ChromaDex that it would refuse to pay for the product it ordered.

3.

7.     Morris and the other former ChromaDex employee took several ChromaDex documents with them to Elysium and thereby breached their confidentiality agreements with ChromaDex and assisted Elysium in its misappropriation of ChromaDex's trade secret information and other proprietary information and documents. These former ChromaDex employees have enabled Elysium to unlawfully benefit from the substantial investments ChromaDex has made in advancing NR and pterostilbene in the market and clearing regulatory hurdles necessary to produce and market the ingredients.

8.     Elysium's and Morris's breaches and theft have caused millions of dollars of damages to ChromaDex and enabled Elysium to profit at ChromaDex's expense.

## JURISDICTION AND VENUE

9.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of seventy-five thousand U.S. Dollars ($75,000), exclusive of interest and costs, and involves a Delaware Corporation with its principal place of business in New York and a New York resident, and a California Corporation with its principal place of business in California.

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 in that this case arises under the laws of the laws of the United States pursuant to the Defend Trade Secrets Act of 2016, specifically 18 U.S.C. § 1836 *et seq.*

11.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a) because the claims are so related to the federal claims that they form a part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because: (1) ChromaDex is located in Orange County, California; (2) Defendants' tortious conduct occurred in this district or was directed at this district; and (3) a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

13.     Plaintiff ChromaDex is a California Corporation with its principal place of business located at 10005 Muirlands Blvd, Suite G, Irvine, CA 92618. ChromaDex discovers, acquires, develops, and commercializes patented and proprietary ingredient technologies in the dietary supplement, food, beverage, skin care, and pharmaceutical markets. Its portfolio of patented ingredient technologies includes NIAGEN®, pTeroPure®, PURENERGY®, ProC3G®, and AnthOrigin™.

14.     Defendant Elysium is a Delaware Corporation with its principal place of business located at 594 Broadway, Suite 707, New York, NY, 10012. Elysium describes itself as a company that utilizes science and technology to create consumer health products.

15.     Defendant Mark Morris is an individual who, on information and belief, resides in New York, NY. Morris is Elysium's current Vice President of Research and Development and ChromaDex's former Vice President of Business Development. On information and belief, Morris resided in California continuously between at least November 1999 and August 2016. Further, by virtue of his employment and various contracts that Morris executed with ChromaDex, Morris agreed to submit to the jurisdiction of any court in California regarding any dispute arising from his contractual obligations to ChromaDex.

## FACTUAL ALLEGATIONS

### ChromaDex and Morris

16.     Morris began employment with ChromaDex in 2007 as a Technical Sales Representative. In 2009, Morris left ChromaDex to pursue employment elsewhere but returned to ChromaDex on January 13, 2011, again as a Technical Sales Representative. Morris was later promoted to the position of Director of Ingredient Sales.

17.     On November 25, 2013, Morris was promoted from the position of Director of Ingredient Sales to Vice President of Sales and Marketing.

18.     As the Vice President of Sales and Marketing, Morris participated in the management of ChromaDex. He oversaw the duties of several employees, helped determine employee compensation, and had input in other personnel decisions, such as hiring, promoting, disciplining, and terminating ChromaDex employees. Morris also had input in ChromaDex's strategic decisions regarding sales and marketing.

19.     On February 26, 2016, Morris executed a confidentiality agreement entitled Receipt & Acknowledgment of Employee Handbook (the "February Confidentiality Agreement"). (*See* Exhibit A.) Morris was required to enter the February Confidentiality Agreement as a condition of his continued employment with ChromaDex.

20.     The February Confidentiality Agreement executed by Morris states in part:

> I understand that during the course of my employment, I may be working with clients, computer systems, software, future plans, strategies and other information that is the property of the Company, and that the Company considers proprietary or confidential. I agree to protect this information by safeguarding it when using it, filing it properly when not using it, and discussing it only with those who have a legitimate business need to know. Furthermore, should I leave the Company for any reason, I understand that all files, documents and software remain the property of the Company and may not be duplicated or removed from the Company. Even after my employment with the Company has terminated, I agree to keep strictly confidential that information which is treated as confidential or proprietary by the Company.

21.     The February Confidentiality Agreement is a valid contract between ChromaDex and Morris obligating Morris to keep ChromaDex's proprietary and confidential information secret during and after his employment and prohibiting him from duplicating or removing all ChromaDex files and documents should he leave ChromaDex.

22.     In 2016, ChromaDex again promoted Morris, this time to the position of Vice President of Business Development. Morris continued to have a role in the management of ChromaDex in this position.

23.     On July 15, 2016, Morris terminated his employment with ChromaDex. On that date, before his termination was completed, Morris and ChromaDex executed a Confidentiality and Non-Solicitation Agreement that affirmed Morris's commitment to guard ChromaDex's trade secrets and other confidential information (the "July Confidentiality Agreement." (*See* Exhibit B.)

24.     Sections 2 and 3 of the July Confidentiality Agreement required Morris to return all tangible items, such as computer stored information and disks, and all ChromaDex trade secret and confidential information, to ChromaDex upon the termination of his employment.

25.     Section 3 of the July Confidentiality Agreement also prohibited Morris from disclosing ChromaDex trade secret and confidential information to any other person or business entity, or using or permitting others to use such information.

26.     During his exit interview at ChromaDex, Morris represented that he had returned all of ChromaDex's files and documents and that he would maintain the confidentiality of ChromaDex's confidential and trade secret information. ChromaDex relied on these representations, in part because they were made by Morris as a departing ChromaDex manager, and did not take further action to protect its information.

27.     As an officer of ChromaDex who participated in management, Morris had a fiduciary duty to ChromaDex and its shareholders to put forth his best efforts to advance ChromaDex's interests in every way and to refrain from doing anything to harm ChromaDex, and to act in good faith. Morris's fiduciary duty arose by at least November 25, 2013, and continued until he terminated his employment with ChromaDex on July 15, 2016.

### ChromaDex and Elysium

28.     ChromaDex sells NIAGEN and other ingredients to customers across the country, one of which was Elysium.

29.     NIAGEN is composed of NR.  NR is found naturally in trace amounts in milk and other foods and is a B3 vitamin metabolite.  The body converts NR into Nicotinamide Adenine Dinucleotide ("NAD+"), which is an essential molecule found in every living cell.  NR increases NAD+ levels in the body, which promote cellular metabolism, mitochondrial function, and energy production.

30.     NIAGEN is a patented, proprietary dietary ingredient owned by ChromaDex.  ChromaDex is the sole owner of the brand "NIAGEN" and the exclusive licensee to several patents related to NR and its manufacture.

31.     pTeroPure is made up of synthetic pterostilbene, which activates a very specific nuclear receptor known as PPAR-alpha.  Nuclear receptors are proteins that activate gene expression.  PPAR-alpha is activated during fasting states or the prolonged periods without food.  Once activated, PPAR-alpha controls lipid metabolism among other essential functions. Most pterostilbene products on the market are extracted from biological sources rather than chemically synthesized.

32.     ChromaDex is the sole owner of the brand "pTeroPure" and the exclusive licensee to several patents related to the synthesis of pterostilbene.

33.     ChromaDex sold—and Elysium promised to buy and pay for—NIAGEN and pTeroPure pursuant to three contracts: (1) the NIAGEN Supply Agreement, dated February 3, 2014 (attached hereto as Exhibit C), as amended by the Amendment to Supply Agreement, dated February 19, 2016 (attached hereto as Exhibit D) (as so amended, the "NIAGEN Supply Agreement"); (2) the pTeroPure Supply Agreement, dated June 26, 2014 (attached hereto as Exhibit E) (the "pTeroPure Supply Agreement," and together with the NIAGEN Supply Agreement, the "Supply Agreements"); and (3) a Trademark License and Royalty Agreement, dated February 3, 2014.   The NIAGEN Supply Agreement and the Trademark License and Royalty Agreement are now terminated.

34.     Elysium sells a health supplement named Basis, which combined NIAGEN and pTeroPure, along with other non-active ingredients.  Elysium now sells Basis with NR and pterostilbene it obtains from sources other than ChromaDex.  On information and belief, Basis is Elysium's only commercial product.

35.     ChromaDex was the sole United States commercial source and supplier of NR and was Elysium's sole supplier of NR and pterostilbene, until Elysium diverted the funds it owed ChromaDex into developing its own alternative sources of both ingredients.  Elysium secretly recruited two senior ChromaDex employees to help it achieve its goal before it exhausted nine months' worth of ingredients it had stockpiled from ChromaDex.  Upon Elysium's unlawful refusal to pay for the product it received, ChromaDex exercised its right to not renew the NIAGEN Supply Agreement effective February 2, 2017.

## Elysium's and Morris's False Pretenses and Promises

36.     When Elysium and ChromaDex first began negotiations for the supply of NR, Elysium demanded a sublicense to ChromaDex's NR patent rights. ChromaDex rejected that demand. This left Elysium with a trusted supply of NR from ChromaDex but no ownership.  Elysium was not content with this outcome, and thereafter hatched its plan to steal product and proprietary information from ChromaDex.

37.     ChromaDex and Elysium's commercial arrangement was expanding but unremarkable until 2016.  In the first quarter of 2016, Elysium ordered nearly double the amount of NIAGEN it ordered in all of 2015.

38.     Unbeknownst to ChromaDex, in April of 2016 Elysium began recruiting ChromaDex's Vice President of Business Development, Mark Morris.

39.     Elysium induced Morris to breach his contractual obligations to ChromaDex with offers of employment. Morris began feeding Elysium confidential and proprietary information on ChromaDex's sales to other customers. In May of 2016, Morris texted Elysium ChromaDex trade secret information concerning the prices and volumes of NR ordered by another ChromaDex customer. Elysium recorded this wrongly obtained trade secret information in a spreadsheet.

40.     The trade secret sales information that Morris sent to Elysium could have only been known to a ChromaDex employee by virtue of his employment with ChromaDex and was ChromaDex property. The information is kept in a highly-confidential central document at ChromaDex called the "Ingredient Sales Spreadsheet," which tracks all sales for all ingredients by quarter since 2012.

41.     The information concerning the purchasing history of the customer Morris sent to Elysium was extremely valuable to Elysium as that customer was one of Elysium's largest competitors selling NR in the direct-to-consumer market at the time.

42.     Elysium encouraged Morris to continue acting on its behalf in violation of his fiduciary duty to ChromaDex by making a firm offer of employment to Morris in exchange for his commitment to act as Elysium's inside agent before he terminated his employment with ChromaDex. Morris accepted that offer, stole proprietary information from ChromaDex on his way out the door, and began working for Elysium.  With a ChromaDex insider in its pocket, Elysium saw an opportunity to execute on its long-held desire to take ChromaDex out of the equation, destroy the competition, and execute its campaign to own NR.

43.     To enable Morris to further act on its behalf without discovery by ChromaDex,  Elysium kept its knowingly wrongful possession of the confidential ChromaDex sales information secret. ChromaDex did not discover Elysium's possession of the ChromaDex trade secret information until Elysium produced a spreadsheet containing it in discovery in this action.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

10.

FIFTH AMENDED COMPLAINT
16-CV-2277

44.     On information and belief, Elysium used the wrongfully-obtained sales information to construct a plan to try to obtain a market advantage over its competitors, as well as ChromaDex, based on a misconstruction of the NIAGEN Supply Agreement. Elysium improperly used the sales information—without revealing its true intentions—to engage ChromaDex in a series of questions about NR pricing for the purpose of seeking out-of-context statements to support its greedy and dishonest aims.

45.     To that end, after Elysium surreptitiously and illegally obtained the trade secret information from Morris, Dan Alminana, Elysium's COO, immediately requested the exact same information from Frank Jaksch, ChromaDex's CEO, under the false pretense that the information was needed for a potential investor. This was the first time Elysium raised concerns about pricing under the NIAGEN Supply Agreement.

46.     Mr. Jaksch reached out to Elysium in an effort to open a dialogue about their concerns and ultimately resolve them.  Elysium, however, refused and/or ignored these offers to talk while it schemed with Morris to inflict as much harm as possible on ChromaDex.

47.     As shown through discovery in this action, in mid-June 2016 Elysium began planning to order a 12-month supply of NIAGEN and pTeroPure from ChromaDex.

48.     Elysium conspired with Morris to implement this plan. Elysium and Morris agreed that before Morris left ChromaDex to work at Elysium, he would act as Elysium's inside agent, ensuring the success of Elysium's scheme to harm ChromaDex by wrongfully giving Elysium information to inform its strategy and by abusing the trust ChromaDex's management and shareholders placed in him to manipulate ChromaDex into accepting the extraordinarily large purchase orders Elysium planned to place.

Cooley LLP
Attorneys At Law
San Diego

11.

Fifth Amended Complaint
16-CV-2277

49.    Elysium and Morris further agreed to keep Elysium's plan to compete with ChromaDex in the manufacture of NR and synthetic pterostilbene secret from ChromaDex and to use ChromaDex's confidential and proprietary documents to help Elysium bring its alternate sources of ingredients to market before it exhausted the stockpile of NR and pterostilbene it planned to obtain from ChromaDex. Morris knew that such competition would harm ChromaDex, which has certain patent rights to both ingredients, and had a fiduciary duty to inform ChromaDex of Elysium's plans to displace ChromaDex in the market.

50.    On June 28, 2016, without any prior discussion or advance notification to ChromaDex, Elysium submitted two extraordinarily large purchase orders for NIAGEN and pTeroPure (the "June 28 Purchase Orders").  These amounts were approximately seven times larger than any previous order from Elysium, and more than double the sum of all Elysium's prior orders combined.  The June 28 Purchase Orders included a demand for the two products at less than half the parties' agreed price.  Elysium never communicated about or discussed the proposed pricing changes with ChromaDex before submitting its June 28 Purchase Orders.  Elysium knew or should have known that ChromaDex would not accept the June 28 Purchase Orders at that price.

51.    Because the June 28 Purchase Orders were wildly inconsistent with the parties' Supply Agreements and past dealings, and in light of Elysium's subsequent failure to pay for the NIAGEN and pTeroPure supplied by ChromaDex, ChromaDex alleges on information and belief that Elysium intended to induce ChromaDex to inadvertently supply large amounts of NIAGEN and pTeroPure to Elysium at grossly discounted prices.

52.    ChromaDex noticed the grossly discounted prices on the June 28 Purchase Orders and did not fulfill them.  Instead, ChromaDex reached out to Elysium to discuss the June 28 Purchase Orders and their inconsistency with the parties' Supply Agreements.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

12.

FIFTH AMENDED COMPLAINT
16-CV-2277

53.   After Elysium again showed an unwillingness to engage with ChromaDex's senior management to discuss the June 28 Purchase Orders, Morris helped schedule a call between ChromaDex and Elysium to address the issues between the parties, including the June 28 Purchase Orders.  The call facilitated by Morris was set for June 30, 2016.

54.   On June 30, 2016, Mr. Jaksch and Will Black of ChromaDex, joined a call with Elysium's CEO, Eric Marcotulli, and Alminana (the "June 30 Call").

55.   On the June 30 Call, the parties discussed Elysium's concerns and the appropriate pricing of NIAGEN for the orders Elysium wished to place.  Alminana and Marcotulli falsely stated that Elysium intended to be a good business partner to ChromaDex and explained that Elysium was ramping up, which was the reason the June 28 Purchase Orders were far larger than their past orders.   Alminana and Marcotulli dishonestly represented that, due to the ramp up, Elysium expected to use all the NIAGEN ordered over the next few months and would place additional large orders in Q3 and Q4 2016.  In reliance on Elysium's statements and promises, ChromaDex offered Elysium a discounted price for NIAGEN.

56.   Though Elysium was not entirely satisfied with the discounted price, Marcotulli represented that Elysium would accept that price, place an order so that Elysium's supply was not interrupted, and work to resolve Elysium's remaining concerns at another time.

57.   Later that same day, June 30, 2016, Elysium submitted two purchase orders to ChromaDex for pTeroPure and NIAGEN (the "June 30 Purchase Orders").  As agreed upon during the June 30 Call, the June 30 Purchase Orders superseded the (in retrospect, disingenuous) June 28 Purchase Orders.  Although smaller than the June 28 Purchase Orders, the June 30 Purchase Orders were still three times the size of any of Elysium's previous fulfilled orders.

Cooley LLP
Attorneys At Law
San Diego

13.

Fifth Amended Complaint
16-CV-2277

58.   Morris—still a ChromaDex officer at the time—failed to inform ChromaDex that Elysium's orders were expected to last for nine months, that Elysium did not intend to pay for the orders, and that Elysium was preparing to compete with ChromaDex by obtaining an alternate source of NR. Morris purposely remained silent despite knowing that the June 30 Orders would cause damage to ChromaDex.

59.   According to the terms of the Supply Agreements, and in reliance on the representations Alminana and Marcotulli made on the June 30 Call and Morris's omissions, ChromaDex accepted the June 30 Purchase Orders.

60.   On information and belief, Elysium believed that under its incorrect interpretation of the NIAGEN Supply Agreement the June 30 Purchase Orders were large enough to entitle it to reduced pricing.  Because Elysium had no intention of paying for any product it received under the June 30 Purchase Orders, the size of the orders further demonstrates Elysium's bad faith in placing them.

61.   Unaware of Elysium's plot to cheat and steal from it, ChromaDex filled the June 30 Purchase Orders on July 1, 2016 and August 9, 2016.

62.   ChromaDex provided Elysium with three invoices for the shipments by email on July 1, 2016 and August 9, 2016 (the "Past Due Invoices").

63.   The total amount ChromaDex invoiced Elysium for the Past Due Invoices is $2,983,350.

64.   On August 10, 2016—one day after ChromaDex confirmed that it shipped the last portion of pTeroPure to Elysium—Alminana wrote an email to ChromaDex stating that Elysium would not pay the Past Due Invoices until the additional concerns raised on the June 30 Call were resolved according to terms set by Elysium.  However, over the next several weeks, Alminana refused ChromaDex's offers to meet, constructively engage, and resolve Elysium's concerns, all the while maintaining that Elysium would not pay for the product that it had received until Elysium's concerns were resolved.

Cooley LLP
Attorneys At Law
San Diego

14.

Fifth Amended Complaint
16-CV-2277

65.     On August 12, 2016, Mr. Black of ChromaDex responded by requesting an in-person meeting to discuss Elysium's concerns and affirmed ChromaDex's commitment to its relationship with Elysium.

66.     Mr. Black received no response to his invitation for an in-person meeting, despite exchanging several emails with Alminana.  Mr. Black reiterated his invitation on August 17, 2016.  Alminana, yet again, ignored this invitation and refused to discuss the issues.     Elysium went dark, refusing to communicate with ChromaDex's management team.

67.     In late August and continuing into October 2016, ChromaDex continued to demand payment from Elysium of the $2,983,350 due for the Past Due Invoices, while also continuing to extend invitations to work toward a solution for all parties concerned and proposing such solutions.

68.     Elysium at all times refused to pay the amount due for the Past Due Invoices and to engage in discussions about a resolution.  Elysium refused to make good on Alminana and Marcotulli's promises on behalf of Elysium to attempt to resolve their concerns with ChromaDex and refused to pay for the June 30 Orders.

69.     To date, Elysium has not paid any sum to ChromaDex for the product Morris's breaches of fiduciary duty enabled it to order, receive, and sell to consumers at a profit according to the June 30 Purchase Orders. Thus, Elysium's profits arising from the June 30 Purchase Orders resulted from Morris's breach of fiduciary duty.

70.     After Elysium's breaches of the parties' Supply Agreements, ChromaDex learned that Morris and another senior employee who had abruptly resigned during the summer had begun work at Elysium immediately after leaving ChromaDex.  Morris had resigned after many years of employment with one only week notice on July 15, 2016, two weeks after the June 30 Order of NIAGEN was shipped.   Ryan Dellinger, ChromaDex's former Director of Scientific Affairs, resigned *effective immediately* on August 10, 2016—the same day Elysium notified ChromaDex that it refused to pay the Past Due Invoices.

CooLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

15.

FIFTH AMENDED COMPLAINT
16-CV-2277

71.     On information and belief, Morris helped Elysium recruit Dellinger while he was still a ChromaDex officer, in further breach of his fiduciary duty to ChromaDex.

72.     Morris participated in an exit interview before terminating his employment with ChromaDex.

73.     When asked about his future professional plans during that interview, Morris lied and told ChromaDex that he did not know what his next steps would be. However, Morris had been planning to work for Elysium for months, had already been acting as Elysium's agent, and had already arranged to begin work at Elysium the day after his resignation from ChromaDex.

74.     Morris also reaffirmed his contractual obligations of confidentiality and stated that he had returned all ChromaDex information in his possession. Those statements and promises were also lies. Morris already intended to disclose ChromaDex's confidential and trade secret information to Elysium after his departure and had likely already saved confidential ChromaDex documents for the purpose of conveying those documents to Elysium.

75.     Morris also turned in his company cell phone, which he had previously used to communicate information to and plot with Elysium, knowing that ChromaDex would re-issue it to another employee after he departed and thereby hide or otherwise destroy evidence of his conspiracy with Elysium.

76.     Morris's acts violated his fiduciary duty to ChromaDex and its shareholders. Morris's failure to inform ChromaDex of Elysium's scheme to harm it by withholding payment and further its own competing development of alternate supplies of NR and pterostilbene, lies concerning his intent to work for Elysium, lies regarding his return of all ChromaDex information, and failure to otherwise execute his duties in good faith and in the best interests of ChromaDex, violated Morris's fiduciary duty to ChromaDex.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

16.

FIFTH AMENDED COMPLAINT
16-CV-2277

77.     Elysium knew that Morris was ChromaDex's Vice President of Business Development and managed other employees, and knew or should have known of Morris's fiduciary duty to ChromaDex, but encouraged and assisted Morris in his breaches of that duty.

78.     Morris's disclosure of ChromaDex's confidential and trade secret information to Elysium, during and after his employment with ChromaDex, and taking of ChromaDex confidential and trade secret documents and information violated the February Confidentiality Agreement Morris entered into with ChromaDex.

79.     Morris's disclosure of ChromaDex's confidential and trade secret information to Elysium after his employment with ChromaDex, and taking of ChromaDex confidential and trade secret documents and information also violated the July Confidentiality Agreement Morris entered into with ChromaDex.

80.     Elysium knew or should have known of Morris's contractual confidentiality obligations to ChromaDex, but induced Morris to breach those obligations.

81.     After conveying ChromaDex's valuable information to Elysium, Morris deleted and otherwise destroyed communications and ChromaDex documents in his possession evidencing his breaches and conspiracy with Elysium to steal and cheat ChromaDex. Those deleted communications and documents, if they still existed, would show that Morris acted as Elysium's agent during his employment, transferred ChromaDex information to Elysium, solicited Dellinger on Elysium's behalf, and lied to ChromaDex when he represented that he had returned all ChromaDex information.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

17.

FIFTH AMENDED COMPLAINT
16-CV-2277

## Elysium's and Morris's Intent to Harm ChromaDex

82.     Morris failed to inform ChromaDex that, at the time Marcotulli and Alminana spoke on the June 30 Call, Elysium was in possession of ChromaDex's trade secret sales information concerning another NR customer and had no intention of (1) ever working with ChromaDex to resolve Elysium's concerns about the NIAGEN Supply Agreement, (2) paying for the NIAGEN or pTeroPure ordered in the June 30 Purchase Orders, or (3) ramping up their sales to the degree they represented.  Instead, unbeknownst to ChromaDex, Elysium was scheming with Morris to exploit Morris's and another former ChromaDex employee's knowledge about ChromaDex and its business to assist Elysium as it developed its own manufacturing capabilities.

83.     After failing to induce ChromaDex to supply NIAGEN and pTeroPure at grossly discounted prices with the June 28 Purchase Orders, Marcotulli and Alminana made their false representations on the June 30 Call with the intent of inducing ChromaDex to provide it with large supplies of NIAGEN and pTeroPure.  Marcotulli, Alminana, and Morris also intended to create financial pressure for ChromaDex by refusing to pay for the orders, making ChromaDex Elysium's unwilling bank and lender while it concurrently obtained an alternative source of NR.  At the time of the June 30 Call, ChromaDex had made vast investments of money, time, and resources into the research, necessary regulatory approvals, clinical studies, marketing, and production capacity needed to manufacture and sell NR on a broad scale.

84.     On information and belief, Alminana, Marcotulli, and Morris further intended to use that financial pressure as bargaining leverage if and when Elysium ever decided it needed to order NR from ChromaDex again.

85.     Alminana's, Marcotulli's, and Morris's intent is evidenced by the fact that

a.  within days of placing the June 30 Purchase Orders, Elysium and Morris began executing a plan to develop an alternate source of NR;

b.  Elysium never ramped up in a way that was consistent with Alminana and Marcotulli's representations on the June 30 Call;

  c. Elysium projected that the NIAGEN and pTeroPure that was delivered in July and August 2016 would be sufficient supply for Elysium well into 2017, and the supply lasted in fact till July 2017, a year after Elysium placed the June 30 Purchase Orders; and

  d. Elysium did not place any other orders, let alone additional large orders, in Q3 and Q4 2016 as Alminana and Marcotulli represented it would.

86. On information and belief, Marcotulli's and Alminana's false promises were further motivated by the fact that Elysium, which was seeking financing during the middle of 2016 and at least into November 2016, has been able to improve its balance sheet by continuing to sell its product for millions of dollars in revenue without paying ChromaDex a dime for the supply, likely engaging in fictional book keeping and deceiving potential or actual investors about Elysium's financial condition.

### Breach of the pTeroPure Supply Agreement

87. The pTeroPure Supply Agreement sets forth the terms under which ChromaDex would sell and deliver, and Elysium would purchase, pTeroPure.

88. Section 2.1 of the pTeroPure Supply Agreement specifies that Elysium shall place orders for the product by submitting purchase orders.

89. Section 2.2 sets the price for pTeroPure and states that "[f]ailure to make prompt and full payment hereunder constitutes a material breach of the Agreement."

90. The invoices for the pTeroPure shipped on July 1, 2016 and August 9, 2016, contain payment terms specifying that payment must be made "30% Net30 70% Net60," meaning 30% of the payment is due within 30 days of the date of the invoice and 70% of the payment is due within 60 days of the date of the invoice.

91. Elysium breached the pTeroPure Supply Agreement on July 31, 2016, by failing to pay 30% of the amount due within 30 days of the July 1, 2016 invoice.  It further breached the agreement by failing to pay any monies due before August 30, 2016, 60 days after the date of the July 1, 2016 invoice.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

19.

FIFTH AMENDED COMPLAINT
16-CV-2277

92.     Elysium breached the pTeroPure Supply Agreement on September 8, 2016, by failing to pay 30% of the amount due within 30 days of the August 9, 2016 invoice.  It further breached the agreement by failing to pay any monies due before October 8, 2016, 60 days after the date of the August 9, 2016 invoice.

### Breach of the NIAGEN Supply Agreement

93.     The NIAGEN Supply Agreement sets forth the terms under which ChromaDex would sell and deliver, and Elysium would purchase, NIAGEN.

94.     Section 7.4 of the NIAGEN Supply Agreement provides that it shall be governed by and construed in accordance with the laws of the State of California.

95.     Section 3.1 of the NIAGEN Supply Agreement sets the maximum price for NIAGEN provided by ChromaDex to Elysium.

96.     Section 3.4 of the NIAGEN Supply Agreement states that "Elysium Health shall pay ChromaDex within thirty (30) days from the date of the applicable invoice by ChromaDex to Elysium Health for all NIAGEN® purchased . . . ."

97.     Elysium breached the NIAGEN Supply Agreement on July 31, 2016 by failing to pay the amount due within 30 days of the July 1, 2016 invoice, as required by Section 3.4 of the agreement.

98.     On October 31, 2016, ChromaDex sent to Elysium, in writing, a notice letter indicating it would not renew the NIAGEN Supply Agreement.  The NIAGEN Supply Agreement, therefore, expired on February 2, 2017, according to Section 5.1 of that agreement, following the initial term of three years.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

20.

FIFTH AMENDED COMPLAINT
16-CV-2277

## Morris and Dellinger Help Elysium Steal ChromaDex's
## Trade Secrets and Other Proprietary Information

99.     Morris began working with Elysium behind ChromaDex's back by at least May 2016, nearly two months before he resigned from ChromaDex, when he texted confidential and trade secret sales information to Elysium.  Morris wrongfully disclosed the confidential ChromaDex information to Elysium for the purpose of helping Elysium negotiate a better price for NIAGEN and to secure employment with Elysium. Elysium induced these wrongful acts and encouraged further acts by making a firm offer of employment to Morris.

100.    Further, just days after Elysium placed the June 30 Purchase Orders and while he was still working for ChromaDex, Morris and Elysium agreed that when Morris began working for Elysium, his main duty would be to assist Elysium in developing its alternative supply of NR. Morris did not tell his then-employer ChromaDex about Elysium's intention to develop a competing source of NR and to use the money that Elysium owed ChromaDex for the June 30 Purchase Orders to fund that dishonest goal.

101.    Before Morris left ChromaDex, he used his personal email account to send Elysium a list of manufacturers who could potentially produce NR for Elysium.  He also attached a ChromaDex document that described the manufacturing process for NR. Morris told Elysium it could use the manufacturing information as a shortcut in developing its own commercial supply of NR.

102.    Also before he left ChromaDex, Morris saved copies of several ChromaDex documents, some containing trade secret, confidential and/or proprietary information, with the intent of using that stolen information for Elysium's purposes. On information and belief, Morris deleted all evidence of the documents and information he stole on behalf of Elysium to prevent ChromaDex from ever discovering the truth. The methods by which Morris saved the ChromaDex documents and the content of those documents can only be revealed through further discovery.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

21.

FIFTH AMENDED COMPLAINT
16-CV-2277

103.   As shown in discovery in this action, on July 18, 2016, Elysium came into possession of the spreadsheet containing highly-valued ChromaDex trade secret information: the "Ingredient Sales Spreadsheet." The Ingredient Sales Spreadsheet is the highly-confidential central document at ChromaDex tracking all sales for all ingredients by quarter since 2012. The spreadsheet contains the detailed purchasing history of every customer who purchased any ingredient from ChromaDex—including customer names, prices, volumes, and dates of purchases. More importantly to Elysium, the spreadsheet contains the detailed purchasing histories of all its closest competitors; companies selling NR or chemically synthesized pterostilbene.

104.   On information and belief, Elysium induced Morris to steal the Ingredient Sales Spreadsheet from ChromaDex while he was still a ChromaDex officer, in obvious breach of his contractual obligations to ChromaDex.

105.   Elysium knew that it should not have possessed the stolen trade secret information contained in the Ingredient Sales Spreadsheet. However Elysium saved the stolen spreadsheet to its servers, did not delete it, and kept its possession of the information secret from ChromaDex. ChromaDex did not discover Elysium's possession of the Ingredient Sales Spreadsheet until Elysium produced the document in discovery in this action.

106.   Shortly after Morris began his *official* employment with Elysium as its Head of Scientific Technology, he started working with a third-party manufacturer to develop a new commercial supply of NR independent of ChromaDex.  Morris was Elysium's main contact with the manufacturer and closely oversaw the development of a manufacturing process.  Given Morris's detailed knowledge of ChromaDex's internal operations, he is well-positioned to use this proprietary information to advance Elysium's competing development.  Elysium later promoted Morris to Vice President of Research and Development.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

22.

FIFTH AMENDED COMPLAINT
16-CV-2277

107.   When it came time for Elysium to provide instruction to its alternative manufacturer on how to manufacture NR, Elysium relied on proprietary ChromaDex documents to do so.

108.   To instruct the alternative manufacturer on the process of creating NR, Morris relied on a ChromaDex document submitted to the U.S. Food and Drug Administration ("FDA") to show that NIAGEN was safe for human consumption.  This document (the "NR GRAS Dossier") contains a step-by-step guide for manufacturing NR along with a description of each step.  FDA requires ingredient manufacturers like ChromaDex to publicly disclose the information like that in the NR GRAS Dossier in order to obtain for their products the marketing designation of "Generally Recognized as Safe" ("GRAS").

109.   ChromaDex spent millions of dollars to research, test, and perfect the manufacturing process described in the NR GRAS Dossier.  ChromaDex then invested additional resources in researching and creating the NR GRAS Dossier itself.  ChromaDex's huge investment was rewarded with FDA affirmation of NIAGEN's GRAS status on August 3, 2016.

110.   Elysium knew that the NR GRAS Dossier contains valuable information that belonged to ChromaDex, as evidenced by the prominent statement, "Prepared for ChromaDex, Inc.," that appears on every page of the NR GRAS Dossier and by Elysium's use of the information it contains to jump-start its own production of NR.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

23.

FIFTH AMENDED COMPLAINT
16-CV-2277

111.   Elysium, through Morris, misappropriated the NR GRAS Dossier and the valuable information it contains.   Morris took screenshots of select pages of the document in a way that removed all references to ChromaDex and the FDA submission. Elysium then claimed the document containing screenshots of ChromaDex's information as its own property by placing a statement at the bottom of each page stating: "This document is proprietary and confidential. No part of this document may be disclosed in any manner."   Finally, on August 1, 2016, Morris provided this fraudulent document to Elysium's alternative manufacturer on behalf of Elysium as the blueprint for developing a process for the commercial manufacture of NR.

112.   Also on August 1, 2016, Morris sent Elysium's management a copy of a confidentiality agreement he and other ChromaDex employees were required to sign as a condition of their employment. On information and belief, Elysium knew of Morris's contractual confidentiality obligations before this date.

113.   On August 2, 2016, Morris sent another email to Elysium's alternative manufacturer with two documents providing further information to guide the development of a new supply of NR. Both documents contained misappropriated ChromaDex information.

114.   The first document described the method ChromaDex developed for analyzing the concentration of NR chloride by high-performance liquid chromatography (the "NRCl Analytical Method"). The ChromaDex document containing the NRCl Analytical Method was labeled "Confidential" in bold font and was sometimes shared with ChromaDex's NR customers for the limited purpose of guiding those customers in their testing of the NIAGEN they received from ChromaDex. ChromaDex had a property interest in the NRCl Analytical Method because it invested the resources to develop the relevant techniques and draft the document to provide the information to its customers and to test its own NIAGEN. Development of analytical standards such as the NRCl Analytical Method can cost up to $50,000.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

24.

FIFTH AMENDED COMPLAINT
16-CV-2277

115.   ChromaDex sent the NRCl Analytical Method to Elysium in June 2014 for the purposes of testing the NIAGEN Elysium purchased under the NIAGEN Supply Agreement. The document was sent under the confidentiality protections of Section 4 of the NIAGEN Supply Agreement, which limited the use and disclosure of each party's confidential information.

116.   The second document Morris sent to Elysium's alternative NR manufacturer described ChromaDex's specifications for the range of acceptable results for several analyses that were regularly performed on the NIAGEN ChromaDex sold (the "NR Specifications"). ChromaDex provided the NR Specifications to its NR customers for the purposes of testing the NIAGEN ChromaDex sold.  ChromaDex has a property interest in the NR Specifications because it invested the resources to develop the specifications, draft the document containing the specifications, and revise the specifications as necessary based on applicable laws and regulations and lessons learned from its experience manufacturing and testing NR.

117.   The NR Specifications were incorporated into the terms of the NIAGEN Supply Agreement as Exhibit A to the agreement. Under Section 4.2 of the NIAGEN Supply Agreement, the parties are restricted from disclosing "any terms or conditions of [the] Agreement."

118.   The NR Specifications sent to Elysium's NR manufacturer appear to be based on at least two or more versions of ChromaDex's NR Specifications, showing that Morris wrongfully accessed documents he stole from ChromaDex during his employment when drafting the document falsely labeled as Elysium's property.

119.   Elysium wrongfully used the NRCl Analytical Method and the NR Specifications documents when (1) it breached the confidentiality obligations of the NIAGEN Supply Agreement by accessing and disclosing the documents for purposes other than those related to the NIAGEN Supply Agreement, and/or (2) Morris breached his confidentiality obligations to ChromaDex by wrongfully accessing ChromaDex documents for Elysium's use after his employment with ChromaDex had terminated.

120.   Morris acts with regard to drafting, disclosing, and using all three documents sent to Elysium's alternative NR manufacturer were in breach of the February and July Confidentiality Agreements' provisions prohibiting Morris from disclosing confidential ChromaDex information.

121.   Elysium misappropriated the NRCl Analytical Method and the NR Specifications when it retyped the ChromaDex documents nearly word-for-word into two separate documents and claimed the resulting document as its own by placing a statement at the bottom of each document stating: "This document is the property of Elysium Health and contains proprietary and confidential information. No part of this document may be disclosed in any manner."

122.   Elysium sent the misappropriated NRCl Analytical Method and NR Specifications to its alternative NR manufacturer to use in the development of a competing supply of NR.

123.   Elysium's inequitable reliance and use of ChromaDex's information and documents, the extent of which can only be revealed through discovery, substantially reduced Elysium's costs for developing a new commercial source of NR while denying ChromaDex a return on its investment in developing the technical processes and standards, and the documents themselves.

124.   While Elysium was pursuing and investing in its own manufacturing process for NR, it was still falsely representing to ChromaDex that it would honor its contractual commitments and be a good business partner.  Elysium did not notify ChromaDex that it would refuse to pay the Past Due Invoices until August 10, 2016.

125.   That same day, Dellinger resigned from ChromaDex, effective immediately.  During his brief exit interview, Dellinger refused to say where he planned to work after his departure.  However, consistent with Elysium's strategic plan, Dellinger immediately joined Elysium in the same position he held at ChromaDex, Director of Scientific Affairs.  Dellinger continues to be employed by Elysium today.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

26.

FIFTH AMENDED COMPLAINT
16-CV-2277

126.   Just as Morris did, Dellinger also entered into confidentiality agreements with ChromaDex as a condition of his employment.  Those contracts restrict his use and disclosure of ChromaDex's information and documents.

127.   Shortly after Dellinger joined Elysium, a potential investor asked Elysium for information concerning the science supporting the marketing claims made by Elysium about its product, Basis.  Elysium did not have such a presentation at that time.  Elysium requested that its two new former-ChromaDex employees, Morris and Dellinger, create one.

128.   On information and belief, instead of developing a presentation for Elysium from scratch, Morris and/or Dellinger instead wrongfully misappropriated two presentations owned by ChromaDex the "NR Presentation" and the "Pterostilbene Presentation" (collectively, the "Presentations").   Those Presentations explain the science supporting the health benefits of ChromaDex's ingredients, including NIAGEN and pTeroPure.

129.   Morris and Dellinger, while ChromaDex employees, had been responsible for drafting the Presentations.  ChromaDex created and refined the Presentations over several years, including by updating them with new information when new scientific articles were published.  Thus, the Presentations each represent a significant investment and creation reflecting valuable ChromaDex resources, knowledge, experience, and strategic market acumen.   Morris and/or Dellinger violated their Confidentiality Agreements with ChromaDex when they wrongfully accessed ChromaDex's Presentations after their employment was terminated, conveyed the Presentations into Elysium's possession, and then used them for Elysium's purposes. Morris's false representations that he had returned the Presentations and all other ChromaDex proprietary and confidential information to ChromaDex during his exit interview, violated his fiduciary duty to ChromaDex.

Cooley LLP
Attorneys At Law
San Diego

27.

Fifth Amended Complaint
16-CV-2277

130.   Morris and/or Dellinger blatantly misappropriated the Presentations by placing many of the original slides, with only minor changes, on an Elysium PowerPoint template with Elysium logos and by removing all ChromaDex logos and references to ChromaDex's branded ingredients, NIAGEN and pTeroPure.   Morris informed Elysium's management that he had used ChromaDex material when drafting the presentation and Elysium's management consented, expressly or impliedly, to the wrongful use of ChromaDex information.

131.   On information and belief, Elysium presented the converted Presentations as its own to a potential investor in late August 2016.

132.   Elysium also presented the converted NR Presentation as its own to the National Advertising Division of the Better Business Bureau in November 2016 in response to an inquiry regarding Elysium's marketing claims.

133.   Discovery in this action has revealed that Elysium did not only improperly rely on confidential ChromaDex documents concerning NR to compete with ChromaDex—it also wrongfully disclosed ChromaDex's "Pterostilbene Specifications" to potential manufacturers for the purpose of informing their development of a competing source of synthetic pterostilbene. ChromaDex provided the Pterostilbene Specifications to its pTeroPure customers for the purposes of testing the pTeroPure ChromaDex sold.  ChromaDex has a property interest in the Pterostilbene Specifications because it invested the resources to develop the specifications, draft the document containing the specifications, and revise the specifications as necessary based on applicable laws and regulations and lessons learns from its experience manufacturing and testing pterostilbene.

134.   The Pterostilbene Specifications were incorporated into the terms of the pTeroPure Supply Agreement as Exhibit A to the agreement. Under Section 15.2 of the pTeroPure Supply Agreement, the parties are restricted from disclosing any terms or conditions of the agreement.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

28.

FIFTH AMENDED COMPLAINT
16-CV-2277

135.   In September of 2016, Elysium sent ChromaDex's Pterostilbene Specifications to at least one potential manufacturer in violation of the pTeroPure Supply Agreement's confidentiality provisions. Only further discovery can reveal if Elysium further wrongfully disclosed the Pterostilbene Specifications in attempt to develop a competing source of synthetic pterostilbene.

136.   Elysium continued its misappropriation of ChromaDex documents into the next year. In 2017, Dellinger helped Elysium prepare a New Dietary Ingredient Notification ("NDI") for submission to FDA to prove that Basis is safe for human ingestion. Dellinger worked with Elysium's regulatory consultants to develop the NDI. Under Dellinger's knowing guidance, Elysium used a confidential ChromaDex document created in 2011 that detailed the safety of pterostilbene, specifically the pTeroPure ingredient produced by ChromaDex (the "pTeroPure GRAS Report").

137.   ChromaDex invested substantial resources, knowledge, and experience into the research and information underlying the pTeroPure GRAS Report and in creating the report itself. ChromaDex clearly marked the document as confidential by labeling it "Confidential" and by restricting its dissemination through confidentiality agreements.

138.   ChromaDex took steps to protect the confidentiality of the pTeroPure GRAS Report when it shared the document with Elysium during the course of the parties' relationship. Specifically, the pTeroPure Supply Agreement contains provisions regarding the restricted use and disclosure of confidential information.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

29.

FIFTH AMENDED COMPLAINT
16-CV-2277

139. Dellinger provided the pTeroPure GRAS Report to Elysium's regulatory consultants as a shortcut in developing its own regulatory documents and submission. By wrongfully using the information in the pTeroPure GRAS Report to prepare its own regulatory documents, Elysium profited from ChromaDex's substantial investment in developing the required safety information. Regulatory submissions such as a GRAS report cost several hundred thousands of dollars to develop and Elysium saved itself time and money by simply "updating" the ChromaDex information in its preparation of an NDI submission or other regulatory documents related to Basis and pterostilbene.

140. On information and belief, Elysium also wrongfully used ChromaDex documents detailing information concerning the safety of NR in its preparation of the NDI submission and other documents seeking to establish the safety of Elysium's new products, such as the NR GRAS Dossier, thereby further profiting off of ChromaDex's considerable investments and experience in the research, production, and marketing of NR.

141. Elysium's inequitable reliance and use of ChromaDex's proprietary information substantially reduced its costs for developing alternative sources of NR and pterostilbene. Had Elysium spent the time and resources to develop alternative sources of NR and pterostilbene without stealing ChromaDex's information, it would have taken a substantially longer period of time to develop the competing supplies. As to the alternate source of NR, which could not be obtained elsewhere, Elysium's cheating caused ChromaDex to lose sales of NIAGEN it otherwise would have made during that period of time. Elysium's further blatant misappropriation of ChromaDex's investments in developing the information to satisfy key regulatory requirements for NIAGEN and pTeroPure further allowed it to profit while denying ChromaDex a return on its investments. The full extent of Elysium's misappropriation of ChromaDex information and documents can only be revealed through further discovery.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

30.

FIFTH AMENDED COMPLAINT
16-CV-2277

**Elysium's Allegations of Patent Misuse and ChromaDex's Denial of Patent Misuse and Conduct to Purge Any Such Alleged Misuse**

142.   Elysium filed its First Amended Counterclaims on March 6, 2017 ("FACC"). (Dkt. 31.) Elysium's Fourth Counterclaim for Relief was for a declaratory judgment of patent misuse. (FACC ¶¶ 111–15.)

143.   Elysium alleges that ChromaDex engaged in patent misuse by "tying [] access to its patent rights to a royalty-bearing trademark license" (FACC ¶ 111) and, "in some instances," by "requir[ing] purchasers not only to license, but also to use ChromaDex trademarks in order to obtain a supply of nicotinamide riboside" (FACC ¶ 39).

144.   ChromaDex moved to dismiss Elysium's counterclaim for declaratory judgment of patent misuse on March 20, 2017 on multiple grounds and contends that there is no viable allegation of patent misuse as a matter of law and fact. (Dkt. 34.) However, the Court denied ChromaDex's motion to dismiss the patent misuse counterclaim by order dated May 10, 2017, permitting Elysium to attempt to prove its allegation of patent misuse at trial. (Dkt. 44.)

145.   ChromaDex denies that it has ever engaged in any act of alleged patent misuse and specifically denies that it has engaged in patent misuse by "tying [] access to its patent rights to a royalty-bearing trademark license" (FACC ¶ 111) and, "in some instances," by "requir[ing] purchasers not only to license, but also to use ChromaDex trademarks in order to obtain a supply of nicotinamide riboside" (FACC ¶ 39). ChromaDex further denies that Elysium's allegations constitute patent misuse as a matter of law.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

31.

FIFTH AMENDED COMPLAINT
16-CV-2277

146.   However, to eliminate an issue from this litigation, to conserve the parties' and the Court's resources and to streamline this action, and without prejudice to ChromaDex's arguments and contentions, ChromaDex restates that it has already terminated the Trademark License and Royalty Agreement on February 2, 2017 and further, hereby unequivocally renounces any rights to collect, charge, or obtain royalties under the Trademark License and Royalty Agreement with Elysium.  Pursuant to Section 14.1 of the Trademark License and Royalty Agreement and ChromaDex's notice sent to Elysium on October 31, 2016, the Trademark License and Royalty Agreement was permanently terminated along with the NIAGEN Supply Agreement, effective February 2, 2017.  Accordingly, the allegedly offending terms of the Trademark License and Royalty Agreement as alleged by Elysium are no longer of any operative effect.  The terminations of both agreements were made in the ordinary course of business and is noted here for the purpose of confirming the purge of any alleged patent misuse.

147.  ChromaDex likewise hereby unequivocally renounces any rights to charge, obtain, or collect royalties on sales of non-trademark bearing NIAGEN from customers other than Elysium, or to require the use of its trademarks under any agreement.  ChromaDex represents to the Court that it is immediately terminating all such trademark license agreements.  These terminations are made for the purpose of purging any and all allegations of patent misuse.

148.   ChromaDex is further refunding and/or crediting any and all past royalties paid by all customers pursuant to all "royalty-bearing trademark licenses."  ChromaDex represents to the Court that it will provide a credit to Elysium for all past royalties against the damages owed by Elysium in this case, including for the failure to pay for product purchased.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

32.

FIFTH AMENDED COMPLAINT
16-CV-2277

149.   These voluntary and proactive actions by ChromaDex are not an admission of any wrongdoing or acts of patent misuse, but instead are intended to prophylactically and completely eliminate issues in this and any other dispute related to ChromaDex's patents by purging any and all allegedly unlawful conduct with respect to all allegations by Elysium of patent misuse.  In particular, these voluntary acts are made to dissipate any and all alleged effects of any alleged patent misuse in the market.  These voluntary steps taken by ChromaDex are intended to moot Elysium's allegation and counterclaim for a declaratory judgment that ChromaDex has misused any of its patents.  Such counterclaim should be promptly voluntarily dismissed by Elysium, or dismissed *sua sponte* by the Court based on the unequivocal terminations and renouncements made herein.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Breach of Contract Against Elysium (pTeroPure Supply Agreement)**

150.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 149, above.

151.   The pTeroPure Supply Agreement is a binding and enforceable contract between ChromaDex and Elysium.

152.   ChromaDex fulfilled its obligations under the pTeroPure Supply Agreement by fulfilling the June 30, 2016 pTeroPure purchase order.

153.   Elysium has materially breached the pTeroPure Supply Agreement by refusing to pay the monies owed to ChromaDex for the pTeroPure which ChromaDex delivered to Elysium.

154.   Elysium's material breach of the pTeroPure Supply Agreement injured ChromaDex and caused it to sustain monetary damages in the amount of $580,750, plus interest.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

33.

FIFTH AMENDED COMPLAINT
16-CV-2277

155.   Section 15.1 of the pTeroPure Supply Agreement restricts the parties' disclosure and use of confidential information, including information that is marked confidential at the time of disclosure.

156.   Under Section 15.1, the parties are prohibited from using or disclosing confidential information except on a need-to-know basis "to the extent such disclosure is reasonably necessary in connection with such party's activities as expressly authorized by [the] Agreement."

157.   ChromaDex shared the pTeroPure GRAS Report with Elysium during the course of the parties' business dealings under the pTeroPure Supply Agreement.

158.   The pTeroPure GRAS Report is labeled "confidential."

159.   Elysium breached Section 15.1 of the pTeroPure Supply Agreement when it disclosed the pTeroPure GRAS Report to its regulatory consultants for the purpose of preparing its NDI submission to FDA regarding a pterostilbene manufactured by an entity other than ChromaDex.

160.   On information and belief, by wrongfully using the confidential information contained in the pTeroPure GRAS Report, Elysium reduced its costs in money, time, and other resources related to the development of its own regulatory submission establishing the safety of pterostilbene for human consumption.

161.   ChromaDex was damaged by being denied a return on its investment in developing the pTeroPure GRAS Report.

162.   Section 15.2 of the pTeroPure Supply Agreement restricts the parties from disclosing "any terms or conditions of [the] Agreement to any Third Party without the prior consent of the other party."

163.   ChromaDex's Pterostilbene Specifications were incorporated into the terms of the pTeroPure Supply Agreement as Exhibit A to the agreement.

Cooley LLP
Attorneys At Law
San Diego

34.

Fifth Amended Complaint
16-CV-2277

164.   Elysium breached Section 15.2 of the pTeroPure Supply Agreement when it disclosed the Pterostilbene Specifications to at least one potential manufacturer to describe the pterostilbene Elysium wanted that manufacturer to produce on its behalf as a synthetic pterostilbene product that would compete against ChromaDex's pTeroPure.

165.   Elysium's further breach of the pTeroPure Supply Agreement further injured ChromaDex, in an amount to be determined at trial.

166.   In addition to damages, ChromaDex further demands that Elysium return all copies of the pTeroPure GRAS Report and the pTeroPure Specifications.

## SECOND CLAIM FOR RELIEF

### Breach of Contract Against Elysium (NIAGEN Supply Agreement)

167.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 166, above.

168.   The NIAGEN Supply Agreement is a binding and enforceable contract between ChromaDex and Elysium.

169.   ChromaDex fulfilled its obligations under the NIAGEN Supply Agreement by fulfilling the June 30, 2016 NIAGEN purchase order within 30 days.

170.   Elysium has materially breached the NIAGEN Supply Agreement by refusing to pay the monies owed to ChromaDex for the NIAGEN that ChromaDex sold and delivered to Elysium.

171.   Elysium's material breach of the NIAGEN Supply Agreement injured ChromaDex and caused it to sustain monetary damages in the amount of $2,402,600, plus interest.

172.   Section 4 of the NIAGEN Supply Agreement restricts the parties' disclosure of the terms of the agreement as well as the disclosure and use of confidential information.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

35.

FIFTH AMENDED COMPLAINT
16-CV-2277

173.   Under Section 4.1 of the NIAGEN Supply Agreement, the parties are prohibited from using or disclosing confidential information except on a need-to-know basis "to the extent such disclosure is reasonably necessary in connection with such party's activities as expressly authorized by [the] Agreement." Section 1.4 of the agreement defines "confidential information" to include information "marked, identified, or otherwise acknowledged to be confidential at the time of disclosure."

174.   ChromaDex labeled the NRCl Analytical Method "confidential" and shared the document with Elysium during the course of the parties' business dealings under the NIAGEN Supply Agreement.

175.   Elysium breached Section 4.1 of the NIAGEN Supply Agreement when it disclosed the NRCl Analytical Method to its alternative manufacturer of NR for the purpose of developing a competing source of NR.

176.   In 2014, ChromaDex drafted a document named the "NIAGEN Investigator's Brochure," that was intended to provide ChromaDex's contract research organization ("CRO") all the basic information it needed regarding NR before and during ChromaDex's first human clinical trial.

177.   In early 2015, as Elysium was preparing to conduct its first clinical trial with the same CRO, it requested information from ChromaDex to support that effort. In response, Dellinger provided Elysium a copy of the NIAGEN Investigator's Brochure, prominently labeled "Confidential" on the front page and stated that Elysium could use it with its CRO, who already had a copy due to its work with ChromaDex. However, Elysium did not limit its use of the NIAGEN Investigator's Brochure to its first clinical trial with the same CRO as ChromaDex. Elysium wrongfully disclosed the NIAGEN Investigator's Brochure, which had been copied into a document named the "Basis Investigator's Brochure," to several other CROs in 2017 and into 2018.

178.   Elysium breached Section 4.1 of the NIAGEN Supply Agreement when it distributed the "confidential" information contained in the NIAGEN Investigator's Brochure.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

36.

FIFTH AMENDED COMPLAINT
16-CV-2277

179.   In early 2015, ChromaDex drafted a document named "NR increases NAD" which concerned the data from a ChromaDex human study examining the effects of NR on NAD+ levels ("NR Study Data"). ChromaDex labeled the NR Study Data "confidential" in bold font. ChromaDex did not distribute the NR Study Data widely and did not make the data public as it drafted an article describing the results through the end of 2015. In January of 2016, ChromaDex began to use the NR Study Data in marketing material and the data was published publicly in October 2016.

180.   In April of 2015, Dellinger, then ChromaDex's Director of Scientific Affairs, was introduced to Elysium's Chief Scientist, Leonard Guarente, to discuss the science supporting NR and ChromaDex's clinical studies, among other topics. After the call, Dellinger sent Guarente the NR Study Data.

181.   However, despite the fact that the NR Study Data was labeled "confidential," Elysium distributed the NR Study Data to at least two dozen potential investors during the second half of 2015—before the data became public and without ChromaDex's authorization, as required by the NIAGEN Supply Agreement.

182.   Elysium breached Section 4.1 of the NIAGEN Supply Agreement when it widely distributed the "confidential" NR Study Data before it became public.

183.   Under Section 4.2 of the NIAGEN Supply Agreement, the parties are restricted from disclosing "any terms or conditions of [the] Agreement."

184.   The NR Specifications were incorporated into the terms of the NIAGEN Supply Agreement as Exhibit A to the agreement.

185.   Elysium breached Section 4.2 of the NIAGEN Supply Agreement when it disclosed the NR Specifications to its alternative manufacturer of NR for the purpose of developing a competing source of NR.

186.   ChromaDex was damaged by being denied a return on its investment in creating the confidential documents described above.

187.   Elysium's further breaches of the NIAGEN Supply Agreement further injured ChromaDex, in an amount to be determined at trial.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

37.

FIFTH AMENDED COMPLAINT
16-CV-2277

188.   In addition to damages, ChromaDex further demands that Elysium return all copies of the confidential documents shared under the NIAGEN Supply Agreement, whether they are falsely labeled as Elysium's property or otherwise.

## THIRD CLAIM FOR RELIEF

**Misappropriation of Trade Secrets Against Elysium and Morris (California)**

189.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 188, above.

190.   Elysium's and Morris's conduct as alleged herein constitutes misappropriation of trade secrets under California Civil Code § 3426, et seq.

191.   The Ingredient Sales Spreadsheet is the central sales document at ChromaDex tracking all sales for all ingredients.

192.   Morris misappropriated ChromaDex's trade secrets when he sent the purchasing history of Elysium's largest NR competitor to Elysium via text message in May 2016. On information and belief, the information conveyed by Morris was extracted from the Ingredient Sales Spreadsheet.

193.   Elysium's acquisition of the trade secret information gave Elysium an undisclosed upper-hand during contract negotiations with ChromaDex.

194.   Morris further misappropriated ChromaDex's trade secrets when he saved a copy of the Ingredient Sales Spreadsheet before leaving ChromaDex for the purpose of conveying the spreadsheet to Elysium. On information and belief, Morris deleted all records revealing how he transmitted the Ingredient Sales Spreadsheet to Elysium.

195.   The spreadsheet Elysium now illegally possesses contains the detailed purchasing history of every customer who purchased any ingredient from ChromaDex from 2012 through at least May 27, 2016—including customer names, prices, volumes, and dates of purchases.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

38.

FIFTH AMENDED COMPLAINT
16-CV-2277

196.   The Ingredient Sales Spreadsheet, and the purchasing histories of specific ChromaDex customers within it, derive independent economic value from not being generally known to the public. While the fact that certain companies are ChromaDex customers is sometimes public information, the spreadsheet also contains information that cannot be gleaned from public sources, such as order forecasts, and the prices, volumes, and dates of each customer's purchases.

197.   The information contained in the Ingredient Sales Spreadsheet gives ChromaDex a competitive edge against other ingredient suppliers. Once it was in Elysium's possession, the Ingredient Sales Spreadsheet provided Elysium with a substantial business advantage against it competitors. The spreadsheet also gave Elysium an advantage in contract negotiations with ChromaDex because Elysium had access to the identities of customers purchasing specific ingredients and the associated prices and volumes.

198.   ChromaDex made and continues to make efforts reasonable under the circumstances to maintain the secrecy of the Ingredient Sales Spreadsheet and the information it contains. These efforts include limiting access of the Ingredient Sales Spreadsheet to only a few employees within ChromaDex and management. ChromaDex requires these employees, and all employees generally, to enter employment and confidentiality agreements limiting their use and disclosure of "secret processes, inventions, customer and supplier lists and other trade secrets…" The spreadsheet and the information it contains is covered by these agreements as a customer list and trade secret. Further, ChromaDex never shared the Ingredient Sales Spreadsheet outside of the company, except for the rare occasion that such disclosure was necessary to financial professionals retained by ChromaDex.

199.   Elysium willfully and maliciously acquired the spreadsheet through improper means and, on information and belief, improperly used the spreadsheet.

Cooley LLP
Attorneys At Law
San Diego

39.

Fifth Amended Complaint
16-CV-2277

200.    Morris, by virtue of his senior sales position with ChromaDex, had access to the Ingredient Sales Spreadsheet, which he agreed to maintain as confidential and not to disclose or use that information in any way contrary to the interests of ChromaDex.

201.    Morris signed the February Confidentiality Agreement with ChromaDex on February 26, 2016 and the July Confidentiality Agreement on July 15, 2016 (collectively, the "Confidentiality Agreements"). The Confidentiality Agreements are valid contracts between ChromaDex and Morris require that he keep ChromaDex's information confidential.

202.    Elysium knew or should have known of Morris's confidentiality and loyalty obligations to ChromaDex and intentionally induced Morris to breach those contractual duties with offers of employment.

203.    Morris actually breached the Confidentiality Agreements with ChromaDex when he saved a copy of the Ingredient Sales Spreadsheet and removed it from ChromaDex for the purposes of conveying it to Elysium while he was still a ChromaDex employee. Morris further breached the Confidentiality Agreements with ChromaDex when he wrongfully disclosed the highly-confidential Ingredient Sales Spreadsheet to Elysium on July 18, 2016.

204.    Elysium further induced Morris's breaches when it saved the spreadsheet, did not delete it, and did not alert ChromaDex to its possession of the spreadsheet.

205.    Elysium's acquisition of the spreadsheet enabled Elysium to access the detailed purchasing histories of all of its closest competitors and gave Elysium an undisclosed upper-hand during contract negotiations with ChromaDex.

206.    Elysium's and Morris's misappropriation of ChromaDex's trade secret information has unjustly enriched Elysium and Morris, and damaged ChromaDex in an amount to be determined at trial.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

40.

FIFTH AMENDED COMPLAINT
16-CV-2277

207.   ChromaDex alleges on information and belief that Elysium's and Morris's acts were fraudulent, willful, malicious, and oppressive and constitute despicable conduct and subjected ChromaDex to unjust hardship in conscious disregard of ChromaDex's rights so as to justify an award of exemplary or enhanced damages under California Civil Code § 3426.3(c), and attorneys' fees pursuant to California Civil Code § 3426.4.

208.   Elysium's and Morris's wrongful conduct in misappropriating ChromaDex's trade secrets, unless and until enjoined and restrained by order of this court, will result in irreparable harm to ChromaDex's business in that ChromaDex trade secrets are being and will continue to be compromised.  ChromaDex has no adequate remedy at law and will be irreparably harmed absent relief enjoining such misappropriation.

209.   ChromaDex has no adequate remedy at law for the injuries it is currently suffering and Elysium will continue to use the misappropriated trade secret information and ChromaDex will be required to maintain a multiplicity of judicial proceedings in order to protect its interest.

## FOURTH CLAIM FOR RELIEF

### Federal Defense of Trade Secrets Act Against Elysium and Morris

210.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 209, above.

211.   Elysium and Morris have undertaken a deliberate plan to engage in the conduct alleged in this complaint and incorporated into this cause of action. These actions constitute a violation of the Federal Defense of Trade Secrets Act, 18 U.S.C. § 1836, as amended.

212.   The information contained in ChromaDex's Ingredient Sales Spreadsheet concerns and has been used in interstate commerce, as evidenced by the information on companies located in several different states, and is intended to be used in interstate commerce.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

41.

FIFTH AMENDED COMPLAINT
16-CV-2277

213.   ChromaDex alleges on information and belief that Elysium and Morris acted willfully and maliciously when they misappropriated ChromaDex's trade secret information so as to justify an award of exemplary damages under 18 U.S.C. § 1836(b)(3)(C).

## FIFTH CLAIM FOR RELIEF

### Breach of February Confidentiality Agreement Against Morris

214.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 213, above.

215.   On February 26, 2016, Morris and ChromaDex entered the February Confidentiality Agreement.

216.   The February Confidentiality Agreement is a binding and enforceable contract between ChromaDex and Morris.

217.   ChromaDex fulfilled its obligations under the February Confidentiality Agreement by providing Morris with continued employment.

218.   The February Confidentiality Agreement prohibits Morris from disclosing ChromaDex's confidential and trade secret information during and after his employment, and prohibits Morris from removing any files from ChromaDex when his employment ended.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

42.

FIFTH AMENDED COMPLAINT
16-CV-2277

219.   Morris breached the February Confidentiality Agreement by using his ChromaDex-issued cell phone to send Elysium confidential and trade secret information for the purposes of helping Elysium and harming ChromaDex. Morris further breached the February Confidentiality Agreement when he kept copies of ChromaDex's confidential and proprietary information after he terminated his employment with ChromaDex. Morris further breached the February Confidentiality Agreement when disclosed ChromaDex's confidential and proprietary information, such as the Ingredient Sales Spreadsheet and other ChromaDex documents, to Elysium after his employment with ChromaDex terminated for the purposes of helping Elysium and harming ChromaDex. The full extent of ChromaDex's confidential information disclosed by Morris to Elysium may not ever be discovered since Morris intentionally deleted evidence of his misconduct.

220.   All of the breaches by Morris described above are material breaches of the February Confidentiality Agreement.

221.   Morris's material breaches injured ChromaDex and caused it to sustain monetary damages in an amount to be determined at trial.

222.   Morris's wrongful conduct is continuing in nature and, unless and until enjoined and restrained by order of this court, will result in irreparable harm to ChromaDex's business in that ChromaDex trade secrets and confidential information are being and will continue to be compromised.  ChromaDex has no adequate remedy at law and will be irreparably harmed absent relief enjoining such misappropriation.

## SIXTH CLAIM FOR RELIEF

### Breach of July Confidentiality Agreement Against Morris

223.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 222, above.

224.   On July 15, 2016, Morris and ChromaDex entered the July Confidentiality Agreement.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

43.

FIFTH AMENDED COMPLAINT
16-CV-2277

225.   The July Confidentiality Agreement is a binding and enforceable contract between ChromaDex and Morris.

226.   ChromaDex fulfilled its obligations under the July Confidentiality Agreement by providing Morris with employment and benefits.

227.   Since executing the contract on July 15, 2016, Morris has materially breached several provisions of the agreement.

228.   Section 2 of the July Confidentiality Agreement prohibits Morris from using or permitting others to use tangible items furnished to Morris in connection with his employment duties such as computer stored information and disks, for any purpose other than enabling Morris to perform duties of employment. Section 2 also required Morris, upon the termination of employment, to "promptly tender any and all items, and all reproductions thereof."

229.   Morris breached Section 2 of the July Confidentiality Agreement by using, and permitting Elysium to use, ChromaDex items furnished to Morris by ChromaDex such as computer stored information and disks, for purposes other than performing his employment duties. Morris further breached Section 2 when he failed to tender all ChromaDex items and reproduction thereof to ChromaDex upon termination of his employment.

230.   Section 3(a)(3) of the July Confidentiality Agreement prohibits Morris from divulging ChromaDex's trade secrets to any person or business entity other than pursuant to Morris's employment on behalf of ChromaDex.

231.   Morris breached Section 3(a)(3) of the July Confidentiality Agreement when he conveyed a ChromaDex trade secret, the Ingredient Sales Spreadsheet, into Elysium's possession after terminating his employment. The exact scope of ChromaDex's trade secret information revealed by Morris to Elysium may not ever be discovered since Morris intentionally deleted evidence of his breach.

Cooley LLP
Attorneys At Law
San Diego

44.

Fifth Amended Complaint
16-CV-2277

232.   Section 3(b)(3) of the July Confidentiality Agreement prohibits Morris from divulging ChromaDex's confidential information to any person or business entity other than pursuant to Morris's employment on behalf of ChromaDex.

233.   Morris breached Section 3(b)(3) of the July Confidentiality Agreement when divulged confidential documents to Elysium after terminating his employment with ChromaDex. The exact scope of ChromaDex's confidential information revealed by Morris to Elysium may not ever be discovered since Morris intentionally deleted evidence of his breach.

234.   Sections 3(a)(4) and 3(b)(4) of the July Confidentiality Agreement required Morris to return all ChromaDex trade secrets and confidential information to ChromaDex upon the termination of his employment.

235.   Morris breached Section 3(a)(4) and 3(b)(4) when he purposefully failed to return all of ChromaDex's trade secrets and confidential information when he left ChromaDex on July 15, 2016.

236.   Morris's material breaches injured ChromaDex and caused it to sustain monetary damages in an amount to be determined at trial.

237.   Morris's wrongful conduct is continuing in nature and, unless and until enjoined and restrained by order of this court, will result in irreparable harm to ChromaDex's business in that ChromaDex trade secrets and confidential information are being and will continue to be compromised.  ChromaDex has no adequate remedy at law and will be irreparably harmed absent relief enjoining such disclosure and use.

### SEVENTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty Against Morris

238.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 237, above.

239.   Morris was an officer of ChromaDex who participated in the management of the company and therefore owed a fiduciary duty to ChromaDex and its shareholders.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

45.

FIFTH AMENDED COMPLAINT
16-CV-2277

240.   Morris breached his fiduciary duty to ChromaDex when he failed to act in the best interests of ChromaDex, committed acts designed to harm ChromaDex, and failed to act in good faith in his dealings with ChromaDex. On information and belief, Morris's acts in breach of his fiduciary duty include without limitation: (1) his acts as an agent of Elysium to undermine and weaken ChromaDex, such as his manipulation of ChromaDex to take actions advantageous to Elysium and to disadvantage ChromaDex in contract negotiations; (2) his lying to ChromaDex about his intent to work for Elysium; (3) his recruitment of Ryan Dellinger on behalf of Elysium; (4) withholding information about Elysium's intent to stockpile NIAGEN and pTeroPure, withhold payment from ChromaDex, and develop competing supplies of NR and pterostilbene, despite knowing that ChromaDex had several patents over the production of NR and synthetic pterostilbene; (5) his lying regarding his return of all of ChromaDex trade secrets and confidential information before the termination of his employment with ChromaDex; and (6) withholding information about Elysium's outreach to ChromaDex's contractual partners in an effort to undermine ChromaDex.

241.   Morris was unjustly enriched by his breach of fiduciary duty and should retain no benefits of that breach.

242.   ChromaDex was damaged by Morris's breach of fiduciary duty by being put at a disadvantage in contract negotiations with Elysium, by conveying extraordinarily large product orders into Elysium's possession without taking measures to ensure that Elysium would pay, by not knowing of Elysium's competing development of NR and pterostilbene, and Elysium's likely patent infringement with regard to its development of a competing source of NR, by not taking measures to protect the confidentiality of the trade secrets and confidential information in Morris's possession, by losing sales of NIAGEN it otherwise would have made, and by further unknown harms.

243.   Morris's breaches of his fiduciary duty injured ChromaDex and caused it to sustain monetary damages in an amount to be determined at trial.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

46.

FIFTH AMENDED COMPLAINT
16-CV-2277

# EIGHTH CLAIM FOR RELIEF

## Aiding and Abetting Breach of Fiduciary Duty Against Elysium

244.   ChromaDex repeats and realleges the allegations contained in paragraphs 1 through 243, above.

245.   Elysium knew or should have known that Morris owed a fiduciary duty to ChromaDex as a ChromaDex officer who participated in the management of ChromaDex.

246.   Elysium knew that Morris's acts in furtherance of Elysium's goals and to the detriment of ChromaDex breached Morris's fiduciary duty to ChromaDex. Elysium further knew that Morris was helping it secretly embark on a mission to compete with ChromaDex while he was still an officer of ChromaDex.

247.   Elysium encouraged and induced Morris to, and intended that he, breach his fiduciary duty through several acts. On information and belief, those acts included cheering and supporting Morris's acts that harmed ChromaDex and aided Elysium, offering Morris employment when Morris agreed to give Elysium ChromaDex's trade secret and confidential information, and by persuading Morris to lie to ChromaDex about his plans for employment with Elysium.

248.   Elysium further substantially assisted Morris in his breaches by acting to keep Morris's breaches secret from ChromaDex so that he could commit further acts in breach of his fiduciary duty without being stopped by ChromaDex. Elysium prevented ChromaDex from discovering Morris's breaches by actively concealing the information Morris was feeding it during negotiations with ChromaDex and by affirmatively misrepresenting its knowledge of Morris's departure from ChromaDex after Morris had begun employment with Elysium.

249.   Elysium's conduct was a substantial factor in causing harm to ChromaDex arising from Morris's breach of fiduciary duty.

250.   Elysium, by aiding and abetting Morris's breach of fiduciary duty, should be liable for all harm caused by that breach.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

47.

FIFTH AMENDED COMPLAINT
16-CV-2277

251.   Elysium was unjustly enriched by Morris's breach of fiduciary duty and should retain no benefits of that breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ChromaDex requests that Judgment be entered in its favor as follows:

a) On the First Cause of Action, monetary damages in an amount to be proved at trial, but believed to be no less than $580,750, plus interest (including prejudgment interest);

b) On the Second Cause of Action, monetary damages in an amount to be proved at trial, but believed to be no less than $2,402,600, plus interest (including prejudgment interest);

c) On the Third Cause of Action, monetary damages in an amount to be proved at trial, plus interest (including prejudgment interest), exemplary damages, disgorgement, and injunctive relief;

d) On the Fourth Cause of Action, monetary damages in an amount to be proved at trial, plus interest (including prejudgment interest), exemplary damages, disgorgement, and injunctive relief;

e) On the Fifth Cause of Action, monetary damages in an amount to be proved at trial, plus interest (including prejudgment interest);

f) On the Sixth Cause of Action, monetary damages in an amount to be proved at trial, plus interest (including prejudgment interest);

g) On the Seventh Cause of Action, compensatory damages in an amount to be proved at trial, plus interest (including prejudgment interest), disgorgement of all benefits received as a result of Morris's breach, and punitive damages;

h) On the Eighth Cause of Action, compensatory damages in an amount to be proved at trial, plus interest (including prejudgment interest), disgorgement of all benefits received as a result of Morris's breach, and punitive damages;

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

48.

FIFTH AMENDED COMPLAINT
16-CV-2277

i) On the First, Second, Third, Fourth, Fifth, and Sixth causes of action, the return and/or destruction of all confidential, trade secret, and misappropriated documents and information;

j) On all causes of action, for attorney's fees as allowed by law;

k) On all causes of action, for such other and further legal and equitable relief as the Court may deem just and proper.

## <u>Request for Jury Trial</u>

ChromaDex hereby requests trial by jury on all causes of action for which a jury trial is available.

Dated:     November 27, 2018

COOLEY LLP
MICHAEL A. ATTANASIO (151529)


*/s/ Michael A. Attanasio*
Michael A. Attanasio

*Attorneys for Plaintiff and Counter-
Defendant ChromaDex, Inc.*

Cooley LLP
Attorneys At Law
San Diego

49.

Fifth Amended Complaint
16-CV-2277