# Exhibit 1

<u>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**</u>

**Exhibit 1**
**Page 3**

*Highly Confidential*
*Attorneys' Eyes Only*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## (SOUTHERN DIVISION)

ChromaDex, Inc.,

       Plaintiff,

v.

Elysium Health, Inc. and Mark Morris,

       Defendants.

Case No.  8:16-02277-CJC (DMF)

## EXPERT REPORT OF DR. IAIN M. COCKBURN

(JUNE 21, 2019)

**Exhibit 1**
**Page 4**

*Highly Confidential*
*Attorneys' Eyes Only*

# TABLE OF CONTENTS

I.     QUALIFICATIONS ................................................................................................ 1

II.    SCOPE OF ASSIGNMENT ................................................................................... 2

III.   DOCUMENTS CONSIDERED ............................................................................. 3

IV.    SUMMARY OF OPINIONS .................................................................................. 3

V.     LEGAL STANDARD ............................................................................................ 5

VI.    BACKGROUND .................................................................................................... 6

VII.   THE RELEVANT MARKET IS THE SUPPLY OF NICOTINAMIDE RIBOSIDE IN THE UNITED STATES ..................................................................... 14

A.     Framework ........................................................................................................... 15

B.     Reasonable Interchangeability of NR from the Supplier and Customer Perspective .................. 16

C.     ChromaDex's Recognition of a Distinct Market for the Supply of NR ...................... 23

D.     The Existence of an NR Market is Further Supported by Pricing Data ..................... 25

E.     The Relevant Geographic Market is the United States ................................................ 28

VIII.  CHROMADEX'S MARKET POWER IN THE NR INGREDIENT MARKET ..................... 29

A.     Framework ........................................................................................................... 30

B.     ChromaDex's Role as the Sole Commercial Supplier of NR is Strong Evidence of its Market Power .................................................................................................... 31

C.     Significant Barriers to Entry Are Further Evidence of ChromaDex's Market Power .................. 32

D.     ChromaDex's Market Power is Evident in the Terms It Required of its Licensees ...................... 36

E.     ChromaDex's Sustained Ability to Price Above Marginal Cost and its Ability to Discriminate in Pricing Also Evidence ChromaDex's Market Power ............................... 36

F.     Elysium's Later Obtaining of an Alternative Supply of NR does not Negate ChromaDex's Market Power During the Relevant Period ...................................... 38

IX.    THE SCOPE AND NATURE OF CHROMADEX'S ALLEGED ACTS OF PATENT MISUSE ................................................................................................. 40

X.     ANTICOMPETITIVE EFFECTS FROM CHROMADEX'S ALLEGED ACTS OF PATENT MISUSE ........................................................................................ 49

A.     ChromaDex's Conduct Has Resulted in a Reduction in Competition and Consumer Choice ...... 49

B.     ChromaDex's Conduct has Resulted in Reduced Ability for Current and Future Competitors to Compete Against the NIAGEN Brand ............................................. 53

XI.    CHROMADEX HAS NOT PURGED ITS ALLEGED PATENT MISUSE ....................... 58

XII.   ELYSIUM'S COUNTERCLAIM DAMAGES ................................................... 60

A.     Breach of the MFN Provision ............................................................................... 60

B.     Breach of the Exclusivity Provision ..................................................................... 63

C.     Breach of the cGMP Provision ............................................................................. 67

**Exhibit 1
Page 5**

*Highly Confidential*
*Attorneys' Eyes Only*

## I.    QUALIFICATIONS

1.    I am the Richard C. Shipley Professor in Management and Chair of the Strategy and Innovation Department at Boston University's Questrom School of Business.  In this capacity, I conduct research on the economics of innovation, with specific application to the pharmaceutical industry, and teach graduate classes on business strategy, competition, innovation, and intellectual property that focus primarily on the biopharmaceutical, software, and information technology industries.  I also serve as a Research Associate at the National Bureau of Economic Research in Cambridge, Massachusetts.  Prior to joining the faculty of Boston University, I held the VanDusen Professorship in Business Administration in the Faculty of Commerce at the University of British Columbia.  In addition to these appointments, I have also been a Visiting Scholar in the Department of Economics at Harvard University, in the Economics, Finance, and Accounting Department at MIT's Sloan School of Management, and at Melbourne Business School.

2.    I received my undergraduate degree from Queen Mary College, University of London in 1984, and my PhD in Economics from Harvard University in 1990.

3.    I have served on the Steering Committee for Government Industry Partnerships for the Development of New Technologies of the National Research Council, and on the Scientific Committee of the European Union INNOVPROD Research Network.  I have also been a co-editor or referee (an expert in the field that reviews submitted articles and recommends whether or not they should be published) for various academic journals in economics, management, and life sciences, including Science, Journal of Health Economics, Health Affairs, the British Medical Journal, Lancet, Management Science, Journal of Economics and Management Strategy, Journal of Political Economy, and American Economic Review.

4.    My research focuses on the economics of innovation, intellectual property, productivity measurement, industrial organization, and applied econometrics.  I have received major research funding from leading research institutions, including the National Science Foundation, the National Academy of Sciences, and the Alfred P. Sloan Foundation.  I am an author on nearly four dozen refereed articles in leading academic journals in both economics and management including the American Economic Review, the RAND Journal of Economics, the Journal of Industrial Economics, and Management Science.  In both 2017 and 2018, my publications ranked among the Top 10% of authors by all-time downloads by the Social Science Research Network (SSRN).  Several of my most highly cited articles are based on research in the biopharmaceutical industry, including "Generics and New Goods in Pharmaceutical Price Indexes" in American Economic Review, "Scale, Scope, and Spillovers: Determinants of

**Exhibit 1**
**Page 6**

*Highly Confidential*
*Attorneys' Eyes Only*

Research Productivity in the Pharmaceutical Industry" in RAND Journal of Economics, "Absorptive Capacity, Coauthoring Behavior, and the Organization of Research in Drug Discovery" in Journal of Industrial Economics, "Is the Pharmaceutical Industry in a Productivity Crisis" in Innovation Policy and the Economy, "The Market for Follow-on Biologics: How Will It Evolve?" in Health Affairs, "Finding the Endless Frontier: Lessons from the Life Sciences Innovation System for Technology Policy" in Capitalism and Society, and "Patents and the Global Diffusion of New Drugs" in American Economic Review.  A complete list of my publications and research grants is included in my curriculum vitae, attached as Appendix A to this report.

5.    Outside academia, I have been a consultant on business strategy to a variety of life sciences and technology companies, and on public policy to government agencies in the U.S., the U.K., and Canada. I have provided expert testimony in litigation and arbitration matters on issues such as licensing and collaboration agreements, patent damages, antitrust, class certification, brand-generic competition, Medicaid and Medicare reimbursement, off-label marketing, transfer pricing, and misappropriation of trade secrets.  A list of matters in which I have testified at trial or deposition in the past four years is attached as Appendix B.

6.    For this matter, I am being compensated at my standard billing rate of $850 per hour.  My compensation in this matter is not in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

## II.    SCOPE OF ASSIGNMENT

7.    I have been retained by Defendant and Counter-Claimant Elysium Health, Inc. ("Elysium") to opine as to:

   a.    whether Plaintiff and Counter-Defendant ChromaDex, Inc. ("ChromaDex") possesses market power in a relevant market;

   b.    the scope and nature of ChromaDex's alleged patent misuse;

   c.    the anticompetitive effects, if any, resulting from the alleged patent misuse;

   d.    whether ChromaDex's alleged patent misuse has been purged and its effects dissipated.

8.    In addition, I have been asked to calculate the economic damages owed to Elysium in the event the trier-in-fact finds ChromaDex breached certain provisions of a supply agreement between ChromaDex and Elysium (the "NR Supply Agreement") including the "most favored nation" pricing provision

2

**Exhibit 1
Page 7**

*Highly Confidential*
*Attorneys' Eyes Only*

("MFN Provision"), the product exclusivity provision ("Exclusivity Provision"), and the current good manufacturing provision ("cGMP Provision").

## III.  DOCUMENTS CONSIDERED

9.    I have been provided with documents produced in discovery by both Elysium and ChromaDex including, but not limited to, various ChromaDex Supply Agreements and Trademark License Agreements with various third party customers; data depicting ChromaDex's customer-level nicotinamide riboside ("NR") ingredient sales; patent license agreements for certain NR technology licensed by ChromaDex and royalty reports depicting ChromaDex's payments under these agreements; Amazon.com retail pricing data for certain dietary supplement products; deposition testimony of ChromaDex and Elysium corporate representatives; as well as various ChromaDex emails, investor presentations, and press releases.  I have also reviewed publicly available documents from my own research regarding the facts and issues in this case including ChromaDex's quarterly and annual financial disclosures to the U.S. Securities and Exchange Commission ("SEC"), ChromaDex press releases, equity analyst research reports, and the relevant economic literature.  A list of all the documents I have received and reviewed in forming my opinions on this matter is set forth in attached Appendix C and/or referenced throughout my report.

10.    The opinions expressed herein are based on information currently available to me and I therefore reserve the right to update or amend my opinions in the event additional information or testimony becomes available.

## IV.  SUMMARY OF OPINIONS

11.    The manufacture and supply of the NR ingredient constitutes a relevant product market in the United States.  At the present time the relevant market consists exclusively of NR due primarily to the lack of available substitutes and the lack of reasonable interchangeability between NR and other potential nicotinamide adenine dinucleotide ("NAD+") precursors.

12.    ChromaDex possesses market power in this market.  Through exclusive licenses to certain patent rights, ChromaDex has established itself as the dominant (and until recently, the only) NR ingredient supplier in the U.S. market; controlling the manufacture and distribution of essentially all of the commercially available NR supply throughout the relevant time.  Evidence of ChromaDex's market power includes, *inter alia*, ChromaDex's statements and related evidence regarding its control of the market; the absence of alternative suppliers during the relevant period; ChromaDex's ability to impose certain

**Exhibit 1**
**Page 8**

*Highly Confidential*
*Attorneys' Eyes Only*

commercial terms on NR customers; ChromaDex's ability to price discriminate among customers; and ChromaDex's ability to earn economic profits that would not otherwise prevail in a competitive market.

13.    From an economic perspective, ChromaDex has committed patent misuse by tying customer purchases of its patented NR ingredient to mandatory licenses or mandatory use of its NIAGEN trademark.

14.    ChromaDex's efforts to use its patent monopoly to establish NIAGEN as the founding trade name for NR has resulted in significant, ongoing anticompetitive effects in the market.  These anticompetitive effects can be expected to persist even after the patent monopoly is lost.

15.    ChromaDex's patent misuse has not been purged.  ChromaDex's patent misuse has had, and will continue to have, anticompetitive effects.  ChromaDex continues to use the NIAGEN mark and reap the benefits of its misuse.  In addition, Elysium has not, to date, recovered monies it was coerced into paying ChromaDex under the terms of its mandatory trademark license, nor has it recovered the opportunity cost of those monies.

16.    Elysium suffered economic damages of $4.39 million or $1.74 million – depending on which of two relevant NR sales spreadsheets produced by ChromaDex is complete and accurate – resulting from ChromaDex's breach of its contractual MFN Provision; calculated as the difference between the total dollar amount actually paid by Elysium and the amount paid Elysium would have paid had it been extended the lowest relevant price paid by a ChromaDex customer buying equal or lower volume.

17.    Elysium has suffered lost profits damages of between $68,355 and $571,981 on lost sales it would have made but-for ChromaDex's breach of Elysium's product exclusivity.  Elysium alleges ChromaDex breached certain provisions of the NR Supply Agreement by facilitating the third party sale of competing dietary supplements comprised of both NR and pterostilbene (or any ingredients that are substantially similar thereto); in combination, whether in the same delivery mechanism or packaging or in a separate form or packaging but marketed together; a "combination" exclusivity specifically granted to Elysium by ChromaDex.

18.    Elysium has suffered economic damages of $221,000 resulting from ChromaDex's breach of its contractual cGMP provision, calculated as the difference between the total dollar amount Elysium actually paid, based on the price it bargained for under the belief that ChromaDex would supply cGMP-compliant material, and the amount it would have paid based on the average price bargained for by large volume Elysium customers to which ChromaDex did not make this commitment.

19.    My opinions, and the bases for them, are set forth in more detail below.

**Exhibit 1
Page 9**

*Highly Confidential*
*Attorneys' Eyes Only*

## V.    LEGAL STANDARD

20.    I have been advised by counsel that the following legal standards and considerations apply in this case.

21.    First, patent misuse occurs when a party holding patent rights conditions access to a patent in a way that "has impermissibly broadened the physical or temporal scope of the patent grant and has done so in a manner that has anticompetitive effects."[1]  Anticompetitive effects can be proven by a "reasonable probability"[2] of an effect in the market, and such effects can be "actual or prospective."[3] In addition:

> Although use of a patent to violate the anti-trust laws will constitute patent misuse, conduct that falls short of an antitrust claim can still be patent misuse.  Patent misuse is viewed as a broader wrong than antitrust violation because of the economic power that may be derived from the patentee's right to exclude.  Thus misuse may arise when the conditions of antitrust violation are not met.  Furthermore, whereas antitrust claimants must normally allege a specific injury to business or property caused by the alleged violations…no allegation of specific injury…is necessary in a claim of patent misuse.  Therefore, patent misuse may be established much more easily than an antitrust violation.[4]

22.    For example, conditioning or tying a patent license or the purchase of a patented product to the purchase of a separate unpatented product is one type of patent misuse. I have been advised that such patent misuse requires that the applicable party has "market power in the relevant market for the patent or patented product on which the license or sale is conditioned."[5]

23.    Second, "[u]nlike […] antitrust analysis, plaintiff need not plead specific injury due to defendant's misuse of its patents."[6]  As the Supreme Court has explained: "[i]t is a principle of general application that courts […] may appropriately withhold their aid where the [patentee] is using the right asserted contrary to the public interest […]. It is the adverse effect upon the public interest of a successful infringement suit in conjunction with the patentee's course of conduct which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the

---

[1] *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010).

[2] *Id.* at 1338.

[3] *Id.* at 1340.

[4] *Seirus Innovative Accessories, Inc. v. Cabela's Inc.*, 2011 U.S. Dist. LEXIS 160301, at *26 (S.D. Cal. Sept. 29, 2011).

[5] 35 U.S.C. § 271(d)(5) (emphasis added).

[6] *Rosenthal Collins Grp., LLC v. Trading Tech. Int'l*, 2005 U.S. Dist. LEXIS 37504, at *25 (N.D. Ill. Dec. 26, 2005).

**Exhibit 1
Page 10**

*Highly Confidential*
*Attorneys' Eyes Only*

patent."[7]  Therefore, "patent misuse may be shown from the totality of a licensor's conduct and business practices."[8]

24.     Third, courts will not aid a patent owner who has misused its patents during the period of misuse or thereafter, unless the effects of such misuse have been dissipated and purged.[9]  Whether and when misuse is dissipated and purged is a question of fact but the court "must give primary consideration to the rights of the public" when making its determination.[10]

25.     Fourth, once a finding of patent misuse has been made, it then becomes the patentee's burden to show that this misuse has been purged.  First, the patentee must demonstrate that the abusive practice is completely abandoned, and, second, that the consequences of the misuse are fully dissipated.[11]  Abandonment requires "clear and unequivocal affirmative action."[12]  Dissipation may likewise require "positive action" as opposed to adopting an "essentially passive approach."[13]  A party cannot just "[take] refuge in the general tendency of time to heal old wounds."[14]

## VI.  BACKGROUND

26.     The following section provides relevant background on the parties, products, licenses, and related facts as initial context for my later analyses.  I provide additional facts and information pertinent to my opinions as needed throughout the remainder of my report.

---

[7] *Morton Salt Co. v. GS Suppiger Co.*, 314 U.S. 488, 492-94 (1942).

[8] *Rosenthal Collins Grp.,* 2005 U.S. Dist. LEXIS 37504, at *26; *Transitron Elec. Corp. v. Hughes Aircraft Co.*, 487 F. Supp. 885, 892 (D. Mass. 1980).

[9] *United States Gypsum v. Nat'l Gypsum*, 352 U.S. 457, 465 (1957).

[10] *Id.* at 473; *Preformed Line Prods. Co. v. Fanner Mfg. Co.*, 328 F.2d 265, 279 (6th Cir. 1964).

[11] *In re Yarn Processing Patent Validity Litig*., 472 F. Supp. 170, 172 (S.D. Fla. 1979); *see Preformed Line Prods. Co*., 328 F.2d 265, 278 (6th Cir. 1964), *citing B. B. Chemical Co. v. Ellis*, 314 U.S.  495, 498 (1942) (plaintiff was properly denied relief for infringement by the defendant "until it could show that it had wholly abandoned its improper practices and that the consequences had been fully dissipated").

[12] *In re Yarn Processing Patent Validity Litig*., 472 F. Supp. 180, 184 (S.D. Fla. 1979).

[13] *Koratron Co. v. Lion Unif., Inc*., 409 F. Supp. 1019, 1025-1028 (N.D. Cal. 1976).

[14] *Id.* at 1028.

**Exhibit 1
Page 11**

*Highly Confidential*
*Attorneys' Eyes Only*

27.    Plaintiff and Counter-Defendant ChromaDex is a publicly traded company headquartered in Los Angeles, CA that now describes itself as a "consumer-facing biotechnology company devoted to improving the way people age."[15]

28.    Defendant and Counter-Claimant Elysium was founded in 2013 by Dan Alminana, Eric Marcotulli, and Dr. Leonard Guarente.[16]  Headquartered in New York, the company sells BASIS, a dietary supplement that contains both NR and pterostilbene that is marketed as capable of restoring NAD+ levels.  BASIS has been commercially available through the direct-to-consumer ("DTC") channel since February 2015.[17]

29.    Over the 2011 to 2014 timeframe, ChromaDex acquired exclusive, worldwide rights to certain patents, which ChromaDex has described as covering products and methods related to NR, under license agreements with the Dartmouth College ("Dartmouth"), Cornell University ("Cornell"), and Washington University ("Washington").[18]  As the exclusive licensee of these patents, ChromaDex is therefore in the position of the patentee with respect to this case.[19]

30.    According to Elysium's website, NR is a form of vitamin $B_3$ that is marketed as increasing NAD+ levels (*i.e.* NR is marketed as an effective NAD+ precursor).[20]  NAD+ is a coenzyme found in all living

---

[15] ELY_0124231 at 124231.

[16] Deposition of Dan Alminana at 12:9-18, 25; ELY_0124234 - 124249.

[17] *Id.*

[18] CDXCA_00142505 - 142516; CDXCA00009968 - 9997; and CDXCA00160556 - 160581.  In May 2014, ChromaDex and Dartmouth executed a second patent license agreement in which ChromaDex was granted the exclusive right to develop and commercialize NR products in the field of human and animal therapeutics.  CDXCA00071302 - 71311.

A summary of the intellectual property licensed by ChromaDex under these agreements (including a listing and brief description of the relevant U.S. patents and their international filings and issued patents) has been included in the company's publicly available March 2019 investor presentation.  ELY_0122932 at 122945.  ChromaDex has listed the following patents on its website in connection with NR:  U.S. Patent No. 8,106,184; U.S. Patent No. 8,114,626; U.S. Patent No. 8,197,807; U.S. Patent No. 8,383,086; U.S. Patent No. 7,776,326; U.S. Patent No. 9,000,147; U.S. Patent No. 9,321,797; U.S. Patent No. 8,889,126; U.S. Patent No. 9,295,688; U.S. Patent No. 9,975,915; U.S. Patent No. 10,000,520.  *See* https://www.chromadex.com/patents/

[19] *See* CDXCA_00142505 - 142516; CDXCA00009968 - 9997; and CDXCA00160556 - 160581

[20] ELY_0123451 - 123454.

7

**Exhibit 1
Page 12**

*Highly Confidential*
*Attorneys' Eyes Only*

cells and is critical to energy, metabolism, brain function, and the nervous system.[21] Beginning in the 1990s, research scientists established a connection between NAD+ levels and aging, showing that sirtuins, a family of proteins that play a role in aging by regulating cellular health, were NAD-dependent.[22]

31.     In acquiring exclusive patent rights from Dartmouth, Cornell, and Washington, ChromaDex sought to, and did, establish and control the commercial supply of the NR ingredient.  ChromaDex has repeatedly characterized itself as the "only company that has been able to successfully manufacture NR at commercial scale," having manufactured and supplied the NR ingredient since 2013 under various manufacturing, supply, and license agreements with W.R. Grace & Co. ("Grace"), a specialty chemicals and materials manufacturing company.[23]

32.     ChromaDex began licensing and supplying its NR ingredient to third party customers for use in products with the execution of its July 2013 NR supply agreement with Thorne Research Inc. ("Thorne").[24]  Subsequently, ChromaDex has licensed and supplied its NR ingredient to approximately 45 additional customers.[25]  In late 2016, ChromaDex identified six (6) primary DTC licensees of its NR ingredient as Elysium, High Performance Nutrition ("HPN"), Live Cell, MAAC10, Nectar7, and Thrive Now Health.[26]

33.     In entering into supply agreements, ChromaDex was able to capitalize on its exclusive rights in its imposition of terms and conditions on the commercial supply of the NR ingredient.  For example, as discussed in more detail below, ChromaDex was able to price discriminate by customer and mandate that nearly all third parties execute and abide by the terms contained in a separate mandatory license to ChromaDex's trademarks.[27]

---

[21] *Id.*

[22] *Id.*; Deposition of Leonard Guarente at 43:17-21.

[23] CDXCA_00154104 - 154106 ("Before ChromaDex started manufacturing commercial quantities of NR back in 2013, it was difficult to find milligrams NR for even basic research."), CDXCA_00082685 - 82702; CDXCA_00131796 -131815; CDXCA_00303015 -303016.

[24] Deposition of Frank Jaksch at 100:19-22, CDXCA_00005450 -5467.

[25] Deposition of Robert Fried at 55:5-7.

[26] CDXCA_00289635 at 289635.

[27] *See* Section VIII.D-E, below.

**Exhibit 1
Page 13**

*Highly Confidential*
*Attorneys' Eyes Only*

34.     ChromaDex's NR supply agreements include contractual language that required various customers to license and use the NIAGEN trademark on their finished consumer product under terms contained in separate trademark license agreements ("TLAs").[28]  This contractual requirement tying together the supply of NR with use or licensing of ChromaDex's NIAGEN trademark was present when ChromaDex first began licensing its NR ingredient.  ChromaDex's first supply agreement, with Thorne, provides that "***Buyer agrees to use the Product trademark NIAGEN.***"[29]  With few exceptions and with only minor differences among them, ChromaDex's supply agreements generally required that:

> ***Buyer shall use the Product trademark NIAGEN***, and agrees to do so in accordance with the Trademark License Agreement that shall be executed by the Parties prior to the sale or marketing of Finished Product.[30]

Therefore, third party licensees were contractually obligated to license and, in the majority of instances, use the ChromaDex trademarks in order to obtain NR from ChromaDex.[31]

35.     In February 2014, June 2014, and February 2016, Elysium and ChromaDex executed and amended agreements under which ChromaDex agreed to supply certain ingredients (including NR) for use in Elysium's dietary supplement, BASIS.[32]  Under the terms of the February 2014 NR supply agreement, ChromaDex agreed to supply Elysium with NR, subject to certain restrictions, for a "Maximum Price" of $1,300 per kilogram conditioned on certain minimum purchase commitments.[33]  Among other terms in the agreement, Elysium received a "most favored nation" pricing provision entitling it to the lowest

---

[28] *See*, *e.g.*, CDXCA_00031414 at 31419; CDXCA_00008496 at 8497; CDXCA_00008508 at 8512; CDXCA_00027271 at 27272; CDXCA_00027392 at 27393; CDXCA_00243110 at 243111; CDXCA_00027515 at 27516; CDXCA_00008653 at 8657; CDXCA_00027740 at 27741; CDXCA_00210959 at 210962; CDXCA_00008797 at 8800; CDXCA_00005450 at 5455; CDXCA_00008946 at 8949; CDXCA_00062195 at 62197.

[29] CDXCA_00005450 at 5455 (emphasis added).

[30] *E.g.*, CDXCA_00027392 at 27395 (emphasis added).

[31] *Id.*; CDXCA_00008496 at 8497; CDXCA_00008508 at 8512; CDXCA_00027271 at 27272; CDXCA_00027392 at 27393; CDXCA_00243110 at 243111; CDXCA_00027515 at 27516; CDXCA_00008653 at 8657; CDXCA_00031414 at 31419; CDXCA_00245404-412 at 245408; CDXCA_00027740 at 27741; CDXCA_00210959 at 210962; CDXCA_00008797 at 8800; CDXCA_00005450 at 5455; CDXCA_00008946 at 8949; CDXCA_00062195 at 62197; CDXCA_00207931-941 at 207937.

[32] CDXCA_00061424 - 61434; CDXCA_00145728 - 145735; CDXCA_00061443 - 61446.

[33] CDXCA_00061424 at 61426.  Under the terms of the supply agreement, Elysium was excluded from certain fields (*e.g.* practitioner channel and multi-level marketing channel).  *Id.* at 61425.

**Exhibit 1
Page 14**

*Highly Confidential*
*Attorneys' Eyes Only*

commercial NR ingredient price being paid by any ChromaDex customer purchasing an equal or lesser volume of NR, and a guarantee that its NR supply would be manufactured according to cGMP Part 210 and 211, applicable to pharmaceuticals.[34]

36.     On February 19, 2016 the parties' amended certain terms of the supply agreement, granting Elysium exclusivity over the manufacture and sale of "any products containing both Niagen and pTeroPure (or any ingredients that are substantially similar thereto) in combination, whether in the same delivery mechanism (including tablet, capsule, melt or liquid form) or packaging or in separate form or packaging but marketed together."[35]

37.     Under the terms of the February 2014 TLA, Elysium was required to pay a minimum royalty of 5% on net sales of its BASIS product for a license to the ChromaDex trademarks even though Elysium had specifically negotiated an exemption from the requirement to use these marks.[36] Based on information summarized in ChromaDex royalty reports, Elysium was required to pay ChromaDex approximately $496,000 in trademark royalties through Q2:2016 under the terms of the TLA.[37]

38.     ChromaDex intended to use its trademark licensing scheme to develop a brand name around its NR ingredient so that consumers would think of NR and NIAGEN synonymously.[38] By ChromaDex's design, many of its third party licensees marketed their NR products under brand names that included the NIAGEN mark, with a number of licensees using "NIAGEN" as the primary product identifier in advertising, marketing, and customer communications.[39] In fact, as ChromaDex recognized by late 2016, five out of six of its most prominent DTC licensees were "using NIAGEN as their *primary* brand

---

[34] CDXCA_00061424 at 61426, 61427.

[35] CDXCA_00061443 - 61446.

[36] CDXCA_00061402 - 61405, Deposition of ChromaDex 30(b)(6) at 74:3-6, Deposition of Eric Marcotulli at 93:24-25, 109:1-7.

[37] CDXCA_00006939 - 6939, CDXCA_00006948 - 6948, CDXCA_00059349 - 59349, CDXCA_00100914 - 100914, CDXCA_00101783 - 101783, CDXCA_00007068 - 7068. I note that Elysium's trademark royalty rate increased from 5.0% to 5.5% of net sales beginning in 2016 as a result of its effective NR ingredient price falling from an average of $1,121.78 per kilogram in 2015 to $1,000 per kilogram beginning in Q1:2016.

[38] Deposition of Robert Fried at 152:4-11.

[39] Deposition of Troy Rhonemus, at 182:20-183:4; *see* Figure A, below.

10

**Exhibit 1**
**Page 15**

*Highly Confidential*
*Attorneys' Eyes Only*

name" and had made substantial investments in the NIAGEN brand.[40]  As shown below, Elysium was the only one of these primary DTC licensees not to use NIAGEN on its product packaging:



(Figure A:  ChromaDex Primary DTC Licensees)

39.     Through Q4:2016, these NIAGEN branded licensees accounted ▇▇▇▇▇▇ of all NR ingredient purchases made by DTC licensees and ▇▇▇ of NR ingredient purchases across all distribution channels.[41]  Therefore, as of late 2016, the majority of ChromaDex's NR ingredient sales for products offered in the DTC channel were being made to DTC licensees who were building out ChromaDex's trademarked NIAGEN brand at the licensees' own considerable expense.[42]

40.     Thereafter, ChromaDex moved to take advantage of the expanding brand recognition generated by its DTC licensees' use of the NIAGEN mark, which had been caused by ChromaDex's requirement that

---

[40] CDXCA_00289635 at 289639 (emphasis in original).  As discussed above the six primary Direct-to-Consumer licensees identified by ChromaDex are MAAC10, Nectar7, Live Cell, HPN, Thrive Now Health, and Elysium.

[41] CDXCA_00429638 – 429638, CDXCA_00422033 – 422033.

[42] *See* CDXCA_00289635 at 289639 ("in some cases substantial investment has been made by those companies with respect to the use of the brand").

**Exhibit 1**
**Page 16**

*Highly Confidential*
*Attorneys' Eyes Only*

its customers use or license the NIAGEN mark in order to obtain supply of NR.[43]  Rob Fried, who was at the time a board member of ChromaDex and is now ChromaDex's CEO, created Healthspan Research, LLC ("Healthspan") for the purpose of marketing and selling its own DTC NIAGEN product.[44]  ChromaDex had taken an early investment position in Healthspan.[45]  Healthspan's primary objective was to "increase the consumer base of [ChromaDex's] DTC NIAGEN brand from 1K to 100K."[46]  On March 12, 2017, ChromaDex fully acquired Healthspan as part of a strategy to enter and take over the DTC market in an accelerated timeframe.[47]

41.    Recognizing that the new consumer product would compete directly with its ingredient customers,[48] ChromaDex decided to terminate its DTC licensees' supply of NR, and to replace those sales with the sales of its own DTC product, TRU NIAGEN.[49]

42.    In the meantime, during this phase out of NR licensees, ChromaDex had effectively decided to take the goodwill previously created by its DTC licensees in the NIAGEN mark for itself.  In a contemporaneous document, ChromaDex stated:

> CDX has had initial discussions with 4 of the 5 existing brands using NIAGEN® as their primary brand name.  This practice was previously allowed by CDX, and in some cases substantial investment has been made by those companies with respect to the use of the brand

---

[43] *See* Deposition of ChromaDex 30(b)(6) at 56:16-57:13 (when asked what led ChromaDex to consider selling NIAGEN direct to consumer, Mr. Varvaro states: "we were looking at a bunch of different analysis of where the brand Niagen was going, how it was performing […] there was a belief from a board-level standpoint, not across to everyone, but discussions came about how we can best achieve shareholder value going forward, and one of the considerations in that was launching or own finished product containing nicotinamide riboside." [sic,]); 60:12-22 ("I'm sure [the fact that there was a market for Niagen-branded products] was one of the facts that was taken into discussion," in deciding to pursue the direct to consumer market); 66:8-23 ("The company made a decision to phase out customers for many different reasons […] and there were ones that the belief was they were going to be phased out because they were potential competitors to the Tru Niagen brand.").

[44] Deposition of Tom Varvaro, at 144:14-16, 146:4-6, 208:19-23; *see* CDXCA_00443724 at 443724; CDXCA_00059038 at 59045.

[45] Deposition of Tom Varvaro, at 137:8-22.

[46] CDXCA_00201321 at 201323.

[47] ELY_0123123 at 123128, Deposition of Tom Varvaro at 215:5-6.

[48] Deposition of Tom Varvaro, at 227:12-14.

[49] CDXCA_00289635 at 289635.

**Exhibit 1**
**Page 17**

*Highly Confidential*
*Attorneys' Eyes Only*

name NIAGEN® and there are agreements in place that will either need to be terminated or permitted to expire.[50]

43.    In May of 2017, ChromaDex began notifying various licensees that it was "no longer requiring the use of the NIAGEN® trademark for products containing its nicotinamide riboside ("NR") ingredient."[51] In some instances, the letter included an amendment to the relevant supply agreement stating "that usage of the NIAGEN® trademark is voluntary, not mandatory."[52]

44.    ChromaDex's trademark strategy has allowed it to receive an ongoing benefit from the NIAGEN branding in which it had forced its licensees to invest as a condition of supply of NR. As set forth in its execution timeline, ChromaDex set out the expectation that these DTC customers would be no longer selling products by June 2017, leaving ChromaDex as the sole seller of products using the NIAGEN branding in the DTC channel.[53] Of the strategy, ChromaDex stated:

> A NIAGEN ingredient TM strategy strengthens the overall NR business …
> - ➢ Provides a trust mark for the consumer
> - ➢ Provides a means of policing our IP
> - ➢ Provides differentiation for CDX if/when NR competition arrives
> - ➢ Promotes CDX as the IP owners and drivers behind NR[54]

45.    It appears that as of Q2:2017, ChromaDex had made significant progress towards its goal of "phasing out" potential DTC competitors by terminating supply agreements with no less than 13 of its NIAGEN customers, including four of its six DTC customers: Nectar7, Elysium[55], MAAC10, and Thrive Now.[56]

---

[50] CDXCA_00289635 at 289639 (emphasis in original).

[51] *E.g.*, CDXCA_00008674 - 8674 (Life Extension); CDXCA_00008535 - 8535 (Barology); CDXCA_00008664 - 8664 (Jarrow); CDCXA_00008789 - 8789 (Pretiva); CDXCA_00008910 - 8910 (Thorne).

[52] *E.g.*, CDXCA_00008535 - 8535 (Barology); CDXCA_00008664 -8664 (Jarrow); CDCXA_00008789 - 8789 (Pretiva).

[53] CDXCA_00289635 at 289641.

[54] CDXCA_00464084 at 464097.

[55] ChromaDex informed Elysium that it was terminating the parties' NR supply agreement and TLA effective February 2, 2017. CDXCA_00007490 - 7490.

[56] CDXCA_00171075 - 171075; CDXCA_00008697 - 8697 (Nectar7), CDXCA_00008682 -8682 (MAAC10), CDXCA_00008936 - 8936 (Thrive Now), CDXCA_00429813 - 429813 (Nordic Clinical), CDXCA_0008507 - 8507 (Alivebynature), CDXCA_00262827 - 262827(Global Radiant Health), CDXCA_00262823 - 262823 (Healthy Directions), CDXCA_00262830 - 262830 (Metabolic Code

**Exhibit 1**
**Page 18**

*Highly Confidential*
*Attorneys' Eyes Only*

HPN remained identified as a "current customer" as of August 2017, and its supply agreement was subsequently terminated December 14, 2017.[57]  In the company's 2017 10-K filing with the SEC, ChromaDex announced it would reduce the number of its NIAGEN supply agreements to just three (3) as of March 2018.[58]

46.    In its Q1:2018 financial disclosure, ChromaDex reiterated its strategic decision to terminate certain NIAGEN supply agreements and indicated that the future success of ChromaDex was now linked to the success of its TRU NIAGEN consumer product, stating:

> By developing and selling TRU NIAGEN, our own consumer standalone NIAGEN supplement product, we are in direct competition with some of our current ingredients segment customers that use NIAGEN® in the products that are sold to consumers.  In an effort to promote and better market our consumer product, we have made a strategic decision not to ship NIAGEN® to certain ingredients segment customers […].

> ***

> In connection with our strategic shift from an ingredient and testing company to a consumer focused company, we expect to generate a significant percentage of our future revenue from sales of our TRU NIAGEN® product.  As a result, the market acceptance of TRU NIAGEN® is critical to our continued success […].[59]

47.    During fiscal year 2018, ChromaDex's net sales of TRU NIAGEN totaled $18.5 million, a three-fold increase over the nearly $5.5 million in sales realized by ChromaDex during its first year commercializing the company's NIAGEN consumer product.[60]

## VII.    THE RELEVANT MARKET IS THE SUPPLY OF NICOTINAMIDE RIBOSIDE IN THE UNITED STATES

48.    As discussed above, proving patent misuse based on conditioning the sale of a patented product on the purchase of a separate product requires a showing that the patentee "has market power in the relevant market for the patent or patented product on which the license or sale is conditioned."[61]  Here, the

---

Enterprise), CDXCA_00008787 - 8787 (Pretiva), CDXCA_00008811 -8811 (ProHealth), CDXCA_00008479 - 8479 (5Linx); *see also* Deposition of Troy Rhonemus, at 69:25-70:3.

[57] CDXCA_00429969 - 429969.

[58] ELY_0123455 at 12359, 123467.

[59] CDXCA_00437048 at 437075.

[60] ELY_0123123 at 123127.

[61] 35 U.S.C. Sec. 271(d)(5).

**Exhibit 1**
**Page 19**

*Highly Confidential*
*Attorneys' Eyes Only*

product at issue is the NR ingredient that ChromaDex supplied to customers like Elysium, HPN, Thorne, Nectar 7, MAAC10, Live Cell, and others.  Therefore, I first set out to define the relevant market at issue here.

49.    For the reasons discussed below, it is my conclusion that the manufacture and supply of the NR ingredient constitutes a distinct product market in the United States.  At the present time, the relevant market consists exclusively of NR due primarily to the lack of available substitutes and the lack of reasonable interchangeability between NR and other potential NAD+ precursors.

## A. Framework

50.    Market definition is a widely applied analytical framework for evaluating competitive concerns and serves several purposes in identifying the nature of competition in a market.  In a matter such as this, the main goal of market definition is to assess the existence, creation, or strengthening of market power, which is defined as the ability of the firm to keep the price above the long-run competitive level.[62] Market definition focuses on demand substitution factors, *i.e.*, on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change, such as a reduction in product quality or service.[63] Products which are reasonably interchangeable in a functional sense are generally also economic substitutes: the ability of consumers to switch between them limits a seller's ability to raise its price without losing sales to substitute products. A firm whose product has one or more close substitutes is generally unable to profitably exercise market power by raising price significantly above marginal cost.

51.    The U.S. antitrust enforcement agencies (*i.e.* the U.S. Department of Justice and the Federal Trade Commission) employ a "hypothetical monopolist test" to evaluate whether and the degree to which groups of products in candidate markets are sufficiently substitutable with one another to constitute a relevant antitrust market.[64]  In this analysis, a relevant product market is one in which a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist"), likely would profitably impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market.[65]  The

---

[62] ELY_0123627 at 123638.

[63] ELY_0123414 at 123423.

[64] *Id.* at 123424-25.

[65] *Id.* at 123425.

**Exhibit 1**
**Page 20**

*Highly Confidential*
*Attorneys' Eyes Only*

degree of economic substitution among products that provides the basis for defining a relevant product market may be determined by calculating the cross-price elasticity of demand.[66]  Cross-price elasticity of demand is defined as the measure of responsiveness or change in the quantity demanded of one good (Product A) based on the change in price of another good (Product B), all else equal.  As such, we would expect the cross-price elasticity of demand for substitute products to be positive; an increase in the price of Product A resulting in a corresponding increase in the quantity demanded of Product B, as some purchasers switch away from Product A.  The magnitude of this effect, normally measured as the percentage change in demand for Product B as the result of a one percent change in the price of Product A, reflects the degree of substitutability among them.

52.    In circumstances where the data necessary to perform a cross-price elasticity analysis are unavailable, incomplete, or poorly measured, then evaluation of reasonable product interchangeability also provides a basis for market definition.  In *Brown Shoe v. United States*, the Supreme Court stated that while the "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," it also recognized the need to examine certain "practical indicia," such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."[67]

### B.    Reasonable Interchangeability of NR from the Supplier and Customer Perspective

53.    Product substitution and interchangeability are driven by consumer choice.  In the patent misuse context, the starting point for market definition would be the patented product at issue, here, the NR ingredient.  One can then attempt to broaden the definition of the relevant market by including products which fall outside the scope of the patent, but are potentially sufficiently similar in characteristics and function to be considered reasonably interchangeable.

54.    In considering the reasonable interchangeability among dietary supplements, one can look for guidance to the analyses of antitrust enforcement agencies in connection with pharmaceuticals.  In pharmaceutical cases, the FTC has adopted market definitions based on (a) drugs used for treatment of

---

[66] Cross-price elasticity of demand ($\eta_{AB}$) is defined as the measure of responsiveness or change in the quantity demanded of one good (Product A) based on the change in price of another good (Product B), all else equal.  For substitutes, we would expect the quantity demanded to increase as the price of the substitute good increases.

[67] *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 325 (1962).

**Exhibit 1**
**Page 21**

*Highly Confidential*
*Attorneys' Eyes Only*

a specific disease or indication, (b) drugs that use the same mechanism of action, and (c) specific compounds.  In some cases, the FTC has even narrowed market definition based on dosage form (*e.g.* tablet vs. injectable), dosage frequency (one-per-day/extended release vs. twice- or four-times-per-day), dosage strength (*e.g.* 30mg vs. 60mg tablets), or brand vs. generic.[68]

55.    NR's marketed mechanism of action is in its ability to act as an effective oral dose NAD+ precursor.[69] The relevant mechanism of action of NR, as it is marketed, is in effectively and consistently raising intracellular levels of NAD+ through dietary supplementation.  From the perspective of a consumer, for a product to be reasonably interchangeable with NR, it would have to have the equivalent effect without dangerous or unpleasant side effects.  Further, products that were not available in an oral dosage (*e.g.* intravenously administered compounds) could not be self-administered, and would not therefore be reasonably interchangeable with NR.

56.    From my review of ChromaDex's own documents and public statements, it appears that NR is marketed to consumers and investors as not being reasonably interchangeable in use with any other products and as having its own peculiar characteristics and uses.  In fact, as discussed below, ChromaDex has repeatedly stated that there are no substitutes for NR.  Thus, the supply of NR must be deemed to be within its own product market because an analysis broadening the market beyond NR – even to just other potential NAD+ precursors – quickly fails to find reasonably interchangeable products.

57.    There is extensive evidence of this lack of substitutability for NR in the materials I have reviewed in this matter.  In fact, in 2017, Dr. Charles Brenner was interviewed to obtain his response to assertions that NR was simply an "expensive vitamin B$_3$ supplement."[70]  Dr. Brenner appears regularly in ChromaDex's documents.  On ChromaDex's website, Dr. Brenner is listed as having a leadership position as ChromaDex's Chief Scientific Advisor and is credited for "multiple seminal contributions to NAD+ metabolism."[71]  In ChromaDex's response, conveyed through the interview of Dr. Brenner, it rejected any claim that substitutes to NR existed, concluding that: "NR is the only NAD-boosting compound that elevates metabolism, protects damaged nerves, extends lifespan in mice and other model

---

[68] Morse, M.  Howard, "Product Market Definition in the Pharmaceutical Industry"; 71 *Antitrust Law Journal* No. 2 (2003), pp. 633 - 676.

[69] CDXCA_00000201 at 210; CDXCA_00036203 at 36212.

[70] ELY_0122964 - 122971.

[71] https://www.chromadex.com/leadership/

**Exhibit 1**
**Page 22**

*Highly Confidential*
*Attorneys' Eyes Only*

systems, and increases insulin sensitivity."[72]   Dr. Brenner continued, stating, "inexpensive NAD precursors […] cannot substitute for NR.  We are dealing with an aging population with a high incidence of chronic diseases that involve [conditions], all of which can potentially be addressed uniquely by NR.  ***You can be assured that there is no other NAD precursor that can do what NR does.***"[73]  He called any arguments that niacin or nicotinamide were substitutable with NR as "utterly inconsistent with facts."[74]

58.   Dr. Brenner supported his views by referring to the properties of other potential substitutes like nicotinamide, niacin, or tryptophan.  These statements include:

i.     "[H]igh dose niacin causes flushing, which limits its use."[75]

ii.    "High dose nicotinamide is not as commonly used.  It doesn't improve cholesterol."[76]

iii.   "The basic thesis of NR is that NR boosts NAD+ without inhibiting sirtuins (the problem with nicotinamide), without causing flushing (the problem with niacin) and in damaged cells including nerves and muscles."[77]

iv.    "Nicotinamide and niacin can't substitute for NR because they aren't used in all of the same cells and they don't produce the same results."[78]

v.     "The best example of these compounds [*i.e.* niacin and nicotinamide] not being equivalent is with respect to glycemic control.  Nicotinamide and niacin promote insulin insensitivity (which is bad), while NR promotes insulin sensitivity (which staves off type 2 diabetes).  So you should not believe anyone who says that the three compounds are equivalent."[79]

vi.    "There are three problems with niacin and two problems with nicotinamide, particularly at high doses.  First, niacin can't be used in lots of tissues because the niacin pathway is not on.  The

---

[72] ELY_0122964 at 122968.

[73] ELY_0122964 at 122968 (emphasis added).

[74] *Id.*

[75] ELY_0122964 at 122966.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

**Exhibit 1
Page 23**

*Highly Confidential*
*Attorneys' Eyes Only*

brain and skeletal muscle can't use niacin to boost NAD and these are two of the most important tissues that suffer the ravages of aging. Niacin also causes flushing at high doses and does not efficiently elevate mitochondrial NAD. The nicotinamide pathway declines in aging, which means you would need even higher doses to try to maintain your NAD. Second, at high doses nicotinamide inhibits sirtuins, which is the opposite of NR."[80]

59.     Dr. Brenner further emphasized the efficiency of different biological pathways in distinguishing between NR and other NAD+ precursors. He explained: "Different cells and tissues use different pathways to make NAD […]. It turns out this is the basis for the differences between NR, niacin and nicotinamide and tryptophan […]. If the genes for a particular NAD precursor are not on, no amount of that precursor can help that cell make NAD."[81] Thus, he used the example of tryptophan, explaining: "[T]hat's part of the reason why tryptophan is such a poor NAD precursor. Tryptophan is an inefficient precursor in some cells and it's simply not an NAD precursor in other cells because the tryptophan pathway genes are off."[82] Similarly, he stated that niacin and nicotinamide "cannot substitute for NR as metabolic boosters because there are different genes required to make NAD from these compounds."[83]

60.     In explaining the uniqueness of NR, Dr. Brenner offered that there "... are only two steps in the NR pathway to NAD.... The NR pathway never gets turned off.... This means that people supplementing with NR are able to keep NAD levels high in stressed cells that specifically have the NR pathway turned on to deal with cellular stress. Supplementing with niacin and nicotinamide doesn't help because they don't feed into the NR pathway, which is turned on by stresses."[84]

61.     Other ChromaDex internal documents and marketing materials also show that the product market is properly defined as the market for the supply of the NR ingredient. Many of these documents echo Dr. Brenner's critiques of niacin, NMN, and nicotinamide, and similarly reject them as substitutes. For example, in press releases, ChromaDex describes NR as having "unique properties."[85] One internal

---

[80] *Id.* at 122967.

[81] *Id.* at 122966.

[82] *Id.*

[83] *Id.*

[84] *Id.* at 122967.

[85] CDXCA_00000187 at 199; CDXCA_00260862 at 260865.

**Exhibit 1
Page 24**

*Highly Confidential*
*Attorneys' Eyes Only*

presentation (prepared with extensive input from ChromaDex management[86]) graphically represents NAD+ pathways.  A slide from this presentation (reproduced in part below) emphasizes the benefits of NR over other potential NAD+ precursors.  Tryptophan and niacin, or nicotinic acid, are referred to as having a "more inefficient" pathway.  Nicotinamide was noted as "not biologically available" and NMN was described as "not orally available."   By contrast to the above, NR had a "highly efficient pathway."[87]



(Source: CDXCA_00105749 at 105766)

62.     In a white paper entitled "Niagen™ The Novel Nicotinamide Riboside" ChromaDex described NR as a "next-generation" product, explaining that NR "uses a more efficient pathway to deliver vitamin B3 to the body and also avoids the flushing side effect often associated with the use of Niacin supplements." [88]  Additionally, ChromaDex's documents state that NR "... is a more efficient delivery

---

[86] *See* CDXCA_00107355- 107356, CDXCA_00107442 - 107442, CDXCA_00107524 - 107525, CDXCA_00126637 - 1226638.

[87] CDXCA_00105749 at 105766.

[88] CDXCA_00070690 at 70693, 70695.

20

Exhibit 1
Page 25

*Highly Confidential*
*Attorneys' Eyes Only*

vehicle for vitamin B3, as it synthesizes NAD+ in fewer steps than niacin," and "NIAGEN's efficiency and lack of associated flushing elevate it to a next-generation vitamin B."[89]

63.     In another presentation from 2017, ChromaDex stated that "NIAGEN® is the most efficient and effective NAD+ booster."[90] Specifically, NR had "the most direct and efficient path to NAD+ creation within the biosynthetic pathway."[91] ChromaDex explained that niacin, by contrast, "requires several different, energy reducing conversions prior to becoming NAD+" and niacin "is often limited by uncomfortable flushing."[92] ChromaDex also suggested that NMN was also less efficient than NR because, although it appeared to potentially be a more direct route to NAD+, NMN "is converted to NR to uptake into the cell, where it is converted back to NMN."[93] The presentation concludes that "research demonstrate[s] NR is the preferred NAD+ booster" because "NR is the most efficient and effective, vitamin B3 at increasing NAD+ levels."[94]

64.     For these reasons, ChromaDex has acknowledged that niacin was not a substitute for NR. On a page entitled "Advantages of Niagen," ChromaDex's Project Crimson presentation states that: "Niagen is considered by researchers to be the best known precursor to NAD+ production [...]Niagen has a superior salvage enzyme profile and displays a lack of flushing when compared to niacin, positioning Niagen as the new standard supplement and/or therapeutic agent to be used in place of niacin."[95] The presentation also states that "ChromaDex controls the only commercially available NAD+ precursor and Niagen has a significant patent estate extending in to the 2030s."[96]

65.     Elysium witnesses have advanced similar conclusions regarding the lack of substitutability between niacin and NR. As Mr. Marcotulli explained in his deposition, when Elysium considered niacin as a potential NAD+ precursor it realized that it was "not nearly as effective" as NR.[97] He explained that

---

[89] *Id.*

[90] CDXCA_00113153 at 113186.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.* at 113189.

[95] CDXCA_00105749 at 105768.

[96] *Id.* at 105777.

[97] Deposition of Eric Marcotulli at 74:18-19.

**Exhibit 1**
**Page 26**

*Highly Confidential*
*Attorneys' Eyes Only*

"[e]verything until a certain point goes through a rate-limiting step that severely inhibits their ability to increase NAD levels," stating that only NR and NMN come after that rate-limiting step.[98]

66.    As shown above, among NAD+ precursor molecules, only those that are understood as effectively and efficiently promoting intracellular production of NAD+ through oral dosing without unpleasant side effects would be considered "reasonably interchangeable" from the perspective of a purchaser, *i.e.* in the same relevant market. As detailed above, only NR currently satisfies these criteria. The only other potential candidate is NMN, but I conclude that it is not properly considered to be in the same market as NR. At this time, NMN is not interchangeable with NR.[99] Currently, there are important limitations on the degree to which NMN can be considered an economic substitute for NR:

  i.    First, clinical research on NMN lags behind NR.[100] NMN's effectiveness in raising intracellular NAD+ levels in humans has not yet been demonstrated in clinical trials.[101] The existence of this kind of clinical evidence differentiates NR from NMN and therefore, customers are much more likely to view any assertions regarding the health effects of NMN as more speculative.

  ii.   Second, the NMN compound has not been commercially available during the relevant period (2013-2017). As described by ChromaDex's then-CEO, the cost to manufacture NMN in commercial quantities was not cost effective for it to be a commercially viable product.[102] As he wrote in an August 2017 e-mail, "[T]here really is no commercial supply for NMN that is

---

[98] *Id.* at 74:18-25.

[99] *See* Deposition of Eric Marcotulli at 75:12-16 ("NMN is not a consideration in our minds, especially at that time, given there was no commercial source, there was no human data around safety or efficacy. So it was not a viable candidate molecule in our opinion."), 76:7-10 ("The research that we're seeing, while it's still very early for NMN, again still no human data, not something we consider to be a viable or competitive candidate to NR yet.").

[100] ELY_0122499 - 501.

[101] *Id.*; Deposition of Eric Marcotulli at 75:12-16 ("NMN is not a consideration in our minds […] there was no human data around safety or efficacy.").

[102] CDXCA_00205378 at 205379 (" […] it will never be cost effective […]").

22

**Exhibit 1**
**Page 27**

*Highly Confidential*
*Attorneys' Eyes Only*

cost effective, and it will never be cost effective, in order to make NMN you start with NR."[103] Elysium's own conclusions were similar.[104]

  iii. Lastly, there is not a consistent price for NMN products at retail level.[105]

**C. ChromaDex's Recognition of a Distinct Market for the Supply of NR**

67. Consistent with my observations, internal and external ChromaDex documents recognize that a distinct market for the supply of NR exists due to the unique properties of NR perceived by ChromaDex, its investors, and its customers. Within a few months following the launch of its NIAGEN product, ChromaDex explicitly referred to "the NR market." [106] Specifically, in a press release in July of 2013, ChromaDex wrote: "Niagen™ is the first and only commercially available brand of NR […]. ChromaDex believes its patent rights create a significant and meaningful barrier to entry for would-be competitors *in the NR market*."[107] Similar statements appear in ChromaDex's internal documents. For example, in presentation entitled "Project Crimson,"[108] it was observed that "The Company is the **only producer of Niagen** and its patent rights create a significant barrier to entry for would-be competitors in the market."[109] In fact, the Project Crimson presentation specifically identifies an "end-market" that it identifies simply as "Niagen."[110] Similarly, in a May 2016 investor presentation, ChromaDex refers to itself as being "in the enviable position of 'gatekeeper' to the entire NAD+ precursor category" by virtue of its control of NR.[111]

---

[103] *Id.* at 205380. This statement was in response to a question seeking a "rationale on why everyone on earth should use NR."

[104] *See* Deposition of Dan Alminana, 36:8-10 ("there were only public statements about manufacturing of NR and not NMN made [...]"); Deposition of Eric Marcotulli at 76:19-20 ("To our knowledge, no viable commercial source exists.")

[105] *See* ELY_0108100.

[106] CDXCA_00000187 at 198.

[107] *Id.* (emphasis added).

[108] The "Project Crimson" presentation was prepared by Jeffries on behalf of ChromaDex, but ChromaDex's management was active in providing information, input, and edits to the presentation. CDXCA_00107524 - 525.

[109] CDXCA_00105749 at 105764 (emphasis in original).

[110] *Id.* at 105820.

[111] CDXCA_00067454 at 67478.

**Exhibit 1**
**Page 28**

*Highly Confidential*
*Attorneys' Eyes Only*

68.    Thus, ChromaDex recognized that a distinct "NR market" existed for ingredient supply, and it believed that it had a competitive advantage in – indeed control of – that particular market. ChromaDex's statements like these would make little sense if the market could be broadly defined to include ingredients other than NR. ChromaDex's hold on the NR ingredient would be irrelevant if customers could simply substitute NR for another ingredient. Put another way, that ChromaDex was the only supplier of NR would be of no business significance if other reasonably interchangeable substitutes existed. ChromaDex would not have kept highlighting its control of NR as a point of differentiation among other investment alternatives. Yet, as discussed in more detail in the market power analysis below, ChromaDex repeatedly told the public and its investors that ChromaDex was the only source of NR. In addition, ChromaDex stated that control of NR gave it control of the market.[112] Thus, ChromaDex and its investors do not appear to have believed that there was a high level of substitutability between NR and other ingredients.

69.    As shown above, an analysis broadening the potential market even somewhat beyond NR quickly fails to find reasonably interchangeable products. Thus, even broader market definitions will also fail. For example, in my opinion, the broadest possible market definition – all anti-aging products – is ruled out because it contains numerous products that are not reasonably interchangeable with NR (*e.g.* skin creams). It is my opinion that a somewhat narrower possible market definition including only anti-aging dietary supplements also fails, because it would still contain large numbers of products that do not have the same therapeutic effect or have a different mechanism of action – *i.e.*, they do not act to raise NAD+ levels. Indeed, as discussed above, even relatively close products like niacin and nicotinamide are not considered substitutes for NR by market participants like ChromaDex. Therefore, including even more distant potential substitutes is inappropriate.[113]

70.    Lastly, the market is properly defined as a supply-side market as opposed to a broader market that includes finished consumer products that contain NR. Markets can be defined by whether companies

---

[112] *E.g.*, CDXCA_00105749 at 105764 ("The Company is the **only producer of Niagen** and its patent rights create a significant barrier to entry for would-be competitors in the market.") (emphasis original); CDXCA_00067454 at 67476. (stating that ChromaDex is "in the enviable position of 'gatekeeper' to the entire NAD+ precursor category" by virtue of its control of NR).

[113] As the Department of Justice's Merger Guidelines explains, "[T]he competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market." In addition, excluding distant substitutes "provides a more accurate indicator of the competitive effects of the conduct at issue." *See* ELY_0123414 at 123423-24.

**Exhibit 1
Page 29**

*Highly Confidential*
*Attorneys' Eyes Only*

and others in the market recognize distinct roles for market participants, like distinct ingredient suppliers.  During the relevant times, ChromaDex documents recognize it as an "ingredients" company.[114]  Indeed, during ChromaDex's more recent entry into the DTC market, ChromaDex explicitly recognized that this entailed a new shift in strategy.  To make that shift, ChromaDex specifically acquired a company that was operating in the DTC market.  As ChromaDex wrote in its 10-Q for the quarter ended April 1, 2017, "entering the DTC market" was a "change[] in our business strategy."[115]  In describing its new business model, ChromaDex wrote:  "With the acquisition of our own DTC company, we have entered the DTC market with our own branded NIAGEN supplement."[116]  Thus, it would not be appropriate to expand the market to include both the supply-side and consumer-side in the same market.[117]

### D. The Existence of an NR Market is Further Supported by Pricing Data

71.     Comprehensive data on sales of dietary supplements are not readily available.  While data on prices of niacin, NR, and NMN dietary supplement products are available, data regarding the quantity of products sold at these prices are not.[118]  Therefore, methods of assessing this market other than price elasticity studies must be applied.  Finally, I am not aware of any proprietary market research in the record, such as surveys, that would permit me to assess the cross-price elasticities among different products using methods such as conjoint analysis.

---

[114] CDXCA_00059784 at 59792 ("The Company is a natural products company that leverages it complementary business units to discover, develop and commercialize patented and proprietary ingredient technologies […]"); CDXCA_00060210 at 60213 ("ChromaDex is an innovator of proprietary health, wellness, and nutritional ingredients […]"); CDXCA_00062271 at 62274 (same); CDXCA_00430857 at 430859 ("In Q3 2015, the ingredients segment generated record net sales of $4.1 million […]"); CDXCA_00431577 at 431577 ("ChromaDex, Inc.  (NASDAQ:CDXC) is an ingredient technology business […]").

[115] CDXCA_00445230 at 445261.

[116] *Id.* at 445247.

[117] In any event, for the reasons discussed in the market power section, my opinion that ChromaDex has market power would not change if the consumer market was included.  As discussed below and as ChromaDex has repeatedly stated, it has been the only source of NR.  Although Elysium no longer sources NR from ChromaDex, that was not the case at the time ChromaDex engaged in its alleged acts of patent misuse, as described below.

[118] Retail prices (bi-annual) on Amazon.com sales of NR, NMN, and niacin from www.keepa.com. ELY_0108100.

**Exhibit 1**
**Page 30**

*Highly Confidential*
*Attorneys' Eyes Only*

72.    However, publicly available data on the pricing of these products does provide evidence consistent with NR constituting a relevant market, with niacin and NMN being, at best, very weak economic substitutes and falling outside the relevant market.

73.    I have reviewed data on the retail prices of NR-based and niacin-based dietary supplement products available on Amazon.com over the January 1, 2011 – October 8, 2018 timeframe.[119] Exhibit 1 plots the median price per milligram of the active ingredient basis within each set of products.  As this chart shows, the price per milligram of niacin products is quite stable over time, fluctuating between 0.00017 and 0.00021 between 2014 and 2018.  For NR products, the median price per milligram of NR between 2014 and 2018 shows slightly more variation, from a low of $0.0048 per milligram to a high of $0.0075 per milligram, but still has not changed a great deal.

74.    Lack of variation in prices mean that cross-price elasticities cannot be reliably estimated.  The stable price of niacin, a candidate substitute for NR, is a particular problem.  If price of niacin had doubled due to a supply disruption, or sudden increase in demand for niacin to treat cholesterol, then it would be possible to look to the magnitude of the change (if any) in quantities sold of NR to assess the amount of buyer substitution between NR and niacin.  Unfortunately, no such change in the price of niacin occurred, and without some variation from some type of exogenous "shock" or quasi-experiment it is not possible as a practical matter to estimate cross-price elasticities, even if adequate data on quantities sold were available.

75.    It is also apparent that there are large and stable differences across these products in their prices.  To make a direct economic comparison between NR and niacin, prices must be expressed in comparable consumption units, such as per daily dose or per month's supply.  Suggested dosing for NR products is in the range of 100mg to 600mg per day, based on product labels and marketing materials.  The recommended dosing of niacin can range from 100mg per day as an OTC dietary supplement to 500mg to 1,000mg per day or more as a treatment for hyperlipidemia,[120] which is a condition involving excess

---

[119] Retail prices (bi-annual) on Amazon.com sales of NR and niacin from www.keepa.com. ELY_0108100.

[120] http://reference.medscape.com/drug/vitamin-b3-niacor-niacin-344422

**Exhibit 1**
**Page 31**

*Highly Confidential
Attorneys' Eyes Only*

lipids in the blood.[121]  The average consumer price per day of products containing NR and products containing niacin at various dosages is depicted in the following table:[122]

| | NR | | | Niacin | | |
|---|---|---|---|---|---|---|
| Daily dosage (mg.) | 100 | 500 | 600 | 100 | 500 | 1,000 |
| Price per day | $0.59 | $2.95 | $3.54 | $0.03 | $0.14 | $0.28 |

76.  NR products are able to realize a substantial price premium over niacin.  Even at the lowest dosage of NR (100mg per day) versus a 1000mg per day dosage of niacin, the cost of a day's supply of NR is 2.1 times higher than the cost of a day's supply of niacin.  I note that high doses of niacin can cause uncomfortable or dangerous side effects and may require medical supervision and regular blood testing. Comparing prices at the 500mg per day dosage level, NR's price per day is 21 times higher than niacin. If niacin and NR were in fact close substitutes, *i.e.*, in the same relevant market, it would be difficult for NR products to sustain such a large price premium.  If consumers believed these to be substitute products, prices for NR-based dietary supplements would have quickly declined to levels competitive with niacin.  It is unusual in my experience to see such large price differences even among "differentiated products" which are not close substitutes but have some degree of interchangeability. These differences in prices suggest that NR and ingredients like niacin are not substitutes and should not be included in the same market.

77.  Finally, products which are in the same market tend to have correlated prices: a high degree of substitution means that small changes in relative prices will result in large changes in demand as buyers switch between products in search of the lowest price, inducing a competitive response.  For example, different brands of gasoline are very close substitutes for one another, and changes in the price of one brand, *e.g.* Shell gasoline, are normally mirrored by changes in the price of other brands, *e.g.* Exxon gasoline.  Highly correlated prices thus suggest that products are highly substitutable and fall within the same relevant market while prices that are not correlated with one another are consistent with products that are from different markets.  From my review of the pricing data, such a lack of correlation

---

[121] As discussed in more detail above, niacin is not considered a particularly effective oral dose NAD+ precursor, but the dosages for these unrelated indications provide insight into daily dosing of niacin in general.

[122] Price per day based on the average per mg price of products containing that ingredient between 2014 and 2018.  ELY_0108100.

**Exhibit 1
Page 32**

*Highly Confidential*
*Attorneys' Eyes Only*

exists between prices of NR and niacin.  As shown in Exhibit 1, neither the introduction of NR-based dietary supplements, nor changes over time in their average price, had a visible impact on the price of niacin.

78.    Based on the above, I conclude that consumer pricing data supports a conclusion that NR-based products constitute a distinct market from a final demand or end-user perspective.  These data are consistent with the interchangeability analysis discussed in the prior section.

79.    In addition, as discussed in more detail below, ChromaDex was able to engage in substantial price discrimination between its customers.  This is also evidence that the market is limited to the supply of the NR ingredient.  Simply stated, ChromaDex would not have been able to engage in and maintain the degree of price discrimination observed in its NR ingredient sales with close, relatively inexpensive substitutes in the market.  Substantial price discrimination is strong economic evidence that close substitutes for a particular product do not exist.  Because the vendor is able to set "take it or leave it" prices that vary between customers, evidence showing that customers take that price is evidence that "leave it" is not an option for them.  In a market with many substitutes – particularly much lower priced substitutes – prices for the same good would tend to even out across customers because of competitive pressures placed on the vendor by the presence of alternatives.

80.    For all the above reasons, I conclude that the relevant product market is defined as the market for the supply of NR.

### E.  The Relevant Geographic Market is the United States

81.    NR dietary supplements are available throughout the United States through online retailers such as Amazon.com and (including in Elysium's case) in DTC online sales channels.  These essentially create a nationwide geographic market.  Lack of availability in physical retail outlets in a specific city, state, or region would not prevent consumers in those locations from being able to purchase these products from online retailers operating in the United States, and any attempt by a retailer to raise prices in a specific location to any significant degree would not be sustainable.  Moreover, ChromaDex's conduct, as it pertains to the patent misuse issues in this case, relates to United States patents.  ChromaDex's supply agreements often limit the territory to domestic markets, sometimes including Canada.[123]  In

---

[123] *E.g.*, CDXCA_00027392 at 27393 ("Territory shall mean online retail in the United States and Canada."); CDXCA_00005450 at 5450 ("Territory shall mean […]The USA and Canada for the direct to practitioner channel."); CDXCA_00008508 at 8509 ("Territory shall mean the United States.");

**Exhibit 1**
**Page 33**

*Highly Confidential*
*Attorneys' Eyes Only*

addition, ChromaDex's SEC filings[124] and internal documents[125] recognize domestic markets as distinct from international markets and emphasize differences between international markets. The relevant geographic market is therefore the United States.

## VIII.    CHROMADEX'S MARKET POWER IN THE NR INGREDIENT MARKET

82.    As I noted above, patent misuse based on conditioning the sale of a patented product on the purchase of a separate product requires a showing that the patentee "has market power in the relevant market." Therefore, the next step of the analysis is to determine whether ChromaDex had market power in the market for the supply of NR during the relevant period. I have focused my analysis on the time period from July 2013 (when ChromaDex first required a licensee to use the NIAGEN mark in order to obtain supply) until May 2017 (when ChromaDex informed licensees that they were no longer required to use the NIAGEN mark).[126]

83.    For the reasons discussed below, in my opinion ChromaDex had market power in the market for the supply of NR during the period in which it conditioned its supply of NR to its customers on the customers' use and licensing of the NIAGEN mark.

---

CDXCA_00008496 at 8497 ("Territory shall mean the United States."); CDXCA_00027271 at 27272 ("Territory shall mean online retail in the United States."); CDXCA_00008604 at 8605 ("Territory shall mean the United States."); CDXCA_00027515 at 27516 ("Territory shall mean the United States and Canada."); CDXCA_00027740 at 27741 ("Territory shall mean the United States.").

[124] *E.g.*, CDXCA_00098540 at 98544 (referring to separate "domestic and international markets"), 98546-47 (separately discussing domestic and international markets), 98550 (noting that "international sales of dietary ingredients are subject to foreign government regulations, which vary substantially from country to country" and further noting that foreign regulatory requirements "may differ" from domestic requirements imposed by the FDA); ELY_0122972 at 122976 (referring separately to the domestic and international market), 123020 (calculating revenue from international sources); ELY_0123123 at 123129 (intended to expand into "new international markets"), 123147 ("the laws of foreign countries may not protect our intellectual property rights to the same extent as do the laws of the United States.").

[125] *E.g.*, CDXCA_00159343 at 159343 ("Will this be sold online in the US or other markets? Since we don't have regulatory approval, it'll be difficult for us to ship into another country […]. We currently do not have any regulatory approval for the international market.").

[126] This is the period during which ChromaDex was actively engaged in the conduct that constitutes the alleged misuse. However, as discussed in more detail in later sections, ChromaDex has not purged its alleged misuse its effects have not dissipated. In addition, as also discussed below, the evidence also is consistent with ChromaDex maintaining its market power even after May 2017.

**Exhibit 1**
**Page 34**

*Highly Confidential*
*Attorneys' Eyes Only*

### A. Framework

84.     At a general level, market power can be thought of as the ability to force a purchaser to do something they would not do in a competitive market.  In economics, market power is usually defined as the ability to successfully maintain price above marginal cost, forcing some purchasers to pay a higher price than they would in a competitive market.  Other forms of exercise of market power include the ability of a seller to impose contractual terms on purchasers that they would not agree to in a competitive market, such as requiring purchases of products that the purchaser would not otherwise be willing to buy.[127]

85.     Evidence for market power is found in two forms in economic data: direct effects, and indirect effects.  Direct effects of market power are generally visible as a high price/cost margin.  The Lerner Index, defined as (Price – Marginal Cost)/Price, is a standard measure of market power in economic theory.  Marginal cost is a manufacturer's cost to supply one more unit of output.  The Supreme Court has explained that "[a]s an economic matter, market power exists whenever prices can be raised above levels that would be charged in a competitive market."[128]  As Landes and Posner have explained, "A simple economic meaning of the term 'market power' is the ability to set price above marginal cost."[129]  Economists also look to "indirect" evidence for market power in the form of structural features such as market share within the relevant market.  "Structural" features of a market, such as the number of competitors, the presence of significant barriers to entry, lack of acceptable substitutes, high costs for buyers to switch to alternative producers, or limits on the ability of buyers to enter into production themselves are also consistent with an incumbent firm possessing market power.[130]  High and durable market shares are generally consistent with the dominant firm having market power.

---

[127] *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 n.46 (1984); *NCAA v. Bd. Of Regents*, 468 U.S. 85, 109 n.38 (1984).

[128] *Jefferson Parish,* 466 U.S. at 27 n.46; *NCAA*, 468 U.S. at 109 n.38 ("Market power is the ability to raise prices above those that would be charged in a competitive market.").

[129] William M. Landes and Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937, 939 (1981).

[130] Such markets are often described as being "structurally attractive" from the perspective of an incumbent firm.  Porter, Michael, "How Competitive Forces Shape Strategy", *Harvard Business Review*, March 1979, pp 137-149.

**Exhibit 1**
**Page 35**

*Highly Confidential*
*Attorneys' Eyes Only*

**B. ChromaDex's Role as the Sole Commercial Supplier of NR is Strong Evidence of its Market Power**

86. The existence of market power may be inferred from the possession of a predominant share of the market.[131]  Here, market structure in the supply of NR in the U.S. indicates that ChromaDex had market power.  ChromaDex was the only supplier of NR in the U.S. during the period in which it required its licensees to use and/or obtain licenses to the NIAGEN mark.

87. ChromaDex has prominently and repeatedly identified itself as the only source of NR.  This point is emphasized in ChromaDex's pitches and presentations to its shareholders and potential investors.  For example, an August 2014 investor presentation prominently features the following in an early slide:



(Source: CDXCA_00073426 at 73433)

88. As early as 2013, shortly after the launch of NIAGEN, ChromaDex described itself as "the 1st and only commercially available brand of nicotinamide riboside."[132]  A 2013 NIAGEN whitepaper describes NIAGEN as "a new product and the first patent protected, commercially available nicotinamide riboside […]."[133]  Similar statements asserting its dominance over the NR supply market are made by ChromaDex throughout the July 2013 to May 2017 period during which ChromaDex was forcing its licensees to use the NIAGEN mark or to obtain a license to it.[134]  In a May 2016 presentation,

---

[131] *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 464 (1992); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).

[132] CDXCA_00071863 at 71881.

[133] CDXCA_00070690 at 70692.

[134] *E.g.* CDXCA_00076403 at 76408 ("NIAGEN® is the 1st and only commercially available nicotinamide riboside (NR)."); CDXCA_00000093 at 104 ("ChromaDex believes its patent rights create a significant and meaningful barrier to entry for would-be competitors in the NR market."); CDXCA_00007500 at 7502 ("ChromaDex owns or controls commercially viable compounds that can act as NAD+ Precursors […]"), 7507 ("All of our work is protecting the IP around NR, building the brand"); CDXCA_00205039 at 205039 ("I can assure you that ChromaDex has the patents necessary to enforce

**Exhibit 1**
**Page 36**

*Highly Confidential*
*Attorneys' Eyes Only*

ChromaDex even refers to itself as being "in the enviable position of 'gatekeeper' to the entire NAD+ precursor category."[135]  Obtaining a dominant position in NR was ChromaDex's strategy from the start. As ChromaDex explains in its investor presentations, ChromaDex's ingredients business strategy was to identify "proprietary ingredients."[136]  As a ChromaDex investor presentation from 2014 notes, "ChromaDex's Unique Strategy Gives it First-mover Advantages in Acquiring Patented Ingredient Technologies."[137]

89.    This strategy is laid out in a 2016 article drafted with the collaboration of ChromaDex's founder and then-CEO Frank Jaksch about the history of the company.  In the draft of the article, in portions that Mr. Jaksch reviewed but did not change, the article explains: "ChromaDex was first out of the gate with NR, launching Nigean [sic] brand in 2013 when the company could produce enough of it to supply the commercial market, Jaksch said.  And, because of its patents, ChromaDex is currently, and will be for quite some time, the gatekeeper of NR."[138]

90.    Thus, throughout this period, as the only commercial supplier of NR, ChromaDex effectively had full control of a single-supplier market.  In ChromaDex's own words, it was the "gatekeeper" to that market. In my opinion, ChromaDex's substantial – indeed, until recently, exclusive – market share strongly supports that it had significant market power in the market for NR.

**C.  Significant Barriers to Entry Are Further Evidence of ChromaDex's Market Power**

91.    Numerous barriers to entry are evident in the NR supply market during the relevant period, and provide further evidence of ChromaDex's market power.

92.    ChromaDex, a publicly traded corporation, has repeatedly signaled to customers and would-be competitors in press releases, public and private statements, investor and shareholder presentations, and in its SEC filings, that "ChromaDex [is] in the enviable position of 'gatekeeper' to the entire NAD+

---

our rights.  Anyone else that tries to sell NR will receive a lawsuit."); CDXCA_00034039 at 34065 ("ChromaDex has a rock solid patent portfolio surrounding NR.").

[135] CDXCA_00067454 at 67478.

[136] CDXCA_00071863 at 71865 (describing ChromaDex mission as including "[t]o acquire, develop, and commercialize novel, proprietary, early-stage Ingredient Technologies").

[137] CDXCA_00073426 at 73430.

[138] CDXCA_00299909 at 299912.

**Exhibit 1
Page 37**

*Highly Confidential*
*Attorneys' Eyes Only*

precursor category"[139] by having created "a significant and meaningful barrier to entry for would-be competitors in the NR market,"[140] a "multilayered fort around NR,"[141] through the acquisition of "a significant patent portfolio"[142] made up of "all of the significant IP surrounding NR."[143] As a result, ChromaDex has itself stated that it "control[s] the NR market and will for quite some time" and that it was prepared to sue "[a]nyone else that tries to sell NR."[144]

93.    The existence of patents, or the threats of patent enforcement, can be meaningful barriers to entry even if the patents are not valid, not enforceable, or not infringed. Buyers seeking other sources of supply would realize they would have had to bear substantial risk of patent litigation costs – even if the patents were found invalid, unenforceable, or not infringed – and would bear the risk and uncertainty of potential damages and either have had to build their own manufacturing facility, or indemnify a third party contract manufacturer.

94.    ChromaDex used the threat of patent enforcement to maintain its control and scare off any potential competition. Indeed, ChromaDex publicly referred to its patents in connection with references to itself as the sole available source of NR. For example, in an early product sheet, ChromaDex described NIAGEN as a "first and only commercially-available nicotinamide riboside (NR) with five patents issued and more pending."[145]

95.    ChromaDex's internal documents are consistent with this strategy. In the Project Crimson analysis prepared by Jeffries with input from ChromaDex management, ChromaDex is described in bold as "the **only producer of Niagen** and its patent rights create a significant barrier to entry for would-be competitors in the market."[146] The presentation also observed that "ChromaDex controls the only

---

[139] CDXCA_00067454 at 67478.

[140] CDXCA_00000093 at 104.

[141] CDXCA_00154104 at 104.

[142] ELY_0124076 at 124080.

[143] CDXCA_00087744 at 87744.

[144] CDXCA_00154104 at 154104; CDXCA_00205039 at 205039.

[145] CDXCA_00204850 at 204850.

[146] CDXCA_00105749 at 00105764 (emphasis in original).

**Exhibit 1**
**Page 38**

*Highly Confidential*
*Attorneys' Eyes Only*

commercially available NAD+ precursor and Niagen has a significant patent estate extending in to the 2030s."[147]

96.     At times, ChromaDex made its threats overt.  During the relevant period, ChromaDex was not hesitant to tout its market power, the lack of any meaningful supply competitors, and its intent to keep others out of the supply market.  For example, in July 2014 a company called ProThera inquired whether ChromaDex would supply NR for use in the practitioner channel.  ChromaDex declined, stating that it had already licensed rights to the practitioner channel exclusively to Thorne.[148]  In response, ProThera inquired whether ChromaDex could provide "referrals to other vendors of nicotinamide riboside."[149]  Mark Morris, who was then employed by ChromaDex, responded that "ChromaDex is the only commercial supplier of nicotinamide riboside.  Most importantly, ChromaDex also owns an extensive patent portfolio which would prevent the use and marketing of alternative material."[150]  In response, ProThera threatened to look for other suppliers, explaining that ChromaDex's position did not make economic sense because it would only encourage additional entrants or encourage customers to seek other suppliers.[151]  ChromaDex's then-CEO Frank Jaksch reiterated in response that no such alternate NR suppliers existed and, if any materialized, ChromaDex would try to stop them.  He wrote that one of the companies identified by ProThera only "sell[s] tiny milligram amounts of a triflate salt for research purposes, so good luck with that."[152]  As for Chinese companies identified by ProThera, Mr. Jaksch wrote, "The Chinese suppliers that advertise NR are nothing more than smoke and mirrors.  We have yet to test a single sample of material from China that is legitimate NR."[153]  He continued, emphasizing that there were no alternative sources for NR other than ChromaDex and that any that emerged would be challenged:  "Even if there was cost effective stable supply, which there is not […] we will go after the company here in the US including the material in their product."[154]

---

[147] *Id.* at 105777.

[148] CDXCA_00169741 at 169744.

[149] *Id.*  at 169742.

[150] *Id.*

[151] *Id.*

[152] *Id.* at 169741.

[153] *Id.*

[154] *Id.*

**Exhibit 1
Page 39**

*Highly Confidential*
*Attorneys' Eyes Only*

97.     In addition to ChromaDex's express and implied threats of patent enforcement, other barriers to entry are evident here.  These barriers provide further evidence of ChromaDex's market power.  One, which I already discussed above, is ChromaDex's first mover advantage in the supply of NR.  A first mover advantage can allow a company to build credibility and awareness that other, later market entrants will need to overcome.  In addition, a first mover can lock up key customers through exclusivities and other arrangements to foreclose any new market entrants from obtaining potential footholds.  For example, Thorne and several other third party licensees agreed to purchase NR "exclusively from [ChromaDex] and not from any third party."[155]  Other barriers to entry evident in the NR supply market include the time and cost to design, build, and certify a manufacturing process and facility, and to establish a brand like the NIAGEN brand.

98.     Contemporaneous market observers shared this view.  In a presentation prepared on behalf of ChromaDex by the Specialty Nutrition Group,[156] ChromaDex was described as "already the leader in NAD+ precursors, with a ten-year head start in identifying, protecting, and commercially developing NAD+ precursors including Niagen®."[157]  In an accompanying e-mail forwarded by Greg Horn – Specialty Nutrition's CEO and the former CEO of GNC – Mr. Horn explained, "ChromaDex has spent a decade acquiring all of the significant IP around Niagen (Nicotinamide Riboside) and other NAD+ precursors and is the only company with a fully IP-protected, safe (GRAS and NDI), manufacturable, market ready and clinically established compound ready for product formulation for consumer, clinical nutrition and prescription drug markets."[158]  I agree with Mr. Horn's observations regarding the barriers to entry that existed, and conclude that significant and diverse barriers to entry, in connection with ChromaDex's dominant market share, provided ChromaDex with substantial market power in the NR supply market in the United States.

---

[155] CDXCA_00005450 at 5454 (Thorne); CDXCA_00008464 at 8465 (5Linx Agreement); CDXCA_00031414 at 31417 (Nectar7 Agreement); CDXCA_00024294 at 24295 (Healthy Directions Agreement); CDXCA_00024270 at 24273 (BPI Agreement); CDXCA_00085323 at 85324 (HPN Agreement); CDXCA_00059152 at 59157 (Healthspan Agreement).

[156] Specialty Nutrition describes itself as "a nutrition brand building firm" that works to help co-develop nutrition products.  ELY_0124233 - 12433 (https://specialtynutrition.com/about-us/).

[157] CDXCA_00107008 at 107015.

[158] CDXCA_00107006 at 107007.

**Exhibit 1**
**Page 40**

*Highly Confidential*
*Attorneys' Eyes Only*

**D. ChromaDex's Market Power is Evident in the Terms It Required of its Licensees**

99.     The ability to cause customers to enter into arrangements they would not have agreed to in a competitive market is also evidence of a firm's market power.  Here, as discussed above, there is evidence that ChromaDex caused many of its customers to invest in the NIAGEN mark, without protection from ChromaDex later pulling out the rug and capturing the customer's investment in the mark for itself (as, in fact, occurred).  More pointedly, ChromaDex was able to cause Elysium to pay a substantial sum for a trademark Elysium expressly did not want to use at all.  As a result, ChromaDex received an unearned benefit by forcing Elysium to pay for a trademark license that it successfully bargained not to use.  Elysium established its own brand name – BASIS for its NR-containing product – and invested resources in developing and maintaining its own brand, distinct from NIAGEN.  With a strategy to develop its own successful brand, it would make no economic or business sense for Elysium to pay for a license to the NIAGEN trademark, yet it was required to do so by ChromaDex.  In the absence of ChromaDex's market power, it is highly unlikely that Elysium (or other ChromaDex licensees with their own established brands) would have been willing to pay any amount for rights to use the NIAGEN mark on their products.  This costly, mandatory trademark license certainly conveyed no economic benefit to Elysium.

100.    It is highly unlikely that these outcomes would have been observed if ChromaDex had not possessed market power in the market for supply of NR.  With competitive supply of NR, potential purchasers of NR would have been able to resist any demand for use of or payment for the trademark by sourcing the product or its equivalent from another seller.

**E. ChromaDex's Sustained Ability to Price Above Marginal Cost and its Ability to Discriminate in Pricing Also Evidence ChromaDex's Market Power**

101.    As discussed above, market power can be observed through evidence of a high price/cost margin.  Under perfect competition (*i.e.* homogenous product, low barriers to entry, in which each competitor possesses an insignificant share of overall market output) firms have no ability to price above marginal cost (where price "P" is equal to marginal revenue "MR" and marginal cost "MC").  In contrast, a firm with market power (an extreme case being a monopolist) is able to price well above its marginal cost of production due to factors such as its control over total market production (here, ChromaDex with its NR ingredient.).  Therefore, one way of measuring the degree of monopoly power is to calculate a firm's ability to deviate from perfect competition by pricing where P > MC; the greater the difference between price and marginal cost, all else equal, indicating a higher degree of market power.

36

**Exhibit 1
Page 41**

*Highly Confidential*
*Attorneys' Eyes Only*

102.   Marginal costs are often difficult to observe directly in accounting data, but in this case ChromaDex's ingredient operations were relatively simple, and its financial records provide a useful estimate of its marginal cost of supplying NR.  ChromaDex used a contract manufacturer to produce NR, and this material acquisition cost, together with the licensee fees that ChromaDex paid to the patent owners accounts for the bulk of its cost to supply NR to its customers.  Any other production activities (testing, warehousing, etc.) charged to cost of goods sold are either not volume-sensitive, in which case they are not marginal costs, or are relatively small.  However, data provided by ChromaDex show that the company calculates the invoice-level profitability of its NR ingredient sales based on its marginal cost of production.  In internal sales and profit spreadsheets ChromaDex calculates profits by subtracting from revenues only its per-kilogram cost of acquiring the NR ingredient from Grace and royalties owed under its patent licenses with Cornell, Dartmouth, and Washington.[159]

103.   At an incremental profit rate (*i.e.* Lerner Index) of ███ over the 2016 - 2017 period, there exists ample evidence of ChromaDex market power; evidenced by its ability to successfully sustain a price for its NR ingredient (*e.g.* ███ per kilogram) ███ higher than its marginal cost of production (*e.g.* ███ per kilogram).[160] As a point of reference, industry-wide margins in specialty chemical manufacturing have declined significantly over the past decade and now range between 18% and 20% of revenues, due to primarily to increased product commoditization.[161]

104.   The data show that ChromaDex has been able to sustain an *average* price of approximately ███ per kilogram on sales of its NR ingredient, (with price-cost margins indicating it possesses market power).  However, average prices veil another indicator of ChromaDex's market power: its ability to price discriminate among customers to a degree that cannot be explained by factors contained in its various supply agreements.  In Exhibit 2, I plot invoice-level NR ingredient prices for ChromaDex's largest customers; whose cumulative purchases account for nearly three-quarters ███ ) of all NR ingredient sales through Q2:2018.  As shown, ChromaDex has been able to effectively price discriminate and sustain significant differences in these prices even among its largest volume customers.  For example, while ChromaDex was able to charge Life Extension per kilogram prices in the ███████ range,

---

[159] CDXCA_00429638 - 429638.

[160] CDXCA_00429638 - 429638, CDXCA_00422033 - 422033.

[161] "S&P 500 Industry Briefing: Specialty Chemicals"; Yardeni Research, Inc., June 18, 2019 and "Future of Chemicals III, The Commoditization of Specialty Chemicals: Managing the Inevitable", Booz&co., 2010.

**Exhibit 1
Page 42**

*Highly Confidential*
*Attorneys' Eyes Only*

Thorne was charged ███ per kilogram while Live Cell paid only $800 per kilogram. As Troy Rhonemus stated at his deposition, ChromaDex's prices for NR "varied for customers."[162] ChromaDex's corporate designee also testified that each negotiation was "unique" and depended on the customer, the customer's plans, the product, the customer base, and volume.[163] The ability to price discriminate across customers indicates that NR was not supplied competitively: in a competitive market, it is very difficult for a supplier to charge different customers different prices for the same product, since competitive bidding tends to reveal prevailing prices, and customers can easily source the product from an alternate supplier.

105.    While volume discounts and renegotiations narrowed the range in prices in the second half of 2016 and through 2017, there remain significant differences across customers in NR ingredient pricing that cannot be accounted for by volume discounting and that could not be sustained in a competitive market.

106.    In sum, for the above reasons, I conclude that ChromaDex had market power in the market for the supply of NR in the United States during the time it engaged in its alleged misuse.

**F.    Elysium's Later Obtaining of an Alternative Supply of NR does not Negate ChromaDex's Market Power During the Relevant Period**

107.    On November 1, 2016, ChromaDex notified Elysium that ChromaDex was terminating its supply agreement with Elysium.[164] I understand that Elysium now obtains its supply of NR from a source other than ChromaDex.[165] However, this does not change my opinion regarding ChromaDex's market power as discussed above.

108.    As an initial matter, it appears that Elysium considered two potential suppliers for NR product. One of these suppliers, ███ did not supply product to Elysium until the spring of 2017.[166] Elysium did not start selling BASIS that contained NR from ███ until July of 2017.[167] ███, another supplier who replaced ██, did not first deliver NR to Elysium until about mid-2018.[168]

---

[162] Deposition of Troy Rhonemus at 160:7-8.

[163] Deposition of ChromaDex 30(b)(6) at 69:8-15.

[164] CDXCA_00007489 - 7490.

[165] Deposition of Elysium 30(b)(6) at 98:15-16.

[166] Deposition of ███ at 40:12-15.

[167] Deposition of Elysium 30(b)(6) at 125:18-20.

[168] *Id.* at 112:14-19.

**Exhibit 1
Page 43**

*Highly Confidential*
*Attorneys' Eyes Only*

109.   As discussed previously, ChromaDex notified its customers that it was no longer requiring them to use the NIAGEN trademark in May 2017.[169]   Elysium appears not to have successfully obtained any alternative supply for use in commercial NR products until after, or very close to the end of, the four-year period from July 2013 until May 2017.  Thus, Elysium's later alternative supply of NR has little, if any, bearing on ChromaDex's market power during the preceding four-year period.

110.   In addition, if anything, the facts surrounding Elysium's alternative supply of NR show how meaningful the barriers to entry for alternative suppliers were.  Here, it required a highly motivated customer who was faced with the threat of being cut off from its NR supply to attempt to overcome those barriers.  In addition, even such a highly motivated party faced challenges.  ██ provided their proposal to Elysium in August 2016,[170] yet it took nearly a year for that to lead to NR that could be used in a commercial product.  ██ identified the project as a difficult one.  As ████████ testified, "we don't make widgets […] So this was complicated.  This was a difficult program."[171]  Specifically, ██ noted the challenges of "scaling up" productions of NR:

> I mean the goal – the goal is to get it up to a 2,000-gallon scale […] So, the most cost effective all the way around is how do we get to a 2,000-gallon scale.  Well, you can't go to a 2,000 scale right from the get-go […].  So we start at smaller equipment and yeah, it didn't go well.  This was a new chemistry and it was difficult to scale-up.  It took a number of batches at smaller scale.[172]

111.   And, ultimately, Elysium did not stay with ██ I as a supplier but instead went to ████.  Despite the near year-long effort, ██ acknowledged that when Elysium switched suppliers, the technology "[wasn't] even at a hundred percent."[173]

---

[169] *See* paragraph 43, above.

[170] Deposition of ████, Exhibit 4.

[171] Deposition of ████ at 41:18-20.

[172] Deposition of ████ at 140:10-141:13; *see also* 145:8-10 ("We had enough problems at 500 gallons without throwing the whole thing into 2,000 gallons.").

[173] Deposition of ████ at 186:21-22.

**Exhibit 1
Page 44**

*Highly Confidential*
*Attorneys' Eyes Only*

112.    Elysium reached out to ████ in May 2017[174] and did not obtain NR for use in a commercial product until about a year later. ████ also faced challenges with the product, particularly during the process development phase.[175]

113.    As noted, ████ began providing NR to Elysium in mid-2018. Thus, between the ██ proposal and ████ supply, it took nearly two years for Elysium to secure a reliable alternative supply of NR. This supports, rather than refutes, the substantial barriers to entries that ChromaDex enjoyed. It took years and a highly motivated customer with substantial investment in an existing product even to attempt to overcome them by investing the efforts and capital required to obtain alternate supply. Therefore, even if Elysium's later alternative supply was relevant to ChromaDex's market power in the 2013-2017 period, this evidence supports my conclusions with respect to ChromaDex's market power.

114.    Indeed, additional evidence shows that ChromaDex maintained its market power after May 2017. As discussed above, Elysium's difficulty in procuring alternative supply supports the presence of substantial continuing barriers to entry other than ChromaDex's asserted patent rights. Elysium's source of supply is captive and unavailable to other companies. Therefore, other product manufacturers would need to undergo the same process from scratch. The majority of ChromaDex's sales prior to 2017 were to other customers, with Elysium comprising only about 21.2% of ChromaDex's sales from the 2013-2016 period. Additionally, in late 2017 presentations ChromaDex continued to describe itself as "'gatekeeper' to the entire NAD+ precursor category."[176] As an economic matter, if ChromaDex's market power had decreased after 2017, one would expect a concomitant fall in its prices; however, ChromaDex's prices did not fall in 2018.[177]

## IX.    THE SCOPE AND NATURE OF CHROMADEX'S ALLEGED ACTS OF PATENT MISUSE

115.    Elysium alleges that ChromaDex committed patent misuse, *i.e.* it impermissibly broadened the scope of its patent rights, by conditioning supply of its NR ingredient to use and/or licensing of the separate, non-essential NIAGEN trademark.[178]

---

[174] Deposition of ████████, Exhibit 87.

[175] Deposition of ████████ at 80:17-81:18, 106:12-20.

[176] CDXCA_00210450 at 210457 (October 2017); CDXCA_00190095 at 190102 (December 2017).

[177] CDXCA_00429638 - 429638, CDXCA_00422033 – 422033.

[178] Docket No. 103, Para. 171.

40

**Exhibit 1**
**Page 45**

*Highly Confidential*
*Attorneys' Eyes Only*

116.    ChromaDex's strategy of using its control of IP around an ingredient to build up a more durable and lasting brand to maintain control of the market appears to have been a core thesis of ChromaDex's business strategy.  Indeed, ChromaDex in many investor presentations expressly draws that link and makes the causality clear.  Below I show the second and third steps of a business strategy slide that ChromaDex included in many investor presentations over the years:



(Source: CDXCA_00072169 at 72189)

117.    As can be seen, in this strategy, ChromaDex outlines a plan to acquire ingredient "technologies and associated IP through licensing" and then use that control of the technology to pivot to a "differentiated offering" based on, among other things "marketing and branding" of the ingredient.

118.    Later presentations would expressly use this strategic framework to emphasize this connection between ChromaDex's acquisition of IP rights to the NR ingredient and developing the NIAGEN brand:



41

**Exhibit 1**
**Page 46**

*Highly Confidential*
*Attorneys' Eyes Only*

(Source:  CDXCA_00075440 at 75455)

119.    I have reviewed a number of NR supply agreements between ChromaDex and supplement manufacturers that require the licensee to use the NIAGEN trademark on its supplement product as it is presented to consumers.  As discussed previously in my report, substantially all of the ChromaDex supply agreements that I reviewed included contract language requiring purchasers of NR to also license and use the NIAGEN trademark on their finished products.  For example ChromaDex's first supply agreement, with Thorne, provides that "***Buyer agrees to use the Product trademark NIAGEN.***"[179]  Another agreement provides that:  "***Buyer shall use the Product trademark NIAGEN***, and agrees to do so in accordance with the Trademark License Agreement […]."[180]  Similarly, the supply agreement with HPN states: "Buyer shall use the tradename NIAGEN® on its Finished Product."[181]  The supply agreement with Thrive Now states, "Buyer shall use the tradename NIAGEN® on all Finished Product, and agrees [to] use the product trademark NIAGEN® in accordance with that certain Trademark License Agreement to be executed by the parties prior to the sale or marketing of Finished Product."[182]  The supply agreement with Nectar7 states, "Buyer shall use the Product trademark NIAGEN®, and agrees to do so in accordance with that certain Trademark License Agreement to be executed by the parties prior to the sale or marketing of the Finished Product."[183]

120.    This benefitted ChromaDex in that it increased brand awareness of NIAGEN.  As ChromaDex's Rule 30(b)(6) corporate designee testified, "[I]t's to the company's benefit if the customers use the mark […].  Again, the company wants to build its brand, Niagen, and it's to our benefit for our customers to use that mark."[184]  The benefit, he said, was "increased brand awareness."[185]

121.    The benefits that ChromaDex received by mandating use of the NIAGEN trademark by its NR licensees were meaningful.  As ChromaDex's corporate designee testified, "obviously selling direct to consumers

---

[179] CDXCA_00005450 at 5455 (emphasis added).

[180] CDXCA_00027392 at 27395 (emphasis added).

[181] CDXCA_00008604 at 8608.

[182] CDXCA_00008946 at 8949.

[183] CDXCA_00031414 at 31419.

[184] Deposition of ChromaDex 30(b)(6) at 120:8-19.

[185] Deposition of ChromaDex 30(b)(6) at 120:18-19.

42

**Exhibit 1**
**Page 47**

*Highly Confidential*
*Attorneys' Eyes Only*

with a Niagen-branded product would help build the brand."[186]  As ChromaDex acknowledged in late 2016, five of ChromaDex's six NR licensees who were selling in the "direct to consumer" or DTC market were "using NIAGEN® as their primary brand name" pursuant to ChromaDex's mandatory trademark program.[187]  The six primary DTC licensees were identified as MAAC10, Nectar7, Live Cell, HPN, Thrive Now Health, and Elysium.[188] Sample images of packaging for the NR supplements of these licensees is shown below.  As can be seen, except for Elysium, they all very prominently display the NIAGEN branding:



(Figure B:  ChromaDex Primary DTC Licensees)

---

[186] Deposition of ChromaDex 30(b)(6) at 57:21-23.

[187] CDXCA_00289635 at 289639.

[188] *Id.* at 289635.

**Exhibit 1**
**Page 48**

*Highly Confidential*
*Attorneys' Eyes Only*

122.    The use of NIAGEN as the name of the supplement product itself was a practice encouraged and followed by each of these DTC licensees other than Elysium.[189]  Rob Fried testified at his deposition that, with the exception of Elysium, all of ChromaDex's customers used the NIAGEN brand.[190]

123.    Elysium was adamant that it would not use the NIAGEN trademark[191] and Elysium's first draft of the agreement with ChromaDex did not contain a trademark license.[192]  During the negotiations with ChromaDex, Elysium determined that the trademark license was not negotiable and that it would be required to pay royalties for a license to the NIAGEN trademark if it wished to obtain access to ChromaDex's NR.  As Mr. Alminana, testified, Elysium/he and Mr. Marcotulli "fought hard with Frank [Jaksch, ChromaDex's then-CEO] to not sign a [trademark] royalty agreement for many reasons but he assured us that everyone else signed it."[193]  He continued, "We were told that everyone has to sign this. Everyone pays a royalty.  This is the standard royalty."[194]

124.    Ultimately, Elysium did in fact pay substantial trademark royalties to ChromaDex even though Elysium did not want to use the trademark.  Elysium was required to pay the royalties whether they used the trademark or not.   Under the ChromaDex-Elysium Trademark License and Royalty Agreement, Elysium was required to pay a base trademark royalty of at least 5% on net sales of BASIS which could increase up to 7.5%.  That base royalty could increase yet another 0.5% to 2.5% if other conditions were met.[195]  Will Black, ChromaDex's Vice President of Sales and Marketing, testified that Elysium's royalty requirement was tied to ChromaDex's intellectual property.[196]

---

[189] Deposition of ChromaDex 30(b)(6) at 114:25-115:6 (Q: "Did ChromaDex ever tell any of its customers that it hoped they would use the mark?" A: "I'm sure we did.  The company would like for our customers to use our trademarks […] Because, like all companies, you want to try to build your brand value over time.")

[190] Deposition of Robert Fried at 261:17-23.

[191] Deposition of Eric Marcotulli at 93:24-25 ("We were very clear that we didn't want the trademarks […]").

[192] CDXCA_00007241 - 7257.

[193] Deposition of Dan Alminana at 166:22-24.

[194] *Id.* at 168:1-3.

[195] CDXCA_00061402 at 61405.

[196] Deposition of Will Black at 301:19-21.

44

**Exhibit 1**
**Page 49**

*Highly Confidential*
*Attorneys' Eyes Only*

125.    Elysium, therefore, was required to purchase a license to a trademark it did not want to use.  This was a substantial cost, and created a significant royalty burden.  In fact, Elysium incurred trademark royalties of approximately $496,000 – nearly half a million dollars – from ChromaDex under the trademark license through the first half of 2016.[197]  In requiring Elysium to pay these substantial sums for a trademark, ChromaDex created a huge incentive for Elysium to use the NIAGEN mark.  By requiring substantial royalty payments, ChromaDex sought to financially coerce Elysium into using the mark.

126.    In my opinion, ChromaDex's conduct leveraged its patent monopoly over one product (its NIAGEN-branded NR ingredient) to extend the scope or term of its patent rights by requiring use and/or payment for a second, separate, non-patented item (the NIAGEN trademark) in an attempt to establish its NIAGEN brand in the market.[198]

127.    First, the supply of NR and the trademark are separate products.  The use of the word "NIAGEN" is not necessary to practicing the patents.  NR can be called by many names other than NIAGEN.  Indeed, this case has some examples of names other than NIAGEN that could be used – such as "nicotinamide riboside," "NR," or "BASIS."  There is nothing inherent about the chemical NR that requires it to be described using the word NIAGEN.  Thus, in my opinion the trademark NIAGEN is not necessary to practicing the patent and is an entirely separate product from NR.  My opinion is consistent with the Court's rulings in this case.  In one of the rulings allowing Elysium's declaratory judgment counterclaim for patent misuse to proceed, the Court stated:

> ChromaDex argues that the tying allegations must fail because a trademark license is not a 'separate product' that can be tied to the patent rights, and "no tying arrangement can exist unless there is a sufficient demand for the purchase of [a trademark license for NIAGEN] separate from [the supply of NIAGEN] to identify a distinct product market in which it is efficient to offer [the trademark license] separately from [NIAGEN]."  However, as Elysium points out, ChromaDex has conflated the test for product separability in the antitrust context with that in the patent misuse context.  "The law of patent misuse in licensing need not look to consumer demand (which may be non-existent) but need look only to the nature of the claimed invention as the basis for determining whether a product is a necessary concomitant of the invention or an entirely separate product."  The Court

---

[197] CDXCA_00006939 - 6939; CDXCA_00006948 - 6948; CDXCA_00059349 - 59349; CDXCA_00100914 - 100914; CDXCA_00101783 - 101783; and CDXCA_00007068; ELY_0046779 - 46779.

[198] *See* Deposition of Troy Rhonemus at 183:2-4 ("I would say getting your brand out there is always something that a company wants.  So yes, we would like for that to happen.").

**Exhibit 1**
**Page 50**

*Highly Confidential*
*Attorneys' Eyes Only*

agrees that here, the patents, and the supply of NR, are entirely different products from ChromaDex's NIAGEN trademark, which Elysium does not use. "The NIAGEN mark is not essential to the sale, supply or use of NR; a seller could call NR by many names, including different brand names or just the chemical name, using 'NR' or 'nicotinamide riboside' to describe the product." Accordingly, Elysium has stated a claim for declaratory relief of patent misuse.[199]

128.    In addition, ChromaDex's practice of requiring its licensees to use the NIAGEN mark on its product, or to pay for a license for the trademark to obtain access to NR supply, acted to impermissibly broaden the scope of ChromaDex's patent rights. Research in economics and marketing shows that brands convey significant market power, visible in price-cost margins higher than would prevail under perfect competition.[200] This can be seen very clearly in contexts like over-the-counter medications, where branded products enjoy very substantial market share and premium pricing advantages over generic equivalents.[201]

129.    Thus, competitors who do not want to be confined to the generic segment must invest in their own brand. Such "informational product differentiation" can therefore be an effective barrier to entry, protecting incumbent firms from competition. It builds customer goodwill and can be a powerful point of differentiation and competitive advantage. This can happen even where the quality of the would-be entrant's product is identical or superior to the quality of the incumbent's product.[202]

130.    Brands can be a powerful barrier to entry for new products. Faced with a successfully established brand, new entrants are often at a competitive disadvantage.[203] Particularly for products, like foods and dietary supplements, which are "experience" or "credence" goods (*i.e.* their quality is difficult to ascertain without first purchasing and consuming them), brands serve to lock in customers to a

---

[199] Order on Plaintiff's Motion to Dismiss Counterclaims, Docket No. 44, at 18-19 (May 10, 2017) (citations omitted).

[200] Nevo, Aviv "Measuring Market Power in the Ready-to-Eat Cereal Industry," *Econometrica*, 2001, 62(2): pp. 307-342.

[201] Kohli, Errol and Buller, Allison "Factors Influencing Consumer Purchasing Patterns of Generic Versus Brand Name Over-the-Counter Drugs." *Southern Medical Journal*, February 2013, 106(2): pp. 155-160.

[202] Bagwell, Kyle, "Informational Product Differentiation as a Barrier to Entry," *International Journal of Industrial Organization*, 8 (1990) pp. 207-223.

[203] Schmalensee, Richard, "Product Differentiation Advantages of Pioneering Brands"; *American Economic Review*, 72 (February 1982). pp. 349-65.

**Exhibit 1
Page 51**

*Highly Confidential*
*Attorneys' Eyes Only*

particular seller.[204]   Having once purchased a product, and having had a satisfactory experience, consumers will be reluctant to incur the cost and risk of switching to another version.  This can be a particularly powerful advantage for "pioneering brands" which are the first to be sold in product category.  Foreseeing an uphill struggle to win market share from the pioneer, perhaps requiring substantial price discounts or costly sampling or marketing campaigns to convince consumers of the quality of their product, potential entrants may choose not to enter.

131.   Branding can be particularly powerful in contexts like dietary supplements where concerns about product quality (amount of ingredients, purity, adulteration, etc.) raise the value of a branded product to consumers as compared to a non-branded equivalent.  By branding and trademarking a product, the manufacturer establishes its provenance, and in effect posts a bond guaranteeing its quality.  If the product is later revealed to be substandard, the manufacturer is directly exposed to reputational risk and its investment in establishing the brand will be largely lost if the brand and associated trademark become associated with poor quality.

132.   Brands are costly and time-consuming to establish.  The manufacturer must incur expenses associated with obtaining and maintaining a trademark, designing and producing distinctive packaging or "trade dress" features of a product, and establishing the familiarity with the brand through marketing and promotional activity.  A brand or trademark can thus be understood as a distinct and valuable economic good.  With respect to experience goods such as dietary supplements, where concerns about product quality and composition raise the value of a branded product to consumers, branding is a very powerful source of informational product differentiation and can often be an effective barrier to competitive entry.

133.   There is a critical difference between this competitive advantage and the benefits that accrue from a patent.  A patent will eventually expire.  By contrast the advantages conferred by strong branding and the goodwill associated with it do not have a set expiration date and are persistent.  In addition, if the patent is ever found invalid, unenforceable, or simply not infringed by a product, the benefits of the brand and associated goodwill will persist.

---

[204] *See* Nelson, Phillip "Information and Consumer Behavior." *Journal of Political Economy,* 78(2) (1970), pp. 311-329.

**Exhibit 1
Page 52**

*Highly Confidential*
*Attorneys' Eyes Only*

134.    ChromaDex effectively used access to the patented product to coerce its customers to expend sales and marketing efforts to establish the NIAGEN brand, at the licensees' own expense.[205]  This brand has economic value, value which is separate and distinct from the patent and is not extinguished once the patent expires.  As the owner of the brand, its value accrues largely to the benefit of ChromaDex, which is free to realize economic benefits through continued use, such as by selling its own branded product, by licensing the brand to others, or by exploiting the brand to raise barriers to entry.  Again, OTC pharmaceutical products illustrate this well: Bayer Aspirin, for example, continues to command significantly higher prices than generic competitors more than 100 years after the expiration of Bayer's patent.  In contrast, a new entrant would have to incur costs to establish its own brand.  By using its market power to establish the NIAGEN brand, ChromaDex is thus able to give itself a competitive advantage in the market that will persist even after the patent expires.

135.    In other words, ChromaDex obtained a trademark-related benefit as a condition of the third party licenses that had the effect of broadening the scope of the patent grant.  Patents will eventually expire.  The value and goodwill created in and by trademarks do not have a set expiration date and can be used to differentiate the product even after the patent expires.

136.    Indeed, in a 2017 memorandum, ChromaDex expressly recognized the benefits it obtained through its NIAGEN trademark strategy, and directly tied that strategy to strengthening and expanding the scope of its IP/patent rights:

---

[205] *See* Deposition of Troy Rhonemus, at 183:2-4 ("I would say getting your brand out there is always something that a company wants.  So yes, we would like for that to happen"); *See also* Deposition of ChromaDex 30(b)(6) at 57:21-23 ("Well, obviously selling direct to consumers with a Niagen-branded product would help build the brand."), at 114:25-115:6 (acknowledging that ChromaDex would like customers to use its trademarks to build brand value.).

**Exhibit 1**
**Page 53**

*Highly Confidential*
*Attorneys' Eyes Only*



Figure C (Source: CDXCA_00464084 at 464097.)

137.    In short, by leveraging its patent and market power to require or cause its supply customers and licensees to use the mark in exchange for access to the patented product, ChromaDex broadened the scope of its patent rights by shifting its patent power into goodwill and trademarks. In my opinion, this constitutes misuse of the patents from economic perspective.

## X.    ANTICOMPETITIVE EFFECTS FROM CHROMADEX'S ALLEGED ACTS OF PATENT MISUSE

138.    ChromaDex's conduct had readily apparent anticompetitive effects. As discussed above, anticompetitive effects can be shown by a "reasonable probability" of an effect in the market, and such effects can be "actual or prospective."[206] I conclude that a reasonable probability of anticompetitive effects existed here, and that those include both actual and prospective anticompetitive effects.

### A.    ChromaDex's Conduct Has Resulted in a Reduction in Competition and Consumer Choice

139.    The first, and most obvious, anticompetitive effect of ChromaDex's alleged patent misuse was a decrease in competition in the market for end-user products that included NR. To start, there was a decrease in brand competition. ChromaDex, by forcing its customers to use the NIAGEN branding, prevented or made it more difficult for those customers to build equity in their own trademarks because they were required to invest in an existing brand that belonged to ChromaDex. This action focused customers on a primary brand and did not promote the development of competing brands by these licensees. This effect can be seen in Figure B above, which shows that of six primary ChromaDex

---

[206]*Princo Corp. v. ITC*, 616 F.3d 1318, 1338, 1340 (Fed. Cir. 2010).

49

**Exhibit 1**
**Page 54**

*Highly Confidential*
*Attorneys' Eyes Only*

DTC licensees five (MAAC10, Nectar7, Live Cell, HPN, and Thrive Now Health) used NIAGEN branding and only one (Elysium) did not.

140. In addition, ultimately there was a decrease in the actual choices available to customers seeking to buy products containing NR caused by ChromaDex taking steps to enter the DTC space and seize it for itself by launching TRU NIAGEN. As ChromaDex has recognized, its customers made a "substantial investment […] with respect to the use of the brand name NIAGEN."[207]

141. Without an end-user product of its own, ChromaDex, unlike these customers, was not in a position to build a strong consumer brand from the ground up. In fact, ChromaDex had previously attempted to itself launch a consumer product (for an ingredient other than NR) under the brand "BluScience."[208] It failed. ChromaDex was unable to "get the brand off the ground" and decided "not to continue the Blue Science brand."[209] ChromaDex then "transitioned back to an ingredient and technology company."[210]

142. By contrast, with NIAGEN, ChromaDex leveraged its patent to establish and develop the brand. Then, in late 2016, ChromaDex moved to take advantage of the strong brand recognition generated by its DTC licensees' mandatory use or licensing of the NIAGEN mark.[211] ChromaDex decided to terminate all of the DTC licensees' supply of NR as soon as it was able, and to replace those sales with the sales of its own DTC product through its acquisition of Healthspan and TRU NIAGEN.[212]

---

[207] CDXCA_00289635 at 289639.

[208] Deposition of ChromaDex 30(b)(6) at 110:2-3 ("ChromaDex had launched a consumer product previously called Blue Science.").

[209] *Id.* at 184:25-85:3.

[210] *Id.* at 182:22-23.

[211] *See* Deposition of ChromaDex30(b)(6) at 56:22-57:13 (when asked what led ChromaDex to consider selling NIAGEN direct to consumer, Mr. Varvaro states: "[w]e were looking at a bunch of different analysis of where the brand Niagen was going, how it was performing […] there was a belief from a board-level standpoint, not across to everyone, but discussions came about how we can best achieve shareholder value going forward, and one of the considerations in that was launching or own finished product containing nicotinamide riboside." [sic,]); 60:12-22 ("I'm sure [the fact that there was a market for Niagen-branded products] was one of the facts that was taken into discussion," in deciding to pursue the direct to consumer market); 66:8-23 ("The company made a decision to phase out customers for many different reasons […] and there were ones that the belief was they were going to be phased out because they were potential competitors to the Tru Niagen brand.").

[212] CDXCA_00289635 - 289641.

**Exhibit 1
Page 55**

*Highly Confidential*
*Attorneys' Eyes Only*

143.    The anticompetitive effect of ChromaDex's leveraging of the now-strengthened NIAGEN brand was recognized by ChromaDex in its SEC filings:  it would result in fewer companies selling NR products to consumers.  For example, as ChromaDex's 10-K for the 2017 fiscal year stated: "The acquisition in March 2017 of Healthspan Research LLC, a company that sold our TRU NIAGEN® product direct to consumers, marked our strategic shift from an ingredient and testing company to a global consumer focused nutraceutical company […].  In connection with our strategic decision to grow our global consumer brand, we have reduced the number of active NIAGEN® ingredient supply agreements."[213]  As ChromaDex's Board Member, Stephen Block testified, "ChromaDex wanted to be the leading producer – seller to the DCT – the DTC channel."[214]

144.    During the phase-out of its ingredient customers, ChromaDex decided that it would prohibit the use of the NIAGEN mark on the front packaging of its customers' products, essentially forcing its licensees to rebrand.  This tactic occurred after ChromaDex used its patent rights to cause its licensees to invest in building the brand.  ChromaDex recognized that its licensees had made significant investments in the NIAGEN brand and would soon be cut off entirely:

> CDX has had initial discussions with 4 of the 5 existing brands using NIAGEN® as their *primary* brand name.  This practice was previously allowed by CDX, and in some cases substantial investment has been made by those companies with respect to the use of the brand name NIAGEN® and there are agreements in place that will either need to be terminated or permitted to expire.[215]

145.    ChromaDex sent DTC licensees new TLAs which contained new clauses stating: "Licensee shall not use ChromaDex Marks on the front panel of the label or packaging.  Specifically, Licensee is prohibited from using the ChromaDex marks on the principal display panel ("PDP")."[216] As ChromaDex told one licensee:  "What this will mean for Live Cell, as we discussed, is changing your NR product brand name to something other than NIAGEN."[217]

---

[213] ELY_0124076 at 124080 - 124081.

[214] Deposition of Stephen Block at 118:1-3.

[215] CDXCA_00289635 at 289639 (emphasis in original).

[216] CDXCA_00030358 at 30358.

[217] CDXCA_00030354 at 30354.

**Exhibit 1
Page 56**

*Highly Confidential*
*Attorneys' Eyes Only*

146.    ChromaDex ultimately followed through on its plan to eliminate all of the DTC licensees from the market so that it could sell its TRU NIAGEN product direct to consumers free of competition.  In its Form 10-Q for the quarterly period ending March 31, 2018, ChromaDex stated:

> By developing and selling TRU NIAGEN®, our own consumer standalone NIAGEN® supplement product, we are in direct competition with some of our current ingredients segment customers that use NIAGEN® in the products that are sold to consumers. In an effort to promote and better market our consumer product, we have made a strategic decision not to ship NIAGEN® to certain ingredients segment customers […].[218]

147.    As a consequence of ChromaDex causing its licensees to invest in the NIAGEN brand to obtain a supply of NR, the number of companies offering consumer NR products has been reduced, as has competition and consumer choice.  As ChromaDex's Rule 30(b)(6) designee testified, ChromaDex's only remaining NR customers are Nestle, Thorne, and Life Extension.[219]  The TRU NIAGEN website identifies ChromaDex's current customers as only including Thorne, Life Extension, and HPN.[220]  ChromaDex has stated that it does not believe that these customers really compete with TRU NIAGEN because they are marketed differently and in different channels.[221]  In addition, in 2018 ChromaDex purchased the division of HPN responsible for its NIAGEN-branded product, and the product was discontinued.[222]

148.    ChromaDex's ability to reduce competition in the direct-to-consumer channel would not have been possible without the substantial investments that ChromaDex previously caused its customers to make in the NIAGEN brand as a condition for obtaining supply of NR.  Thus, the reduction in choices and competition in direct-to-consumer products is a consequence and anticompetitive effect of ChromaDex's conduct that persists to this day.

---

[218] ELY_0108035 at ELY_108065.

[219] *See* Deposition of ChromaDex 30(b)(6) at 63:17 (the only remaining NR customers are Nestle, Thorne, and Life Extension).

[220] ELY_0122929 at 122930 (visited June 2019).

[221] Deposition of ChromaDex 30(b)(6) at 62:6-63:8.  Thorne, as noted above, sells in the practitioner channel.  In late 2018 Nestle obtained rights to sell TRU NIAGEN in the medical nutrition category with some rights (co-exclusive with ChromaDex) to sell certain products within the consumer health category. *See* ELY_0123394 - 123396.

[222] ELY_0123381 - 123384.

**Exhibit 1**
**Page 57**

*Highly Confidential*
*Attorneys' Eyes Only*

**B. ChromaDex's Conduct has Resulted in Reduced Ability for Current and Future Competitors to Compete Against the NIAGEN Brand**

149.  ChromaDex's conduct also reduced the ability of current and future competitors to compete against ChromaDex and thus resulted in additional actual and prospective anticompetitive effects.

150.  By requiring licensees to use NIAGEN trademark on their supplement products, ChromaDex obtained a significant benefit that made it easier for it to exclude other competitors. I discuss those advantages, and the related economic literature, extensively in Section IX above. As explained above, a brand or trademark represents goodwill, or a signal of product quality, and plays an important role in influencing consumer decisions. Once a consumer comes to like and trust products sold under a certain trademark, he or she will look for products bearing that trademark in the future and be less likely to purchase competing products sold under other marks. Such goodwill may even be carried over to new products, as a consumer is more likely to try something new if it is sold under the "umbrella" of a trademark that the consumer recognizes and trusts.[223] These benefits are long-lasting. Once the NIAGEN brand was established, both through its presence in the packaging and marketing materials of licensees, and through the efforts of licensees to educate consumers and win sales, new entrants were at a significant competitive disadvantage. ChromaDex recognized this when it noted that its "NIAGEN ingredient TM strategy" "[p]rovides differentiation for CDX if/when NR competition arrives," as shown in Figure C, above.[224]

151.  In addition to this product differentiation, any supplement manufacturer seeking to introduce a NR product with a trademark other than NIAGEN would have to overcome a consumer's familiarity with (and trust in) the NIAGEN mark. Overcoming this obstacle would require substantial resources and business risk. ChromaDex also recognized this advantage – the establishment of a "trust mark" in ChromaDex's own words – from its NIAGEN strategy as shown in Figure C, above.[225]

152.  This strengthening of the trademark NIAGEN resulting from ChromaDex's leveraging of its patent-based control of the supply of NR to impose mandatory trademark use/licensing was more pronounced

---

[223] *See* Wernerfelt, Birger "Umbrella branding as a signal of new product quality: an example of signaling by posting a bond." *RAND Journal of Economics*, 19(3) (1988), pp. 458-66.

[224] CDXCA_00464084 at 464097.

[225] CDXCA_00464084 at 464097.

**Exhibit 1**
**Page 58**

*Highly Confidential*
*Attorneys' Eyes Only*

because NIAGEN was a "pioneering brand."[226]  By using its patent rights to strengthen the mark early, ChromaDex sought to establish itself as the "true" (or "TRU") version of NR.  As ChromaDex has again noted, the NIAGEN trademark strategy allowed it to promote ChromaDex as the "driver behind NR." [227]

153.    Consumers encountering products sold under the NIAGEN mark in the marketplace may consider NIAGEN, rather than NR, as the name of the authentic ingredient.  In that sense, ChromaDex's mandatory trademark and licensing strategy resulted in NIAGEN becoming something of a "proprietary eponym"—a term used to refer to situations where a successful trademark is commonly used in a generic fashion but which is yet still a valid, enforceable trademark.  (Familiar examples are Xerox and Kleenex.)  This is the case here.[228]  When a manufacturer has exclusive rights over such a "proprietary eponym," competitive problems can arise.  The owner of the trademark has a clear advantage, and its products are often thought of as "the real thing" or the highest quality option regardless of the actual product attributes.  Conversely, the sellers of competing products can experience difficulty establishing consumer recognition and goodwill in the face of competition by a super-brand.

154.    In fact, ChromaDex has exploited this anticompetitive effect, and continues to do so.  Indeed, the name TRU NIAGEN suggests that ChromaDex's brand of NR is the only genuine one, and thus, the only NR a consumer should want.[229]  On the TRU NIAGEN website (www.truniagen.com), the menu at the bottom of the page contains a link entitled "Unauthorized NR."[230]:

---

[226] *See* Schmalensee, Richard, "Product Differentiation Advantages of Pioneering Brands"; *American Economic Review*, 72 (February 1982). 349-65.

[227] CDXCA_00464084 at 464097.

[228] *See* Deposition of Amy Boileau at 36:25-37:2 (Q: "Did you use the term 'NR' and 'Niagen' interchangeably at ChromaDex?" A: "Pretty much, yes"); Deposition of ███████, at 98: 4-8 (Q: "Was it your understanding that Niagen was the name of the ingredient you'd be producing for Elysium?" Q: "Yes, I never had any idea that Niagen was – I actually thought that's what they called it."); Deposition of ChromaDex 30(b)(6) at 116:20 ("Nicotinamide riboside is Niagen.").

[229] This is representative of ChromaDex's marketing strategy.  At his deposition, Rob Fried testified that ChromaDex's marketing of TRU NIAGEN sought to imply that the consumers were getting the "real thing." Deposition of Robert Fried at 143:10-25, Exhibit 8 (CDXCA_00276583); Deposition of ChromaDex 30(b)(6) at 116:17-21 (Q: "Is ChromaDex's marketing designed to get customers to associate the brand name Niagen with the substance nicotinamide riboside?" A: "Yeah.  Nicotinamide riboside is Niagen.  That's what the company would do, yes.").  *See also* CDXCA_00276582 ("NR is NIAGEN®").

[230] ELY_0123385 at (visited June 2019).

**Exhibit 1**
**Page 59**

*Highly Confidential*
*Attorneys' Eyes Only*



(Source: ELY_0123385 (highlight added))

155.    Clicking on that link takes the reader to a page with the words "counterfeit-nicotinamide-riboside" in the URL. The page prominently shows a bottle with ChromaDex's own TRU NIAGEN product. It also shows an unmarked container, but one which has a striking resemblance to the shape, size, and color as the container that Elysium uses for BASIS. The page asks: "Is your nicotinamide riboside authentic, safe, & effective?"[231]



(Source: ELY_0123390 at 123390)

---

[231] ELY_0123390 at 123390 (visited June 2019).

55

**Exhibit 1**
**Page 60**

*Highly Confidential*
*Attorneys' Eyes Only*

156.    ChromaDex's response to this question is for its customers to look for the NIAGEN branding on the label.    It also continues to draw a link between ChromaDex's patent rights and the NIAGEN branding.[232]



**LOOK FOR "NIAGEN®" ON THE LABEL**

—

NR is a patented ingredient, only sold as NIAGEN®. ChromaDex holds the patent rights to NR, and sells the ingredient to consumers as TRU NIAGEN®.

(Source: ELY_0123390 at 123390)

157.     ChromaDex thus clearly continues to leverage the power it built up in the NIAGEN brand by misusing its patent rights to suggest that any competitors that do not use the NIAGEN brand are "counterfeit," not "authentic" NR, and even not "safe & effective."    This is a clear anticompetitive effect from ChromaDex's conduct.

158.    In addition, ChromaDex's conduct prevented or hampered its customers from building equity in their own trademarks because they were forced to use or license the NIAGEN branding.   This, by itself, had anticompetitive effects, as it focused customers on a single brand and did not promote the healthy adoption of several competing brands.   As ChromaDex recognized, many of its customers made a "substantial investment […] with respect to the use of the brand name NIAGEN."[233]   They were then forced to rebrand by ChromaDex, with the daunting prospect of having to build a brand from scratch and then compete against the well-established NIAGEN brand that they themselves had been forced to help build.

159.    The trademark license with Elysium had separate and distinct anticompetitive effects in addition to those outlined above.   ChromaDex's conduct impacted the ability of Elysium, who was required to make royalty payments, to compete.   As shown below in Figure D, Elysium was effectively required to pay substantially more to ChromaDex than other large volume licensees once the trademark licensing payments are factored in.

---

[232] *Id.*

[233] CDXCA_00289635 at 289639.

**Exhibit 1
Page 61**

*Highly Confidential*
*Attorneys' Eyes Only*



(Source: CDXCA_00429638 - 429638, CDXCA_00422033 - 422033)

160.    As shown, these trademark royalties effectively increased Elysium's price paid for NR by approximately $200 to an average of $1,247 per Kg over the Q1:2015 – Q1:2016 timeframe; higher than the NIAGEN prices paid by its high volume DTC competitors.  Unless these costs could be passed through to consumers, the gross margins made by Elysium were necessarily reduced, negatively affecting its ability to compete.  With higher costs, it would have less flexibility to lower prices to retail customers.  Money used to make these royalty payments was also not available for building its business, developing new products, or expanding the end-user market for products containing NR.  Elysium's CEO Eric Marcotulli testified that the money spent paying for trademarks Elysium did not want nor used could have been used "to further scale [Elysium's] business and invest in other products or clinical trials, et cetera."[234]

---

[234] Deposition of Eric Marcotulli at 108:9-14.

**Exhibit 1
Page 62**

*Highly Confidential*
*Attorneys' Eyes Only*

161.    It is important to recognize that the impact of ChromaDex's conduct on Elysium had a broader anticompetitive effect on the market for NR products.  Elysium was actively selling into the retail NR channel, and limits on its ability to compete necessarily had a negative impact on the pro-competitive effects of Elysium's presence in the market, such as greater consumer choice with respect to the variety of products and options for purchasing them (for example, single bottle vs. annual subscription), and sponsorship of research.

162.    For the reasons discussed above, I conclude that ChromaDex's conduct in requiring its NR supply customers to use or license the NIAGEN trademark had profound, lasting, and continuing anticompetitive effects.

## XI.    CHROMADEX HAS NOT PURGED ITS ALLEGED PATENT MISUSE

163.    Finally, ChromaDex has failed to purge and dissipate the long-term effect of its conduct.  As discussed above, in May 2017 ChromaDex sent letters to some number of its licensees informing them that they were not required to use the ChromaDex trademarks. [235]  In addition, within the same time frame it informed some licensees that their supply of NR had been terminated.[236] I understand ChromaDex has also asserted that it would refund royalty payments to some customers (but not to Elysium).[237]  In my opinion, these actions are insufficient to purge the alleged misuse and dissipate its effects.

164.    Far from dissipating the anticompetitive effects of ChromaDex's conduct, ChromaDex's strategic decision to terminate its prior licensees' supply in order to establish its own TRU NIAGEN branded supplement exacerbated them.  For instance, the NIAGEN trademark has gained consumer recognition and goodwill as a result of the licensed use, and ChromaDex is now reaping those benefits in conjunction with its sale of TRU NIAGEN and excluding the companies that invested in that brand.  As discussed above, by pushing out the NIAGEN name through multiple licensees, ChromaDex ensured that consumers came to know the product as NIAGEN.  Therefore, the anticompetitive effects from this conduct continue to linger while ChromaDex continues to exploit the NIAGEN branding.  In my opinion, the effects of ChromaDex's alleged misuse cannot be purged and dissipated while

---

[235] *See, e.g.,* CDXCA_00008603 - 8603, CDXCA_00008535 - 8535, CDXCA_00008664 - 8864, CDXCA_00008877 - 8877 (notifications regarding use of trademark).

[236] *See, e.g.,* CDXCA_00008507 - 8507, CDXCA_00262823 - 262823, CDXCA_00429813 at 429813, CDXCA_00008682 - 8282, CDXCA_00008787 - 8787, CDXCA_00008811 - 8811, CDXCA_00008936 - 8936 (notifications of termination of supply).

[237] ChromaDex's Answer to First Amended Counterclaim, Docket No. 46, at 11.

**Exhibit 1**
**Page 63**

*Highly Confidential*
*Attorneys' Eyes Only*

ChromaDex continues to use the NIAGEN branding. Otherwise, ChromaDex will continue to enjoy the benefits of its conduct and, as discussed above, the anticompetitive consequences of that misuse will continue to persist.

165.     Moreover, because ChromaDex has already used the strength of the NIAGEN branding to exclude its prior DTC supply customers from the consumer market, the effects of the alleged misuse cannot effectively be dissipated because those customers are no longer present. There is now less competition because of ChromaDex's misuse. Like any market, competitive outcomes are path-dependent. Even if the currently excluded competitors were able to return to the market and use the NIAGEN brand, there is no guarantee that competitive outcomes would be the same as they would have been but for ChromaDex's conduct. Since the clock cannot be rewound, competitive advantages accruing to ChromaDex from its conduct cannot be expunged, and thus the effects of ChromaDex's alleged patent misuse cannot be fully dissipated.

166.     A further example of the continuing effects of ChromaDex's conduct can be seen from ChromaDex's truniagen.com website where, as discussed in detail above, ChromaDex asserts that any products that do not contain the NIAGEN brand are "counterfeit," not "authentic," and not "safe & effective." This conduct shows that ChromaDex has not purged its alleged misuse and that its effects persist.

167.     ChromaDex has also not returned the license fees paid by Elysium, nor has it compensated Elysium for the opportunity cost of such fees or for the legal fees that Elysium has incurred in connection with litigating its patent misuse counterclaim. While ChromaDex has stated that it will offset the amount of royalties against any amounts that ChromaDex recovers in this lawsuit,[238] it is uncertain whether judgment will enter in ChromaDex's favor.

168.     Moreover, it is my opinion that these anticompetitive effects arising from the Elysium license will never be fully dissipated. Even if ChromaDex returns license fees paid by Elysium with interest, the clock cannot be turned back. The marketplace continues to evolve, and Elysium has been constrained to follow a particular path in developing its business. Lost opportunities that Elysium may have had, or gains that Elysium may have been able to realize if operating under looser financial constraints, are difficult to quantify but are nonetheless real economic losses that are irreparable.

---

[238] ChromaDex's Answer to Elysium's First Amended Counterclaim, ECF No. 46, at 11 (May 24, 2011).

**Exhibit 1
Page 64**

*Highly Confidential*
*Attorneys' Eyes Only*

169.    As to the additional anticompetitive effects on the third party licensees who were forced to rebrand due to a change in the mandated trademark license, who ChromaDex acknowledged "in some cases [made] substantial investment […] with respect to the use of the brand name NIAGEN,"[239] those effects have likewise not been dissipated, as there is no evidence that they have recovered their investment or otherwise been made whole.

## XII.    ELYSIUM'S COUNTERCLAIM DAMAGES

170.    I have been informed that Elysium filed counterclaims in this matter alleging, *inter alia*, that ChromaDex breached certain provisions of the February 2014 NR supply agreement and its February 2016 amendment.[240]  As a result, I have been asked by counsel for Elysium to analyze and quantify the amount of economic damages suffered by and owed to Elysium in the event that the trier of fact finds ChromaDex liable for the breaches alleged by Elysium.

### A.    Breach of the MFN Provision

171.    Section 3.1 of the NR supply agreement states that

> With respect to all Niagen provided by ChromaDex to Elysium Health under this agreement Elysium Health shall pay ChromaDex a maximum price of one thousand three hundred US dollars per kilogram ($1,300 per kg) ("Maximum Price"); If, at any time during the Term, ChromaDex supplies Niagen (or a substantially similar product) to a Third Party at a price that is lower than that at which Niagen is supplied to Elysium Health under this agreement, then the price of Niagen supplied under this Agreement shall be revised to such Third Party price with the effect from the date of the applicable sale to such Third Party and ChromaDex shall promptly provide Elysium Health with any refund or credits thereby created; provided Elysium Health purchases equal volumes or higher volumes than the Third Party.  For the sake of clarity this Section does not apply to inter-Affiliate transfers.[241]

172.    Elysium alleges ChromaDex breached Section 3.1's most favored nations pricing terms (*i.e.* the MFN Provision) by repeatedly supplying its NR ingredient to several customers at per-kilogram prices below those being paid by Elysium for equal or higher volumes and that ChromaDex neither "revised to such

---

[239] CDXCA_00289635 at 289639.

[240] Answer to Fifth Amended Complaint and Restated Counterclaims filed February 19, 2019 (ECF No. 192) (incorporating by reference the Third Amended Counterclaim, dated February 22, 2018 (ECF No. 103) and the Sixth Counterclaim for Relief, dated August 9, 2018 (ECF No. 118)); CDXCA_0061424 - 434, CDXCA_00061443 - 446.

[241] CDXCA_00061424 – 434 at 426.

**Exhibit 1**
**Page 65**

*Highly Confidential*
*Attorneys' Eyes Only*

Third Party price" nor "promptly provide[d] Elysium Health with any refund or credits" as obligated under their agreement.[242]

173.    I have been provided with ChromaDex's transaction-level data depicting its NR ingredient sales over the June 2013 – June 2018 timeframe which ChromaDex identified in response to an interrogatory asking for details regarding its NR sales.[243]  The interrogatory requested ChromaDex to

> Identify every sale of nicotinamide riboside by ChromaDex to any Person from February 3, 2014, through February 2, 2017, including the Person's full name; the date the order was placed; the quantity of the order; the date the order was shipped; the price charged by ChromaDex (including both price per kilogram and royalty, as applicable); the revenue recognized by ChromaDex from the transaction; the amount of any refunds, discounts, rebates, or other price concessions provided by ChromaDex; any order number or other identifying mark assigned to each such sale; and the contract identified in response to Interrogatory No. 1 (if any) applicable to such sale.[244]

174.    In response, ChromaDex stated that the information could be found in two spreadsheets it identified by production numbers CDXCA_00422033 and CDXCA_00429638, among other documents.

175.    As shown in Exhibits 3 and 4, Elysium purchased NR from ChromaDex under nine (9) separate purchase orders, each time at per-kilogram prices greater than the prevailing lowest, most favorable price being paid by a (then) current ChromaDex customer purchasing equal or lower volumes.  The correct measure of economic damages resulting from ChromaDex's alleged breach of the MFN Provision is therefore simply the difference between the total amount actually paid by Elysium for specific purchases of NR and the total amount it would have paid had it purchased the same quantity of NR during that period at the price provided for under the MFN provision.

176.    I am advised by counsel that Section 3.1 functions as a "non-contemporaneous MFN" provision: on any given date, the purchaser is entitled to receive the lowest price previously extended to a third party for the same or lower quantity after the date of the agreement.

177.    Exhibit 3, sets forth for each of the nine (9) purchase orders at issue Elysium's actual per-kilogram price and identifies, as of each date the but-for price, which is the lowest, but-for price previously paid by a ChromaDex third-party customer as of that date.  Except for Elysium's first purchase, each

---

[242] *Id.*

[243] CDXCA_00429638

[244] Elysium's First Set of Interrogatories to ChromaDex, dated September 6, 2017.

**Exhibit 1**
**Page 66**

*Highly Confidential*
*Attorneys' Eyes Only*

purchase by Elysium came after ChromaDex sold 1 kilogram of NR to Proctor & Gamble for $100 on February 2, 2015, as reflected on CDXCA_00429638. As a result, $100 per kilogram serves as the but-for or most favored price for eight of the nine purchases made by Elysium. For example, on May 27, 2015, Elysium purchased 100 kilograms of NR at a price of $1,300 per kilogram despite the fact that Proctor & Gamble had previously purchased 1 kilogram of NR at a more favorable $100 per-kilogram price on February 2, 2015. At a difference in price of $1,200 per-kilogram, Elysium overpaid, and is entitled to a refund or credit, of $120,000 on this specific purchase order alone. As summarized in Exhibit 3, Elysium's overpayments to ChromaDex, *i.e.* the measure of its economic damages resulting from ChromaDex's alleged breach of the MFN Provision for which Elysium is entitled to a refund or credit, totals approximately $4.39 million.

178.    I note that the sale to Proctor & Gamble for $100 per kilogram is reflected in CDXCA_00429638 but not in the other spreadsheet identified by ChromaDex in its response to the interrogatory quoted above, CDXCA_00422033. In the event that the $100 per kilogram sale to Proctor & Gamble is disregarded, Exhibit 4, alternatively sets forth for each of the nine (9) purchase orders at issue Elysium's actual per-kilogram price and identifies, as of each date the but-for price which is the lowest price previously paid by a ChromaDex third-party customer as of that date. In none of these instances was the lowest price extended by ChromaDex to a third-party customer associated with an order quantity greater than that ordered by Elysium. For example, on May 27, 2015, Elysium purchased 100 kilograms of NR at a price of $1,300 per kilogram despite the fact that another of ChromaDex's third-party customers, Live Cell, had previously purchased 30 kilograms of NR at a more favorable $900 per-kilogram price on February 10, 2015. At a difference in price of $400 per-kilogram, Elysium overpaid, and is entitled to a refund or credit, of $40,000 on this specific purchase order alone. As summarized in Exhibit 4, Elysium's overpayments to ChromaDex, *i.e.* the measure of its economic damages resulting from ChromaDex's alleged breach of the MFN Provision for which Elysium is entitled to a refund or credit, totals approximately $1.74 million.

**B. Breach of the Exclusivity Provision**

179.    Under the February 2016 amendment to the parties' NR supply agreement, ChromaDex and Elysium agreed in Section 3.11.3 that ChromaDex

> Shall not, directly or indirectly sell, transfer or otherwise provide to any Third Party, or license or otherwise enable any Third Party to make, any products containing both Niagen and pTeroPure® (or any ingredients that are substantially similar thereto) in combination, whether in the same delivery mechanism (including tablet, capsule, melt or liquid form) or

**Exhibit 1**
**Page 67**

*Highly Confidential*
*Attorneys' Eyes Only*

packaging or in separate form or packaging but marketed together (collectively a "Combined Product").[245]

180.    Data provided by ChromaDex indicates that it continued to ship NR to certain customers even after granting exclusivity to Elysium. I understand from counsel that resveratrol and pterostilbene are "substantially similar" ingredients and that Elysium alleges that ChromaDex's supply of NR to third parties that marketed those ingredients in combination for sale to consumers after February 2016 constitutes a breach of the agreement.

181.    I have been provided with data identifying third party products containing both NR and resveratrol that were marketed and sold by ChromaDex customers between February 2016 and February 2017. During this period, four combination consumer products contained NR and resveratrol.

| Company | Product | Channel | Retail ASP | NR (mg.) | Resveratrol (mg.) | Pterostilbene (mg.) | Pills/day | Pills/bottle |
|---------|---------|---------|-----------|----------|-------------------|---------------------|-----------|--------------|
| Thorne | ResveraCel | Practitioner & DTC | $48.00 | 300 | 150 | | 2 | 60 |
| Thorne | Extra Nutrients | Unknown | $60.00 | 25 | 25 | | 4-8 | 240 |
| LEF | Optimized Resveratrol with NR | DTC | $42.00 | 100 | 250 | | 1 | 30 |
| Vitaquest | Mitoboost | DTC | $42.95 | 100 | 30 | | 1 | 30 |
| Elysium | Basis | DTC | $60.00 | 250 | | 50 | 2 | 60 |

182.    To the extent that Elysium lost sales of BASIS to these four products as a result of ChromaDex's alleged breach, it incurred damages in the form of lost profits on these lost sales. It was also likely damaged by loss of the ability to position its product as the only product combining NR with a sirtuin activator. This would have conveyed some marketing advantage, which all else equal would have translated into some higher volume of sales over the relevant period, and out into the future. But while these are very real economic losses to Elysium, it is not possible to quantify them precisely using the available data.

183.    To estimate lost profits, the first step is to assess the potential volume of sales of BASIS in the but-for world in which none of these combination products were available. The normal method used in economics to estimate but-for outcomes in these circumstances is to redistribute sales of the excluded

---

[245] CDXCA_00061443 - 446 at 445.

**Exhibit 1**
**Page 68**

*Highly Confidential*
*Attorneys' Eyes Only*

products to any remaining sellers.  In this case, consumers who purchased one of the four at-issue products have shown that they prefer a combination product to alternatives such as purchasing ingredients separately, and their demand can therefore be allocated, after any necessary adjustments, to the only remaining combination product, BASIS.

184.   In my opinion, the number of actual world retail purchasers of Thorne Extra Nutrients who could be expected to purchase BASIS in the but-for world is de minimis.  This product does contain NR and resveratrol, but contains NR only in much smaller quantities than BASIS (25mg vs 250mg), and it also contains a large number of additional ingredients.[246]  While some customers might have considered purchasing BASIS along with separately sold products containing the other ingredients, I am unable to determine what proportion would have found this to be equivalent to their actual world choice, or to reliably determine the cost of the other ingredients.  To be conservative, I have therefore excluded Thorne Extra Nutrients from further consideration, and none of the actual world sales of this product are allocated to BASIS in the but-for world.  For the other combination products, I take into account a number of factors in assessing how much of their sales could have been captured by BASIS in the but-for world.

185.   None of the at-issue combination products combine NR with pterostilbene, instead they contain a substantially similar compound, resveratrol.  In the absence of evidence to the contrary, I assume that consumers would regard these as equivalent in terms of therapeutic effect and thus that, for example, Vitaquest's Mitoboost (100mg NR plus 30mg resveratrol) is equivalent to 40% of a BASIS pill that contains 250mg of NR plus 50 mg of pterostilbene.  LEF's "Optimized Resveratrol with NR" contains 100mg of NR per pill with 250mg/pill of resveratrol, and is not therefore not directly equivalent to BASIS, but for purposes of estimating but-for sales of BASIS, the LEF product can be assumed to be one pill containing 100mg NR with 30mg resveratrol (similar to Mitoboost), equivalent to 40% of a BASIS pill, plus an additional pill with 220mg of resveratrol.

186.   At retail prices the cost of a month's supply (one 30-count bottle per month) of Mitoboost in the actual world was $42.95.[247]  If BASIS were the only combination NR plus sirtuin activator product available,

---

[246] Including Vitamin A, Vitamin C, Vitamin E, Vitamin D, Vitamin K, Thiamin, Riboflavin, Niacin, Vitamin B6, Folate, Vitamin B12, Biotin, Pantothenic Acid, Choline, Iodine, Magnesium, Zinc, Selenium, Copper, Manganese, Chromium, Molybdenum, Quercetin Phytosome, Bilberry, Mixed Carotenoids, Boron, and Vanadyl Sulfate.

[247] https://nordicclinical.com/product/mitoboost/.

**Exhibit 1
Page 69**

*Highly Confidential*
*Attorneys' Eyes Only*

a consumer could have obtained the same amount of NR in the form of BASIS pills at a cost of $12 per month ($60 for a 60-count bottle, equivalent to 5 months' supply of pills containing 100mg of NR.)  It is reasonable therefore to assume that a large fraction of Mitoboost customers would have been Elysium customers in the but-for world, since BASIS would have been substantially less costly and a consumer who purchased Mitoboost in the actual world has shown that they prefer a combination product to purchasing ingredients separately.  Insufficient data is available to determine precisely how many Mitoboost customers could have been BASIS customers in the but-for world.  Not all Mitoboost customers can be assumed to purchase BASIS in the but-for world, since Mitobooost is not exactly equivalent to BASIS and some of the characteristics and features of Mitoboost that played a role in the purchase decision were not offered by BASIS.  Elysium did not sell BASIS in a formulation containing 100mg NR per pill, and while "pill-splitting" is a common behavior, some customers preferring a 100mg per day dose might have not been willing to do this.  BASIS was also sold primarily as a continuing subscription rather than single purchase, which some customers may not have been willing to sign up for, or to purchase single bottles from Elysium's website as opposed to their actual world method of purchase.  Some number of actual Mitoboost customers might therefore choose not to purchase an NR combination product in the but-for world, switching to separately purchased NR-only and resveratrol-only or pterostilbene-only products, or exiting the market entirely.  Based on my knowledge and experience in analyzing demand for pharmaceutical and OTC products, and allowing for the fact that the products are not identical in terms of dosage and formulation and that BASIS is sold primarily as an annual subscription rather than per bottle, in my opinion as much as 90%, but no less than 10%, of the volume of Mitoboost sales could have been captured in the but-for world by the equivalent amount of BASIS sales.

187.    A similar logic holds for LEF's "Optimized Resveratrol with NR".  Some customers may have purchased this product for other benefits of its resveratrol content beyond sirtuin activation, and for them the relevant price comparison is therefore the cost of one-tenth of a bottle of BASIS plus additional resveratrol.  Even after including an additional $12.77 per month for costs of buying additional resveratrol, the $12 cost per month to buy the equivalent amount of NR in the form of BASIS, plus the cost of additional resveratrol,[248] is still substantially lower than the $42 per month cost of LEF's

---

[248] This is the cost of 30 days x 220mg of resveratrol, based on the average price per mg of three resveratrol products listed on Amazon.com: Jarrow Formulas Resveratrol 100mg 120 veggie caps; Life

**Exhibit 1
Page 70**

*Highly Confidential*
*Attorneys' Eyes Only*

product.[249]  As with Mitoboost, there are differences between the LEF product and BASIS that would likely cause some number of actual world customers to decline to purchase BASIS in the but-for world. Apart from the question of single purchase versus subscription, the LEF product emphasized resveratrol over NR, and contained the two ingredients in quite different proportions than present in BASIS.  Based on my knowledge and experience in analyzing demand for pharmaceutical and OTC products, and allowing for these product differences, in my opinion as much as 75%, but no less than 10%, of the volume of "Optimized Resveratrol with NR" sold by LEF could have been captured in the but-for world by the equivalent amount of BASIS sales.

188.  Estimating but-for capture of sales of Thorne's ResveraCel product by BASIS requires the following factors be taken into account. Firstly, ResveraCel was sold both in the practitioner channel, from which Elysium was contractually excluded, and the DTC channel, where BASIS can be assumed to have been able to meet some demand in the but-for world.  There is insufficient data disclosed in discovery to determine what fraction of ResveraCel was sold through the DTC channel. Here, I assume the sales of ResveraCel are split evenly (50%) between the practitioner and DTC channels. Secondly, ResveraCel contains 300mg of NR, and to acquire an equivalent amount of NR by purchasing BASIS, a ResveraCel customer would have to buy 20% more bottles on a monthly basis.  This would make BASIS more costly, $72 per month versus $48.[250]  By the Law of Demand, some number of ResveraCel consumers would have been deterred from buying BASIS in the but-for world.  Again, insufficient data has been disclosed to allow direct estimation of the price elasticity of demand, but assuming a price elasticity of -1.5 to -2, which is consistent with Elysium's price-cost margins and my experience in estimating econometric models of demand for this type of product, the higher price of BASIS would have resulted in between 75% and 100% lower volume.

189.  On the assumption that between 10% and as many as 90% of ResveraCel's DTC customers would have been likely purchasers of BASIS, then in my opinion as much as 11.25% (25% of 90% of the 50% of customers in the DTC) of the total volume of ResveraCel sold by Thorne could have been captured in the but-for world by the equivalent amount of BASIS.

---

Extension 100mg 60 vegetarian capsules; SOURCE NATURALS Resveratrol 100 Mg Vegetable Capsules, 120 Count.

[249] Exhibit 5, Schedule A.

[250] *Id.*

**Exhibit 1
Page 71**

*Highly Confidential*
*Attorneys' Eyes Only*

190.     Exhibit 5 shows the upper and lower bounds on additional volume of but-for sales of BASIS that could have been made in place of each of the products at issue in each scenario, and Elysium's lost profits on the lost sales attributable to ChromaDex supplying NR and resveratrol to the sellers of these combination products.  In total, Elysium's lost profits due to the alleged breach are between $68,355 and $571,981.

### C.  Breach of the cGMP Provision

191.     The agreement under which ChromaDex supplied NR to Elysium specifically states that "THE NIAGEN SOLD HEREUNDER SHALL BE (i) MANUFACTURED IN ACCORDANCE WITH cGMP AND APPLICABLE LAWS AND REGULATIONS IN THE UNITED STATES …".[251]     The agreement defined "cGMP" as "current good manufacturing practices (i) as described in parts 210 and 211 of Title 21 of the United States' Code of Federal Regulations and the latest FDA guidance documents pertaining to manufacturing and quality control practice, and (ii) as applicable in each other country in which Elysium Health advises ChromaDex in writing that Niagen products are intended to be sold [.]"[252] The expectation that the product received would meet the standards of pharmaceutical cGMP would have, all else equal, raised Elysium's willingness to pay, resulting in a higher per kg price in the agreement.  I have been advised that the NR supplied to Elysium by ChromaDex was not manufactured in accordance with current good manufacturing practices as described in Parts 210 and 211 of Title 21 of the United States Code of Federal Regulations and the latest FDA guidance documents pertaining to manufacturing and quality control practice.[253]  Had Elysium understood that it was in fact bargaining for supply of a product manufactured to a lower standard, and less expensively than a product manufactured to pharmaceutical cGMP, basic economic considerations suggest that it would only have agreed to a lower price.

192.     Elysium has thus suffered economic harm.  The appropriate measure of damages is the difference between the actual price paid and the lower price that Elysium can be assumed to have negotiated had it been aware that ChromaDex was not supplying cGMP-compliant NR, multiplied by the quantity purchased.

---

[251] CDXCA_00061424 – 434 at 427.

[252] CDXCA_00061424.

[253] *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm.

**Exhibit 1**
**Page 72**

*Highly Confidential*
*Attorneys' Eyes Only*

193.    To estimate Elysium's but-for price, I examined the prices negotiated and paid by comparable customers purchasing NR from ChromaDex at the time of the Elysium supply agreement.[254]  Damages for the alleged breach of current good manufacturing practices are as follows:

| Year | Elysium Price (kg.) | But-for Price (kg.) | Elysium volume (kg.) | Damages |
|------|---------------------|---------------------|----------------------|---------|
| 2014 | $1,300 | ███ | 100 | ███ |
| 2015 | $1,102 | ███ | 910 | ███ |
| 2016 | $1,000 | ███ | 1,500 | ███ |
| Total cGMP Damages | | | | $221,070 |

194.    For each year in which Elysium purchased NR, I calculate both its average price per kilogram and the but-for price paid by comparable NR customers.  I calculate Elysium's cGMP damages as this difference in price multiplied by the actual volume of NR purchased by Elysium.  As set forth in the table above, Elysium's cGMP damages totaled approximately $221,000 on 2,510 kilograms of NR over the 2014 – 2016 timeframe.

---

[254] Comparable NR customers include Thorne, Live Cell, and HPN.

68

**Exhibit 1**
**Page 73**

*Highly Confidential*
*Attorneys' Eyes Only*

Executed on June 21, 2019 in Boston, MA.

_____

Iain M. Cockburn

**Exhibit 1**
**Page 74**

# Exhibit 2

## <u>REDACTED VERSION OF DOCUMENT PROPOSED TO BE<br>FILED UNDER SEAL</u>

**Exhibit 2**
**Page 75**

1              UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF CALIFORNIA
2                 (SOUTHERN DIVISION)

3    ------------------------X
     ChromaDex, Inc.,              )
4                                  ) Case No.
            Plaintiff,             )
5                                  ) SACV 16-02277-CJC(DFMx)
        v.                         )
6                                  )
     Elysium Health, Inc.,         )
7                                  )
            Defendant.             )
8    _____  )
                                   )
9    Elysium Health, Inc.,         )
                                   )
10          Counterclaimant,       )
                                   )
11       v.                        )
                                   )
12   ChromaDex, Inc.,              )
                                   )
13          Counter-Defendant.     )
     ------------------------X

14

15              HIGHLY CONFIDENTIAL

16            VIDEOTAPED DEPOSITION
        OF IAIN MICHAEL COCKBURN, PH.D.
17
              500 Boylston Street
18         Boston, Massachusetts 02166

19          Tuesday, August 6, 2019

20                 9:17 a.m.

21

22

23   Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR,

24   CCR, CLR, RSA, LiveDeposition Authorized Reporter

25   Job No. 81280

Exhibit 2
Page 76

1        products.                                          10:59

2    BY MR. ANDERSON:

3        Q.    So you -- you said that it's

4    determined by consumers' understanding of

5    mechanism of action.                                   10:59

6              That's one of the things you just said

7    in your answer, right?

8        A.    That could be one of the things that a

9    consumer would take into account.

10       Q.    Do you have any specific examples that    10:59

11   you cite in your report of a consumer expressing

12   that they were purchasing NR because of its

13   mechanism of action?

14       A.    No.

15             MR. QUINA:  Objection.                       10:59

16   BY MR. ANDERSON:

17       Q.    Go ahead and flip to Page 23.

18             So this is where Subsection C starts

19   that is titled ChromaDex's Recognition of a

20   Distinct Market for the Supply of NR.                  10:59

21       A.    Yes.

22       Q.    And this subsection goes on to

23   further -- onto Page 25, Paragraphs 67 through 70.

24       A.    Yes.

25       Q.    And in that first paragraph, 67, the        11:00

Exhibit 2
Page 77

1    first sentence says, Consistent with my          11:00

2    observations, internal and external ChromaDex

3    documents recognize that a distinct market for the

4    supply of NR exists due to the unique properties

5    of NR perceived by ChromaDex, its investors and    11:00

6    its customers.

7            Do you have any specific examples of

8    customers saying that they were purchasing NR

9    because of its unique properties?

10       A.   No, I don't.                              11:00

11       Q.   If you look down on Page 24 to

12   Paragraph 69 --

13       A.   Yes.

14       Q.   -- the first sentence says, As shown

15   above, an analysis broadening the potential market  11:00

16   even somewhat beyond NR quickly fails to find

17   reasonably interchangeable products.  Thus, even

18   broader market definitions will also fail.

19       A.   Yes.

20       Q.   Is -- is your opinion that broader       11:01

21   market definitions will also fail dependent on

22   your prior analysis?

23            MR. QUINA:  Objection to form.

24            THE WITNESS:  Well, it certainly

25       incorporates it.                              11:01

Exhibit 2
Page 78
93

1          Q.    You -- you can't tell me sitting here      11:31
2     whether you controlled for the presence of other
3     ingredients in your pricing analysis?
4          A.    I just don't recall.  I don't want to
5     speculate.  I'll be happy to get back to you on      11:31
6     that.
7          Q.    Do you think it would be important to
8     control for the presence of those ingredients?
9          A.    It may or may not be.
10         Q.    Why wouldn't you control for the            11:31
11    presence of ingredients -- other ingredients?
12         A.    Well, the question here I was
13    interested in answering is, Does the price of
14    niacin -- is it correlated with the price of -- of
15    NR?                                                   11:32
16              Now, one way to look at this would be
17    to segregate our products that only contain niacin
18    and those which only contain NR, look at the
19    per-milligram prices of those and do a correlation
20    analysis.                                             11:32
21              You could also look more broadly at
22    the full set of products which might be those
23    which are also combination products, just to
24    check.  And I can't recall, sitting here -- you
25    know, I looked at this issue -- I don't want to --   11:32

1    marketplace.                                        11:34

2              What you can't tell is exactly how

3    many bottles were sold at retail of each of the

4    many different products which contained NR.  You

5    know, and we have -- I think it's very difficult   11:34

6    to obtain reliable data or even to make an

7    inference about the total quantity of niacin

8    products.

9         Q.    So it's fair to say that your analysis

10   did not include the median prices being weighted   11:34

11   by quantities sold of the supplements?

12        A.    It did not.

13              MR. ANDERSON:  This might be a good

14         time to take a break --

15              MR. QUINA:  Okay.                        11:35

16              MR. ANDERSON:  -- if that's okay.

17              THE VIDEOGRAPHER:  Okay.  We are now

18         going off the record.  The time is 11:35.

19                      -  -  -

20              (Whereupon, a recess was taken from      11:35

21         11:35 a.m. to 11:46 a.m.)

22                      -  -  -

23              THE VIDEOGRAPHER:  Okay.  We are now

24         back on the record.  The time is 11:46.

25

1          thinking about competitive effects, the          12:24
2          question ultimately I think is about the
3          impact, as I said earlier, social welfare
4          and particularly focused upon the impact on
5          consumers.  So the issue here is not          12:25
6          whether -- ultimately whether ChromaDex's
7          conduct affected the profitability or
8          economic situation or -- or interests of
9          Elysium, per se, rather, what is the impact
10          of that specifically and -- and, more          12:25
11          generally, on the wider marketplace and how
12          that impacts consumers.
13               For example, in Paragraph 161, I go
14          on to discuss things like consumer choice,
15          a variety of products and the ways in which          12:25
16          they could be purchase.
17     BY MR. ANDERSON:
18          Q.    So if your analysis is focused on
19     social welfare, is it fair to say that social
20     welfare -- there's -- there are situations where          12:25
21     social welfare might increase, although, Elysium's
22     outcomes are decreased?
23               MR. QUINA:  Objection to form.
24               THE WITNESS:  It's possible.  What
25          I'm -- what I'm talking about here is          12:26

**Exhibit 2**
**Page 81**

1          A.     They may have seen some cost-saving,     03:08
2     yes.  And the subsequent paragraphs in my report
3     work through this.
4          Q.     Okay.  I'm just identifying them.
5                 You identified -- or did you consider     03:08
6     that they might have chosen different combination
7     products to achieve different effects --
8                 MR. QUINA:  Objection to form.
9     BY MR. ANDERSON:
10         Q.     -- different therapeutic effects?     03:09
11                You can add that.
12         A.     So you're hypothesizing that rather
13    than purchase NR in combination with resveratrol,
14    they would have chosen to purchase some completely
15    different product?     03:09
16         Q.     I'm not -- I'm not hypothesizing.  I'm
17    just asking, Did you consider whether they were
18    purchasing combination products specifically for
19    an advertised therapeutic effect?
20         A.     Yes.     03:09
21         Q.     And you considered that as part of
22    your analysis?
23         A.     I considered and conduct my analysis
24    on the assumption that a customer who is
25    purchasing NR in combination with -- I think we're     03:09

1    calling them "sirtuin activators," is looking for        03:09

2    a specific therapeutic effect.  Why else would

3    they -- why else would they be purchasing it?

4          Q.    Are you aware of whether any of these

5    four at-issue products contained other ingredients        03:09

6    than NR and resveratrol?

7          A.    Yes.  One of them is Thorne Extra

8    Nutrients.  I exclude that from further

9    consideration because it contains a large number

10   of different ingredients.                                  03:10

11         Q.    Did you consider whether any of the

12   other three contained different ingredients than

13   just NR and resveratrol?

14         A.    To my knowledge, they did not.

15         Q.    Okay.  If you look at Paragraph 185,          03:10

16   in the second paragraph, you say, In the absence

17   of evidence to the contrary, I assume the

18   consumers would regard these as equivalent in

19   terms of therapeutic effect and thus that, for

20   example, Vitaquest's MitoBoost (100 milligrams NR         03:10

21   plus 30 milligrams resveratrol) is equivalent to

22   40 percent of a Basis pill that contains

23   250 milligrams of NR plus 50 milligrams of

24   pterostilbene.

25               Now, when you say an "absence of             03:11

**Exhibit 2**
**Page 83**

1    evidence to the contrary," did you go looking for        03:11

2    evidence to the contrary?

3         A.    I looked within the record.

4              I'm trying to remember if I -- I think

5    I asked counsel if they were aware of -- of              03:11

6    anything or if they had a technical expert who

7    might be testifying on that point, and they told

8    me no.

9         Q.    Okay.  Did you ever go looking for

10   affirmative evidence to support your assumption          03:11

11   that consumers would regard these as equivalent in

12   terms of therapeutic effect?

13             MR. QUINA:  Objection to form.

14             THE WITNESS:  I was generally aware

15        that dosing of these types of products              03:12

16        is -- I don't know if "controversy" is the

17        right word, but not something which has

18        been reviewed by FDA or about which there

19        is -- there is consensus among scientists.

20        So I think there's some haziness around             03:12

21        what is the appropriate dose and what is

22        a -- what is a therapeutically active dose.

23             That was something I took into

24        account in determining that it was a -- a

25        reasonable assumption, lacking any evidence         03:12

```
1            to the contrary, that equivalence              03:12
2            between -- on a milligram basis between
3            resveratrol and pterostilbene was not a
4            major issue.
5    BY MR. ANDERSON:                                       03:13
6            Q.    Okay.  So there -- there's two parts
7    of this sentence I -- I want to just focus in on
8    for a second.
9            So you assumed, first, that NR
10   combined with pterostilbene and NR combined with       03:13
11   resveratrol would be equivalent in terms of
12   therapeutic effect.
13           That's one assumption that you made?
14           A.    Yes.
15           Q.    Did you also assume, then, that          03:13
16   consumers would understand that those products are
17   equivalent in terms of therapeutic effect?
18           A.    I assumed consumers would regard these
19   as equivalent in terms of therapeutic effect.
20           Q.    Okay.  So I just want to make sure.       03:13
21   So there are two assumptions.  One is they're
22   equivalent, and the other is that consumers would
23   regard them as equivalent?
24           A.    No --
25           MR. QUINA:  Objection to form.                 03:13
```

Exhibit 2
Page 85

1    surprised.                                               03:20

2         Q.    So you're relying on your expertise in

3    the pharmaceutical industry when you opine that

4    pill splitting is a common behavior?

5         A.    Yes.  As I said, I'm not aware of any       03:20

6    study which has looked at this in any context of

7    dietary supplements.

8         Q.    Okay.  If you look a little bit

9    further down in that paragraph, 186, about eight

10   lines up, there's a line that begins, Some number    03:21

11   of actual MitoBoost customers might, therefore,

12   choose not to purchase an NR combination product

13   in the but-for world, switching to separately

14   purchased NR-only and resveratrol-only or

15   pterostilbene-only products or exiting the market    03:21

16   entirely.

17              Is it your understanding that -- that

18   consumers did, indeed, purchase separate --

19   separate products containing ingredient-only --

20   certain ingredients only?  Put that in a better      03:21

21   phrase.

22              MR. QUINA:  Objection to form.

23              THE WITNESS:  Well, we know that

24        there are some successful products in the

25        marketplace which are NR-only or             03:22

1      opposed to wherever they were buying                03:23

2      MitoBoost.

3           Those, I think, are real

4      possibilities.  I take a count of them in

5      arriving at my opinion.  Unfortunately,             03:23

6      there's a relatively wide band of

7      uncertainty around how much of that demand

8      could be reasonably assumed to be taken up

9      by Basis in a counterfactual world and for

10     how much of it consumers would have gone            03:23

11     elsewhere.

12   BY MR. ANDERSON:

13        Q.    So when you referenced the wide band

14   of uncertainty, it's this last line that begins,

15   Based on my knowledge and experience --               03:23

16        A.    Yes.

17        Q.    -- in analyzing demand for

18   pharmaceutical and OTC products?

19        A.    Yes.

20        Q.    And you conclude at the end that in        03:24

21   your opinion, As much as 90 percent, but no less

22   than 10 percent, of the volume of MitoBoost sales

23   could have been captured in the but-for world by

24   the equivalent amount of Basis sales.

25        A.    Yes.                                        03:24

**Exhibit 2**
**Page 87**

1           Q.    Now, 90 percent to 10 percent is the      03:24

2     wide band that you were referencing?

3           A.    Yes.

4           Q.    And other than your experience and

5     knowledge in analyzing demand for pharmaceutical      03:24

6     and OTC products, did you rely on anything else

7     when coming to your conclusion that between 90 and

8     10 percent of MitoBoost sales would have been --

9     could have been captured?

10          A.    Yes.  It was my evaluation of this        03:24

11    marketplace, these products, their pricing,

12    volumes, you know, in light of my -- and I'll cast

13    modesty -- modesty to the winds -- considerable

14    expertise in studying demand for prescription and

15    OTC pharmaceuticals suggest to me that these are      03:24

16    reasonable bounds within which the trier of fact

17    could determine that a counterfactual volume of

18    sales would lie.

19          Q.    Okay.  Did you conduct any formal

20    economic analysis to establish the 90 and           03:25

21    10 percent numbers?

22                MR. QUINA:  Objection to form.

23                THE WITNESS:  What do you mean by

24        "formal economic analysis"?

25

1          the amount of resveratrol that customer's          03:27

2          buying, one also needs to take into account

3          the fact that these customers, I'm

4          assuming, have a strong preference for a

5          large amount of resveratrol and might be          03:27

6          unconvinced that the amount of sirtuin

7          activation or whatever function they

8          were -- they were seeking to -- to obtain

9          by purchasing this product was met by -- by

10         Basis.                                            03:28

11              In light of my experience in

12         thinking about substitutability amongst

13         closely related but not identical products

14         in pharmaceutical and OTC category, I

15         lowered my estimate of the upper bound from       03:28

16         90 percent to 75 percent.

17              This makes some allowance for the

18         fact that there's an extra cost of buying

19         the additional amount of resveratrol --

20    BY MR. ANDERSON:                                       03:28

21         Q.    So that the --

22         A.    And --

23         Q.    I'm sorry.

24         A.    -- and there's some, you know, less

25    degree of -- of substitutability likely in the        03:28

**Exhibit 2**
**Page 89**

1    BY MR. ANDERSON:                                      03:32

2         Q.    That's okay.

3         A.    -- I have a lot of experience in

4    evaluating patterns of substitution among

5    categories of pharmaceutical products and, indeed,    03:32

6    for over-the-counter consumer health products, so

7    I've crunched a lot of that type of data over the

8    course of my career.  I have a strong sense of

9    what the likely potential is for substitution.

10             I don't know that there's a -- there        03:32

11   is, to my knowledge, no formulaic approach to this

12   or hard-and-fast rule.  I've done my best to

13   inform the trier of fact here as to what I think

14   will be a reasonable range within which they could

15   determine what extra volume -- what volume of        03:33

16   these sales could reasonably be assumed to be

17   picked up by Basis in a but-for world.

18        Q.    Okay.  And you said you'd crunch

19   numbers in other cases.

20             But you didn't crunch any numbers to        03:33

21   come to the 75 percent number?

22        A.    The data are not available to do that

23   kind of calculation.

24        Q.    If you look, then, down at

25   Paragraph 189 --                                      03:33

1    have been captured in the but-for world by the

2    equivalent amount of Basis --

3            A.    Yes.

4            Q.    -- and I believe you used that same

5    language with respect to the prior two            03:39

6    ingredients, LEF's optimized resveratrol with NR

7    and MitoBoost, the could have been captured in the

8    but-for world --

9            MR. QUINA:  Objection -- hold on.

10           Objection to form.                          03:40

11   BY MR. ANDERSON:

12           Q.    Yeah.  But if you need to go take a

13   second to look, I -- I just want --

14           A.    On each -- I phrased this quite

15   carefully.  In each of those -- each of the -- for   03:40

16   each of these three products, I -- I'm careful to

17   use the word "could" --

18           Q.    So you don't --

19           A.    -- rather than "would."

20           Q.    -- you don't come to a specific amount  03:40

21   of what you believe would have been captured in

22   the but-for world?

23           A.    No.  I believe the best that can be

24   done here, given the limited data that's available

25   and the nature of this marketplace, is to offer    03:40

1    upper and lower bounds, which I believe are          03:40

2    reasonable minimum and maximum amounts of demand

3    for these products, which would have been met by

4    Basis in a but-for world.

5        Q.   Okay.                                        03:41

6             MR. ANDERSON:  Let's go ahead and

7        mark -- this will be Cockburn Exhibit 6,

8        but it is Exhibit 5 to his report.

9             MR. QUINA:  You should have planned

10       that better.                                      03:41

11            MR. ANDERSON:  I should have.

12                    (Laughter.)

13                     -  -  -

14            (Cockburn Deposition Exhibit Number

15             6, Exhibit 5 to Expert Report of           03:41

16             Dr. Iain M. Cockburn, marked for

17             identification, as of this date.)

18                     -  -  -

19   BY MR. ANDERSON:

20       Q.   Do you recognize this document,             03:41

21   Dr. Cockburn?

22       A.   I do.

23       Q.   If you can, on this -- Exhibit 5,

24   the -- the first page of it, not Schedule A, the

25   first page -- it has a graph here with four rows     03:41

1        Q.    I'm sorry.  What do you mean by you        03:45
2    don't assume the order --
3        A.    To the -- to the extent that Elysium
4    would have needed to acquire more NR and more
5    pterostilbene to meet this extra volume, I assume,    03:45
6    in the but-for world, that they would have ordered
7    that from -- from ChromaDex under the terms that
8    were -- that were available to them.
9            We're talking about a but-for world
10   here, and no reason to believe that they would not   03:46
11   have ordered if they needed extra as compared to
12   their inventory level and that ChromaDex would not
13   have supplied it.
14       Q.    So you -- you assume that they would
15   have ordered more and that ChromaDex would have       03:46
16   provided it?
17       A.    Yes.  We know that ChromaDex had a lot
18   of excess inventory.



19                                                          03:46
20
21
22
23
24
25                                                          03:46

1     standard places on a manufacturer?                    04:01

2          A.    I've looked at them.

3          Q.    The -- the -- have you analyzed them?

4                MR. QUINA:  Objection to form.

5                THE WITNESS:  I've looked at them          04:01

6          and formed an opinion as an economist as to

7          their complexity and stringency, yes.

8     BY MR. ANDERSON:

9          Q.    Okay.  Did you do that in this case?

10         A.    Not specifically for this case.  As I     04:01

11    said, I'm generally familiar with cGMP as it

12    impacts the economics of being a company engaged

13    in the manufacture or distribution of products

14    which it can -- over which the FDA has some

15    oversight.                                            04:02

16         Q.    Did you use the expertise that you

17    just testified about to analyze how much it would

18    have cost ChromaDex to manufacture NR under

19    pharmaceutical cGMP standards?

20         A.    No, I did not.                             04:02

21         Q.    Okay.  Did you analyze any lost sales

22    incurred by Elysium as a result of the alleged

23    breach of the cGMP provision?

24         A.    I did not identify any lost sales.

25         Q.    Did you identify any lost profits of      04:02

252

**Exhibit 2**
**Page 94**

1    is, you know, What price could Elysium have                04:09

2    negotiated for supply of NR had they known that it

3    was not cGMP-compliant product?

4              The way I suggest that we can -- can

5    estimate that is by looking at the price paid by       04:09

6    comparable customers in the actual world.  Now, I

7    don't think that any specific -- obviously, every

8    customer has their own negotiation with ChromaDex.

9    Each customer gets its own -- its own price.

10   There's no standard price extended to all              04:10

11   customers, as best I can tell.

12             I don't think you can identify any

13   single agreement as being indicative of the price

14   that Elysium could have negotiated in the but-for

15   world.  That's why I -- I look at the average          04:10

16   price paid across a number of what I view as being

17   broadly comparable customers who are not

18   negotiating for supply of cGMP-compliant product.

19        Q.    Why did you not compare Elysium's

20   price directly to these comparable NR customers?       04:10

21             MR. QUINA:  Objection to form.

22             THE WITNESS:  Well, as I explained,

23        each of these prices arises out of a

24        idiosyncratic and unique negotiation

25        between ChromaDex and that company.  You          04:10

**Exhibit 2**
**Page 95**

1     don't have any inform -- there was not a          04:10

2     but-for negotiation conducted, as I discuss

3     earlier in this section.

4          Basic economics tells us that these

5     prices in this type of transaction are the        04:11

6     outcome of a negotiation.  Basic economics

7     also tells us that the price that arise in

8     that negotiation will fall between two

9     bounds, the seller's minimum -- minimum

10    willingness to sell and the purchaser's           04:11

11    maximum willingness to pay.

12         Basic economics also tells us

13    that Elysium's willingness to pay would

14    have been higher for cGMP-compliant

15    material than noncompliant.  To the extent        04:11

16    that there are costs associated with

17    cGMP-compliant manufacturing, ChromaDex's

18    minimum willingness to sell would have been

19    slightly higher.

20         So that describes the actual-world           04:12

21    negotiation, that the bargaining range is

22    all -- or is somewhat higher for

23    cGMP-compliant product and that the price

24    realized in the context of that negotiation

25    should be understood as such.                     04:12

Exhibit 2
Page 96

1          If we look at these other companies,        04:12

2      what we know is that their supply agreement

3      did not specify cGMP compliance.  By the

4      same logic, I believe it's safe to assume

5      that the bargaining range as between          04:12

6      ChromaDex and each of those other customers

7      would have been somewhat lower.

8          The actual bargaining outcome

9      reflects the average prices -- reflects the

10     prices that were actually paid.  By           04:12

11     averaging over those customers, I believe

12     it provides us with an estimate of the

13     likely price that Elysium would have been

14     able to realize had cGMP been off the

15     table, which is, you know, somewhat lower.    04:13

16     It's going to be higher -- somewhat lower

17     than it actually paid.  It's going to be

18     higher than some of Thorne, Life Cell or

19     HPN, and lower than others.

20 BY MR. ANDERSON:                                  04:43

21     Q.   All right, Doctor, you said a whole

22 lot in that answer, so forgive me while we go back

23 through it.

24          You discussed maximum willingness to

25 buy and minimum willingness to sell; is that      04:13

**Exhibit 2
Page 97**

1    right?                                                        04:13

2         A.    Maximum willingness to pay, minimum

3    willingness to sell.

4         Q.    Did you ever calculate ChromaDex's

5    minimum willingness to sell?                                 04:13

6         A.    No.

7         Q.    So you assumed that it was lower than

8    Elysium's maximum willingness to pay?

9         A.    It would have to be; otherwise, they

10   wouldn't transact.                                           04:13

11        Q.    Now, if you assumed that Elysium's

12   maximum willingness to pay would go down based on

13   its understanding of the cGMP provision?

14        A.    Let's assume that -- I don't know

15   what -- you don't need to know the exact number,            04:14

16   but let's assume for argument's sake that

17   Elysium's economics are such that they might have

18   been willing to pay up to $1,700 per kilo and at a

19   price above that, they would have been out of

20   business just for -- just as a hypothesis.  Okay?           04:14

21   Whatever their maximum willingness to pay defines

22   the upper bound of the bargaining range.

23        If we -- I don't know what ChromaDex's

24   minimum willingness to sell would have been.  It's

25   probably -- I'm sure it's north of ████ per kg.             04:14

Exhibit 2
Page 98

1    sell -- it's got to be below the prices paid by        04:17

2    Thorne, Life Cell and HPN; otherwise, they

3    would -- otherwise, they would not have been --

4    they wouldn't have done business with them.

5        Q.    But you agree that each customer gets        04:17

6    its own price based on the negotiation with that

7    customer?

8        A.    Yes.

9        Q.    And did you review any evidence about

10   the negotiations between ChromaDex and any of its       04:17

11   NR customers?

12       A.    No.

13              MR. QUINA:  Objection.

14   BY MR. ANDERSON:

15       Q.    Do you have any evidence that the             04:17

16   negotiations between ChromaDex and its NR

17   customers relied on the cGMP standard under which

18   it manufactured NR?

19              MR. QUINA:  Objection to form.

20              THE WITNESS:  I don't think it               04:17

21       really matters for my analysis whether it's

22       explicitly a point or just regarded as

23       being irrelevant.

24   BY MR. ANDERSON:

25       Q.    So your opinion is that it's                  04:18

Exhibit 2
Page 99

264

1    reviewing comparable NR customers, that they had    04:36

2    different purchase patterns, they purchased

3    different order sizes at different times?

4                 MR. QUINA:  Objection to form.

5                 THE WITNESS:  Each company doesn't    04:36

6        order the same amount in every month, no.

7    BY MR. ANDERSON:

8        Q.    Okay.  Now, in the year 2016, if you

9    go over to the Elysium volume per kilogram, it

10   says, 1,500 kilograms.    04:36

11                Why did you not include the July 1

12   invoice from Elysium for 3,000 kilograms of NR?

13       A.    I don't think that was a fair

14   comparison.  At that point -- at that point, I

15   think Elysium had grown skeptical about the nature    04:37

16   of their agreement with ChromaDex and at what

17   point they became aware that they were purchasing

18   non-cGMP-compliant material that last -- I

19   ordinarily recall was at a much lower price, I

20   think one of the reasons it was low is because at    04:37

21   that point, they had become aware that it was not

22   cGMP compliant.

23       Q.    So from your memory, Elysium was aware

24   as of June 30th, 2016, that the product it was

25   purchasing was not cGMP compliant?    04:37

Exhibit 2
Page 100

1          A.    I don't recall exactly at what point        04:37

2     they became aware.  I just think, to be

3     conservative, I'm not including that large order

4     since it's unclear to me at what point the

5     renegotiated price that Elysium obtained did or     04:37

6     did not include an understanding that there

7     were -- their belief that it was cGMP-compliant

8     material might have -- might have started to

9     erode.

10         Q.    Okay.  Was there any other reason that     04:38

11    you didn't include that $3,000 volume?

12         A.    No.

13              MR. QUINA:  Objection to form.

14              You said "$3,000."

15    BY MR. ANDERSON:                                     04:38

16         Q.    Excuse me.  3,000-kilogram order.

17              You said that -- that the June 30th

18    order, the July 1 invoice was at a lower price for

19    Elysium; is that right?

20         A.    That's right.                             04:38

21         Q.    If you included that in your

22    calculation for the Elysium price, do you know if

23    that would drop below the but-for price?

24         A.    I don't know.

25         Q.    If it did, would that entitle Elysium     04:38

1                    REPORTER'S CERTIFICATE

2              I, Cindy L. Sebo, Federally Certified

3    Shorthand Reporter, do hereby certify that the

4    deponent was duly sworn and the foregoing testimony

5    was reported by me and was thereafter transcribed

6    with computer-aided transcription; that the

7    foregoing is a full, complete, and true record of

8    said proceedings.

9              I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceedings and caption named or in any

12   way interested in the outcome of the cause in said

13   caption.

14             The dismantling, unsealing, or unbinding of

15   the original transcript will render the reporter's

16   certificate null and void.

17             In witness whereof, I have hereunto set my

18   hand this day:  August 8, 2019.

19             XXXXX  Reading and Signing was requested.

20             _____  Reading and Signing was waived.

21             _____  Reading and Signing was not requested.

22

23   _____

24   Cindy L. Sebo, RMR/CRR/RPR/CSR/CCR/CLR/RSA

25   LiveLitigation Authorized Reporter

**Exhibit 2**
**Page 102**

# Exhibit 3

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 3
Page 103

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**(WESTERN DIVISION)**

| | |
|---|---|
| ChromaDex, Inc., | Case No. SACV 16-02277-CJC(DFMx) |
| Plaintiff, | |
| v. | |
| Elysium Health, Inc. and Mark Morris, | |
| Defendants. | |
| Elysium Health, Inc., | |
| Counterclaimant, | |
| v. | |
| ChromaDex, Inc., | |
| Counter-Defendant. | |

**EXPERT REPORT OF RANDAL HEEB, PHD**

**July 26, 2019**

**Exhibit 3**
**Page 104**

█████████████████████████████████████████████         ████ By comparison, the median operating margin among companies involved in the "Drugs" industry group as of March 31, 2017 was 24.4% and 20.7% for the previous five years.[34] For the broader "Chemicals and Allied Products" industry group, the median operating margin was 16.5% as of March 31, 2017 and 16.4% for the previous five years.[35] ChromaDex's profits are therefore substantially below the average competitive returns in the industry. Such evidence is consistent with the supply of nicotinamide riboside ingredient being competitive, since the actual "monopolist" in this candidate market is unable to earn profits above the competitive level.

### III.C.1.b. A new entrant cannot price below the hypothetical monopolist

(48)    If the supply of nicotinamide riboside is a properly defined antitrust market, the price when ChromaDex is the only supplier would be the actual monopoly outcome, and the price charged by ChromaDex would be the "monopoly price." If this price is above the competitive level, then an entrant would be able to undercut this "monopoly price." Elysium's recruitment of ████ as a new entrant into the nicotinamide riboside "market" and an alternative supplier to ChromaDex provides evidence of whether the ChromaDex's price is above the competitive level. That is, we can actually test whether a hypothetical monopolist (in this case, an actual monopolist, if nicotinamide riboside ingredient were actually a proper market) is able to impose a SSNIP above a benchmark market price of competitive suppliers. If the entrant does not offer a price lower than ChromaDex, that suggests that ChromaDex was not able to impose a price above what would occur in an otherwise more competitive benchmark setting. Thus, the supply of nicotinamide riboside is not an antitrust market, and nicotinamide riboside belongs to an antitrust market that includes a larger number of products.

(49)    The data show that the entrants were not able to offer a price systematically lower than ChromaDex. As shown in Figure 4, when Elysium was purchasing nicotinamide riboside from ChromaDex, its price started at $1,300/kg, steadily declined through time, and fell as low as $800/kg by the end. The average price from ChromaDex was $913/kg. With one exception (a November 2017 purchase from ████), Elysium's transaction prices from ████ were higher than the $800/kg that prevailed by the end of the relationship between ChromaDex and Elysium. Elysium's average price from ████ was more than ████████████

(50)    These entrant prices are also higher than the price from ChromaDex after including the revenue sharing component of the agreement. That component of the ChromaDex price depended on volume

---

[33]   CDXCA_00464291.

[34]   In its 2017 Valuation Handbook, Duff & Phelps defines its "Drugs" group to include 47 companies that are "primarily engaged in medicinal chemical and botanical products, pharmaceutical preparations, in vitro and in vivo diagnostic substances, biological products, except diagnostic substances." *See* Duff & Phelps, *2017 Valuation Handbook: U.S. Industry Cost of Capital, Market Results through March 2017* (Hoboken, NJ: John Wiley & Sons, 2017), Group 283.

[35]   *See* Duff & Phelps, *2017 Valuation Handbook: U.S. Industry Cost of Capital, Market Results through March 2017* (Hoboken, NJ: John Wiley & Sons, 2017), Group 28.

**Exhibit 3**
**Page 105**

and other terms that could vary through time, but the average of Elysium's payments under that provision amounted to about an additional 10% of the per-unit price.[36] The total average price paid by Elysium for purchases from ChromaDex is nevertheless still lower than those paid by Elysium to ▇ the first new entrant.[37] This demonstrates that nicotinamide riboside prices are not supra-competitive, and hence nicotinamide riboside ingredient is not an antitrust product market.

**Figure 4. Prices paid by Elysium for nicotinamide riboside**



Source: ELY_0125945.
For scaling purposes, this figure excludes purchase order P4-17NRB, an Elysium purchase from ▇ from July 2017, which has a cost per kilogram of $9,485.39.

### III.C.1.c. A second new entrant also cannot price below the hypothetical monopolist

(51)   In addition to ▇ Elysium also obtained supply of nicotinamide riboside from a second new entrant, ▇. Elysium's average price from ▇ is $1,191/kg, and ChromaDex's average prices to Elysium are lower than those from ▇, as can be seen in Figure 4. Again, if ChromaDex were pricing above the competitive level, an entrant could have undercut their price. The fact that this did

---

[36]  See paragraph (82).

[37]  Dr. Cockburn asserts that Elysium's prices under the percentage of revenue terms ("royalties") added about $200/kg to the per-unit price. I calculate that this provision added about 10% to the total price paid by Elysium. The same conclusion holds if one accepts Dr. Cockburn's calculation.

**Exhibit 3**
**Page 106**
Page 16

not occur is evidence that the supply of nicotinamide riboside fails the Hypothetical Monopolist Test, and so is not an antitrust market.

### III.C.1.d. The supposed monopolist in nicotinamide riboside supply changed strategy to focus instead on the supplements market

(52)    If there was truly an antitrust market for the supply of nicotinamide riboside, ChromaDex could have continued its supply to customers other than Elysium (who switched their supply to ███████), and enjoyed the fruits of its near-monopoly position. Instead, ChromaDex refocused away from the supply of nicotinamide riboside to become a downstream seller of supplements. If the ingredient market were in fact an antitrust market, it would be by definition monopolizable, and there would be no need to refocus on the downstream opportunity.

## III.C.2. Why is the supply of nicotinamide riboside not a market?

(53)    The supply of nicotinamide riboside is not an antitrust market primarily because the demand for nicotinamide riboside is derived directly from the demand for the anti-aging supplements in which it is used. ChromaDex's customers demand nicotinamide riboside only for, and in direct proportion to, their sales of the supplement to end consumers.

(54)    As I discuss below, the market for these anti-aging supplements is highly competitive. If a hypothetical monopolist in the supply of nicotinamide riboside tried to raise the price of that input, it would be passed onto consumers, who would then begin to switch to alternative anti-aging supplements, making such a price increase unprofitable. Thus, the supply of nicotinamide riboside is not an antitrust market, but rather part of a larger market for anti-aging supplements.

## III.C.3. Why the excitement if supply of the nicotinamide riboside ingredient is not a market?

(55)    If supply of the nicotinamide riboside ingredient is not an antitrust market, why are ChromaDex and Elysium and the many others firms with nicotinamide riboside supplements so bullish? Simply put, anti-aging supplements comprise a huge sector, and a hit product in that space is potentially very profitable. In this sense, supplements are similar to many other types of businesses. For example, the restaurant business is notoriously competitive, characterized by large numbers of entrants and a high turnover of startups. Nonetheless, there is an apparently continuous supply of optimistic and enthusiastic entrants, with some of those entrants finding significant consumer acceptance, and achieving significant profits.

(56)    If the science evolves and proves that nicotinamide riboside is as effective as its proponents hope and expect, if nicotinamide riboside supplement makers can get the word out over their cacophonous competitors in the antiaging supplement space, if knock-offs and next generation new products do not

**Exhibit 3**
**Page 107**

Expert Report of Randal Heeb, PhD                    Highly Confidential – Attorneys' Eyes Only

## VIII.B. ChromaDex eliminated all requirements to use the NIAGEN® trademark by Elysium and other licensees

(171)   Around May 25, 2017, ChromaDex eliminated the requirement that its customers use the NIAGEN® trademark.[244] Only about 23% of the nicotinamide riboside acquired for resale to consumers from 2013 to 2018 was sold by a customer that used the NIAGEN® trademark under a licensing requirement by ChromaDex.[245] Many companies voluntarily used the NIAGEN® mark during this period even though it was not required. For example, Live Cell Research[246] was the ▓▓ largest purchaser of nicotinamide riboside, with ▓▓ of the total purchases from 2013 to 2018. Live Cell was not required to use the trademark, but chose to use the trademark on its front panel.[247] Elysium itself also never used the NIAGEN® trademark.[248] Elysium accounts for ▓▓ of the nicotinamide riboside purchased from 2013 to 2018. ChromaDex itself is the largest seller of nicotinamide riboside products (not ingredients) through sales of its TRU NIAGEN® product, with ▓▓% share of nicotinamide riboside sales. TRU NIAGEN® also uses the NIAGEN® mark, but this is ChromaDex's own trademark for its own products.

(172)   In Figure 28, I calculate the fraction of total nicotinamide riboside purchased by the largest buyers for use in anti-aging supplements from 2013 to 2018 from the three US suppliers of nicotinamide riboside (i.e., ChromaDex, ▓▓ and ▓▓ This includes the nicotinamide riboside provided by ChromaDex for its own TRU NIAGEN® product. As shown in Figure 28, the total amount of nicotinamide riboside sold by ChromaDex, ▓▓, and ▓▓ during this period is ▓▓ kgs.[249] Since no current sellers are required to use the trademark, any additional sales since 2018 would

---

[244]  Most customers subject to the restriction were notified on May 25, 2017. *See, e.g.*, CDXCA_00008535 (Barology Bar), CDXCA_00008603 (High Performance Nutrition), CDXCA_00008664 (Jarrow Formulas), CDXCA_00008789 (Petriva), CDXCA_00008674 (Life Extension/Quality Vitamins & Supplements). Thorne research was notified on June 1, 2017 (*see* CDXCA_00276221).

Will Black confirmed that ChromaDex stopped requiring use of its trademark, and ChromaDex attempted to notify it past and current customers of that change (to the extent that it was a change, as not all customers ever had that requirement). Interview with Will Black, former ChromaDex Vice President of Sales and Marketing, July 25, 2019.

A handful of small customers subject to the restriction were terminated in June, 2017. *See, e.g.*, CDXCA_00008506 (Alivebynature), CDXCA_00429966 (Evolved Organics LLC), CDXCA_00262823 (Healthy Directions, LLC), CDXCA_00262830 (Metabolic Code Enterprises), CDXCA_00276207 (ProHealth, Inc.), CDXCA_00262855 (Radishing Medical LLC), CDXCA_00262849 (Thrive Now).

[245]  From 2013 to 2018, ChromaDex sold ▓▓ kgs of NIAGEN® to third parties and used another ▓▓ kgs in production of its own TRU NIAGEN® product. Elysium purchased 8,873 kgs of nicotinamide riboside from ▓▓ and ▓▓, for a total of ▓▓ kgs. See Figure 28 for more information. *See* CDXCA_00449733, CDXCA_00464688, and ELY_0125945.

[246]  As noted earlier, Living Cell Research, Live Cell Research, and Whole Body Research are three different company names associated with the same customer number (108649) in ChromaDex's data. *See* CDXCA_00449733.

[247]  CDXCA_00200421, CDXCA_00464669.

[248]  Cockburn Report, ¶¶ 38, 99.

[249]  I understand that ▓▓ and ▓▓ did not supply nicotinamide riboside to any customers other than Elysium during this period. If ▓▓ or ▓▓ also sells nicotinamide riboside to other customers, then all the percentages in this table would be reduced proportionately with those additional sales.

**Exhibit 3**
**Page 108**
Page 76

Highly Confidential – Attorneys' Eyes Only

_____    July 26, 2019
                                    _____

Randal Heeb, PhD                    Date

Exhibit 3
Page 109
Page 93

# EXHIBIT 4

Exhibit 4
Page 110

# AMENDMENT TO SUPPLY AGREEMENT

THIS AMENDMENT is entered into this 19th day of February, 2016 (the "Effective Date" of the Amendment), by and between ChromaDex, Inc., a corporation duly organized and existing under the laws of California, having its principal place of business at 10005 Muirlands Blvd, Suite G, Irvine, CA 92618 (hereinafter referred to as "ChromaDex") and Elysium Health, Inc, a Delaware corporation, with principal offices located at 594 Broadway Suite 707, New York, NY 10012 (hereinafter referred to as "Elysium Health," and collectively with ChromaDex, the "Parties," and each, a "Party").

WHEREAS, ChromaDex and Elysium Health (the successor in interest Elysium Health LLC) are parties to a Supply Agreement, with an Effective Date of February 3, 2014 pursuant to which ChromaDex supplies NIAGEN® to Elysium Health (the "NIAGEN® Agreement");

WHEREAS, the Parties are parties to a Supply Agreement, with an Effective Date of June 26, 2014 pursuant to which ChromaDex supplies pTeroPure® (as defined below) to Elysium Health (the "pTeroPure® Agreement");

WHEREAS, the Parties have determined that it is in their mutual interest to amend the NIAGEN® Agreement in accordance with the terms of this Amendment, including, to grant Elysium Health certain exclusivity rights as set forth herein;

NOW THEREFORE, in consideration of mutual premises and mutual agreements herein contained, the Parties hereto agree to amend the NIAGEN® Agreement as follows:

1.  Amend Section 1.5 to added additional Excluded Products. The amended Section 1.5 in its entirety states:

> "1.5    "Excluded Products" means topical skincare or cosmetic products, foods or beverages, and any and all dietary supplements in the form of an energy shot or a melt (melting or dissolvable tablet or delivery system), the combination of NIAGEN® with Choline and/or Betaine and/or DMG (all forms), unless it is a multi-vitamin, the combination of NIAGEN® with collagen, nano NIAGEN®, and Finished Products with "methyl donor" claims. Additional products, may be added to this definition of Excluded Products at any time at the sole discretion of Seller upon written notice, unless the Parties have previously agreed in writing that such product may not be excluded because Buyer has demonstrated established sales of or other commitment to a similar product or product format. Notwithstanding the foregoing, in no event shall the definition of Excluded Products be altered to hinder, impair or prevent Buyer from selling dietary supplement products in tablet or capsule form for which it has been granted exclusivity hereunder."

2.  Add Section 1.16 which states:
> ""pTeroPure®" shall mean the novel and proprietary ingredient, Pterostilbene."

3.  Amend Section 3.4 to include language pertaining to Seller's ability to modify credit terms. The amended Section 3.4 in its entirety states:

> "3.4    Payments. Elysium Health shall pay ChromaDex within thirty (30) days from the date of the applicable invoice by ChromaDex to Elysium Health for all NIAGEN® purchased hereunder; provided, however, solely if Elysium Health is delinquent on previous invoices, ChromaDex reserves the right to modify such credit terms in its commercially reasonable discretion by notice in writing to Elysium Health. Elysium Health shall make all payments under the Agreement to ChromaDex in United States dollars to ChromaDex's account in a financial institution located in the United States."

30822/00100/SF/5550433.4



**EXHIBIT**
202
3/29/2019

**Exhibit 4**
**Page 111**

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY



ELY_0036835

4.    Amend Section 3.11 by deleting it and replacing it in its entirety with the following:

"3.11   Minimum Purchase Commitments.  In each of the calendar years set forth in Sections 3.11.1 and 3.11.2 below, Elysium Health will purchase the corresponding minimum quantity of NIAGEN® and/or pTeroPure® set forth below (and, for the avoidance of doubt, all purchases during the applicable calendar year of NIAGEN® under the NIAGEN® Agreement and of pTeroPure® under the pTeroPure® Agreement shall be counted to determine whether the applicable minimum quantities have been purchased):

3.11.1

(a)  2016:       the lesser of (i) 1,000kg at the then-current price, or (ii) $1,000,000, take or pay;
(b)  2017:       the lesser of (i) 2,000kg at the then-current price, or (ii) $2,000,000, take or pay;
(c)  2018:       the lesser of (i) 3,000kg at the then-current price, or (ii) $3,000,000 take or pay;
(d)  2019 and every year thereafter shall be negotiated in good faith within 90 days prior to the end of the previous calendar year.

If Elysium Heath fails to meet the applicable minimum purchase commitment set forth in this Section 3.11.1 in a calendar year, Elysium Health may, within 90 days of the end of the applicable calendar year, purchase the difference between the actual amount of NIAGEN® and pTeroPure® purchased by it during the applicable calendar year and the applicable minimum purchase requirement set forth above in this Section 3.11.1.  If Elysium Heath fails to meet the minimum purchase requirement set forth above in this Section 3.11.1, and Elysium Health does not purchase the difference as aforesaid, the Parties will use commercially reasonable efforts to negotiate in good faith revised minimum purchase commitments for the following calendar year.  If the Parties do not agree upon such minimum purchase commitments within 120 days of the end of the applicable calendar year, ChromaDex, at its sole option and discretion, and upon written notice to Elysium Health, has the right to terminate this Agreement.

3.11.2

(a)  2016:       the lesser of (i) 2,000kg at the then-current price, or (ii) $2,000,000;
(b)  2017:       the lesser of (i) 4,000kg at the then-current price, or (ii) $4,000,000;
(c)  2018:       the lesser of (i) 6,000kg at the then-current price, or (ii) $6,000,000;
(d)  2019 and every year thereafter shall be negotiated in good faith within 90 days prior to the end of the previous calendar year.

If Elysium Heath fails to meet the applicable minimum purchase requirement set forth in this Section 3.11.2 in a calendar year, Elysium Health may, within 90 days of the end of the applicable calendar year, purchase the difference between the actual amount of NIAGEN® and pTeroPure® purchased by it with respect to the applicable calendar year (including any additional purchases by Elysium Health under Section 3.11.1) and the applicable minimum purchase requirement set forth above in this Section 3.11.2.  If Elysium Heath fails to meet the minimum purchase requirement set forth above in this Section 3.11.2, and Elysium Health does not purchase the difference as aforesaid, ChromaDex, at its sole option and discretion, and upon written notice to Elysium Health, has the right to terminate Section 3.11.3.

2

30822/00100/SF/5550433.330822/00100/SF 5550433.4



**Exhibit 4
Page 112**

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

ELY_0036836

3.11.3  During the Term, ChromaDex shall not, directly or indirectly, sell, transfer or otherwise provide to any Third Party, or license or otherwise enable any Third Party to make, any products containing both Niagen and pTeroPure® (or any ingredients that are substantially similar thereto) in combination, whether in the same delivery mechanism (including tablet, capsule, melt or liquid form) or packaging or in separate form or packaging but marketed together (collectively a "Combined Product"). To the extent not prohibited by applicable law, ChromaDex shall restrict (through contracts and/or purchase orders, marketing literature, shipping documents, or similar documents used when a supply, distribution or similar agreement is not in place) its customers and distributors and require similar restrictions throughout the supply chain, from selling any Combined Product. ChromaDex shall use its best efforts to enforce such restrictions, including by (i) notifying such customer or distributor in writing of such alleged violation, (ii) conducting an investigation of such alleged violation reasonably appropriate under the circumstances, and (iii) suspending shipments of the applicable ingredients to a customer or distributor if ChromaDex becomes aware that such customer or distributor is selling such Combined Product.

5.    Except as changed, altered, amended or restructured by this Amendment, all terms and provisions of the NIAGEN® Agreement shall remain unchanged and unaffected and in full force and effect. For the avoidance of doubt, the pTeroPure®-Agreement shall remain unchanged and unaffected and in full force and effect.

6.    This Amendment may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Facsimile, Portable Document Format (PDF) or photocopied signatures of the Parties will have the same legal validity as original signatures.

3

30822/00100/SF/5550433.330822/00100/SF.5550433.4

**Exhibit 4**
**Page 113**

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

ELY_0036837

IN WITNESS WHEREOF, the Parties have executed this Amendment by their duly authorized representatives for good and valuable consideration.

**CHROMADEX, INC.**

By: _____

Name: _____

Title: _____

Date: _____

**ELYSIUM HEALTH, INC.**

By: _____

Name: Daniel Alminana

Title: Chief Operating Officer

Date: 2/19/2016

30822/00100/SF/5550433.330822/00100/SF-5550433.4

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Exhibit 4**
**Page 114**

ELY_0036838

# Exhibit 5

<u>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE**</u>
<u>**FILED UNDER SEAL**</u>

**Exhibit 5**
**Page 115**

1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
2                   SOUTHERN DIVISION

3

4    CHROMADEX, INC.,            )
                                 )
5          Plaintiff,            )
                                 )
6        vs.                     ) Case No. SACV 16-02277-CJC
                                 )
7    ELYSIUM HEALTH, INC.,       )
     and MARK MORRIS,            )
8                                )
           Defendant.            )
9    _____ )
     ELYSIUM HEALTH, INC.,       )
10                               )
           Counterclaimant,      )
11                               )
             vs.                 )
12                               )
     CHROMADEX, INC.,            )
13                               )
           Counter-Defendant.    )
14   _____ )

15

16

17       HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

18                   DEPOSITION OF

19                   RAMON PADILLA

20               NEW YORK, NEW YORK

21                 MARCH 21, 2019

22

23

24   Reported by:
     VICTORIA RUSSO
25   No. 19-76231

**Exhibit 5**
**Page 116**

1    CGMPs at a minimum?

2         A.    Correct.



Exhibit 5
Page 117

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1                C E R T I F I C A T E

2

3          I, VICTORIA RUSSO, a Certified Shorthand

4    Reporter and Notary Public within and for the States

5    of New York and New Jersey, do hereby certify:

6          I reported the proceedings in the

7    within-entitled matter, and that the within

8    transcript is a true record of such proceedings.

9          I further certify that I am not related, by

10   blood or marriage and that I am in no way interested

11   in the outcome of this matter.

12          IN WITNESS WHEREOF, I have hereunto set my

13   hand this 4th day of April, 2019.

14

15

16

17                     _Victoria Russo_

18        _____
                     VICTORIA RUSSO
19        Registration No. 01RU4849015
          Notary Public for the State of New York
20        My commission expires: October 31, 2021
          Registration No. 2347397
21        Notary Public for the State of New Jersey
          My commission expires: July 20, 2021

22

23

24

25

# Exhibit 6

## DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 6
Page 119

# Exhibit 7

<u>**DOCUMENT PROPOSED TO BE FILED UNDER SEAL**</u>

**Exhibit 7
Page 151**

# Exhibit 8

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 8
Page 235

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                      WESTERN DIVISION

 4   CHROMADEX, INC.,           )
                                )
 5           Plaintiff,         )
                                ) Case No. SACV 16-02277-CJC(DFMx)
 6        vs.                   )
                                )
 7   ELYSIUM HEALTH, INC. and   )
     MARK MORRIS,               )
 8                              )
             Defendants.        )
 9   _____)
     ELYSIUM HEALTH, INC.,      )
10                              )
             Counterclaimant,  )
11                              )
12             vs.              )
                                )
     CHROMADEX, INC.,           )
13                              )
          Counter-Defendant.   )
14   _____)

15

16

17                  HIGHLY CONFIDENTIAL

18                    DEPOSITION OF

19            THOMAS E. WILHELM, Ph.D, ESQ.

20                  NEW YORK, NEW YORK

21                    JUNE 6, 2019

22

23

24   Reported by:
     VICTORIA RUSSO
25   No. 19-79319
```

Exhibit 8
Page 236

HIGHLY CONFIDENTIAL TRANSCRIPT

```
 1   2016.
 2          Q.    Does Elysium have any of that NR from
 3   ChromaDex left in its inventory?
 4          A.    I believe there are some retained
 5   samples, yes.
 6          Q.    Other than retained samples, does
 7   Elysium have any of that Niagen left?
 8          A.    I don't believe so.
 9          Q.    And you understand Niagen to mean the
10   ChromaDex NR; is that right?
11          A.    Yes.
12          Q.    Has Elysium sold all of the ChromaDex
13   Niagen that it had in inventory?
14          A.    I believe other than the retained
15   samples, yes.
16          Q.    Did Elysium decline to sell, for any
17   reason, any of the ChromaDex Niagen that it
18   received?
19          A.    Not to my knowledge.
20          Q.    So it didn't discard any of that
21   Niagen?
22          A.    I don't believe so.
23          Q.    It put all of that Niagen into Basis
24   and sold it to consumers?
25          A.    Yes.
```

Exhibit 8
Page 237

121

```
 1              Q.    Did it sell that Basis made with
 2   ChromaDex Niagen at regular prices for Basis?
 3                   MR. SACCA:  Object to the form of the
 4         question.
 5         A.    Yes.
 6              Q.    So it didn't discount any Basis that
 7   was made with ChromaDex Niagen for any reason?
 8         A.    There would have been various
 9   discounts applied for sales or to specific customers
10   but --
11              Q.    There were no discounts applied
12   because Basis was made with ChromaDex Niagen?
13         A.    Not to my knowledge, no.
14              Q.    Would you agree that Elysium has made
15   money from selling ChromaDex's Niagen?
16                   MR. SACCA:  Object to the form of the
17         question.
18         A.    We have made money by selling Basis.
19              Q.    And you sold Basis that contains
20   ChromaDex Niagen?
21         A.    Yes.
22              Q.    And you've made money from that?
23         A.    Yes.
24              Q.    And Elysium has profited from that?
25                   MR. SACCA:  Object to the form of the
```

1          question.

2          A.     We made money from that.

3                 MR. ANDERSON:  I'd like to mark what,

4          I believe, will be 235.

5                 (Whereupon, Exhibit 235, Document

6     Bates stamped ELY_0070419-0070465, was marked for

7     identification, as of this date.)

8     BY MR. ANDERSON:

9          Q.     Dr. Wilhelm, do you recognize this

10    document?

11         A.     It appears to be the Board of

12    Directors update packet for February 2018.

13         Q.     And this is one of those packets, that

14    I asked you about earlier, prepared before those

15    board meetings?

16         A.     Yes.

17         Q.     And this was in February of 2018.  So

18    you were employed by Elysium at this time?

19         A.     I was.

Exhibit 8
Page 239

HIGHLY CONFIDENTIAL TRANSCRIPT

```
 1    run.
 2            Q.     Okay.
 3            A.     I don't know.
 4            Q.     Has Elysium ever based any pricing of
 5    Basis due to the cGMPs under which the ingredients
 6    were manufactured?
 7            A.     Our pricing has always been the same
 8    so --
 9            Q.     So Elysium -- go ahead.
10            A.     I imagine that when the initial
11    pricing was determined that, in part, took into
12    account that we believed we were getting 210, 211
13    cGMP product from ChromaDex.
14            Q.     Okay.
15                   So you said you believe that that's
16    what the pricing was based on; do you know, did
17    Elysium base its pricing of Basis on the fact that
18    ingredients were manufactured on pharmaceutical
19    cGMPs?
20            A.     I believe that they were -- the
21    pricing was determined based on us having a premium
22    product and part of that included the pharma
23    compliance.
24            Q.     Has Elysium ever charged less for
25    Basis that was made with ingredients that it knows
```

**Exhibit 8
Page 240**

256

```
 1    is manufactured under dietary supplement CGMPs?
 2         A.    Our pricing has always been the same.
 3         Q.    So that's a no to my question; they've
 4    never charged less for Basis?
 5         A.    We have always charged the same for
 6    Basis.
 7              MR. ANDERSON:  Let's go ahead and take
 8         a quick break.
 9              THE VIDEOGRAPHER:  The time is 3:48.
10         Off the record.
11              (Whereupon, a brief recess was taken.)
12              THE VIDEOGRAPHER:  The time is 4:05
13         p.m.  This begins DVD number 5.  Back on the
14         record.
15    BY MR. ANDERSON:
16         Q.    Dr. Wilhelm, before the break, we were
17    talking about pharmaceutical cGMP standards.
18              When did Elysium first discover that
19    Niagen was made according to dietary supplement
20    cGMPs?
21         A.    I believe it was in late 2016 that we
22    learned that Niagen didn't meet any cGMPs.
23         Q.    You're saying didn't meet even dietary
24    supplement cGMPs?
25         A.    Correct.
```

HIGHLY CONFIDENTIAL TRANSCRIPT

```
 1          Q.     So Elysium may the choice to continue
 2   to sell the product that it had?
 3          A.     Yes.
 4          Q.     And it sold it at the same price that
 5   it always had?
 6          A.     Correct.
 7          Q.     Did Elysium believe that that product
 8   was safe for human consumption when it sold it?
 9          A.     Yes.
10          Q.     Did Elysium incur any expenses as a
11   result of learning that Niagen was not manufactured
12   under pharmaceutical CGMPs?
13                 MR. SACCA:   Object to the form of the
14          question.
15          A.     Yes.
16          Q.     What are those expenses?
17          A.     I believe there were legal and
18   consulting expenses in relation to that.
19          Q.     Are those the only expenses that you
20   can think of?
21          A.     That's the -- those are the only
22   things that come to mind.
23          Q.     How much money in legal fees and
24   consulting fees has Elysium spent on this issue?
25          A.     I don't know for sure.
```

**Exhibit 8**
**Page 242**            269

HIGHLY CONFIDENTIAL TRANSCRIPT

```
 1              C E R T I F I C A T E

 2

 3          I, VICTORIA RUSSO, a Certified Shorthand

 4    Reporter and Notary Public within and for the States

 5    of New York and New Jersey, do hereby certify:

 6          I reported the proceedings in the

 7    within-entitled matter, and that the within

 8    transcript is a true record of such proceedings.

 9          I further certify that I am not related,

10    by blood or marriage and that I am in no way

11    interested in the outcome of this matter.

12          IN WITNESS WHEREOF, I have hereunto set my

13    hand this 9th day of June, 2019.

14

15

16    _____
             VICTORIA RUSSO
17           Registration No. 01RU4849015
             Notary Public for the State of New York
18           My commission expires: October 31, 2021
             Registration No. 2347397
19           Notary Public for the State of New Jersey
             My commission expires: July 20, 2021
20

21

22

23

24

25
```

THE SULLIVAN GROUP OF COURT REPORTERS

**Exhibit 8**
**Page 243**              348

# EXHIBIT 9

**Exhibit 9**
**Page 244**

Page 1

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                     WESTERN DIVISION

4

5    CHROMADEX, INC.,                          )
                                               )
6                          PLAINTIFF, )CASE NO.
                                       )16-02277-CJC-(DFMx)
7               vs.                            )
                                               )
8    ELYSIUM HEALTH, INC., AND                 )
     MARK MORRIS,                              )
9                                              )
                           DEFENDANTS. )
10   _____)
     AND RELATED CROSS-ACTIONS.                )
11   _____)

12

13

14         * * * ATTORNEYS' EYES ONLY * * *

15            VIDEOTAPED DEPOSITION OF

16    CHROMADEX'S 30(B)(6) WITNESS THOMAS VARVARO

17          TAKEN WEDNESDAY, MAY 8, 2019

18            LOS ANGELES, CALIFORNIA

19

20

21

22

23

24      Reported by Audra E. Cramer, CSR No. 9901
                Job No. 160326

25

**Exhibit 9**
**Page 245**

Attorneys' Eyes Only

Page 69

1    Q.   Currently -- well, from 2017 forward

2    does any company sell nicotinamide riboside as

3    an ingredient besides ChromaDex?

4    A.   Not that I'm aware of, no.

5    Q.   How did ChromaDex decide what price it

6    would charge customers for nicotinamide

7    riboside?

8    A.   We started with a list price, and each

9    and every customer was a unique negotiation that

10   depended on the customer, what that customer's

11   plans were, where they intended to go, what

12   their product was going to look like, how they

13   were going to approach the customer base, what

14   volumes they might give, and every one of those

15   was a unique discussion.

16   Q.   Who determine the list price of NR?

17   A.   I don't recall who exactly determined

18   the list price, but I know it was set probably

19   between a combination of myself and Frank Jaksch

20   and Troy Rhonemus.

21   Q.   And what factors went into setting the

22   list price?

23   A.   I think the list price was initially

24   set early on at a time when our cost of goods

25   from Grace was fairly high.

**Exhibit 9
Page 246**

Page 355

1    STATE OF CALIFORNIA          )

2    COUNTY OF LOS ANGELES        )   SS.

3

4         I, AUDRA E. CRAMER, CSR No. 9901, in and for the

5    State of California, do hereby certify:

6         That, prior to being examined, the witness named

7    in the foregoing deposition was by me duly sworn to

8    testify the truth, the whole truth and nothing but the

9    truth;

10         That said deposition was taken down by me in

11    shorthand at the time and place therein named, and

12    thereafter reduced to typewriting under my direction,

13    and the same is a true, correct and complete transcript

14    of said proceedings;

15         I further certify that I am not interested in the

16    event of the action.

17         Witness my hand this 20th day of May,

18    2019.

19

20

21

22    _____

23         AUDRA E. CRAMER

24         Reporter for the

25         State of California

# Exhibit 10

## DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Exhibit 10**
**Page 248**

# Exhibit 11

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Exhibit 11
Page 253

*Highly Confidential*
*Attorneys' Eyes Only*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## (SOUTHERN DIVISION)

ChromaDex, Inc.,

        Plaintiff,

v.

Elysium Health, Inc. and Mark Morris,

        Defendants.

Case No. 8:16-02277-CJC (DMF)

## REBUTTAL EXPERT REPORT OF DR. IAIN M. COCKBURN

JULY 26, 2019

**Exhibit 11**
**Page 254**

*Highly Confidential*
*Attorneys' Eyes Only*

## TABLE OF CONTENTS

I.     QUALIFICATIONS .......................................................................................... 1

II.    SCOPE OF ASSIGNMENT ............................................................................ 2

III.   DOCUMENTS CONSIDERED ....................................................................... 3

IV.    SUMMARY OF OPINIONS ........................................................................... 4

V.     BACKGROUND .............................................................................................. 4

   A.   The Parties ................................................................................................. 4

     1)   ChromaDex ............................................................................................ 4

     2)   Elysium ................................................................................................... 6

     3)   Mark Morris ............................................................................................ 6

   B.   The ChromaDex – Elysium Agreements ................................................. 6

     1)   NR Supply Agreement and Amendment .............................................. 6

     2)   Trademark License and Royalty Agreement ........................................ 7

     3)   Pterostilbene Supply Agreement ........................................................... 8

     4)   ChromaDex Terminates the Elysium NR Supply Agreement ............ 8

   C.   The Morris Confidentiality Agreements ................................................. 9

   D.   ChromaDex's Claimed Trade Secrets and Confidential Information ........................... 10

VI.    DEFENDANTS' ALLEGED TRADE SECRET MISAPPROPRIATION AND
      BREACHES OF CONTRACT ...................................................................... 14

   A.   Legal Framework ..................................................................................... 14

   B.   ChromaDex's Allegations Against Elysium and Morris ..................... 16

     1)   Breach of Contract Against Elysium (pTeroPure Supply Agreement) ................... 16

     2)   Breach of Contract Against Elysium (NIAGEN Supply Agreement) ..................... 17

     3)   Misappropriation of Trade Secrets against Elysium and Morris (California) ............... 18

     4)   Federal Defense of Trade Secrets Act Against Elysium and Morris ........................ 18

     5)   Breach of February Confidentiality Agreements Against Morris ....................... 19

     6)   Breach of July Confidentiality Agreement Against Morris .......................... 19

     7)   Breach of Fiduciary Duty Against Morris ........................................... 19

     8)   Aiding and Abetting Breach of Fiduciary Duty Against Elysium ..................... 20

VII.   REBUTTAL OF THE GUNDERSON REPORT ......................................... 21

   A.   Rebuttal of ChromaDex's Alleged Harm ............................................. 22

     1)   No Harm to ChromaDex's Supply Chain and Purchase Commitments ............... 23

**Exhibit 11
Page 255**

*Highly Confidential*
*Attorneys' Eyes Only*

2) No Harm to ChromaDex's Market Position and Competitive Advantage .................... 31

B.  Rebuttal of the Gunderson Report's Damages/Unjust Enrichment Calculations ......... 33

1) Aggregate Profits are not the Correct Measure of Elysium's Alleged Gains ............... 35

2) ChromaDex's Alleged Lost Profits are Unfounded ....................................... 42

3) Elysium's Avoided Costs ............................................................ 44

4) ChromaDex Unpaid Sales Invoices .................................................... 45

5) ChromaDex's "Improper" Price Discounts ............................................. 46

6) ChromaDex's Out-of-Pocket Financing Expenses ...................................... 48

7) Mark Morris's Compensation ........................................................ 48

8) Elysium's Refund/Credit for Required Trademark Royalty Payments ...................... 49

**Exhibit 11**
**Page 256**

*Highly Confidential*
*Attorneys' Eyes Only*

## I.    QUALIFICATIONS

1.    I am the Richard C. Shipley Professor in Management and Chair of the Strategy and Innovation Department at Boston University's Questrom School of Business.  In this capacity, I conduct research on the economics of innovation, with specific application to the pharmaceutical industry, and teach graduate classes on business strategy, competition, innovation, and intellectual property that focus primarily on the biopharmaceutical, software, and information technology industries.  I also serve as a Research Associate at the National Bureau of Economic Research in Cambridge, Massachusetts.  Prior to joining the faculty of Boston University, I held the VanDusen Professorship in Business Administration in the Faculty of Commerce at the University of British Columbia.  In addition to these appointments, I have also been a Visiting Scholar in the Department of Economics at Harvard University, in the Economics, Finance, and Accounting Department at MIT's Sloan School of Management, and at Melbourne Business School.

2.    I received my undergraduate degree from Queen Mary College, University of London in 1984, and my PhD in Economics from Harvard University in 1990.

3.    I have served on the Steering Committee for Government Industry Partnerships for the Development of New Technologies of the National Research Council, and on the Scientific Committee of the European Union INNOVPROD Research Network.  I have also been a co-editor or referee (an expert in the field that reviews submitted articles and recommends whether or not they should be published) for various academic journals in economics, management, and life sciences, including Science, Journal of Health Economics, Health Affairs, the British Medical Journal, Lancet, Management Science, Journal of Economics and Management Strategy, Journal of Political Economy, and American Economic Review.

4.    My research focuses on the economics of innovation, intellectual property, productivity measurement, industrial organization, and applied econometrics.  I have received major research funding from leading research institutions, including the National Science Foundation, the National Academy of Sciences, and the Alfred P. Sloan Foundation.  I am an author on nearly four dozen refereed articles in leading academic journals in both economics and management including the American Economic Review, the RAND Journal of Economics, the Journal of Industrial Economics, and Management Science.  In both 2017 and 2018, my

**Exhibit 11**
**Page 257**

publications ranked among the Top 10% of authors by all-time downloads by the Social Science Research Network (SSRN). Several of my most highly cited articles are based on research in the biopharmaceutical industry, including "Generics and New Goods in Pharmaceutical Price Indexes" in American Economic Review, "Scale, Scope, and Spillovers: Determinants of Research Productivity in the Pharmaceutical Industry" in RAND Journal of Economics, "Absorptive Capacity, Coauthoring Behavior, and the Organization of Research in Drug Discovery" in Journal of Industrial Economics, "Is the Pharmaceutical Industry in a Productivity Crisis" in Innovation Policy and the Economy, "The Market for Follow-on Biologics: How Will It Evolve?" in Health Affairs, "Finding the Endless Frontier: Lessons from the Life Sciences Innovation System for Technology Policy" in Capitalism and Society, and "Patents and the Global Diffusion of New Drugs" in American Economic Review. A complete list of my publications and research grants is included in my curriculum vitae, attached as Appendix A to this report.

5. Outside academia, I have been a consultant on business strategy to a variety of life sciences and technology companies, and on public policy to government agencies in the U.S., the U.K., and Canada. I have provided expert testimony in litigation and arbitration matters on issues such as licensing and collaboration agreements, patent damages, antitrust, class certification, brand-generic competition, Medicaid and Medicare reimbursement, off-label marketing, transfer pricing, and misappropriation of trade secrets. A list of matters in which I have testified at trial or deposition in the past four years is attached as Appendix B.

6. For this matter, I am being compensated at my standard billing rate of $850 per hour. My compensation in this matter is not in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

## II.    SCOPE OF ASSIGNMENT

7. I have been retained by Defendant and Counter-Claimant Elysium Health, Inc. ("Elysium") and Defendant Mark Morris ("Mr. Morris"), (collectively, "Defendants") to respond to the opinions and calculations set forth in the Expert Report of Lance E. Gunderson (the "Gunderson report") proffered on behalf of Plaintiff and Counter-Defendant ChromaDex, Inc. ("ChromaDex").

2

**Exhibit 11**
**Page 258**

*Highly Confidential*
*Attorneys' Eyes Only*

8.    ChromaDex alleges, *inter alia*, that Defendants both misappropriated certain trade secrets, confidential and/or proprietary information and breached certain contractual obligations under their respective agreements with ChromaDex.[1] ChromaDex asserts, through the "financial analysis, opinions, and conclusions" contained in the Gunderson report, that Elysium's and Mr. Morris's alleged bad acts have resulted in both economic losses to ChromaDex and unjust gains to the Defendants.[2]

9.    I previously submitted an expert report on behalf of Elysium in this matter on June 21, 2019 (the "Cockburn report") in which I addressed whether ChromaDex possesses market power in a relevant market, the scope and nature of ChromaDex's alleged patent misuse, the anticompetitive effects resulting from the alleged patent misuse, and whether ChromaDex's alleged patent misuse has been purged and its effects dissipated. In addition, my initial report also included calculations regarding the quantum of economic damages owed to Elysium in the event the trier-in-fact finds ChromaDex breached certain provisions of a supply agreement and its amendment (the "NR Supply Agreement") between ChromaDex and Elysium including the "most favored nation" pricing provision ("MFN Provision"), the product exclusivity provision ("Exclusivity Provision"), and the current good manufacturing provision ("cGMP Provision").

### III.    DOCUMENTS CONSIDERED

10.    In addition to the documents identified in Appendix C of my initial expert report as having been previously considered by me, I have been provided additional documents, deposition testimony, and data from both ChromaDex and Elysium related to the alleged economic damages suffered by ChromaDex's and the alleged unjust gain received by Elysium's set forth in the Gunderson report.  Appendix C lists the additional documents I have received and reviewed in forming the opinions contained in my rebuttal report.

---

[1] Fifth Amended Complaint, November 27, 2018, pp. 33 – 47.

[2] Gunderson report, p. 6.

**Exhibit 11**
**Page 259**

*Highly Confidential*
*Attorneys' Eyes Only*

11.     As stated in my initial report, the opinions expressed herein are based on information currently available to me and I therefore reserve the right to update or amend my opinions in the event additional information or testimony becomes available.

## IV.     SUMMARY OF OPINIONS

12.     The Gunderson report is a fundamentally flawed recitation of ChromaDex's legal arguments, unsupported assumptions, and aggregated financial records that concludes, unsurprisingly, that ChromaDex has suffered significant harm resulting from the various "wrongful acts" of the Defendants.

13.     Mr. Gunderson makes no attempt, and therefore fails to establish in any meaningful way, the required causal nexus between each of the alleged misappropriations, disclosures, and breaches that constitute these "wrongful acts" and any effect or harm to ChromaDex or unjust benefit to either Elysium or Mr. Morris that results.

14.     As such, Mr. Gunderson has not and, given the contradictory facts available to him, cannot establish that his bundled collection of "wrongful acts" have provided any unjust economic benefit to either Elysium or Mr. Morris or any actual loss to ChromaDex.

## V.     BACKGROUND

### A. The Parties

#### 1) ChromaDex

15.     Plaintiff and Counter-Defendant ChromaDex is a publicly traded company headquartered in Irvine, CA that describes itself as a "consumer-facing biotechnology company devoted to improving the way people age."[3] Prior to 2017, ChromaDex characterized itself as a "natural products company" whose core business activity was "to discover, acquire, develop and

---

[3] *See* http://investors.chromadex.com/phoenix.zhtml?c=212121&p=irol-newsArticle&ID=2384497.

**Exhibit 11
Page 260**

*Highly Confidential*
*Attorneys' Eyes Only*

commercialize" new ingredient technologies that address "the dietary supplement, food, beverage, skin care and pharmaceutical markets."[4]

16. I understand that over the 2011 – 2014 timeframe, ChromaDex acquired exclusive, worldwide rights to certain patents on products and methods related to nicotinamide riboside ("NR") in the field of dietary supplements, food additives, drugs, sports nutrition, skin care/cosmetics, and therapeutics under license agreements with the Dartmouth College ("Dartmouth"), Cornell University ("Cornell"), and Washington University ("Washington").[5] In acquiring these exclusive rights, ChromaDex sought to, and did, establish and control the commercial supply of the NR ingredient. In fact, ChromaDex has repeatedly characterized itself as the "only company that has been able to successfully manufacture NR at commercial scale", having manufactured and supplied the NR ingredient since 2013 under various manufacturing, supply, and license agreements with W.R. Grace & Co.-Conn ("Grace"), a specialty chemicals and materials manufacturing company.[6]

17. ChromaDex began licensing and supplying its NR ingredient to third party customers for use in downstream dietary supplement products beginning in July 2013 and has distributed its NR ingredient to 45 customers, many under the terms and conditions set forth their respective NR supply agreements.[7]

---

[4] ChromaDex Corporation Annual Report, Form 10-K for the fiscal year ended December 31, 2016, p. 2 (ChromaDex Form 10-K (2016), p. 2.) In addition to its core ingredients technology segment, ChromaDex has previously identified additional business segments to include core standards and contract services, chemistry and analytical testing services, and regulatory consulting.

[5] CDXCA_00142505 – 516; CDXCA00009970 – 997; CDXCA00160556 – 581. In May 2014, ChromaDex and Dartmouth executed a second patent license agreement in which ChromaDex was granted the exclusive right to develop and commercialize NR products in the field of human and animal therapeutics (CDXCA00071302 – 311). A summary of the intellectual property licensed by ChromaDex under these agreements (including a listing and brief description of the relevant U.S. patents and their international filings and issued patents) has been included in the company's publicly-available March 2019 investor presentation.

[6] CDXCA_00154104 – 106. "Before ChromaDex started manufacturing commercial quantities of NR back in 2013, it was difficult to find milligrams NR for even basic research." *See also* CDXCA_00082685 – 702; CDXCA_00131796 – 815; CDXCA_00205039 – 43; and CDXCA_00303015 – 16.

[7] Deposition of Frank Jaksch dated April 12, 2019 at 100:19 – 22, CDXCA_00000037. ChromaDex Form 8-K (Q2:2013), Exhibit 99.1. ChromaDex sales data indicates that 45 entities received NR ingredient shipments from ChromaDex through Q2:2018. *See also* Deposition of Rob Fried dated April 17, 2019 at 55:6 – 7.

**Exhibit 11**
**Page 261**

*Highly Confidential*
*Attorneys' Eyes Only*

### 2) Elysium

18.   Defendant and Counterclaimant Elysium was founded in 2013 by Leonard Guarente, Novartis Professor of Biology at the Massachusetts Institute of Technology, Eric Marcotulli, and Dan Alminana.[8] In February 2015, Elysium launched Basis, a direct-to-consumer dietary supplement containing both NR and pterostilbene that works by "bringing your levels of NAD+ back up and activating sirtuins – slowing a key mechanism of aging in your cells."[9] Elysium markets and sells its Basis product to consumers at a price of $60 per bottle paid monthly; a 6-month prepaid plan at $45 per bottle; and a $40 per bottle option for a one year prepaid plan.[10]

### 3) Mark Morris

19.   Mr. Morris is the Vice President of Research and Development at Elysium. Prior to joining Elysium, Mr. Morris worked as a Technical Sales Representative at ChromaDex from 2007 until 2009. Mr. Morris returned to ChromaDex in January 2011 in his previous capacity and was later promoted to Director of Ingredient Sales.[11] On November 25, 2013, Mr. Morris was promoted into the position of Vice President of Sales and Marketing and in 2016 he was elevated to Vice President of Business Development.[12] I understand that on July 15, 2016, Mr. Morris again terminated his employment at ChromaDex and joined Elysium on July 18, 2016.[13]

### B. The ChromaDex – Elysium Agreements

### 1) NR Supply Agreement and Amendment

20.   On February 3, 2014 Elysium and ChromaDex entered into an agreement under which ChromaDex agreed to supply its branded NR ingredient ("Niagen"), to Elysium ("NR

---

[8] Deposition of Dan Alminana dated March 29, 2019 at 12:9 – 18, 25 ("Alminana deposition"); https://biology.mit.edu/profile/leonard-p-guarente/.

[9] https://www.elysiumhealth.com/en-us/basis.

[10] https://www.elysiumhealth.com/en-us/plans-pricing.

[11] Fifth Amended Complaint, November 27, 2018, p. 5.

[12] *Id*, pp. 5 – 6.

[13] *Id*, p. 7, ELY_0067687.

**Exhibit 11
Page 262**

*Highly Confidential*
*Attorneys' Eyes Only*

agreement").[14] Under the terms of the NR supply agreement, Elysium agreed to pay a "Maximum Price" of $1,300 per kilogram for the NR ingredient, subject to certain minimum purchase commitments.[15] Additional terms under this included the grant to Elysium of a "most favored nations" pricing provision which entitled Elysium to the lowest per-kilogram price at which ChromaDex supplies NR to a third-party customer, provided Elysium "purchases equal volumes or higher volumes than the Third Party."[16] As part of this MFN Provision, I understand that ChromaDex was obligated to promptly provide Elysium with "any refund or credit" of its overpayment "with effect from the date of the applicable sale to such Third Party."[17] The NR agreement included an initial term of three (3) years from the effective date and would continue to renew for additional one (1) year periods until terminated by either party with 90 days written notice, in the event of a material breach, or bankruptcy.[18]

21.    I understand that on February 19, 2016, ChromaDex and Elysium amended certain terms of their NR supply agreement including the grant to Elysium of exclusivity rights over the manufacture and sale of "any products containing both Niagen and pTeroPure" or any substantially similar ingredients (the "Exclusivity Provision") in exchange for higher minimum purchase commitments, and a more expansive set of excluded products.[19]

### 2)  Trademark License and Royalty Agreement

22.    Concomitant with the execution of its NR supply agreement, ChromaDex and Elysium entered into a separate Trademark License and Royalty Agreement ("TLA") under which Elysium was required to accept a "worldwide, non-exclusive, non-transferable, revocable license to use and display the ChromaDex Marks solely to market, advertise, promote, sell and distribute Qualifying Products and to use the ChromaDex Marks on labeling, advertising, promotional

---

[14] CDXCA_00061424 – 434.

[15] *Id.* at 426.  Under the terms of the supply agreement, Elysium was excluded from certain fields (e.g. doctor channel and Multi-Level Marketing channel.)

[16] CDXCA_00061424 – 434.

[17] *Id.*

[18] *Id.*

[19] CDXCA_00061443 – 446.

**Exhibit 11
Page 263**

*Highly Confidential*
*Attorneys' Eyes Only*

collateral materials and websites in accordance with the terms of this Agreement, and the Brand Usage Guidelines."[20]

23.  Under the terms of the TLA, Elysium was required to pay a base royalty rate of 5% on net sales of its Basis product, in addition to a potential increase to this base royalty rate, as compensation to ChromaDex for a license to the ChromaDex trademarks even though Elysium had specifically negotiated around the use of these marks.[21]  Based on information summarized in ChromaDex royalty reports, Elysium's total trademark royalty obligation under the terms of its TLA was approximately $496,000 through Q2:2016.[22]

### 3) Pterostilbene Supply Agreement

24.  On June 26, 2014, Elysium and ChromaDex executed a supply agreement under which ChromaDex agreed to supply its pterostilbene ingredient ("PT"), to Elysium for use in its NR-based Basis dietary supplement product.[23]  Under the terms of the agreement, Elysium agreed to a purchase price of $1,000 per kilogram with an agreement to "negotiate in good faith price reductions based on volumes purchased."[24]

### 4) ChromaDex Terminates the Elysium NR Supply Agreement

25.  On November 1, 2016, ChromaDex notified Elysium of its decision to terminate the parties' NR supply agreement effective as of February 3, 2017.[25]

26.  I understand that around the time of this notification, ChromaDex began discussions with Rob Fried regarding an agreement with Healthspan Research LLC ("Healthspan") to "[d]evelop a new Direct sell to Consumer (DTC) brand under Healthspan ("HS") [sic] that features a single entity nicotinamide riboside (NR) as the product strategy and ChromaDex ("CDX"), as the

---

[20] CDXCA_00061402 – 408.

[21] CDXCA_00061402 – 408, 30(b)(6) Deposition at 74:3 – 6.

[22]  CDXCA_00006939; CDXCA_00006948; CDXCA_00059349; CDXCA_00100914; CDXCA_00101783; and CDXCA_00007068. Elysium's base royalty rate increased 0.5% to 5.5% beginning in Q1:2016 based on Elysium's effective NR price in 2015.

[23] ELY_0036857 – 864. The agreement contained a one (1) year term from the effective date, continuing in successive one (1) year automatic renewals unless otherwise terminated by one of the parties upon ninety (90) days prior written notice.

[24] *Id.*

[25] CDXCA_0000749.

**Exhibit 11**
**Page 264**

*Highly Confidential*
*Attorneys' Eyes Only*

creator of Niagen."[26] In weighing its DTC channel development options, Frank Jaksch suggested:

> "If we are going to seriously consider an option where we would restructure ChromaDex, which is an ingredient company, into a consumer products company, ie. Be our own Elysium, I think we need to see a very detailed business plan outlining what this strategy would look like."[27]

I understand that one "key action" that would be undertaken to restructure ChromaDex was the phasing out of ChromaDex's (then) six DTC customers of its NR ingredient with revenue loss expected to be $12.2 million in 2017 and $18-25 million in 2018.[28]

27.    In March 2017, ChromaDex announced as part of its "strategic shift from an ingredient and testing company to a global, consumer focused nutraceutical company", it has acquired the internet-based, direct-to-consumer business of Healthspan with the goal to "commercialize TRU NIAGEN as a consumer brand, launching the consumer product in 2017."[29] In the company's 2017 10-K filing with the U.S. Securities and Exchange Commission, ChromaDex announced it would reduce the number of its NR supply agreements to just three (3) as of March 2018.[30]

### C.  The Morris Confidentiality Agreements

28.    I understand that while previously employed at ChromaDex, Mr. Morris entered into two agreements: the Receipt & Acknowledgement of Employee Handbook (the "February Agreement") signed and acknowledged on February 26, 2016 and the ChromaDex, Inc. Confidentiality and Non-Solicitation Agreement (For New Employees) (the "July Agreement") that he signed on his last day of employment at ChromaDex (July 15, 2016).[31] I have been advised that under the terms of these agreements, Mr. Morris agreed not to "disclose and/or improperly use ChromaDex's trade secrets, confidential and/or proprietary

---

[26] CDXCA_00173447 – 452.

[27] CDXCA_00271848 – 850.

[28] CDXCA_00263064 – 077.

[29] ChromaDex Form 10-K (2017), p. 2.

[30] *Id.*, pp. 2 and 10.

[31] Exhibit A; Exhibit B.

**Exhibit 11
Page 265**

information."[32] I understand ChromaDex alleges that during and after his employment at ChromaDex, Mr. Morris violated his confidentiality agreements by wrongfully disclosing ChromaDex's trade secrets, confidential and/or proprietary information, and helping Elysium solicit a former ChromaDex employee.[33] In addition, ChromaDex alleges Mr. Morris specifically shared internal presentation slides with Elysium, sent information pertaining to its customer Live Cell to Elysium, and improperly uploaded the Ingredient Sales Spreadsheet to Elysium's server.[34] ChromaDex alleges that it has suffered damages as a result of Mr. Morris's various breaches and believes it is entitled to recovery in the form of Mr. Morris's alleged unjust gains.[35]

29.    However, Defendants contend that at least some of the purported trade secrets, confidential and/or proprietary information that Mr. Morris is alleged to have misappropriated was already publicly available or otherwise disseminated by ChromaDex in such a manner as to render it not properly characterized as trade secrets and not confidential pursuant to the NR and PT supply agreements.[36]

### D.  ChromaDex's Claimed Trade Secrets and Confidential Information

30.    As repeated throughout the Gunderson report, ChromaDex alleges that Elysium and Mr. Morris have misappropriated several of the company's claimed trade secrets, confidential and/or proprietary information (i.e. Mr. Gunderson's ubiquitous "wrongful acts"), the result of which has allegedly harmed ChromaDex and unjustly benefitted Defendants.  As a threshold matter, I observe that the Gunderson report does not appear to distinguish between alleged trade secrets, confidential information, or proprietary information and instead treats those three categories as one.

---

[32] Gunderson report, p. 38.

[33] *Id.*, p. 54.

[34] *Id.*, p. 55, 176-179.

[35] *Id.*, p. 57.

[36] Deposition of Thomas C. Varvaro dated April 2, 2019 at 74:21 – 75:5 ("Varvaro deposition")

**Exhibit 11
Page 266**

*Highly Confidential*
*Attorneys' Eyes Only*

31.  Based on my review of both the case pleadings and the Gunderson report, I have identified what I believe to be a comprehensive list of the various documents and other information which ChromaDex claims are its trade secrets and confidential information, including:

    a.  NR Study Data[37];

    b.  NRCl Analytical Method[38];

    c.  pTeroPure GRAS Report[39];

    d.  Ingredient Sales Spreadsheet (and information contained therein)[40];

    e.  ChromaDex's NR █████/kg. price paid to Grace[41];

    f.  ChromaDex's research and development work regarding different salts for use in manufacturing NR[42];

    g.  ChromaDex's research and development work with Genomatica[43];

    h.  pTeroPure Specifications[44];

    i.  NIAGEN Specifications[45];

    j.  NIAGEN Investigator's Brochure[46]

    k.  ChromaDex NR and Pterostilbene Presentations[47]; and,

    l.  NR GRAS Dossier[48].

32.  While I understand that the opinions expressed both in this report and in the Gunderson report are proffered under the assumption that ChromaDex has met its burden with respect to establishing its claims, this supposition does not exhaust the legal requirement of conducting an objective analysis into the causal effect, if any, and subsequent economic consequences, if any, attributable to the misappropriation and/or disclosure as to <u>each</u> of the trade secrets or the

---

[37] ELY_0061094.

[38] ELY_0022340.

[39] ELY_0024180-208.

[40] ELY_00108750, ELY_008567, ELY_0046025.

[41] ELY_0085617, Chat No. 4243.

[42] ELY_0086517.

[43] ELY_0107391.

[44] CDXCA_00071689.

[45] CDXCA_00071573.

[46] ELY_0023715.

[47] ELY_0037480, ELY_0094668.

[48] ELY_0058829-929.

**Exhibit 11**
**Page 267**

confidential/proprietary information of the plaintiff. I believe that this requirement is especially pertinent in the current matter given the number, source, and disparate nature and value of the information claimed by ChromaDex. Simply put, the exercise here should show both (a) how use of this information <u>caused</u> something to happen (i.e. resulted in some measurable change) and (b) how the direct effect of this change resulted in a measurable harm to one or benefit to another. With respect to these claimed trade secrets and other confidential information, I make the following general observations:

    a. The few disclosures of certain price, purchase volume, and the "sales goals" of select ChromaDex customers, primarily Live Cell, reflect only a snapshot of such information at a single point in time. Given its limited scope as well as its questionable value as actionable, strategic business information, there is simply no evidence, and Mr. Gunderson cites to none, indicating that Elysium used, let alone was unjustly enriched by, knowledge or possession of information with such limited practical value.[49]

    b. ChromaDex itself previously (or has subsequently) disclosed publicly a number of the same trade secret and confidential documents that it asserts against Elysium. For example, while ChromaDex asserts that Elysium sent both its confidential Pterostilbene and NR Specification documents to its non-ChromaDex NR manufacturer, Frank Jaksch conceded that each of these specification documents had been publicly disclosed by ChromaDex prior to the alleged misappropriation.[50] So too did ChromaDex publicly disclose the NRCl Processes. I further understand

---

[49] The absence of objective evidence showing if or how 1) Elysium actually used this particular information and 2) how its alleged use caused some measurable harm to ChromaDex and/or gain to Elysium leaves Mr. Gunderson undeterred. He asserts that this very information allowed Elysium to "construct a plan to obtain a market advantage over its competition, as well as ChromaDex", that it provided Elysium a "competitive advantage against its competitors", and that enabled Elysium when "undermining ChromaDex's supply relationship with Grace and soliciting new investors." *See* the Gunderson report, pp. 45, 48.

[50] Jaksch deposition, 164:13 – 167:6. See http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MzQ1NjIwfENoaWxkSUQ9LTF8VHlwZT0z&t=1&cb=6360516889 84896349

**Exhibit 11**
**Page 268**

that the NRCl Analytical Method is also publicly available, as is much of the information contained in the NR Presentation, and the Pterostilbene Presentation.[51]

   c.   With respect to the usefulness or value of ChromaDex's protected information to teach, instruct, or otherwise short-cut the development time or cost to manufacture the NR ingredient, I understand that with respect to its NR specifications, ███████ ███████████ testified this alleged trade secret/confidential information was "not really" helpful.[52]

33.   Mr. Gunderson's report is replete with unsupported assertions as to the critical importance of its alleged trade secrets, confidential and/or proprietary information to "obtain investors for Elysium's Series B financing of $20 million", "undermine ChromaDex's exclusive license to NR patents from Dartmouth", and provide Elysium with an "unfair competitive advantage to develop an alternative non-ChromaDex supplier" (among several others.)[53]   Important questions such as "How so?", "By how much?", "To what extent?", "For how long?" and, fundamentally, "Was it even used?" are tellingly unaddressed or unanswered by Mr. Gunderson.

34.   Accusation is not evidence and supposition is not proof; Mr. Gunderson bundles this set of unconnected, disparate information into a single, comprehensive assertion that he repeatedly imposes on Elysium to exaggerate both ChromaDex's alleged losses and Defendants' alleged gains.

---

[51] CDXCA_00179402-404 (email with attached poster showing that ChromaDex disclosed this poster publicly when it was "presented at the FASEB meeting on Mitochondrial Biogenesis and Dynamics in Health, Disease and Aging in West Palm Beach Florida MAY 17-22", 2015, and indicating that the poster would be presented at a conference in Germany on August 9-14, 2015;
https://www.docdroid.net/AJLBuaW/cdxa-atr-8292-00-ord79140-nicotinamide-riboside-chloride.pdf;
https://www.fda.gov/files/food/published/GRAS-Notice-000635--Nicotinamide-riboside-chloride.pdf;
https://www.lifeextension.com/magazine/2014/11/the-youth-restoring-benefits-of-nad/page-01?p=1.
http://d18rn0p25nwr6d.cloudfront.net/CIK-0001386570/bb257127-d60c-433d-9a5a-712898864580.pdf.  I have been advised that much of the information contained in the Pterostilbene Presentation came from publicly available studies.

[52] Deposition of ███████████ dated November 29, 2018 at 41:3 – 15.

[53] Gunderson report, pp. 65 – 66, 49.

**Exhibit 11**
**Page 269**

*Highly Confidential*
*Attorneys' Eyes Only*

## VI.   DEFENDANTS' ALLEGED TRADE SECRET MISAPPROPRIATION AND BREACHES OF CONTRACT

### A.  Legal Framework

35.   I understand that state law trade secret damages in California are governed by California Code, Civil Code - CIV § 3426.3:

   a.  A complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

   b.  If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

   c.  If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b).

36.   I understand that section (a) requires damages for an actual loss be "caused by" the misappropriation.  Put another way, the plaintiff must "sufficiently show[] <u>a causal link</u> between a potential misappropriation of a trade secret and the alleged damages."[54]

37.   I understand that "Damages … need to rest on a 'reasonable basis.'"[55] To be reasonable, damages must also be apportioned among the allegedly misappropriated trade secrets.  In *O2 Micro Intern. Ltd. v. Monolithic Power Systems, Inc,* the plaintiff's expert at trial only presented damages testimony on the misappropriation of all 12 alleged trade secrets as a whole, but gave no testimony on the damages sought for misappropriation of any one of the trade secrets or on a subset of them.  The jury found fewer than all 12 of the trade secrets were misappropriated, and as a result, the Court found that the "expert testimony regarding damages for misappropriation of all trade secret [sic] was useless to the jury" because "[t]he jury was then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages."[56]

---

[54] *Science of Skincare, LLC v. Phytoceuticals, Inc.*, CV 08-4470 ODW (SSX), 2009 WL 2050042, at *5 (N.D. Cal.) (emphasis added).

[55] *O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1076 (N.D. Cal. 2005).

[56] *Id.*, 399 F.Supp.2d at 1077.

**Exhibit 11**
**Page 270**

*Highly Confidential*
*Attorneys' Eyes Only*

38.    One California case sheds some light on the principle that damages experts must connect the damage with each alleged harm.   In *Hilderman v. Enea Teksci, Inc*., the counterclaim-defendant Enea (the trade secret owner) alleged that the plaintiff Hilderman misappropriated its trade secrets including (1) a list of employee e-mail addresses, (2) a list of the names of fifteen specific customers and (3) a training manual. Enea's expert calculated the value of its trade secrets to be $13.5 million, which was the value of the goodwill allocated in the purchase price Enea had paid a few years earlier for the subsidiary company that owned the trade secrets, less 25% to account for a decline in sales since Enea's purchase of the subsidiary. Enea's expert reasoned that this transaction was indicative of the fair market value of the intangible assets at issue because, being a service business, Enea's customer list and employee list constituted the bulk of its general intangibles.[57]

39.    The Court disagreed, noting that the Enea's expert "did not conduct an analysis or render an opinion regarding (1) any actual losses suffered by [Enea] as a result of [Hilderman's] alleged conduct; or (2) any profit derived by [Hilderman] as a result of obtaining clients, employees, or contracts as a result of the alleged misappropriation of trade secret or confidential information."[58] The Court found "[Enea's expert's] opinion is unreliable because it rests on a number of unfounded assumptions. Most significantly, [Enea's expert] assigns the entire 'Goodwill' value of $13,550.362 to the trade secrets allegedly misappropriated by Counter-Defendants."

40.    The Court explained that Enea's expert had no basis in fact for his conclusion that "since [the Enea subsidiary] was a 'service' business, [the Enea subsidiary's] customer list and employee list constituted the 'bulk' of [the Enea subsidiary's] general intangibles."[59] The Court noted that while testifying, Enea's expert "conceded that the general intangibles in this case probably included internally developed good will (reputation in the community), going-concern value, customer relationships, and a trained and assembled workforce. Indeed, [Enea's expert] admitted that a trained and assembled workforce would be worth more than a list of employee

---

[57] *Hilderman v. Enea Teksci, Inc*., 05CV1049 BTM (AJB), 2010 WL 546140, at *1 (S.D. Cal. Feb. 10, 2010).

[58] *Id.*

[59] *Id.*

**Exhibit 11**
**Page 271**

*Highly Confidential*
*Attorneys' Eyes Only*

e-mails and that there was a 'great deal of value' in it."[60]  The Court further noted that Enea's expert "did not have enough knowledge … to form an opinion as to whether the 'Goodwill' included other categories of intangible assets, such as marketing and promotional materials or preexisting contracts."[61]

41.    The Court explained that Enea's expert "erroneously equated the value of the e-mail list and customer list with the value of Enea's customer and employee relationships [and that] the value of the e-mail list and the customer list is not equal to the value of all of Enea's customer and employee relationships," and that similarly, Enea's expert "did not have knowledge of any clients or contracts obtained by Counter-Defendants to the detriment of Enea."[62]  As a result, the Court concluded that Enea's expert's opinion "is not based on sufficient facts or data and is entirely speculative," and excluded his report.

### B. ChromaDex's Allegations Against Elysium and Morris

42.    ChromaDex asserts eight claims for relief in its Fifth Amended Complaint: (1) Breach of Contract Against Elysium (pTeroPure Supply Agreement), (2) Breach of Contract against Elysium (NIAGEN Supply Agreement), (3) Misappropriation of Trade Secrets against Elysium and Morris (California), (4) Federal Defense of Trade Secrets Act Against Elysium and Morris, (5) Breach of February Confidentiality Agreements Against Morris, (6) Breach of July Confidentiality Agreement Against Morris, (7) Breach of Fiduciary Duty Against Morris, and (8) Aiding and Abetting Breach of Fiduciary Duty Against Elysium.

### 1)  Breach of Contract Against Elysium (pTeroPure Supply Agreement)

43.    ChromaDex alleges that Elysium did not pay for the pterostilbene it received from the June 30, 2016 purchase order and hence breached the supply agreement. ChromaDex alleges this harmed ChromaDex and that the damages amount to $580,750 plus interest.[63]

---

[60] *Id.*

[61] *Id.* at 2.

[62] *Id.* at 3.

[63] Fifth Amended Complaint, November 27, 2018, p. 33.

**Exhibit 11**
**Page 272**

*Highly Confidential*
*Attorneys' Eyes Only*

44.     ChromaDex further alleges that Elysium broke the confidentiality provisions in the agreement. According to ChromaDex, Elysium allegedly shared the pTeroPure GRAS report, which was labeled "confidential", to its regulatory consultants for the purpose of preparing its NDI submission to FDA regarding a pterostilbene manufactured by an entity other than ChromaDex, which ChromaDex claims allowed Elysium to reduce its "costs in money, time, and other resources related to the development of its own regulatory submission establishing the safety of pterostilbene for human consumption."[64]  ChromaDex additionally alleges it was "damaged by being denied a return on its investment in developing the pTeroPure GRAS Report." [65]

45.     ChromaDex alleges that Elysium disclosed the Pterostilbene Specifications to possible manufacturers which ChromaDex argues could help Elysium develop a supply of pterostilbene that would "compete against ChromaDex's pTeroPure."[66]

### 2)  Breach of Contract Against Elysium (NIAGEN Supply Agreement)

46.     ChromaDex asserts that Elysium breached the NIAGEN Supply Agreement in five (5) ways:

  i.   ChromaDex alleges Elysium received NR from the June 30, 2016 purchase order and Elysium did not pay for the NR they received. ChromaDex claims $2,402,600 plus interest in damages for this breach of contract.[67]

  ii.  ChromaDex alleges that the supply agreement prohibits Elysium from using and disclosing confidential information. ChromaDex asserts that Elysium wrongfully disclosed four confidential documents.

  iii. ChromaDex alleges that Elysium disclosed the NRCl analytical method and NR Specifications in its effort to develop a competing source of NR.

  iv.  ChromaDex alleges Elysium disclosed and plagiarized, ChromaDex's "NIAGEN Investor's Brochure."

  v.   ChromaDex alleges that Elysium shared ChromaDex's NR Study Data "before the data became public and without ChromaDex's authorization."[68]

---

[64] *Id.*, p. 34.

[65] *Id.*.

[66] *Id.*, p. 35.

[67] *Id.*, p. 35.

[68] *Id.*, p. 37.

**Exhibit 11
Page 273**

*Highly Confidential*
*Attorneys' Eyes Only*

### 3)  Misappropriation of Trade Secrets against Elysium and Morris (California)

47.    ChromaDex alleges that in May 2016, Mark Morris, at the time a ChromaDex employee, breached his confidentiality agreements with ChromaDex when he texted to Elysium a copy of the purchasing history of a ChromaDex customer called Live Cell.[69] ChromaDex alleges that this information was extracted from ChromaDex's Ingredient Sales Spreadsheet.

48.    ChromaDex alleges that Morris also misappropriated ChromaDex's entire Ingredient Sales Spreadsheet and uploaded it to Elysium's server.[70] ChromaDex alleges that Elysium induced Morris to misappropriate this information when it saved the information and did not delete it.[71] ChromaDex alleges that the information in this spreadsheet gave Elysium detailed information about its competitors' purchasing history and gave Elysium an unfair advantage in negotiations with ChromaDex.[72]

49.    ChromaDex alleges that it was harmed and Elysium was unjustly enriched by the actions of Mr. Morris and Elysium.[73]

### 4)  Federal Defense of Trade Secrets Act Against Elysium and Morris

50.    ChromaDex alleges violation of the Federal Defense of Trade Secrets Act Against Elysium and Morris:

> ChromaDex alleges Elysium and Morris undertook "a deliberate plan to engage in the conduct alleged in this complaint and incorporated into this cause of action" in violation of the Federal Defense of Trade Secrets Act, presumably for the actions ChromaDex alleged for violations of California trade secret law. ChromaDex further alleges that "Elysium and Morris acted willfully and maliciously when they misappropriated ChromaDex's trade secret information so as to justify an award of exemplary damages under 18 U.S.C. § 1836(b)(3)(C)." [74]

---

[69] *Id.*, p. 38

[70] *Id.*, p. 39.

[71] *Id.*, p. 50.

[72] *Id.*

[73] *Id.*

[74] *Id.*, p. 41.

**Exhibit 11**
**Page 274**

*Highly Confidential*
*Attorneys' Eyes Only*

### 5)  Breach of February Confidentiality Agreements Against Morris

51.   ChromaDex alleges that Morris breached a confidentiality agreement he signed on February 26, 2016 in which he pledged that he would not disclose trade secrets, confidential and/or proprietary information. ChromaDex alleges Morris breached that agreement when he (a) used his ChromaDex-issued cell phone to send Elysium confidential and trade secret information, (b) kept copies of ChromaDex's confidential and proprietary information after he terminated his employment with ChromaDex and (c) disclosed ChromaDex's confidential and proprietary information, such as the Ingredient Sales Spreadsheet and other ChromaDex documents, to Elysium after his employment with ChromaDex terminated, all for the purposes of helping Elysium and harming ChromaDex.[75]

### 6)  Breach of July Confidentiality Agreement Against Morris

52.   ChromaDex alleges that Morris breached a confidentiality agreement he signed on July 15, 2016 in which he pledged that he would not disclose trade secrets, confidential and/or proprietary information. ChromaDex claims Morris breached that agreement when he (a) used, and permitted Elysium to use, ChromaDex items furnished to Morris by ChromaDex such as computer stored information and disks, for purposes other than performing his employment duties, (b) failed to tender all ChromaDex items and reproduction thereof to ChromaDex upon termination of his employment, (c) conveyed a ChromaDex trade secret, the Ingredient Sales Spreadsheet, into Elysium's possession after terminating his employment.[76]

### 7)  Breach of Fiduciary Duty Against Morris

53.   ChromaDex alleges that Mark Morris, as an officer of ChromaDex who participated in the management of the company, had a fiduciary duty to ChromaDex which he breached when he (a) manipulated of ChromaDex to take actions advantageous to Elysium and to disadvantage ChromaDex in contract negotiations, (b) lied to ChromaDex about his intent to work for Elysium, (c) recruited of Ryan Dellinger on behalf of Elysium, (d) withheld information about Elysium's intent to stockpile NIAGEN and pTeroPure, withheld payment from ChromaDex,

---

[75] *Id.*, p. 42.

[76] *Id.*, pp. 43-45.

**Exhibit 11**
**Page 275**

and develop competing supplies of NR and pterostilbene, despite knowing that ChromaDex had several patents over the production of NR and synthetic pterostilbene, (e) lied regarding his return of all of ChromaDex trade secrets and confidential information before the termination of his employment with ChromaDex, and (f) withheld information about Elysium's outreach to ChromaDex's contractual partners in an effort to undermine ChromaDex.[77]

54. ChromaDex alleges that Mr. Morris was unjustly enriched by his breach of fiduciary duty.[78] ChromaDex alleged that it was damaged by Mr. Morris' breach of fiduciary duty by being put at a disadvantage in contract negotiations with Elysium, by conveying extraordinarily large product orders into Elysium's possession without taking measures to ensure that Elysium would pay, by not knowing of Elysium's competing development of NR and pterostilbene, and Elysium's likely patent infringement with regard to its development of a competing source of NR, by not taking measures to protect the confidentiality of the trade secrets and confidential information in Morris's possession, by losing sales of NIAGEN it otherwise would have made.[79]

### 8) Aiding and Abetting Breach of Fiduciary Duty Against Elysium

55. ChromaDex alleges Elysium knew or should have known that Morris owed a fiduciary duty to ChromaDex as a ChromaDex officer who participated in the management of ChromaDex, and that Elysium aided and abetted Morris's breach of fiduciary duty when it encouraged and induced Morris to, and intended that he, breach his fiduciary duty through several acts including supporting Morris's acts that harmed ChromaDex and aided Elysium, offering Morris employment when Morris agreed to give Elysium ChromaDex's trade secret and confidential information, persuading Morris to lie to ChromaDex about his plans for employment with Elysium, and acting to keep Morris's breaches secret from ChromaDex so that he could commit further acts in breach of his fiduciary duty without being stopped by ChromaDex, ChromaDex further alleges that Elysium prevented ChromaDex from discovering

---

[77] *Id.*, p. 46

[78] *Id.*

[79] *Id.*, pp. 45-46.

**Exhibit 11
Page 276**

Morris's breaches by actively concealing the information Morris was feeding it during negotiations with ChromaDex and by affirmatively misrepresenting its knowledge of Morris's departure from ChromaDex after Morris had begun employment with Elysium.

56.    ChromaDex asserts that Elysium, by allegedly aiding and abetting Morris's breach of fiduciary duty, should be liable for all harm caused by Morris' breach.[80]

## VII.    REBUTTAL OF THE GUNDERSON REPORT

57.    The opinions expressed in the Gunderson report are little more than a rote recitation of ChromaDex's legal arguments, unsupported assumptions as to the alleged use and practical value of ChromaDex's claimed trade secrets, confidential and or proprietary information, and the reproduction of certain Elysium and ChromaDex aggregate financial information and sales records produced in this litigation.[81]

58.    As a general proposition, the Gunderson report makes no attempt to establish a causal nexus between each of the "wrongful acts" claimed by ChromaDex and the resulting economic loss and/or unjust gain, if any, to either ChromaDex or the Defendants. In lieu of any attempt to measure the cause and effect stemming from the specific harms alleged by ChromaDex, Mr. Gunderson offers the trier-of-fact nothing more than a *post hoc ergo propter hoc* approach to damages under which the broadly-defined harms claimed by ChromaDex are simply assumed to result from the cumulative bundling of "wrongful acts" of the Defendants; the appropriate remedy for which, according to Mr. Gunderson, is nothing less than the totality of Elysium's gross profits and/or ChromaDex's (greatly exaggerated) claimed "losses."

59.    In the following section, I first address the categories of general harms claimed by ChromaDex and proffered through the Gunderson report, the aim of which is to test the veracity of Mr. Gunderson's assumptions and conclusions. Following, I address the legitimacy and accuracy of Mr. Gunderson's damages opinions and corresponding calculations to determine whether or

---

[80] *Id.*, pp. 47.

[81] As a threshold matter, it is important to note that the majority of opinions and conclusions contained in the Gunderson report are based on nothing more than statements made by ChromaDex in its Fifth Amended Complaint; a pleading that is cited as a source for Mr. Gunderson no less than 160 times throughout his report.

**Exhibit 11
Page 277**

*Highly Confidential*
*Attorneys' Eyes Only*

not these opinions reflect an appropriate measure of recovery for the alleged wrongful acts of the Defendants.

### A. Rebuttal of ChromaDex's Alleged Harm

60.  ChromaDex asserts, both through its pleadings and through the Gunderson report, a series of general harms to its "market position/competitive advantage", forecasted sales, cash flow for working capital, and in its "supply chain management with Grace" resulting from the alleged wrongful acts on the part of defendants Elysium and Mr. Morris.[82]

61.  In the following section, I analyze these alleged harms in light of both the sources cited in the Gunderson report as well as other documents, data, and testimony on record in this case to determine if Mr. Gunderson has established the requisite causal link between each specific allegation of misappropriation, improper disclosure, or breach alleged by ChromaDex and any observable impact on and quantifiable loss to ChromaDex and/or gain to Elysium and Mr. Morris.

62.  As a threshold matter, the prerequisite to establishing a causal link between a specific misappropriation or breach and the resulting harm is evidence of use, and for the vast majority of the claims made in his report, Mr. Gunderson provides no evidence whatsoever that Elysium used (or even how it hypothetically could or would have used) the alleged misappropriated information. For example, Mr. Gunderson's opinion that the information identified as "volumes of NR Customers compared to Elysium" enabled Elysium to "learn its market position relative to other direct-to-consumer companies . . . and enabled Elysium to use that knowledge when undermining ChromaDex's supply relationship with Grace and soliciting new investors" is, without evidence of Elysium's use, nothing more than a speculation.[83] Mr. Gunderson cites no actual evidence of any actual use by Elysium of any alleged misappropriation except his own bald assertions. Conspicuously, Mr. Gunderson does not consider or evaluate what other sources of such information that might have been available to Elysium.

---

[82] Gunderson report, pp. 62 – 83.
[83] *Id.*, pp. 47 – 48.

**Exhibit 11
Page 278**

*Highly Confidential*
*Attorneys' Eyes Only*

**1)  No Harm to ChromaDex's Supply Chain and Purchase Commitments**

63.   Based only on his undocumented "discussions with ChromaDex personnel", Mr. Gunderson understands that "Defendants' alleged wrongful acts significantly impacted: (1) ChromaDex's ability to pay for ingredients purchased from Grace when the payments were due; (2) ChromaDex's ingredient supply forecasting and its revenue forecasting accuracy; and (3) ChromaDex's ingredients manufacturing/supply operations and business relationship with Grace."[84] Specifically, Mr. Gunderson opines that due to Elysium's wrongful acts:

   a)  ChromaDex's purchase orders to Grace for NR ingredients increased due to forecasted revenue from Elysium that did not come;

   b)  ChromaDex was required to take delivery of, and pay for, the additional ingredients forecasted under purchase orders ChromaDex submitted to Grace for 2016 that took into account the forecasted revenue expectations of Elysium; and that,

   c)   ChromaDex was unable to finance its working capital needs and that it had fewer funds available for reinvestment into growth of the business.[85]

64.   While Mr. Gunderson's fluid definition of "wrongful acts" typically references an alleged misappropriation of a ChromaDex trade secret or the disclosure of some confidential and/or proprietary information by the Defendants, in this setting Mr. Gunderson's "wrongful acts" refer to 1) Elysium's failure to pay for NR and PT ingredients under the June 30 Purchase Orders and 2) Elysium's failure to keep its "promises" of future ingredient purchases from ChromaDex.[86] I understand that while Elysium's alleged, unspecified, and undocumented "promises" to ChromaDex are not themselves a claimed or allowed cause of action, the available evidence here nonetheless contradicts Mr. Gunderson's unsupported claims that Elysium was the source of ChromaDex's supply chain management, late payments, and inventory troubles.

---

[84] *Id.*, pp. 79.

[85] *Id.*, p. 79.

[86] *Id.*, pp. 74, 78 – 79.

**Exhibit 11**
**Page 279**

*Highly Confidential*
*Attorneys' Eyes Only*

a.  ChromaDex's Forecasting and Inventory Issues Predate Elysium's Alleged "Promises"

65.  The objective evidence and data here shows that Chromadex's forecast inaccuracies and unmet demand, excess inventory, and payment issues which allegedly adversely impacted its supply chain management and business relationship with Grace are the result of ChromaDex's own missteps that began months prior to Elysium's alleged wrongful acts.

66.  Effective September 22, 2015, ChromaDex and Grace executed a "Take or Pay Purchase Agreement for nicotinamide riboside chloride" under which ChromaDex agreed to "purchase from Grace not less than ▮▮▮ kg of Product (the "Required Amount") between September 4, 2015 and December 31, 2015 at the price of ▮▮▮ per kg." (the "2015 NR Take or Pay Agreement) [87] Based on my analysis of the Grace purchase orders produced in this case, I calculate that ChromaDex's committed purchase volume under this single agreement was as much NR as its cumulative purchases from Grace dating back to NR's first commercial production in May 2013.[88]

67.  Contrary to Mr. Gunderson's unsupported suppositions, ChromaDex's execution of its 2015 NR Take or Pay Agreement with Grace and the NR volume it committed to purchase, and in fact received under that agreement over the September – December 2015 timeframe represent a self-inflicted business decision that adversely impacted ChromaDex's performance and its relationship with Grace throughout all of 2016. As shown in Exhibit 1, ChromaDex held approximately ▮▮▮ kilograms of NR in inventory at the end of September 2015, the value of which represented approximately ▮▮▮ of ChromaDex's total Q1 – Q3: 2015 revenues. However, ChromaDex's significant remaining Q4 2015 NR volume commitment, coupled with the company's lower than expected fourth-quarter sales (actual NR sales volume was about ▮▮▮ kilograms below ChromaDex's budget forecast), left it "swimming in inventory" with more than ▮▮▮ kilograms of NR in inventory at year-end. This ▮▮▮ kg of inventory

---

[87] CDXCA_00214716 – 717. The agreed-to ▮▮▮ per kilogram contract price represented a ▮▮▮ discount off of the effective NR price paid by ChromaDex in 2015 (through August).

[88] ChromaDex was shipped ▮▮▮ kilograms of NR at a total cost of ▮▮▮ million under this agreement.

**Exhibit 11
Page 280**

of NR was greater than ChromaDex's total cumulative sales of the ingredient up through December 2015.[89]

      b.  ChromaDex's Relevant Forecasts Predate Elysium's Alleged "Promises"

68.    Despite ChromaDex's (then) significant stockpile of NR in inventory, contemporaneous evidence indicates that ChromaDex's initial estimates of NR purchases from Grace for 2016 were between ▮ MT and ▮ MT (i.e. ▮▮▮▮▮▮▮ kilograms), and on February 8, 2016, Troy Rhonemus communicated ChromaDex's initial 2016 NR demand forecast via email to Brett Reynolds of Grace.[90]  In Exhibit 1, I reproduce the company's monthly February 2016 NR demand forecast which estimated total purchases by ChromaDex from Grace of ▮▮▮▮ kilograms through December 2016 but with no (zero) expected NR purchases until June 2016. A summary of Grace purchase orders shows that ChromaDex did not place an order for NR over the January – May timeframe.[91]  In response to Grace's ongoing email outreach to ChromaDex in March, May, and June requesting information on its expected NR sales volumes and shipment schedules, ChromaDex's communications with Grace demonstrate that ChromaDex insisted on deferring any additional NR purchase decisions until at least July, for example:

      "I do not want to over commit on volume needed because I do not want to be pressured into buying material."[92];

      "I would rather start taking material in July.  This would help me manage working capital."[93]; and,

      "I'm sorry but I thought we already discussed that ChromaDex was not taking product in June.[94]"

69.    As shown in Exhibit 1, ChromaDex's reluctance to submit purchase orders and its insistence that it would not need additional product until mid-year is in line with the information provided

---

[89] Exhibit 1. CDXCA_00364827-829.

[90] CDXCA_00364827-829.

[91] Exhibit 1

[92] CDXCA_00364830

[93] CDXCA_00364831-832

[94] CDXCA_00364824-825

**Exhibit 11**
**Page 281**

*Highly Confidential*
*Attorneys' Eyes Only*

to Grace from its February 2016 forecast.[95]  It should be noted that ChromaDex's insistence here is wholly consistent with, and unchanged from, its February 2016 forecast it previously communicated to Grace.[96]

70.   In a June 23, 2016 email exchange between Troy Rhonemus of ChromaDex and Brett Reynolds of Grace, the parties agreed to a six-month forecast, through December 2016, that included essentially the very same NR purchase volumes found in ChromaDex's February 2016 forecast.[97] In fact, Brett Reynold's stated as such, "I currently have ██████7MT in the forecast which is slightly less than your original Feb forecast of ██████MT."[98]  Despite direct evidence to the contrary, Mr. Gunderson opines that,

> "ChromaDex's purchase orders to Grace for NR ingredients manufactured and supplied by Grace increased due to forecasted revenue from Elysium, however, due to the alleged wrongful acts ChromaDex revenue and ingredients supply forecasts were not met." [99]

71.   However, ChromaDex's own forecasts and actions at that very time directly contradict both their assertions and Mr. Gunderson's opinions. A side-by-side comparison of both the February 8, 2016 and June 23, 2016 ChromaDex forecasts demonstrates that there was effectively <u>no change</u> in ChromaDex's forecasted NR purchase orders throughout 2016, let alone any <u>increase</u> that Mr. Gunderson both claims and attributes solely to Elysium.[100]

72.   I understand that the next time ChromaDex provided Grace with its required NR purchase order forecast was more than three months later.[101]  On September 27, 2016, Brett Reynolds emailed Troy Rhonemus to discuss ChromaDex's volume commitments under its June 23 forecast, its own manufacturing schedule, and the significant inventory Grace would be left with if ChromaDex did not take shipment of its balance of the NR manufactured for the June 23 – September 23 period.[102]  Following up on this and previous email exchanges between

---

[95] Exhibit 1.

[96] *Id.*,

[97] CDXCA_00364721 – 724.

[98] *Id.*  I calculate that the difference in NR volumes between the February 8, 2016 and June 23, 2016 forecasts is just -0.13%.

[99] Gunderson report, p. 79.

[100] Exhibit 1.

[101] CDXCA_00364866 – 872.

[102] CDXCA_00364868.

**Exhibit 11
Page 282**

ChromaDex and Grace, Al Beninati reiterates that "we [Grace] have a contractual requirement to produce a specific amount of product for you by year's end" and that Grace has "a forecasted amount per month through December that you have already provided."[103] Replying that "I understand that you have a batch of NR in process at the facility, but please do not start another batch of material", Troy Rhonemus provided Grace with an updated NR purchase order forecast for 0 kilograms of NR per month for the October 2016 through June 2017 period.[104]

73.    As shown in Exhibit 1, ChromaDex provided Grace with only three NR purchase order forecasts during the first nine months of 2016 including those on February 8, June 23, and September 30, 2016.[105] Given that ChromaDex contends it relied on Elysium's representations and "promises" made on their June 30 phone call to increase its purchase orders from Grace, neither its February 8 nor June 23 NR forecasts, both of which predate June 30, were or could have been adjusted to reflect ChromaDex's contentions.  In fact, comparing both the February 8 forecast and the unchanged June 23 forecast with ChromaDex's 2016 actual NR purchases shows that ChromaDex purchased only about 60% of the NR ingredient depicted in its forecasts, <u>directly contradicting</u> (again) claims that it had "to take delivery of, and pay for, the additional ingredients forecasted under purchase orders ChromaDex submitted to Grace for 2016 that took into account the forecasted revenue expectations of Elysium."[106]

74.    Mr. Gunderson contends that ChromaDex's financial position was harmed, "including its forecasted revenues", by an amount Elysium "promised" to purchase, or would have purchased, had it not obtained an alternative supply of NR and PT through the Defendants' alleged wrongful acts.[107]  In supporting this opinion, Mr. Gunderson references only two sources: ChromaDex's own estimated ingredient sales to Elysium for Q4:2016 and 2017 taken from a November 3, 2016 Liquidity/Going Concern memorandum written by ChromaDex when it was seeking a bridge loan (the purpose of which was to support ChromaDex's effort

---

[103] CDXCA_00364866 – 867.

[104] CDXCA_00364866.

[105] Exhibit 1. ChromaDex confirmed a "disconnect" where they "did not provide monthly forecasts in July and August and then in September until September 30th." See CDXCA_00364675.

[106] Gunderson report, p. 79.

[107] *Id.*, p. 73.

**Exhibit 11
Page 283**

*Highly Confidential*
*Attorneys' Eyes Only*

to secure a bridge loan based on expected sales, including sales to Elysium), and certain unsupported assertions in ChromaDex's pleadings that Elysium "expected that it would continue to purchase significantly increased volumes of NIAGEN and pTeroPure products after the June 30 Purchase Orders."[108]

75. Mr. Gunderson leaves out a key fact about ChromaDex's November 3, 2016 Liquidity/Going Concern memorandum, which included forecasts of sales of NR to Elysium. Two days before that letter, ChromaDex sent a November 1, 2016 email to Elysium *terminating* its agreement to supply NR to Elysium. Thus, Mr. Gunderson's reliance on ChromaDex's November 3, 2016 Liquidity/Going Concern letter is baseless because by the time that ChromaDex had written that memorandum showing forecasted sales to Elysium, ChromaDex had already terminated its supply agreement with Elysium.

76. Mr. Gunderson makes no effort to show the trier-of-fact how one or more of the specific "wrongful acts" alleged by ChromaDex <u>caused</u> an identifiable harm for which ChromaDex could be recompensed. The support he cites and the inferences he makes conflict with the relevant facts on record in this case. For example, ChromaDex's termination of its NR supply agreement with Elysium *prior* to the date of ChromaDex's Liquidity/Going Concern memorandum, described above, casts serious doubt on the veracity of these projected ingredient sales to Elysium and renders the conclusions drawn by Mr. Gunderson from them, namely that they evidence harm to ChromaDex resulting from Elysium's "wrongful acts", to be wholly erroneous.[109]

   c. ChromaDex Failure to Update Forecasts Resulted in Binding Purchases

77. Contemporaneous statements made by Grace directly contradict Mr. Gunderson's assertion that ChromaDex "was required to take delivery of, and pay for, the additional ingredients forecasted under purchase orders ChromaDex submitted to Grace for 2016 that took into

---

[108] CDXCA_00463684 – 686; *See* Fifth Amended Complaint, November 27, 2018, p. 13.

[109] Gunderson report, pp. 73 – 74. With respect to the veracity of the forecasts cited by Mr. Gunderson, it should be noted that as of November 3, 2016, nearly half way through the fourth-quarter of 2016, ChromaDex was still projecting $3.5 million in ingredient sales to Elysium despite the fact that 1) it had already informed Elysium regarding the decision to terminate the NR supply agreement and 2) that Elysium had not placed a purchase order with ChromaDex in more than four months.

**Exhibit 11
Page 284**

account the forecasted revenue expectations from Elysium"[110] In a September 30, 2016 reply to Al Beninati regarding Grace's "obligation to produce to the current [September 30 forecast]" absent additional forecast guidance from ChromaDex, Troy Rhonemus states that, "[i]t looks like that from what you are saying <u>Oct, Nov, & Dec are already locked in for shipment regardless</u> of what you have currently manufactured (manufacturing) or regardless of what we need."[111]

78.    That ChromaDex's binding NR purchases for October – December resulted from ChromaDex's contractual commitments, and were not caused by Elysium, is further confirmed by Tom Varvaro on December 5, 2016 when he argues that, "it doesn't make sense that, with this disconnect, Grace relied on a three-month old forecast to produce large amounts of NR for ChromaDex for September, November and December without confirming those production amounts with us."[112]

79.    Contradicting its own claims and Mr. Gunderson's opinions against Elysium here, ChromaDex's correspondences with Grace show that its binding NR purchases were based on its June 30 forecast and that ChromaDex's failure to provide Grace with monthly forecasts from July – September 30, as required under their agreement, was the actual cause of these binding NR purchases.

    d.    ChromaDex's Late Payments and Working Capital Issues Unrelated to Elysium

80.    With respect to the alleged harm to ChromaDex's cash flow and working capital balances, Mr. Gunderson "understands" Elysium's wrongful acts to be the sole cause:

> "Elysium's failure to pay, in addition to its false representations regarding its expected sales, resulted in ChromaDex being unable to finance its working capital needs solely from cash provided by its operations, and it also reduced the amount of funds that would have been available to ChromaDex for reinvestment into growth of the business, all else constant."[113]

---

[110] *Id.*, p. 79.

[111] CDXCA_00364859 – 60. (Emphasis added.)

[112] CDXCA_00364675.

[113] Gunderson report, p. 78.

**Exhibit 11
Page 285**

*Highly Confidential*
*Attorneys' Eyes Only*

But "all else" was not "constant" at ChromaDex.  As explained above, ChromaDex's own missteps created its liquidity problems, including its over-commitment to make purchases from Grace and its termination of its supply agreement with Elysium (the latter of which was ultimately done so that ChromaDex could enter the market to sell its own product that competes with Elysium's product).  Other causes of ChromaDex's claimed reduced ability to finance its working capital needs are identified below.

81.    Based on its correspondences with Grace going back to the beginning of 2016, it appears that ChromaDex had ongoing issues regarding late payments and working capital issues that predate and were not caused by Elysium.  For example, in February 2016, Trisa Nguyen at Grace reached out to Tom Varvaro regarding ChromaDex's outstanding, unpaid remaining balance of approximately $2.9 million on purchase orders from November and December.[114] I understand that even after its net 45-day payment terms, ChromaDex's $2.0 million payment was 30 days overdue.[115]  I understand that despite the fact that ChromaDex purchased no NR ingredient from January through May 2016 (and with only one order split between June and July), ChromaDex received an inquiry from Grace's chief financial officer regarding "the matter of unpaid invoices and invoices coming due."[116]

82.    ChromaDex contends that Elysium's alleged non-payment of the June 30 Purchase Orders was the source of its cash flow issues and its resulting need for credit facility financing.[117] However, the evidence of record points to other sources that also had an impact on ChromaDex's cash flows.  ChromaDex's "net loss of approximately $781,000 recorded for the nine months ended October 1, 2016" and that it has a "history of losses and may continue to incur operating and net losses" is, in fact, the source of ChromaDex's working capital and ongoing cash flow issues.[118]  In addition, documents on the record in this case show that at least two other

---

[114] CDXCA_001778747 – 748.

[115] CDXCA_00214762 – 779.

[116] CDXCA_00364752.  In another example of ChromaDex's payment and cash flow problems that predate ChromaDex's accusations against Elysium, I understand that in May 2016, Troy Rhonemus indicated to Brett Reynolds that he "would rather start taking material in July. This would help me manage working capital." See CDXCA_00364831-832.

[117] Gunderson report, p. 74.

[118] CDXCA_00463684 – 86.

**Exhibit 11
Page 286**

*Highly Confidential*
*Attorneys' Eyes Only*

ChromaDex customers, Nectar7 and 5Linx, that also had/have large, outstanding balances for unpaid NR ingredient purchases totaling $449,159.01 and $389,720, respectively.[119]

83.    While the Gunderson report provides no meaningful analysis or evidence as to how these unspecified "wrongful acts" "significantly impacted" ChromaDex's ability to forecast and pay for its ingredient purchases or its business relationship with Grace, its most glaring omission is that it fails to show a causal connection between these factors and any of ChromaDex's alleged lost sales or the indeterminate harm to its market position and competitive advantage.

### 2)  No Harm to ChromaDex's Market Position and Competitive Advantage

84.    The Gunderson report makes several general claims regarding the harm to ChromaDex's "market position" and that Elysium allegedly relied on ChromaDex's trade secrets, confidential and/or proprietary information to "gain an improper competitive advantage, persuade investors to contribute capital to Elysium, and to provide instructions to its alternative manufacturer on how to manufacture NR for the accused Basis products", which enabled Elysium to develop an alternative source of both the NR ingredients.[120]

85.    As a result, ChromaDex claims that it has "lost sales and the market position it held in the anti-aging and supplement spaces, including as the sole United States commercial source and supplier of NR and as Elysium's sole supplier of NR and PT."[121] I understand that in addition to ChromaDex's lost sales, Mr. Gunderson also opines that Elysium's own profits reflect "additional negative impacts" to ChromaDex's market position and competitive advantage that are "not taken into account in ChromaDex's lost sales"; suggesting that ChromaDex may be entitled to an additional recovery from Elysium over and above its own lost profits for the same harm.[122]

86.    In addition, the Gunderson report also lists several other factors as contributing to Elysium's allegedly unfair competition with ChromaDex including Elysium's development of certain

---

[119] CDXCA_00008697 – 98, CDXCA_00008479.
[120] Gunderson report, pp. 62 – 63.
[121] *Id.*, pp. 63.
[122] *Id.*, p. 63.

**Exhibit 11**
**Page 287**

*Highly Confidential*
*Attorneys' Eyes Only*

non-NR and non-PT pipeline products from funds owed to ChromaDex[123], $20 million in Series B investment financing obtained by Elysium in December 2016[124], the expedited manufacture and regulatory approval of Elysium's alternatively-sourced NR and PT ingredients[125], and the "strategies developed by Mark Morris to help Elysium undermine ChromaDex's relationships with Grace and Dartmouth."[126]

    a.  No Causal Nexus Between the Alleged Misappropriation and Contract Breaches and the Economic Harm Claimed by ChromaDex

87.    The fundamental flaw that permeates the four corners of Mr. Gunderson's expert report is his failure to establish, with facts and evidence, a causal connection between the wrongs alleged by ChromaDex and a specific, measurable loss to ChromaDex or unjust gain to either Elysium or Mr. Morris. Mr. Gunderson enumerates the assertions "supporting" ChromaDex's alleged lost sales and lost "market position" and lost "competitive advantage" but these cannot constitute an economic basis for damages unless accompanied by actual demonstration of quantifiable harm caused by specific alleged actions. Mr. Gunderson provides no proof and no evidence that the alleged trade secrets and other confidential information were *used* by Elysium, let alone establish that it was this use, to the exclusion of all other factors, that caused the totality of harm to ChromaDex and benefit to Elysium that plaintiff alleges here.

88.    For example, ChromaDex asserts, and Mr. Gunderson assumes, that Elysium *used* specific information from a subset of ChromaDex's asserted trade secrets, confidential and/or proprietary information, that this specific information was both actionable (i.e. allowed Elysium to do then something productive) and valuable to General Catalyst, and that the value added by Elysium's alleged, unproven use of this specific information, taken from a subset of ChromaDex's asserted trade secrets that, to the exclusion of all other factors, persuaded General Catalyst to invest $20 million dollars in Elysium.[127] Below I list the alleged trade secrets, confidential information, and "strategies to undermine ChromaDex" that Mr.

---

[123] *Id.*, p. 63 – 64.

[124] *Id.*, p. 65.

[125] *Id.*, p. 66.

[126] *Id.*, p. 66.

[127] Gunderson report, p. 65.

**Exhibit 11**
**Page 288**

*Highly Confidential*
*Attorneys' Eyes Only*

Gunderson asserts, with no evidence of actual use or measurable value, secured $20 million in investment funding for Elysium:

- NR Study Data (no evidence of use or value)
- NR Presentations (no evidence of use or value)
- July 1, 2016 text with volumes by customer to inform strategy to undermine ChromaDex with Grace (no evidence of use or value)
- Ingredient sales spreadsheet (no evidence of use or value)
- ██████ cost from Grace (no evidence of use or value)
- Morris's and Elysium's undermining of ChromaDex's relationship with Dartmouth (not a claimed misappropriation or purported breach)
- Elysium's efforts to obtain a license Dartmouth patent (not a claimed misappropriation or breach)
- Other Morris strategies to undermine ChromaDex with Grace and Dartmouth (not a claimed misappropriation or breach)[128]

89.    Finally, it is important to point out that the example of Mr. Gunderson's analysis exposed here is by no means exclusive to this particular claim as each assertion made by ChromaDex and each opinion proffered by Mr. Gunderson's throughout his expert report suffers from the same deficiencies with respect to evidence of use and measurable value.

### b.    ChromaDex Would Not Have Made the But-For Sale

90.    ChromaDex asserts that but-for the alleged "wrongful acts" of the Defendants, it would have made the sales NR and PT ingredients that Elysium either "promised" to purchase, or would have purchased. As I establish below in my rebuttal of Mr. Gunderson's lost profit calculations, all of the available evidence, including ChromaDex's own termination of the NR supply agreement with Elysium and its strategic decision to effectively exit its ingredients business, contradicts this assertion.

### B.    Rebuttal of the Gunderson Report's Damages/Unjust Enrichment Calculations

91.    Mr. Gunderson claims to have "provided analysis of ChromaDex's actual losses, and Defendants' unjust enrichment, resulting from the wrongful acts."[129] He has unquestionably

---

[128] Gunderson report, pp. 65 – 67.
[129] Gunderson report p. 83.

**Exhibit 11
Page 289**

*Highly Confidential*
*Attorneys' Eyes Only*

failed to do so. What Mr. Gunderson has provided are the aggregate profits or expenses of certain ChromaDex and/or Elysium efforts and not the actual losses or unjust enrichment shown to have resulted from, *inter alia*, a "causal link between a potential misappropriation of a trade secret and the alleged damages."[130]

92.   Mr. Gunderson report has failed to even attempt to measure the <u>incremental</u> economic harm or gain <u>caused</u> by the misappropriation; nor has he tried to show the nexus between the alleged bad act and its resulting effect on ChromaDex's actual economic loss or Elysium's (or Morris') alleged unjust benefit.

93.   The damages/unjust enrichment calculations proffered in the Gunderson report thus offer little more than summaries of ChromaDex and Elysium financial documents and sales data across seven categories including Elysium's profits, Elysium's avoided costs, ChromaDex's unpaid sales invoices, ChromaDex's price discount, ChromaDex's lost profits, ChromaDex's out-of-pocket financing expenses, and Mr. Morris's compensation.[131] Rather than assign his various damages and unjust enrichment calculations to a particular cause of action (e.g. misappropriation of trade secrets, confidential and/or proprietary information), Mr. Gunderson simply presents them in total, stating that each of these categories of recovery are also "acceptable damages remedies" for other causes of action pled by ChromaDex.[132]

94.   Mr. Gunderson assumes, incorrectly, that he has exhausted his responsibility as a damages expert by simply "establishing Elysium's sales from the accused Basis products" (i.e. reproducing Elysium's own sales records) with Elysium bearing the "burden of proving any portion of the sales not attributable to the trade secrets information, and the appropriateness of any expenses and/or deductions claimed."[133]

95.   However, the proper measure of damages is the measurement of the incremental profits/losses specifically causally tied to each alleged bad act.  Mr. Gunderson cannot, in effect, simply assert the Elysium would have made NO sales/profits but-for each and every bad act.

---

[130] *Science of Skincare, LLC v. Phytoceuticals, Inc.*, CV 08-4470 ODW (SSX), 2009 WL 2050042, at *5 (N.D. Cal.).
[131] Gunderson report, p. 84.
[132] *Id.*, p.119.
[133] *Id.*, p. 86.

**Exhibit 11
Page 290**

*Highly Confidential*
*Attorneys' Eyes Only*

96.    As set forth in Section VI (above), the Gunderson report enumerates several "harms" suffered by ChromaDex as a result of Defendants' alleged wrongful acts including harm to ChromaDex's market position and competitive advantage, harm to its forecasted sales and purchase commitments, harm to its cashflow and working capital, and harm to its supply chain management with Grace but provides no calculus measuring the incremental effect Defendants' alleged breaches and misappropriations have had on ChromaDex or Elysium.[134]

### 1)    Aggregate Profits are not the Correct Measure of Elysium's Alleged Gains

97.    Mr. Gunderson indicates that he has been asked to "calculate Elysium's profits on its accused Basis products <u>resulting from the alleged misappropriation</u> of ChromaDex's trade secrets, confidential and/or proprietary information at issue, and from the alleged aiding and abetting of Mark Morris's breach of fiduciary duty" and that in doing so he has "determined the sales of the accused Basis products, and the profits contributed to Elysium by the accused Basis products, for purposes of determining Elysium's profits in this case."[135]

98.    In order to "inform the Court", Mr. Gunderson states that he has been "asked to provide analysis of Elysium's profits under three alternative periods: (1) starting from July 16, 2015, based upon Defendants' alleged improper uses and/or disclosures of ChromaDex's trade secrets, confidential and/or proprietary information at issue, including regarding the initial alleged improper uses of information regarding Live Cell's historical sales as well as its sales goals of NR-containing products and business strategies; (2) starting May 30, 2016, based upon Defendants' alleged improper uses and/or disclosures of ChromaDex's trade secrets, confidential and/or proprietary information at issue, including the purchasing history for Live Cell; or alternatively, (3) starting from October 1, 2016, based upon when Elysium began to sell the accused Basis products containing ChromaDex's NR ingredients supplied to Elysium under the June 30 Purchase Orders."[136] I understand that the calculation of Elysium's total

---

[134] *Id.*, pp. 62 – 83.

[135] Gunderson report, p. 86. (Emphasis added) Mr. Gunderson additionally states his understanding that ChromaDex "bears the burden of establishing Elysium's sales from the accused Basis products" and that Elysium "bears the burden of proving any portion of the sales not attributable to the trade secrets information, and the appropriateness of any expenses and/or deductions claimed."

[136] *Id.*, pp. 86 – 87. Parenthetical information omitted.

**Exhibit 11
Page 291**

incremental profits under these three scenarios are set forth in Schedules 5, 5A, and 5B of the Gunderson report. Below, I address the assumptions, implications of, and the flawed methodology regarding both the appropriateness and calculation of Elysium's profits as proffered here by Mr. Gunderson.

a. Profits Resulting from the Alleged Misappropriation

99. Mr. Gunderson "determined the sales of the accused Basis products" as simply "all of Elysium's Basis revenues calculated from July 16, 2015 through December 2018."[137] Mr. Gunderson calculated the Elysium's Basis profits over the same time period. However, Mr. Gunderson cites to no evidence demonstrating that any alleged misappropriation, either on its own or combined with others, caused any of those profits generated by Elysium's Basis product.

100. Mr. Gunderson appears to opine that misappropriation of all of the alleged trade secrets and alleged confidential information entitles ChromaDex to all of Elysium's profits. However, in *O2 Micro*, the Court found that "expert testimony regarding damages for misappropriation of all trade secret [sic] was useless to the jury" because "[t]he jury was then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages."[138] Similarly here, Mr. Gunderson's analysis is useless to the trier of fact.

b. Mr. Gunderson Bundles ChromaDex's Trade Secrets/Confidential Information

101. Despite the quantity of trade secrets/confidential information alleged, the varied nature and relative importance (or lack thereof) of the information contained therein, the date of disclosure of the trade secrets/confidential information, and the available guidance from relevant court opinions, the Gunderson report nonetheless offers no analysis as to how, and by how much, Elysium's alleged misappropriation and/or use of each claimed trade secret or piece of confidential information unjustly benefitted Elysium or caused ChromaDex the actual losses it claims.[139] For example, ChromaDex claims that information extracted from its Ingredient Sales Spreadsheet "provided Elysium with a competitive advantage against its competitors"

---

[137] *Id.*, p. 86.

[138] *O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1077 (N.D. Cal. 2005).

[139] *See id.*, at 1076 (N.D. Cal. 2005).

**Exhibit 11**
**Page 292**

and yet makes no showing as to how Elysium purportedly used such information to gain an unjust advantage over its competitors or how Elysium's alleged use adversely impacted ChromaDex.[140] One could reasonably assume that if such information was as valuable to Elysium as both ChromaDex and Mr. Gunderson contend, then the incremental benefit attributable to its specific use should be readily identifiable and easily quantified (e.g. higher profits, increased revenues, declining ingredient purchases by competitors.) Instead, Mr. Gunderson prefers the aggregate: bundling all of ChromaDex's claimed trade secrets/ and purported confidential information together, assuming that any particular misappropriation is a collective "wrongful act", and opining the remedy for such "wrongful acts", no matter how inconsequential, is Elysium's total cumulative profits.

102.    Finally, it is certainly worth reemphasizing that despite his broad, persistent claims that the alleged trade secrets and confidential information enabled Elysium to "obtain a market advantage"[141], "undermine ChromaDex's exclusive license to NR patents from Dartmouth"[142], "persuade investors to contribute capital"[143], and gain an "unfair competitive advantage to develop and alternative non-ChromaDex supplier"[144], Mr. Gunderson provides no evidence or analysis connecting these claims to Elysium's actual strategy or performance: no new business or marketing strategy, no evidence of increased sales or market share, no evidence of greater profitability, no evidence of greater ease in attracting investor capital, or a license to the Dartmouth NR patents.

c.    The Implication of Elysium's Total Profits

103.    Opining that any one of the "wrongful acts" entitles ChromaDex to a recovery equal to <u>all</u> of Elysium's profits necessarily implies that without each alleged wrongful act, Elysium would make no revenues or profits. This implication is not simply *reductio ad absurdum,* but an opinion that proffers that "Elysium was at a 'crucial point in [its] company life cycle'" and that "[a]s it relates to the potential estimated value that Elysium stood to gain by staying in

---

[140] Gunderson report, p. 45.

[141] *Id.*, p. 45.

[142] *Id.*, p. 66.

[143] *Id.*, p. 63.

[144] *Id.*, p. 49.

**Exhibit 11
Page 293**

*Highly Confidential*
*Attorneys' Eyes Only*

business" (regarding the alleged critical role ChromaDex's trade secrets played in Elysium developing its alternative source of the NR ingredient.[145])

104. It is simply baseless to conclude, as Mr. Gunderson does here, that ChromaDex's trade secrets and other confidential and proprietary information claimed here are responsible for the entirety of Elysium's profits, individually or *in toto*.

       d. Mr. Gunderson's Fatally Flawed Damages Approach

105. I understand that ChromaDex "may claim that it is entitled to Elysium's profits" under a theory of unjust enrichment; arguing that Elysium was unjustly enriched in the amount of its total profits from the alleged misappropriation of ChromaDex's claimed trade secrets, confidential and/or proprietary information.[146] With respect to the first of three alternative time periods, Mr. Gunderson calculates Elysium's total (incremental) profits from July 16, 2015 through December 2018 to be      .[147] Regarding this particular date, he offers that the July 16, 2015 start date reflects the "initial improper uses of information . . . regarding Live Cell's historical sales as well as its sales of NR-containing products and business strategies."[148] The specific information disclosed on July 15, 2016, in its entirety, is reproduced below:

> "The Clemens brothers along with Josh Golder decided to take their skills in copywriting and internet marketing to the world of health and wellness. They launched Whole Body Research and Keyboitics was selling 450k bottles per month when Google shut them down in the middle of 2014. They were also selling 160k bottles of garcinia. Recently, they have been focusing on skincare with Beverly Hills MD. That product is up to 600k bottles per month. They are at 50k bottles per month of Niagen and looked to double that in August and be at 250k bottles per month in early 2016. They are taking Niagen to the retail space this year and are currently producing radio commercials. This relationship is so volatile and can completely fall apart at any moment. It is a terrible existence from my perspective.
>
> There is absolutely no doubt these guys can move product. There is also absolutely no doubt lying is a business practice for them and everyone in the supply chain should lose

---

[145] *Id.*, pp. 87 – 89. With respect to the NR Specifications that ChromaDex alleges enabled Elysium to "stay in business" with an alternative source of NR,    , Vice President of R&D at    testified that this information was a "standard document" and was of "not much" help to the development process. *See*      deposition, p. 41: 10 – 15.

[146] Gunderson report, p. 86.

[147] *Id.*, p. 91, Schedule 5.

[148] *Id.*, pp. 86 – 87.

**Exhibit 11
Page 294**

*Highly Confidential*
*Attorneys' Eyes Only*

money at the expense of Golden Hippo making money. They are the worst partners. I hate talking negative but that is the truth."[149]

106.    With respect to the information allegedly disclosed by Mr. Morris (above), I make the following observations: first, Mr. Gunderson states that this reflects the initial "use" of ChromaDex's data on Live Cell but fails to show the nature or extent of Elysium's "use"; second, Mr. Gunderson provides no opinion as to the alleged strategic, actionable value of this specific information to Elysium; third, the Live Cell data and "plans" revealed here are limited in both scope and time (e.g. "50k bottles per month of Niagen", "looked to double that in August" and "taking Niagen to the retail space this year") and are of questionable value to Elysium even as tradecraft gossip, never mind with respect to the company's long-run business plans; and lastly, this information is of questionable legitimacy having been provided to ChromaDex by those for whom "lying is a business practice."[150]

107.    As an alternative scenario, Mr. Gunderson provides in Schedule 5A a calculation of Elysium's profits beginning on May 30, 2016 and continuing through December 2018. Over this timeframe, Mr. Gunderson calculates Elysium's total profits from its alleged unjust enrichment to be ███████████. In selecting this alternative date to start Elysium's unjust enrichment clock, Mr. Gunderson is informed by the "initial improper uses of information from the highly-confidential purchasing history of Live Cell" sent by Mr. Morris via text message to Elysium on May, 29, 2016.[151] Once again, I provide the complete disclosure of the alleged confidential information below:

> "Dan - Live Cell was at $1400 until 8/29/14 when we sold them 100kg at $900. Then on 2/27/15 we sold them 300kg at $800. They have been there ever since including orders for 250kg on both 4/28/16 and 5/19/16. They never payed [sic] a royalty."[152]

108.    Once again, Mr. Gunderson did not attempt to establish if or how Elysium relied upon this information, nor has he calculated the amount of profits to Elysium likely resulting from some action or decision that was better informed by knowing this information. More important to

---

[149] ELY_0108750 – 751.

[150] *Id*.

[151] ELY_0085617.

[152] *Id*.

**Exhibit 11**
**Page 295**

Mr. Gunderson's damages calculation here is the date this was disclosed, and not what was allegedly disclosed.

109.   Lastly, in his third alternative scenario Mr. Gunderson opines that ChromaDex is entitled to recover Elysium's total profits "starting from October 1, 2016, based upon when Elysium began to sell the accused Basis products containing ChromaDex's NR ingredients supplied to Elysium under the June 30 Purchase Orders."[153]   Under this alternative scenario, Elysium's unjust profits total ███████████ from October 1, 2016 through December 2018.[154]

110.   The subjective choice of start dates used in his unjust enrichment calculations exposes the extent to which Mr. Gunderson's entire damages methodology is erroneous. Under Mr. Gunderson's theory, the amount of profits unjustly accruing to Elysium doesn't depend on which, how many, or when the claimed trade secrets or other confidential information were allegedly misappropriated by Elysium, but merely on the date of Mr. Gunderson's choosing.

111.   Consider then the tortured logic that results from Mr. Gunderson's damages approach under a scenario in which the trier-of-fact returns an award of Elysium's profits "based upon when Elysium began to sell the accused Basis products containing ChromaDex's NR ingredients supplied to Elysium under the June 30 Purchase Orders."[155] While an award of Elysium's total profits starting on October 1, 2016 implies that the profits are attributable to the misappropriation prior to this date are $0, such an award also implies that *none, $0,* of Elysium's profits attributable to the alleged misappropriation.  Again, Mr. Gunderson justifies his seemingly arbitrary selection of start dates thus:

   a.   July 16, 2015: based on "Defendants' improper uses and/or disclosures of ChromaDex's trade secrets, confidential and/or proprietary information at issue, including regarding the initial improper uses of information of Elysium's largest NR competitor, Live Cell, regarding Live Cell's historical sales as well as its sales goals of NR-containing products and business strategies."[156]

---

[153] Gunderson report, p. 87.

[154] *Id.*, p. 91, Schedule 5B.

[155] *Id.*, p. 87.

[156] *Id.*

**Exhibit 11
Page 296**

b.  May 30, 2016: based on "Defendants' improper uses and/or disclosures of ChromaDex's trade secrets, confidential and/or proprietary information at issue, including regarding the initial improper uses of information from the highly-confidential purchasing history for Live Cell." [157] and,

c.  October 1, 2016: starting from October 1, 2016, based upon when Elysium began to sell the accused Basis products containing ChromaDex's NR ingredients supplied to Elysium under the June 30 Purchase Orders."[158]

112.  While the trier-of-fact's decision to award Elysium's total profits under either (a) or (b) is necessarily predicated on "including regarding the initial improper uses of information", scenario (c) is decidedly not.  It is instead for some reason unrelated to the alleged misappropriation of ChromaDex's claimed trade secrets, confidential and/or proprietary information. As such, Elysium's total profits attributable to ChromaDex misappropriation claims are $0.

113.  However, an award of Elysium's profits beginning on October 1, 2016 based upon when Elysium begins the sale of its Basis product manufactured NR ingredient supplied under the disputed June 30 Purchase Orders presents even more torture to Mr. Gunderson's logic. Given that the appropriate remedy to compensate ChromaDex for the NR ingredient supplied under the June 30 Purchase Orders is payment of those alleged outstanding amounts, an award of Elysium's total profits beginning on October 1, 2016, fully ▮▮▮▮▮▮▮▮, is both illogical and unallowable recovery.[159]

    e.  Mr. Gunderson's Flawed Calculations

114.  Under unjust enrichment from Schedule 5C, Mr. Gunderson calculates total profits on both 1) products made with the NR and PT from the June 30 purchase orders and 2) on Basis products manufactured from NR and PT manufactured by Elysium's alternative ingredients manufacturer.  Beginning in November 2017, the Basis product was manufactured with an

---

[157] *Id.*

[158] Gunderson report, p. 87.

[159] By way of illustration, such an award would be similar to disgorging all the profits of a Mexican restaurant as of the date it began to use the rice that it had received but allegedly had not paid for.

**Exhibit 11
Page 297**

*Highly Confidential*
*Attorneys' Eyes Only*

alternative supply of NR and PT; therefore, the calculation of Elysium's profits in Schedule 5B are overstated by ▮▮▮▮▮▮▮, all else equal.

115.    Fatally to a sound economic analysis, the Gunderson report assumes that asserted trade secrets, confidential and/or proprietary information accounts for all of Elysium's value, which fails to consider any facts relating to Elysium's own significant investments in its company and its products, including:

- Investing in clinical trials to show that Basis works for its intended purpose;
- Investing more than ▮▮▮▮▮▮ to establish its own supply chain;
- Investing in its own patents;
- Testing each lot of Basis for quality and purity both during and after manufacturing;
- Further testing each lot at independent, third-party labs to confirm quality and purity.[160]

### 2)  ChromaDex's Alleged Lost Profits are Unfounded

116.    ChromaDex claims it has suffered, and Mr. Gunderson calculates damages for, "lost profits on ingredient sales that Elysium promised that it would make, or would have made, but that it failed to make as a result of the alleged wrongful acts of the Defendants."[161] Specifically, ChromaDex alleges that Mr. Morris's omissions and breaches, Elysium's stockpile of NR and PT and its non-payment for this inventory, along with other "wrongful acts" as needed, allowed Elysium to invest in an alternative source of NR and PT which it used instead of continuing to purchase these ingredients from ChromaDex.[162] However, missing (again) from Mr. Gunderson's analysis here is the evidence of Elysium's actual use and the causal connection between each of these allegations and Elysium's alternative sources of supply.

117.    Contradicting all of ChromaDex's supposition and Mr. Gunderson's assumptions and leaps of faith are the very inconvenient (for ChromaDex) actual facts and evidence on record in this case.  Fact No. 1:  ChromaDex terminated its supply agreement with Elysium on November 1, 2016, effective February 3, 2017.[163]  Therefore, the probability that ChromaDex would have

---

[160] https://www.elysiumhealth.com/en-us/basis/supply-chain
[161] Gunderson report, p. 104.
[162] *Id.*
[163] CDXCA_0000749.

**Exhibit 11**
**Page 298**

*Highly Confidential*
*Attorneys' Eyes Only*

supplied the NR and PT ingredients to Elysium in the but-for world are essentially zero. Fact No. 2: As discussed previously in my report, ChromaDex made a strategic decision in late-2016 and early-2017 to effectively terminate its ingredients business and launch its own direct-to-consumer NR dietary supplement and in doing so, it terminated the NR supply agreements with the majority of its existing customers.[164] Given this fact, the probability that ChromaDex would have made the but-for sale of NR and PT to Elysium is, again, zero.

118.    Fact No. 3: As depicted in Exhibit 1, ChromaDex's own forecasts directly contradict its repeated claims that Elysium "promised" to purchase larger volumes of NR and PT on a going forward basis.[165] Lastly, Fact No. 4: Elysium did not contract with or purchase NR ingredient from Grace.

119.    In Schedules 7 and 7B, Mr. Gunderson calculates ChromaDex's alleged but-for lost profits based on 1) an August 31, 2016 email from Dan Alminana to Grace including Elysium NR volume projections for 2017 – 2021 and 2) the minimum purchase commitments included in Elysium's terminated NR supply agreement. Mr. Gunderson calculates ChromaDex's total lost profits under these scenarios are $25.5 million and $7.6 million, respectively.

120.    Again, in order for ChromaDex to establish, with evidence and not argument, that it would have made the lost sales to Elysium but-for Elysium's "wrongful acts", ChromaDex must show that an alternative source of manufacturing NR would not have been available to Elysium absent its "wrongful acts."

121.    As for Mr. Gunderson's lost profit calculations, I have the following observations: (1) it should go without saying that Elysium's email to Grace (a manufacturer it did not contract with) regarding its projected NR volumes (that Elysium never purchased or manufactured) is not a "promise" to ChromaDex;[166] (2) I understand that Elysium's responsibility under the minimum purchase requirements in Elysium's NR supply agreement do not survive its termination; and (3) Mr. Gunderson's reliance on a per kilogram price of $1,000 ignores both the volume

---

[164] ChromaDex Form 10-K (2017), pp. 2 and 10.
[165] Exhibit 1.
[166] ELY_0122866 – 69.

**Exhibit 11**
**Page 299**

discount pricing that would otherwise be available to Elysium based on these projected sales volumes and (again) Elysium's MFN rights.

122.    In conclusion, contrary to ChromaDex's baseless claims, the evidence of ChromaDex terminating its NR supply agreement with Elysium and its departure from its NR ingredient supply business alone confirm that the probability ChromaDex would have made these "lost" ingredient sales to Elysium, let alone at the fictitious levels and prices supported by Mr. Gunderson, is zero.

### 3)  Elysium's Avoided Costs

123.    ChromaDex asserts that Elysium received a "financial windfall" in the form of avoided research and development costs it would otherwise have incurred but-for its misappropriation of ChromaDex's trade secrets, confidential and/or proprietary information.[167] In addition, ChromaDex also suggests that "such cost avoidance has allowed Elysium to enter and advance in the market" with its Basis product where ChromaDex "has had a competitive advantage over potential start-up competitors like Elysium."[168]

124.    With respect to Elysium's alleged misappropriation of these particular trade secrets, confidential and/or proprietary information, Mr. Gunderson offers no expert opinion and merely recites a list of ChromaDex's unsupported accusations and "conversations with ChromaDex personnel.[169] Despite this, Mr. Gunderson calculates that ChromaDex is owed $523,449 allegedly representing its own R&D investments in its NR Study Data, NRCl Analytical Method, and pTeroPure GRAS Report.[170]

125.    With respect to ChromaDex's NR Study Data, I understand that ChromaDex itself had disclosed this information publicly as early as May 2015.[171] Given its previous public disclosure, Elysium's avoided R&D costs to develop this information is $0. Additionally, I have been advised that ChromaDex also publicly disclosed the both the NRCl Analytical

---

[167] Gunderson report, p. 92.
[168] Gunderson report, p. 92.
[169] *Id.*, p. 94.
[170] *Id.*, p. 95, Schedule 6.
[171] CDXCA_00179402 – 404.

**Exhibit 11
Page 300**

*Highly Confidential*
*Attorneys' Eyes Only*

Method and Processes prior to Elysium's alleged misappropriation.[172] From an economic perspective, the amount Elysium would be willing to invest to reproduce freely accessible, publicly-available information is also $0.

126.  Lastly, ChromaDex claims, with no support, that Elysium used the information contained in its pTeroPure GRAS Report, that this alleged use allowed Elysium to avoid incurring certain R&D expenses, and that the proper compensation for this alleged use and misappropriation is best approximated by ChromaDex's own proposed investment ($60,000).[173]  Mr. Gunderson cites no evidence of Elysium actually benefitting from the pTeroPure GRAS Report.

### 4)  ChromaDex Unpaid Sales Invoices

127.  Under ChromaDex's claim with respect to its unpaid sales invoices, Mr. Gunderson has calculated ChromaDex's damages for the "amount due to ChromaDex based on the July 1, 2016 and August 9, 2016 sales invoices for the NIAGEN and pTeroPure product delivered under the Supply Agreements."[174]  As set forth in Schedule 12 of the Gunderson report, Mr. Gunderson calculates damages totaling $2,983,350 on shipments of 3,000 kilograms of the NR ingredient and 580 kilograms of the pterostilbene ingredient to Elysium.[175]

128.  I am advised that when it submitted these at-issue purchase orders to ChromaDex on June 30, 2016, Elysium understood that it was entitled to a refund or credit from ChromaDex, based on its breach of the MFN Provision of the NR supply agreement, that would result in a significant or complete offset of the amounts invoiced in the June 30 Purchase Orders.

129.  As set forth in my previous expert report, I calculated the measure of Elysium's economic damages resulting from ChromaDex's alleged breach of the MFN Provision for which Elysium is entitled to a refund or credit, totals approximately $4.39 million (Cockburn report, Exhibit 3) or $2.74 million (Cockburn report, Exhibit 4) depending on the trier-of-fact's determination as to the appropriate third-party transaction.[176]

---

[172] https://www.lifeextension.com/magazine/2014/11/the-youth-restoring-benefits-of-nad/page-01?p=1.

[173] Gunderson report, pp. 95 – 96.

[174] *Id.*, p. 99.

[175] *Id.*, Schedule 12.

[176] *Id.*, p. 62.

**Exhibit 11**
**Page 301**

*Highly Confidential*
*Attorneys' Eyes Only*

130.    I understand that the amount of the invoices on the June 30 Purchase Orders is not in dispute and therefore does not require expert opinion but I am prepared to assist the trier-of-fact in calculating an offset to these amounts based upon resolution of the parties MFN Provision dispute.

### 5) ChromaDex's "Improper" Price Discounts

131.    Following a June 30, 2016 phone call between principals at Elysium and ChromaDex regarding, *inter alia*, NR pricing on orders from Elysium, Elysium submitted purchase orders to ChromaDex for 3,000 kilograms of NR at an agreed-upon price of $800 per kilogram. I understand that while neither ChromaDex nor Elysium dispute these general facts, they are in sharp disagreement as to the appropriateness of the events that precipitated the submission and acceptance of these purchase orders (the "June 30 Purchase Orders".)

132.    ChromaDex, through Mr. Gunderson's report, claims Mr. Morris's "wrongful acts" and Elysium's "inducement" resulted in damages to ChromaDex totaling $600,000 on the June 30 Purchase Orders, calculated as the product of a $200 per kilogram "reduction in the selling price" on the "significantly larger amounts" (i.e. 3,000 kilograms) of NR ordered by Elysium.[177] Mr. Gunderson contends ChromaDex was damaged by having provided "the price discount [to Elysium] in reliance on Mr. Morris's inappropriate omissions and Elysium's wrongful acts" that occurred only "*after* Elysium received ChromaDex's trade secret from Mark Morris."[178] For support, Mr. Gunderson points the trier-of-fact to certain disclosures of Mr. Morris (then an employee at ChromaDex) to Elysium including information on Live Cell's allegedly confidential per kilogram NR price and volume purchases from ChromaDex as well as ChromaDex's own per kilogram cost to acquire NR ingredient from its contract manufacturer W. R. Grace.[179]

---

[177] Gunderson report, p. 103.  Mr. Gunderson calculates the $200 per kilogram "reduction in selling price" as the difference between Elysium's pre-July 1, 2016 NR price of $1,000 per kilogram and the "discounted" $800 per kilogram price.

[178] *Id.* (emphasis added).

[179] *Id.*, pp. 101 – 102.

"Dan, Live Cell was at $1400 until 8/29/14, when we sold them 100 kilograms at $900. Then on 2/27/15, we sold them 300 kilograms at $800. They have been there ever since, including orders for 250 kilograms on both 4/28/16 and 5/19/16." *See* ELY_0085617 at #15764, Chat No. 298.

**Exhibit 11**
**Page 302**

*Highly Confidential*
*Attorneys' Eyes Only*

133.   Finally, Mr. Gunderson relies on ChromaDex's unsupported legal claims for additional proof as to the Defendants' wrongful acts,

> "Elysium personnel falsely stated on the June 30 Call that Elysium intended to be a good business partner to ChromaDex and explained that Elysium's business was "ramping up," as the reason the June 28 Purchase Orders were significantly larger than Elysium's past orders at significantly discounted prices."[180]

134.   However, conspicuously absent from Mr. Gunderson's damages analysis is any consideration of the following two important, highly relevant facts on record in this case: first, ChromaDex's (then) existing contractual obligation, as set forth in section 3.1 of the parties' February 3, 2014 supply agreement, to revise Elysium's NR price "to such Third Party price" in the event "ChromaDex supplies Niagen (or a substantially similar product) to a Third Party at a price that is *lower* than that at which Niagen is supplied to Elysium Health" and second, ChromaDex's own disclosure to Elysium of the per kilogram prices paid by its other NR customers, including data showing ChromaDex had agreed to sell NR to other purchasers a prices more favorable than the price at which ChromaDex had sold NR to Elysium (the "Fraudulent Spreadsheet".)[181]

135.   It is important to note that Mr. Gunderson's damages opinion is predicated entirely on ChromaDex having had to provide Elysium a $200 per kilogram price discount on its NR purchases due to Mr. Morris's disclosure of allegedly confidential information including, *inter alia*, Live Cell's $800 per kilogram NR price. However, this approach results in an obvious conflict in his analysis based on Elysium's rights under the MFN Provision not previously considered by Mr. Gunderson; that is, Mr. Gunderson's damages calculation survives only if ChromaDex is allowed to charge Elysium its previous (but-for) price of $1,000 per kilogram. However, I am advised that doing so would implicate ChromaDex in an ongoing material

---

"I verified – These guys paid ███ for this inventory." *See* ELY_0085617 at #4243, Chat No. 159.

   I have been advised that despite their ongoing commercial relationship, ChromaDex and Live Cell have not executed a supply agreement.  As a result, I have been advised that these parties therefore have no agreed-upon definition of what constitutes Live Cell's or ChromaDex's confidential information.

[180] Gunderson report, p. 102 (citing ChromaDex's Fifth Amended Complaint, November 27, 2018, pp 12 – 13.)

[181] CDACA_00061424 – 434 at 426; Elysium's First Amended Counterclaims, March 6, 2017, p.3. I understand that under the MFN Provision, Elysium was entitled to a revised (i.e. lower) NR price provided that it "purchases equal volumes or higher volumes than the Third Party."

**Exhibit 11
Page 303**

breach of Elysium's MFN Provision that were brought to light by Mr. Morris's and ChromaDex's own disclosures.

### 6) ChromaDex's Out-of-Pocket Financing Expenses

136.    ChromaDex seeks to recover from Elysium the out-of-pocket financing expenses of approximately $238,000 it allegedly incurred to "establish a revolving line of credit with Bridge Bank . . . on November 4, 2016" as a result of Mr. Morris's alleged omissions and Elysium's alleged non-payment of the June 30 Purchase Orders.[182]

137.    As with each of the positions claimed by ChromaDex and supported by Mr. Gunderson in this matter, the mere fact that one event (ChromaDex establishing a line of credit) follows another (Mr. Morris's alleged omissions and Elysium's alleged non-payment) does not establish that the first was, in fact, caused by the second. As the company itself points out in its November 3, 2016 Liquidity / Going Concern Memorandum, ChromaDex has a "history of losses" and may continue to incur them.[183] As noted earlier in my report, ChromaDex also has a history of late payments with respect to its own NR ingredient purchases from Grace and has also previously raised concern about its working capital. Given these facts, and the evidence of significant unpaid balances with respect to other ChromaDex customers, the evidence here contradicts ChromaDex's assertion that Elysium and Mr. Morris are the specific cause of ChromaDex's financial issues.

### 7) Mark Morris's Compensation

138.    Based on the alleged breach of his February and July Confidentiality Agreements and various "omissions" and "strategies for undermining", ChromaDex seeks to disgorge Mr. Morris's actual pay while at ChromaDex over a five-month period ending on July 16, 2016 ($77,137) plus their estimate of his salary and the value of his shares in Elysium from August 1, 2016 through December 31, 2018 ($607,644).[184]

---

[182] Gunderson report, pg. 116.
[183] CDXCA_00463684 – 686.
[184] Gunderson report, pp. 116 – 118, Schedule 11.

**Exhibit 11
Page 304**

*Highly Confidential*
*Attorneys' Eyes Only*

139.    ChromaDex makes no effort at apportionment, and Mr. Gunderson offers no expert opinion justifying their claim, especially with respect to the disgorgement of his entire compensation as an employee of Elysium.

### 8) Elysium's Refund/Credit for Required Trademark Royalty Payments

140.    In the report I previously served in this matter, I estimated Elysium's total royalty obligation under its February 2014 TLA with ChromaDex.[185]  Based on the information summarized in ChromaDex's own royalty reports, Elysium was required to pay ChromaDex approximately $496,000 in trademark royalties through Q2:2016 under the terms of the TLA.[186]

141.    Based upon my review of Schedule 18 of Mr. Gunderson's expert report, he calculates the refund/credit of royalty payments made by Elysium to be $250,773.[187] I have been advised that the entitlement to a refund or credit here is the responsibility of the trier-of-fact and agree that the computation of Elysium's refund or credit does not require expert opinion.

---

[185] CDXCA_00061402 – 408.

[186] CDXCA_00006939 - 6939, CDXCA_00006948 - 6948, CDXCA_00059349 - 59349, CDXCA_00100914 - 100914, CDXCA_00101783 - 101783, CDXCA_00007068 - 7068.  I note that Elysium's trademark royalty rate increased from 5.0% to 5.5% of net sales beginning in 2016 as a result of its effective NR ingredient price falling from an average of $1,121.78 per kilogram in 2015 to $1,000 per kilogram beginning in Q1:2016.

[187] Gunderson report, pp. 121 – 122, Schedule 18.

**Exhibit 11
Page 305**

*Highly Confidential*
*Attorneys' Eyes Only*

Executed on July 26, 2019 in Boston, MA.

_____

Iain M. Cockburn

**Exhibit 11**
**Page 306**