1  COOLEY LLP
   MICHAEL A. ATTANASIO (151529)
2  (mattanasio@cooley.com)
   BARRETT J. ANDERSON (318539)
3  (banderson@cooley.com)
   CRAIG E. TENBROECK (287848)
4  (ctenbroeck@cooley.com)
   SOPHIA M. RIOS (305801)
5  (srios@cooley.com)
   JAYME B. STATEN (317034)
6  (jstaten@cooley.com)
   4401 Eastgate Mall
7  San Diego, CA  92121
   Telephone: (858) 550-6000
8  Facsimile:  (858) 550-6420

9  *Attorneys for Plaintiff and Counter-Defendant*
   *ChromaDex, Inc.*
10
   *Counsel continued on following page*
11

12              **UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

14                    **(WESTERN DIVISION)**

15  ChromaDex, Inc.,                    | Case No.  8:16-cv-2277-CJC (DFMx)

16              Plaintiff,              | **CHROMADEX, INC.'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

17         v.

18  Elysium Health, Inc. and Mark Morris,

19              Defendants.

20  ───────────────────────────────     | Judge:          Hon. Cormac J. Carney
    Elysium Health, Inc.,                | Courtroom:      7C
21
              Counterclaimant,          | Pretrial Conference:  Sept. 18, 2019
22                                       | Trial:                October 15, 2019
         v.
23
    ChromaDex, Inc.,
24
              Counter-Defendant.
25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1   COVINGTON & BURLING LLP
    MITCHELL A. KAMIN (202788)
2   (mkamin@cov.com)
    1999 Avenue of the Stars, Suite 3500
3   Los Angeles, CA 90067-4643
    Telephone:  (424) 332-4800
4   Facsimile:   (424) 332-4749

5   COVINGTON & BURLING LLP
    PHILIP A. IRWIN (admitted *pro hac vice*)
6   (pirwin@cov.com)
    620 Eighth Avenue
7   New York, NY 10018-1405
    Telephone:   (212) 841-1000

8
    *Attorneys for Plaintiff and Counter-Defendant*
9   *ChromaDex, Inc.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

# Table of Contents

**Page**

I.     INTRODUCTION ................................................................. 1

II.    SUMMARY STATEMENT OF CHROMADEX'S CLAIMS .......................... 2

III.   ELEMENTS REQUIRED TO ESTABLISH CHROMADEX'S CLAIMS ...... 2

IV.    KEY EVIDENCE IN SUPPORT OF CHROMADEX'S CLAIMS ................. 5

    A.   Key Evidence In Support of ChromaDex's Claims for Breach of the PT and NR Supply Agreements (Elysium) ......................... 5

        1.   Failure to pay for 580 kilograms of pTeroPure and 3,000 kilograms of NIAGEN .......................................... 5

        2.   Disclosure and/or use of confidential and proprietary information .......................................................... 5

    B.   Key Evidence in Support of ChromaDex's Claims for Breach of the February and July Confidentiality Agreements (Morris) .................. 6

    C.   Key Evidence In Support of ChromaDex's Claims for Misappropriation of Trade Secrets under CUTSA and the DTSA (Elysium and Morris) ......................................... 7

    D.   Key Evidence in Support of ChromaDex's Claims for Breach of Fiduciary Duty (Morris) and Aiding and Abetting Breach of Fiduciary Duty (Elysium) .................................. 10

V.     SUMMARY STATEMENT OF ELYSIUM'S COUNTERCLAIMS ............. 11

VI.    ELEMENTS REQUIRED TO ESTABLISH DEFENDANTS' COUNTERCLAIMS ................................................. 11

VII.   SUMMARY STATEMENT OF DEFENDANTS' AFFIRMATIVE DEFENSES ........................................................ 13

VIII.  KEY EVIDENCE IN OPPOSITION TO ELYSIUM'S COUNTERCLAIMS ................................................. 15

    A.   Key Evidence in Opposition to Elysium's Counterclaims for Breach of Sections 3.7 and 3.9 ............................ 15

    B.   Key Evidence in Opposition to Elysium's Counterclaim for Breach of Sections 3.1 ........................................ 18

    C.   Key Evidence in Opposition to Elysium's Counterclaim for Breach of Section 3.11.3 ...................................... 19

    D.   Key Evidence in Opposition to Elysium's Counterclaim for Breach of Section 4.1 ........................................ 21

    E.   Key Evidence in Opposition to Elysium's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing ................ 22

    F.   Key Evidence in Opposition to Elysium's Counterclaim for Fraudulent Inducement ...................................... 22

    G.   Key Evidence in Opposition to Elysium's Counterclaim for Patent Misuse ...................................................... 23

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

i.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

1

**Table of Contents**
(continued)

2
**Page**

3    H.    Key Evidence in Opposition to Elysium's Counterclaim for
          Restitution for Unjust Enrichment ........................................................ 24

4  IX.  SUMMARY STATEMENT OF CHROMADEX'S AFFIRMATIVE
        DEFENSES ............................................................................................... 24

5  X.   ANTICIPATED EVIDENTIARY ISSUES ................................................ 26

6  XI.  BIFURCATION OF ISSUES .................................................................... 28

7  XII. JURY TRIAL ........................................................................................... 28

8  XIII. ISSUES OF LAW .................................................................................... 28

   XIV. ATTORNEYS' FEES ............................................................................... 29

9  XV.  ABANDONMENT OF ISSUES ............................................................... 29

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

Pursuant to Local Rule 16-4 of the United States District Court for the Central District of California, Plaintiff and Counter-Defendant ChromaDex, Inc. ("ChromaDex" or "Plaintiff") respectfully submits its Memorandum of Contentions of Fact and Law.

## I.      INTRODUCTION

ChromaDex and Elysium Health, Inc. ("Elysium") both sell products containing a nutraceutical ingredient known as nicotinamide riboside, or "NR." ChromaDex licensed key NR patents in 2012 and was the first company to successfully commercialize NR. In 2014, ChromaDex began to produce and sell commercial batches of NR under the tradename "NIAGEN" to companies marketing direct-to-consumer ("DTC") products.

One of those DTC companies was Elysium. Elysium approached ChromaDex in 2013 seeking to purchase commercial quantities of NR in order to market a dietary supplement they later named "Basis." Elysium first sold Basis to consumers in 2015 and continues to sell it today.

On June 30, 2016, Elysium ordered from ChromaDex large shipments of NR and another ingredient it puts in Basis, pterostilbene ("PT"). Elysium did not, and never has, paid for those orders. After June 30, Elysium never again placed an order for NR from ChromaDex, and its Basis product is now made with a new source of NR.

ChromaDex filed this lawsuit in December 2016 to recover what it is owed for the June 30 ingredient orders. It has since expanded its claims and now alleges, among other things, that Elysium and former ChromaDex executive Mark Morris schemed to steal the ingredients from ChromaDex, "destroy" ChromaDex by undermining its relationships with its NR patent licensor and NR manufacturer, and accelerate Elysium's acquisition of an alternate source of NR, all while Morris was a ChromaDex executive. It also alleges that both Elysium and Morris (collectively, "Defendants") breached various confidentiality obligations in contracts they executed with ChromaDex by disclosing and misusing ChromaDex documents and information.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-cv-2277-CJC (DFMx)

1    Elysium responded with counterclaims.

2    **II.    SUMMARY STATEMENT OF CHROMADEX'S CLAIMS**

3    ChromaDex brings claims against Elysium and Morris pursuant to California and

4    federal law.  Each claim is identified below:

5        1.    Elysium breached the PT Supply Agreement;

6        2.    Elysium breached the NR Supply Agreement;

7        3.    Elysium and Morris violated the California Uniform Trade Secrets Act

8              ("CUTSA") (Cal. Civ. Code § 3426, *et seq.*);

9        4.    Elysium and Morris violated the Federal Defense of Trade Secrets Act

10             ("DTSA") (18 U.S.C. § 1836, as amended);

11       5.    Morris breached the February Confidentiality Agreement;

12       6.    Morris breached the July Confidentiality Agreement;

13       7.    Morris breached his fiduciary duty; and

14       8.    Elysium aided and abetted Morris's breach of fiduciary duty.

15   **III.   ELEMENTS REQUIRED TO ESTABLISH CHROMADEX'S CLAIMS**

16   **Elements of Breach of Contract: PT Supply Agreement (Elysium):**

17       1.    ChromaDex and Elysium entered into a contract (the PT Supply

18             Agreement);

19       2.    ChromaDex did all, or substantially all, of the significant things that the

20             contract required it to do, or was excused from having to do those things;

21       3.    Elysium failed to do something the contract required it to do;

22       4.    ChromaDex was harmed; and

23       5.    Elysium's breach of contract was a substantial factor in causing

24             ChromaDex's harm.

25   [*Authority:* Judicial Council of California, Civil Jury Instructions 303; *see Toyo Tire &*

26   *Rubber Co. v. Doublestar Dong Feng Tyre Co.*, 2018 WL 1895696, at *6 (C.D. Cal.

27   Apr. 12, 2018) (Carney, J.).]

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

2.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

**Elements of Breach of Contract Claim: NR Supply Agreement (Elysium):**

1.  ChromaDex and Elysium entered into a contract (the NR Supply Agreement);

2.  ChromaDex did all, or substantially all, of the significant things that the contract required it to do, or was excused from having to do those things;

3.  Elysium failed to do something the contract required it to do;

4.  ChromaDex was harmed; and

5.  Elysium's breach of contract was a substantial factor in causing ChromaDex's harm.

[*Authority:* Judicial Council of California, Civil Jury Instructions 303; *Toyo Tire & Rubber Co*, 2018 WL 1895696, at *6.]

**Elements of Breach of Contract: February Confidentiality Agreement (Morris):**

1.  ChromaDex and Morris entered into a contract (the February Confidentiality Agreement);

2.  ChromaDex did all, or substantially all, of the significant things that the contract required it to do, or was excused from having to do those things;

3.  Morris failed to do something the contract required him to do;

4.  ChromaDex was harmed; and

5.  Morris's breach of contract was a substantial factor in causing ChromaDex's harm.

[*Authority:* Judicial Council of California, Civil Jury Instructions 303; *Toyo Tire & Rubber Co*, 2018 WL 1895696, at *6.]

**Elements of Breach of Contract: July Confidentiality Agreement (Morris):**

1.  ChromaDex and Morris entered into a contract (the July Confidentiality Agreement);

2.  ChromaDex did all, or substantially all, of the significant things that the contract required it to do, or was excused from having to do those things;

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

3.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

3.    Morris failed to do something the contract required him to do;

4.    ChromaDex was harmed; and

5.    Morris's breach of contract was a substantial factor in causing ChromaDex's harm.

[*Authority:* Judicial Council of California, Civil Jury Instructions 303; *Toyo Tire & Rubber Co*, 2018 WL 1895696, at *6.]

### Elements of Misappropriation of Trade Secrets under CUTSA and DTSA (Morris and Elysium):

1.    ChromaDex owned one or more trade secrets;

2.    The trade secret was a trade secret at the time of the misappropriation;

3.    Defendants improperly used the alleged trade secret;

4.    ChromaDex was harmed or Defendants were unjustly enriched; and

5.    Defendants' use was a substantial factor in causing ChromaDex's harm or Defendants' unjust enrichment.

[*Authority:* Judicial Council of California, Civil Jury Instructions 4401; Cal. Civ. Code § 3426.1; *Automotive Data Sols., Inc. v. Directed Elecs. Canada, Inc.* 2018 WL 4742289, at *3 (C.D. Cal. Aug. 15, 2018 ("The elements of misappropriation under the DTSA are similar to those under the CUTSA."); *see* 18 U.S.C. § 1839(5).]

### Elements of Breach of Fiduciary Duty:

1.    Morris was ChromaDex's corporate officer;

2.    Morris knowingly acted against ChromaDex's interests in connection with his dealings with Elysium;

3.    ChromaDex did not give informed consent to Morris's conduct;

4.    ChromaDex was harmed; and

5.    Morris's conduct was a substantial factor in causing ChromaDex's harm.

[*Authority:* Judicial Council of California, Civil Jury Instructions 4102]s

### Elements of Aiding and Abetting Breach of Fiduciary Duty (Elysium):

1.    Elysium knew that a breach of fiduciary duty was going to be committed

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

4.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)

1   by Morris against ChromaDex;

2       2.    Elysium gave substantial assistance or encouragement to Morris; and

3       3.    Elysium's conduct was a substantial factor in causing harm to ChromaDex.

4   [*Authority:* Judicial Council of California, Civil Jury Instructions 3610.]

5   **IV.   KEY EVIDENCE IN SUPPORT OF CHROMADEX'S CLAIMS**

6       **A.   Key Evidence In Support of ChromaDex's Claims for Breach of the
7   PT and NR Supply Agreements (Elysium)**

8   ChromaDex and Elysium entered into two supply agreements, the PT Supply

9   Agreement and the NR Supply Agreement.   Documents and testimony show that

10   Elysium breached both agreements in multiple ways.

11       **1.   Failure to pay for 580 kilograms of pTeroPure and 3,000 kilograms of NIAGEN**

12   On June 30, 2016, Elysium ordered 580 kilograms of pTeroPure and 3,000

13   kilograms of NIAGEN ("June 30 Orders").   ChromaDex delivered the product, and

14   Elysium refused to pay for it.

15       **2.   Disclosure and/or use of confidential and proprietary
16   information**

17   Elysium also disclosed ChromaDex's confidential and proprietary information to

18   third parties in violation of various contractual provisions.   The documents and

19   information at issue are identified in ChromaDex's Second Amended Response to Mark

20   Morris's Interrogatory No. 1, dated August 9, 2019.   Examples of specific contractual

21   violations include the following:

22   Section 15.1 of the PT Supply Agreement restricted the parties' disclosure and

23   use of confidential information.   Elysium violated this provision by disclosing the

24   pTeroPure GRAS Report to third parties.   The pTeroPure GRAS Report was not public

25   and was labeled confidential.

26   Section 4.1 of the NR Supply Agreement prohibited the parties from using or

27   disclosing confidential information except on a need-to-know basis "to the extent such

28   disclosure is reasonably necessary in connection with such party's activities as

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

5.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)

expressly authorized by [the] Agreement." Elysium violated this provision by disclosing certain confidential documents and information to third parties for purposes *not* authorized by the agreement. These documents included: the NRCl Analytical Method, the NIAGEN Investigator's Brochure, and the NR Study Data.

Section 15.2 of the PT Supply Agreement prohibited the parties from disclosing "any terms or conditions of [the] Agreement to any Third Party without the prior consent of the other party." ChromaDex's Pterostilbene Specifications were incorporated into the terms of the PT Agreement as Exhibit A to the agreement. Elysium violated Section 15.2 by disclosing the Pterostilbene Specifications to at least one potential manufacturer to describe the pterostilbene Elysium wanted that manufacturer to produce on its behalf as a synthetic pterostilbene product that would compete against ChromaDex's pTeroPure.

Section 4.2 of the NR Supply Agreement prohibited the parties from disclosing "any terms or conditions of [the] Agreement." The NR Specifications were incorporated into the terms of the NR Supply Agreement as Exhibit A to the agreement. Elysium violated Section 4.2 by repackaging and then disclosing the NR Specifications to its alternative manufacturer of NR for the purpose of developing a competing source of NR.

**B.    Key Evidence in Support of ChromaDex's Claims for Breach of the February and July Confidentiality Agreements (Morris)**

ChromaDex and Morris entered into two agreements: the February Confidentiality Agreement and the July Confidentiality Agreement. Morris signed the February Confidentiality Agreement on February 26, 2016, and the July Confidentiality Agreement on July 15, 2016. Both agreements obligated him to keep ChromaDex's trade secrets and confidential information within the company and to return or destroy any ChromaDex information upon leaving the company. Morris breached both agreements repeatedly, as shown by text messages and emails. While employed by ChromaDex, Morris fed documents and information to Elysium. After leaving, he

CooLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

6.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

repurposed valuable ChromaDex documents for Elysium's benefit.  For example, Morris admitted at his deposition that he downloaded the "Ingredient Sales Spreadsheet" from a thumb drive onto Elysium's computers rather than return it to ChromaDex or destroy it.  Morris has since "lost" that thumb drive, although he admitted that it likely contained other ChromaDex documents and information, and also admitted that he deleted personal emails and text messages that are relevant to the case. Morris also provided sales information to Elysium to support its effort to persuade ChromaDex's contract manufacturer W.R. Grace ("Grace") to sell NR directly to Elysium.

The trade secrets and/or confidential information at issue are among those identified in ChromaDex's Second Amended Response to Mark Morris's Interrogatory No. 1, dated August 9, 2019.

### C. Key Evidence In Support of ChromaDex's Claims for Misappropriation of Trade Secrets under CUTSA and the DTSA (Elysium and Morris)

ChromaDex will rely on documents and testimony to show that Elysium and Morris harmed ChromaDex by misappropriating ChromaDex's trade secrets in violation of the California Uniform Trade Secret Act ("CUTSA"), codified at Cal. Civ. Code § 3426, *et seq.*, and the Federal Defend Trade Secrets Act ("DTSA"), codified at 18 U.S.C. § 1836, *et seq*.  There are four primary categories of trade secrets at issue: (1) ChromaDex's ingredient sales information, including customer purchasing histories and customers' relative market positions (such as ChromaDex's "Ingredient Sales Spreadsheet"); (2) the price ChromaDex paid to obtain NR from Grace; (3) ChromaDex's research and development work regarding different salts for use in manufacturing NR; and (4) ChromaDex's research and development work regarding different methods for manufacturing NR.

**Sales Information.**  Defendants misappropriated ChromaDex's ingredient sales information.  ChromaDex's ingredient sales information derives independent economic value from not being generally known to the public.  ChromaDex's ingredient sales

Cooley LLP
Attorneys At Law
San Diego

7.

ChromaDex's Memorandum of
Contentions of Fact and Law
8:16-cv-2277-CJC (DFMx)

information contains data that cannot be gleaned from public sources, such as the prices, volumes, and dates of each customer's purchases.  ChromaDex's ingredient sales information gives ChromaDex a competitive edge against other ingredient supplies, and would be valuable to a competitor.

Moreover, ChromaDex made and continues to make efforts reasonable under the circumstances to maintain the secrecy of its ingredient sales information.  These efforts include limiting the access to this information to select ChromaDex employees, requiring employees to enter employment and confidentiality agreements restricting their use and disclosure of "secret processes, inventions, custom and supplier lists and other trade secrets."

On May 29, 2016, Morris texted Dan Alminana—Elysium's COO—the pricing and purchasing history of ChromaDex's ingredient customer Live Cell.  Morris and Elysium also misappropriated ChromaDex Ingredient Sales Spreadsheet, which contains the detailed purchasing history of every ChromaDex ingredient customer since 2012.  ChromaDex never shared the Ingredient Sales Spreadsheet outside of the company, except on the rare occasion such disclosure was necessary to financial professionals retained by ChromaDex. Yet the Ingredient Sales Spreadsheet was saved to Elysium's servers on July 18, 2016—Morris's first day of work.  The Ingredient Sales Spreadsheet was produced in discovery by Elysium from the files of Eric Marcotulli, Elysium's CEO.

**Manufacturing Cost.**  Defendants misappropriated the price ChromaDex pays to its NR contract manufacturer, Grace.  The price ChromaDex pays Grace for ChromaDex's supply of NR derives independent economic value from not being generally known to the public.  This information concerning ChromaDex's profit margins could, and would be, competitively advantageous to a competitor, who could use that information to undercut ChromaDex's pricing in the ingredient supply market or use it to develop and establish a competing source of NR.

ChromaDex made, and continues to make, reasonable efforts to protect the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

8.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)

secrecy of this information.  ChromaDex efforts to maintain the secrecy of this information also include limiting the access to this information to select ChromaDex employees and members of management, requiring employees to enter employment and confidentiality agreements restricting their use and disclosure of trade secrets.

Sometime in late in June 2016, Morris oral told and then later confirmed by text message to Alminana the price that ChromaDex pays to W.R. Grace for its supply of NR.  Documents produced in discovery as well as deposition testimony show that Elysium used that price point to negotiate a lower price with ChromaDex, develop and establish its competing source of NR, and obtain additional financing to keep its business afloat.

**R&D (salts).**  Defendants misappropriated ChromaDex's research and development work regarding different salts for use in manufacturing NR.  ChromaDex's research and development work regarding salts for use in manufacturing NR derives independent economic value from not being generally known to the public.  This information cannot be gleaned from public sources.  ChromaDex's manufacturing research and development gives ChromaDex a competitive edge against other suppliers of NR, as it has refined the process and obtained the know how to produce quality NR.

Moreover, ChromaDex made and continues to make efforts reasonable under the circumstances to maintain the secrecy of this information.  These efforts include limiting the access to this information to select ChromaDex employees, and requiring employees to enter employment and confidentiality agreements restricting their use and disclosure of "secret processes . . . and other trade secrets."

Once his official employment with Elysium began, Morris provided this key research and development work regarding salts to Elysium's contract manufacturer in order for Elysium to obtain an alternate supply of NR faster than it otherwise would have, enabling it to survive as a business, and for it to obtain additional financing to keep Elysium's business afloat.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

9.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)

**R&D (manufacturing methods).** Defendants misappropriated ChromaDex research and development work regarding different methods for manufacturing NR. Morris provided these documents to Elysium's contract manufacturer in order to obtain an alternate supply of NR, and to do so more quickly than it otherwise could have, in order to stay in business, and for it to use in its scheme to undermine ChromaDex's relationships with key contractual partners.

**D.    Key Evidence in Support of ChromaDex's Claims for Breach of Fiduciary Duty (Morris) and Aiding and Abetting Breach of Fiduciary Duty (Elysium)**

ChromaDex will rely on documents and testimony to show that Morris, an executive of ChromaDex with managerial responsibilities, breached his fiduciary duty and was substantially encouraged and assisted by Elysium. Elysium began considering Morris for employment by at least spring of 2016, and required him to sign a nondisclosure agreement as part of that process. Elysium eventually offered him a job. Despite Morris's desire to move to Elysium, Elysium ordered him to stay at ChromaDex to act as Elysium's agent to induce ChromaDex to accept the June 30 Orders. Morris's breach is illustrated in an email chain in which he declares his "unconditional loyalty" to Elysium's officers while still employed by ChromaDex. Morris even thanked Elysium's officers for persuading him to lie to ChromaDex about the reasons for his departure and to remain silent about his future with Elysium.

Examples of Morris's misconduct include: (1) acting as Elysium's agent to manipulate ChromaDex into fulfilling the June 30 Orders and giving Elysium an unwarranted discount; (2) withholding information about Elysium's intent to stockpile NIAGEN and pTeroPure without paying ChromaDex, so it could develop competing supplies of NR and pterostilbene; (3) lying to ChromaDex about his plan to work for Elysium; (4) working for Elysium while still employed by ChromaDex; (5) lying about returning ChromaDex trade secrets and confidential information; and (6) helping Elysium to undermine ChromaDex with third parties.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

10.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

1    There is ample evidence of his misconduct. For example, Morris was aware of

2  Elysium's "strategy" to submit enormous orders of NR and pterostilbene at the end of

3  June 2016 for a stockpile that it planned to last well into 2017, but said nothing to his

4  employer, even after Elysium lied to ChromaDex that it would place more large orders

5  in 2016.   Morris also assisted Elysium in its search for a new supplier while still

6  employed by ChromaDex.   In certain text messages with Alminana and Marcotulli,

7  Morris promoted his efforts to "get rid of the scumbags holding this magnificent [NR]

8  technology" and "make [ChromaDex's] nightmares come true!" Morris also texted

9  about ChromaDex, "I want to destroy them!"

## V.    SUMMARY STATEMENT OF ELYSIUM'S COUNTERCLAIMS

11   Elysium brings counterclaims against ChromaDex pursuant to both California

12  and federal law.  Each counterclaim is identified below.

13   1.    ChromaDex breached the NR Supply Agreement.

14   2.    ChromaDex breached the Implied Covenant of Good Faith and Fair

15        Dealing contained in the NR Supply Agreement.

16   3.    ChromaDex fraudulently induced Elysium to enter into the Trademark

17        License and Royalty Agreement.

18   4.    Elysium   seeks   declaratory   judgment   for   ChromaDex's   conduct

19        constituting patent misuse.

20   5.    Elysium   seeks   restitution   for   ChromaDex's   alleged   unjust   enrichment

21        resulting from ChromaDex's patent misuse.

## VI.   ELEMENTS   REQUIRED   TO   ESTABLISH   DEFENDANTS' COUNTERCLAIMS

### Elements of  Breach of Contract – NR Supply Agreement:

    1.    ChromaDex and Elysium entered into a contract (the NR Supply
          Agreement);

    2.    Elysium did all, or substantially all of the significant things that the
          contract required it to do, or was excused from those things;

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

11.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

3.     ChromaDex failed to do something the contract required to do;

4.     Elysium was harmed; and

5.     ChromaDex's breach of contract was a substantial factor in causing Elysium's harm.

[*Authority:* Judicial Council of California, Civil Jury Instructions 303; *Toyo Tire & Rubber Co*, 2018 WL 1895696, at *6.]

**Elements of Breach of Implied Covenant of Good Faith and Fair Dealing Contained in the NR Supply Agreement:**

1.     ChromaDex and Elysium entered into a contract (the NR Supply Agreement);

2.     Elysium did all, or substantially all of the significant things that the contract required it to do, or that it was excused from having to do those things;

3.     All conditions required for Elysium's performance occurred or were excused;

4.     ChromaDex unfairly interfered with Elysium's right to receive the benefits of the contract; and

5.     Elysium was harmed by ChromaDex's conduct.

[*Authority:* Judicial Council of California, Civil Jury Instructions 325.]

**Elements of Fraudulent Inducement:**

1.     ChromaDex represented to Elysium that a fact was true;

2.     ChromaDex's representation was false;

3.     ChromaDex knew that the representation was false when made, or that the representation was made recklessly and without regard for its truth;

4.     ChromaDex intended that Elysium rely on the representation;

5.     Elysium reasonably relied on ChromaDex's representation;

6.     Elysium was harmed; and

7.     Elysium's reliance on ChromaDex's representation was a substantial

Cooley LLP
Attorneys At Law
San Diego

12.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

factor in causing Elysium's harm.

[*Authority:* Judicial Council of California, Civil Jury Instructions 1900; *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).]

**Elements of Declaratory Judgment of Patent Misuse:**

1. ChromaDex imposed conditions on Elysium that impermissibly broadened the scope of a patent with anticompetitive effect; and

2. ChromaDex acted in bad faith and with an improper purpose.

[*Authority: Moss v. Moss*, 2014 WL 4669302, at \*6 (N.D.N.Y. Sept. 18, 2014); *Astra Aktiebolag v. Kremers Urban Dev. Co.*, 2001 WL 1807917, at \*1 (S.D.N.Y. Oct. 26, 2001); *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1001 (Fed.Cir.1986); 35 U.S.C. § 271(d).]

**Elements of Restitution for Unjust Enrichment:**

1. ChromaDex received a benefit; and

2. ChromaDex unjustly retained the benefit at Elysium's expense.

[*Authority: ChromaDex, Inc. v. Elysium Health, Inc.*, 2017 WL 7080237, at \*4 (C.D. Cal. Nov. 28, 2017); *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000).]

## VII.   SUMMARY STATEMENT OF DEFENDANTS' AFFIRMATIVE DEFENSES

Defendants assert 14 affirmative defenses.  Each affirmative Defense is identified below.

1. **Affirmative Defense No. 1**: The Fifth Amended Complaint fails to state a claim upon which relief may be granted.

2. **Affirmative Defense No. 2:** The amount sought to be recovered in this action is barred, in whole or in part, by the amount owing from ChromaDex to Elysium.

3. **Affirmative Defense No. 3:** ChromaDex's claims are barred, in whole or in part, because, and to the extent that, any relief or recovery would unjustly enrich it.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

13.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)

4.    **Affirmative Defense No. 4:** ChromaDex's claims are barred, in whole or in part, because ChromaDex materially breached one or more of the Agreements.  Accordingly, Elysium's obligations under the Agreements were excused in whole or in part and the damages to which ChromaDex would otherwise be entitled, if any, are offset in whole or in part.

5.    **Affirmative Defense No. 5:** ChromaDex's claims are barred, in whole or in part, because all or part of Elysium's undertaking of obligations under the Agreements resulted from fraud, deceit, and/or misrepresentation (whether knowingly, recklessly, negligently, or otherwise) by ChromaDex.

6.    **Affirmative Defense No. 6:** ChromaDex's claims are barred in whole or in part because ChromaDex failed to perform its obligations under the Agreements and/or failed to satisfy a condition precedent.

7.    **Affirmative Defense No. 7:** ChromaDex's claims are barred in whole or in part by the doctrines of waiver, estoppel, ratification, and/or consent.

8.    **Affirmative Defense No. 8:** Any and all actions taken by Elysium in relation to ChromaDex and the agreements were taken in good faith and in accordance with Elysium's duties, obligations, and rights pursuant to the Agreements.

9.    **Affirmative Defense No. 9:** ChromaDex's claims are barred in whole or in part by the doctrine of unclean hands.

10.   **Affirmative Defense No. 10:** ChromaDex's claims are barred in whole or in part by the doctrine of laches.

11.   **Affirmative Defense No. 11:** ChromaDex's claims are barred in whole or in part by fraud.

12.   **Affirmative Defense No. 12:** ChromaDex's claims are barred in whole or in part by lack of consideration.

13.   **Affirmative Defense No. 13:** ChromaDex's claims are barred in whole or

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

14.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

1      in part by ChromaDex's failure to mitigate.

2      14.   **Affirmative Defense No. 14:** ChromaDex's claims are barred in whole or

3            in part by the doctrine of setoff.

4      Certain of Defendants' defenses are not affirmative defenses.  Accordingly, there

5 are no elements required to be established with respect to these pled defenses.  Other

6 affirmative defenses—*e.g.*, Nos. 5 and 11, and Nos. 2 and 14—appear duplicative of

7 each other.  Finally, some affirmative defenses—*e.g.*, No. 8 (good faith) are not plead

8 with sufficient particularity for ChromaDex to know whether an affirmative defense

9 exists.   ChromaDex will meet and confer with opposing counsel regarding the

10 affirmative defenses and will provide more detail with the jury instructions and other

11 proposed pre-trial documents that the Court has ordered filed on September 9, 2019.

12 (Dkt. 220.)

13 **VIII.  KEY EVIDENCE IN OPPOSITION TO ELYSIUM'S COUNTERCLAIMS**

14      ChromaDex will present the following key evidence in opposition to Elysium's

15 asserted counterclaims.

16      **A.    Key Evidence in Opposition to Elysium's Counterclaims for Breach of
17            Sections 3.7 and 3.9**

18      Elysium brings claims for breach of contract under Section 3.7 and Section 3.9.

19 Section 3.7 is a limited liability provision which states, in relevant part (in all capital

20 letters):

21      ALL CLAIMS MADE WITH RESPECT TO THE PRODUCT SHALL
        BE DEEMED WAIVED BY ELYSIUM HEALTH UNLESS MADE IN
22      WRITING AND RECEIVED BY CHROMADEX WITHIN THIRTY
        (30) DAYS OF DELIVERY [] ELYSIUM HEALTH MUST MAKE ANY
23      CLAIM   FOR   NON-CONFORMING   NIAGEN,   BREACH   OF
        WARRANTY WITH RESPECT TO THE NIAGEN SOLD, OR ANY
24      CLAIM OF ANY NATURE WHATSOEVER WITH RESPECT TO THE
        NIAGEN SOLD HEREUNDER IN WRITING WITHIN THIRTY (30)
25      DAYS AFTER ELYSIUM HEALTH'S RECEIPT OF NIAGEN; AND []
        ELYSIUM  HEALTH  IRREVOCABLY  WAIVES  AND  RELEASES
26      ALL CLAIMS THAT ARE NOT PROPERLY MADE WITHIN SAID
        PERIOD.

27

28

1   Elysium claims that ChromaDex violated Section 3.7 by manufacturing
2   NIAGEN pursuant to food-grade current Good Manufacturing Practices ("cGMPs"),
3   rather than in accordance with pharmaceutical cGMPS.  Elysium also brings a claim
4   under the purity and safety provision of Section 3.9, which states that ChromaDex will
5   "promptly inform Elysium Health in writing of any information concerning or that can
6   potentially impact the . . . quality or purity of any Niagen of which it becomes aware."

7   Elysium has waived its claims under Sections 3.7 and 3.9.  Over the course of
8   approximately two years, Elysium purchased, and ChromaDex filled, nine NIAGEN
9   purchase orders.  Yet, at no point in time during the contract period did Elysium inform
10  ChromaDex of its cGMP or acetamide claims, as it was required to do under limited
11  liability provision of Section 3.7.  To be sure, at least as early as September 7, 2016,
12  Elysium was aware that ChromaDex manufactured NAGEN in accordance with food-
13  grade cGMPs.  On that day, Alminana emailed Marcotulli with the claim that
14  ChromaDex has breached the cGMP warranty, "as all of the Niagen sold to date has not
15  been manufactured in a GMP facility."  Elysium even drafted, but never sent, a letter
16  notifying ChromaDex of the purported cGMP breach in late September 2016.  And by
17  at least April 2017, Elysium received the first erroneous acetamide testing results.
18  Despite this knowledge, Elysium ***never*** provided notice to ChromaDex of either claim,
19  as it was required to do under Section 3.7 of the NR Supply Agreement and California
20  law.

21  In addition to its waiver, Elysium has put forth no evidence to demonstrate how
22  it was damaged by ChromaDex's alleged breach of these provisions.  Elysium accepted
23  all of the NIAGEN sold by ChromaDex, incorporated that ingredient into its direct-to-
24  consumer product Basis, and sold Basis for a profit.  Elysium did not adjust the price at
25  which it sold Basis, even with the knowledge that Basis was manufactured according to
26  food—not pharmaceutical—cGMPs.

27  With respect to Elysium's product and safety claim under Section 3.9, that
28  provision requires ChromaDex to "promptly inform Elysium Health in writing of any

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

16.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

1  information concerning or that can potentially impact the . . . quality or purity of any

2  Niagen of which it becomes aware." But there is no evidence to prove, or even suggest,

3  that ChromaDex knew of any purity, quality, or safety concerns related to acetamide

4  during the contract period, which ended effective February 3, 2017.

5       The only remaining evidence Elysium submits in support of its Section 3.9

6  counterclaim is its erroneous product testing, and the egregious and slanderous table

7  included in Paragraph 101 of its Third Amended Counterclaims. (Dkt. 103.) Elysium

8  wrongly alleges that the NR it received contained acetamide in excess of the safe-harbor

9  limit in California's Proposition 65 ("Prop. 65"). ChromaDex's acetamide expert, Dr.

10  Carla Kagel, reviewed ChromaDex testing of retained samples of the NR it shipped to

11  Elysium and found conclusively that it does not contain levels of acetamide in excess

12  of Prop. 65's safe-harbor limit. Further, Dr. Kagel reviewed the test method and testing

13  results produced by Elysium and found them "unreliable, inaccurate and invalid." The

14  record establishes that Elysium knew its test results were deficient. Communications

15  between Elysium and its testing laboratory show that Elysium knew that the laboratory

16  had never tested for acetamide. Despite this, Elysium directed the lab to use a testing

17  method that would generate "false positives" for acetamide. Even more concerning, the

18  evidence shows Elysium ignored repeated warnings that the method was not suitable

19  for testing finished products. In the face of this overwhelming evidence, Elysium put

20  forth no expert to opine on its Section 3.9 claim, declined to depose Dr. Kagel, and has

21  put forth no evidence bolstering its unreliable test results.

22       With respect to Elysium's cGMP counterclaim (Section 3.7) in particular,

23  ChromaDex will rely on documents and communications during the time at which the

24  parties were negotiating the supply agreement, to show that the pharmaceutical cGMP

25  standard was included in the contract by mistake.

26

27

28

Cooley LLP
Attorneys At Law
San Diego

17.

ChromaDex's Memorandum of
Contentions of Fact and Law
8:16-cv-2277-CJC (DFMx)

**B.     Key Evidence in Opposition to Elysium's Counterclaim for Breach of Sections 3.1**

Elysium asserts a counterclaim for breach Section 3.1 of the NR Supply Agreement—the MFN Provision. The MFN Provision states, in relevant part:

> If, at any time during the Term, ChromaDex supplies Niagen (or a substantially similar product) to a Third Party at a price that is lower than that at which Niagen is supplied to Elysium Health under this Agreement, then the price of Niagen supplied under this Agreement shall be revised to such Third Party price with effect from the date of the applicable sale to such Third Party and ChromaDex shall promptly provide Elysium Health with any refund or credits thereby created; provided Elysium Health purchases equal volumes or higher volumes than the Third Party.

ChromaDex's key evidence in opposition to this counterclaim includes the language of the contract itself.  The MFN Provision is triggered "provided Elysium Health purchases equal volumes or higher volumes than the Third Party."  Specifically, to qualify for MFN pricing, Elysium must purchase equal volumes or higher volumes. The word "volumes," as it appears in the contract is plural, evidencing that one single order is not sufficient to trigger MFN pricing.   Instead, under ChromaDex's interpretation, Elysium's and other customer's orders would be reviewed on an annual or twelve-month trailing basis to ascertain whether Elysium purchased equal volumes or higher volumes.  To this point, ChromaDex will rely on its history of sales to its other high volume customers.

This argument is further bolstered by the language contained in at least one other customer's supply agreement.  For example, Healthspan Research LLC executed a supply agreement for the supply of NR, which included a MFN Provision.  That clause specifically stated that it applied "retroactive to the date that Seller first either sold or offered to sell the Product on more favorable terms."  In contrast, Elysium's agreement does not contain this language.  The parties negotiated the NR Supply Agreement in an arm's length negotiation, and Elysium cannot now read into provision language for which it could have negotiated.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

ChromaDex's internal communications, as well as those with Elysium, also show that any breach of the MFN Provision, to the extent one occurred, was in good faith, and that ChromaDex performed all or substantially all of the significant things required by the contract.  Namely, ChromaDex delivered the NR ordered by Elysium.  Elysium therefore received what the NR Supply Agreement called for—the supply of NR.  Thus, any breach of the MFN Provision only serves to mitigate Elysium's damages.  And because Elysium retained and re-sold the product received from ChromaDex, any award of damages would now cause Elysium to be unjustly enrichment.

Finally, Elysium engaged in inequitable conduct with respect to the MFN Provision, such that it has unclean hands and should be barred from recovery on its Section 3.1 claim.   Prior to the June 30 Order, Elysium possessed Live Cell's purchasing history—trade secret information—that allowed it to calculate the exact volume it would need to qualify for MFN pricing.  Elysium used this information to submit the June 30 Orders, and subsequently to claim breach of the MFN Provision.  Through this plot, Elysium never intended to pay for June 30 Orders, and instead intended to "drop" an email alleging breach the moment the June 30 Order was in the hands of its contract manufacturer.

## C.   Key Evidence in Opposition to Elysium's Counterclaim for Breach of Section 3.11.3

Elysium's counterclaim for breach of Section 3.11.3, which was added to the NR Supply Agreement by an amendment in February 2016 ("the Exclusivity Provision"), alleges that ChromaDex has created or sold, or has enabled its customers to create and sell, consumer products containing both NR and PT or NR and resveratrol.  Elysium's claimed damages arise only from those products combining NR and resveratrol, not NR and PT.

The language of the Exclusivity Provision specifies that it applies to "both Niagen and pTeroPure® (or any ingredients that are substantially similar thereto)."  Because the Provision uses ChromaDex's tradenames, not NR and PT generally, the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

19.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)

"substantially similar" term encompasses only other types of NR and PT.  For example, a "substantially similar" ingredient to pTeroPure—which is a patented form of synthetic PT—would be other forms of PT or ingredients like PureEnergy, a PT-caffeine hybrid. Testimony from ChromaDex deponents is consistent: a substantially similar ingredient to pTeroPure is other forms of PT.  And communications between the parties at the time of the negotiation of the Exclusivity Provision show that neither party contemplated resveratrol as a "substantially similar" ingredient to pTeroPure.

Even if resveratrol is substantially similar to pTeroPure under the terms of the amendment, ChromaDex exercised its best efforts substantially to perform the contract. The Exclusivity Provision required ChromaDex to (i) notify customers or distributors in writing of any alleged violations, (ii) conduct an investigation reasonably appropriate under the circumstances, and (iii) suspend shipments to the relevant customer or distributor if ChromaDex became aware that a customer or distributor is selling a combined product.  Even though it did not believe resveratrol was covered by the terms of the Exclusivity Provision, when Elysium voiced its concerns, ChromaDex nonetheless informed customers selling NIAGEN and resveratrol combined products that ChromaDex could no longer sell them ingredients, or requested that those customers reformulate their products while ChromaDex worked towards a resolution with Elysium.

To the extent Elysium's breach of Section 3.11.3 is predicated on Life Extension's or Purpose's sale of products containing NIAGEN and pTeroPure or a substantially similar ingredient, Elysium has waived those claims.  While negotiating the amendment to the supply agreement, ChromaDex informed Elysium about Life Extension's and Purpose's respective pre-existing formulations, and that these customers would need to sell through their current stock and work to reformulate their products.  Elysium did not object.  As such, Elysium's freely and knowingly agreed to allow these customers to "sell through" their Combined Product inventories.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

20.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)

1    Elysium also cannot maintain this claim, as its theory for lost profit damages fails.

2    As evidenced by the record and Elysium deponents, Elysium significantly reduced its

3    marketing during this time in an effort to conserve its dwindling inventory.  Elysium

4    did not have a supply of NR, such that it had the capacity to make additional sales in

5    support of its lost profits theory.

6    Elysium has also engaged in inequitable conduct such that its unclean claims

7    should bar this counterclaim.  Elysium induced ChromaDex to enter an exclusive

8    arrangement and amend the NR Supply Agreement by promising to meet certain

9    minimum purchase commitment for years into the future when it planned to halt orders

10   of NR from ChromaDex in the short term in favor of its new supply.  And because

11   Elysium never paid for the June 30 Orders of NIAGEN, it did not substantially perform

12   its obligations under the NR Supply Agreement, and thus ChromaDex had no obligation

13   to perform.

14       **D.      Key Evidence in Opposition to Elysium's Counterclaim for Breach of
              Section 4.1**

15   Elysium alleges that ChromaDex breached the confidentiality provision of the

16   NR Supply Agreement by sending its NR Specifications to its other ingredient

17   customers.  ChromaDex created the NR Specifications for Elysium from ChromaDex's

18   proprietary information, which it invested the time and resources to create and which it

19   owned before it signed the NR Supply Agreement and are independent of its terms.

20   ChromaDex had no restriction on the disclosure of its own information, and any

21   disclosure did not damage Elysium.  Further, ChromaDex maintains numerous different

22   versions of its NR Specifications, which are constantly updated and tweaked to fit

23   different customers' manufacturing needs.  The NR Specifications that were attached

24   as Exhibit A to Elysium's supply agreement are different than any specifications sent

25   to other ingredient customers.

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

21.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)

**E.    Key Evidence in Opposition to Elysium's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing**

Elysium claims that ChromaDex breached the implied covenant of good faith and fair dealing "by recommending to other customers that they create products containing both nicotinamide riboside and either pterostilbene or a substantially similar ingredient, which unfairly interfered with Elysium's right to receive the benefits of exclusivity under the NR Supply Agreement."

Elysium's claim for the breach of the implied covenant of good faith and fair dealing fails for lack of damages.  The record is devoid of any evidence in support of this claim that is different, separate, or apart from the evidence Elysium uses to support the damages elements of its breach of contract claim. As such, Elysium's claim and any recovery is duplicative of its Exclusivity Provision breach of contract claim, and therefore cannot stand as a matter of law.   Even if it could, the same facts discussed above with respect to the Exclusivity Provision counterclaim would also apply to defeat this counterclaim.

**F.    Key Evidence in Opposition to Elysium's Counterclaim for Fraudulent Inducement**

Elysium alleges that "[o]n December 16, 2013, on a phone call between Jaksch, Marcotulli and Alminana, Jaksch falsely represented that all of ChromaDex's customers who signed purchase agreements to obtain nicotinamide riboside were also required to sign separate trademark license and royalty agreements, whether they wanted to or intended to use ChromaDex marks or not."

This claim fails because there is a lack of evidence in the record supporting that (1) the statement was made at all, or (2) that it was false at the time it was made. Elysium has produced no evidence—email, text message, or document— contemporaneous with the December 16 call that shows that Jaksch made the alleged statement.  Neither Elysium's CEO nor its COO were able to offer any testimony regarding the negotiation of the TLRA.  And Elysium's 30(b)(6) witness testified that

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

22.

CHROMADEX'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

he "[d]idn't remember anything about a call on December 16, 2013.  Moreover, documents produced by ChromaDex in discovery show that it had one executed supply agreement in effect at the time with Thorne Research LLC ("Thorne").  Thorne also paid royalties and signed a trademark license agreement.  As such, Jaksch's statement—if he even made the statement—was true.

Even if Jaksch made the statement and it was false, he did not make the statement with fraudulent intent or intend for Elysium to rely on it, and Elysium did not rely on it.  No evidence exists that he intended to defraud Elysium or intended Elysium to rely on the statement to its detriment.  And the trail of negotiations between the parties shows that Elysium continued to negotiate royalties beyond December 16, 2013, such that it did not feel beholden to Jaksch's comment that it must pay royalties for the supply of NR.  Moreover, it was unreasonable for Elysium to rely on this one statement—to the extent it was made and was false—without any further clarification, follow-up, or memorialization. Nor was Elysium harmed by the representation, because it sought and received a supply of NR as a result of the agreement and was granted the right not to use ChromaDex's trademark.

## G.    Key Evidence in Opposition to Elysium's Counterclaim for Patent Misuse

Elysium's counterclaim for patent misuse rests on several unsupported assertions.  Elysium alleges, for example, that ChromaDex required customers to purchase and use the ChromaDex trademarks to obtain NR, whether the customer desired to use the mark or not.  But the record is devoid of evidence that any customer was forced to accept a mandatory-use provision in its supply agreement against its wishes.   In fact, *Elysium* itself was able to negotiate around a mandatory-use requirement.  Moreover, many of ChromaDex's NR customers willingly used the NIAGEN mark, even without a mandatory use provision in their supply agreement.  Customers often chose to use the NIAGEN mark as their brand of familiarity and convenience.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)

ChromaDex will provide expert testimony to establish, among other things, that Elysium has failed to establish a relevant market or show that ChromaDex has market power in that market, or that ChromaDex's conduct had anticompetitive effects.

Finally, to the extent there was any possible anticompetitive effect arising from alleged patent misuse, ChromaDex purged it by canceling the mandatory use provisions in its supply agreements and crediting or covenanting to return all royalties paid by its customers.  By doing so, however, ChromaDex did not and does not concede that the mandatory use provisions or royalty provisions were in any way improper.

**H.     Key Evidence in Opposition to Elysium's Counterclaim for Restitution for Unjust Enrichment**

As a remedy for its patent misuse claim, Elysium seeks restitution for its unjust enrichment claim.  ChromaDex will put forth evidence that demonstrates that restitution for unjust enrichment is a quasi-contract cause of action that cannot stand without Elysium's patent misuse claim.  Elysium has also failed to put forward any evidence of damages for this counterclaim.  To the extent Elysium was damaged, it was through payment of royalties, and ChromaDex (without admitting fault) has already covenanted to return those royalties to Elysium.

**IX.   SUMMARY STATEMENT OF CHROMADEX'S AFFIRMATIVE DEFENSES**

ChromaDex presently intends to assert the following affirmative defenses at trial.

1.      **Affirmative Defense No. 2:** Elysium fails to state a claim upon which relief can be granted.

2.      **Affirmative Defense No. 3:** Elysium consented to and/or ratified any actions that it now alleges to be unlawful.

3.      **Affirmative Defense No. 4:** Elysium did not sustain any loss, damage, harm, or detriment in any amount as a result of the allegations against ChromaDex.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

24.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)

4.    **Affirmative Defense No. 5:** Elysium acquiesced to any actions it now alleged to be unlawful or wrongful.

5.    **Affirmative Defense No. 6:** Elysium's counterclaims are barred by the doctrine of unclean hands.

6.    **Affirmative Defense No. 7:** Elysium is barred from recovery, in whole or in part, by the doctrine of laches, estoppel, election of remedies, and other applicable equitable doctrines.

7.    **Affirmative Defense No. 8:** Elysium has engaged in conduct and activities with respect to the subject matter of this dispute by reason of which it has waived any claims or demands.

8.    **Affirmative Defense No. 9:** Elysium waived any claims under Section 3.7 of the NR Supply Agreement.

9.    **Affirmative Defense No. 10:** Elysium's claim under Section 3.7 of the NR Supply Agreement is barred as a result of a unilateral or mutual mistake of the parties regarding the applicable definition of current Good Manufacturing Practices.

10.   **Affirmative Defense No. 11:** Elysium's breach of contract counterclaims are barred because Elysium failed to substantially perform its contractual obligations under the contracts and/or there was a failure of consideration.

11.   **Affirmative Defense No. 12:** The counterclaims are barred because Elysium would be unjustly enriched by any recovery against ChromaDex.

12.   **Affirmative Defense No. 13:** ChromaDex has acted reasonably, in good faith, and with innocent intent with respect to the conduct alleged.

13.   **Affirmative Defense No. 14:** Elysium's cause of action for declaratory judgment of patent misuse is barred because ChromaDex has purged any and all alleged patent misuse.  Although ChromaDex denies Elysium's allegations constitute patent misuse as a matter of law, to eliminate an issue from this litigation, to conserve the parties' and the Court's resources and

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

25.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

to streamline this action, and without prejudice to ChromaDex's arguments and contentions, ChromaDex unequivocally renounced any rights to collect, charge, or obtain royalties under the Trademark License and Royalty Agreement with Elysium. ChromaDex likewise unequivocally renounced any rights to charge, obtain, or collect royalties on sales of non-trademark bearing NIAGEN from customers other than Elysium, or to require the use of its trademarks under any such agreement. These voluntary steps taken by ChromaDex were intended to moot Elysium's allegation and counterclaim for a declaratory judgment that ChromaDex has misused any of its patents. Such counterclaim should be promptly voluntarily dismissed by Elysium, or dismissed *sua sponte* by the Court based on the unequivocal terminations and renouncements made by ChromaDex.

14. **Affirmative Defense No. 15:** Elysium's cause of action for declaratory judgment of patent misuse is moot.

15. **Affirmative Defense No. 16:** ChromaDex seeks to offset any damages owed to Elysium, if any, by the amount Elysium owes to ChromaDex.

ChromaDex continues to evaluate whether it will maintain or abandon these affirmative defenses prior to trial. ChromaDex will meet and confer with opposing counsel regarding the remaining affirmative defenses and will provide more detail about its affirmative defenses with the jury instructions and other proposed pre-trial documents that the Court has ordered filed on September 9, 2019. (Dkt. 220.)

## X. ANTICIPATED EVIDENTIARY ISSUES

In addition to any disputes regarding the admissibility or relevance of specific testimony or exhibits that the parties may raise, the parties have raised the evidentiary issues below.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

26.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

**ChromaDex:**

1.     Exclusion of certain opinions by Dr. Cockburn regarding patent misuse. Specifically, ChromaDex seeks to exclude this testimony because (a) Dr. Cockburn does not define the relevant product market using an accepted methodology applied to the facts, (b) Dr. Cockburn cannot offer legal opinions disguised as expert testimony, and (c) Dr. Cockburn's opinions regarding anticompetitive effects are not based on economic analysis;

2.     Exclusion of certain opinions by Dr. Cockburn about Elysium's alleged damages. Specifically, ChromaDex seeks to exclude this testimony because (a) Dr. Cockburn's lost profit opinion invites rank speculation, and (b) Dr. Cockburn's cGMP opinion suffers from analytical gaps;

3.     Exclusion of evidence and argument relating to Barry Honig, Michael Brauser, and Philip Frost, including but not limited to any reference to (a) investigation or litigation initiated by the U.S. Securities and Exchange Commission, and (b) statements suggesting ChromaDex is or was managed by or affiliated with "criminals";

4.     Exclusion of testimony, argument, or references to the spreadsheet sent to Elysium by then-ChromaDex CEO Frank Jaksch on June 13, 2016 as "fraudulent"; and

5.     Exclusion of evidence or argument to the jury relating to ChromaDex termination of contract terms with, and its refund of royalty payment to, some of its customers in an attempt to purge any alleged patent misuse or alleged anticompetitive effects.

**Elysium:**

1.     Exclusion of evidence and argument related to the personal conduct of Elysium personnel;

2.     Exclusion of certain opinions of Lance Gunderson methodology for analyzing trade secret misappropriation damages, including apportionment

1   of damages flowing from Elysium's and Morris's trade secret

2   misappropriation; and

3   3.   Exclusion of the Supplemental Expert Report of Dr. Carla Kagel.

## XI.   BIFURCATION OF ISSUES

The parties met and conferred with respect to bifurcation of Elysium's counterclaims for patent misuse and unjust enrichment.  The parties agree that patent misuse is an equitable claim and should be adjudicated by the Court rather than the jury. *Cordance Corp. v. Amazon.com, Inc.*, 2009 WL 2252556, at *1 (D. Del. July 28, 2009) (noting that patent misuse is an equitable defense, if tried to a jury, is "noted to be fraught with potential abuse, including 'unfair prejudice, confusion of issues, or misleading the jury,' resulting in the loss of 'fundamental fairness of the adjudication.'").  The parties agree that because Elysium's counterclaim for unjust enrichment is pled as a remedy for patent misuse, the Court should retain and decide that issue too.

To avoid confusing or misleading the jury, ChromaDex respectfully requests the Court bifurcate Elysium's counterclaims for patent misuse and unjust enrichment, to be heard separately by the Court.

## XII.   JURY TRIAL

Other than ChromaDex's request that the Court bifurcate and separately hear Elysium's counterclaims for patent misuse and unjust enrichment, all issues in this case are to be tried to a jury.  Both parties' operative complaints filed in this case demand a jury trial.

## XIII.   ISSUES OF LAW

ChromaDex identifies the following issues of law that are in dispute:

1.   **Apportionment of Trade Secret Damages.**  Elysium asserts that trade secret damages must be apportioned on a trade-secret-by-trade-secret basis.  ChromaDex maintains that it is not required to apportion trade secrets on an individualized basis, nor is it feasible to do so here when

Cooley LLP
Attorneys At Law
San Diego

28.

ChromaDex's Memorandum of
Contentions of Fact and Law
8:16-cv-2277-CJC (DFMx)

Elysium's cumulative misappropriation supports ChromaDex's theory of damages. *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 989 (N.D. Cal. 2018) (California "does not require an apportionment of damages" among trade secrets.).

2.   **Interpretation of "Fiduciary."**   Elysium and Morris have taken the position that Morris, as Vice President of ChromaDex, was not a fiduciary because he was not a "C-Suite" executive. ChromaDex asserts that as an officer with managerial responsibilities, Morris was a ChromaDex fiduciary. *GAB Bus. Servs., Inc. v. Lindsey & Newsome Claim Servs., Inc.*, 83 Cal. App. 4th 409, 420–21 (2000), *disapproved of on other grounds by Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004), ("[A]n officer who participates in management of the corporation, exercising some discretionary authority, is a fiduciary of the corporation as a matter of law.").

# XIV.  ATTORNEYS' FEES

Plaintiff prays for the recovery of attorney's fees in this case. Plaintiff's seeks attorneys' fees in connection with its trade secret misappropriation claim under CUTSA, pursuant to California Civil Code § 3426.4.

Elysium prays for attorneys' fees in connection with its claims for declaratory judgment of patent misuse, and restitution for unjust enrichment.

# XV.  ABANDONMENT OF ISSUES

ChromaDex abandons the following affirmative defenses: No. 1 (standing) and No. 17 (statute of limitations).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

29.

CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMx)

1  Dated:      August 28, 2019          COOLEY LLP
2                                       MICHAEL A. ATTANASIO (151529)
                                        BARRETT J. ANDERSON (318539)
3                                       CRAIG E. TENBROECK (287848)
                                        SOPHIA M. RIOS (305801)
4                                       JAYME B. STATEN (317034)
5
6
7                                       */s/ Michael A. Attanasio*
                                        Michael A. Attanasio (151529)
8
                                        *Attorneys for Plaintiff and Counter-Defendant*
9                                       *ChromaDex, Inc.*
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO
                                30.
CHROMADEX'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
8:16-CV-2277-CJC (DFMX)