MICHAEL R. MATTHIAS, Bar No. 057728
*mmathias@bakerlaw.com*
ELIZABETH M. TRECKLER, Bar No. 282432
*etreckler@bakerlaw.com*
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, California 90025-0509
Telephone:  (310) 820-8800
Facsimile:  (310) 820-8859

JOSEPH N. SACCA, (admitted *pro hac vice*)
*jsacca@bakerlaw.com*
ESTERINA GIULIANI (admitted *pro hac vice*)
*egiuliani@bakerlaw.com*
BENJAMIN D. PERGAMENT (admitted *pro hac vice*)
*bpergament@bakerlaw.com*
KRISTIN L. KERANEN (admitted *pro hac vice*)
*kkeranen@bakerlaw.com*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111-0100
Telephone:   (212) 589-4290
Facsimile:    (212) 589-4201

*Counsel continued on following page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| ChromaDex, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Elysium Health, Inc. and Mark Morris, <br><br> Defendants. | Case No.:  8:16-cv-02277-CJC-DFM <br> [Assigned to the Hon. Cormac J. Carney] <br><br> **ELYSIUM HEALTH, INC.'S AND MARK MORRIS'S MEMORANDUM OF CONTENTIONS OF LAW AND FACT [L.R. 16-4]** |
| Elysium Health, Inc., <br><br> Counterclaimant, <br><br> v. <br><br> ChromaDex, Inc., <br><br> Counter-Defendant. | <br> Pre-Trial Conference: September 18, 2019 <br> Trial:                    October 15, 2019 |

1   DONALD R. WARE (admitted *pro hac vice*)
    dware@foleyhoag.com
2   MARCO J. QUINA (admitted *pro hac vice*)
    mquina@foleyhoag.com
3   JULIA HUSTON (admitted *pro hac vice*)
    jhuston@foleyhoag.com
4   **FOLEY HOAG LLP**
    155 Seaport Boulevard
5   Boston, Massachusetts 02210
    Telephone:   (617) 832-1000
6   Facsimile:    (617) 832-7000

7   *Attorneys for Defendant and Counterclaimant*
    ELYSIUM HEALTH, INC.
8   *Attorneys for Defendant*
    MARK MORRIS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Defendant and Counterclaimant Elysium Health, Inc. ("Elysium") and Defendant Mark Morris ("Morris") (collectively, "Defendants") hereby submit, pursuant to Local Rule 16-4, the following contentions of law and fact regarding their claims and defenses in this matter.

## I.   **INTRODUCTION**

Elysium sells a direct-to-consumer ("DTC") product called Basis, a dietary supplement that supports cellular health by increasing and sustaining NAD+ levels and activating sirtuins.   Basis is comprised principally of two ingredients: nicotinamide riboside ("NR") and pterostilbene ("PT").   Under three different agreements, from 2014 to 2016, Elysium purchased NR and PT from ChromaDex: the NR Supply Agreement, executed in February 2014 and amended in February 2016 (the "Amendment"); the Trademark License and Royalty Agreement, executed in February 2014 ("TLA"); and the pTeroPure Supply Agreement, executed in June 2014. ChromaDex was the sole commercial supplier of NR, and was the exclusive licensee of certain NR-related patents.

Over time, ChromaDex grew envious of Elysium's success in the DTC market, and it ultimately developed a strategy to, in the words of its then-CEO, "Be our own Elysium."   In 2015, ChromaDex executed a NR supply agreement with a company founded and owned by one of its directors called Healthspan Research, LLC ("Healthspan"). Healthspan planned to sell a NR supplement in the DTC market. ChromaDex's agreement with Healthspan provided for ChromaDex to supply Healthspan with a substantial amount of NR at no cost in exchange for a small equity stake in Healthspan.   From this initial foray, ChromaDex's strategy evolved to the point where it decided to acquire Healthspan outright as a platform for it to sell NR in the DTC market. Another prong of this strategy called for ChromaDex to eliminate its existing NR customers, including Elysium, from the DTC market by ceasing sales of NR to them. Indeed, ChromaDex completed its acquisition of Healthspan just a month after it effected a termination of its agreement to supply Elysium with NR.

1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Elysium was unaware that ChromaDex was using it and ChromaDex's other customers as a stalking horse to create the dietary supplement market for NR so that ChromaDex could then introduce its own DTC product, cut off the ingredient supply to its customers, and seize the market for itself. Even though ChromaDex was keeping its intentions quiet, however, it was making its contempt for Elysium as a long-term customer clear. The parties' relationship deteriorated over the course of 2016 after Elysium became aware that ChromaDex had breached the most-favored-nations pricing provision ("MFN Provision") of the parties' NR supply agreement, but ChromaDex refused to provide Elysium with the information necessary to determine the amount of refund or credit it was owed by ChromaDex. While that issue remained unresolved, Elysium learned that ChromaDex was in violation of its agreement to give Elysium exclusivity over products containing NR and PT or any substantially similar ingredients, and then subsequently discovered that ChromaDex had been, through the life of their relationship, in breach of the NR supply agreement's provision requiring ChromaDex to deliver NR manufactured to standards agreed to in the NR Supply Agreement. Elysium also learned that ChromaDex's CEO had defrauded it into executing the TLA, which required it to pay royalties to ChromaDex and gave it access to ChromaDex trademarks it did not want to, and never did, use, by falsely representing that it required every one of its NR customers to sign a similar agreement.

The parties were unable to reach agreement on their disputes – in hindsight, no surprise, since ChromaDex had determined to eliminate Elysium as an NR customer as part of its plan to take the DTC market for itself – and this litigation followed.

## II. PLAINTIFF'S CLAIMS

### A. Summary

ChromaDex asserts eight claims for relief: (1) breach of contract by Elysium (pTeroPure Supply Agreement); (2) breach of contract by Elysium (NR Supply Agreement); (3) misappropriation of trade secrets under California's Uniform Trade

Secrets Act ("CUTSA") by Defendants; (4) violation of Federal Defense of Trade Secrets Act (18 U.S.C. § 1836) by Defendants; (5) breach of contract by Morris ("Receipt & Acknowledgment of Employee Handbook"); (6) breach of contract by Morris ("Confidentiality and Non-Solicitation Agreement (For New Employees)"); (7) breach of fiduciary duty by Morris; and (8) aiding and abetting a breach of fiduciary duty by Elysium.

**B. Elements Required to Establish Plaintiff's Claim Against Elysium for Breach of Contract (pTeroPure Supply Agreement & NR Supply Agreement) (Claims 1 & 2)**

Plaintiff ChromaDex must establish the following in order to recover damages on these claims:

1. That Elysium breached the pTeroPure Supply Agreement by not paying for its last order of pterostilbene ($580,750);

2. That Elysium breached the NR Supply Agreement by not paying for its last order of NR ($2,402,600);

3. That ChromaDex's report purporting to determine that pterostilbene is safe (the "pTeroPure GRAS Report") was "Confidential" under the terms of § 15.1 of the pTeroPure Supply Agreement;

4. That Elysium breached the pTeroPure Supply Agreement by disclosing the pTeroPure GRAS Report to a third party;

5. That ChromaDex's PT Specifications were "terms" of the pTeroPure Supply Agreement pursuant to § 15.2 of that agreement;

6. That Elysium breached the pTeroPure Supply Agreement by disclosing ChromaDex's PT Specifications to a third party;

7. That what ChromaDex calls the "NR Study Data," which are the results of a clinical trial, were "Confidential" under the terms of § 4.1 of the NR Supply Agreement;

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

3

8. That Elysium breached the NR Supply Agreement by disclosing the NR Study Data to a third party;

9. That what ChromaDex calls the NRCl Analytical Method, which is a method for testing the purity of NR, was "Confidential" under the terms of § 4.1 of the NR Supply Agreement;

10. That Elysium breached the NR Supply Agreement by disclosing the NRCl Analytical Method to a third party;

11. That ChromaDex's NR Investigator's Brochure was "Confidential" under the terms of § 4.1 of the NR Supply Agreement;

12. That Elysium breached the NR Supply Agreement by disclosing ChromaDex's NR Investigator's Brochure to a third party;

13. That ChromaDex's NR Specifications were "terms" of the NR Supply Agreement pursuant to § 4.2 of that Agreement;

14. That Elysium breached the NR Supply Agreement by disclosing ChromaDex's NR Specifications to a third party;

15. That ChromaDex suffered damages for each individual alleged breach outlined above; and

16. That ChromaDex's own breaches of the NR Supply Agreement did not excuse Elysium's alleged breaches.

1. <u>Elysium's Evidence in Opposition to Plaintiff's Claims for Breach of Contract (Claims 1 & 2)</u>

*First*, the evidence will show that because of ChromaDex's breach of the MFN Provision of the NR Supply Agreement, discussed *infra* at 23, ChromaDex owes Elysium a credit larger than the combined amount of the orders of PT and NR that it claims Elysium did not pay for, and therefore that ChromaDex cannot succeed on its claims for breach of contract.

*Second*, the evidence will show that Elysium did not breach either the NR Supply Agreement or the pTeroPure Supply Agreement by disclosing to a third party

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   the NR Specifications and PT Specifications that ChromaDex contends constituted

2   part of the "terms" of those agreements.  ChromaDex does not even allege, much less

3   can it prove, that Elysium provided to any third party either the NR or the PT

4   Specifications that were referenced in and attached to the NR Supply Agreement and

5   the pTeroPure Supply Agreement, respectively.  Indeed, ChromaDex concedes that

6   the specifications for NR and PT Elysium provided to a third party differ from the

7   NR and PT Specifications attached to the parties' contracts.  Moreover, the evidence

8   will show that ChromaDex publicly disclosed the NR Supply Agreement and the

9   pTeroPure Supply Agreement, *with the NR Specifications and the PT Specifications*

10  *attached*, as part of a quarterly filing it made with the United States Securities and

11  Exchange Commission *months* before it alleges that Elysium disclosed any set of

12  specifications to a third party.

13      *Third*, the evidence will show that none of the documents ChromaDex claims

14  were improperly disclosed by Elysium were in fact "confidential" under the terms of

15  the parties' contracts.  The relevant confidentiality clauses of the supply agreements

16  state that information is <u>not</u> confidential if it "become[s] publicly known, without

17  fault on the part of the other party, subsequent to disclosure of such information by

18  the disclosing party to the other party."  ChromaDex publicly disclosed the NR Study

19  Data on multiple occasions, including at scientific conferences and through

20  publication of an article in a scientific journal.  The NRCl Analytical Method can be

21  found publicly on the internet, and there is no evidence Elysium put it there, because

22  it did not.  ChromaDex provided its NR Investigator's Brochure (a document that

23  largely summarizes data from articles published in scientific publications) to a third

24  party and granted that third party permission to use it, and was fully aware that

25  Elysium had contracted with (and paid) that third party to create the Basis

26  Investigator's Brochure ChromaDex now complains improperly borrows from the

27  NR Investigator's Brochure.  Notably, not only was ChromaDex aware of this,

28  ChromaDex gave permission for the third party to use this brochure.  Finally,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

ChromaDex appears to have widely circulated its pTeroPure GRAS Report to persons and entities who were not under any obligation to maintain the document as confidential.

*Fourth*, the evidence will show that ChromaDex cannot prove damages for the alleged disclosure of the NR or PT Specifications or of any purported "confidential" information. Its damages expert, upon whose testimony ChromaDex solely relies to establish its claims for damages, did not purport to establish that any one of these alleged disclosures caused injury to ChromaDex or unjust benefit to Elysium, and instead improperly conducted an undifferentiated damages analysis, attributing all alleged damages to all claims, rather than calculating damages for each alleged wrongful act. *See*, *e.g.*, *Bennion & Deville Fine Homes, Inc. v. Windermere Real Estate Servs. Co.*, 2016 WL 11498956, at *1 (C.D. Cal. Nov. 30, 2016) (granting summary judgment because asserted contractual damages included damages from other claim in case).

**C.    Elements Required to Establish Plaintiff's Claim Against Defendants for Misappropriation of Trade Secrets Under California's Uniform Trade Secrets Act and Violation of Federal Defense of Trade Secrets Act (18 U.S.C. § 1836) (Claims 3 & 4)**

Plaintiff must establish the following in order to recover damages for its claims of trade secret misappropriation:

California's Uniform Trade Secrets Act ("CUTSA") and the Federal Defense of Trade Secrets Act ("DTSA") share the same elements and require that ChromaDex prove that it (1) owned a trade secret, (2) that Elysium or Morris acquired, disclosed, or used ChromaDex's trade secret through improper means, and (3) Elysium or Morris's actions damaged ChromaDex. *Sci. of Skincare, LLC v. Phytoceuticals, Inc.*, 2009 WL 2050042, at *5 (C.D. Cal. July 7, 2009); *Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*, 2018 WL 2558388, at *3 (C.D. Cal. Feb. 27, 2018) ("Because the pleading standards of Cedars–Sinai's DTSA and CUTSA claims are the same, the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

6

Court will analyze those two claims together."); *Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, 2018 WL 2298500, at *2 (N.D. Cal. May 21, 2018) ("The elements of a misappropriation of trade secrets claim under the Defend Trade Secrets Act ("DTSA") and California Uniform Trade Secrets Act ("CUTSA") are essentially the same.").

*First*, for each trade secret allegedly misappropriated—whether two or any other number ChromaDex now claims—ChromaDex must first prove that the information in question is a trade secret. A trade secret is information that "derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *See* Cal. Civ. Code § 3426.1(d).

*Second*, ChromaDex must prove that Elysium or Morris acquired, disclosed, or used that *specific* trade secret through improper means, and not simply that Elysium or Morris was in possession of the trade secret. If Elysium or Morris were merely in possession of one of ChromaDex's trade secrets, that is not enough for ChromaDex to succeed on a claim of misappropriation of trade secrets. *See S. Cal. Inst. of Law v. TCS Educ. Sys.*, 2011 WL 1296602, at *7 (C.D. Cal. Apr. 5, 2011) (holding that "[a]lleging mere possession of trade secrets is not enough" to state a claim under CUTSA). "Misappropriation" means:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

7

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

 (i) Derived from or through a person who had utilized improper means to acquire it;

 (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

 (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1. "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. *See* Cal. Civ. Code § 3426.1.

*Third*, ChromaDex must prove that Elysium or Morris's actions damaged ChromaDex. *Prunty v. Ark. Freightways, Inc.*, 16 F.3d 649, 652 (5th Cir. 1994). ("[W]hen one of the prima facie elements of a claim is damages and the claimant fails to introduce evidence of those damages, he or she commits a fatal error."); *see also Propulsion Techs., Inc. v. Attwood Corp.*, 369 F.3d 896, 905 (5th Cir. 2004) ("the missing link for recovery of such damages remains:  there is no evidence that Attwood used trade secrets to generate those profits").

 1. <u>Defendants' Evidence in Opposition to Plaintiff's Claims for Misappropriation of Trade Secrets Under California's Uniform Trade Secret Act and Violations of Federal Defense of Trade Secrets Act (18 U.S.C. § 1836) (Claims 3 & 4)</u>

The evidence will show that ChromaDex cannot (1) prove that the information it alleges were trade secrets were, in fact, trade secrets because it will be unable to demonstrate that the information had independent economic value to ChromaDex from not being generally known or that it took steps to maintain its alleged secrets; (2) prove that Elysium or Morris acquired, disclosed, or used each trade secret through improper means; and (3) prove that Elysium's or Morris's actions damaged ChromaDex.  In short, the evidence will show that ChromaDex cannot prove any of the elements of a misappropriation of trade secrets claim let alone all the elements needed, under either CUTSA or DTSA.

The Fifth Amended Complaint alleges two instances of trade secret misappropriation, both of which relate to a single document ChromaDex called the Ingredient Sales Spreadsheet ("ISS"), which tracked ChromaDex's quarterly ingredient sales by customer, amount, and price, among other information.  On the night discovery closed, *after* Elysium deposed ChromaDex's damages expert, ChromaDex supplemented its response to an interrogatory served six months ago and identified a list of twelve purported trade secrets that are subject of its misappropriation claims, divided into four categories: (1) "ChromaDex's ingredient sales information, including customer purchasing histories and customers' relative market positions," which includes the ISS; (2) "the price ChromaDex paid to obtain NR from its contract manufacturer;" (3) "ChromaDex's research and development work regarding different salts for use in manufacturing NR;" and (4) "ChromaDex's research and development work regarding different methods for manufacturing NR."

*First*, the evidence will show that none of the information in these four categories meets the definition of trade secrets, and that neither Elysium nor Morris misappropriated the information in question.  With respect to the first category, the ISS contained information about ChromaDex's customers' order history (and the other items in ChromaDex's asserted first category of trade secrets are sub-sets of information contained in the ISS), but the evidence will show that ChromaDex did

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

9

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

not treat the price and volume of its customers' purchases as trade secrets because it did not take reasonable steps to maintain their secrecy. For example, ChromaDex's CEO freely shared with Elysium information about the price and volume of Niagen purchases made by another of its customers, and ChromaDex even sent Elysium copies of some of that customer's invoices. ChromaDex's CEO also shared with a competitor of Elysium detailed information about the volume of Elysium's NR purchases. *See Cornwell v. Belton*, 245 Fed. Appx. 592, 594 (9th Cir. 2007) (affirming district court's denial of plaintiff's claim for trade secret misappropriation where plaintiff failed to make reasonable efforts to maintain secrecy of purported trade secret).

ChromaDex claims that possession of the ISS gave Elysium an unfair advantage in its contract negotiations with ChromaDex. The evidence will show, however, that Elysium negotiated its last purchase from ChromaDex on June 30, 2016, and did not possess the ISS until weeks later, when Morris joined Elysium. Elysium could not have benefited during that negotiation from information it did not then have. ChromaDex also alleges that Elysium could have derived some competitive benefit from knowing its competitors' purchases, but there is no evidence in the record that anyone at Elysium even saw the ISS before Morris deleted it from his computer, much less that Elysium ever changed any part of its competitive strategy on the basis of the ISS. ChromaDex's theory that Elysium was unjustly enriched by the possession of the ISS is therefore "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

ChromaDex also claims that Morris disclosed trade secrets to Elysium by telling Elysium in May 2016 that ChromaDex sold NR to a customer called Live Cell for an amount below Elysium's price, and the date and volume of Live Cell's recent purchases. Testimony from ChromaDex's then-CFO will establish that it was part of Morris's responsibilities at ChromaDex to inform Elysium if it was entitled to a lower price per the MFN provision, which is exactly what Morris did. The evidence

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

will also show that ChromaDex's then-CEO did likewise, telling Elysium that Live Cell paid less than Elysium and was a lower volume purchaser than Elysium—the same information Morris allegedly wrongfully conveyed.  As a result, ChromaDex cannot premise its claim on Morris's alleged disclosure of information that: (1) he was authorized to disclose to Elysium in the first place, and (2) Elysium was also receiving from others at ChromaDex, both of which demonstrate that ChromaDex did not consider Live Cell's price and volume information to be a trade secret, and further because the information was provided by ChromaDex, ChromaDex cannot demonstrate that either Elysium or Morris misappropriated the Live Cell information. Further, given that ChromaDex's CEO gave substantively the same information as Morris gave Elysium during the course of the negotiations over the June 30 order, it would be impossible to conclude that Elysium derived some benefit from the information provided by Morris.  The evidence will show that ChromaDex freely shared within and among its customers information concerning other customer orders and pricing.

With respect to the second category of asserted trade secrets, information Morris provided to Elysium about the price ChromaDex paid its contract manufacturer for NR, the evidence will also show that ChromaDex did not treat this information as a trade secret and in fact freely provided it to Elysium.  ChromaDex's CEO told Elysium during negotiations over Elysium's final order for NR the margin ChromaDex sought to maintain on its NR sales (meaning that the information was not misappropriated), and the evidence will demonstrate that this information was tantamount to a disclosure of the price ChromaDex was paying to obtain NR from its manufacturer.  Moreover, ChromaDex cannot establish that Elysium used this purported trade secret to its benefit or ChromaDex's detriment.  ChromaDex's damages expert suggested that Elysium used its knowledge of the amount that ChromaDex paid for NR to secure investment from a potential investor.  But all that Elysium told that investor in August 2016 was that it hoped to be able to bring down

its cost for NR to $300/kg within several months; it never disclosed what ChromaDex paid for NR, which was nowhere close to the $300/kg price Elysium stated it hoped to achieve.  No jury will be able to find that Elysium informed its expectation of a $300/kg price by knowing ChromaDex's substantially different price, much less that this one communication was the reason for that investor's decision to invest, which followed months of extensive due diligence and negotiations.

The third category of alleged trade secrets, ChromaDex's alleged research and development work relating to certain input material used in the manufacture of NR, again is not a trade secret.  ChromaDex discloses publicly that the input material at issue is used in the manufacture of its NR, including by listing it on jars of its product, Tru Niagen.  And as to this third and the final category, alleged information related to ChromaDex's research and development work on different methods of manufacturing NR, ChromaDex will be unable to prove that the sparse, general information about which it complains had any independent economic value, was misappropriated, or was used by Elysium to its benefit or ChromaDex's detriment.

*Second*, ChromaDex cannot prove damages, the required third element of a trade secrets claim.  ChromaDex cannot prove damages because ChromaDex relies solely on its expert witness to support its damages claims, and its expert did not differentiate between damages for alleged trade secret misappropriation and damages for ChromaDex's other claims, nor did he calculate damages on a trade-secret-by-trade-secret basis.  The expert's purported "analysis of trade secret misappropriation damages" is, as he admits, based on alleged conduct that ChromaDex does not even plead as trade secret misappropriation, including Elysium's purported use of "confidential and/or proprietary information at issue" that were made public by ChromaDex (such as the NR and PT Specifications ChromaDex publicly filed with the SEC) and Elysium's "alleged aiding and abetting of Mark Morris's breach of fiduciary duty."  Damages must be tied to an actionable wrong, not other conduct.  *See, e.g., Mattel, Inc. v. MGA Entmn't, Inc.*, 616 F.3d 904, 910–11 (9th Cir. 2010)

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

12

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

(rejecting over-inclusive damages award that included amounts not traceable to the actionable wrong); *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 304 (Cal. Ct. App. 2002) ("[p]ublic disclosure, that is the absence of secrecy, is fatal to the existence of a trade secret.").

The expert's opinion, ChromaDex's only evidence of damages, is therefore inadmissible. *See, e.g.*, *LivePerson, Inc. v. [24]7.AI, Inc.*, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018) (excluding expert report because "he does not apportion trade secret misappropriation damages among particular alleged trade secrets, and offers no methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets in the case"); *O2 Micro Intern. Ltd. v. Monolithic Power Sys.*, 399 F. Supp. 2d 1064, 1076, 1079 (N.D. Cal. 2005) ("expert testimony regarding damages for misappropriation of all trade secret [sic] was useless to the jury" because "[t]he jury was then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages"); *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 2011 WL 4625760, at *9 (E.D. Va. Oct. 3, 2011) (damages expert report failed to set forth specific damages calculations for the trade secret and non-trade secret claims); *MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 369 (5th Cir. 2010) (plaintiff's trade secret damages calculation impermissibly included damages not attributable to the misappropriation). Without this expert report, ChromaDex has no evidence of damages.

**D.    Elements Required to Establish Plaintiff's Claim Against Morris for Breach of Contract ("Receipt & Acknowledgment of Employee Handbook," (Claim 5) and "Confidentiality and Non-Solicitation Agreement (For New Employees)" (Claim 6))**

Plaintiff ChromaDex must establish the following in order to recover damages on these claims:

1.  That the "Receipt & Acknowledgement of Employee Handbook" is a valid contract;

2.  That the "Confidentiality and Non-Solicitation Agreement (For New Employees)" is a valid contract;

3.  That Morris disclosed trade secrets, confidential, or proprietary information in violation of those contracts; and

4.  That ChromaDex was damaged by *each* disclosure.

    1.  <u>Morris's Evidence in Opposition to Plaintiff's Claims for Breach of Contract ("Receipt & Acknowledgement of Employee Handbook," (Claim 5) and "Confidentiality and Non-Solicitation Agreement (for New Employees)" (Claim 6))</u>

ChromaDex claims Morris breached these contracts when he disclosed allegedly confidential information, as well as alleged trade secrets, to Elysium while employed by ChromaDex. ChromaDex also claims Morris retained copies of some of ChromaDex's allegedly confidential information after he departed ChromaDex. The evidence will show, however, that ChromaDex cannot prove that Morris transmitted information that was either confidential or a trade secret. Testimony from ChromaDex's former CFO will show that it was part of Morris's job responsibilities to give to customers like Elysium information that ChromaDex now alleges to be a trade secret or confidential, and therefore not a breach of his contract. And, as discussed above, the evidence will also demonstrate that others at ChromaDex, including its own CEO, freely provided to Elysium and to other of ChromaDex's customers information substantively identical to the types of information ChromaDex now contends Morris provided to Elysium, demonstrating that this information did not constitute trade secrets or confidential or proprietary information. The evidence also shows that nobody at Elysium actually saw the ISS, which is the principal trade secret ChromaDex contends Morris disclosed. Moreover, as further described above, ChromaDex itself has failed to maintain the asserted confidentiality

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

14

ELYSIUM HEALTH, INC.'S AND MARK MORRIS'S MEMORANDUM
OF CONTENTIONS OF LAW AND FACT PURSUANT TO L.R. 16-4;
CASE NO.: 8:16-CV-02277-CJC-DFM

of many of the documents in question, as much of the information ChromaDex claims is confidential and proprietary has been publicly disclosed or otherwise widely circulated by ChromaDex without restriction.

With respect to Claim Six, ChromaDex alleges that, in return for Morris signing the Confidentiality and Non-Solicitation Agreement (for New Employees) upon his departure from ChromaDex, it provided him with continued employment and benefits, access to confidential information, and forbore certain actions. The evidence will show that none of those allegations are true. By the time he signed this agreement, Morris had already relinquished all access to ChromaDex systems, including his computer, phone, and building key card. Immediately after executing the agreement, Morris exited ChromaDex's offices for the last time. ChromaDex did not provide him with continued employment or benefits, access to confidential information, or "forbear" any actions. Moreover, forbearance as consideration requires a "meeting of the minds," which did not happen here. *Blonder v. Gentile*, 149 Cal.App.2d 869, 875 (1957).

Additionally, ChromaDex violated the California Labor Code by threatening to withhold Morris's final paycheck—more than $12,000—in order to coerce Morris into signing the New Employee Agreement, rendering the contract void under California Civil Code § 1608 and California Labor Code §§ 202(a), 203, and 206.

Finally, as explained above, the evidence will show that ChromaDex cannot prove damages for the alleged breaches. Its expert improperly conducted an undifferentiated damages analysis, attributing all alleged damages to all claims, instead of calculating damages for each alleged wrongful act. *See*, *e.g.*, *Bennion & Deville Fine Homes, Inc. v. Windermere Real Estate Servs. Co.*, 2016 WL 11498956, at *1 (C.D. Cal. Nov. 30, 2016) (granting summary judgment because asserted contractual damages included damages from other claim in case); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 2011 WL 4625760, at *9 (E.D. Va. Oct. 3,

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

15

2011) (expert report failed to set forth separate damages calculations for the trade secret and non-trade secret claims).

**E.     Elements Required to Establish Plaintiff's Claim Against Morris for Breach of Fiduciary Duty (Claim 7)**

Plaintiff ChromaDex must establish the following in order to recover damages on this claim:

1.  That Morris was a fiduciary to ChromaDex;

2.  That Morris acted in a manner inconsistent with his fiduciary duties; and

3.  That ChromaDex was harmed by each alleged breach of fiduciary duty by Morris.

Under California law, a plaintiff asserting breach of fiduciary duty must prove the following elements: "(1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damages." *Gutierrez v. Girardi*, 194 Cal. App. 4th 925, 932 (Cal. Ct. App. 2011).

1.     <u>Morris's Evidence in Opposition to Plaintiff's Claim for Breach of Fiduciary Duty (Claim 7)</u>

ChromaDex argues that Morris was an officer of ChromaDex and that he purportedly breached his fiduciary duties to ChromaDex by allegedly (1) manipulating ChromaDex to Elysium's advantage during contract negotiations between the parties, (2) lying to ChromaDex about his decision to work for Elysium, (3) recruiting a ChromaDex employee to Elysium, (4) withholding information about Elysium's intent to stockpile Niagen and pTeroPure, withhold payments from ChromaDex, and develop competing supplies of NR and pterostilbene, (5) not telling ChromaDex he retained information upon his departure from the company; and (6) withholding information about Elysium's outreach to ChromaDex's contractual partners in an attempt to undermine ChromaDex's relationships with them. The evidence will show that Morris was not a fiduciary to ChromaDex.  Morris's job responsibilities at ChromaDex were limited to interacting with its customers and

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

16

potential customers to increase sales.  He had little autonomy or managerial authority, and virtually no role in the company's decision-making processes. For example, Morris was not permitted to establish pricing with customers and instead needed approval from his superiors.

Moreover, ChromaDex will be unable to prove its alleged breaches of fiduciary duty even if Morris is a fiduciary.  Morris's supposed "manipulation" of ChromaDex relates to the same conduct ChromaDex claims constitutes trade secret misappropriation, *i.e.*, Morris providing the same information to Elysium regarding ChromaDex's sales to a customer that ChromaDex's own CEO also gave to Elysium during negotiations.  This claim will fail for substantially the same reason as the trade secret misappropriation claims.  ChromaDex will not be able to prove that Morris was obligated to tell it where he would work next after resigning from ChromaDex, let alone that not doing so violated any "fiduciary" obligations or that this "failure" caused it any harm.  The evidence shows that Morris did not recruit the ChromaDex employee in question on behalf of Elysium, and demonstrates further that Morris was no longer even employed by ChromaDex at the time Elysium began to recruit that employee.  The evidence disproves that Elysium intended to stockpile quantities of Niagen and pTeroPure at the time of its June 30th purchase orders, and that it intended not to pay for those orders.  There is thus no evidence that Morris was aware of either non-existent intention. ChromaDex's contention that Morris did not advise it that he retained some ChromaDex information when he left the company is undercut by the fact that Morris was unaware he had any ChromaDex information, and is otherwise co-extensive with ChromaDex's deficient breach of contract claims against Morris. Moreover, ChromaDex will be unable to prove that Elysium's contact with any of its contractual partners caused ChromaDex any harm at all; all of its contractual relationships are still in place.  Finally, to the extent ChromaDex's fiduciary duty claim relies on ChromaDex's alleged trade secrets, it is preempted by CUTSA. *Anokiwave, Inc. v. Rebeiz*, 2018 WL 4407591, at *4 (S.D. Ca. Sept. 17, 2018).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

17

ChromaDex also will be unable to prove damages on its claim for breach of fiduciary duty, because the fundamental defects inherent in its expert's undifferentiated damages analysis apply with equal force to this claim.

**F.    Elements Required to Establish Plaintiff's Claim Against Elysium for Aiding and Abetting a Breach of Fiduciary Duty (Claim 8)**

Plaintiff ChromaDex must establish the following in order to recover damages on this claim:

1. That Morris was a fiduciary of ChromaDex;

2. That Morris acted in a manner inconsistent with his fiduciary duties;

3. That Elysium had actual knowledge of that breach of fiduciary duty;

4. That Elysium rendered substantial assistance or encouragement to Morris's breach; and

5. That Elysium's conduct was a substantial factor in causing harm to ChromaDex.

Under California law, to make a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show that (1) defendants knew the purported fiduciary's conduct constituted a breach of fiduciary duty; and (2) provided "substantial assistance or encouragement" to the purported fiduciary to accomplish the breach. *Estate of Migliaccio v. Midland Nat'l Life Ins. Co.*, 436 F. Supp. 2d 1095, 1107 (C.D. Cal. 2006) (quoting *In re Textainer P'ship Sec. Litig.*, 2005 WL 3801596, at *16 (N.D. Cal. Dec. 12, 2005).

1.    Elysium's Evidence in Opposition to Plaintiff's Claim for Aiding and Abetting a Breach of Fiduciary Duty (Claim 8)

As discussed above, the evidence will show that Morris was not a fiduciary of ChromaDex, and that, even if he was, he did not breach any fiduciary duty. Therefore, there can be no claim of "aiding and abetting" such a breach. The evidence will also show that Elysium did not encourage Morris to breach any alleged fiduciary duty, nor did it offer him employment in exchange for the receipt of

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

confidential and proprietary ChromaDex information.  Moreover, to the extent that this claim relies on ChromaDex's alleged trade secrets, it is preempted by CUTSA. *Anokiwave, Inc. v. Rebeiz*, 2018 WL 4407591, at *4 (S.D. Ca. Sept. 17, 2018).  And, like with ChromaDex's claim for breach of fiduciary duty, the fundamental defects inherent in its expert's undifferentiated damages analysis will preclude it from proving damages on this claim as well.

### III.   ELYSIUM'S COUNTERCLAIMS

As set forth in Elysium's Third Amended Counterclaims (ECF No. 103) and Answer to Fourth Amended Complaint and Restated Counterclaims (ECF No. 118), Elysium has pleaded and is pursuing the following counterclaims against ChromaDex in this matter:

Counterclaim 1:   Breach of Contract Against ChromaDex (NR Supply Agreement and Amendment)

Counterclaim 2:   Breach of the Implied Covenant of Good Faith and Fair Dealing

Counterclaim 3:  Fraudulent Inducement

Counterclaim 4:  Patent Misuse

Counterclaim 5:  Unjust Enrichment

Counterclaim 6:   Breach of Contract Against ChromaDex (NR Supply Agreement and Amendment)

**A.**   **Elements of Elysium's Counterclaim for Breach of Contract Against ChromaDex (NR Supply Agreement and Amendment) (Counterclaims 1 and 6)**

Elysium will establish the following in order to prove that ChromaDex is liable to Elysium for breaching the NR Supply Agreement and the Amendment thereto:

1. That ChromaDex sold Niagen to other customers at lower prices than the prices paid by Elysium, even though Elysium purchased higher

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

19

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

volumes than those customers, and ChromaDex failed to provide Elysium with refunds or credits due;

2. That ChromaDex did not manufacture Niagen in compliance with Parts 210 and 211 of Title 21 of the United States' Code of Federal Regulations;

3. That ChromaDex allowed customers to sell products that combined Niagen and resveratrol;

4. That resveratrol is "substantially similar" to pterostilbene;

5. That the Niagen sold by ChromaDex to Elysium contained acetamide at levels above the No Significant Risk Levels established by California's Proposition 65 and that ChromaDex failed to notify Elysium of that fact;

6. That Elysium was damaged by each of these actions.

"[A] breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of a contract." *Hosp. of Barstow, Inc*. v. *California Nurses Ass'n*, 2013 WL 6095559, at *5 (C.D. Cal. Nov. 18, 2013).

**B.     Elements of Elysium's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing (NR Supply Agreement) (Counterclaim 2)**

Elysium will establish the following in order to prove that Plaintiff is liable to Elysium for breach of the implied covenant of good faith and fair dealing:

1. That Elysium fulfilled its obligations under the NR Supply Agreement;

2. That ChromaDex enabled and encouraged at least one customer to manufacture, sell, or distribute products containing both NR and resveratrol;

3. That resveratrol is "substantially similar" to pterostilbene; and

4. That Elysium was damaged by ChromaDex's actions.

*See* CACI No. 325; *HRN Servs., Inc. v. XL Specialty Ins. Co.*, 2018 WL 4959053, at *1 (C.D. Cal. Apr. 30, 2018) ("In order to state a claim for breach of the

20

implied covenant of good faith and fair dealing, a plaintiff must allege the defendant's failure or refusal to discharge contractual responsibility, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party.") (citations omitted).

### C.   Elements of Elysium's Counterclaim for Fraudulent Inducement (License and Royalty Agreement) (Counterclaim 3)

Elysium will establish the following in order to prove that Plaintiff is liable to Elysium for fraudulent inducement:

1. That ChromaDex's then-CEO told Elysium that all of ChromaDex's NR customers were required to execute trademark license and royalty agreements;

2. That this representation was knowingly false when made;

3. That ChromaDex intended to defraud Elysium by forcing it to pay royalties under an agreement to license trademarks it neither wanted nor used;

4. Elysium justifiably relied on ChromaDex's representation; and

5. Elysium was damaged by paying ChromaDex royalties.

*Romero v. San Pedro Forklift, Inc.,* 2008 U.S. App. LEXIS 2607, at *7-8 n.2 (9th Cir. Feb. 1, 2008) (claim for fraudulent inducement has the same elements as claim for fraud under California law) (citing *Lazar v. Superior Court,* 909 P.2d 981, 984 (1996)); CACI Nos. 1900, 1901, 1902.

### D.   Elements of Elysium's Counterclaim for Patent Misuse (Counterclaim 4)

For its counterclaim for declaratory judgment of patent misuse, Elysium must prove that:

1.   ChromaDex conditioned access to its patent rights or a patented product in a way that has impermissibly broadened the scope of those patent rights. *Blonder*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

21

1  *Tongue Labs. v. University of Illinois Found.*, 402 U.S. 313, 343 (1971); *B.B. Chem.*

2  *Co. v. Ellis*, 314 U.S. 495 (1942); *Morton Salt Co. v. G.S. Suppinger Co.*, 314 U.S.

3  488, (1942); *Carbice Corp. of Am. v. Am. Patents Dev. Corp.*, 283 U.S. 27, 33 (1931);

4  *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 518 (1917).

5       2.   ChromaDex "has market power in the relevant market for the patent or

6  patented product on which the license or sale is conditioned." 35 U.S.C. § 271(d)(5).

7       Once Elysium has shown the above two[1] elements, the burden shifts to

8  ChromaDex to show that the misuse has been purged. *B.B. Chem. Co. v. Ellis*, 314

9  U.S. 495, 498 (1942).  A showing of purgation requires proof by ChromaDex that:

10            a.   The misuse of the patent has been fully abandoned. *Id.*

11            b.   The consequences of the misuse have been fully dissipated. *Id.*

12  **E.   Elements of Elysium's Counterclaim for Unjust Enrichment**

13       **(Counterclaim 5)**

14       For its counterclaim for restitution for unjust enrichment, Elysium must

15  prove that:

16       1. It paid royalties to ChromaDex under the Trademark and License

17  Agreement whether Elysium used ChromaDex's trademarks or not.

18       2. ChromaDex's retention of those payments for its benefit would be unjust.

19       "Under California law, the elements of unjust enrichment are: (1) receipt of a

20  benefit; and (2) unjust retention of the benefit at the expense of another." *Baggett v.*

21  *Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1270 (C.D. Cal. 2007).

22  **F.   <u>Elements for Punitive Damages</u>**

23       Elysium will establish the following in order to recover a punitive damages

24  award against ChromaDex:

25            1.   ChromaDex committed fraudulent inducement;

26

27  ───────────────

[1] As discussed in more detail in Section VI (Issues of Law) below, some Federal

28  Circuit cases list "anticompetitive effect" as an additional element of patent misuse.
These Federal Circuit cases are inconsistent with recent Supreme Court case law,
which makes clear that anticompetitive effect is not an element of patent misuse.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

22

ELYSIUM HEALTH, INC.'S AND MARK MORRIS'S MEMORANDUM
OF CONTENTIONS OF LAW AND FACT PURSUANT TO L.R. 16-4;
CASE NO.: 8:16-CV-02277-CJC-DFM

1        2.      ChromaDex acted with "oppression, fraud or malice;"

2        3.      Elysium can establish ChromaDex's "oppression, fraud or

3    malice" by "clear and convincing evidence."

4    *See* Cal. Civ. Code § 3284(a).

## IV. ELYSIUM'S COUNTERCLAIMS ARE AMPLY SUPPORTED BY THE EVIDENCE IN THIS ACTION

The following key evidence establishes the existence of each element of Elysium's counterclaims:

### A. Evidence Supporting Elysium's Claims for Breach of Contract (Counterclaims 1 and 6)

The NR Supply Agreement contains the following provisions:

- Section 3.1 ("the MFN Provision") states that if "at any time during the Term, ChromaDex supplies Niagen (or a substantially similar product) to a Third Party at a price that is lower than that at which Niagen is supplied to Elysium Health under this Agreement, then the price of Niagen supplied under this Agreement shall be revised to such Third Party price with effect from the date of the applicable sale to such Third Party and ChromaDex shall promptly provide Elysium Health with any refund or credits thereby created; provided Elysium Health purchases equal volumes or higher volumes than the Third Party."

- Section 3.7 (the "cGMP Provision") provides that "ChromaDex warrants that the Niagen sold hereunder shall be . . . manufactured in accordance with cGMP," which the agreement defined as "current good manufacturing practices . . . as described in Parts 210 and 211 of Title 21 of the United States' Code of Federal Regulations." (§ 1.3.) These regulations apply to the manufacture of pharmaceutical-grade ingredients.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

ELYSIUM HEALTH, INC.'S AND MARK MORRIS'S MEMORANDUM
OF CONTENTIONS OF LAW AND FACT PURSUANT TO L.R. 16-4;
CASE NO.: 8:16-CV-02277-CJC-DFM

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- Section 3.9 (the "Product Purity Provision"), which required ChromaDex to promptly inform Elysium of any information concerning or that could potentially impact the safety, identity, strength, quality or purity of Niagen of which it became aware.

- Section 3.11.3 of the Amendment (the "Exclusivity Provision"), which granted Elysium the exclusive right to sell products combining NR and pterostilbene (or any substantially similar ingredients).

- Section 4.2 (the "Confidentiality Provision"), which prohibits the parties from disclosing "any terms or conditions of this Agreement to any Third Party without the prior consent of the other party."

### 1.     The MFN Provision

The evidence will show that ChromaDex breached the MFN Provision nine separate times, by selling Niagen to Elysium at a higher price than it sold NR to a third party, even though Elysium had purchased a higher volume of NR.  For example, on February 5, 2014, ChromaDex supplied Niagen to a customer called Innovations 4 Health (a "Third Party," as defined in the agreement) at a price per kilogram well below the price it charged to Elysium for its June 27, 2014 purchase of a substantially higher quantity of Niagen than Innovations 4 Health had bought. Subsequently, on February 2, 2015, ChromaDex sold Niagen to Proctor & Gamble ("P&G") (a "Third Party," as defined in the agreement) at a price per kilogram significantly below the price paid by Elysium for eight purchases it made following that February 2, 2015 sale to P&G, each of which was for a substantially higher volume of NR than P&G had purchased.  ChromaDex never issued Elysium a refund or a credit for these overcharges as required by the MFN Provision.

The complete record of ChromaDex's breaches of the MFN Provision is explained and analyzed in detail in the expert report of Dr. Iain Cockburn, along with the damages Elysium suffered as a result of the breaches of the MFN provision.

### 2.     The cGMP Provision

1       ChromaDex does not dispute that it violated the cGMP Provision.  The

2  evidence will show, through both documents and testimony, that its contract

3  manufacturer never manufactured Niagen pursuant to Pharmaceutical cGMPs, nor

4  was it ever able to do so.

5       The cGMP provision of the NR Supply Agreement warrants that "THE

6  NIAGEN SOLD HEREUNDER SHALL BE (i) MANUFACTURED IN

7  ACCORDANCE WITH cGMP AND APPLICABLE LAWS AND REGULATIONS

8  IN THE UNITED STATES . . . ."  The term "cGMP" was defined in the agreement

9  as "current good manufacturing practices (i) as described in parts 210 and 211 of

10  Title 21 of the United States' Code of Federal Regulations and the latest FDA

11  guidance pertaining to manufacturing and quality control practice, and (ii) as

12  applicable in each other country in which Elysium Health advises ChromaDex in

13  writing that Niagen products are intended to be sold."

14       Despite ChromaDex's obligation under the NR Supply Agreement, Elysium

15  discovered that none of the NR ChromaDex supplied to it was, in fact, manufactured

16  in accordance with cGMPs as described in parts 210 and 211 of Title 21, the standard

17  for pharmaceutical grade ingredients.  ChromaDex never advised Elysium of its

18  breach of this provision.  As a result of this breach, Elysium has suffered economic

19  harm, with damages measured as the difference between the price Elysium paid for

20  the NR it purchased less the price Elysium would have negotiated it had it been aware

21  ChromaDex was not supplying pharmaceutical cGMP-grade NR, multiplied by the

22  quantity purchased by Elysium.  These damages are laid out in detail in the expert

23  report of Dr. Iain Cockburn.

24           3.   <u>The Exclusivity Provision</u>

25       The evidence will show that ChromaDex breached the Exclusivity Provision

26  by permitting four of its customers to sell NR in combination with resveratrol, an

27  ingredient that is substantially similar to pterostilbene.  In February 2016,

28  ChromaDex granted Elysium exclusivity over products that combine NR and PT or

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

25

substantially similar products, such as resveratrol, yet it enabled other customers to sell products in violations of that exclusivity grant. Elysium's expert Dr. Iain Cockburn analyzed sales of third-party combined products in breach of the exclusivity provision between the date of the exclusivity grant and the termination of the NR Supply Agreement and estimated the portion of those sales that Elysium would have captured if, as provided for under the contract, it had been the only seller of combined product. Dr. Cockburn conservatively eliminated sales of a combined product called Thorne Extra Nutrients because the ratio of NR to resveratrol in the product rendered the too dissimilar from Elysium's own product Basis to conclude that Elysium would have captured any of Thorne's sales. As to each of the remaining three combined products sold during the relevant period with similar ingredient ratios, Dr. Cockburn considered a number of factors specific to each (such as marketing channel, price, dosage, and ratio of NR to resveratrol relative to Basis) and reached the conclusion that Elysium would have captured between 10% and 90% of sales of a product called Mitoboost, between 10% and 75% of sales of a product called "Optimized Resveratrol with NR", and as much as 11.25% of sales of a product called ResveraCel. The damages Elysium suffered as a result of the breach of the cGMP Provision are laid out in detail in the expert report of Dr. Iain Cockburn.

### 4.  The Product Purity Provision

The evidence will show that ChromaDex breached the Product Purity Provision when it failed to inform Elysium of elevated levels of acetamide, an industrial solvent, in its NR. Third party testing of the NR ChromaDex supplied to Elysium that was conducted in the Spring of 2017 revealed levels of acetamide above the No Significant Risk Levels established by California's Proposition 65. Although ChromaDex proffered an expert witness on the issue of acetamide testing, it apparently declined to show these test results to her, and she does not opine on them. During the time ChromaDex was selling NR to Elysium, it did not test for the presence of acetamide in the product, despite knowing that acetamide was a likely

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

26

byproduct of the manufacturing process.  Elysium suffered damages because of the costs it incurred to uncover on its own the information ChromaDex wrongfully failed to provide, including through the costs of the third-party testing Elysium had to commission.

5.   Improper Disclosure

The evidence will show that Section 4.2 of the NR Supply Agreement prohibits the parties from disclosing "any terms or conditions of this Agreement to any Third Party without prior consent of the other party."  The NR Specifications were annexed to the NR Supply Agreement and provided part of the definition of "Niagen" therein. ChromaDex contends that the NR Specifications were "terms" of the agreement, and that Elysium violated the NR Supply Agreement's prohibition on disclosing the terms of the agreement to third parties by providing NR specifications (albeit not the ones attached to the NR Supply Agreement) to a third party.  If this was a breach of the agreement, then so too were ChromaDex's multiple disclosures of the NR Specifications to other ChromaDex customers.

**B.   Evidence Supporting Elysium's Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Counterclaim 2)**

The evidence will show that ChromaDex unfairly interfered with Elysium's bargained-for exclusivity rights under the NR Supply Agreement when it encouraged at least one customer to sell a combination of NR and resveratrol, a product substantially similar to pterostilbene.  The damages evidence for this claim overlaps with the evidence of damages on Elysium's counterclaim for breach of the Exclusivity Provision.

**C.   Evidence Supporting Elysium's Counterclaim for Fraudulent Inducement (Counterclaim 3)**

Defendants will present evidence at trial that, during the negotiations that led to the NR Supply Agreement, ChromaDex's then-CEO falsely informed Elysium that ChromaDex required all of its customers who purchased nicotinamide riboside to

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

27

sign trademark license and royalty agreements, and that Elysium relied on this representation to execute a trademark license and royalty agreement that obligated it to pay royalties to ChromaDex.  The evidence also will show that ChromaDex's then-CEO's statement was false; he later admitted in an email to Elysium that at least one customer that purchased NR prior to and during the course of Elysium and ChromaDex's negotiations never signed a trademark license and royalty agreement or paid royalties.  Elysium was damaged by this fraud in the amount of the royalties it paid to ChromaDex under the trademark and license agreement it was fraudulently induced to sign.

**D.  Evidence Supporting Elysium's Counterclaim for Patent Misuse (Counterclaim 4)**

1.  ChromaDex impermissibly broadened the scope of its patent rights by tying supply of NR to its customers' use or licensing of the NIAGEN® mark

Defendants will present evidence that ChromaDex is the exclusive licensee of various patents that ChromaDex has described as covering NR, its use, or its manufacture.

More broadly, evidence will show that it was ChromaDex's express business strategy to identify niche ingredients that may be subject to patent rights, obtain those rights, and then improperly use those patents to build out a durable trademark that would extend beyond expiration of the patent rights.  In particular, evidence will show that ChromaDex used its market and patent power to condition the supply of NR on use of, or purchase of a license to use, ChromaDex's NIAGEN® trademark. ChromaDex's very first NR supply agreement provided that "Buyer agrees to use the Product trademark NIAGEN."   Numerous NR supply agreements with other purchasers similarly conditioned supply of NR on the purchaser's use of ChromaDex's trademark when it sold the purchaser's product, stating that "Buyer shall use the Product trademark NIAGEN…."  The evidence will show that Elysium

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

28

was required to pay substantial royalties for a license to use the NIAGEN® mark, which Elysium did not want to do, but was told by ChromaDex it must sign such a license as a condition to obtaining an NR supply agreement.  (SAMF ¶ 18).

Evidence will also show that ChromaDex recognized it had caused its customers to make a "substantial investment… with respect to the use of the brand name NIAGEN."  (SAMF ¶ 29).  This conduct allowed ChromaDex's patent monopoly to strengthen the NIAGEN® brand.  The NIAGEN® brand is not a right conferred by the patent grant.  Moreover, trademarks are more durable than patents.  Unlike patents, trademarks do not expire, and, unlike patents, trademarks cannot be invalidated as obvious by prior art or as covering unpatentable subject matter such as a natural molecule found in common foodstuff.

2.  ChromaDex has market power in the market for the patented product

Supply of NR as a Distinct Product Market

Evidence, including the testimony of Elysium's economist expert Dr. Iain Cockburn, will show that there is a distinct market for the supply of NR.  This testimony will be confirmed by admissions by ChromaDex and the recognition of others that a market for supply of NR exists.  The evidence will show that NR has unique properties, and that products, including other NAD precursors, are not substitutes.   The evidence will show, therefore, that NR is not reasonably interchangeable with other products.  NR's marketed mechanism of action is as an effective oral dose NAD+ precursor.  The evidence will show that NR is unique in that it is highly efficient and does not have unpleasant side effects.  Evidence, including statements by ChromaDex's chief scientific advisor, will show that "there is no NAD precursor that can do what NR does."  ChromaDex's internal and external documents are consistent on this score, and repeatedly describe NR a highly efficient NAD precursor with unique properties.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    The evidence will further show that ChromaDex and others have recognized a

2    distinct market for NR.  These includes statements by ChromaDex, its executives,

3    and third parties discussing "the NR market."  Moreover, evidence will show that

4    ChromaDex believes that its patent and trademark rights, and other barriers to entry,

5    gave it control over a market consisting of the supply of NR.  Other evidence will

6    also support Elysium's market definition, including pricing data.

7        The evidence will further show that the relevant geographic market is the

8    supply of NR in the United States.

9    <u>ChromaDex's Market Power</u>

10       Evidence will also show that ChromaDex has market power in a market for the

11   supply of NR.  Dr. Cockburn will provide testimony regarding ChromaDex's market

12   power.  Evidence will show that during the relevant period, ChromaDex was the sole

13   supplier of NR.  As such, ChromaDex repeatedly described itself as the source of the

14   "1st and Only Commercially Available Nicotinamide Riboside."  Additional evidence

15   will also show that ChromaDex CEO Frank Jaksch explained that "ChromaDex does

16   control the NR market and will for quite some time," having "created [a] multilayered

17   fort around NR, protecting our controlling position in the market."  Further evidence

18   will show barriers to entry in the NR supply market, including patent rights, access

19   to manufacturing, and other barriers.  For example, ChromaDex has publicly touted

20   that "Niagen™ is the first and only commercially available brand of NR…

21   ChromaDex believes its patent rights create a significant and meaningful barrier to

22   entry for would-be competitors in the NR market."  Referencing its NR patent rights,

23   ChromaDex has told investors, that it is "in the enviable position of 'gatekeeper' to

24   the entire NAD+ precursor category."  The evidence will also show that ChromaDex

25   was able to discriminate between customers in price and contractual terms.

26   ChromaDex was also able to enjoy high price/cost margins in the supply of NR to its

27   customers.

28       3.    <u>ChromaDex's conduct had anticompetitive effects</u>

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

30

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Although (as discussed in more detail below[2]) proof of anticompetitive effect

2  is not an element of a patent misuse claim, Elysium is prepared to present evidence

3  showing that ChromaDex's conduct had such an effect.

4  The evidence will show that ChromaDex's coupling of its patent and

5  trademark rights allowed it to use its patent rights to strengthen the NIAGEN® brand

6  and increase the distinctiveness of its product, at the expense of healthy competition.

7  This evidence includes the expert testimony of Dr. Cockburn, who opines as an

8  economist that ChromaDex's conduct had anticompetitive effects.  The admissions

9  of ChromaDex's own expert will also confirm the anticompetitive effects of

10  ChromaDex's conduct.

11  The evidence will show that ChromaDex's conduct minimized brand

12  competition among NR products sold to consumers and reduced consumer choice.

13  The evidence will show that ChromaDex's patent misuse distorted its trademark

14  rights and have given it an undue and unearned advantage.  ChromaDex recognized

15  that it had caused its customers to make a "substantial investment . . . with respect to

16  the use of the brand name NIAGEN."  ChromaDex's trademark use requirement had

17  the purpose and effect of leveraging ChromaDex's NR patent rights in order to

18  strengthen ChromaDex's NIAGEN trademark, increasing barriers to entry and

19  foreclosing competition more effectively and durably than could ChromaDex's

20  patent rights alone.  As ChromaDex recognized in internal documents, its "NIAGEN

21  ingredient TM strategy strengthens the overall NR business . . ." because it

22  "[p]rovides differentiation for CDX [ChromaDex] if/when NR competition arrives."

23  The evidence will also show that ChromaDex's conduct reduced the likelihood

24  of ChromaDex experiencing meaningful competition.  ChromaDex created a strong

25  mark that made it more difficult for new entrants to compete.  Elysium was required

26  to pay almost half a million dollars in exchange for an unwanted license for use of

27  the NIAGEN® mark.  This substantial expense diminished Elysium's ability to

28

---

[2] *See* Section E., below.

31

innovate and provide broader choice to consumers.  It also made it more difficult and costly for Elysium to provide brand competition against the NIAGEN® mark.

The evidence will also show that, after forcing NR customers to invest substantially in the NIAGEN® mark and grow the intrinsic value of the mark by conditioning supply of NR on the customers' use of the mark, ChromaDex then moved to capture that goodwill for itself.  ChromaDex abruptly cut off supply to those customers and commenced its own sales of NIAGEN® directly to consumers. Based on the strength of the NIAGEN® brand, ChromaDex was able to supplant all of its direct-to-consumer licensees in 2017 by terminating their supply agreements and catapulting itself to become a major direct-to-consumer seller of a product that it now markets as TRU NIAGEN®.  The evidence will show that ChromaDex has capitalized on its patent misuse and unearned commercial advantage.  ChromaDex to this day tells customers to "Look for 'Niagen®' on the label" to determine if an NR product is "authentic, safe, & effective."

### 4.  ChromaDex has not purged its misuse

The evidence will show that ChromaDex has not purged its misuse by completely abandoning its wrongful conduct, and that the effects of that conduct have not been, and never can be, fully dissipated.  The evidence will show that ChromaDex continues to exploit the NIAGEN mark.  Not only that, ChromaDex took steps to take for itself the unearned goodwill in the NIAGEN® mark that it had caused its licensees to build by requiring use of the mark as a condition of supply.  ChromaDex has exploited, and continues to exploit, the NIAGEN mark.  The evidence will show that ChromaDex continues to tell customers to "Look for 'Niagen® on the label" to determine if a product is "authentic, safe, & effective."  Moreover, ChromaDex has not repaid Elysium for the trademark royalties Elysium was forced to pay.  And, expert testimony and other evidence will show, ChromaDex's conduct has distorted the market in ways that cannot be repaired or dissipated.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

32

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**E.    Evidence Supporting Elysium's Counterclaim for Unjust Enrichment (Counterclaim 5)**

The evidence will show that Elysium paid royalties to ChromaDex under the Trademark Royalty and License Agreement, and that Elysium was required to do so, whether or not it used ChromaDex's trademarks, as a condition of purchasing NR from ChromaDex under the Supply Agreement.  As discussed in part D(a), the evidence will show that the License and Royalty Agreement was unenforceable and that requiring the royalty payments constituted patent misuse.  Further, the evidence will show that ChromaDex has retained for its own benefit, and not reimbursed Elysium for, the royalties Elysium paid to ChromaDex under the License and Royalty Agreement.

**F.    Evidence Supporting Elysium's Claim for Punitive Damages**

With respect to Elysium's claim for punitive damages, the evidence listed in above establishes the existence of each element required for recovering punitive damages from ChromaDex.  Elysium will also rely on ChromaDex's financial statements and other disclosures filed with the SEC in support of its claim for punitive damages.

**V.    ANTICIPATED EVIDENTIARY ISSUES**

Elysium anticipates evidentiary issues relating to the confidentiality of material to be presented as evidence at trial as well as the admissibility of various purported pieces of evidence.  Those issues are the subject of pending motions *in limine.*

**VI.    ISSUES OF LAW**

The following issue of law is germane to Elysium's counterclaim for a declaration of patent misuse.

**Whether, after the Supreme Court's decision in *Kimble v. Marvel Entm't, LLC,* proof of anticompetitive effects is not required for conduct to constitute patent misuse.**  Although the Federal Circuit has stated that misuse requires proof of

33

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

"anticompetitive effect," *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010), this requirement is inconsistent with more recent subsequent Supreme Court case law. As the Supreme Court recently held in *Kimble v. Marvel Entm't, LLC*, proof of anticompetitive effect is not an element of patent misuse. 135 S. Ct. 2401, 2413 (2015) ("The patent laws—unlike the Sherman Act—do not aim to maximize competition….). In *Kimble*, Marvel agreed to pay a 3% royalty for Kimble's patent without an end date. *Id.* at 2406. Kimble argued this was an economically efficient arrangement that should not be struck down as patent misuse. The Court rejected Kimble's argument that the Court should engage in a "practice specific analysis" that balanced benefits and harms to the parties and to competition. *Id.* at 2413 and 2408-09. Instead, the Court held that the parties' agreement was unenforceable due to patent misuse, stating, "all patents, and all benefits from them, must end" even if the conduct was arguably desired or beneficial to the parties or to competition. *Id.* at 2408. The Court was clear that "patent (not antitrust) policy gave rise to the Court's conclusion that post-patent royalty contracts are unenforceable—utterly regardless of a demonstrable effect on competition." *Id.* at 2413. Given these clear pronouncements by the Supreme Court that patent policy is with "carefully guarding [the patent law's] cut-off date [and]… subject matter limits", *id.* at 2407, rather than maximizing competition, it would be legal error for a court to require a showing of anticompetitive effect to prove patent misuse.

## VII.   ISSUES TRIABLE TO A JURY AND TO THE COURT

### A.   Counterclaim 4 (Declaratory Judgment of Patent Misuse)

Patent misuse is an equitable claim that is not triable to a jury as of right. *See Cordance Corp. v. Amazon.com, Inc.*, 2009 U.S. Dist. LEXIS 64986 (D. Del. July 28, 2009). Given the equitable nature of this claim, its strong public policy grounding, the Defendants' request for declaratory relief, and the potential for jury confusion, Elysium agrees with ChromaDex that patent misuse is properly tried to the Court. However, for efficiency, Elysium proposes that to the extent there is

34

overlapping testimony on jury triable issues that is relevant to patent misuse, the testimony can be used in the patent misuse trial.

### B.  Counterclaim 5 (Unjust Enrichment)

Because Elysium's unjust enrichment counterclaim is tied directly to its patent misuse claim, Elysium believes that this claim should also be tried to the Court and not to a jury.

### C.  All Other Claims and Counterclaims

Defendants believe all other claims and counterclaims at issue in this litigation are properly tried to a jury.

### D.  Punitive Damages

Elysium has a right to a jury trial regarding its claim for punitive damages:  "It is established that suits for money damages, including punitive damages, are legal in nature entailing the right to a jury trial, and that this right cannot be abridged even if the damages are considered incidental to the equitable claims."  *Malone v. Norwest Fin. Cal., Inc.*, 245 B.R. 389, 399 (E.D. Cal. 2000) (citing *Curtis v. Loether*, 415 U.S. 189, 196 n. 11 (1974)).

## VIII.  <u>BIFURCATION OF ISSUES</u>

Elysium does not believe that bifurcation is appropriate in this action.  With respect to the patent misuse claim, Elysium has addressed bifurcation above in connection with the discussion of whether the claim should be tried to the Court or to the jury.

## IX.   <u>ABANDONMENT OF ISSUES</u>

Elysium has not abandoned any of its counterclaims.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2                                Respectfully submitted,

3    Dated:  August 28, 2019      **BAKER & HOSTETLER LLP**

4

5                            By:   */s/ Joseph N. Sacca*
                                      JOSEPH N. SACCA

6                            *Attorneys for Defendant and Counterclaimant*
7                            ELYSIUM HEALTH, INC. *and Defendant*
MARK MORRIS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES