# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| CHROMADEX, INC., | Case No.: SACV 16-02277-CJC(DFMx) |
| Plaintiff, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART CHROMADEX, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. 233] AND ELYSIUM HEALTH, INC.'S AND MARK MORRIS' MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. 230] |
| ELYSIUM HEALTH, INC., and MARK MORRIS, | |
| Defendants. | |
| ELYSIUM HEALTH, INC., | |
| Counterclaimant, | |
| v. | |
| CHROMADEX, INC., | |
| Counter-Defendant. | |

## I.  INTRODUCTION

Plaintiff ChromaDex, Inc. ("ChromaDex") filed this case against Defendant Elysium Health, Inc. ("Elysium") on December 29, 2016.  (Dkt. 1.)  It later added Mark Morris—former ChromaDex Vice President of Business Development, who then took a job at Elysium—as a defendant.  The operative pleadings are now ChromaDex's Fifth Amended Complaint (Dkt. 153 [hereinafter "FAC"]), and Elysium's and Mark Morris' Third Amended Counterclaims (Dkt. 103 [hereinafter "TACC"]).  One additional counterclaim is found in Elysium's Answer to the Fourth Amended Complaint and Restated Counterclaims.  (Dkt. 118 [hereinafter "RCC"].)  Before the Court are ChromaDex's Motion for Partial Summary Judgment (Dkt. 233 [hereinafter "ChromaDex Mot."]), and Elysium's and Mark Morris' Motion for Partial Summary Judgment (Dkt. 230, hereinafter ["Elysium Mot."]), along with the parties' supplemental briefs the Court requested (Dkt. 373 [hereinafter "Elysium Supp."], Dkt 384 [hereinafter "ChromaDex Supp."], Dkt. 390, [hereinafter "Elysium Supp. Reply"]).  The Court held a hearing on January 13, 2020.  For the following reasons, both motions are **GRANTED IN PART AND DENIED IN PART**.

## II.  BACKGROUND

The Court presents the facts relevant to each issue of law in the discussion below, and presents only a high-level overview here.  ChromaDex is a nutraceutical company devoted to improving the way people age.  (Dkt. 296-6 ¶ 1.)  ChromaDex supplied Elysium with nicotinamide riboside ("NR"), which ChromaDex sold under the trade name Niagen (sometimes appearing as NIAGEN), and pterostilbene ("PT"), which ChromaDex sold under the trade name pTeroPure.  (Dkt. 295-1 ¶ 1.)  Elysium uses those ingredients in its dietary supplement called "Basis."  (*Id.* ¶¶ 4–5.)

ChromaDex and Elysium were parties to three contracts:

1. The Niagen Supply Agreement (Dkt. 239-6), dated February 3, 2014, as amended by the Amendment to Supply Agreement (Dkt. 239-10), dated February 19, 2016 (Dkt. 239-6 [hereinafter the "NR Supply Agreement"]),

2. The pTeroPure Supply Agreement, dated June 26, 2014 (Dkt. 153-5 [hereinafter the "PT Supply Agreement"]), and

3. The Trademark License and Royalty Agreement, dated February 3, 2014 (hereinafter the "TLRA").

In this case, each party alleges that the other breached these contracts. Although the case began as a relatively straightforward breach of contract case where ChromaDex alleged Elysium failed to pay for NR it ordered on June 30, 2016 for just under $3 million ("the June 30 orders"), by the time these motions were filed, it had ballooned into a case where ChromaDex sought $60 million against both Elysium and Morris for trade secret misappropriation, breach of confidentiality agreements, and breach of fiduciary duty. (*See* Dkt. 369.)

## III.  LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. A factual issue is "genuine" when there is sufficient evidence such that a

reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law.  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 249.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor.  *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).  The court does not make credibility determinations, nor does it weigh conflicting evidence.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).  But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment.  *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## IV.  DISCUSSION

ChromaDex's FAC alleges claims for breach of the NR Supply Agreement and PT Supply Agreement against Elysium, misappropriation of trade secrets under California and federal law against Elysium and Morris, breaches of confidentiality agreements and breach of fiduciary duty against Morris, and aiding and abetting breach of fiduciary duty against Elysium.  As damages, ChromaDex seeks contract damages in addition to some of Elysium's profits, avoided costs, a price discount, and Morris' compensation.  Elysium moves for summary judgment on portions of all of those claims.

Elysium's TACC and RCC allege claims for breaches of the NR Supply Agreement, breach of the implied covenant of good faith and fair dealing, fraudulent

inducement of the TLRA, and also seek declaratory judgment of patent misuse and restitution for unjust enrichment.  ChromaDex moves for summary judgment on substantially all of those claims.

### A.    ChromaDex's Motion

ChromaDex moves for partial summary judgment on portions of each of Elysium's six counterclaims.  For the following reasons, the Court **GRANTS** ChromaDex's motion for summary judgment on Elysium's first counterclaim as it relates to alleged breach of Sections 3.7, 3.9, and 3.11.3 of the NR Supply Agreement, and also Elysium's second and sixth counterclaims.  The Court **DENIES** ChromaDex's motion for summary judgment on Elysium's third, fourth, and fifth counterclaims.

### 1.  First Counterclaim: Breach of Section 3.7 of the NR Supply Agreement (cGMP)

In Section 3.7 of the NR Supply Agreement, ChromaDex warranted that the Niagen it sold Elysium would be "manufactured in accordance with cGMP [current good manufacturing practices] and applicable laws and regulations in the United States" (all caps omitted).  Section 1.3 of that agreement defines cGMPs to "mean current good manufacturing practices . . . as described in Parts 210 and 211 of Title 21 of the United States' Code of Federal Regulations."  Those parts apply to the manufacture of pharmaceutical ingredients and products.  *See* 21 C.F.R. Ch. I, Subch. C, Pts. 210–11; (ChromaDex Mot. at 18.)  Elysium counterclaims that the Niagen it received did not comport with pharmaceutical cGMPs.  (TACC ¶¶ 151–52.)  ChromaDex does not appear to deny that its Niagen did not comport with pharmaceutical cGMPs, but rather contends that "[t]he reference to pharmaceutical regulations was a mistake," and that "ChromaDex manufactured the NIAGEN it shipped to Elysium under the cGMP standards for food and

dietary ingredients," which are described elsewhere in the Code of Federal Regulations. (ChromaDex Mot. at 18.)  ChromaDex's then-CEO testified that ChromaDex did not tell Elysium it could manufacture NR in accordance with pharmaceutical cGMPs, so he did not know how that term ended up in the agreement, because it "shouldn't have been in there."  (Dkt. 240-2 at 110–11.)

ChromaDex argues that summary judgment is appropriate on this counterclaim because it is barred by California Commercial Code Section 2607, which states that a buyer that has accepted tender "must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy."  Cal. Com. Code § 2607(3)(A); (ChromaDex Mot. at 18–20).  On September 7, 2016, Elysium's COO, Daniel Alminana, emailed Elysium's CEO, Eric Marcotulli, "we now know that ChromaDex has breached [the cGMP provision], as all Niagen sold to date has not been manufactured in a GMP facility."  (Dkt. 240-2 [Ex. 57].)  On September 24, 2016, Elysium drafted a letter notifying ChromaDex of the purported cGMP Provision breach.  (*Id.* [Ex. 58].)  However, Elysium never sent that letter.  (*See* ChromaDex. Mot. at 19.)  Instead, the first time representatives of Elysium notified representatives of ChromaDex of the alleged breach was on January 9, 2018—at least sixteen months after Elysium discovered the breach—when Elysium's lawyers told ChromaDex's lawyers that Elysium intended to amend its counterclaims to include a counterclaim based on cGMP violations.  (Dkt. 240-2 [Ex. 60] at 750.)

ChromaDex also argues summary judgment is appropriate because Elysium waived its claim under the terms of the Agreement.  Section 3.7 of the NR Supply Agreement, titled "Limited Warranty and Disclaimer of all other Warranties," states:

> ALL CLAIMS MADE WITH RESPECT TO THE PRODUCT SHALL BE DEEMED WAIVED BY ELYSIUM HEALTH UNLESS MADE IN WRITING AND RECEIVED BY CHROMADEX WITHIN THIRTY (30) DAYS OF

DELIVERY [] ELYSIUM HEALTH MUST MAKE ANY CLAIM FOR NON-CONFORMING NIAGEN, BREACH OF WARRANTY WITH RESPECT TO THE NIAGEN SOLD, OR ANY CLAIM OF ANY NATURE WHATSOEVER WITH RESPECT TO THE NIAGEN SOLD HEREUNDER IN WRITING WITHIN THIRTY (30) DAYS AFTER ELYSIUM HEALTH'S RECEIPT OF NIAGEN; AND [] ELYSIUM HEALTH IRREVOCABLY WAIVES AND RELEASES ALL CLAIMS THAT ARE NOT PROPERLY MADE WITHIN SAID PERIOD.

The parties do not dispute that Elysium waited from at least September 7, 2016 to January 9, 2018 to tell ChromaDex about the alleged cGMP violation. Elysium instead argues that "equitable principles" excuse its failure to give notice for that amount of time under both California law and the NR Supply Agreement. (Elysium Opp. at 16–17 [citing *Gueyffier v. Ann Summers, Ltd.*, 43 Cal. 4th 1179, 1186 (Cal. 2008) (explaining that "California law allows for equitable excusal of contractual conditions causing forfeiture in certain circumstances, including circumstances making performance futile" and affirming arbitrator's determination that plaintiff was excused from giving notice of breach and opportunity to cure because "notice of [the] breaches would have been an idle act"); Cal. Civ. Code § 3532 ("The law neither does nor requires idle acts."); *In re Raiton*, 139 B.R. 931, 935 (B.A.P. 9th Cir. 1992) ("It is well-established that, in cases involving notice, the law does not require a useless act.")].) Specifically, Elysium maintains that ChromaDex could not have cured the defects because it "was the sole commercial supplier of NR and *all* of the NR it sold to Elysium was defective," so notice would have been futile. (*Id.*) According to Elysium, then, notice was unnecessary because ChromaDex could not have fixed the cGMP issue, and Elysium's only other option under the Agreement—to return the product for a refund—"was no option at all" because it would have meant "the loss of all saleable product." (*Id.* at 16.)

"The question whether notice was properly given must be determined from the particular circumstances and, where but one inference can be drawn from undisputed

facts, the issue may be determined as a matter of law." *Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal. App. 4th 116, 135–36 (2008) (internal quotation omitted).  Here, only one inference can be drawn from the undisputed facts:  Elysium's failure to give notice for sixteen months was not reasonable under California law.  Elysium stated in no uncertain terms that it "kn[e]w" of its cGMP claim on September 7, 2016.  (Dkt. 240-2 [Ex. 57].)  Aware of its obligation to notify ChromaDex of any alleged breach, on September 24, 2016, Elysium drafted a letter notifying ChromaDex of the purported cGMP provision breach.  (*Id.* [Ex. 58].)  For whatever reason, Elysium decided not to send that letter.  For whatever reason, Elysium decided not to include its cGMP counterclaim in its initial Counterclaims, filed January 25, 2017.  (Dkt. 11.)  Nor did Elysium elect to include this counterclaim in its First Amended Counterclaims, filed March 6, 2017.  (Dkt. 31.)  It did not even decide to include the counterclaim in its Second Amended Counterclaims, filed October 11, 2017.  (Dkt. 65.)  Rather, the first time it notified ChromaDex of the alleged breach was through its lawyers on January 9, 2018, more than sixteen months after Elysium knew of the breach.  (Dkt. 240-2 [Ex. 60] at 750.)

Elysium made a business decision not to notify ChromaDex of the alleged breach of the cGMP provision, or to include a counterclaim for the alleged breach until its *fourth* pleading in this case, the Third Amended Counterclaims.  (*See* Dkt. 240-2 [Exs. 57, 58]; *compare* Dkt. 65 [Second Amended Counterclaims] *with* Dkt. 103 [TACC].)  Elysium's response that it would have been futile to give notice ignores the other purposes of giving notice besides allowing for cure of the alleged breach, including "to allow the seller the opportunity to . . . reduce damages, avoid defective products in the future, and negotiate settlements," and  "also inform[] the seller of the need to preserve evidence and to be prepared to defend against the suit, and protect[] against stale claims." *Cardinal Health*, 169 Cal. App. 4th at 135.  Elysium cannot make that business decision and also maintain this counterclaim.

Elysium alternatively argues that since it told ChromaDex of *other* issues with the Niagen transaction—specifically, that ChromaDex purportedly overcharged Elysium in violation of the contract's Most Favored Nation pricing provision (discussed in Section IV.B.1.), and that ChromaDex enabled third parties to sell products containing NR and PT or a substantially similar ingredient in violation of the exclusivity provision (discussed in Section IV.A.3.)—"ChromaDex received all the notice to which it was entitled." (Elysium Opp. at 18.)  The Court disagrees.

Elysium correctly contends that "the buyer need not set forth each and every ground for breach." (*Id.*)  The buyer's notice "need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched," so as to "open[] the way for normal settlement through negotiation," and does not have to detail everything wrong with the product or "include a clear statement of all the objections that will be relied on by the buyer."  Cal. Com. Code § 2607, UCC Cmt. 4.  For example, courts have found that informing a defendant that a product the plaintiff purchased "was bad" is sufficient notice to survive a motion to dismiss. *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 2014 WL 2916472, at *10 (N.D. Cal. June 26, 2014) (cited in Elysium Opp. at 18; ChromaDex Reply at 14).

But here, Elysium's objections that the Niagen was overpriced and not sold exclusively were so far removed from its objection to the quality of the Niagen product that the notice Elysium gave ChromaDex was insufficient as a matter of law.  Again, the purpose of the notice requirement makes this clear.  Telling ChromaDex that the Niagen delivered purportedly violated contractual pricing and exclusivity provisions does nothing to allow ChromaDex to "reduce damages, avoid defective products in the future, and negotiate settlements" regarding the quality of the Niagen. *Cf Cardinal Health*, 169 Cal. App. 4th at 135 (concluding that giving notice to company that had bought the relevant defendant's electronics division was insufficient because relevant defendant

"had no opportunity to preserve any relevant evidence or attempt any form of settlement discussions or negotiations"). Nor did it inform ChromaDex "of the need to preserve evidence and to be prepared to defend against the suit," or "protect[] against stale claims." *See id.* Elysium's notice failed to satisfy the purpose of the notice statute.

Elysium next argues that it did not discover the alleged cGMP breach until after it had notified ChromaDex of the pricing and exclusivity breaches, and that it should not be punished for failing to give notice merely because it "continued to discover more breaches." (Elysium Opp. at 19.) The Court is not persuaded. That Elysium had previously notified ChromaDex of other breaches does not mean it could not have notified ChromaDex of additional breaches. Indeed, Elysium had already done exactly that: it notified ChromaDex of the purported pricing violation on June 29, 2016, and of the exclusivity provision in August 2016. (*Id.* at 18.) Elysium does not explain why it could not have returned to ChromaDex to notify it of a third alleged breach. Indeed, it drafted a letter doing exactly that, which it chose not to send. (Dkt. 240-2 [Ex. 58].)

Given its finding that Elysium failed to give reasonable notice of the alleged violation of the cGMP provision of the NR Supply Agreement, the Court **GRANTS** ChromaDex's motion for summary judgment on Elysium's counterclaim for breach of Section 3.7 of the NR Supply Agreement.

## 2.  First Counterclaim: Breach of Section 3.9 of the NR Supply Agreement (Product Safety)

Section 3.9 of the NR Supply Agreement, titled "Product Safety," states: "ChromaDex shall promptly inform Elysium Health in writing of any information concerning or that can potentially impact the safety, identity, strength, quality or purity of any Niagen of which it becomes aware, and shall provide supporting documentation."

Elysium counterclaims that ChromaDex breached this section by failing to promptly inform Elysium that the NR Elysium purchased contained the carcinogen acetamide in levels that exceeded limits set by California's Proposition 65.  (TACC ¶¶ 90–91,151–52.)

ChromaDex again moves for summary judgment on the basis that Elysium failed to provide statutory notice.  Notice on this counterclaim is slightly different because Elysium did not receive the test results it argues indicated breach of the product safety provision until April 2017, which was after this litigation began, and after Elysium had already filed its Counterclaims and First Amended Counterclaims.  (*See* Dkt. 240-2 [Ex. 69] at 304–05 [Dr. Thomas Wilhelm testifying that one "factor" in Elysium's failure to immediately notify ChromaDex about the alleged product safety breach was that Elysium was "at that point . . . months into active litigation with ChromaDex"].)  Given this difference, it is difficult for the Court to say that there is "but one inference can be drawn from undisputed facts."  *See Cardinal Health*, 169 Cal. App. 4th at 136.  A reasonable jury might find Elysium's notice was reasonable under these circumstances.

However, summary judgment is warranted on this claim for another reason: lack of evidence to show unsafe levels of the carcinogen acetamide.  To show that ChromaDex failed to "promptly inform" Elysium of quality issues, Elysium has to show that there were in fact quality issues with the NR about which ChromaDex should have informed Elysium.  The only evidence Elysium presents that the NR it received from ChromaDex did not comply with the product safety provision of the contract are results from PCI Synthesis' ("PCI")[1] April 2017 tests of ChromaDex NR for acetamide.  (Elysium Opp. at

---

[1] Elysium asks the Court to redact PCI's name because it claims that if the "identity of suppliers and manufacturers for Elysium's product, Basis . . . is disclosed to the public, Elysium's competitors would benefit from access to this information at Elysium's expense. . . and place [Elysium] at a competitive disadvantage.  (*See, e.g.*, Dkt. 391 at 3–4.)  A party seeking to file documents under seal "bears the burden of overcoming [the] strong presumption" in favor of public access to court records.  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (quotation omitted).  "The presumption of access is based on the need for federal courts, although independent—indeed,

20.)  Those test results showed acetamide levels that appeared high.  However, Charles Donovan, the PCI employee conveying the results, advised Elysium to "[p]lease keep in mind, this method is not ready yet," and that "[t]hese all are preliminary results to move forward" in "see[ing] whether we have [a] method to provide accurate results or not." (*See* Dkt. 333-2 [Ex. 82] at 1044.)

On July 17, 2017, Morris (from his Elysium email address) asked another company, Ampac Fine Chemicals ("Ampac"), about methods for testing NR for acetamide.  He reported that PCI's April 2017 testing method generated "inconsistent results" due to "interference."  (Dkt. 241-14 [Ex. 50] at 680.)  Because of that, he recounted that he had asked PCI to "dig into the analytical method for acetamide."  (*Id.*) In July 2017, PCI had "essentially created an entirely new method" of testing for acetamide to replace the April 2017 method.  (Dkt. 333-3 [Ex. 83] at 1084.)  Morris told Ampac that once the method changed, the same samples were "now analyzing very low levels of acetamide."  (*Id.* at 680.)  Ampac recommended a method different from the April 2017 PCI method in order to "avoid interference and false positives," and Morris, on behalf of Elysium, asked for a proposal for development of that different method.  (*Id.* at 680.)

The Court finds that the April 2017 test results are simply insufficient by themselves to support Elysium's product safety counterclaim.  PCI itself described the

---

particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice."  *Id.* (quotation omitted).  "Unless a particular court record is one traditionally kept secret, a strong presumption in favor of access is the starting point." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).  "'[C]ompelling reasons' must be shown to seal judicial records attached to a dispositive motion," like these motions for summary judgment.  *Id.* at 1179.  Elysium has failed to show compelling reasons to keep this name under seal. This information is at the center of this litigation, and Elysium's conclusory statement that its release would cause competitive harm is not sufficient to overcome the presumption of public access to court records, especially at this stage of the litigation.  Accordingly, the Court denies Elysium's applications to seal insofar as they ask that PCI's name be kept under seal.

method it used to develop those results as "not ready" and "preliminary."  (Dkt. 333-2 [Ex. 82] at 1044.)  It expressed a lack of certainty that its results were "accurate."  (*Id.*)  Moreover, Mark Morris was working for Elysium at the time the April 2017 test results were received.  He therefore had every reason to construe those results as showing a breach by ChromaDex.  Instead, he acknowledged that those results were unreliable and marred by "inconsisten[cies]," and asked PCI to "dig into the analytical method" to explain those inconsistencies.  (Dkt. 241-14 [Ex. 50] at 680.)  When it turned out the inconsistencies were due to "interference," he asked Ampac for a proposal for a different method.  (*Id.* at 679–80.)

Moreover, there is evidence that Elysium believed the Basis it sold was safe for consumption even after it received the April 2017 test results.  (*See* Dkt. 240-2 [Ex. 69] at 305–06 [Dr. Wilhelm so testifying].)  Indeed, Elysium sold all of the Niagen it had, even after discovering alleged heightened levels of acetamide.  (*Id.*)

ChromaDex has therefore shown that there is an absence of evidence to support Elysium's claim.  *See Celotex*, 477 U.S. at 325 (explaining that where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by showing that there is an absence of evidence to support the nonmoving party's case); *Standard Fabrics Int'l, Inc. v. Dress Barn Inc.*, 2017 WL 240072, at *5 (C.D. Cal. Jan. 19, 2017) (finding that the plaintiff identified an absence of evidence supporting lawful first sale, and the defendant failed to show a genuine dispute of fact as to lawful acquisition).  Elysium has failed to show a genuine dispute of fact as to its product safety counterclaim.  Accordingly, the Court **GRANTS** summary judgment in favor of ChromaDex on Elysium's first counterclaim as it relates to alleged breach of Section 3.9 of the NR Supply Agreement.

### 3.   First Counterclaim: Breach of Section 3.11.3 of the pTeroPure Supply Agreement (Exclusivity), and Second Counterclaim: Breach of the Implied Covenant of Good Faith and Fair Dealing

Section 3.11.3 of the pTeroPure Supply Agreement provides:

> ChromaDex shall not, directly or indirectly, sell, transfer or otherwise provide to any Third Party, or license or otherwise enable any Third Party to make, any products containing both Niagen and pTeroPure® (or any ingredients that are substantially similar thereto) in combination.

Elysium counterclaims that ChromaDex breached this exclusivity provision by allowing three other customers to sell products containing NR and resveratrol—which Elysium contends is a "substantially similar" ingredient[2]—in violation of Section 3.11.3 of the Supply Agreement.  (TACC ¶¶ 148–49.)  It similarly counterclaims that ChromaDex breached the implied covenant of good faith and fair dealing "by recommending to other customers that they create products containing both [NR] and either [PT] or a substantially similar ingredient, which unfairly interfered with Elysium's right to receive the benefits of exclusivity under the NR Supply Agreement."  (*Id.* ¶ 160.)

ChromaDex argues summary judgment is appropriate on both claims because Elysium's evidence of damages for the claims is unsupported and speculative. (ChromaDex Mot. at 22–24.)  Elysium's damages theory on alleged breach of the exclusivity provision and breach of the implied covenant of good faith and fair dealing is this:  Elysium bargained to capture the entire market for products that combine NR and PT or substantially similar ingredients.  (Elysium Opp. at 22–24.)  ChromaDex violated that agreement by selling NR and resveratrol to four other companies.  (*Id.*)  That meant that instead of Elysium being the only company selling a product containing NR and PT

---

[2] ChromaDex disputes that resveratrol is a "substantially similar ingredient" under the agreement, but the parties have assumed for purposes of this motion that it is.  (*See* Elysium Opp. at 22 n.10.)

or substantially similar ingredients, there were five companies selling such products. (Dkt. 296-2 [Expert Report of Dr. Iain M. Cockburn, hereinafter "Cockburn Rep."] ¶¶ 179–182.)  This "cost Elysium some portion of the market it would have had but for the breach."  (Elysium Opp. at 22.)

However, a major obstacle for Elysium is trying to present a plausible methodology with supporting evidence for calculating the portion of the market it would have captured if ChromaDex had not allegedly breached the exclusivity provision of the NR Supply Agreement.  Elysium's expert, Dr. Cockburn, tried to assess how many people who bought competing products would have bought Elysium's product, Basis, "in the but-for world in which none of these [competing] products were available." (Cockburn Rep. ¶ 183.)  The idea is that consumers who bought the other four products showed a preference for products containing NR and PT or substantially similar ingredients, so if the other four products had not existed, those consumers may have bought Elysium's Basis.  (*Id.*)  This is a tenuous stretch.

Indeed, Dr. Cockburn himself acknowledges that "[i]nsufficient data is available to determine precisely how many [of the competitors'] customers could have been BASIS customers in the but-for world" where no competition existed, because "[n]ot all [competitors'] customers can be assumed to purchase BASIS in the but-for world, since [the competitors' products are] not exactly equivalent to BASIS and some of the characteristics and features of [the competitors' products] that played a role in the purchase decision were not offered by BASIS."  (*Id.* ¶ 186.)  For example, one competing product, Vitaquest's Mitoboost, contained 100mg NR per pill, while Basis contains 250mg NR per pill.  (*Id.*)  Dr. Cockburn explained that "while 'pill-splitting' is a common behavior, some customers preferring a 100mg per day dose might have not been willing to do this," and therefore might not have bought Basis at all.  (*Id.*)

Similarly, another competing product, LEF's Optimized Resveratrol with NR, emphasized resveratrol over NR, and contained the two ingredients in very different proportions than Basis.  (*Id.* ¶ 187.)  Substantial guesswork is required to decide whether consumers who decided to buy Optimized Resveratrol, with its proportions of NR and resveratrol, would have bought Basis, with different proportions, if it were the only product on the market.  Another difference is that Basis was sold primarily as a continuing subscription, whereas competitor products sold for a single purchase.  (*Id.* ¶ 186.)  Some customers, even if they were interested in a product containing both NR and PT, may not have been willing to sign up for a continuing subscription, and therefore might not have bought Basis even if there had been no competing products.  (*Id.*)  As another example, other products in the market cost between $42 and 48 per bottle, whereas Elysium's cost $60.  (*Id.* ¶ 181.)  If Elysium's had been the only product on the market, some customers that decided to try a competitor's $42 bottle may not have been willing to buy Elysium's $60 bottle even if it had been the only option.

Despite all of these dissimilarities, Dr. Cockburn estimated how many customers who bought competing products would have bought Basis.  This exercise was a shot in the dark riddled with speculation.  Dr. Cockburn estimates, "[b]ased on [his] knowledge and experience in analyzing demand for pharmaceutical and OTC products," that Elysium would have captured 10–90% of Mitoboost sales (*id.* ¶ 186), 10%–75% of Optimized Resveratrol with NR sales, (*id.* ¶ 187), and 10–90% of half of ResveraCel's sales (*id.* ¶¶ 188–89).  Dr. Cockburn excluded the final competitor, Thorne's Extra Nutrients, because it "contains NR only in much smaller quantities than BASIS (25mg vs 250mg), and it also contains a large number of additional ingredients," so he was "unable to determine what proportion [of consumers] would have found this to be equivalent to their actual world choice."  (*Id.* ¶ 184.)  Applying these ranges to the amount of sales competitors made, and factoring in Elysium's profit margin, Dr. Cockburn calculated that Elysium "suffered lost profits damages of between $68,355 and $571,981 on lost sales it

would have made but-for ChromaDex's breach of Elysium's product exclusivity." (*Id.* ¶¶ 17, 190.)

This analysis is simply too speculative. Expert testimony must be "based on sufficient facts or data," be "the product of reliable principles and methods," and be the result of the expert's reliable application of "the principles and methods to the facts or data." Fed. R. Evid. 702(b)–(d). Dr. Cockburn's testimony is not any of these. There are too many variables involved, including the amount and proportion of nonidentical ingredients, subscription versus single purchase, and price, not to mention the vagaries of consumer choice, to make any reliable prediction as to what consumers would choose if no competitors existed under these circumstances. *See Greenwich S.F., LLC v. Wong*, 190 Cal. App. 4th 739, 766 (2010) (concluding that evidence was insufficient to show lost profits with reasonable certainty where the calculation "involved numerous variables that made any calculation of lost profits inherently uncertain"). Indeed, Dr. Cockburn readily admitted in his deposition that "there's a relatively wide band of uncertainty around how much of [consumer] demand could be reasonably assumed to be taken up by Basis in a counterfactual world and for how much of it consumers would have gone elsewhere." (Dkt. 241-20 [Ex. 71] at 888.)

Compounding these issues is the fact Dr. Cockburn made several assumptions that "were inherently uncertain, contingent, unforeseeable and speculative." *See Greenwich*, 190 Cal. 4th at 766. For example, Dr. Cockburn had to "assume that consumers would regard [PT and resveratrol] as equivalent in terms of therapeutic effect," based only on his contention that there is an "absence of evidence to the contrary." (*Id.* ¶ 185.) This assumption is baseless, and the Court in its role as gatekeeper is wary of allowing a jury to rely on it. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (explaining that the district court has a "special obligation" to serve as a gatekeeper for expert testimony). Indeed, Elysium's CEO Eric Marcotulli, stated that "Lenny Guarente,

[Elysium's] co-founder and Chief Scientist, is the pioneer of resveratrol, and he will be the first to tell you it lacks both potency and bioavailbililty."  (Dkt. 298-4 [Ex. 59] at 592.)

Dr. Cockburn further had to assume that a competing product that contains, for example, 100mg NR plus 30mg resveratrol is equivalent to 40 percent of a Basis pill that contains 250mg of NR plus 50 mg of PT.  (Cockburn Rep. ¶ 185.)  He presents no reliable business principle or method to suggest that this is how consumers would have gone about their purchasing decisions.  Dr. Cockburn does not rely on surveys or other data to decide what consumers would do, and instead applies his purported knowledge and experience.  This is not a reliable method here.  *See Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (explaining that where there was no explanation of experts' reasoning and methods underlying their conclusions, district court did not err in rejecting the testimony as unreliable because it was based only on "subjective belief and unsupported speculation").  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

There are even more assumptions underlying Elysium's damages theory.  Another competing product, ResveraCel, "was sold both in the practitioner channel, from which Elysium was contractually excluded, and the [direct-to-consumer] channel, where BASIS can be assumed to have been able to meet some demand in the but-for world."  (*Id.* ¶ 188.)  Dr. Cockburn did not know what proportion of ResveraCel's sales were to practitioners and which were direct-to-consumer, so he had to assume—based on no data whatsoever—that they were half and half.  (*Id.*)

In sum, Dr. Cockburn's testimony—Elysium's only evidence of damages on its claim for breach of the exclusivity provision—is insufficient evidence to show lost profits with reasonable certainty. *See id.* "Letting [this category of damages] go to a jury would necessarily invite a speculative and factually-unsupported award." *Goodness Films, LLC v. TV One, LLC*, 2014 WL 12594201, at *4 (C.D. Cal. Aug. 28, 2014) (granting partial summary judgment on lost profits damages items where there was no admissible evidence capable of proving the plaintiff's lost profits with reasonable certainty). The Court thus **GRANTS** ChromaDex's motion for summary judgment on Elysium's first counterclaim as it relates to the exclusivity provision, and Elysium's second counterclaim for breach of the implied covenant of good faith and fair dealing.

### 4.  Third Counterclaim: Fraudulent Inducement on the TLRA

Elysium counterclaims that ChromaDex fraudulently induced Elysium to sign the TLRA by falsely representing that, in order to purchase Niagen, Elysium was required to pay royalties on product sales for use of ChromaDex marks. (TACC ¶¶ 162–69.) Specifically, Elysium alleges that on a December 16, 2013 phone call between Frank Jaksch (ChromaDex's former CEO), Eric Marcotulli (Elysium's CEO), and Daniel Alminana (Elysium's COO), Jaksch falsely represented that ChromaDex customers were required to sign separate trademark license and royalty agreements, whether or not they wanted or intended to use ChromaDex marks. (*Id.* ¶¶ 52, 165.)

ChromaDex argues summary judgment is appropriate because Elysium has no evidence that (1) the alleged representation was made, or (2) the representation was false at the time it was allegedly made. (ChromaDex Mot. at 24–25.) The Court is not persuaded. In considering a motion for summary judgment, courts must examine all the evidence in the light most favorable to the nonmoving party, and draw all justifiable

inferences in its favor.  *Anderson*, 477 U.S. at 252; *T.W. Elec. Serv.*, 809 F.2d at 630–31. Courts do not weigh conflicting evidence.  *Eastman Kodak*, 504 U.S. at 456.

Elysium claims Jaksch made the statement, citing Marcotulli's and Alminana's testimony.  (Dkt. 306-1, Ex. 12 at 93:6–9 [Marcotulli testifying that Jaksch told Elysium "that all customers pay a royalty and that was their way of doing business, given their ownership of the NR supply chain"]; *id.*, Ex. 13 at 168:1–3 [Alminana testifying that Elysium was "told that everyone has to sign this," that "[e]veryone pays a royalty," and "[t]his is the standard royalty"].)  ChromaDex says Jaksch did not make the statement, citing Jaksch's testimony.  (Dkt. 240-2, Ex. 72 at 134:23–25 [Jaksch testifying that he did not tell Elysium that all ChromaDex customers must execute a license and royalty agreement to do business with ChromaDex]; *see* Dkt. 233-2 at ¶ 5 [Jaksch stating that trademark licensing was never a requirement for purchasing NR].)  This type of he said-she said disagreement is exactly the type of disputed fact juries are meant to resolve.

ChromaDex additionally objects that "on the eve of trial" Elysium is "informally amend[ing] its allegation" from being that customers who signed NR supply agreements were told royalty agreements were required, to now being that all customers who purchased NR (regardless of whether they had a signed agreement) were told this. (Reply at 21.)  But both formulations are in the TACC.  (*Compare* TACC ¶ 52 [describing the statement as "that *all of ChromaDex's customers who signed purchase agreements* to obtain nicotinamide riboside were also required to sign separate trademark license and royalty agreements"] *with* TACC ¶ 165 [describing the statement as "that ChromaDex required *all of its customers who purchased nicotinamide riboside* to sign trademark license and royalty agreements."] [emphases added].)  The jury can consider the import of the differing characterizations of the alleged misrepresentation.

ChromaDex alternatively argues that even if Elysium had proof of a statement, that statement could not have been false when made because the only ChromaDex customer who had signed an NR supply agreement by the date of the alleged statement also paid royalties.  (*See* ChromaDex Mot. at 25; ChromaDex Reply at 21–22.)  But that a customer paid royalties does not mean the customer was *required* to pay royalties.  And even if this argument were persuasive, it only covers one formulation of what Elysium contends (with evidence in the form of testimony from its employees) Jaksch said.  And as to the formulation that ChromaDex required all customers who purchased NR to sign trademark license and royalty agreements, ChromaDex acknowledges that Elysium has at least some evidence that people who purchased NR (but did not have executed NR purchase agreements) did not have trademark license agreements.  (*See* ChromaDex Reply at 22.)  Given the parties' conflicting evidence regarding ChromaDex's purported requirement that purchasers of NR pay royalties, the Court cannot determine on summary judgment that no formulation of what Jaksch allegedly said was false when made.  ChromaDex's motion for summary judgment on the fraudulent inducement claim is therefore **DENIED.**

### 5.  Fourth Counterclaim: Declaratory Judgment of Patent Misuse, and Fifth Counterclaim: Restitution for Unjust Enrichment

Elysium counterclaims that ChromaDex conditions some customers' ability to purchase NR on their agreement to use ChromaDex's trademarks, and that this constitutes patent misuse.  (TACC ¶¶ 170–81.)  Elysium itself was not subject to the alleged patent misuse:  it was required to license and pay royalties for the Niagen mark, but it was not required to *use* the mark.  (*See* Dkt. 296-6 ¶ 11; Dkt. 40-2 [Ex. 69] at 285 [Dr. Wilhelm testifying that Elysium's agreement does not require Elysium to use the Niagen mark and that Elysium never used the Niagen mark when selling Basis].)  Rather, its alleged injury is that ChromaDex's conduct "increase[ed] barriers to entry and

foreclose[ed] competition more effectively and durably than could ChromaDex's patent rights alone." (Elysium Supp. at 18.)  Elysium argues that by requiring people to use the Niagen mark that otherwise might not have, ChromaDex's patent misuse unlawfully strengthened the Niagen mark in a way ChromaDex still benefits from, and decreased brand competition among NR products.  (Elysium Supp. Reply at 12–14.)  The fourth counterclaim seeks a declaration that ChromaDex's patents are currently unenforceable based on this misuse, and the fifth seeks restitution for past misuse.  (TACC ¶¶ 170–81, 182–88.)  The parties agree that these counterclaims rise and fall together.

A patentee generally "may not condition the right to use his patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of his patent monopoly." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 136 (1969).  Elysium argues that ChromaDex tied the right to purchase NR—a patented product—to a purchaser's agreement to use ChromaDex's Niagen mark.  It cites to certain NR supply agreements that state, "Buyer agrees to use the Product trademark NIAGEN," or "Buyer shall use the Product trademark NIAGEN."  (*See, e.g.*, Dkt. 296-5, Exs. 16, 17, 19.)  And it contends that the mere existence of some agreements between ChromaDex and other customers requiring that the customer use the Niagen mark is sufficient evidence to show that ChromaDex used its leverage impermissibly to tie purchase of the patented NR to royalties for use of the Niagen mark.  (Elysium Opp. at 10.)  But tying no longer constitutes *per se* patent misuse.  *See Ill. Tool Works Inc. v. Indep. Ink*, 547 U.S. 28, 42–43 (2006); (ChromaDex Reply at 4).  Rather, Congress and the Supreme Court have decided that just because a tying product is patented does not mean market power is presumed to have been used to secure an agreement to purchase the tied product.  *See id.*

Instead, to show patent misuse, the accuser must show the "patentee has impermissibly broadened the physical or temporal scope of the patent with

anticompetitive effect." *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868–869 (Fed. Cir. 1997) (internal quotations and citations omitted).  "What patent misuse is about, in short, is 'patent leverage,' i.e., the use of the patent power to impose overbroad conditions on the use of the patent" or "exact concessions from a licensee" that are not fairly within the reach of the government-granted monopoly, with anticompetitive effect. *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1331, 1333 (Fed. Cir. 2010) (internal quotation omitted); *U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1184 (Fed. Cir. 2005) (explaining that the purpose of the doctrine is to "prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right"); *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) ("The defense of patent misuse arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage. . . The key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect.").

    The question, then, is whether ChromaDex used its patent leverage to exact agreements to use the Niagen mark.  ChromaDex argues Elysium's patent misuse counterclaim fails because "the unvarnished facts show that Elysium voluntarily agreed to pay royalties as part of an arm's length negotiation."  (ChromaDex Mot. at 14.)  For example, ChromaDex cites a September 10, 2013 email from Eric Marcotulli to Frank Jaksch reflecting negotiations over contract terms where Marcotulli writes, "we feel we have made significant concessions related to equity and royalties to compensate for our perceived startup risk."  (Dkt. 238-4 [Ex. 10] at 187; *see* Dkt. 240-2 [Ex. 69] at 231–32 [Dr. Wilhelm deposition testimony regarding that email].)  Elysium counters that even if it voluntarily paid royalties, ChromaDex may still have used its patent leverage to coerce that agreement.  It cites the alleged misrepresentation discussed in the previous section that people with NR supply agreements were required to pay royalties on the Niagen

mark (over which there is a factual dispute).  (Elysium Opp. at 11–13.)  These issues require weighing evidence in a way not appropriate for summary judgment.  *See Eastman Kodak*, 504 U.S. at 456.  Accordingly, the Court **DENIES** summary judgment on Elysium's fourth counterclaim regarding patent misuse and its fifth counterclaim for unjust enrichment.

### 6.  Sixth Counterclaim: Breach of Section 4.1 of the NR Supply Agreement (Confidentiality)

Elysium alleges that ChromaDex breached Section 4.1 of the NR Supply Agreement.  (RCC ¶¶ 192, 195.)  At the hearing, the parties advised that both parties have abandoned their claims for violation of Section 4.1 of the NR Supply Agreement. Accordingly, ChromaDex's motion for summary judgment is **GRANTED** on Elysium's counterclaim for breach of Section 4.1 of the NR Supply Agreement.

### B.    Elysium's and Mark Morris' Motion

Elysium moves for summary judgment on ChromaDex's liability on its first counterclaim for breach of the Most Favored Nation ("MFN") pricing provision in the NR Supply Agreement (but not on damages for that alleged breach).  For the following reasons, the Court **DENIES** summary judgment on this counterclaim.  Elysium and Mark Morris also move for summary judgment on some portion of all of ChromaDex's claims because they argue ChromaDex's damages evidence is fatally insufficient, and on ChromaDex's sixth claim because they argue Morris' July Confidentiality Agreement lacks consideration and is void.  For the following reasons, the Court **GRANTS** Elysium's and Mark Morris' motion for summary judgment as to ChromaDex's claim for $110,000 in avoided costs and **DENIES** their motion as to ChromaDex's claim for $8.3 million in resale profits, the $600,000 price discount, and Mark Morris' $684,781

compensation, and also **DENIES** summary judgment on ChromaDex's sixth claim for breach of the July Confidentiality Agreement against Morris.

### 1.   First Counterclaim: Breach of Section 3.1 of the NR Supply Agreement (Most Favored Nation Pricing)

Under Section 3.1 of the NR Supply agreement,

> If, at any time during the Term, ChromaDex supplies Niagen (or a substantially similar product) to a Third Party at a price that is lower than that at which Niagen is supplied to Elysium Health under this Agreement, then the price of Niagen supplied under this Agreement shall be revised to such Third Party price with effect from the date of the applicable sale to such Third Party and ChromaDex shall promptly provide Elysium Health with any refund or credits thereby created; provided Elysium Health purchases equal volumes or higher volumes than the Third Party.

Elysium counterclaims that ChromaDex sold NR to other companies for a price less than the price at which ChromaDex sold it to Elysium, but failed to refund or credit Elysium.  (TACC ¶ 147.)  ChromaDex does not dispute that it sold NR to other companies at lower prices.  (*See* ChromaDex Opp. at 23–25.)  Specifically, on February 5, 2014, ChromaDex sold 1 kilogram of NR to Innovations 4 Health for $1,000; on February 2, 2015, it sold 1 kilogram to Proctor & Gamble for $100; on February 10, 2015, it sold 30 kilograms to Live Cell for $900 per kilogram; and on August 24, 2015, it sold 300 kilograms to Live Cell for $800 per kilogram.[3]  (Dkt. 295-1 ¶¶ 34, 36, 37, 41.) ChromaDex gave no refund or credit to Elysium, which bought 100 kilograms of NR at

---

[3] ChromaDex asks the Court to keep under seal the names of these three customers, and the volumes and prices at which they bought NR.  As the Court explained at the hearing on these motions, the Court finds that ChromaDex has not met its burden of showing compelling reasons for keeping this outdated information, which is at the center of this litigation, under seal.  *See Kamakana*, 447 F.3d at 1178.  Nor can the Court conceive how ChromaDex can be prejudiced by disclosure of this information at this late stage of the litigation and several years after the sales.

$1,300 a kilogram, and at other times purchased at $1,000 a kilogram.  (*Id.* ¶¶ 35, 39, 40.) Elysium argues summary judgment is thus warranted on ChromaDex's liability under the MFN provision; Elysium does not seek summary judgment on the amount of damages.

ChromaDex argues that summary judgment is not appropriate because the MFN provision is ambiguous, including as to the terms "volumes" and "supplies." (ChromaDex Opp. at 24–25.)  Specifically, ChromaDex contends that the term "volumes," plural, referred in both the provision and in common industry parlance to purchases over a period of time, and that the term "supplies" implies selling NR to a third party with a supply agreement or under a continuing supply relationship.  (*Id.*) According to ChromaDex, "a one-off sale at a reduced price (such as discounted samples to prospective customers)" does not necessarily entitle Elysium to the same reduced price.  (*Id.* at 25; *see* Dkt. 295-1 ¶ 36 [noting that the Proctor & Gamble sale is labeled as "SAMPLE" on the relevant spreadsheet].)

As Elysium acknowledges, the purpose of contract interpretation is to give effect to the parties' intention at the time they contracted.  (Elysium Mot. at 9 [citing Cal. Civ. Code § 1636].)  The Court is not persuaded that there is no genuine dispute of fact that the parties intended transactions involving quantities and circumstances like the ones with Innovations 4 Health, Proctor & Gamble, and Live Cell to trigger the MFN provision.  For example, a reasonable juror could find that those transactions were so unique in circumstance, for example providing a sample at a heavily discounted cost, that they did not create a duty under the MFN provision.  Where "the terms of the contract are ambiguous or uncertain, determining the contract's terms is a question of fact for the trier of fact (here the jury), based on all credible evidence concerning the parties' intentions." *Indigo Grp. USA, Inc. v. Polo Ralph Lauren Corp.*, 2012 WL 12884634, at *2 (C.D. Cal. Aug. 29, 2012) (cleaned up).  The Court thus **DENIES** summary judgment on Elysium's counterclaim for violation of the MFN provision.

### 2.  Sufficiency of ChromaDex's Damages Evidence

Elysium argues that ChromaDex's damages evidence is so insufficient that the Court should grant summary judgment on all of its claims, except insofar as they allege failure to pay for the June 30 orders.  The Court first addresses whether ChromaDex may seek each category of damages it seeks, and then addresses Elysium's arguments that ChromaDex has failed to sufficiently apportion damages by trade secret or by claim.

### a.  Damages Sought

It is first useful to examine precisely what damages ChromaDex seeks.  ChromaDex's expert Lance E. Gunderson provided the initial basis for its requested damages.  (Dkts. 245-5, 249-10 [hereinafter "Gunderson Rep."].)  The Court requested further briefing on those damages.  (Dkt. 369 at 2–3.)  In response to the Court's order, ChromaDex modified the damages it would seek at trial.  (ChromaDex Supp. at 2.)  The following table compares the damages previously sought with those now sought:

| Gunderson Report | | ChromaDex's Supplemental Brief |
|---|---|---|
| Unpaid Sales Invoices | $2,983,350 | Same |
| Elysium's Profits | $31,643,692 | $8.3 million – Resale Profits |
| Elysium's Avoided Costs | $523,449 | $110,000 |
| ChromaDex's Lost Profits | $25,549,320 | $0 |
| ChromaDex's Out-of-Pocket Financing Expenses | $237,921 | $0 |
| ChromaDex's Price Discount | $600,000 | Same |
| Mark Morris' Compensation | $684,781 | Same |

At the hearing, ChromaDex confirmed that it is abandoning for purposes of trial its claims for ChromaDex's lost profits, ChromaDex's out-of-pocket financing expenses, and Elysium's profits except $8.3 million in resale profits.

### i.   Resale Profits

In the damages category of Elysium's profits, ChromaDex originally sought *all* of Elysium's profits, in the amount of $31,643,692[4].  Among other theories, ChromaDex sought these profits on the theory that without stealing ChromaDex's trade secrets, Elysium would have gone out of business, but instead, Elysium was able to (a) give ChromaDex's trade secret information to potential investors and secure additional investment that helped Elysium stay afloat, and (b) get a new supply of NR—both of which allowed Elysium to stay in business.  The Court had concerns about this theory, including regarding "huge leaps in th[e] causal chain the Court is not sure ChromaDex can prove."  (Dkt. 369 at 4.)  The Court asked questions including, "what specific evidence is there to show that a specific ChromaDex trade secret was a substantial factor in an investors' decision to invest? What specific evidence shows that those investments were a substantial factor in Elysium not going under? What specific trade secret was a substantial factor in Elysium being able to develop an alternative supply, and how?" (Dkt. 369 at 4–5.)

---

[4] The Court finds that Elysium has not met its burden to show compelling reasons to seal this number and the profit rates discussed in this section.  The Court fails to understand why a company's profits or profit rates must be kept under seal on a dispositive motion, especially where the amount of those profits is now years old.  *See Kamakana*, 447 F.3d at 1178; *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 3283478, at *4 (N.D. Cal. Aug. 9, 2012), *rev'd on other grounds and remanded,* 727 F.3d 1214 (Fed. Cir. 2013) (rejecting request to seal information regarding profits or profit margins because "Apple has not explained how *past* profit and unit sales data can be used to meaningfully predict Apple's *future* business plans").  Indeed, this profit information is relevant to the parties' damages calculations, making it important to the public's understanding of the eventual outcome.  *See id.*

In response to the Court's order, ChromaDex significantly narrowed the Elysium profits it seeks.  Now, it seeks to recover only $8.3 million in "profits Elysium made from ingredients it stole from ChromaDex with Morris' help" under two theories: one for "disgorgement of illicit profits as a remedy for both aiding-and-abetting breach of fiduciary duty and misappropriation of trade secrets," and one based on promissory fraud. (ChromaDex Supp. at 4–6.)

This is how ChromaDex calculates the $8.3 million it seeks:  From October 1, 2016, when Elysium began to sell Basis containing the NR it bought in the June 30 Purchase Orders, to December 31, 2018, when Elysium sold the last of such products, Elysium's weighted average profit rate was approximately 51.7% of revenue. (ChromaDex. Supp. at 4 [citing Gunderson Rep. Schedule 5B].)  Applying the approximately $16 million in revenue Elysium received from the Basis products that used the unpaid-for ingredients to the Elysium profit rate of approximately 51.7% yields Elysium profits of $8.3 million.  (*See id.*; Dkt. 382-30 [Ex. 141, Gunderson Deposition Transcript] at 128:8–18; Dkt. 302-29 [spreadsheet in which Elysium tracked sales of its product Basis based on batch of ChromaDex ingredients in those products].)

### (a)  Misappropriation Theory For Recovering Resale Profits

ChromaDex's first theory for recovering Elysium's resale profits is this: Mark Morris gave Elysium valuable trade secret information[5] including the price competitors paid for NR in specific volumes on specific dates, and the price ChromaDex paid its contract manufacturer—W.R. Grace—for the NR.  (ChromaDex Supp. at 5.)  Elysium then used this information to pressure ChromaDex during negotiations, and that pressure caused ChromaDex to accept the June 30 orders.  (*Id.*)  Because ChromaDex accepted the

---

[5] For purposes of this analysis, the Court assumes that this information constitutes a trade secret.

June 30 orders, Elysium was able to sell its products that included the NR from those orders, and made $8.3 million in profits from those sales.  (*Id.* at 6.)  ChromaDex argues that a reasonable jury could infer that the misappropriation was a substantial factor in Elysium's unjust enrichment from the resale because without the misappropriation, ChromaDex would not have accepted the June 30 orders, and Elysium would not have made the sales.  (*Id.* at 4, 6.)

Elysium argues that summary judgment is warranted because ChromaDex "cannot show any causal link between any allegedly misappropriated trade secret and the June 30 Orders, Elysium's alleged failure to pay, or Elysium's profits from those ingredients." (Elysium Supp. Reply at 2–3.)  Specifically, Elysium argues that ChromaDex gave Elysium on the June 30 call the information Elysium first received from Morris, so Elysium's possession of that information could not have caused ChromaDex to accept the orders.  (*Id.* at 3.)

ChromaDex agreed to a provision in the NR Supply Agreement that if ChromaDex sold NR to another customer for a price lower than Elysium was getting it for, Elysium would get a refund or credit to make Elysium's price the same as the other customer's (the MFN provision discussed in Section IV.B.1.).  Accordingly, the parties agree that Elysium had a contractual right to know some information about what other customers were paying.  However, the parties dispute the amount of information Elysium had a right under the contract to know.  Specifically, ChromaDex argues that Mark Morris gave Elysium much more information than Elysium contractually deserved, or that ChromaDex would have given Elysium.  The Court finds that summary judgment on this category of damages is not warranted because genuine disputes of fact remain regarding at least (1) the amount of information Elysium had a right to know, (2) what was said on the June 30 call, and (3) the effect, if any, of Elysium having information from Morris more than a month before the June 30 call.

*The amount of information Elysium had a right to know.*  ChromaDex explains that Elysium had a right to know, and it intended to tell Elysium, some information about the price other customers were paying.  Accordingly, ChromaDex sent Elysium a "blinded" spreadsheet with "the price per kilogram, the royalty percentage, equity percentage, market segment, and a notes section listing specific obligations of twelve purchasers, including Elysium."  (Dkt. 231 at 10.)[6]

ChromaDex argues that Morris gave Elysium much more information and color than this, and that Elysium was able to use that extra information to its negotiating advantage.  For example, ChromaDex points to the following text message exchange, which occurred on May 29, 2016 (one month before Elysium placed the June 30 orders), between Morris (while he was still a ChromaDex employee) and Daniel Alminana, Elysium's COO:

> <u>Morris</u>: Dan – Live Cell was at $1400 until 8/29/14 when we sold them 100kg at $900.  Then on 2/27/15 we sold them 300 kg at $800.  They have been there ever since, including orders for 250 kg on both 4/28/16 and 5/19/16.  They never payed a royalty.
>
> <u>Alminana</u>: This is between us and you are the F'n man!!
>
> <u>Morris</u>: As you know, it's in your contract and you deserve it.  You are honoring the contract and so should ChromaDex.
>
> <u>Alminana</u>: 1 million %!  These guys have no idea how bad off they are when they lose you

---

[6] What ChromaDex did not realize when it sent the spreadsheet is that a second tab, which was "an internal document that was being used to generate the other document," and "should have been removed," was not actually removed.  (Dkt. 244-1 at 206.)  This tab "contained the detailed pricing information for many of ChromaDex's customers including the name of each purchaser, the date their supply agreement was executed, the purchaser's operating territory, any exclusivity rights to which each purchaser was entitled, excluded products, excluded fields or channels for each purchaser, terms and termination clauses from each purchaser's supply agreement, mandatory obligations for each purchaser, trademark agreement status for each purchaser, price per kilogram for each purchaser, royalty percentage, and equity percentage."  (Dkt. 231 at 10–11.)

(Dkt. 302-5 at 25.)  A reasonable jury could conclude that Morris gave Elysium substantially more information than ChromaDex had to give or would have given Elysium under the MFN provision, and that the additional information Morris gave caused Elysium to be in a stronger negotiating position, causing ChromaDex to accept an order on terms it might not otherwise have accepted.

*What was said on the June 30 call*.  Elysium argues that Morris giving Elysium this information could not have caused ChromaDex to accept an $800/kg price for the June 30 orders because ChromaDex itself told Elysium on the June 30 call that it was charging another customer $800/kg for NR.  (Elysium Supp. Reply at 3.)  But the parties dispute what level of detail ChromaDex shared on the June 30 call.  Frank Jaksch (ChromaDex's then-CEO) testified that on the June 30 call, he told Elysium executives that ChromaDex sold to LiveCell for $800/kg, but that he does not believe he told them when those sales took place, the volumes involved in those sales, or on how many occasions ChromaDex had sold to LiveCell at that price.  (Dkt. 244-1 at 250.)  He further testified that he told Elysium on the call that ChromaDex wanted to keep "a minimum margin of 50 percent."  (*Id.* at 251.)  Eric Marcotulli's (Elysium's CEO) notes from the call, sent to Dan Alminana on June 30 at 5:03 p.m., seem to confirm that Jaksch did not relay all of the information Morris had given Elysium:

> Livecell - not a long term relationship; $640/kg cost to CDXC for NR last year (when doing handshake deal with livecell that went down to $700/kg); never placed an order at the low price, but "most of the stuff was in the $900 range - they may have gotten lower than that number, with some volume at $800"

> Today, CDXC is in the $450-500 range in NR cost/kg

> Will honor $800/kg today for Elysium order and will re-evaluate the entire agreement in Q3, with Elysium getting more defensibility but with Elysium agreeing to potentially higher prices.

(Dkt. 249-7.)  A reasonable jury could infer from this evidence that ChromaDex did not share on the June 30 call the level of detail Elysium got from Morris and used to inform its negotiating position, and that Morris' disclosures were a substantial factor in causing ChromaDex to accept the $800/kg price.

***The effect, if any, of Elysium having information from Morris more than a month before the June 30 call.***  After Morris sent Elysium LiveCell's history on May 29, 2016, he texted Alminana on June 28, 2016 that there was internal conflict at ChromaDex about their position on pricing after it was revealed that the "blinded" spreadsheet with pricing information was not actually "blinded," and therefore contained more information than ChromaDex intended to disclose.  Morris explained that one executive was "saying to not take an order this quarter," while Jaksch was "talking about $800/kg."  (Dkt. 302-5 at 42.)  Alminana responded, "I love how he is talking 800/kg when we clearly see livecell deal at 700/kg for 2400kg."  (*Id.*)  Finally, later the same day, Morris texted Alminana, "I verified – These guys paid $450 for this inventory."  (*Id.* at 43.)  Alminana responded, "Amazing! / 500 is our limit then."  (*Id.*)  On June 28, 2016, Elysium submitted a purchase order for 6,600 kilograms of NR at $400/kg.  (Dkt. 231 ¶ 55.)  A reasonable jury could infer from this evidence that Elysium gained an unfair advantage by being able to use this information to plan for nearly a month in advance regarding its negotiating position.

In sum, there is sufficient evidence supporting ChromaDex's misappropriation theory for recovery of resale profits to permit this theory to go to the jury.

### (b)  Promissory Fraud Theory For Recovering Resale Profits

ChromaDex's second theory for recovering Elysium's resale profits is this: Elysium never planned to pay for the June 30 orders, instead intending to accuse

ChromaDex of contractual breaches to get out of those payments.  Morris knew of that plan.  Nevertheless, Morris pushed ChromaDex to accept the terms of the June 30 orders, including the $2,983,350 purchase price.  ChromaDex accepted the orders because it did not know of that plan, and Morris pushed ChromaDex to accept.  ChromaDex argues that a reasonable jury could infer that Elysium's scheming with Morris was a substantial factor in Elysium's unjust enrichment.  (ChromaDex Mot. at 4–6.)

In support of this theory, ChromaDex cites evidence including text messages between Morris (before he left ChromaDex) and Alminana where Alminana is devising a plan for what price to request for the June 30 orders using information Morris gave him. (Dkt. 302-5 at 224–242).  It also cites July 1, 2016 text messages between the two regarding what Morris described as a "major" breach of the exclusivity provision by ChromaDex, with Alminana responding, "Beyond major!  I am going to drop that email the second our ingredients are at Tishcon," Elysium's Basis manufacturer.  (*Id.* at 246–47.)  Morris asks Alminana not to send the email until he leaves ChromaDex, adding "I want to destroy them!"  (*Id.* at 249.)  Jury questions remain on this theory as well, including questions as to what Elysium intended at the time it placed the June 30 orders, and why ChromaDex accepted the orders.  Accordingly, the Court will permit this theory to go to the jury.

### ii.  Avoided Costs

ChromaDex contends that Elysium breached obligations to keep two ChromaDex documents—the NRCl Analytical Method and the pTeroPure GRAS (which stands for "Generally Recognized as Safe") Report—confidential by disclosing them to others and thereby saved money on development.  (ChromaDex Supp. at 7.)  It asserts that these documents "provided Elysium with a guide for the development of its own supplies of NR and PT ingredients from non-ChromaDex suppliers."  (Gunderson Rep. at 96.)

ChromaDex seeks $110,000, which it states is the amount it spent developing the two documents, on the theory that by exploiting these documents, Elysium saved money on development, and was unjustly enriched.  (*Id.* at 93, 95–96; ChromaDex Supp. at 7.)

Section 4.1 of the NR Supply Agreement states:

> During the Term, and for a period of five (5) years following the termination hereof, each party shall maintain in confidence all Confidential Information disclosed by the other party, and shall not use, disclose or grant the use of the Confidential Information except on a need-to-know basis to those **Affiliates, directors, officers, employees, consultants, clinical investigators, contractors, agents, or permitted assignees, to the extent such disclosure is reasonably necessary in connection with such party's activities as expressly authorized by this Agreement.**  To the extent that disclosure is authorized by this Agreement, prior to disclosure, each party hereto shall obtain agreement of any such person or entity to hold in confidence and not make use of the Confidential Information for any purpose other than those permitted by this Agreement.  Each party shall notify the other promptly upon discovery of any unauthorized use or disclosure of the other party's Confidential Information.

The NRCl Analytical Method document "describes how to test a substance to determine if NR is present and, if so, how much."  (ChromaDex Supp. at 8.)  It contains a High Performance Liquid Chromatography Method for Nicotinamide Riboside Chloride, including necessary equipment, reagents, standards, procedures, and analytical method. (Dkt. 382-8 at 11–15.)[7]  ChromaDex gave Elysium this document (which contained a

---

[7] ChromaDex fails to carry its burden to show compelling reasons why this document should be kept under seal at this stage of dispositive motions.  *See Kamakana*, 447 F.3d at 1178.  Indeed, the document is at the center of one of the claims in the litigation and is thus central to the public's understanding of the outcome.

"confidential" watermark) on June 27, 2014, when Elysium told ChromaDex that "Marko at Tishcon" was looking for analytical methods to test NRCl and pTeroPure. (Dkt. 382-5 at 1174 [Ex. 110].)  Tishcon is Elysium's manufacturing partner.  (*See id.* at 1203.) When ChromaDex emailed Elysium the document, it stated that it was attaching the "documents . . . for Tishcon."  (*Id.*)[8]

The pTeroPure GRAS Report is a 2011 report prepared by AIBMR Life Sciences, Inc. on behalf of ChromaDex that established that pTeroPure was generally recognized as safe. (Dkt. 382-11 [Ex. 116].)  The report is also marked confidential.  (*See id.*)

Elysium argues that summary judgment is appropriate because there is no evidence to show that Elysium avoided costs by using the purportedly confidential documents. (*See* Elysium Supp. at 15.)  But there is such evidence.  As to the NRCl Analytical Method, this evidence includes testimony from PCI researchers that PCI in "developing the manufacturing process for NR" "started with" the NRCl Analytical Method, which had "very good" information that otherwise PCI would have had to develop "iteratively." (Dkt. 382-34 at 62–82 [Ex. 147, Rajesh Shukla, Ph.D. Deposition Transcript]); Dkt. 382-33 at 83–85 [Ex. 146, Edward Price Deposition Transcript].)  Moreover, developing that information "iteratively" would have been difficult because NR was "not really" an easy molecule to make because it is a "delicate molecule" that "can degrade quickly" and has associated "issues with stability" and "purity," but having a reference "makes things easier and quicker for sure."  (*Id.*)  And as to the pTeroPure GRAS Report, the evidence that Elysium saved costs by using ChromaDex's document includes an August 2017 email from Elysium to NutraSource explaining that Elysium needed to "self-affirm" PT,

---

[8] The Court is not aware of any evidence in the record that Elysium sought permission from ChromaDex to share these documents with others, as Section 4.1 requires.  Since the parties do not raise this issue, the Court does not address it.

and providing ChromaDex's pTeroPure GRAS Report, which self-affirmed ChromaDex's PT, to assist in the process.  (Dkts. 382-14–382-16 [Exs. 121–123].)

Elysium next argues summary judgment is appropriate because it had a right to disclose these documents to certain people while the agreements were in place, and that ChromaDex fails to separate out disclosures that were permitted and expected by ChromaDex from possibly impermissible disclosures.  (Elysium Supp. Reply at 7.) However, a reasonable jury could find that Elysium disclosed these documents in a way the agreement did not contemplate.  For example, a reasonable jury could infer from the fact that Elysium took parts of the NRCl Analytical Method document, added a banner reading "[t]his document is the property of Elysium Health and contains proprietary and confidential information," and sent it to researchers, that Elysium was using the document in a way inconsistent with the parties' agreement.  (Dkt. 382-6 [Ex. 111, August 2, 2016 email from Mark Morris to Ed Price at PCI Synthesis attaching the document].)  A reasonable jury could also conclude that sharing the NRCl document with PCI—the company that created Elysium's alternative supply of NR and thus enabled Elysium to get NR from somewhere other than ChromaDex—was not a use the contract contemplated.  (*See* Dkts. 382-33, 382-34.)  Similarly, a reasonable jury could conclude that sharing ChromaDex's pTeroPure GRAS Report, which is ChromaDex's self-affirmance of PT as GRAS, with a company helping Elysium self-affirm PT in the same way, was not a use the contract contemplated.  (*See* Dkts. 382-14–382-16 [Exs. 121–123].)

However, summary judgment is appropriate on this claim because there is insufficient evidence supporting ChromaDex's claim for $110,000 in damages.  The only evidence showing how ChromaDex calculated this $110,000 figure is Gunderson's statement that he "estimated" that amount "[b]ased on [his] discussions with ChromaDex personnel and [his] review of ChromaDex's research and development costs provided in

this case." (Gunderson Rep. at 95.)  As explained, expert testimony must be "based on sufficient facts or data," be "the product of reliable principles and methods," and be the result of the expert's reliable application of "the principles and methods to the facts or data."  Fed. R. Evid. 702(b)–(d).  In determining the reliability of proffered expert testimony, the district court's task "is to analyze not what the experts say, but what basis they have for saying it."  *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995).

Here, Gunderson says nothing more than that he spoke with ChromaDex personnel and reviewed ChromaDex research and development costs.  (Gunderson Rep. at 95.)  He does not say what ChromaDex personnel he spoke with, what he asked them, or what they told him.  Nor does he report what research and development costs he reviewed, or what those costs were.  *See Daubert II*, 43 F.3d at 1319 (explaining that experts must "explain the methodology [they] followed to reach their conclusions [and] point to any external source to validate that methodology").  Gunderson's $110,000 "estimate," therefore, is not based on sufficient facts or data.  *See XPays, Inc. v. Internet Commerce Grp., Inc.*, 2009 WL 10671981, at *4 (C.D. Cal. Mar. 4, 2009) (excluding expert testimony where, although it would have been appropriate for expert to opine on the potential reactions of consumers to the use of certain images based on his experience in marketing, the Court was not satisfied that his opinion that the clips caused confusion was based on sufficient facts to make that opinion reliable); *United States ex rel. Jordan v. Northrop Grumman Corp.*, 2003 WL 27366247, at *3 (C.D. Cal. Feb. 24, 2003) (excluding expert testimony where expert "made . . . conclusions without adequate factual support"); *Carbrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) ("An opinion based on . . . unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702.").  Gunderson's conclusory statement that ChromaDex spent $110,000 to develop the NRCl

Analytical Method and the pTeroPure GRAS Report, without any evidentiary support, is not sufficient evidence of damages to go to the jury.

The other evidence in the record only confirms this absence of evidence supporting the $110,000 figure.  For example, ChromaDex's 30(b)(6) witness on damages, Thomas Varvaro, testified that he did not know how much it cost ChromaDex to develop the NRCl Analytical Method, that it would take "quite some time to prepare the data around that," and that he did not know if ChromaDex had done that work.  (Dkt. 390-6 at 316 [Thomas Varvaro Deposition Transcript[9]].)  He further testified that to calculate the amount, ChromaDex would "need to go back and find out how much time each of those employees spent on it, which the company did not track."  (*Id.* at 319.)  He also said he did not believe ChromaDex had gone to those employees to ask them how much time they spent in hindsight.  (*Id.* at 320–21.)  Gunderson does not say he did that.

The only other piece of evidence ChromaDex relies on to support the $110,000 figure is a declaration from its Senior Director of Research and Development, Aaron Erickson.  (ChromaDex Supp. at 8 [citing Dkt. 382-3 ¶¶ 11, 13].)  But that declaration states only that ChromaDex "invests significant resources into developing and perfecting analytical methods for testing NIAGEN," and that ChromaDex "invested months of time

---

[9] ChromaDex objects that this deposition transcript is inadmissible hearsay and hearsay within hearsay. (Dkt. 386-3 ¶ 5.)  This objection is **OVERRULED**.  The statements upon which the Court relies are statements ChromaDex made that Elysium is using against ChromaDex, and are therefore admissible as an opposing party's statement.  *See* Fed. R. Evid. 801(d)(2).  "A corporation's 30(b)(6) deponent speaks on behalf of the corporation and therefore the deponent's statements are generally admissible against a corporate party as statements by a party-opponent" under Rule 801(d)(2).  *New Show Studios LLC v. Needle*, 2016 WL 5745078, at *5 (C.D. Cal. Sept. 29, 2016); *see Kanellakopoulos v. Unimerica Life Ins. Co.*, 2018 WL 984826, at *7 (N.D. Cal. Feb. 20, 2018) ("Because Ms. Demers was deposed as Defendant's Rule 30(b)(6) witness, her statements constitute party admissions.").  The Court has reviewed the rest of the parties' evidentiary objections (*see* Dkts. 295-2, 334-11, 350, 386-3, 393, 394 [Chromadex's]; Dkts. 339-4, 339-5, 390-7, 390-8 [Elysium's]), and the Court does not rely in this order on any other evidence subject to an objection.  Accordingly, the rest of both parties' evidentiary objections are **OVERRULED AS MOOT**.

and tens of thousands of dollars to develop" the NRCl Analytical Method.  (Dkt. 382-3 ¶ 10.)  That is not sufficient evidence to send the $110,000 claim to the jury.

In sum, although ChromaDex points to sufficient evidence in the record that Elysium used these two documents for purposes not contemplated by the contract, ChromaDex has pointed to no evidence in the record supporting its contention that ChromaDex spent (and Elysium avoided spending) $110,000 to develop these documents.  Summary judgment is appropriate where the party bringing a claim lacks competent evidence from which a jury could fairly estimate damages. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988).  Because the jury, like ChromaDex, would only be speculating or guessing as to the amount of damages, ChromaDex may not seek avoided costs at trial.

### iii. Price Discount

ChromaDex also seeks to recover what it calls a "$600,000 price discount" that Elysium was able to secure "in large part" because of "Morris' fiduciary breaches and Elysium's aiding-and abetting of those breaches."  (ChromaDex Supp. at 10.)  Its theory is that Elysium improperly learned the price at which ChromaDex acquired NR and the price competitors were paying at particular volumes and over time, and used that information to negotiate a more favorable deal.  (*Id.*)  Accordingly, whereas ChromaDex would have sold to Elysium at $1,000/kg if Elysium did not have all of the information it did, ChromaDex argues Elysium was able to pressure ChromaDex into selling at $800/kg because it had the trade secret information Morris passed along.  Multiplying the $200/kg change by the 3,000 kilograms Elysium purchased in the June 30 orders, ChromaDex seeks $600,000.  (Gunderson Rep. Schedule 13.)

Summary judgment is not warranted on this claim for the same reasons summary judgment is not appropriate on the resale profits claim. *See supra* Section IV.B.2.a.i.(a). Although there is no dispute that Elysium was entitled to some information regarding how much competitors were paying based on the MFN provision, ChromaDex argues Elysium was not entitled to and ChromaDex never would have given Elysium all of the information regarding price, volume, and sales history that Mark Morris gave Elysium. Elysium, on the other hand, contends that this was not a "discount" but rather the price to which the MFN provision entitled Elysium. The jury will have to resolve these factual disputes and decide whether ChromaDex is entitled to these damages.

### iv. Mark Morris Compensation

As a remedy for Morris' alleged breaches of fiduciary duty, ChromaDex seeks from Morris the compensation it paid him from February to July 2016 (totaling $77,137) and the compensation Elysium paid Morris from August 2016 through December 2018 (totaling $607,644). (ChromaDex Supp. at 11; Gunderson Rep. Schedule 14.)

A person may not take advantage of his own wrongdoing. *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1481 (2014), *as modified* (May 27, 2014). Accordingly, the law allows recovery of both "restitutionary disgorgement, which focuses on the plaintiff's loss, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment." *Id.* at 1482. "[A]n employee who violates the[] fundamental duties of loyalty cannot recover even for the services he has rendered." *J. C. Peacock, Inc. v. Hasko*, 196 Cal. App. 2d 353, 358 (Ct. App. 1961).

There is sufficient evidence in the record that Morris was disloyal to ChromaDex to permit a jury to decide whether disgorgement of the salary he received from both ChromaDex and Elysium is appropriate. Indeed, on July 7, 2016, Morris explicitly

expressed his "unconditional loyalty" to two Elysium executives before he left
ChromaDex.  (Dkt. 302-18 at 550.)  Additionally, in a discussion about when Morris
would join Elysium, he wrote on June 21, 2016, "Time to change the world and get rid of
the scumbags holding this magnificent technology."  (*Id.* at 232.)  At a time when Jaksch
had texted Alminana asking to talk about pricing, Morris texted Alminana on June 28,
2016, "Dan – If I call from this phone – Don't answer – It will be Frank sitting in the
room and forcing me to make the call," and, "Feel the pain Frank!!!"  (*Id.* at 240–41.)
And in text messages giving Elysium executives information regarding ChromaDex's
internal operations before Morris left ChromaDex, he said on July 6, 2016, "I want to
destroy them!"  (Dkt. 302-5 at 249.)

Morris argues that ChromaDex cannot recover the salary it paid him because
"ChromaDex's witnesses testified that Morris was successfully performing his job duties
at ChromaDex."  (Elysium Supp. at 13.)  But an employee cannot recover even for
legitimate services performed during a time of disloyalty.  *J. C. Peacock*, 196 Cal. App.
2d at 358.  That Morris may have performed work of some value does not mean the jury
cannot decide whether to award these damages.  Accordingly, ChromaDex may seek this
category of damages at trial.

### b.  Trade Secret by Trade Secret Apportionment

Elysium argues that since Gunderson lumped together his damages estimates for
all trade secrets allegedly misappropriated, without apportioning damages as to each trade
secret individually, the jury cannot meaningfully assess how much to award if it does not
find for ChromaDex on every trade secret allegedly misappropriated.  (Elysium Mot. at
14.)  Elysium argues this damages evidence is so insufficient that the Court should grant
summary judgment on all misappropriation claims.  (*Id.* at 11–15.)

This case has changed substantially since Elysium filed its motion.  Relevant to this argument, when Elysium filed its motion, ChromaDex sought about $62 million based on four trade secrets: (1) ChromaDex's sales information, including the Ingredient Sales Spreadsheet, (2) the $450/kg price paid to Grace, (3) ChromaDex's research and development work regarding different salts for use in manufacturing, and (4) its research and development work with a company called Genomatica.  (Gunderson Rep. Schedule 15; *see* Elysium Mot. at 11–12 [referring to these four categories of trade secrets].)  Gunderson collected Elysium's profits, Elysium's avoided costs, ChromaDex's unpaid sales invoices, ChromaDex's price discount, ChromaDex's lost profits, ChromaDex's out-of-pocket financing expenses, and Mark Morris' compensation and stated that all of these amounts form the basis of his damages opinions on the trade secrets claims.  (Gunderson Rep. at 6, 84–118.)

In supplemental briefing and in response to the Court's questions at the hearing, however, ChromaDex has now clarified that only two trade secrets will be at issue at trial: (1) sales information and (2) the price paid to Grace.  The damages correlating to those trade secrets are now much clearer.  Specifically, for the misappropriation of those two trade secrets, ChromaDex seeks $8.3 million in resale profits (not the over $31 million in Elysium profits ChromaDex previously sought) and the $600,000 price discount ChromaDex allegedly gave Elysium because it possessed those trade secrets.  Given the facts surrounding ChromaDex's theory of recovery for these two categories of damages—namely, that Morris allegedly provided both trade secrets to Elysium and Elysium used both of those trade secrets to strengthen its negotiating provision—ChromaDex is no longer relying on the portion of Gunderson's opinion that Elysium found objectionable.  The Court thus **DENIES AS MOOT** Elysium's motion for summary judgment based on this argument.

//

### c.  Claim by Claim Apportionment

Similarly, Elysium argued that Gunderson's failure to apportion the damages ChromaDex seeks by claim justifies summary judgment on each of those claims. (Elysium Mot. at 15–19.)  Here again, the case has changed significantly since Elysium's motion was filed, and it is now much clearer exactly what damages ChromaDex seeks on which claims.  For example, ChromaDex seeks $8.3 million in resale profits and $600,000 in price discount on its misappropriation claims, and Mark Morris' $684,781 compensation on the breach of fiduciary duty claim.  Accordingly, the Court **DENIES AS MOOT** Elysium's motion on this ground.

### 3.  Sixth Claim: Breach of July Confidentiality Agreement Against Morris

On February 26, 2016, Morris executed a confidentiality agreement entitled Receipt & Acknowledgment of Employee Handbook (what the parties call the "February Confidentiality Agreement").  (Dkt. 153 at 50 [Ex. A].)  In that agreement, Morris agreed to protect ChromaDex's proprietary or confidential information "by safeguarding it when using it, filing it properly when not using it, and discussing it only with those who have a legitimate business need to know."  (*Id.* at 51.)  He further agreed that if he left ChromaDex, he would "keep strictly confidential that information which is treated as confidential or proprietary by" ChromaDex, and that confidential documents "may not be duplicated or removed from the Company."  (*Id.*)

The day he left ChromaDex, Morris signed another confidentiality agreement (what the parties call the "July Confidentiality Agreement").  (Dkt. 295-1 ¶ 121; Dkt. 153 at 52 [Ex. B].)  In that agreement, Morris agreed to "not at any time directly or indirectly,

either during or after the term of employment, divulge any Trade Secrets to any other person or business entity, nor use or permit the use of any Trade Secrets, other than pursuant to [his] employment on behalf of CHROMADEX." (*Id.* at 54.)  He also agreed to keep ChromaDex's confidential information in confidence, and return to ChromaDex at the end of his employment all ChromaDex confidential information.  (*Id.* at 55.)

ChromaDex alleges that Morris breached both confidentiality agreements.  (FAC ¶¶ 214–237.)  Morris argues summary judgment is warranted on ChromaDex's claim for breach of the July Confidentiality Agreement because that agreement lacks consideration and is void because he was coerced into signing the agreement in exchange for his final paycheck.  (Elysium Mot. at 19–23.)

The Court is not persuaded that the July Confidentiality Agreement lacks consideration.  That agreement states that ChromaDex's consideration under the agreement includes "without limitation . . . an offer of employment with [ChromaDex] in an at-will employment relationship and [Morris'] exposure to [ChromaDex's] proprietary and confidential business information as its employee, and [Morris'] service to [ChromaDex], acting in good faith and in [ChromaDex's] best interests." (Dkt. 153-2.) ChromaDex contends that there was consideration because Morris still had access to ChromaDex's confidential information after he signed the agreement.  (ChromaDex Opp. at 23.)  At the very least, it is undisputed that Morris had the Ingredient Sales Spreadsheet on a USB flash drive when he left ChromaDex, and that he then downloaded that document from the USB flash drive to his computer at Elysium sometime in the first few weeks of his employment there.  (Dkt. 298-4 at 1149 [Ex. 106, Morris Interrogatory Response]; Dkt. 298-4 at 1044 [Ex. 96, Morris Deposition Testimony].)  The Ingredient Sales Spreadsheet contains sales data for all ChromaDex customers, including the company name, ingredient, quantity, and price purchased, and dates orders were placed and shipped from 2012 to 2016.  (Dkt. 302-9.)  ChromaDex also contends Morris had

access after he signed the agreement to the ChromaDex network, his computer, and ChromaDex email, citing two emails Morris sent after the meeting where he signed the agreement, and the testimony of ChromaDex's Human Resources Manager who conducted the meeting with him and handled other matters related to his last day at ChromaDex.  (Dkt. 295-3 ¶ 23; Dkt. 298-4 [Exs. 75, 76].)  Accordingly, the Court is unconvinced that summary judgment is warranted on ChromaDex's claim for breach of the July Confidentiality Agreement for lack of consideration—Morris' continued exposure to ChromaDex confidential information is sufficient consideration to submit this claim to the jury.  (*See* Dkt. 153-2.)

Elysium also contends that the July Confidentiality Agreement is void because ChromaDex conditioned the receipt of his final wages on his agreement to keep ChromaDex information confidential.  California law requires that an employer pay an employee's wages, including all wages on termination, "without condition."  Labor Code § 206; *Sullivan v. Del Conte Masonry Co.*, 238 Cal. App. 2d 630, 633 (Ct. App. 1965).  Morris cites his own testimony in support of his contention that ChromaDex conditioned his final paycheck on his signing the confidentiality agreement.  (Dkt. 234-1 ¶ 19.)  ChromaDex cites its HR Manager's testimony in support of its contention that it did not.  (Dkt. 295-1 ¶ 120; Dkt. 295-3 ¶ 29.)  The jury will have to assess credibility and weigh the evidence to resolve these factual issues.  *See Eastman Kodak*, 504 U.S. at 456.

On the merits of this claim, several disputed issues of fact exist as to whether Morris breached the confidentiality agreements.  For example, Morris may take the position that the documents he admits he took from ChromaDex, including the Ingredient Sales Spreadsheet, were not confidential.  Alternatively, as counsel suggested at the hearing, Morris may argue that ChromaDex suffered no damages from Morris taking some confidential information because, for example, it contends no one at Elysium saw the Ingredient Sales Spreadsheet.  ChromaDex may take the position that Morris

breached these agreements by using confidential ChromaDex information he had in his head, even beyond the documents he took.  Accordingly, the Court **DENIES** summary judgment on ChromaDex's claim against Morris for violations of the July Confidentiality Agreement.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** summary judgment in favor of ChromaDex on the following counterclaims of Elysium:

1. Elysium's first counterclaim, as it relates to alleged breach of Section 3.7 of the NR Supply Agreement,

2. Elysium's first counterclaim, as it relates to alleged breach of Section 3.9 of the NR Supply Agreement,

3. Elysium's first counterclaim, as it relates to alleged breach of Section 3.11.3 of the NR Supply Agreement,

4. Elysium's second counterclaim for breach of the implied covenant of good faith and fair dealing, and

5. Elysium's sixth counterclaim for breach of Section 4.1 of the NR Supply Agreement.

The Court **DENIES** summary judgment on the following counterclaims of Elysium:

1. Elysium's first counterclaim, for breach of Section 3.1 of the NR Supply agreement,

2. Elysium's third counterclaim, for fraudulent inducement on the Trademark License and Royalty Agreement,

3. Elysium's fourth counterclaim, for declaratory judgment of patent misuse, and

4. Elysium's fifth counterclaim, for restitution for unjust enrichment.

The Court **GRANTS** Elysium's and Mark Morris' motion for summary judgment on ChromaDex's claim for $110,000 in avoided costs damages.

The Court **DENIES** summary judgment on the remaining claims and categories of damages sought by ChromaDex, including:

1. $8.3 million in resale profits,
2. $600,000 price discount,
3. Mark Morris' $684,781 compensation, and
4. ChromaDex's sixth claim for breach of the July Confidentiality Agreement against Morris.

DATED:      January 16, 2020

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE