FILED
CLERK, U.S. DISTRICT COURT
4/27/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CW___ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| CHROMADEX, INC., <br><br> Plaintiff, <br><br> v. <br><br> ELYSIUM HEALTH, INC., and MARK MORRIS, <br><br> Defendants. <br><br><br> ELYSIUM HEALTH, INC., <br><br> Counterclaimant, <br> v. <br><br> CHROMADEX, INC., <br><br> Counter-Defendant. | Case No.: SACV 16-02277-CJC (DFMx) <br><br><br><br> **ORDER DENYING CHROMADEX'S MOTION FOR SANCTIONS [Dkt. 413]** |

## I. INTRODUCTION

In this 2016 case, Plaintiff ChromaDex, Inc. ("ChromaDex") and Defendant Elysium Health, Inc. ("Elysium") each allege that the other party breached 3 of the parties' contracts. Two of Elysium's executives recently filed declarations with the Court admitting that they lied in their depositions about one of the executive's cocaine use. ChromaDex now moves for terminating sanctions on 3 of Elysium's counterclaims based on the deception. Both parties also move to file under seal certain evidence and briefing related to this motion. For the following reasons, ChromaDex's motion for sanctions and both parties' applications to file under seal are **DENIED**.

## II. BACKGROUND

### A. Case Background

ChromaDex supplied Elysium with nicotinamide riboside ("NR"), which ChromaDex sold under the trade name Niagen, and pterostilbene ("PT"), which ChromaDex sold under the trade name pTeroPure. (Dkt. 295-1 ¶ 1.) Elysium used the NR and PT it bought from ChromaDex in its dietary supplement called "Basis." (*Id.* ¶¶ 4–5.) Eric Marcotulli and Daniel Alminana are the co-founders and principal executives of Elysium. Marcotulli is CEO, and Alminana is COO.

After the Court's summary judgment order, (Dkt. 413), only certain of the parties' claims remain. As relevant to this motion, Elysium's third, fourth, and fifth counterclaims remain for trial. Elysium's third counterclaim alleges that ChromaDex fraudulently induced Elysium to sign the Trademark License and Royalty Agreement, dated February 3, 2014 (the "TLRA"), by falsely representing that, in order to purchase Niagen, Elysium was required to pay royalties on product sales for use of ChromaDex marks. (Dkt. 103 [Third Amended Counterclaims] ¶¶ 162–69.) Elysium's fourth

counterclaim seeks a declaratory judgment of patent misuse based on the allegation that ChromaDex conditions some customers' ability to purchase NR on their agreement to use ChromaDex's trademarks. (*Id.* ¶¶ 170–81.) Relatedly, Elysium's fifth counterclaim seeks restitution for ChromaDex's alleged unjust enrichment due to its patent misuse. In other words, Elysium alleges that by requiring entities to use the Niagen mark, ChromaDex unlawfully strengthened the Niagen mark and decreased brand competition among NR products.

What the parties said during the negotiation of the TLRA is disputed and important to the resolution of Elysium's third, fourth, and fifth counterclaims. Most critical to the third counterclaim is a December 16, 2013 phone call between Frank Jaksch (ChromaDex's former CEO), Marcotulli (Elysium's CEO), and Alminana (Elysium's COO). (*See id.* ¶¶ 52, 165.) Marcotulli and Alminana testified that Jaksch falsely represented that ChromaDex customers were required to sign separate trademark license and royalty agreements, whether or not they wanted or intended to use ChromaDex marks. (Dkt. 306-1, Ex. 12 at 93:6–9 [Marcotulli testifying that Jaksch told Elysium "that all customers pay a royalty and that was their way of doing business, given their ownership of the NR supply chain"]; *id.*, Ex. 13 at 168:1–3 [Alminana testifying that Elysium was "told that everyone has to sign this," that "[e]veryone pays a royalty," and "[t]his is the standard royalty"].) Jaksch, on the other hand, testified that he made no such statement. (Dkt. 240-2, Ex. 72 at 134:23–25 [Jaksch testifying that he did not tell Elysium that all ChromaDex customers must execute a license and royalty agreement to do business with ChromaDex]; *see* Dkt. 233-2 ¶ 5 [Jaksch stating that trademark licensing was never a requirement for purchasing NR].) At summary judgment, the Court cited this factual dispute and concluded that summary judgment was not warranted on Elysium's third, fourth, and fifth counterclaims.

**B. Text Messages**

The facts relevant to this motion begin on December 18, 2018, when Elysium produced text messages from Marcotulli's phone showing that he—from September 29, 2015 through October 15, 2016—frequently purchased cocaine (referred to in the messages as "fire white," "fire shit," "white," and "the special," among other terms), including having it delivered to the Elysium office. (Dkt. 284-7.) The messages also show Marcotulli confiding in January 2016 to a friend he met on a dating application that he had been "do[ing] too many drugs," specifically "[c]oke," and drinking a lot, for "maybe 6 months," and how he wanted to stop but has not been able to. (Dkts. 284-8, 284-9; Dkt. 473-6 at 149–50.)

The text messages also suggest that Alminana knew about Marcotulli's drug use. For example, on November 25, 2015, at around 10:00 AM, Alminana asked Daniel Fabricant, a former Elysium board member, "[w]hat time did you two assholes finish up last night." (Dkt. 284-14 at 14.) Fabricant reported it was "330 I think," and added, "[t]here are no drugs left in Manhattan." (*Id.*) Alminana laughed and joked, "Wow early night. I bet Eric [Marcotulli] wakes up around 6pm today." (*Id.*)

On February 14, 2019, Elysium filed an *ex parte* application attempting to claw back the text messages. Magistrate Judge Douglas F. McCormick denied the application. (Dkt. 194.)

**C. Depositions**

At his March 27, 2019 deposition, Marcotulli lied under oath about the text messages. (Dkt. 473-6 [Transcript of Deposition of Eric Marcotulli].) He stated that he did not recall buying drugs from the dealer, and could not recall who the dealer was or why he had agreed to meet up with the dealer multiple times, including at Elysium's

office. (*Id.* at 128–35.) He stated that he did not know what "fire white" was, or what "coke" was. (*Id.* at 129, 152.) He repeated multiple times that he did not recall buying any illegal drugs from September 2015 to March 2016. (*Id.* at 130, 132, 145.) He stated that he had never used cocaine, never used cocaine while working at Elysium, and that he had never to his recollection drugs for personal use. (*Id.* at 144, 147, 155–56.)

On March 29, 2019, Alminana also lied under oath at his deposition, stating that he was not aware that Marcotulli had used illegal drugs during his time at Elysium. (Dkt. 473-6 [Transcript of Deposition of Daniel Alminana] at 30.)

**D. Events Between the False Testimony and the Corrections**

On June 3, 2019, Elysium produced an errata sheet for Marcotulli's deposition, outlining 10 typographical errors, transcription errors, and clarifications (none having to do with the text messages), and a copy of the transcript with Marcotulli's signature. (Dkt. 472, Exs. 8, 9.) Marcotulli signed the errata sheet on May 30, 2019 with this statement:

> I, ERIC MARCOTULLI, having appeared for my deposition on March 27, 2019, do this date declare under penalty of perjury that I have read the foregoing deposition, I have made any corrections, additions or deletions that I was desirous of making in order to render the within transcript true and correct.

(Dkt. 472, Ex. 10.) On August 7, 2019, Elysium produced an errata sheet and signed transcript for Alminana's deposition, which contained the same statement. (Dkt. 472, Exs. 11–13.) Alminana also did not make any corrections related to the text messages.

On August 22, 2019, Elysium filed a motion in limine to exclude the text messages and Marcotulli's and Alminana's testimony about them. (Dkt. 269-1 at 1, 7.)

ChromaDex argued in opposition that Marcotulli and Alminana had committed perjury in their depositions. (Dkt. 284-1 at 9–11.) In reply, Elysium called "ChromaDex's irresponsible and inflammatory accusations of perjury . . . a collateral sideshow on a collateral issue that fails to address the merits of the admissibility of the evidence," and described the perjury accusation as "hyperbolic charges [that] are factually, logically, and legally baseless." (Dkt. 344-1 at 12 n.8.) Elysium repeatedly denied that Marcotulli used drugs. (*See generally* Dkt. 344-1.) The Court denied without prejudice all motions in limine because many of the issues to be resolved in the motions in limine overlapped with the pending summary judgment motions, and stated that it would set a new deadline for motions in limine after ruling on summary judgment. (Dkt. 369 at 10.)

The text messages came up again in December 2019 when ChromaDex sought to modify the protective order to allow the parties to use discovery from this case in a New York case between them involving overlapping facts and issues. (*See* Dkt. 398-4 [ChromaDex's letter brief]; *see also* Dkt. 398-3 [Elysium's letter brief].) At the hearing on ChromaDex's motion, it became clear that Elysium opposed ChromaDex's motion principally because it did not want the text messages that it "inadvertently produced" in this case to be discoverable in the New York Action. (*See* Dkt. 405-2 at 7.) As to the text messages, Magistrate Judge McCormick explained, "We've been around the bend on those documents a number of times before, and . . . there's just no way to clawback documents that shouldn't have been produced in the first place." (*Id.* at 7–8.) On December 6, 2019, Magistrate Judge McCormick granted ChromaDex's proposed modification to the protective order. (Dkt. 405-2 at 4.) Elysium asked this Court to reverse Magistrate Judge McCormick's decision, and this Court refused, concluding that the decision was not clearly erroneous or contrary to law. (Dkt. 412.)

On January 21, 2020, the Court granted Elysium's request for new counsel.

**E. Notices of Correction of Depositions**

On December 11, 2020, Elysium filed a "Notice of Correction of Depositions." (Dkt. 453.) Elysium stated that it "and its current counsel believe it is appropriate to file this Notice of Correction of Depositions with the Court, to ensure that the Court is apprised of the changes and corrections to the deposition testimony." (*Id.*) It further advised that it planned "to file a new motion in limine before trial concerning the subject matter of the changed and corrected deposition testimony and the related text messages." (*Id.*)

With the Notice of Correction of Depositions, Elysium filed declarations from Marcotulli and Alminana. (Dkts. 455-1 [Declaration of Eric Marcotulli, hereinafter "Marctotulli Decl."], 455-2 [Declaration of Daniel Alminana, hereinafter "Alminana Decl."].) In Marcotulli's declaration, he explained that he came to the deposition prepared and "expect[ing] to answer questions relating to Elysium's contracts with ChromaDex," not to face questions "about sensitive and wholly personal matters relating to the personal text messages that, without my knowledge, had been produced inadvertently." (Marctoulli Decl. ¶ 5.) He stated that when he was asked questions about his cocaine use, he "was caught by surprise, unprepared, and embarrassed, and [he] gave answers that were not truthful." (*Id.* ¶ 6.)

Among the lies Marcotulli identified were his denials that he regularly bought and used cocaine during the period of his employment with Elysium and certain contract negotiations with ChromaDex, that he bought cocaine from the dealer identified in the text messages, that he used cocaine at work at Elysium, that he used cocaine before going to work at Elysium, that he used cocaine while participating in his role as Elysium CEO, and that he used cocaine before communicating with ChromaDex employees. (*Id.* ¶¶ 7, 9.) "In truth," Marcotulli admitted, "I had used and purchased cocaine on a regular basis

in the period between late 2015 and early 2017." (*Id.* ¶ 7.) He also stated that his "answers were untruthful as to [his] past history and recollection of past cocaine use." (*Id.* ¶ 8.) Marcotulli stated that he "sincerely" and "deeply regret[s] giving testimony denying or expressing an inability to remember" issues about his cocaine use and purchase history, and therefore came forward with the declaration. (*Id.* ¶ 13.)

Similarly, in Alminana's declaration, he explained that his answer regarding whether Marcotulli had used illegal drugs "was not truthful, as at that time I understood and believed that Mr. Marcotulli had used illegal drugs during his time with Elysium." (Alminana Decl. ¶ 6.) Alminana stated that he "deeply regret[s] that [his] answer was untruthful and inaccurate." (*Id.*)

ChromaDex now seeks terminating sanctions on Elysium's third, fourth, and fifth counterclaims for Marcotulli and Alminana's lies. (Dkt. 413.)

### III. LEGAL STANDARD

District courts have inherent power to impose sanctions to manage their cases and courtrooms effectively, ensure the orderly administration of justice, and to enforce compliance with their orders. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994); *Aloe Vera of Am., Inc. v. United States*, 376 F.3d 960, 965 (9th Cir. 2004); *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988) ("Dismissal under a court's inherent powers is justified . . . in response to abusive litigation practices . . . and to insure the orderly administration of justice and the integrity of the court's orders."). Indeed, "courts cannot function efficiently unless they can effectively require compliance with reasonable rules. Absence of meaningful power to require that compliance would make for disorder and preclude effective judicial administration." *Chism v. Nat'l Heritage Life Ins. Co.*, 637 F.2d 1328, 1332 (9th Cir.

1981), *overruled on other grounds by Bryant v. Ford Motor Co.*, 832 F.2d 1080 (9th Cir. 1987).

In extreme circumstances, a court may use its inherent power to enter terminating sanctions (e.g. striking a party's pleading in whole or in part and entering default judgment against the party or dismissing the action) against a party that repeatedly and willfully violates the district court's orders. Fed. R. Civ. P. 16(f)(1); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Dismissing or entering default is appropriate only where a court finds that the party's conduct demonstrates willfulness, fault, or bad faith. *Leon*, 464 F.3d at 958 (citing *Anheuser–Busch v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)). For example, a terminating sanction is available where "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" or "willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Id.* (quoting *Anheuser–Busch*, 69 F.3d at 348).

To determine whether awarding terminating sanctions is just, courts consider five factors: (1) the public's interest in expeditious resolution of litigation, (2) the district court's need to manage its docket, (3) the risk of prejudice to the party seeking sanctions, (4) the public policy favoring disposition of cases on their merits, and (5) the availability of less drastic sanctions. *Leon*, 464 F.3d at 958 n.4; *Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004).

//
//
//

**IV. DISCUSSION**

Marcotulli and Alminana lied under oath. Marcotulli denied or stated that he did not recall buying or using cocaine dozens of times when the truth was that he did regularly buy and use cocaine during the period about which he was asked. Alminana stated that he was not aware of Marcotulli's cocaine use when the truth was that he was aware of it.

But the Court is not persuaded that sanctions—much less terminating sanctions—are an appropriate remedy for these lies. Dismissal "is so harsh a penalty it should be imposed as a sanction only in extreme circumstances." *Thompson v. Hous. Auth. of City of Los Angeles*, 782 F.2d 829, 831 (9th Cir. 1986). It is a "drastic substitute for the adversary process of litigation" and should only be used when absolutely necessary to protect the orderly administration of justice and integrity of judicial proceedings. *Halaco*, 843 F.2d at 382. Dismissal is appropriate only when the complained-of activity is a "pattern of deception" that "threaten[s] to interfere with the rightful decision of the case" or makes it impossible to conduct a trial "with any reasonable assurance that the truth would be available." *Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998).

This standard is not met here. Although Marcotulli and Alminana's lies are troubling, especially since their credibility is important in this case, the lies do not in the Court's judgment "threaten to interfere with the rightful decision of the case" or make it impossible to conduct a trial "with any reasonable assurance that the truth would be available." *Valley Eng'rs*, 158 F.3d at 1057. Instead, the ordinary adversary process of litigation is an adequate remedy for Marcotulli and Alminana's lies. *See Halaco*, 843 F.2d at 382. Significantly, some text messages and some of Marcotulli and Alminana's testimony about the text messages will be admissible at trial. Both are relevant to Marcotulli and Alminana's credibility—an important issue, especially on the third counterclaim—and Marcotulli's ability to perceive and remember events during

critical contract negotiations between the parties. The prejudice to Elysium from admitting the text messages and related testimony does not substantially outweigh the significant probative value of the evidence, and a jury will be able to evaluate the import of the evidence without making a decision on an improper basis. Nor will the Court permit a mini-trial on the issue.

Because some of the text messages and testimony will be admissible at trial, ChromaDex will be able to show the jury that Marcotulli and Alminana lied under oath. The jury will be allowed to draw inferences from Marcotulli and Alminana's lies in assessing their credibility, and will be able to decide how much weight to give their testimony accordingly. This is sanction enough to protect the orderly administration of justice and the integrity of these proceedings. *See Halaco*, 843 F.2d at 382.

## V.   CONCLUSION

For the foregoing reasons, the Court **DENIES** ChromaDex's motion for sanctions.[1]

DATED: April 27, 2021

_____
HON. CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[1] The parties ask the Court to seal much of the briefing and evidence in support of these motions. (Dkts. 472 [Application to Seal Related to Motion], 480 [Application to Seal Related to Opposition], 484 [Application to Seal Related to Reply].) The motions are **GRANTED**.